UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| D'ANNA WELSH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:22-cv-00216 |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM V. MARTINEZ, JR., and KELLY | ) | |
| MARTINEZ f/k/a KELLY ROUSSEAU, and | ) | |
| PROSPERITY HOME MORTGAGE, LLC, | ) | |
| and MORTGAGE ELECTRONIC | ) | |
| REGISTRATION SYSTEMS, INC., as | ) | |
| nominee for Prosperity Home Mortgage and its | ) | |
| Successors and Assigns, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff D'Anna Welsh brings this action against Defendants William V. Martinez, Jr. ("Martinez"), Kelly Martinez f/k/a Kelly Rousseau ("Rousseau"), Prosperity Home Mortgage, LLC ("Prosperity") and Mortgage Electronic Registration Systems, Inc. ("MERS").

## INTRODUCTION

1. Following a 2012 jury trial in Connecticut, the Connecticut Superior Court entered a $2,360,000 judgment in Plaintiff's favor against Defendant Martinez.[1] In 2017, the Connecticut court held Defendant Martinez in contempt for willfully violating a court-mandated asset standstill order and fraudulently transferring over $2,000,000 to Martinez's ex-wife to thwart Plaintiff's judgment enforcement efforts. As a contempt fine, the Connecticut court ordered Martinez to pay

---

[1] Defendant Martinez, a medical doctor, installed spy cameras in Plaintiff's home, including secret cameras in Plaintiff's bedroom pointed toward her bed and a camera pointed toward her bathroom shower, Martinez implanted spyware on Plaintiff's computer and he covertly placed a GPS tracker on her vehicle. *Welsh v. Martinez*, 157 Conn. App. 223, 227 (2015), *cert. denied*, 317 Conn. 922 (2015) (judgment affirmed on appeal).

Plaintiff $25,000 per month until the contempt fine was paid in full. The contempt finding was affirmed on appeal in 2019. Despite having been held in contempt of court dating back to 2017, Defendant Martinez never purged his contempt. In December 2020, the Connecticut court issued a capias for Martinez's arrest, which remains open amid his continued defiance of court orders.

2.      While Martinez was in contempt of court and flouting the court-mandated $25,000 monthly contempt fine payments owed to Plaintiff, Martinez took the following actions: (1) Martinez withdrew $798,956 from his Charles Schwab IRA, drawing down the balance from $1,040,274 to $241,318, (2) Martinez withdrew $270,472 from his Capital Group American Funds IRA, drawing down the balance from $270,472 to $0, (3) Martinez fraudulently transferred $120,000 as a purported down payment/gift on Defendant Rousseau's home in Englewood, Florida, (4) Martinez fraudulently transferred $140,000 as another down payment/gift on Defendant Rousseau's second home purchase in Naples, Florida, and (5) Martinez fraudulently transferred $380,000 as a purported early pre-payment of Defendant Rousseau's mortgage on the Naples home.

3.      Martinez's intention in fraudulently conveying his assets was again to frustrate Plaintiff's judgment enforcement efforts. Plaintiff respectfully petitions the Court for relief.

## **PARTIES**

4.      Plaintiff is a natural person residing at 97 Jonathan Trail, Glastonbury, CT 06033 in Hartford County, Connecticut.

5.      Defendant Martinez is a natural person residing at 15919 Secoya Reserve Circle, Naples, FL 34110 in Collier County, Florida.

6.      Defendant Rousseau is a natural person residing at 15919 Secoya Reserve Circle, Naples, FL 34110 in Collier County, Florida.

7.     Defendant Prosperity is a Virginia limited liability company with a principal place of business at 14501 George Carter Way, Suite 300, Chantilly, VA, 20151.

8.     Defendant MERS is a Delaware corporation with a principal place of business at 5660 New Northside Drive NW 3rd Floor, Atlanta, GA 30328.

## JURISDICTION AND VENUE

9.     There is complete diversity between the parties pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Connecticut. Defendants Martinez and Rousseau are citizens of Florida. Defendant Prosperity is a citizen of Virginia. Defendant Prosperity is a wholly owned subsidiary of its sole member Long & Foster Real Estate, Inc., which is also a citizen of Virginia, having been incorporated in Virginia and maintaining a principal place of business at 14501 George Carter Way, Suite 300, Chantilly, VA, 20151. MERS is a citizen of Delaware and Georgia.

10.    The amount in controversy requirements of 28 U.S.C. § 1332 are satisfied because more than $75,000 is at issue, exclusive of costs, interest and attorneys' fees.

11.    This action properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1391 because facts giving rise to this action occurred within this District and Defendants reside within this District.

12.    The real property referenced in the Complaint is located in this District.

13.    Venue is appropriate in this court.

## FACTS COMMON TO ALL ALLEGATIONS

14.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set out herein.

15.    Plaintiff is a judgment-creditor as to a $2,360,000 judgment against Defendant Martinez dated December 5, 2012 entered by the Superior Court of Hartford County, Connecticut

under Case No. CV-10-6012959-S (the "$2.3 Million Judgment Dated December 5, 2012"). A certified copy of the $2.3 Million Judgment Dated December 5, 2012 is attached as Ex. A.

16.     On February 9, 2021, Plaintiff domesticated the $2.3 Million Judgment Dated December 5, 2012 as an active Florida judgment pursuant to Fla. Stat. § 55.505 under Collier County Circuit Court Case No. 11-2021-CA-000365-0001-XX.

**Background of the $2.3 Million Judgment Dated December 5, 2012,
Defendant Martinez's Fraudulent Transfer of Assets and the 2017 Contempt Order**

17.     In a 2015 reported opinion, the Appellate Court of Connecticut set forth the unsettling facts which led to the $2.3 Million Judgment Dated December 5, 2012. *Welsh v. Martinez*, 157 Conn. App. 223 (2015), *cert. denied*, 317 Conn. 922 (2015) is attached as Ex. B.

18.     As set forth therein, Defendant Martinez engaged in a spine-chilling scheme of covert conduct in his installation of spy cameras in Plaintiff's home including cameras in Plaintiff's bedroom pointed toward her bed, a camera positioned toward her bathroom shower, keystroke/spyware implanted on Plaintiff's computer and a GPS tracker on her vehicle. *Id.*

19.     In the second of two reported cases, in 2019, the Appellate Court of Connecticut set forth the facts which led to the 2017 contempt order against Defendant Martinez. *Welsh v. Martinez*, 191 Conn. App. 862 (2019) is attached as Ex. C.

20.     After the jury returned the 2012 verdict in Plaintiff's favor, in 2012, Plaintiff moved for prejudgment attachment and filed a "Motion to Prevent Defendant's Fraudulent Transfer of Property." *Id.* at 866. Plaintiff alleged that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property in violation of [the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq.]." *Id.* The Connecticut court granted Plaintiff's 2012 motion, allowed Plaintiff to attach up to $2 million of Martinez's property, ordered Martinez to disclose his assets and enjoined Martinez from "voluntarily transferring or encumbering any assets except

business assets in the ordinary course of business and personal assets for ordinary living expenses, including court-ordered alimony and child support." *Id.* at 866-67.

21.     Martinez willfully violated the court's order. In 2017, the Connecticut court held Martinez in contempt for violating its orders, including the asset standstill order dating back to 2012. In violation of that order, Martinez had fraudulently transferred the entirety of his over $2 million in income from October 30, 2012 to March 24, 2016 to his ex-wife's bank account "for the express purpose of placing the entirety of such funds outside the reach of the plaintiff." *Id.* at 869. As a contempt fine, running concurrent with the judgment, the court imposed a compensatory fine of $2.2 million "payable directly to [the plaintiff] in an amount of $25,000 per month, until such fine is paid in full." *Id.* at 876. The court found that Defendant Martinez had the ability to pay, including based on "statements from certain individual retirement accounts held by the defendant" such as his statement from an account with Charles Schwab & Co., Inc. in the amount of $802,888.19 as of May 31, 2017 and a statement from an account with American Funds, administered by Capital Group, with an ending value of $464,910.48 as of June 30, 2017. *Id.* at 882.

22.     Defendant Martinez appealed the 2017 contempt finding, with his seven-figure annual salary, claiming that he purportedly did not have an ability to pay. The appellate court disagreed, finding that based on Martinez's income, his lack of substantial liabilities and the substantial assets in his retirement accounts, Martinez "had not proven a financial incapacity to comply with the court's fine of $25,000 per month" and instead he "possessed 'sufficient income and other assets' to pay that fine." *Id.*

23.     The appellate court found that Plaintiff was "harmed by the defendant's contemptuous conduct," and the appellate court remanded to the trial court to liquidate a specific damages calculation. *Id.* at 883.

**The Trial Court Liquidated a Damages Award of**
**$2,048,009 Pursuant to the 2017 Contempt Ruling on Remand**

24.     Following the 2019 remand from the Appellate Court of Connecticut, the Connecticut Superior Court conducted proceedings in conformity with the Appellate Court of Connecticut's 2019 opinion.

25.     Accordingly, on December 20, 2019, the Connecticut Superior Court held a hearing on damages.

26.     On February 19, 2020, the Honorable Carl J. Schuman of the Connecticut Superior Court entered a Ruling on Remand from the Appellate Court. The February 19, 2020 Ruling is attached as Ex. D.

27.     As referenced in the 2019 appellate decision, Defendant Martinez wrongfully and fraudulently transferred the equivalent of $2,220,400 into his ex-wife's account between October 2012 and March 2016.

28.     Pursuant to the February 19, 2020 Ruling, Judge Schuman factored in Plaintiff's loss of use of the $2,220,400 that Defendant Martinez diverted, as the Court found no evidence of superior liens or anything that would have prevented Plaintiff from collecting on the full amount. The court factored in postjudgment interest at 3.5% totaling $308,946 through February 19, 2020 and attorney's fees of $55,992. The court then subtracted Defendant Martinez's total payments to date of $537,331. Pursuant to these calculations, the court found that the total amount of Plaintiff's loss from Martinez's fraudulent transfers to his ex-wife was $2,048,009. *Id.* at ¶¶ 1-5.

29.     In calculating Plaintiff's loss of $2,048,009, the calculations were as follows: $2,220,400 loss of use of diverted funds + $308,946 interest + $55,992 attorneys' fees for contempt – $537,331 in payments from Defendant = $2,048,009 in damages. *Id.* at ¶ 2-5.

30.     On February 19, 2020, Judge Schuman expressly ordered Defendant Martinez to pay Plaintiff a compensatory contempt fine of $2,048,009, which must be paid directly to the Plaintiff in the amount of $25,000 per month until paid in full. *Id.* at ¶ 6

> 6. The court accordingly orders the defendant to pay a compensatory contempt fine of $2,048,009.06. The court continues Judge Moll's order to pay the fine directly to the plaintiff in the amount of $25,000 per month until the defendant has fully paid the net actual loss. *Welsh v. Martinez,* supra, 191 Conn. App. 870. Any payments that the defendant makes should be credited against the judgment of $2,360,000 plus postjudgment interest at the rate of 3.5%.

*Id.*

31.     The court confirmed that any payment made by Defendant Martinez pursuant to the compensatory contempt fine would be credited against the $2.3 Million Judgment Dated December 5, 2012 plus post judgment interest at 3.5%. The court concluded by stating "it will be up to the plaintiff to decide what remedy to employ to collect the compensatory fine if the defendant does not comply with paragraph 6 of this order." *Id.* at ¶ 6-8.

32.     Accordingly, Defendant Martinez had been found in contempt on November 9, 2017. He has remained in contempt since that time. On August 20, 2019, the Appellate Court of Connecticut affirmed the Superior Court's November 9, 2017 contempt finding. On February 19, 2020, the Superior Court expressly issued the contempt fine of $2,048,009 and ordered Defendant Martinez to continue to pay $25,000 per month until the Defendant has fully paid the net actual loss of $2,048,009. On February 19, 2020, the Superior Court also noted the existence of retirement accounts which "may total $1.5 million."

33.     After entry of the 2019 appellate opinion affirming the trial court's 2017 contempt finding, Defendant Martinez did not appeal any orders.

**Defendant Martinez Fraudulently Transferred $120,000 to Defendant
Rousseau for Rousseau's Purchase of Real Property in Englewood, Florida**

34.     On January 23, 2020, in the Connecticut Superior Court, Plaintiff filed a Statement of Amount of Judgment with Post-Judgment Interest and Attachment. Eight days later on January 31, 2020, Martinez withdrew $120,000 from his American Funds retirement account.

35.     On February 19, 2020, the Connecticut Superior Court entered its Ruling on Remand liquidating the $2,048,009 contempt fine and it again ordered Martinez to pay monthly installments of $25,000. Twelve days later on March 2, 2020, Martinez fraudulently transferred approximately $120,000 as a purported down payment/gift on the house Rousseau purchased on March 4, 2020 located at 6231 Lomax St, Englewood, FL 34224 (the "Englewood Property").

36.     The Warranty Deed for Rousseau's purchase of the Englewood Property is dated March 2, 2020. Ex. E. Rousseau signed the deed March 4, 2020 and it was recorded on March 12, 2020 in the Charlotte County Clerk of Circuit Court (OR Book: 4550, PGS: 1825-26). *Id.*

37.     The purchase price for the Englewood Property was $238,200.

38.     On March 3, 2020, Rousseau executed a mortgage as to the Englewood Property in favor of Bank of America, N.A. to secure a note for $108,200 pursuant to the purchase of the Englewood Property. Ex. F.

39.     The mortgage was recorded on March 12, 2020 in the Charlotte County Official Records (OR Book: 4550, PGS: 1827-41).

40.     Considering the purchase price of $238,200, the mortgage of $108,200 and Martinez's payment of $120,000, Martinez paid at least half of the purchase price of Rousseau's Englewood Property instead of paying any of that money to Plaintiff.

41.     In 2019, as he geared up to transfer six-figure sums of money as a gift for the purchase of a different woman's real property, Martinez failed to make his court-ordered $25,000 monthly contempt-fine payments to Plaintiff in March 2019, September 2019, October 2019, November 2019 and December 2019.

42.     In 2020, amid his fraudulent transfers, Martinez failed to make his court-ordered $25,000 monthly contempt-fine payments to Plaintiff in January 2020, February 2020, March 2020, April 2020, May 2020, June 2020, July 2020, August 2020, October 2020, November 2020 and December 2020.

43.     To be sure, Defendant Martinez increased his fraudulent conveyance activity amid a scheme to gin up the excuse that he did not have enough money to comply with the court-mandated $25,000 monthly contempt fine. Martinez engaged in this bad faith conduct while already in contempt of court and under threat of incarceration, eventually resulting in the issuance of a capias for his arrest.

44.     In further willful defiance of the court's orders, Martinez failed to make _**any**_ of his court-ordered $25,000 monthly contempt-fine payments to Plaintiff for the _entire year of 2021_ and thus far _for the entire year of 2022_ despite having resumed his high-salary employment as a surgeon in Florida.

### The Connecticut Court Again Ordered Martinez to Pay $25,000 per Month and Informed him that he will be Incarcerated Upon Continued Non-Compliance

45.     As noted above, in March 2020, Defendant Martinez fraudulently transferred $120,000 to be concealed as purported equity in a house owned by Rousseau. Meanwhile, Defendant Martinez failed to pay his court-ordered $25,000 monthly contempt fines under the purposed auspices of a lack of sufficient funds. In effect, Defendant Martinez proclaimed himself insolvent while in the midst of his fraudulent transfers.

46.     On March 18, 2020 Plaintiff filed an Affidavit of Non-Payment in the Connecticut Superior Court. Then on April 13, 2020, Plaintiff filed a Motion for Incarceration or in the Alternative for Other Sanctions Due to Failure to Comply.

47.     Pursuant to Plaintiff's April 13, 2020 motion, on August 14, 2020, Judge Schuman entered an order holding that Defendant Martinez failed to make any of the $25,000 monthly payments dating back to August 2019 (the "August 14, 2020 Contempt Order").  Ex. G.

48.     In the August 14, 2020 Contempt Order, the court reaffirmed Defendant Martinez's ability to pay, holding that "the court continues to believe that the defendant has the ability to pay." *Id*. at 1.

49.     The court expressly held that "the exhibits and the testimony of the defendant establish that the defendant has approximately $1 million in retirement funds." *Id*. Moreover, this amount was after Defendant Martinez had already withdrawn and fraudulently transferred at least $120,000 for amalgamation into Rousseau's Englewood Property.

50.     The court further found that between December 2019 and August 2020, while Defendant Martinez failed to make any of the $25,000 monthly payments as ordered, Defendant had "liquidated approximately $216,000 in additional retirement funds, thus revealing the defendant's willingness to pay any applicable taxes and penalties and use funds that are nominally reserved for retirement." *Id*.

51.     Accordingly, pursuant to the August 14, 2020 Contempt Order, the court again expressly ordered that, "defendant shall pay the plaintiff $25,000 by September 15, 2020 and by the fifteenth of each succeeding month." *Id*.

52.     The court expressly warned that upon noncompliance, Defendant Martinez "shall be incarcerated or otherwise confined for civil contempt." *Id*.

**As to the Purchase of Property in Naples, Florida, Martinez Fraudulently
Transferred $140,000 for a Down Payment and Rousseau Executed a $480,000 Mortgage**

53.     The day before the court entered its August 14, 2020 Contempt Order, sellers Timo Petermichl and Mandy Petermichl signed a Warranty Deed dated August 13, 2020 transferring the real property at 5919 Secoya Reserve Circle, Naples, FL 34110 (the "Secoya Property") to Rousseau. Ex. H. Pursuant to that deed, title was taken in Rousseau's sole individual name.

54.     The Secoya Property features four bedrooms, three and a half bathrooms, 3,091 square feet and a pool.

55.     The Collier County property appraiser lists the date of the sale of the Secoya Property as August 13, 2020.

56.     The Warranty Deed for the Secoya Property recorded with the Clerk of Court and Comptroller for Collier County, however, is dated August 25, 2020 and was recorded on August 28, 2020 (OR 5808, PGS 1542-43). Ex. I. The recorded deed grants title of the Secoya Property to both Defendant Rousseau and Defendant Martinez as tenants by the entireties. The recorded deed has the seller's same signature page, which was signed and notarized on August 13, 2020, however the first page where title is taken was swapped out and replaced.

57.     The purchase price of the Secoya Property was $620,000, per the Collier County Property Appraiser.[2]

58.     On August 28, 2020, Defendant Prosperity recorded a $480,000 mortgage signed by Martinez and Rousseau on August 25, 2020 (OR 5808, PGS 1544-56). Ex. J. Under the mortgage, Defendant MERS is the mortgagee, acting solely as a nominee for Prosperity and Prosperity's successors and assigns.

---

[2] As of today, the Secoya Property reflects an approximate market value of $1,061,200.
https://www.zillow.com/homedetails/15919-Secoya-Reserve-Cir-Naples-FL-34110/113984127_zpid/

59.     With a purchase price of $620,000 and a mortgage of $480,000, the purchase of the Secoya Property was funded with at least $140,000 in cash.

60.     Defendant Martinez is a judgment-debtor and Defendant Martinez's credit was not used pursuant to the Prosperity mortgage on the Secoya Property.

61.     Defendant Martinez, however, supplied the entirety of the $140,000 in cash for the purchase of the Secoya Property in August 2020. Yet, during the same time frame, Defendant Martinez was simultaneously claiming to be unemployed and supposedly without an ability to pay the $25,000 per month contempt fine to Plaintiff as ordered by the court and for which Martinez was already in contempt.

62.     To obtain the $480,000 mortgage for the Secoya Property, Rousseau completed and signed a Uniform Residential Loan Application on August 25, 2020. Therein, Rousseau asserted that she earned base employment income of $13,750 per month ($165,000 per year). Rousseau also claimed she owned liquid assets in the bank in the amount of $147,994, which were likely the proceeds of a fraudulent transfer from Defendant Martinez. Defendant Rousseau also asserted ownership of the Englewood Property which she valued at $250,000. Therefore, on her application Rousseau claimed total assets of $397,994.

63.     Rousseau's monthly payment pursuant to the $480,000 mortgage consisted of $1,991 in principal and interest, plus an estimated escrow amount for property taxes and insurance of $650 per month for a total of $2,641, against $13,750 per month in income. With her salary of $165,000 per year and approximately $400,000 in assets, Rousseau easily qualified for the mortgage without Martinez. Rousseau had the ability to pay the $2,641 monthly mortgage payments with her $13,750 monthly salary, after which she ran a monthly surplus of $11,109.

**Martinez Fraudulently Transferred $380,000 to Prosperity**
**to Conceal Assets pursuant to the Pretext of a Purported Prepayment of**
**Rousseau's Mortgage Supposedly Designed to Lower Monthly Mortgage Payments**

64.     On August 28, 2020, less than two weeks after the Connecticut Superior Court ordered Defendant Martinez to continue paying Welsh $25,000 per month or face incarceration or confinement for civil contempt, Martinez fraudulently transferred $380,000 to Defendant Prosperity through a check from Martinez's Bank of America account.

65.     August 28, 2020 was also the same day on which the mortgage securing Rousseau's $480,000 note payable was recorded. Accordingly, the very same day that the $480,000 mortgage was recorded, Martinez paid Rousseau's note down by $380,000, from $480,000 to $100,000.

66.     Martinez attempted to justify this $380,000 fraudulent conveyance by proclaiming that he was supposedly trying to "lower the monthly mortgage payment." But the mortgage itself does not provide for "recasting" of an amortization schedule or otherwise reconfiguring and lowering monthly payments pursuant to a partial prepayment.

67.     Martinez admitted that he has no evidence that the amount of Rousseau's monthly mortgage payments actually decreased by any amount whatsoever. There is no evidence of any recasting, refinancing or any new mortgage with a lower monthly payment recorded on the Secoya Property.

68.     Accordingly, Martinez's explanation for his $380,000 fraudulent conveyance on grounds that he was attempting to lower Rousseau's monthly mortgage payment, wihtout any evidence of a reduction of the payment, appears to be pretext consisting of apparent perjury by Martinez.

69.     Moreover, Martinez proclaimed to have been unemployed during this time, around August 28, 2020, he was a judgment-debtor as to Plaintiff and he had been failing to pay his court-

ordered $25,000 monthly contempt fine payments to Plaintiff. Therefore, Martinez was not in any reasonable position prepay someone else's mortgage.[3]

### Martinez Willfully Failed to Provide his Quarterly Court-Ordered Financial Disclosures amid his Fraudulent Conveyances and Intentional Depletion of Assets

70.     August 2020 was the month in which the closing on the Secoya Property occurred, it was the month in which Martinez transferred $140,000 for the down payment on the Secoya Property and it was the month in which Martinez transferred another $380,000 for the pre-payment on Rousseau's mortgage. In this same month, August 2020, Martinez stopped complying with his court-mandated production of quarterly asset and financial statements. For over a year from August 20, 2021 to August 19, 2021, Martinez willfully violated the unambiguous court order requiring his production of quarterly asset disclosure statements.

71.     Between June 2020 and July 2021, Defendant Martinez withdrew $779,652 from his Charles Schwab retirement account, in the absence of any retirement.

72.     From the $779,652, Defendant Martinez converted $120,000 into a down payment on the Secoya Property and another $380,000 as a prepayment of the mortgage on the Secoya Property which was not in his name.

73.     Rousseau was fully aware of all material aspects of Martinez's fraudulent transfers.

74.     Rousseau was also fully aware of Martinez's court-ordered obligation to provide quarterly financial statements. In fact, according to Martinez, Rousseau helped Martinez draft quarterly financial statements by actually typing financial information dictated by Martinez into an Excel document.

---

[3] Defendant Martinez is no longer unemployed and yet, to this day, he persists in refusing to pay his monthly $25,000 court-ordered contempt fine payments to Plaintiff.

**Rousseau Sold the Englewood Property and Retained the Equity from the Fraudulent Conveyance while Martinez Continued to Refuse to Pay Plaintiff Despite Court Orders**

75.     On October 14, 2020, Rousseau signed a Warranty Deed dated October 13, 2020 transferring the Englewood Property to buyer Joan Riswold. Ex. K. The Warranty Deed was recorded with the Charlotte County Clerk of Circuit Court on October 16, 2020 (OR Book: 4647, PGS: 1121-22).

76.     The sale price for the Englewood Property was $247,500, per the Charlotte County Property Appraiser.

77.     With a $247,500 sale price and a $108,200 mortgage, before commission and closing costs, approximately $140,000 was available in cash from the proceeds of the sale.

78.     On November 3, 2020, a Mortgage, Release, Satisfaction and Discharge was recorded regarding the satisfied mortgage on the Englewood Property (OR Book: 4665, PG: 1159). Ex. L.

79.     Defendants used none of the approximately $140,000 in sales proceeds to pay Plaintiff, as Martinez has not made a single monthly $25,000 payment, or any payment at all, to Plaintiff for the past 18 months since September 14, 2020.

**Martinez Willfully Violated the August 14, 2020 Contempt Order, He Remains in Contempt and the Court Issued a Capias for his Arrest**

80.     On December 23, 2020, the Honorable Carl J. Schuman of the Connecticut Superior Court entered an order holding Defendant Martinez in contempt (the "December 23, 2020 Contempt Order"). The December 23, 2020 Contempt Order is attached as Ex. M.

81.     Judge Schuman held as follows:

    A.     Defendant failed to comply with the court order (Entry #321.86, para. 1) to pay the $25,000 monthly fine in October, November, and December, 2020;

      B.     Defendant failed, since August, 2020, to comply with the court order (Entry #167.86 , para. 2) to provide a detailed asset and financial disclosure on a quarterly basis;

      C.     Defendant has the ability to pay, based largely on money held in his retirement accounts;

      D.     Defendant remains in contempt of court;

      E.     The court will issue a capias for his arrest;

      F.     The capias will identify the following conditions of release: 1) posting of a $75,000 bond, cash or surety, and 2) provision of a current asset and financial statement.

*Id.*

82.     Accordingly, on December 23, 2020, Judge Schuman held that Martinez "remains in contempt of court" and separately issued a capias for Martinez's arrest.

83.     Martinez absconded to Florida with the open capias, though he claims he had moved to Florida shortly before Judge Schuman issued the capias. To date, Martinez has refused to surrender in Connecticut or otherwise purge his contempt, preferring instead to burden this Court and Plaintiff with the task of securing Martinez's compliance.

84.     As set forth in the December 23, 2020 Contempt Order, Martinez failed to pay the court-ordered $25,000 monthly contempt fine in October 2020, November 2020, December 2020 for a total amount owed at that time of $75,000.

85.     Martinez also failed to pay the court-ordered $25,000 monthly fine in January 2021, February 2021, March 2021, April 2021, May 2021, June 2021, July 2021 and August 2021, September 2021, October 2021, November 2021, December 2021, January 2022, February 2022 and March 2022, for a total additional amount owed of $375,000.

86.     Accordingly, through March 2022, Martinez owes $450,000 in $25,000 monthly contempt fines alone. Apparently, a capias for his arrest was not enough to motivate Martinez to abide by judicial orders.

87.     On May 18, 2021, Plaintiff filed a separate action against Martinez for enforcement and contempt pursuant to Martinez's continuing violations of the Connecticut orders (*D'anna Welsh v. William V. Martinez, Jr.*, Case No. 2:21-cv-00396). That case is pending before this Honorable Court.

### In Furtherance of the Fraud, Defendants Martinez and Rousseau Deceptively Altered the Title of the Secoya Property as Purported Joint Tenants

88.     A year after purchasing the Secoya Property, on August 25, 2021 Martinez and Rousseau executed another quitclaim deed, this time transferring the Secoya Property to themselves as joint tenants (instead of tenants by the entireties), and this time using Rousseau's name as Kelly "Martinez." Ex. N. The quitclaim deed was recorded with the Clerk of Court and Comptroller for Collier County on September 20, 2021 (OR 6013, PGS 3663-64).

89.     Martinez has admitted in the pending companion case (*Welsh*, Case No. 2:21-cv-00396) that since January 1, 2020, Martinez has withdrawn at least $600,000 from his retirement accounts and he admitted that he used the money for reasons other than to pay Plaintiff. Defendant Martinez failed to fully account for that $600,000 in missing money.

90.     Since January 1, 2020, Martinez withdrew $1,069,428 from his retirement accounts amid his failure to pay Plaintiff.  Since January 1, 2020, the balance of Martinez's Charles Schwab IRA Rollover account decreased by $798,956 from $1,040,274 to $241,318. Since January 1, 2020, the balance of Defendant Martinez's Capital Group American Funds IRA decreased from $270,472 to $0.00.

91.     Even after accounting for taxes and early withdrawal penalties, Martinez fraudulently transferred at least $640,000 to Rousseau since January 1, 2020. Martinez fraudulently transferred to Rousseau the $120,000 down payment for Englewood Property, the $140,000 down payment for the Secoya Property and the $380,000 purported prepayment of Rousseau's mortgage on the the Secoya Property. At a minimum, however, those fraudulent transfers should be set aside and Defendants should be held jointly accountable to Plaintiff in full.

92.     Plaintiff has engaged counsel and agreed to pay counsel's reasonable attorneys' fees.

## COUNT ONE – VIOLATION OF THE UNIFORM FRAUDULENT TRANSFER ACT § 726.105, FLA. STAT. ANN.

### (Against Defendants Martinez and Rousseau)

93.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

94.     Plaintiff is a creditor under § 726.102, Fla. Stat. Ann.

95.     Martinez is a debtor under § 726.102, Fla. Stat. Ann.

96.     Under § 726.105, Fla. Stat. Ann., Martinez's transfers of cash for the down payments and purchase of the Englewood Property and Secoya Property in the name of Rousseau, as well as Martinez's paydown of Rousseau's mortgage, were transfers made with actual intent to hinder, delay and defraud Plaintiff.

97.     Moreover, under § 726.105, Fla. Stat. Ann., the transfers were made without Martinez receiving a reasonably equivalent value in exchange for the transfer, and Martinez was engaged in a transaction for which the remaining assets of Martinez were unreasonably small in relation to the transaction. Furthermore, Martinez intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

98.    The transfers to Rousseau were to an insider. Under § 726.102(8), Fla. Stat. Ann., Rousseau is an insider because she is a relative of Martinez as his wife.

99.    Moreover, Martinez retained possession or control of the property transferred after each transfer.

100.    Martinez did not disclose the transactions to Plaintiff until after they occurred. Moreover, despite multiple court orders, Martinez failed to provide Plaintiff with quarterly financial statements after August 2020 until August 2021.

101.    Before Martinez made each transfer, he not only had been sued by Plaintiff but he was already a judgment-debtor and was in contempt of court for non-compliance with payment orders.

102.    Each transfer was of a substantial amount of Martinez's assets.

103.    Furthermore, Martinez absconded. The transfers were made within less than a year of Martinez fleeing Connecticut and relocating to Florida.

104.    Martinez has removed and concealed hundreds of thousands of assets, including as he admitted, by removing $1,069,428 from his retirement accounts since January 1, 2020 and aside from one $25,000 payment in September 2020, using it for reasons other than to pay Plaintiff.

105.    Martinez received little to no consideration in exchange for each transfer, and received nothing in exchange for titling the Secoya Property as tenants by the entireties with Rousseau, and then as joint tenants.

106.    Martinez was unemployed and/or insolvent at the time of the transfer or became insolvent shortly after the transfer was made.

107.    Moreover, the transfers occurred in close temporal proximity to the entry of court orders and other court proceedings.

108.    The fraudulent transfers to Rousseau were in violation of Uniform Fraudulent Transfer Act § 726.105, Fla. Stat. Ann.

109.    Plaintiff demands all remedies, including without limitation a money judgment for the amount of the fraudulent transfers and all remedies under § 726.108, Fla. Stat. Ann, including equitable and injunctive relief, including a lien on real property, and including costs and reasonable attorneys' fees.

### COUNT TWO – VIOLATION OF THE UNIFORM FRAUDULENT TRANSFER ACT § 726.106, FLA. STAT. ANN.

#### (Against Defendants Martinez and Rousseau)

110.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

111.    Plaintiff is a creditor under § 726.102, Fla. Stat. Ann.

112.    Martinez is a debtor under § 726.102, Fla. Stat. Ann.

113.    Under § 726.106, Fla. Stat. Ann., Plaintiff's claim against Martinez arose before the transfers of cash for the down payments and purchases of the Englewood Property and Secoya Property were made and before the paydown of Rousseau's mortgage.

114.    Moreover, Martinez made the transfers without receiving a reasonably equivalent value in exchange.

115.    Martinez was unemployed and/or insolvent at the time of the transfer or became insolvent as a result of each transfer.

116.    Furthermore, under § 726.106, Fla. Stat. Ann., Plaintiff's claim arose before the transfers were made and the transfers were made to Rousseau as an insider.

117.    Under § 726.102(8), Fla. Stat. Ann., Rousseau is an insider because she is a relative of Defendant Martinez as his wife.

118.     Moreover, Rousseau, as the insider, had reasonable cause to believe that debtor was insolvent because she knew of Martinez's finances and his unemployment and assisted him in drafting his mandatory financial statements to Plaintiff.

119.     The fraudulent transfers to Rousseau were in violation of Uniform Fraudulent Transfer Act § 726.106, Fla. Stat. Ann.

120.     Plaintiff demands all remedies, including without limitation a money judgment for the amount of the fraudulent transfers and all remedies under § 726.108, Fla. Stat. Ann, including equitable and injunctive relief, including a lien on real property, and including costs and reasonable attorneys' fees.

### COUNT THREE – VIOLATION OF THE UNIFORM FRAUDULENT TRANSFER ACT § 726.105, FLA. STAT. ANN.

#### (Against Defendants Martinez and Prosperity)

121.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

122.     Plaintiff is a creditor under § 726.102, Fla. Stat. Ann.

123.     Martinez is a debtor under § 726.102, Fla. Stat. Ann.

124.     Under § 726.105, Fla. Stat. Ann., Martinez's transfer of cash to Prosperity for the paydown of Rousseau's mortgage was a transfer made with actual intent to hinder, delay and defraud Plaintiff.

125.     Moreover, under § 726.105, Fla. Stat. Ann., the transfer was made without Martinez receiving a reasonably equivalent value in exchange for the transfer, and Martinez was engaged in a transaction for which the remaining assets of Martinez were unreasonably small in relation to the transaction. Furthermore, Martinez intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

126.    The transfer to Prosperity was for the benefit of Rousseau, who is an insider. Under § 726.102(8), Fla. Stat. Ann., Rousseau is an insider because she is a relative of Martinez as his wife.

127.    Moreover, Martinez retained possession or control of the property transferred after each transfer.

128.    Martinez did not disclose the transaction to Plaintiff until after it occurred. Moreover, despite multiple court orders, Martinez failed to provide Plaintiff with quarterly financial statements after August 2020 until August 2021.

129.    Before Martinez made the transfer, he not only had been sued by Plaintiff but already was in contempt of court and threatened with further contempt proceedings.

130.    The transfer was of a substantial amount of Martinez's assets.

131.    Furthermore, Martinez absconded. The transfer was made within less than a year of Martinez fleeing Connecticut and relocating to Florida.

132.    Martinez has removed and concealed hundreds of thousands of assets, including as he admitted, by removing $1,069,428 from his retirement accounts since January 1, 2020 and aside from one $25,000 payment in September 2020, using it for reasons other than to pay Plaintiff.

133.    Martinez received little to no consideration in exchange for the transfer.

134.    Martinez was unemployed and/or insolvent at the time of the transfer or became insolvent shortly after the transfer was made.

135.    Moreover, the transfer occurred in close temporal proximity to the entry of court orders and other court proceedings.

136.    The fraudulent transfer to Prosperity was in violation of Uniform Fraudulent Transfer Act § 726.105, Fla. Stat. Ann.

137.     Plaintiff demands all remedies, including without limitation a money judgment for the amount of the fraudulent transfers and all remedies under § 726.108, Fla. Stat. Ann, including equitable and injunctive relief, including a lien on real property, and including costs and reasonable attorneys' fees.

## COUNT FOUR – VIOLATION OF THE UNIFORM
## FRAUDULENT TRANSFER ACT § 726.106, FLA. STAT. ANN.

### (Against Defendants Martinez and Prosperity)

138.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

139.     Plaintiff is a creditor under § 726.102, Fla. Stat. Ann.

140.     Martinez is a debtor under § 726.102, Fla. Stat. Ann.

141.     Under § 726.106, Fla. Stat. Ann., Plaintiff's claim against Martinez arose before the transfer of cash to Prosperity for the paydown of Rousseau's mortgage.

142.     Moreover, Martinez made the transfer without receiving a reasonably equivalent value in exchange.

143.     Martinez was unemployed and/or insolvent at the time of the transfer or became insolvent as a result of the transfer.

144.     Furthermore, under § 726.106, Fla. Stat. Ann., Plaintiff's claim arose before the transfer was made and the transfer was made to Prosperity for the benefit of Rousseau, who is as an insider.

145.     Under § 726.102(8), Fla. Stat. Ann., Rousseau is an insider because she is a relative of Defendant Martinez as his wife.

146.     Moreover, Rousseau, as the insider, had reasonable cause to believe that debtor was insolvent because she knew of Martinez's finances and his unemployment and assisted him in drafting his mandatory financial statements to Plaintiff.

147.     The fraudulent transfer to Prosperity for the benefit of Rousseau was in violation of Uniform Fraudulent Transfer Act § 726.106, Fla. Stat. Ann.

148.     Plaintiff demands all remedies, including without limitation a money judgment for the amount of the fraudulent transfer and all remedies under § 726.108, Fla. Stat. Ann, including equitable and injunctive relief, including a lien on real property, and including costs and reasonable attorneys' fees.

## COUNT FIVE – INJUNCTIVE RELIEF

### (Against All Defendants, Martinez, Rousseau, Prosperity and MERS)

149.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

150.     This claim is pled in the alternative.

151.     Plaintiff seeks an injunction directing Martinez, Rousseau, Prosperity and MERS, as applicable, to abstain and refrain from selling the Secoya Property without an escrow at the closing of at least the balance of the $520,000 (representing Martinez's $140,000 down payment plus $380,000 mortgage paydown) owed to Plaintiff. Plaintiff expressly reserves the right to move for prejudgment attachment and all related relief.

152.     Plaintiff seeks an injunction directing Prosperity and MERS, as applicable, to abstain and refrain from foreclosing any lien or mortgage on the Secoya Property without an escrow at the closing of at least the $520,000 balance owed to Plaintiff.

153.    Plaintiff seeks an injunction directing Martinez and Rousseau, Prosperity and MERS, as applicable, to abstain and refrain from further mortgaging and/or encumbering the Secoya Property without a written and recorded confirmation that Plaintiff shall be paid at least $520,000 before any further funds are collected by Martinez, Rousseau, Prosperity and MERS or its assigns pursuant to the Secoya Property.

154.    Plaintiff seeks an injunction directing Martinez, Rousseau, Prosperity and MERS, as applicable, to abstain and refrain from assigning or transferring its mortgage or secured lien on the Secoya Property without a written and recorded confirmation that Plaintiff shall be paid at least $520,000 before any further funds are collected by Martinez, Rousseau, Prosperity and MERS or its assigns pursuant to the Secoya Property.

155.    Plaintiff has a clear legal right or interest in the $520,000 fraudulently transferred by Martinez as it pertains to the Secoya Property and a there exists a substantial likelihood of success on the merits of her claims to same.

156.    Plaintiff has no available remedy at law.

### COUNT SIX – EQUITABLE RELIEF

### (Against All Defendants, Martinez, Rousseau, Prosperity and MERS)

157.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

158.    This claim is pled in the alternative.

159.    Plaintiff seeks a court order directing Martinez, Rousseau, Prosperity and MERS, as applicable, to abstain and refrain from selling the Secoya Property without an escrow at the closing of at least the balance of the $520,000 (representing Martinez's $140,000 down payment

plus $380,000 mortgage paydown) owed to Plaintiff. Plaintiff expressly reserves the right to move for prejudgment attachment and all related relief.

160.    Plaintiff seeks a court order directing Prosperity and MERS, as applicable, to abstain and refrain from foreclosing any lien or mortgage on the Secoya Property without an escrow at the closing of at least the $520,000 balance owed to Plaintiff.

161.    Plaintiff seeks a court order directing Martinez and Rousseau, Prosperity and MERS, as applicable, to abstain and refrain from further mortgaging and/or encumbering the Secoya Property without a written and recorded confirmation that Plaintiff shall be paid at least $520,000 before any further funds are collected by Martinez, Rousseau, Prosperity and MERS or its assigns pursuant to the Secoya Property.

162.    Plaintiff seeks a court order directing Martinez, Rousseau, Prosperity and MERS, as applicable, to abstain and refrain from assigning or transferring its mortgage or secured lien on the Secoya Property without a written and recorded confirmation that Plaintiff shall be paid at least $520,000 before any further funds are collected by Martinez, Rousseau, Prosperity and MERS or its assigns pursuant to the Secoya Property.

163.    Plaintiff seeks a court order establishing and confirming that Plaintiff has a security interest in the Secoya Property.

164.    Plaintiff seeks a court order establishing and confirming that Plaintiff has an equitable lien in the Secoya Property.

165.    Plaintiff seeks a court order establishing a constructive trust in Plaintiff's favor for at least the $520,000 balance as to the Secoya Property.

166.    Plaintiff seeks a court order establishing a constructive trust in Plaintiff's favor for at least the $520,000 balance as to the Secoya Property.

## COUNT SEVEN – FRAUDULENT ASSET CONVERSION

### (Against Defendant Martinez)

167.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

168.    This is a claim under § 222.30, Fla. Stat. Ann., as Martinez fraudulently converted hundreds of thousands of dollars in cash, in an attempt to make the assets immune from the claims of Plaintiff, his creditor.

169.    The fraudulent conversions include without limitation all amounts paid from Defendant's non-exempt bank accounts toward the purchase of the Englewood Property and Secoya Property and the paydown of Rousseua's mortgage on the Secoya Property.

170.    Martinez effectuated the fraudulent conversions with intent to hinder, delay and defraud Plaintiff, his creditor.

171.    Upon information and belief, Martinez continues to fraudulently convert and deplete his assets and liquidity in order to avoid paying Plaintiff the debt he owes.

172.    As a result of Martinez's misconduct, Plaintiff has sustained hundreds of thousands of dollars, plus interest and attorney's fees.

## COUNT EIGHT – DECLARATORY JUDGMENT

### (Against All Defendants, Martinez, Rousseau, Prosperity and MERS)

173.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

174.    This is a claim under Fla. Stat. 86, and as such, this Court has jurisdiction to declare the rights, statuses and other equitable and legal relations among the parties to this action.

175.    Plaintiff seeks a declaration of rights, statuses and other equitable and legal relations among the parties.

176.    This includes without limitation a declaration of Plaintiff's and Defendants' rights, statuses and equitable and legal relations as it pertains to § 222.29, Fla. Stat. Ann., § 222.30, Fla. Stat. Ann., § 726.105, Fla. Stat. Ann. and § 726.106, Fla. Stat. Ann.

177.    This claim is pled in the alternative.

178.    There is a present, actual and justiciable controversy among the parties.

179.    Plaintiff has a claim regarding the fraudulent transfer of money effectuated by Defendant Martinez to acquire the Secoya Property and significantly pay down Rousseau's mortgage on the Secoya Property. Plaintiff has a right and an interest in said money.  Moreover, Plaintiff may also have a claim and an interest in certain other instruments, memoranda or other articles associated with the fraudulent transfer or other fraudulent transfers made by Martinez.

180.    Plaintiff seeks to obtain a declaration of rights, status and other equitable and legal relations among all the Parties to this action involving Martinez's fraudulent transfers for the down payment on the Secoya Property and significant paydown of Rousseau's mortgage on the Secoya Property.

181.    Plaintiff seeks a declaratory judgment holding that under these circumstances, the down payment and paydown of the mortgage were fraudulent transfers and fraudulent asset conversions. As such, Plaintiff seeks a declaratory judgment that the down payment and mortgage paydown transactions be declared null and void, that the transactions be voided, and that the money used be placed into escrow and then paid to Plaintiff to partially satisfy the existing judgments and contempt orders against Martinez which are owed to Plaintiff.

182.   The relief sought is not intended as a request for legal advice or an advisory opinion of the Court.

183.   Plaintiff requests a declaratory judgment holding that Plaintiff shall have a security interest in the form of a lien upon the Secoya Property.

184.   Plaintiff seeks a declaratory judgment that Plaintiff has an equitable lien in the Secoya Property.

185.   Plaintiff seeks a declaratory judgment that Plaintiff is entitled to a constructive trust in Plaintiff's favor for at least the $520,000 balance as to the Secoya Property.

## COUNT NINE – DECLARATORY JUDGMENT

### (Against Defendants Martinez and Rousseau)

186.   Plaintiff incorporates by reference all the allegations in Paragraphs 1-92 of the Complaint as if fully set out herein.

187.   This is a claim under Fla. Stat. 86, and as such, this Court has jurisdiction to declare the rights, statuses and other equitable and legal relations among the parties to this action.

188.   This claim is pled in the alternative.

189.   There is a present, actual and justiciable controversy among the parties.

190.   Defendant Martinez has claimed that certain payments he has paid to or for the benefit of Defendant Rousseau were loans. This includes without limitation Defendant Martinez's approximately $120,000 down payment on the Englewood Property and Defendant Rousseau's alleged repayment of that amount to Defendant Martinez upon the sale of the Englewood Property.

191.   Plaintiff seeks a declaration of rights, statuses and other equitable and legal relations among the parties as it pertains to any and all alleged loans from Defendant Martinez to Defendant Rousseau, and from Defendant Rousseau to Defendant Martinez. This includes, without

limitation, a declaration on the validity of those loans and any alleged repayment of those loans, and a declaration regarding Plaintiff's rights to the loan proceeds and amounts exchanged between Defendant Rousseau and Defendant Martinez as it pertains to Plaintiff's status as a judgment creditor and beneficiary of multiple contempt orders against Defendant Martinez.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant as follows:

A.  Issuance of a money judgment against both Defendants, jointly and severally, for at least $640,000;

B.  Avoidance of the transfers or obligations to the extent necessary to satisfy the Plaintiff's claim;

C.  An attachment, lien, equitable lien, or other remedy, or provisional remedy, against the assets transferred or other property of Rousseau, Martinez, Prosperity and/or MERS, in accordance with applicable law;

D.  Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

1.  An injunction against further disposition by Martinez and Rousseau of the assets transferred and their other property;

2.  Appointment of a receiver to take charge of the assets transferred and of other property of Rousseau; and

3.  Any other relief the circumstances may require.

E.  Execution on the assets transferred and any of their proceeds;

F.  An Order nullifying the paydown of the Prosperity note and MERS mortgage;

G.  An Order directing that the money paid to Prosperity be placed into escrow and then transferred to Plaintiff;

H.  Judgment against Defendant Martinez for damages in the total amount of all money paid pursuant to the fraudulent transfers and fraudulent asset conversions;

I.      An injunction directing Defendants Martinez and Rousseau to immediately cease fraudulently transferring and fraudulently converting Martinez's assets;

J.      An Order directing Defendants Martinez and Rousseau to make an accurate accounting of Martinez and Rousseau's current assets and liabilities and any substantial transfers of their assets or property since January 1, 2020;

K.      An Order holding Defendant Martinez in contempt of court;

L.      An Order enjoining Defendant Rousseau from receiving further fraudulent transfers from Defendant Martinez;

M.      An Order enjoining Defendant Prosperity from receiving further fraudulent transfers from Defendant Martinez;

N.      Appointment of a receiver to ascertain the accuracy of Martinez's representations regarding his assets and liabilities and information regarding his asset transfers and asset conversions;

O.      Reasonable attorneys' fees payable to Plaintiff in an amount to be determined;

P.      Costs of collection; and

Q.      Such other and further relief as this Court deems just and proper.


Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:     */s/ Kenneth E. Chase*
        Kenneth E. Chase
        Florida Bar No. 0017661
        Chase Law & Associates, P.A.
        1141 71st Street
        Miami Beach, FL 33141
        Tel: (305) 402-9800
        Fax: (305) 402-2725
        Email: kchase@chaselaw.com

# EXHIBIT A

STATE OF CONNECTICUT

DOCKET NUMBER: CV 10-6012959 S                    SUPERIOR COURT

D'Anna Welsh                                       JUDICIAL DISTRICT
184 Oliver Way
Bloomfield, CT  06002
                                                  OF
Vs.

William V. Martinez, Jr.                          HARTFORD
92 Northgate
Avon, CT  06001

                                                  December 5, 2012

Present:      Hon. Antonio Robaina, Judge

JUDGMENT

This action, by writ and complaint, claiming damages came to this Court on August 3, 2010, and thence
to August 16, 2010 when the defendant filed his appearance. The action continued thence to
September 10, 2010, when an answer was filed, and thereafter to June 21, 2012 when an amended
complaint was filed.  The action continued thence to later dates when the parties appeared and were at
issue, as on file, and when all the evidence having been submitted, the court thereupon committed the
action to the jury together with the following interrogatories:

**COPY CERTIFIED**

JAN -7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

**COPY CERTIFIED**

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

App. 0010

DN:  HHC-CV10-6012959-S          :          SUPERIOR COURT

D'ANNA WELSH                     :          J.D. OF HARTFORD

VS.                              :          AT HARTFORD

WILLIAM MARTINEZ                 :          JUNE 22, 2012


## JURY INTERROGATORIES


I.      THE PLAINTIFF'S CLAIMS OF INVASION OF PRIVACY

    1.      Did the Defendant, Dr. Martinez, invade Ms. Welsh's privacy in one or more of the ways alleged?

        Yes_____ ✓ _____          No_____

        If you answered Yes to question #1, then proceed to Question #2.  If you answered No, then you have reached a verdict for the defendant on Count One of the Plaintiff's Complaint.  Proceed to Section II.


    2.      Was the Defendant's invasion of the Plaintiff's privacy a substantial factor in causing injuries to the Plaintiff?

        Yes_____ ✓ _____          No_____

        If you answered Yes to Question #2, then proceed to Question #3.  If you answered No, then you have reached a verdict for the defendant on Count One of the Plaintiff's Complaint.  Proceed to Section II.

COPY CERTIFIED

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

COPY CERTIFIED

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

2

App. 0011

3.    Do you find that the defendant's actions as to the claim(s) of invasion of privacy as decided in questions 1 and 2 above constitute intentional, willful, wanton or malicious misconduct?

Yes_____✓_____          No_____

## II.   THE PLAINTIFF'S CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1.    Did the defendant intentionally inflict emotional distress on the plaintiff?

Yes_____✓_____          No_____

If you answered Yes to Question #1, then proceed to Question #2.  If you answered No, then you have reached a verdict for the defendant on Count Three of the Plaintiff's Complaint.  Proceed to Section III.

2.    Was the Defendant's intentional infliction of emotional distress a substantial factor in causing injuries?

Yes_____✓_____          No_____

If you answered Yes to Question #2, then proceed to Question #3.  If you answered No, then you have reached a verdict for the defendant on Count Three of the Plaintiff's Complaint.  Proceed to Section IV.

COPY CERTIFIED

JAN -7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

COPY CERTIFIED

JAN -7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

2

App. 0012

3.    Do you find that the defendant's actions as to the claim(s) of intentional infliction of emotional distress as decided in questions 1 and 2 above constitute intentional, willful, wanton or malicious misconduct?

Yes_____          No_____

### III.    THE PLAINTIFF'S CLAIM OF NEGLIGENT MISREPRESENTATION

1.    Has the plaintiff, Ms. Welsh, proven her claim as to Negligent Misrepresentation?

Yes_____          No_____

If you answered Yes to Question #1, then proceed to Question #2.  If you answered No, then you have reached a verdict for the defendant on Count Four of the Plaintiff's Complaint, and your deliberations are over.  Please have the jury foreperson sign the verdict form below, and notify the clerk.

Was the Defendant's negligent misrepresentation(s) a substantial factor in causing injuries?

Yes_____          No_____

### IV.    THE PLAINTIFF'S CLAIM OF NEGLIGENCE PER-SE

1. Eavesdropping

Has the plaintiff proven by a fair preponderance of the evidence that the defendant was negligent by engaging in eavesdropping as defined in the instructions?

COPY CERTIFIED

JAN – 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT



3

YES ___✓___        NO _____


If you answered Yes to Question #1, then proceed to Question #2.  If you answered No,  proceed to Question #3.


2.    Was the Defendant's negligence in this regard a substantial factor in causing injuries to the Plaintiff?

Yes_____✓_____        No_____

3. Voyeurism

Has the plaintiff proven that the defendant was negligent by engaging in voyeurism with malice as defined in the instructions?

YES ___✓___        NO _____

Has the plaintiff proven that the defendant was negligent by engaging in voyeurism for the purpose of sexual gratification as defined in the instructions?


YES _____        NO ___✓___


Was the Defendant's negligence in either regard a substantial factor in causing injuries to the Plaintiff?

YES ___✓___        NO _____

**COPY CERTIFIED**

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

**COPY CERTIFIED**

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

4

5

App. 0014

_Kristen L. Harrigan_

**Foreperson**
(Must sign in ink)

COPY CERTIFIED

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

COPY CERTIFIED

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

5

6

The jury returned its verdict as follows:

<u>Verdict for Plaintiff</u>

We, the jury, find the issues in favor of the plaintiff and award damages in the following amount:

$2,000.000.00

6/25/12                                    /s/_____
                                           Jury Foreperson

The court accepted the verdict and the answers to the interrogatories.  On June 29, 2012, the defendant duly filed a motion for remittitur and a motion for judgment notwithstanding the verdict.  The parties appeared and were fully heard on the defendant's motions.  The court, having heard the parties, finds that the motion for remittitur should be and the same is denied.  The court further finds that the motion for judgment notwithstanding the verdict should be and the same is granted as to the portion of the verdict which finds negligence per se for eavesdropping.  The plaintiff filed a motion for punitive damages on July 17, 2012.  The court, having heard the parties, finds that the motion should be and the same is granted in accordance with its memorandum of decision filed on December 5, 2012.

Whereupon it is adjudged that judgment enter for the plaintiff and against the defendant in the amount of $2,360,000.00, plus costs of $1027.00.

By the Court,

_____
Deputy Chief Clerk

COPY CERTIFIED

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

COPY CERTIFIED

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

7

App. 0016

# EXHIBIT B

157 Conn.App. 223

Appellate Court of Connecticut.

D'Anna WELSH

v.

William V. MARTINEZ, Jr.

No. 35335.
|
Argued Feb. 17, 2015.
|
Decided May 12, 2015.

**Synopsis**

**Background:** Ex-girlfriend brought action against ex-boyfriend for invasion of privacy, negligence per se, intentional infliction of emotional distress, and negligent misrepresentation for ex-boyfriend's installation of spying cameras around her house, spyware on her computer, and a global positioning system (GPS) in her vehicle while they were together. The Superior Court, Judicial District of Hartford, Robaina, J., denied ex-boyfriend's motion for remittitur after a jury rendered verdict in favor of ex-girlfriend for $2 million in damages. Ex-boyfriend appealed.

**Holdings:** The Appellate Court, Gruendel, J., held that:

[1] trial court did not abuse its discretion in playing back counsel's question to ex-girlfriend after jury requested to hear ex-girlfriend's testimony;

[2] damages award was not excessive; and

[3] damages award was not punitive.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (20)

**[1]** **Appeal and Error** 🔑 Custody and conduct of jury

The Appellate Court reviews the trial court's decision to permit the playback of certain testimony during a jury's deliberations for an abuse of discretion.

**[2]** **Appeal and Error** 🔑 Abuse of discretion
 **Appeal and Error** 🔑 Abuse of discretion

Under the abuse of discretion standard, the Appellate Court will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion; the ultimate issue is whether the trial court could reasonably conclude as it did.

**[3]** **Trial** 🔑 Cumulative evidence in general
 **Trial** 🔑 Statements as to Facts, Comments, and Argument

Trial court did not abuse its discretion in playing back counsel's question to ex-girlfriend, which included a prefatory remark regarding the transmission capabilities of spy cameras ex-boyfriend installed in ex-girlfriend's house, after jury requested to hear the testimony in ex-girlfriend's action for invasion of privacy, where ex-boyfriend raised no objection to the remark when it was originally made, the statement was cumulative of other testimony, and potential harm, if any, was minimized by the court's instruction that statements and questions from counsel were not evidence.

**[4]** **Appeal and Error** 🔑 Custody and conduct of jury

The Appellate Court would decline to review the merits of ex-boyfriend's challenge, in his appellate brief, to the playback of ex-girlfriend's allegedly improper testimony that an image from a spy camera installed by ex-boyfriend could be captured 300 yards away in ex-girlfriend's action for invasion of privacy, where ex-boyfriend did not raise the challenge before the trial court and ex-boyfriend conceded at oral argument that he was not challenging such testimony. Practice Book 1998, §§ 5–2, 60–5.

**[5]**   **Appeal and Error** 🔑 **Instructions understood or followed**

Unless there is a clear indication to the contrary, a jury is presumed to follow the trial court's instructions.

1 Cases that cite this headnote

**[6]**   **New Trial** 🔑 **Remission or Reduction of Excess of Recovery**

In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict.

2 Cases that cite this headnote

**[7]**   **New Trial** 🔑 **Remission or Reduction of Excess of Recovery**

Upon the trial court's completion of its review of the evidence in the light most favorable to sustaining the verdict to determine whether to order remittitur, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant.

**[8]**   **New Trial** 🔑 **Remission or Reduction of Excess of Recovery**

The ultimate test which must be applied to the verdict by the trial court in determining whether to order remittitur is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake, or corruption.

**[9]**   **New Trial** 🔑 **Remission or Reduction of Excess of Recovery**

The trial court's broad power to order a remittitur should be exercised only when it is manifest that the jury has included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions.

**[10]**   **Appeal and Error** 🔑 **Excessive Award; Remittitur**

The reviewing court's examination of the trial court's decision on whether to order remittitur requires careful balancing.

1 Cases that cite this headnote

**[11]**   **Appeal and Error** 🔑 **Excessive Award; Remittitur**

The first step for the reviewing court's examination of the trial court's decision on whether to order remittitur is to retrace the steps of the trial court by reviewing the evidence, construed in the light most favorable to sustaining the verdict, just as the trial court was required to do.

1 Cases that cite this headnote

**[12]**   **Appeal and Error** 🔑 **Excessive Award; Remittitur**

**Appeal and Error** 🔑 **Excessive award; remittitur**

The second step for the reviewing court's examination of the trial court's decision on whether to order remittitur is to examine the trial court's decision in such a way that the reviewing court employs every reasonable presumption in favor of its correctness, which is to examine the evidentiary basis for the jury verdict itself to determine whether the trial court reviewed the verdict in the light most favorable to its correctness.

**[13]**   **Appeal and Error** 🔑 **Excessive Award; Remittitur**

Where the evidence supports the jury's award of damages, a trial court abuses its discretion by ordering remittitur.

5 Cases that cite this headnote

**[14]**   **Damages** 🔑 **Particular cases**

Jury's award of $2 million for noneconomic damages to ex-girlfriend, who suffered from post-traumatic stress disorder, humiliation, betrayal, and devastation as a result of ex-boyfriend installing spying cameras around her house, spyware on her computer, and a global positioning system (GPS) in her vehicle, did not shock the sense of justice or otherwise fall beyond the limits of just damages for ex-boyfriend's invasion of her privacy, where the extensive spying activities occurred over the course of several years, ex-boyfriend swore under oath that no further surveillance equipment remained in ex-girlfriend's home while transmissions and daily e-mail reports actually continued, and ex-girlfriend lived in perpetual state of fear that someone was watching her.

1 Cases that cite this headnote

[15]   **Damages**  ⬅  Physical suffering and inconvenience in general

There exists no precise formula on which a court can instruct a jury as to the computation of compensation for pain and suffering.

[16]   **Damages**  ⬅  Physical suffering and inconvenience resulting from injuries

**New Trial**  ⬅  Excessive Damages

The award of damages for pain and suffering is peculiarly within the province of the trier, and will be sustained, even though generous, if it does not shock the sense of justice.

[17]   **Damages**  ⬅  Physical suffering and inconvenience in general

Proper compensation for pain and suffering cannot be computed by a mathematical formula, and there is no iron-clad rule for the assessment of damages.

[18]   **Damages**  ⬅  Injuries to the Person

The test for proper compensation for pain and suffering is whether the amount awarded falls within the necessarily uncertain limits of just damages.

[19]   **Trial**  ⬅  Nature of evidence in general

Jury's award of $2 million for noneconomic damages to ex-girlfriend, who suffered from post-traumatic stress disorder, humiliation, betrayal, and devastation as a result of ex-boyfriend's invasion of her privacy by installing spying cameras around her house, spyware on her computer, and a global positioning system (GPS) in her vehicle, was not improperly predicated on witness's statement that ex-boyfriend was employed at a seven-figure salary, where ex-boyfriend did not object to such testimony at trial and did not claim any evidentiary error.

[20]   **Damages**  ⬅  Sufficiency of verdict or findings

Jury's award of $2 million for noneconomic damages to ex-girlfriend, who suffered from post-traumatic stress disorder, humiliation, betrayal, and devastation as a result of ex-boyfriend's invasion of her privacy by installing spying cameras around her house, spyware on her computer, and a global positioning system (GPS) in her vehicle, was compensatory and not punitive, where the court provided specific instructions that damages should compensate ex-girlfriend for loss or injury and should not be based on sympathy or prejudice in favor of or against any party, and there was no evidence indicating the jury strayed from the instructions.

**Attorneys and Law Firms**

**\*\*1233**  James H. Lee, Fairfield, for the appellant (defendant).

Alinor C. Sterling, Bridgeport, for the appellee (plaintiff).

GRUENDEL, PRESCOTT and BORDEN, Js.

114 A.3d 1231

## Opinion

GRUENDEL, J.

**\*225** The defendant, William V. Martinez, Jr., appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, D'Anna Welsh. He contends that the court improperly (1) permitted, during jury deliberations, the playback of a statement by the plaintiff's attorney, and (2) denied his motion for remittitur. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following relevant facts. The defendant at all relevant times was employed as a cardiovascular and thoracic surgeon at St. Francis Hospital (hospital). In January, 2001, the plaintiff was hired by the hospital as a physician's assistant in the cardiac surgery department. The defendant served as a supervisor to the plaintiff, who worked with several of his patients.

At that time, the defendant was married and living with his wife and nine children. The defendant nevertheless sought to become romantically involved with the plaintiff. The parties flirted with each other, but when the defendant expressed his interest **\*\*1234** in exploring a relationship with her, the plaintiff indicated that she would not consider dating a married man unless and until he moved out of his family's home. In April, 2001, the defendant moved out of that house and into an apartment. The parties then began a personal relationship **\*226** that lasted for years. The plaintiff testified that she fell deeply in love with the defendant. The two talked about getting married and having children together, while shopping for engagement and wedding rings and selecting children's names. At the same time, the plaintiff "was very frustrated that [the defendant] was still married [because] that wasn't in accordance with the value system that [she] wanted to be living."

In 2002, the plaintiff and the defendant visited her father at a convalescent home in Texas, where he was suffering from lung cancer. The defendant shook her father's hand and told him not to worry about the plaintiff, as he would take care of her. That assurance "meant a lot" to the plaintiff. Her father passed away months later.

The plaintiff subsequently received an inheritance from her father. She testified that her "father was a very hard worker. I learned my work ethic from him and he had put money

aside for his children, and I knew I needed to do something important with it, and I decided to purchase my first home." Once built, her new home was extremely special to her because she "felt accomplished [and] very grateful to [her] father because it would not have happened without him."

When the plaintiff moved into the house in November, 2004, she gave the defendant a set of keys, and he began spending almost every night in her home. Soon thereafter, the defendant installed a wireless Internet network in the house against the plaintiff's wishes. [1] In December, 2004, the defendant gave the plaintiff a laptop computer as a Christmas gift. Unbeknownst to the **\*227** plaintiff, the defendant had installed a spyware program on the computer that discreetly forwarded to him, via e-mail on a daily basis, a copy of everything composed thereon. A few months later, the defendant purchased an air purifier for the plaintiff. That would be the first of several gifts given to her by the defendant that secretly housed wireless spy cameras. After unsuccessfully attempting to install spy cameras in the ceiling above her bed, the defendant gave the plaintiff two clock radios and a television, which all contained spy cameras and were positioned in her bedroom in the direction of her bed. The air purifier likewise was positioned in the direction of her bathroom shower.

The defendant also installed a receiver antenna in a crawl space portion of the plaintiff's basement directly beneath her bedroom. That antenna received transmissions from each of the spy cameras. The transmissions then were recorded on a "multiplexer hard drive machine" connected to the antenna in the crawl space. The defendant testified that, when the plaintiff was not present, he routinely would enter the crawl space, attach a small television monitor to the hard drive machine and review captured footage. That behavior continued throughout 2005 and 2006. As a result, the defendant testified that he saw everything that transpired in the plaintiff's bedroom.

**\*\*1235** In addition, the defendant purchased a global positioning system (GPS) device in the summer of 2005. He installed that tracking device in the plaintiff's vehicle without her knowledge. The plaintiff also later learned that the defendant covertly accessed her cell phone records by impersonating her and adding his e-mail address to the account.

By February, 2007, the defendant had begun dating a nurse at the hospital without the plaintiff's knowledge. On February

12, 2007, the defendant returned his set **\*228** of house keys to the plaintiff. At that time, he explained that he was preoccupied with starting his own medical practice and finalizing his divorce. The plaintiff was devastated. When he ended their relationship, the defendant never informed the plaintiff that he had installed surveillance equipment in her home, computer and vehicle, or that he was dating another woman. The defendant testified that, in the months that followed, he continued to receive daily e-mails documenting everything that the plaintiff wrote on her computer and that the surveillance equipment in the plaintiff's home continued to broadcast and record from therein.

On July 18, 2007, the plaintiff hired a plumber to repair a broken faucet on her property. In order to do so, the plumber entered the crawl space in her basement and discovered the defendant's surveillance equipment. At the plumber's urging, the plaintiff contacted the police. Members of the Bloomfield Police Department responded to her residence and discovered both the recording equipment in the basement and the two clock radios in her bedroom containing spy cameras.[2] The plaintiff immediately realized that the defendant had been spying on her. As she testified, "I was devastated. I knew exactly how they had been—flashback in my head [to] him handing them to me." Realizing that the defendant had been spying on her for years, the plaintiff felt "betrayed, alarmed, betrayed, humiliated, controlled. I didn't feel like a person. I felt like I was just a—I don't even know, something that he—just like a toy of his, like I just didn't count." When she called the defendant and confronted him about the surveillance equipment, the defendant offered an "empty apology" and did not deny that he had spied on her over the course of their relationship. Notably, the defendant did not inform the plaintiff that he also had monitored her **\*229** computer with a spyware program or that he had monitored her vehicle with a GPS device. At that time, the plaintiff declined to press charges against the defendant.

In the months that followed, the defendant, although uninvited, repeatedly appeared at the plaintiff's home. He sent her numerous e-mails and left items, such as books on marital infidelity, at her property. In response, the plaintiff told the defendant "to leave me alone." In September, 2007, the defendant informed her that "I can hear you from outside your house." The plaintiff found his words to be terrifying. As she recounted at trial:

"[The Plaintiff's Attorney]: Was it like a threat or how did that come up?

"[The Plaintiff]: It was like—it was like control.... Like scary, honestly scary.

"[The Plaintiff's Attorney]: Did you believe him?

"[The Plaintiff]: Yes.

**\*\*1236** "[The Plaintiff's Attorney]: Did you know at that point if you had gotten all of the spy equipment out of the house?

"[The Plaintiff]: Well, I didn't know how he was hearing me and I thought it was really weird that he always knew when I was home.

"[The Plaintiff's Attorney]: What do you mean by that?

"[The Plaintiff]: Well, like I would get home, and ... five minutes later he would show up ... unannounced and I didn't—I wasn't a creature of habit. It wasn't like I was always home at a particular time.... I didn't understand how he knew ... who I was talking to.... I thought he was still [spying on] me somehow."

**\*230** The defendant continued to appear at the plaintiff's property unannounced, sometimes banging on her door. When she rebuffed his attempts to rekindle a relationship, the defendant left her a voice mail message stating that she was "fucking unbelievable." The defendant also left a handwritten note at her house that stated in relevant part: "I wanted to fix [our relationship] and start anew but you are your stubborn, nasty self." In another letter, dated November 14, 2007, the defendant complained of a lack of closure and accused the plaintiff of being "extremely unfair" and "evil." He stated that he had "tried and tried in every way imaginable to connect with you" and that that "the way you have treated me recently is horrific."

On yet another occasion, the defendant drove by the plaintiff's house at night and spotted a vehicle in her driveway. The defendant then parked his vehicle, snuck into her backyard and approached a back window. From that vantage point, he watched the plaintiff and a male guest inside.[3] The defendant then returned to the front of the plaintiff's property and examined the license plate on the parked vehicle. The defendant testified that he used that license plate number to illegally identify the male guest inside the residence. The defendant then placed a phone call to the home of that male

guest and left a message on an answering machine stating that "your husband is having an affair, and you should probably check his phone records."

The plaintiff testified that, as the defendant's behavior continued, she grew scared. As she put it: "I didn't want any contact with him. I didn't want to be confronted with him. I didn't want him to try to control another conversation with me. I didn't want him to touch me, try to hug me, try to make it better. I just **\*231** want him to leave me alone.... I ... was afraid he might set my house on fire." On cross-examination, the defendant's attorney inquired as to the basis of that concern. The plaintiff responded that the defendant was "[a]t times a very violent, angry-faced, frustrated, the handwriting in his letters, the voice in the voice mail, you are fucking unbelievable, I mean to say that to someone that you care about. I've heard a number of times of women getting killed because the man can't have them or won't comply.... [H]e's a man of control."

The unrelenting phone calls, letters and unannounced visits by the defendant to her house eventually overwhelmed the plaintiff in February, 2008. As she testified, "I got a text message from a friend of mine about a conversation I had ... in my house that he would have no way of knowing and I just—I felt tortured in my own home, and it was at that point that I called the police to look into this further." The defendant thereafter was arrested and charged with voyeurism and eavesdropping.

**\*\*1237** In response, the defendant filed an application for accelerated rehabilitation with the Superior Court. A hearing followed on July 15, 2008, at which the defendant provided sworn testimony in which he stated that the plaintiff "had nothing to worry about." The defendant further represented that no further surveillance equipment remained in the plaintiff's home. [4] On the **\*232** basis of those representations, the court granted the defendant's application for accelerated rehabilitation. [5] The defendant did not apprise the court of the fact that additional surveillance equipment remained in the plaintiff's bedroom, her vehicle, and her computer.

In the year that followed, the plaintiff continued to feel unsafe in her house. The plaintiff ultimately retained a Boston company to inspect her home in January, 2010, in an effort to "know once and for all" that her home was safe and free of surveillance equipment. To the plaintiff's horror, that inspection proved fruitful, as images broadcasting from the

plaintiff's bedroom appeared almost immediately on both a "professional looking" receiver as well as a handheld receiver that "anybody could get from Radio Shack." The plaintiff testified that her "worst fear" was realized when she learned that the television in her bedroom "didn't have to be turned on for [the spy camera] to be transmitting up to three football field lengths in distance from my house ... it was still transmitting a view of whatever was happening in my bedroom." [6] As a result, the plaintiff testified that "I felt like I had been victimized. I felt betrayed, lied to, just dehumanized, taken advantage of, just very angry." The bedroom television was impounded at that time.

**\*233** The plaintiff commenced this civil action against the defendant later that year. The operative complaint consisted of four counts alleging tortious invasion of privacy, negligence per se, [7] intentional infliction of emotional distress, and negligent misrepresentation. During a subsequent deposition of the defendant, the plaintiff first learned that the defendant also had installed **\*\*1238** the GPS device in her vehicle and the spyware program on her computer.

At trial, the plaintiff, as part of her case-in-chief, introduced into evidence, inter alia, the surveillance equipment found in her home, which had been impounded by the Bloomfield Police Department, and various correspondences from the defendant. Significantly, the defendant in his testimony admitted that he (1) had installed the surveillance equipment found in the plain-tiff's home, (2) had reviewed captured transmissions therefrom, and (3) had surveyed her e-mail, her phone calls and her movements outside the home.

The jury also heard the testimony of Kevin Connelly, a licensed psychologist who specializes in treating post-traumatic stress disorder. Connelly diagnosed the plaintiff as suffering from that affliction due to her symptoms, which included avoidance behavior, hypervigilance, persistent nightmares and flashbacks, difficulty concentrating and exaggerated startle response. He testified that "the variable that often has much more influence on a person's trauma ... is the relationship variable.... [W]hen people are hurt intentionally by someone who is supposed to love them, who cares about them ... can be tenfold more damaged because of that relationship.... [I]n [the plain-tiff's] case because she never saw it coming, because **\*234** she never expected it naturally you begin to doubt your own judgment, your own perceptions. You don't know who's safe, who's not safe. If people that love you are hurting you well what else could happen?" Connelly also explained that post-traumatic stress

disorder "isn't something that goes away" and cannot be cured, only managed.

The plaintiff testified that, as a result of her experience with the defendant, she never feels safe and always feels as though someone is spying on her. She does not feel safe anywhere. The plaintiff suffers from the persistent grinding of teeth, an affliction known as bruxism, which necessitated the removal of a tooth. She also experiences frequent nightmares of "[b]eing covered in lava, suffocating, being beat up, being shot, full sweat in the middle of the night." Even when in the privacy of her own home, the plaintiff testified that "I never feel private.... I always ... feel like there's no dignity, and I feel humiliated, and I feel I'm being laughed at...." She testified that she remains ever fearful that someone is peering into her home.

At the conclusion of trial, the jury returned a verdict in favor of the plaintiff on all counts and awarded her $2 million in damages. The defendant thereafter filed a motion for remittitur, claiming that the jury's verdict was against the weight of the evidence and excessive as a matter of law. The court denied that motion, and this appeal followed.

I

The defendant first claims that the court improperly permitted the playback of a portion of testimony during the jury's deliberations. We disagree.

 [1]    [2]   We review the trial court's decision to permit the playback of certain testimony for an abuse of discretion. See *State v. Rubaka,* 82 Conn. 59, 68, 72 A. 566 (1909)  **\*235** jury review of trial testimony "must rest, to a great extent, in the discretion of the trial judge"); *State v. Fletcher,* 10 Conn.App. 697, 703, 525 A.2d 535 (1987) ("[a] determination of the reasonableness of the request for a review of testimony lies within the discretion of the trial court"), aff'd, 207 Conn. 191, 540 A.2d 370 (1988). Under that standard, "[w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of **\*\*1239** discretion.... In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *State v. Andrews,* 313 Conn. 266, 276, 96 A.3d 1199 (2014).

The following additional facts are relevant to the defendant's claim. During its deliberations, the jury sent a note to the court, in which it inquired: "Can we have the plaintiff's testimony about police presence when James Atkinson was hired to check for more surveillance equipment?" The court reviewed that testimony with counsel outside the presence of the jury. The court then highlighted a portion of the plaintiff's June 21, 2012 testimony and then stated in relevant part: "All right. Well ... the question that follows the [plain-tiff's] statement where [her attorney] asked, 'Does anyone in your neighborhood' and so on ... that should not come in.... [T]he question leading up to it, I think, can come because ... it sets up the question and the answer that it appears that the jury is looking for, and I'll tell them if they want other things, they certainly are free to ask for other things...." In response, the defendant's attorney replied, "Right." After both parties indicated that they were ready to proceed, the court called the jury into the courtroom and had the following portion of the audio recording played back:

 **\*236**   "[The Plaintiff's Attorney]: There's been some testimony in the case about the transmission capabilities of these cameras and whether they can be seen out in your neighborhood or seen by other people with baby monitors and so. What's your fear about that?

"[The Plaintiff]: It's my worst fear. First off, that television didn't have to be turned on for it to be transmitting up to three football field lengths in distance from my house so while it was off it was still transmitting a view of whatever was happening in my bedroom. It was very simple. The monitor that Jim Atkinson had in his hand that I saw my bedroom on which someone else even outside my own neighborhood could have had and viewed, and I know they went down the street, Officer Ledger and Jim Atkinson to test this, and I—I fear that [the defendant] had one of those too. I still fear that [the defendant] had one of those, and I don't believe that he didn't." [8]

During playback of that testimony, the defendant's attorney objected to the inclusion of what he referred to as the "preamble" to the question posed by the plaintiff's attorney. After excusing the jury, the court engaged in the following colloquy with counsel:

"The Court: I understand your concern ... but it's all part of the same answer. It's all one long answer without questions in between so I think it was appropriate to start at the question and then play the answer back.

"[The Defendant's Attorney]: I understand, but Your Honor will note my objection to having that preamble read.

**\*237** "The Court: Yes, sir."

The defendant plainly did not object to the playback of any of the plaintiff's testimony. Rather, his sole objection pertained to the playback of a prefatory remark **\*\*1240** to the question by her counsel, in which counsel stated: "There's been some testimony in the case about the transmission capabilities of these cameras and whether they can be seen out in your neighborhood or seen by other people with baby monitors and so." The defendant did not furnish any basis for his objection or request a curative instruction from the court.

[3]   [4]   On appeal, the defendant claims that the court improperly denied his objection to the playback of the prefatory remark of the plaintiff's attorney. [9] For multiple reasons, we do not agree.

**\*238** First, we note that the defendant raised no objection to that statement when it was made at trial. This case thus is plainly distinguishable from 🔖 *State v. Miguel C.,* 305 Conn. 562, 46 A.3d 126 (2012), the sole authority relied on by the defendant in support of his claim. Unlike the present case, the defendant in *Miguel C.* raised a distinct objection in the middle of the prosecutor's questioning at trial, which objection the trial court ultimately sustained. 🔖 *Id.,* at 566–68, 46 A.3d 126. For that reason, our Supreme Court concluded that the playback of the stricken question during the jury's deliberations was improper. 🔖 *Id.,* at 579–81, 46 A.3d 126. In particular, the court emphasized that "the contested testimony was not merely cumulative, but, rather, was the sole means by which the state was able to make [the contested statement] known to the jury." 🔖 *Id.,* at 579, 46 A.3d 126.

By contrast, the substance of the contested statement in the present case was cumulative of other testimony. The prefatory remark of the plaintiff's counsel concerned the transmission capabilities of the spy cameras in the plaintiff's bedroom and whether they were capable of reception outside of her home. Following the plaintiff's testimony on direct examination that the spy camera in her bedroom television was capable of broadcasting "up to three football fields in distance" from her house—to which testimony the defendant did not object—the

defendant elicited substantially similar testimony in his cross-examination of the plaintiff:

**\*\*1241** "[The Defendant's Attorney]: And this expert came in and swept [your home], found that the [television] was capable of sending a signal out although it could go to that equipment because that equipment which was all in evidence here was locked up. Correct?

"[The Plaintiff]: Correct.

"[The Defendant's Attorney]: So were you concerned that [the television] is broadcasting a signal of you or **\*239** your family or loved ones to persons or persons unknown within the range that you talk about. Am I correct?

"[The Plaintiff]: Correct."

The defendant has provided this court with no authority to support his proposition that a trial court possesses the authority, in the midst of the jury's deliberations, to remove from the jury's consideration certain trial testimony that properly was elicited and to which no objection was raised. That novel assertion finds no support in Connecticut law. Because no objection was taken when the attorney made the prefatory remark at issue in the present case, and mindful of our obligation to indulge every reasonable presumption in favor of the trial court's ruling, we cannot say that the court abused its discretion in permitting the playback of the prefatory remark of the plaintiff's counsel.

[5]   Furthermore, any potential harm stemming from the playback of that prefatory remark was minimized by the court's limiting instructions. As this court repeatedly has observed, "a question from counsel is not evidence of anything." (Internal quotation marks omitted.) *State v. Grant,* 154 Conn.App. 293, 317, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). It is undisputed that the court, in its charge to the jury, specifically instructed that "[y]ou should determine the facts by careful consideration of all the evidence presented and based solely on the evidence.... [S]tatements made by lawyers ... are not evidence. A question is not evidence. It is the answer [and] not the question or the assumption made in the question that is the evidence." "Our jurisprudence is clear ... that unless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions." (Internal quotation marks omitted.) 🔖 *State v. Boscarino,* 86 Conn.App. 447, 460, 861 A.2d 579 (2004).

Nothing  **\*240** in the record before us suggests that the jury failed to heed those instructions.

## II

The defendant also claims that the court improperly denied his motion for remittitur. He maintains that the jury's monetary award is not supported by the evidence. He further alleges that the jury improperly predicated that award on a punitive, rather than compensatory, basis. We do not agree.

**[6]   [7]   [8]   [9]**   "In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict.... Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant.... The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption.... The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the **\*\*1242** court's explicit and unchallenged instructions....

**[10]   [11]   [12]   [13]**   "[O]ur review of the trial court's decision requires careful balancing.... First, we must retrace the steps of the trial court. That is, we must begin by reviewing the evidence, construed in the light most favorable to sustaining the verdict, just as the trial court was required to do. We then must examine the trial court's decision in such a way that we employ every reasonable presumption in favor of its correctness.... Stated differently, we must examine the evidentiary basis for the jury verdict itself to determine whether the trial **\*241** court reviewed the verdict in the light most favorable to its correctness. Where the evidence supports the jury's award of damages, a trial court abuses its discretion by ordering remittitur." (Citations omitted; footnote omitted; internal quotation marks omitted.)

*Tomick v. United Parcel Service, Inc.,* 135 Conn.App. 589, 614–15, 43 A.3d 722, cert. denied, 305 Conn. 920, 47 A.3d 389 (2012).

A

**[14]**   We first consider the defendant's claim that the jury's award of $2 million in damages is not supported by the evidence. The undisputed evidence before the jury revealed that the defendant conducted extensive covert surveillance of the plaintiff over the course of several years. That surveillance included intimate video transmissions from her bedroom and shower, daily reports as to every notation made on her computer, and GPS monitoring of her vehicle. The jury also had before it evidence that although the defendant swore under oath before the court at the accelerated rehabilitation hearing in July, 2008, that the plaintiff "had nothing to worry about" and that no further surveillance equipment remained in the plaintiff's home, the transmissions from her bedroom thereafter continued and the defendant continued to receive daily e-mail reports from the spyware on the plaintiff's computer. The jury also was presented with evidence that despite her request for the defendant to leave her alone, he continued to appear unannounced and uninvited at her home. His behavior terrified the plaintiff, particularly when he informed her that "I can hear you from outside your house." In addition, the defendant's angry and violent conduct left the plaintiff scared for her life.

In addition, the jury heard testimony from a licensed psychologist that, as a result of the defendant's actions, the plaintiff suffers from post-traumatic stress disorder, **\*242** which cannot be cured. It also heard testimony that plaintiff was "tenfold more damaged" by the trauma intentionally inflicted by the defendant in light of her close personal relationship with him. There was evidence before the jury that, as a result of the defendant's conduct, the plaintiff exhibits avoidance behavior, hypervigilance, difficulty concentrating and an exaggerated startle response. She also suffers from bruxism and experiences persistent nightmares and flashbacks.

In her testimony, the plaintiff further detailed the pain and suffering she sustained as a result of the defendant's conduct. Apart from the humiliation, betrayal and devastation she experienced upon learning that the defendant had been spying on her for a number of years, the jury had before it evidence that the plaintiff suffered, and continues to suffer, pain and anguish stemming therefrom. She lives in a perpetual state of fear that someone is watching or spying on her and she does not feel safe anywhere. Even in her own home, she feels no sense of privacy. In short, her world view has been

fundamentally **\*\*1243** altered as a result of the defendant's actions against her.

In his motion for remittitur, the defendant argued that the plaintiff "failed to claim any economic damages, and instead claimed pain and suffering caused by post-traumatic stress disorder for the balance of her life." The defendant renews that claim in this appeal, and appears to suggest that noneconomic damages alone cannot justify a sizeable award of damages. We disagree. As our Supreme Court has explained, "[c]omparison of verdicts is of little value. No one life is like any other, and the damages for the destruction of one furnish no fixed standard for others." (Internal quotation marks omitted.) 🔖 *Katsetos v. Nolan,* 170 Conn. 637, 658, 368 A.2d 172 (1976). The destruction in the present case primarily is psychological, rather than physical, in **\*243** nature. That does not diminish its degree, as evidenced by Connelly's testimony.

[15] There exists no precise formula on which a court can instruct a jury as to the computation of compensation for pain and suffering. *Jerz v. Humphrey,* 160 Conn. 219, 221, 276 A.2d 884 (1971). A jury in such instances necessarily is tasked with quantifying something that is inherently difficult to quantify. In their closing arguments to the jury, the plaintiff requested an award of approximately $20 million in compensation in light of her thirty-seven and one-half year life expectancy; the defendant suggested that an award of $100,000 was more appropriate. The jury rejected both suggestions, and instead concluded that $2 million was proper compensation for the plaintiff's pain and suffering.[10]

[16]  [17]  [18] "The award of damages for pain and suffering is peculiarly within the province of the trier, and will be sustained, even though generous, if it does not shock the sense of justice.... Proper compensation cannot be computed by a mathematical formula, and there is no iron-clad rule for the assessment of damages.... The test is whether the amount awarded ... falls within the necessarily uncertain limits of just damages...." (Citations omitted; internal quotation marks omitted.) *Manning v. Michael,* 188 Conn. 607, 616, 452 A.2d 1157 (1982). On the unique facts of this case, and construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury's monetary award does not shock the sense of justice or otherwise fall beyond the limits of just damages.

## B

[19] The defendant also asserts that the jury improperly predicated its award of damages on a punitive, rather **\*244** than compensatory, basis.[11] That assertion necessarily presumes that the jury disregarded the court's instructions.

[20] In its charge, the court instructed that "it is up to you to decide what fair, just and reasonable compensation is.... The general rule of damages is this: Insofar as money can do it the plaintiff is to **\*\*1244** receive fair, just and reasonable compensation for all injuries and losses which are legally caused by the defendant's proven acts and or negligence. Under this rule *the purpose of an award of damages is not to punish or penalize the defendant but to compensate the plaintiff* for the resulting injuries and losses." (Emphasis added.) The court cautioned the jury that it "may not guess or speculate as to the nature or extent of the plaintiff's losses or injuries. The decision must be based on reasonable probabilities in light of the evidence presented during the trial."

The court then turned to the specifics of the case, noting that "the damages which are claimed are known as noneconomic damages. Noneconomic damages are monies awarded as compensation for nonmonetary losses and injuries which the plaintiff has suffered or is reasonably likely to suffer in the future as a result of the defendant's negligence and or [his] intentional acts. They're awarded for things such as physical pain and suffering, mental and emotional pain and suffering and loss of diminution, the ability to enjoy life's pleasures. In this case, the plaintiff seeks to recover noneconomic damages for each of the following types of **\*245** nonmonetary loss or injury: her fear, extreme emotional distress, recurrent and intrusive thoughts of being exposed and violated, interference with her personal relationships, feelings of vulnerability and mistrust, sleep problems including damage to her teeth and difficulties concentrating as well as anxiety and anger." The court then instructed that "[y]our award should be in accordance with the nature and extent of such physical impairment, loss of function or injury and the length of time that the plaintiff is reasonably expected to endure its negative consequences."[12] At the same time, the court admonished the jury that "[o]bviously your verdict cannot be reached on the basis of sympathy for any party or on the basis of prejudice in favor of or against any party."

Under Connecticut law, we presume "that the jury follows the instructions given by the court." *Gajewski v. Pavelo,* 229 Conn. 829, 837, 643 A.2d 1276 (1994); see also *Hurley v. Heart Physicians, P.C.,* 298 Conn. 371, 403, 3 A.3d 892 (2010) ("[i]n accordance with our jurisprudence and the lack of evidence to the contrary, we presume that the jury followed the trial court's charging instructions"). On the record before us, we cannot say that the jury strayed from those instructions. Viewed in a light most favorable to sustaining the verdict, the present case involves a plaintiff irreparably damaged by the intentional acts of a loved one that destroyed any sense of privacy and security, even in her own home. The record does not indicate that the jury predicated its award on an improper basis, but rather that it sought to compensate the plaintiff for the injuries that resulted from the defendant's intentional conduct. We, therefore, conclude that the court did not abuse **\*246** its discretion in denying the defendant's motion for remittitur.

The judgment is affirmed.

In this opinion the other judges concurred.

**All Citations**

157 Conn.App. 223, 114 A.3d 1231

## Footnotes

1    The plaintiff testified that she told the defendant that she did not want the wireless network installed in her home, stating that "[h]e ... expressed his wanting wireless Internet in the house, and I adamantly did not want it in the house, because it felt creepy to me." The plaintiff testified that, despite her protests, he installed it anyway.

2    The officers did not find the spy camera installed on the television in the plaintiff's bedroom.

3    At trial, the defendant admitted that he had trespassed onto the plaintiff's property.

4    At trial, the defendant testified as follows with respect to his representation at the July 15, 2008 hearing:

"[The Plaintiff's Attorney]: You were under oath at the [accelerated rehabilitation] hearing?

"[The Defendant]: Yes....

"[The Plaintiff's Attorney]: You told the judge, you told [the plaintiff] there was no more spy equipment in her house?

"[The Defendant]: Correct.

* * *

"[The Plaintiff's Attorney]: [A]t that hearing—did you authorize [your attorney] to assure [the plaintiff] that there were no other surveillance [devices] except for the ones that the Bloomfield Police had already impounded?

"[The Defendant]: Yes.

"[The Plaintiff's Attorney]: So you made—you gave [your attorney] the authority to assure the court and to assure [the plaintiff] that there was no more surveillance left in her house.

"[The Defendant]: Yes."

5    As conditions of his accelerated rehabilitation, the court also ordered the defendant to (1) be supervised for two years; (2) make a $500 donation to the court; (3) pay the defendant's counseling fees for one year; (4) have no contact with the defendant; (5) remain one hundred yards from her property; and (6) see a psychologist.

6    The surveillance inspector, James Atkinson, walked down the plaintiff's street and captured the transmissions from inside her bedroom with a handheld receiver.

7    More specifically, the negligence per se count alleged that the defendant's conduct was unreasonable and violative of General Statutes §§ 53a–189, 53a–189a, and 53a–189b, which govern the offenses of eavesdropping, voyeurism, and dissemination of voyeuristic material, respectively.

8    Prior to commencing this appeal, the defendant filed a motion for rectification with the trial court. The parties thereafter filed a stipulation with the court indicating precisely what was played for the jury during its

deliberations on June 25, 2012. The court granted the motion for rectification and ordered the rectification of the June 25, 2012 transcript in accordance with the parties' stipulation.

9    In his principal appellate brief, the defendant appears also to contest the propriety of the plaintiff's answer, arguing that "the plaintiff was able to insert, into her response to a question about what she feared, her opinion that images from the undiscovered camera could be seen from 300 yards away." We decline to review the merits of that assertion for two reasons. First, our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise its claim before the trial court. See Practice Book § 5–2 ("[a]ny party intending to raise any question of law which may be the subject of an appeal must ... state the question distinctly to the judicial authority"); Practice Book § 60–5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at trial or arose subsequent to trial"). For that reason, we repeatedly have held that "we will not decide an issue that was not presented to the trial court. To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *State v. Martin,* 110 Conn.App. 171, 180, 954 A.2d 256 (2008), appeal dismissed, 295 Conn. 192, 989 A.2d 1072 (2010); see also *State v. Favoccia,* 119 Conn.App. 1, 14, 986 A.2d 1081 (2010) ("[i]t is axiomatic that issues not properly raised before the trial court ordinarily will not be considered on appeal"), aff'd, 306 Conn. 770, 51 A.3d 1002 (2012). The record reveals that the defendant did not voice any objection to the plaintiff's answer during either her trial testimony or the subsequent playback of that testimony to the jury as it deliberated.

Second, at oral argument before this court, the defendant's counsel conceded that he was challenging only the propriety of the prefatory remark of counsel, and not the subsequent answer provided by the plaintiff. We therefore confine our review to the sole objection raised by the defendant before the trial court.

10    Calculated in light of her life expectancy, the plaintiff's request amounted to approximately $10,000 per week as compared to the defendant's suggestion of $50 per week. The jury's award of damages amounts to approximately $1000 per week.

11    In his principal appellate brief, the defendant also complains that the jury's verdict was improperly predicated on certain testimony adduced at trial, such as a witness' statement that the defendant was "employed at a seven-figure salary." It nevertheless remains that the defendant did not object to such testimony at trial, nor has he claimed any evidentiary error with respect thereto in this appeal. The jury's consideration of that testimony, therefore, was not improper.

12    The court also instructed the jury, consistent with the stipulation of the parties, that the plaintiff's life expectancy was thirty-seven and one-half years.

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   12

# EXHIBIT C

191 Conn.App. 862
Appellate Court of Connecticut.

D'Anna WELSH

v.

William V. MARTINEZ

(AC 41115)
|
February 4, 2019
|
Officially released August 20, 2019

**Synopsis**

**Background:** Ex-girlfriend filed a postjudgment motion for contempt against her ex-boyfriend, alleging he had transferred money into his wife's bank account for the purpose of defeating asset standstill order issued in connection with award to ex-girlfriend of $2,360,000 in invasion of privacy, negligence per se, intentional infliction of emotional distress, and negligent misrepresentation claim. The Superior Court, Judicial District of Hartford, Moll, J., found ex-boyfriend in civil contempt and imposed a compensatory fine. Ex-boyfriend appealed.

**Holdings:** The Appellate Court, Elgo, J., held that:

[1] asset standstill order was unambiguous;

[2] extraordinary circumstances existed as to warrant trial court's use of its contempt power;

[3] ex-boyfriend failed to prove financial incapacity or inability to pay trial court's compensatory fine; and

[4] trial court lacked proper factual basis to support $2.2 million compensatory fine.

Affirmed in part and reversed in part.

See also, 157 Conn.App. 223, 114 A.3d 1231.

**Procedural Posture(s):** On Appeal; Motion for Contempt.

West Headnotes (33)

**[1]    Creditors' Remedies** 🔑 Proceedings

Despite the apparent contradiction in terms, a prejudgment remedy may be granted after the entry of judgment but before appellate disposition in order to protect assets to satisfy the judgment.

**[2]    Contempt** 🔑 Review

In reviewing a civil judgment of contempt, first, the appellate court must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt; this is a legal inquiry subject to de novo review.

**[3]    Contempt** 🔑 Review

In reviewing a civil judgment of contempt, if the appellate court makes the threshold determination that the underlying court order was sufficiently clear and unambiguous, it must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding.

**[4]    Judgment** 🔑 Application of general rules of construction

**Motions** 🔑 Construction and operation of orders in general

As a general rule, orders and judgments are to be construed in the same fashion as other written instruments; the determinative factor is the intention of the court as gathered from all parts of the order or judgment.

1 Cases that cite this headnote

**[5]** **Judgment** 🔑 Application of general rules of construction

**Motions** 🔑 Construction and operation of orders in general

The interpretation of an order or judgment may involve the circumstances surrounding its making; effect must be given to that which is clearly implied as well as to that which is expressed.

**[6]** **Judgment** 🔑 Application of general rules of construction

**Motions** 🔑 Construction and operation of orders in general

In interpreting an order or judgment, it is a fundamental of construction that the question of ambiguity is resolved by considering the language in question as applied to the particular facts of the case.

**[7]** **Contempt** 🔑 Civil contempt

**Contempt** 🔑 Disobedience to Mandate, Order, or Judgment

Civil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts; one cannot be placed in contempt for failure to read the court's mind.

1 Cases that cite this headnote

**[8]** **Contempt** 🔑 Disobedience to Mandate, Order, or Judgment

A person must not be found in contempt of a court order when ambiguity either renders compliance with the order impossible, because it is not clear enough to put a reasonable person on notice of what is required for compliance, or makes the order susceptible to a court's arbitrary interpretation of whether a party is in compliance with the order.

2 Cases that cite this headnote

**[9]** **Fraudulent Conveyances** 🔑 Construction and Operation

In construing an asset standstill order, the court accords the language contained therein its common meaning.

**[10]** **Contempt** 🔑 Disobedience to Mandate, Order, or Judgment

Asset standstill order, enjoining ex-boyfriend from voluntarily transferring or encumbering any assets except business assets in ordinary course of business and personal assets for ordinary living expenses, including court-ordered alimony and child support, issued following ex-girlfriend's award of $2,360,000 in her invasion of privacy claim against ex-boyfriend was unambiguous, for purposes of civil contempt determination, where order provided sufficient notice to reasonable person that wholesale transfer of wages to bank account of third party was not permitted.

**[11]** **Judgment** 🔑 Application of general rules of construction

**Motions** 🔑 Construction and operation of orders in general

In construing an order or judgment, ambiguity arises if the language in question, when read in context, is susceptible to multiple reasonable interpretations.

**[12]** **Contempt** 🔑 Demand and refusal of performance of act required

Sufficient evidence supported finding that ex-boyfriend willfully violated asset standstill order, issued following ex-girlfriend's award of $2,360,000 in her invasion of privacy claim against ex-boyfriend, for purposes of civil contempt determination; after ex-boyfriend's bank account had become frozen, he and his wife opened new bank account solely in his wife's name for express purpose of placing entirety of his wages outside reach of ex-girlfriend, as judgment creditor, and wife provided him with

full access to account, including bank card with her name on it and password information to access account.

**[13]   Contempt 🔑 Disobedience to Mandate, Order, or Judgment**

Extraordinary circumstances existed as to warrant trial court's use of its contempt power for ex-boyfriend's willful violation of asset standstill order, issued following ex-girlfriend's award of $2,360,000 in her invasion of privacy claim against ex-boyfriend; ex-boyfriend went to great lengths to deprive ex-girlfriend of ability to use statutory collection procedures, as, after his bank account had been frozen, he voluntarily opened bank account solely in his wife's name and placed entirety of his wages into wife's account.

**[14]   Contempt 🔑 Ability to obey**

Ex-boyfriend failed to prove financial incapacity or inability to pay trial court's compensatory fine of $2.2 million, payable at $25,000 per month, following finding ex-boyfriend in contempt of asset standstill order in connection with ex-girlfriend's invasion of privacy claim against ex-boyfriend, in which she had been awarded $2,360,000; ex-boyfriend, employed as heart surgeon, testified he earned gross annual income of $1.2 million, which resulted in net income after taxes of almost $60,000 per month, he had two retirement accounts, valued at $802,888.19 and $464,910.48, and, with respect to liabilities, he had monthly mortgage payment of $7,500 and monthly payments of $14,000 for divorce-related obligations, but no other long-term debt.

**[15]   Contempt 🔑 Review**

The appellate court reviews the propriety of the fines imposed for civil contempt pursuant to an abuse of discretion standard.

**[16]   Contempt 🔑 Review**

The appellate court reviews the trial court's factual findings in the context of a motion for contempt to determine whether they are clearly erroneous.

**[17]   Contempt 🔑 Indemnity to Party Injured**

A trial court possesses inherent authority to make a party whole for harm caused by a violation of a court order, even when the trial court does not find the offending party in contempt.

**[18]   Motions 🔑 Enforcement of orders**

A trial court has the authority to enforce its own orders; this authority arises from the common law and is inherent in the court's function as a tribunal with the power to decide disputes.

1 Cases that cite this headnote

**[19]   Contempt 🔑 Indemnity to Party Injured**

In a contempt proceeding, a trial court has broad discretion to make whole a party who has suffered as a result of another party's failure to comply with a court order.

**[20]   Contempt 🔑 Indemnity to Party Injured**

It was within trial court's discretion to awarding compensatory fine against ex-boyfriend for his in civil contempt of asset standstill order in connection with ex-girlfriend's invasion of privacy claim against ex-boyfriend, in which she had been awarded $2,360,000; ex-boyfriend, by opening bank account solely in wife's name in which he deposited entirety of his wages, deliberately attempted to thwart ex-girlfriend's ability to utilize statutory collection procedures, such as remedy of attachment, and compensatory fine was intended to offset, rather than augment, ex-girlfriend's recovery in underlying action. Conn. Gen. Stat. Ann. § 52-279 et seq.

**[21]   Contempt 🔑 Amount of fine**

Pursuant to a finding of contempt, compensatory fines must be narrowly circumscribed, and must be confined to the actual losses sustained by a

contemnee as a result of noncompliance with a court order.

**[22]**   **Contempt** 🔑 Indemnity to Party Injured

Judicial sanctions in civil contempt proceedings may, in a proper case, be employed to compensate the complainant for losses sustained; where compensation is intended, a fine is imposed, payable to the complainant.

**[23]**   **Contempt** 🔑 Amount of fine

A fine imposed pursuant to civil contempt proceedings intending to compensate complainant must, of course, be based upon evidence of the complainant's actual loss.

**[24]**   **Contempt** 🔑 Civil contempt

Civil contempt proceedings are not punitive, i.e., they are not imposed for the purpose of vindicating the court's authority, but are purely remedial.

**[25]**   **Contempt** 🔑 Indemnity to Party Injured

The court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender.

**[26]**   **Contempt** 🔑 Amount of fine

A compensatory fine issued in a proceeding for civil contempt, imposed as compensation for the special damages the injured party may have sustained by reason of the conduct of the offender, must necessarily be limited to the actual damages suffered by the injured party as a result of the violation.

**[27]**   **Contempt** 🔑 Amount of fine

The court must furnish an adequate factual basis to substantiate its actual loss determination for a compensatory fine imposed as a civil contempt sanction.

1 Cases that cite this headnote

**[28]**   **Creditors' Remedies** 🔑 Writ or Warrant of Attachment

The writ of attachment is an instrument intended to secure the assets of a judgment debtor.

**[29]**   **Creditors' Remedies** 🔑 Operation and Effect of Attachment

**Creditors' Remedies** 🔑 Lien and Priority

A properly served writ of attachment does not, in and of itself, establish a judgment creditor's entitlement to liquidate or possess the asset in question, but rather enables a creditor to gain priority over any subsequent claim to the attached property, and impairs the judgment debtor's ability to dispose of the asset.

**[30]**   **Creditors' Remedies** 🔑 Operation and Effect of Attachment

A writ of attachment has no effect but to take the asset in question into the custody of the law, to secure it against the alienation of the debtor, and the attachment of other creditors, and to hold it to be levied upon by an execution.

**[31]**   **Contempt** 🔑 Findings

Trial court lacked proper factual basis to support $2.2 million compensatory fine for ex-boyfriend's civil contempt of asset standstill order in connection with ex-girlfriend's invasion of privacy claim against ex-boyfriend, in which she had been awarded $2,360,000, where there were no findings as to ex-girlfriend's actual loss sustained, such as amount of attorney's fees she had expended in pursuing motion.

**[32]**   **Appeal and Error** 🔑 Authority to find facts

The appellate court, as an appellate tribunal, cannot find facts.

1 Cases that cite this headnote

[33]  **Contempt**   Determination and disposition of cause

Remand was warranted for hearing on damages to determine precise measure of loss that occurred as result of ex-boyfriend's contemptuous conduct in violation of asset standstill order in connection with ex-girlfriend's invasion of privacy claim against ex-boyfriend, in which she had been awarded $2,360,000, where trial court had lacked proper factual basis to support $2.2 million compensatory fine.

**Attorneys and Law Firms**

**\*\*722** Jeffrey J. Mirman, with whom were David A. DeBassio and, on the brief, Thomas J. Farrell, Hartford, for the appellant (defendant).

Irve J. Goldman, Bridgeport, with whom, on the brief, was Timothy G. Ronan, Stamford, for the appellee (plaintiff).

Lavine, Prescott and Elgo, Js.

**Opinion**

ELGO, J.

**\*864** The defendant, William V. Martinez, Jr.,[1] appeals from the judgment of the trial court holding **\*865** him in contempt for violating the terms of an asset standstill order. On appeal, the defendant claims that the court improperly (1) found him in contempt because that order lacked sufficient clarity and was ambiguous, (2) failed to consider the defendant's ability to pay in imposing a compensatory fine, and (3) abused its discretion in imposing that fine. We affirm in part and reverse in part the judgment of the trial court.

In 2010, the plaintiff, D'Anna Welsh, commenced a civil action (underlying action) against the defendant, in which she alleged tortious invasion of privacy, negligence per se, intentional infliction of emotional distress, and negligent misrepresentation. At trial, the jury was presented

with "undisputed evidence" that the defendant "conducted extensive covert surveillance of the plaintiff over the course of several years. That surveillance included intimate video transmissions from her bedroom and shower, daily reports as to every notation made on her computer, and GPS monitoring of her vehicle. The jury also had before it evidence that although the defendant swore under oath before the [Superior Court] at [an] accelerated rehabilitation hearing ... that the plaintiff 'had **\*\*723** nothing to worry about' and that no further surveillance equipment remained in the plaintiff's home, the transmissions from her bedroom thereafter continued and the defendant continued to receive daily e-mail reports from the spyware on the plaintiff's computer. The jury also was presented with evidence that despite her request for the defendant to leave her alone, he continued to appear unannounced and uninvited at her home. His behavior terrified the plaintiff, particularly when he informed her that 'I can hear you from outside your house.' In addition, the defendant's angry and violent conduct left the plaintiff scared for her life."[2]  **\*866** Welsh v. Martinez, 157 Conn. App. 223, 241, 114 A.3d 1231, cert. denied, 317 Conn. 922, 118 A.3d 63 (2015). The jury thereafter returned a verdict in favor of the plaintiff on all counts and awarded her $2 million in damages, the propriety of which this court affirmed on appeal. See id., at 240–46, 114 A.3d 1231.

After the jury returned a verdict in her favor, the plaintiff filed a motion with the trial court seeking punitive damages in the amount of her attorney's fees. The trial court, *Robaina, J.*, granted that motion over the defendant's objection and awarded "the sum of $360,000 as punitive damages in favor of the plaintiff."[3]  As a result, the plaintiff had an outstanding judgment against the defendant in the amount of $2,360,000 as of December, 2012.[4]

[1]  On the same day that the jury delivered its verdict, the plaintiff filed two pleadings relevant to this appeal. The first was an application for a prejudgment remedy.[5]  In the second, which was titled "Plaintiff's Motion to Prevent Defendant's Fraudulent Transfer of Property," the plaintiff alleged that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property in violation of [the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq.]."

On July 9, 2012, the court, *Graham, J.*, held a hearing on the latter motion. At its conclusion, the court entered an order that stated: "The [defendant] is enjoined from **\*867** voluntarily transferring or encumbering any assets except business assets

in the ordinary course of business and personal assets for ordinary living expenses, including court-ordered alimony and child support" (asset standstill order).[6]

Weeks later, on July 31, 2012, Judge Robaina granted the plaintiff's application for a prejudgment remedy. In so doing, the court ordered: "[The] plaintiff is allowed to attach up to $2 million of the defendant's property and [the] defendant is to provide a disclosure of assets by **724 August 10, 2012. No wage garnishment to be sought at this time." On June 24, 2013, in response to a motion by the plaintiff, the court entered an additional order requiring the periodic disclosure of assets by the defendant (asset disclosure order).[7]

On May 2, 2017, the plaintiff filed a postjudgment motion for contempt and an accompanying memorandum of law. In that motion, the plaintiff alleged that the defendant voluntarily had transferred more than $2 million to Cristina Martinez (Cristina) "by depositing his monies directly into her bank account for no valid purpose but for the purpose of defeating [the] asset standstill order." The plaintiff also alleged that the *868 defendant had "concealed and refused to disclose his personal property, financial bank and trading accounts, and debts due and owing to him" in violation of the asset disclosure order. The defendant filed an objection to the plaintiff's motion, to which the plaintiff filed a reply.

The court, *Moll, J.*, held an evidentiary hearing on the plaintiff's motion for contempt on August 2, 2017. The plaintiff called three witnesses: David Baker, the vice president of corporate security at Farmington Bank; Jamie Cook, the custodian of records at People's United Bank; and the defendant.[8] At that hearing, the court received undisputed documentary and testimonial evidence indicating that, at the time that the verdict was rendered in the underlying action in 2012, the defendant was the sole holder of an account with Farmington Bank, into which he regularly deposited his wages. When that account became frozen in October, 2012, as a result of collection actions undertaken by the plaintiff, the defendant began depositing his wages in their entirety into an account with People's United Bank held solely by his then-wife, Cristina.[9] By his own admission, the defendant made those deposits in a deliberate attempt to avoid the freezing of those funds. The court found, and the defendant does not dispute, that he deposited $2,220,400.67 into Cristina's account between October, 2012, and March, 2016.

In his testimony, the defendant confirmed that, at all relevant times, he was employed as a heart surgeon. His gross annual income at the time of the contempt hearing was $1.2 million; after taxes, the defendant *869 earned approximately $700,000. With respect to his liabilities, the defendant testified that he made monthly mortgage payments of $7500 and monthly payments of $14,000 for his "divorce-related obligations." Beyond that, the defendant acknowledged that he had no other long-term debt. The defendant further testified that, after depositing his wages into **725 Cristina's account, those funds later were used to pay ordinary living expenses, including court-ordered alimony and child support.[10]

In its memorandum of decision, the court concluded that the defendant's failure to disclose certain assets—namely, a retirement account, a $50,000 promissory note, three motor vehicles and a gun collection—did not constitute a wilful violation of the asset disclosure order. At the same time, the court found that the defendant's conduct in "depositing the entirety of his wages into Cristina's People's United Bank account for the period October 30, 2012 through March 24, 2016, constitutes a series of wilful violations of the asset standstill order. Because the *entirety* of his income was deposited to an account held in the name of Cristina alone, he is deemed to have 'voluntarily transferr[ed] or encumber[ed]' his income (i.e., a personal asset) beyond what was necessary 'for ordinary living expenses, including court-ordered alimony and child support.' [The defendant] engaged in such conduct knowingly, with full knowledge of the asset standstill order, and for the *870 express purpose of placing the entirety of such funds outside the reach of the plaintiff (i.e., with the intention of depriving the plaintiff of significant statutory postjudgment procedures authorized by chapter 906 of the General Statutes). The court therefore finds [the defendant] in civil contempt." (Emphasis in original.) The court thus imposed a "compensatory fine" of $2.2 million "payable directly to [the plaintiff] in an amount of $25,000 per month, until such fine is paid in full," which amount the court found represented "the plaintiff's proven, actual losses as a result of [the defendant's] wilful violations of the asset standstill order." From that judgment, the defendant appealed to this court.

The defendant subsequently filed a motion to stay enforcement of the $2.2 million compensatory fine pending resolution of the present appeal. In denying that request, the court clarified that the compensatory fine was not intended to supplement the $2,360,000 award that the plaintiff had

received in the underlying action. Rather, the court explained that "[a]ny payment [the defendant] makes to the plaintiff in compliance with the contempt order serves to offset the amount of the judgment due."

I

The defendant contends that the court abused its discretion in holding him in contempt because the asset standstill order lacked sufficient clarity and was ambiguous. We disagree.

[2] [3] Before addressing the merits of the defendant's claim, we set forth certain general principles that govern our review. "[O]ur analysis of a [civil] judgment of contempt consists of two levels of inquiry. First, we must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt.... This is a legal **726 inquiry subject to de novo review. *871 ... Second, if we conclude that the underlying court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding." (Citations omitted.) *In re Leah S.*, 284 Conn. 685, 693–94, 935 A.2d 1021 (2007).

[4] [5] [6] "As a general rule, [orders and] judgments are to be construed in the same fashion as other written instruments.... The determinative factor is the intention of the court as gathered from all parts of the [order or] judgment.... The interpretation of an [order or] judgment may involve the circumstances surrounding [its] making .... Effect must be given to that which is clearly implied as well as to that which is expressed." (Internal quotation marks omitted.) *State* v. *Denya*, 294 Conn. 516, 529, 986 A.2d 260 (2010). Furthermore, it is a fundamental tenet of construction that the question of ambiguity is resolved by considering the language in question as applied to the particular facts of the case. See, e.g., *Corsair Special Situations Fund, L.P.* v. *Engineered Framing Systems, Inc.*, 327 Conn. 467, 473, 174 A.3d 791 (2018) (concluding that statute in question "is ambiguous as applied to the facts of the present case"); *State* v. *Crespo*, 317 Conn. 1, 10 n.10, 115 A.3d 447 (2015) ("[a] statute may be clear and unambiguous as applied in one context but not in another"); *Lexington Ins. Co.* v. *Lexington Healthcare*

*Group, Inc.*, 311 Conn. 29, 42, 84 A.3d 1167 (2014) (language in contract must be construed in circumstances of particular case and cannot be found ambiguous in abstract).

With those principles in mind, we begin by noting the context in which the asset standstill order arose. Weeks prior to its issuance, a jury returned a $2 million *872 verdict against the defendant. Immediately thereafter, the plaintiff filed a "Motion to Prevent the Defendant's Fraudulent Transfer of Property," in which she averred in relevant part that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property ...." Following a hearing, the court issued the asset standstill order, stating in relevant part that the defendant "is enjoined from voluntarily transferring or encumbering any assets except ... personal assets for ordinary living expenses, including court-ordered alimony and child support."

The plaintiff concedes that the defendant initially complied therewith, as his wages were deposited into his Farmington Bank account in the months subsequent to the issuance of the asset standstill order. [11] When that bank account was frozen in October, 2012, the defendant began depositing *all* of his wages into the People's United Bank account held solely by Cristina in an effort to shield them from a judgment creditor. [12] That undisputed fact **727 lies at the heart of the court's decision in the present case.

In its memorandum of decision, the court acknowledged that the asset standstill order permitted the defendant to utilize his personal assets to make payments on ordinary living expenses and to satisfy family court judgments. The court nevertheless held that the *873 plain language of that order prohibited the defendant from depositing the entirety of his income to Cristina's bank account over the course of several years. We agree.

[7] [8] As our Supreme Court has explained, "[c]ivil contempt is committed when a person violates an order of court which requires that person in *specific and definite language* to do or refrain from doing an act or series of acts.... One cannot be placed in contempt for failure to read the court's mind.... [A] person must not be found in contempt of a court order when ambiguity either renders compliance with the order impossible, because it is not clear enough to put a reasonable person on notice of what is required for compliance, or makes the order susceptible to a court's arbitrary interpretation of whether a party is in compliance with the order." (Citations omitted; emphasis in original;

internal quotation marks omitted.) *In re Leah S.,* supra, 284 Conn. at 695, 935 A.2d 1021.

[9] On appeal, the defendant argues that the asset standstill order "may fairly be read to mean that [he] was permitted to transfer or encumber personal assets for ordinary living expenses and court-ordered alimony and support payments." We do not quarrel with that contention. To the extent that the defendant made any voluntary transfers of his personal assets to pay such expenses, including ones made from funds contained in his Farmington Bank account in 2012, those transfers certainly complied with the terms of the asset standstill order. This case, however, is not about transfers of the defendant's personal assets to pay qualifying expenses. Rather, this case is about the transfer [13] of the defendant's wages (1) in their entirety, (2) into the bank **874** account of a third party, (3) subsequent to the freezing of the defendant's own bank account into which his wages previously were deposited, (4) for the purpose of shielding those assets from the reach of a judgment creditor. We reiterate that ambiguity is determined by considering the language in question as applied to the particular facts of the case. Guided by that precept, we agree with the trial court that the voluntary transfer of the defendant's wages in their entirety into Cristina's account contravened the plain intent of the asset standstill order, irrespective of how those funds later were dispersed.

[10] [11] Ambiguity arises if the language in question, when read in context, is susceptible to multiple reasonable interpretations. See, e.g., *Francis* v. *Fonfara,* 303 Conn. 292, 300, 33 A.3d 185 (2012). In the context of the facts of this case, we **728** conclude that the defendant's interpretation of the asset standstill order is not a reasonable one. The asset standstill order provided sufficient notice to a reasonable person that the wholesale transfer of wages to the bank account of a third party was not permitted. We therefore reject the defendant's claim that the asset standstill order, as applied to the facts of this case, lacked sufficient clarity or was ambiguous.

[12] We further conclude that the court's determination that the defendant wilfully violated the asset standstill order is supported by the evidence in the record before us. The defendant testified that his Farmington Bank account became frozen in October, 2012, at which time the defendant and Cristina responded by opening a People's United Bank account solely in Cristina's name. **875** The court found, and the evidence reflects, that her account was opened for the express purpose of placing the entirety of the defendant's

wages outside the reach of a judgment creditor. By so doing, the court found that the defendant "engaged in a gross exercise of self-help, which the law disallows, and wilfully disobeyed the asset standstill order by depositing the entirety of his wages ... into Cristina's bank account, outside the reach of the plaintiff." The court thus concluded that "[t]o exonerate [the defendant's] wages-related conduct would be an undue inducement to litigants' exercise of self-help." (Internal quotation marks omitted.) We concur with that assessment.

[13] In rendering a judgment of contempt, the court recognized that contempt is a drastic measure, but emphasized that "this case, which does not involve the collection of a 'routine debt,' falls well outside the parameters of 'normal circumstances,' where the defendant has gone to great lengths to deprive the plaintiff of the ability to use statutory collection procedures. The court concludes that extraordinary circumstances warrant the court's use of the contempt power in the present case." We agree and, therefore, conclude that the court did not abuse its discretion in holding the defendant in contempt.

II

[14] The defendant claims that the court failed to consider the defendant's ability to pay in imposing a compensatory fine. We do not agree.

In *Ahmadi* v. *Ahmadi,* 294 Conn. 384, 397, 985 A.2d 319 (2009), our Supreme Court addressed a similar claim, as the defendant in that case argued that "the trial court's contempt order was improper because the court failed to elicit evidence of the defendant's financial ability before crafting a payment order." In response, the court clarified that it was the defendant **876** who bore the burden "to prove any financial incapacity." Id., at 397, 985 A.2d 319. The court then articulated the standard applicable to appellate review of such claims, stating: "Whether the defendant established his inability to pay the order by credible evidence is a question of fact. Questions of fact are subject to the clearly erroneous standard of review.... A finding of fact is clearly erroneous when there is no evidence in the record to support it ... or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.... Because it is the trial court's function to weigh the evidence ... we give great

deference to its findings." (Internal quotation marks omitted.) *Id.*, at 397–98, 985 A.2d 319.

After finding the defendant in contempt of the asset standstill order, the court in the present case imposed a compensatory fine of $2.2 million "payable directly to [the plaintiff] in an amount of $25,000 per **729 month, until such fine is paid in full." On appeal, the defendant submits that "[t]here is no mention in the trial court's memorandum of decision that suggests, let alone finds, that [the defendant] has an ability to pay the contempt fine." He is mistaken. On page sixteen of its memorandum of decision, the court plainly states: "The court finds that [the defendant] has sufficient income and other assets that render him financially able to pay the monthly amount ordered herein."

That finding is substantiated by the evidence in the record before us. At the contempt hearing, the defendant testified that he continued to earn a gross annual income of $1.2 million from St. Francis Hospital, which resulted in a net income after taxes in excess of $700,000, or almost $60,000 per month. [14] Also admitted **877 into evidence as full exhibits were statements from certain individual retirement accounts held by the defendant. A statement from an account with Charles Schwab & Co., Inc., specifies an "account value" of $802,888.19 as of May 31, 2017. A statement from an account with American Funds, administered by Capital Group, specifies an "[e]nding value" of $464,910.48 as of June 30, 2017. Furthermore, with respect to his liabilities, the defendant testified that he made monthly mortgage payments of $7500 and monthly payments of $14,000 for his "divorce-related obligations." Beyond those obligations, the defendant testified that he had no other long-term debt.

In light of the foregoing, the court reasonably could conclude that the defendant had not proven a financial incapacity to comply with the court's fine of $25,000 per month. The court's finding that the defendant possessed "sufficient income and other assets" to pay that fine is supported by evidence in the record and, therefore, is not clearly erroneous.

III

The defendant also claims that the court abused its discretion in imposing the $2.2 million compensatory fine. Although we agree with the court's conclusion that the plaintiff was harmed by the defendant's contemptuous conduct, we disagree with its

measure of the resulting damages. A new hearing on damages, therefore, is warranted in the present case.

[15] [16] As this court recently observed, "[w]e review the propriety of the fines imposed [for civil contempt] pursuant to an abuse of discretion standard." *Medeiros* v. *Medeiros*, 175 Conn. App. 174, 202, 167 A.3d 967 (2017). With respect to subordinate findings of fact, "we review the court's factual findings in the context of a motion for contempt to determine whether they are clearly erroneous.... A factual finding is clearly erroneous *878 when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, 187 Conn. App. 604, 653, 203 A.3d 645, cert. denied, 331 Conn. 907, 202 A.3d 1022 (2019).

The following additional facts are relevant to this claim. In its memorandum of decision, the court found that the defendant wilfully deposited a total of $2,220,400.67 into Cristina's bank account in contravention of the asset standstill order **730 and with the intent to deprive the plaintiff of statutory collection procedures. As the court found, "[b]y directing the deposit of his wages [into Cristina's bank account], [the defendant] made it impossible for the plaintiff to attach" those assets. On that basis, the court held the defendant in contempt and imposed a compensatory fine of $2.2 million. In so doing, the court found that "[t]he amount of the fine represents the plaintiff's proven, actual losses as a result of [the defendant's] wilful violations of the asset standstill order." The court made no other factual findings with respect to the plaintiff's actual pecuniary losses.

In response, the defendant filed a motion to reargue, in which he alleged that the plaintiff had failed to present "evidence of what particular damages she sustained as a result" of his noncompliance with the asset standstill order. The defendant further alleged that the court "without explanation, apparently used as a basis for the amount of the fine of contempt the total amount deposited into the subject account. This amount is not the proper measure of damages to be used in an order of contempt. Rather, the amount must be specifically related to the damages caused by the purported contempt of the asset standstill order." By order dated *879 November 30, 2017, the court denied that motion, stating: "The [defendant] has failed to demonstrate that the court overlooked a controlling decision or legal principle, that the court misapprehended the facts, that the court's decision contains inconsistencies,

and/or that the court failed to address a legal claim raised previously."

After commencing the present appeal, the defendant filed a motion for articulation with the trial court, in which he sought, inter alia, an articulation of the factual basis of the court's finding that the compensatory fine "represents the plaintiff's proven, actual losses as a result of [the defendant's] wilful violations of the asset standstill order." In denying that motion, the court stated that it had "re-reviewed the memorandum and order. Based on that review, the court concludes that the requested articulations are not necessary for the proper presentation of the issues." The defendant then filed a motion for review with this court, in which he requested appellate review of the court's denial of his motion for articulation. In its March 21, 2018 order, this court granted review, but denied the relief requested therein.

 [17]   [18]   [19]  Our analysis begins with the well established principle that "a trial court possesses inherent authority to make a party whole for harm caused by a violation of a court order, even when the trial court does not find the offending party in contempt." *O'Brien v. O'Brien*, 326 Conn. 81, 96, 161 A.3d 1236 (2017). As this court recently observed, "it has long been settled that a trial court has the authority to enforce its own orders. This authority arises from the common law and is inherent in the court's function as a tribunal with the power to decide disputes.... [I]n a contempt proceeding ... a trial court has broad discretion to make whole a party who has suffered as a result of another party's failure to comply with a court order." (Citation omitted; internal **\*880** quotation marks omitted.) *Nappo v. Nappo*, 188 Conn. App. 574, 596, 205 A.3d 723 (2019).

 [20]  A close reading of its memorandum of decision indicates that the court endeavored to do precisely that. The contemptuous conduct in this case involves a deliberate attempt on the part of the defendant to thwart the plaintiff's ability to utilize statutory collection procedures by depositing the entirety of his wages into the account of a third party in contravention **\*\*731** of the asset standstill order over the course of several years. In addition, the compensatory fine that the court imposed was intended to offset, rather than augment, the plaintiff's recovery in the underlying action, as the court made clear in its ruling on the defendant's motion for stay. The court, in short, sought to make the plaintiff whole in the present case. Its decision to do so was both a proper exercise of the court's discretion and understandable given the facts of this case.

 [21]   [22]   [23]   [24]   [25]   [26]   [27]  We nevertheless disagree with the measure of damages set forth in the court's memorandum of decision. Under our law, compensatory fines must be narrowly circumscribed, and must be "confined" to the actual losses sustained by a contemnee as a result of noncompliance with a court order. *DeMartino v. Monroe Little League, Inc.*, 192 Conn. 271, 279–80, 471 A.2d 638 (1984). As our Supreme Court explained, "[j]udicial sanctions in civil contempt proceedings may, in a proper case, be employed ... to compensate the complainant for losses sustained.... Where compensation is intended, a fine is imposed, payable to the complainant. *Such fine must of course be based upon evidence of [the] complainant's actual loss* .... Civil contempt proceedings are not punitive—i.e., they are not imposed for the purpose of vindicating the court's authority—but are purely remedial.... [I]t is well settled ... that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to  **\*881**  an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender.... [S]uch a compensatory fine *must necessarily be limited to the actual damages suffered by the injured party as a result of the violation* ...." (Citations omitted; emphasis altered; internal quotation marks omitted.) *Id., at 278–79, 471 A.2d 638.* Moreover, the court must furnish an adequate factual basis to substantiate its actual loss determination. See *Medeiros v. Medeiros, supra, 175 Conn. App. at 203–204, 167 A.3d 967; DPF Financial Holdings, LLC v. Lyons, 129 Conn. App. 380, 387, 21 A.3d 834 (2011).*

The facts of this case plainly indicate, and the court so found, that the principal loss sustained by the plaintiff was the inability to employ statutory collection procedures against the defendant, and the remedy of attachment in particular. [15] See General Statutes § 52-279 et seq. Nonetheless, the ability to attach an asset is both conceptually and procedurally distinct from the ability to execute on an attachment to satisfy an outstanding judgment.

 [28]  The writ of attachment is an instrument intended to secure the assets of a judgment debtor. See *Bernhard-Thomas Building Systems, LLC v. Dunican*, 286 Conn. 548, 557, 944 A.2d 329 (2008) ("[t]he purpose of the prejudgment remedy of attachment is security for the satisfaction of the plaintiff's judgment" [internal quotation marks omitted] ); *Rhode Island Hospital Trust National Bank v. Trust*, 25 Conn. App. 28, 40, 592 A.2d 417 (*Foti, J.,* dissenting) ("remedy

of attachment provides necessary security for the creditor by protecting it from the uncertainties of future events"), cert. granted, 220 Conn. 904, 593 A.2d 970 (1991) (appeal **882** withdrawn July 10, 1992); *Cerna* v. *Swiss Bank Corp.*, 503 So. 2d 1297, 1298 (Fla. App.) ("a writ of attachment ... serves as a lien upon property which may **732** be the subject of execution upon a later-obtained judgment"), review denied, 513 So. 2d 1060 (Fla. 1987); *Northwestern National Ins. Co.* v. *William G. Wetherall, Inc.*, 267 Md. 378, 384, 298 A.2d 1 (1972) ("[a]n attachment on a judgment is a tool by which a judgment creditor can reach the assets of a judgment debtor in the hands of a third party").

[29]  [30]  At the same time, a properly served writ of attachment does not, in and of itself, establish a judgment creditor's entitlement to liquidate or possess the asset in question, but rather "enables a creditor to gain priority over any subsequent claim to the attached property," and impairs the judgment debtor's ability to dispose of the asset. 📗 *Mac's Car City, Inc.* v. *DiLoreto*, 238 Conn. 172, 179–80, 679 A.2d 340 (1996). As our Supreme Court explained long ago, an attachment "has no effect but to take the [asset in question] into the custody of the law, to secure it against the alienation of the debtor, and the attachment of other creditors, and to hold it to be levied upon by an execution ...." *Lacey* v. *Tomlinson*, 5 Day 77, 80 (1811); accord *Camp* v. *Bates*, 11 Conn. 50, 54 (1835) *Camp* v. *Bates*, 11 Conn. 50, 54 (1835) (when asset is attached "the hand of the law is upon it"). Furthermore, as with any prejudgment remedy, a defendant whose assets are the subject of an attachment is entitled to a hearing, at which the court must take into account "any defenses, counterclaims or set-offs" asserted by the defendant. See General Statutes § 52-278d; *TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 141, 943 A.2d 406 (2008) ("it is well settled that, in determining whether to grant a prejudgment remedy, the trial court must evaluate both parties' evidence as well as any defenses, counterclaims and setoffs").

**883** We agree with the plaintiff that, had the defendant deposited his wages into an account like the one he maintained with Farmington Bank, she very likely would have been able to avail herself of the collection procedures codified in our General Statutes. For that reason, the court properly found that the plaintiff was deprived of the ability to utilize statutory collection procedures as a result of the defendant's contemptuous conduct. The court found, and the record substantiates, that the plaintiff lost the ability to attach $2,220,400.67 in wages that the defendant deposited into Cristina's bank account.

The court nevertheless failed to furnish an adequate factual basis to support its determination that the plaintiff had proven $2.2 million in actual pecuniary losses as a result thereof. An attachment merely provides security for a judgment creditor; whether that judgment creditor ultimately may execute on the attachment, in whole or in part, to obtain satisfaction of an outstanding judgment is an altogether different question, and one that is dependent on a number of factors, including the extent to which the judgment has been satisfied and the existence of other attachments on the assets of the judgment debtor. [16] Furthermore, a judgment debtor **884** who **733** believes that a particular attachment constitutes an excessive levy may petition for relief from the court. [17] As a result, a judgment creditor's ability to execute on an attachment remains a possibility, not a certainty. We therefore fundamentally disagree with the plaintiff's contention that her actual losses are "equivalent to the total amount of deposits that were redirected by [the] defendant to [Cristina's] account" and rendered immune from attachment.

[31]  Apart from impairing the plaintiff's ability to attach such assets, the court made no findings that provide the requisite factual basis for its $2.2 million compensatory fine, such as the amount of attorney's fees expended by the plaintiff in pursuing the contempt motion. Absent such findings, the court could not ensure that its compensatory fine was confined to the actual loss sustained by the plaintiff, as required under Connecticut law. See 📗 *DeMartino* v. *Monroe Little League, Inc.*, supra, 192 Conn. at 279–80, 471 A.2d 638; *DPF Financial Holdings, LLC* v. *Lyons*, supra, 129 Conn. App. at 386–88, 21 A.3d 834.

[32]  It is axiomatic that this court, as an appellate tribunal, cannot find facts. See **885** *State* v. *Edwards*, 314 Conn. 465, 478, 102 A.3d 52 (2014). "[T]his appellate body does not engage in fact-finding. Connecticut's appellate courts cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts." (Internal quotation marks omitted.) 📗 *Hogan* v. *Lagosz*, 124 Conn. App. 602, 618, 6 A.3d 112 (2010), cert. denied, 299 Conn. 923, 11 A.3d 151 (2011). We therefore are not at liberty to resolve the question of precisely what actual pecuniary losses the plaintiff suffered as a result of the defendant's contemptuous conduct.

[33]  Because the court's finding that the plaintiff sustained an actual loss of $2.2 million lacks the necessary factual basis,

we conclude that the court abused its discretion in imposing a compensatory fine in that amount. The parties thus "are entitled to a hearing on damages to determine [the precise measure of the loss that] occurred as a result of the defendant's contemptuous conduct in violation of the court's order." *DPF Financial Holdings, LLC* v. *Lyons*, supra, 129 Conn. App. at 388, 21 A.3d 834. Accordingly, a remand to the trial court for a new hearing limited solely to the issue of damages is necessary.

**734** We are mindful of our Supreme Court's admonition that "a trial court in a contempt proceeding may do more than impose penalties on the offending party; it also may remedy any harm to others caused by a party's violation of a court order." *O'Brien* v. *O'Brien*, supra, 326 Conn. at 99, 161 A.3d 1236. In determining whether a compensatory fine is warranted, the trial court on remand must consider the question of actual pecuniary loss resulting from the defendant's contemptuous conduct, such as attorney's fees.

The court should also consider the impairment of the plaintiff's ability to utilize statutory collection procedures and fashion whatever relief that the court, in its discretion, deems appropriate under the facts of this case. Such relief may include the issuance **\*886** of an order requiring the defendant to return the $2,220,400.67 in deposited funds to an account that may be attached by the plaintiff.

The judgment is reversed only as to the order of damages and the case is remanded for a hearing on damages with respect to the court's judgment of contempt. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

**All Citations**

191 Conn.App. 862, 216 A.3d 718

---

## Footnotes

1   William V. Martinez, Jr., was the sole defendant in the underlying civil action commenced by the plaintiff in 2010. See *Welsh* v. *Martinez*, 157 Conn. App. 223, 114 A.3d 1231, cert. denied, 317 Conn. 922, 118 A.3d 63 (2015). The plaintiff subsequently commenced a fraudulent transfer action against Martinez's then-wife, Cristina Martinez (Cristina), and other family members in the fall of 2016, which later was consolidated with the underlying civil action by order of the court in 2017. Because the contempt motion at issue in this appeal pertains solely to William V. Martinez, Jr., for purposes of clarity, we refer to him as the defendant in this opinion.

2   For a more detailed account of the conduct that gave rise to this litigation, see *Welsh* v. *Martinez*, supra, 157 Conn. App. at 225–34, 114 A.3d 1231.

3   The defendant did not challenge the propriety of that supplemental award on appeal.

4   On April 23, 2013, the trial court granted the plaintiff's motion for postjudgment interest and ordered that "interest at the rate of 3.5 percent per annum is awarded as of December 25, 2012."

5   We note that "[d]espite the apparent contradiction in terms, a prejudgment remedy may be granted after the entry of judgment but before appellate disposition in order to protect assets to satisfy the judgment." *Tadros* v. *Tripodi*, 87 Conn. App. 321, 335 n.9, 866 A.2d 610 (2005); see also *Gagne* v. *Vaccaro*, 80 Conn. App. 436, 454, 835 A.2d 491 (2003) ("a prejudgment remedy is available to a party who has prevailed at the trial level and whose case is on appeal"), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004).

6   We refer to the court's July 9, 2012 order as the "asset standstill order" both for convenience and because that is the nomenclature employed by the parties and the trial court in this case.

7   The asset disclosure order required the defendant to provide quarterly asset disclosures to the plaintiff under penalty of false statement. In those disclosures, the defendant was obligated to identify: "(a) Any and all real property, personal property, title, rights, and thing of value whatsoever, in which [the defendant] has an interest from the period of July 9, 2012 through the date of the disclosure; (b) Any and all wages paid to [the defendant], including amounts, formulas, and their scheduled dates of disbursement, from the period of July

9, 2012 through the date of the disclosure; (c) The financial institution, location, account number, and monthly balances of all bank or trading accounts ever held by, in the name of, or for the benefit of [the defendant] from the period of July 9, 2012 through the date of the disclosure; and (d) Any and all debts due and owing to [the defendant] from the period of July 9, 2012 through the date of the disclosure."

8   The defendant did not call any witnesses during the contempt hearing.

9   At the contempt hearing, the defendant testified that although the account was in Cristina's name alone, she provided him with full access to the account, including an ATM card with her name on it and her password information to access the account online.

10   The evidence adduced at the contempt hearing includes statements from Cristina's account at People's United Bank. Although those statements provide specificity as to certain transactions, such as utility payments, they provide no explanation for numerous other transactions. For example, the November 27, 2014 statement includes a withdrawal of $6660 on October 28, 2014, for "Check 387," a withdrawal of $13,382 on October 31, 2014, for "Check 389," a withdrawal of $48,867.47 on November 3, 2014, for "Check 390," a withdrawal of $851.01 on November 6, 2014, for "Check 392," a withdrawal of $1550 on November 7, 2014, for "Check 393," a withdrawal of $1484.45 on November 18, 2014, for "Check 398," and a withdrawal of $2217.76 on November 18, 2014, for "Check 399."

11   The court found, and the parties do not dispute, that the defendant's wages constituted "personal assets" as that term is used in the asset standstill order. (Internal quotation marks omitted.)

12   The record before us includes a copy of a writ and attachment that the plaintiff served on the main office of People's United Bank for the purpose of attaching Cristina's bank account in connection with the present litigation. The record also includes a copy of the January 2, 2014 letter that Norma Jurnack, a legal service of process representative at People's United Bank, sent to the plaintiff's counsel, in which she stated: "This letter is in response to the Writ and Attachment ... served on People's United Bank .... We have researched our records and found that [the defendant] [does] not maintain accounts at [People's] United Bank."

13   In construing the asset standstill order, we accord the language contained therein its common meaning. See 📄 *Barnard* v. *Barnard*, 214 Conn. 99, 115, 570 A.2d 690 (1990). To "transfer" ordinarily means "to convey from one person, place, or situation to another." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 1328; see also Black's Law Dictionary (9th Ed. 2009) p.1636 (defining "transfer" as "[t]o convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control"). Application of that common meaning compels the conclusion that the defendant transferred personal assets when he deposited his wages into a third party's bank account in which he concededly had no legal interest.

14   A copy of the defendant's December 26, 2015 pay stub was admitted into evidence at the contempt hearing. That document reflects a net annual income of $707,522.83. The record also contains the defendant's July 3, 2017 affidavit, in which he averred in relevant part that he currently was "paid one hundred thousand ($100,000) dollars per month."

15   As the court found in its memorandum of decision, "[b]y directing the deposit of his wages [into Cristina's People's United Bank account], [the defendant] made it impossible for the plaintiff to attach" those assets.

16   The court's memorandum of decision contains no finding as to whether the plaintiff had attached any other assets of the defendant besides his Farmington Bank account. For example, the court made no finding as to whether the plaintiff had filed an attachment on the defendant's real property known as 92 Northgate in Avon, despite the fact that Judge Robaina, in granting the plaintiff's application for a prejudgment remedy on July 31, 2012, ordered that the plaintiff was "allowed to attach property of the defendant to the amount of $2 million including, but not limited to property located at 92 Northgate, Avon, Connecticut ...." The defendant's quarterly disclosures of assets were admitted into evidence as full exhibits at the contempt hearing. Exhibit 10 (Q) is his July, 2017 disclosure, in which the defendant acknowledged his 100 percent interest in the 92 Northgate property. That disclosure also included a copy of his separation agreement with Cristina, which was incorporated into the judgment of dissolution rendered by the Superior Court on May 5, 2017, and which

14A. 3d 2 40

provides in relevant part that the defendant "shall retain the marital home located at 92 Northgate, Avon, Connecticut, free and clear of any claim by [Cristina]...."

The court also made no factual findings as to whether the plaintiff had obtained any recovery on the underlying judgment in the five years that had passed since the jury rendered a verdict in her favor, or the specific amount thereof. In its memorandum of decision, the court found that Farmington Bank notified the plaintiff on October 22, 2012, that it "was holding $26,717.83" in response to the attachment filed by the plaintiff. The court nevertheless made no finding as to whether the plaintiff recovered those funds in the years between that attachment and the contempt hearing.

17  See, e.g., *Glanz v. Testa*, 200 Conn. 406, 411 n.3, 511 A.2d 341 (1986) ("[a] defendant who perceives that an attachment is excessive is free" to bring claim to court's attention); *E. J. Hansen Elevator, Inc. v. Stoll*, 167 Conn. 623, 629, 356 A.2d 893 (1975) (discussing case involving "an application for the reduction or dissolution of a claimed excessive attachment made in an action brought to the Superior Court"); *Hodgen v. Roy*, 102 Kan. 197, 169 P. 1143, 1144 (1918) ("[a] court has authority to protect a defendant ... by preventing an excessive levy" in attachment of property); 6 Am.Jur.2d 700, Attachment and Garnishment § 286 (2019) ("[a] debtor is entitled to relief from an excessive levy upon proper application to the court").

---

**End of Document**                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

NO.  X03 HHD CV10-6012959S  :  STATE OF CONNECTICUT

D'ANNA WELSH  :  SUPERIOR COURT

v.  :  COMPLEX LITIGATION DOCKET

WILLIAM A. MARTINEZ  :  JUDICIAL DISTRICT OF HARTFORD

:  FEBRUARY 19, 2020

**HARTFORD J.D.**

**FEB 19 2020**

**FILED**

## <u>Ruling on Remand from the Appellate Court</u>

This case comes back to the court on remand from the Appellate Court.  The court assumes

familiarity with the long history of the case.  In its August 20, 2019 decision, the Appellate Court

ruled that: 1) the court, *Moll, J.,* did not abuse its discretion in finding the defendant in civil

contempt and that the underlying asset standstill order did not lack sufficient clarity; 2) in imposing

a compensatory fine, the court did not fail to consider the defendant's ability to pay; and  3) the court

erred in imposing a compensatory fine of $2.2 million without providing a sufficient factual basis.

*Welsh v. Martinez,* 191 Conn. App. 862, 216 A.3d 718 (2019).  The Court remanded the case "for

a hearing on damages with respect to the court's judgment of contempt."  Id., 886.  More

specifically, the Court asked the trial court to consider the "actual pecuniary loss resulting from the

defendant's contemptuous conduct ...." Id., 885.

As requested, the court held a hearing on damages December 20, 2019 (remand hearing).

The plaintiff was represented by counsel.  The defendant filed a pro se appearance and represented

himself.  The plaintiff submitted a posthearing statement of claim on January 7, 2020 and then,

pursuant to court order, a refiled posthearing statement of claim with an affidavit from the office of

plaintiff's counsel on January 23, 2020.  (Entries # 316.00, 316.86, 317.00).  The court gave the

defendant until February 13, 2020 to respond.  (Entry # 316.86.)  The defendant failed to respond.

1

318.00

On the basis of the remand hearing, the exhibits introduced at the hearing, and the uncontested statement of claim and affidavit, the court makes the following findings.

1. The plaintiff's "actual pecuniary loss resulting from the defendant's contemptuous conduct"; *Welsh v. Martinez,* supra, 191 Conn. App. 885; focuses on her loss of ability to attach and execute on the money that the defendant, in violation of a court order, diverted from his Farmington Bank account. Id., 883-84. That amount, as found by Judge Moll, is $2,220,400.67. Id., 883. There is no evidence of any liens senior to that of the plaintiff that would have prevented the plaintiff from executing on this entire account. Id., 883. The plaintiff would naturally have sought to execute on this entire amount because it was less than the $2,360,000 civil tort judgment, which consisted of $2 million in compensatory damages awarded by the jury plus $360,000 awarded by the court, *Robaina, J.,* in punitive damages. Id., 866.

2. The plaintiff lost use of the $2,220,400.67 due to the defendant's diversion of it. The plaintiff is therefore entitled to interest on the amount diverted. The defendant's diversions took place between October 2012 and March, 2016. Id., 868. The court awarded postjudgment interest on the tort judgment at the rate of 3.5%. Id., 866 n.4. Using this same interest rate, and assuming (favorably to the defendant) that the defendant diverted all of the money on March 1, 2016, a total of 1451 days have elapsed through today's date. (www.timeanddate.com) The per diem interest on $2,220,400.67 is $212.92. (www.pafirsttimehomebuyer.net). Multiplying, the product is $308,946.92.

3. The plaintiff is entitled to recover her attorney's fees in connection with these contempt proceedings. *Welsh v. Martinez,* supra, 191 Conn. App. 884. The affidavit of plaintiff's attorney and attached exhibits establishes reasonable attorney's fees in the amount of $55,992.50. (Ex. 9.)

4. The defendant is entitled to credit on the amounts he has paid to satisfy the judgment. *Welsh v. Martinez,* supra, 191 Conn. App. 883.   To satisfy the underlying tort judgment, the defendant has paid or is entitled to credit for paying the plaintiff $22,618.36 from the Farmington Bank (Ex. 8); $14,712.67 from the sale of the defendant's interest in real property in Simsbury (Heller Aff., ¶ 3); and $500,000 in payments of the contempt fine (Entry #316.00, Addendum, pp. 2-3). See also *Welsh v. Martinez,* supra, 191 Conn. App. 883-84 n.16 (concerning funds available in the Farmington Bank.) These amounts total $537,331.03 (Entry #317.00, Affidavit of Gerald M. Heller (Heller Aff.), Ex. A, p. 2.).

5. The gross total of the plaintiff's loss (paragraphs 1-3, above) is $2,585,340.09.  Deducting the defendant's payments of $537,331.03 yields $2,048,009.06.

6. The court accordingly orders the defendant to pay a compensatory contempt fine of $2,048,009.06.  The court continues Judge Moll's order to pay the fine directly to the plaintiff in the amount of $25,000 per month until the defendant has fully paid the net actual loss. *Welsh v. Martinez,* supra, 191 Conn. App. 870.  Any payments that the defendant makes should be credited against the judgment of $2,360,000 plus postjudgment interest at the rate of 3.5%.

7. The Appellate Court suggested as a possible form of relief that the court enter an "order requiring the defendant to return the $2,220,400.67 in deposited funds to an account that may be attached by the plaintiff." Id., 886.  Such an order would not be effective here. The defendant testified at a hearing in this case in February, 2019 that he had no cash assets aside from a Pioneer Valley Credit Union account that he closed in late 2018 or early 2019.  (Ex. 4, pp. 40-41.) This testimony reveals that the People's United Bank account, to which the plaintiff diverted the monies in question, is also no longer open.  Thus, the diverted money cannot readily be transferred back

from one account to another.

8. In addition to the defendant's apparent lack of available cash, the defendant has lost his real estate due to a foreclosure by People's United Bank. (Ex. 5.)  It would appear that the defendant's only significant assets are retirement accounts that may total $1.5 million. (Entry # 293.00, p. 3.)  Given these facts, it will be up to the plaintiff to decide what remedy to employ to collect the compensatory fine if the defendant does not comply with paragraph 6 of this order.

It is so ordered.

*Schuman, J.*

Carl J. Schuman
Judge, Superior Court


Notice sent : 2/19/2020
— OCR
— William A. Mortinez, M.D.

4

# EXHIBIT E



Recording requested by:
Laura Fitzgerald
Coastal Security Title, Inc.
3670 N. Access Road
Englewood, FL 34224

File Number: 26742
Parcel ID: 412001177023

## Warranty Deed

THIS WARRANTY DEED dated March 2, 2020, by **Manasota Capital Corp. Inc, a Florida Corporation**, whose address is , (hereinafter referred to as "Grantor"), to Kelly Rousseau, whose address is 22 Weatherstone, Avon, CT 06001, (hereinafter referred to as "Grantee"):

(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

WITNESSETH: That the grantor, for and in consideration of the sum of $10.00 and other valuable consideration, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys, and confirms unto the grantee, all the certain land situated in Charlotte County, Florida to wit:

Lot 2, Block 3713, Port Charlotte Subdivision Section 63, a Subdivision according to the Plat thereof as recorded in Plat Book 5, Page 77, Public Records of Charlotte County, Florida.

Subject to easements, restrictions, reservations and limitations of record, if any.

TO HAVE AND TO HOLD the same in Fee Simple forever.

AND the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple, that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever, and that said land is free of all encumbrances, except taxes accruing subsequent to: December 31, 2019.

IN WITNESS WHEREOF, the said **Grantor**, has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Print Name: _Laura L Fitzgerald_        Daniel Hucul, PVST of Manasota Capital Corp. Inc

Print Name: _MARY S. BAXTER_

STATE OF FLORIDA
COUNTY OF CHARLOTTE

The foregoing instrument was acknowledged before me by means of ✓ physical presence or ___ online notarization, this 4th day of March 2020 by _____ .

Signature of Notary Public
Print, Type/Stamp Name of Notary

LAURA L FITZGERALD
Commission # GG 273952
Expires November 4, 2022
Bonded Thru Budget Notary Services

Personally Known:_____ OR Produced Identification:_____
Type of Identification
Produced:_____

**WARRANTY DEED**

# EXHIBIT F

Return To:
Coastal Security Title, Inc.
3670 N. Access Rd.
Englewood, FL 34224

After Recording Return To:
**BANK OF AMERICA, N.A.**
**4500 Amon Carter Blvd., Doc Proc**
**TX2-979-01-19**
**Ft. Worth, TX 76155**

This Document Prepared By:
**Lidia Bartel**
**BANK OF AMERICA, N.A.**
**4500 Amon Carter Blvd**
**Fort Worth, TX 76155**
**(866) 310-2894**

_____

[Space Above This Line For Recording Data]

# MORTGAGE

ROUSSEAU
Doc ID #: xxxxxxxxx521
MIN: 100015701000365217
MERS Phone: 1-888-679-6377
PIN: 412001177023
Escrow/Closing #: 26742

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **MARCH 3, 2020**, together with all Riders to this document.

**(B) "Borrower"** is **KELLY ROUSSEAU**. Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is **BANK OF AMERICA, N.A.**. Lender is a **National Association** organized and existing under the laws of **THE UNITED STATES**. Lender's address is **101 South Tryon Street, Charlotte, NC 28255.**

**(E) "Note"** means the promissory note signed by Borrower and dated **MARCH 3, 2020**. The Note states that Borrower owes Lender **One Hundred Eight Thousand Two Hundred And 00/100** Dollars (U.S. **$108,200.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **April 1, 2050**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3010 1/01
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)      Page 1 of 14      BANK OF AMERICA, N.A.



*1000365213616404000*



Doc ID #: xxxxxxxxx521

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☒ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **COUNTY** of **Charlotte**:

**Lot 2, Block 3713, Port Charlotte Subdivision Section 63, a Subdivision according**

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)      Page 2 of 14      BANK OF AMERICA, N.A.




*1000365213616404000*

Doc ID #: xxxxxxxxx521

**to the Plat thereof as recorded in Plat Book 5, Page 77, Public Records of Charlotte County, Florida.**

**Parcel ID #412001177023**
which currently has the address of 6231 **Lomax St, Englewood,** Florida 34224-8988 ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)           Page  3  of 14        BANK OF AMERICA, N.A.





*1000365213616404000*

Doc ID #: xxxxxxxxx521

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be




*1000365213616404000*

Doc ID #: xxxxxxxxx521

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                  **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)                             Page 5 of 14                      BANK OF AMERICA, N.A.





*1000365213616404000*

Doc ID #: xxxxxxxxx521

this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)                                        Page 6 of 14                          BANK OF AMERICA, N.A.





*1000365213616404000*

Doc ID #: xxxxxxxxx521

progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)                                    Page 7 of 14                                    BANK OF AMERICA, N.A.





*1000365213616404000*

Doc ID #: xxxxxxxxx521

requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)                    Page 8 of 14                   BANK OF AMERICA, N.A.

 

*1000365213616404000*

Doc ID #: xxxxxxxxx521

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)         Page 9 of 14         BANK OF AMERICA, N.A.





*1000365213616404000*

Doc ID #: **xxxxxxxxx521**

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT           **Form 3010 1/01**
Modified by **BANK OF AMERICA, N.A.**
**FLORIDA MORTGAGE (SIMTG.FL )**
317.36 (01/20)                       Page 10 of 14                 BANK OF AMERICA, N.A.




*1000365213616404000*

Doc ID #: xxxxxxxxx521

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT **Form 3010 1/01**
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)                                     Page 11 of 14                                     BANK OF AMERICA, N.A.





*1000365213616404000*

Doc ID #: xxxxxxxxx521

Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)                              Page 12 of 14                        BANK OF AMERICA, N.A.





*1000365213616404000*

Doc ID #: xxxxxxxxx521

Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

*Kelly Rousseau*

- BORROWER - KELLY ROUSSEAU

Borrower's Mailing Address: **22 WEATHERSTONE, AVON, CT 06001**

[Space Below This Line For Acknowledgment]

STATE OF __CT__

COUNTY OF __Hartford__

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this __March 3, 2020__, by __Kelly Rousseau__ , who is personally known to me or who has produced __Drivers License__ as identification.

*Flora Prekshi*

Notary Public

**My Commission Expires June 30, 2023**

My Commission Expires: _____

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Modified by BANK OF AMERICA, N.A.
FLORIDA MORTGAGE (SIMTG.FL )
317.36 (01/20)

Page 13 of 14

Form 3010 1/01

BANK OF AMERICA, N.A.

*1000365213616404000*

Lot 2, Block 3713, Port Charlotte Subdivision Section 63, a Subdivision according to the Plat thereof as recorded in Plat Book 5, Page 77, Public Records of Charlotte County, Florida.

# SECOND HOME RIDER

**ROUSSEAU**
Doc ID #: **xxxxxxxxx521**
Escrow/Closing #: **26742**

THIS SECOND HOME RIDER is made this **3rd** day of **March, 2020**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to **BANK OF AMERICA, N.A.** (the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at: **6231 Lomax St, Englewood, FL 34224-8988** [Property Address].

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower will occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property, including short-term rentals, and will not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property. Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**8. Borrowers Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.



- BORROWER - **KELLY ROUSSEAU**

**MULTISTATE SECOND HOME RIDER-** Single Family -**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3890 1/01 (rev. 4/19)**

SECOND HOME RIDER (SHRDR.US)
35.44 (07/19)                     Page 1 of 1                     BANK OF AMERICA, N.A.

*1000365213616404000*

# EXHIBIT G

ORDER   414999

DOCKET NO: HHDCV106012959S

WELSH, D'ANNA
   V.
MARTINEZ, WILLIAM

SUPERIOR COURT

JUDICIAL DISTRICT OF HARTFORD
   AT HARTFORD

8/14/2020

<u>ORDER</u>

ORDER REGARDING:
04/13/2020 321.00 MOTION FOR ORDER

Plaintiff's Counsel and Defendant Present.

The foregoing, having been heard by the Court, is hereby:

ORDER: GRANTED

The court heard plaintiff's counsel and the self-represented defendant, Dr. William Martinez, Jr., by virtual courtroom technology.

The court, Moll J., found the defendant in civil contempt on November 9, 2017. (Entry # 268.00.) The Appellate Court affirmed the contempt finding on August 20, 2019. Welsh v. Martinez, 191 Conn. App. 862, 216 A.2d 718 (2019). That ruling is the law of the case and thus the court will not entertain the defendant's arguments that the contempt finding was invalid.

The question instead is whether the court should revise the sanctions imposed for the contempt. Judge Moll had originally imposed a fine of $25,000 per month. Judge Moll warned that, if the defendant failed to pay, "the court will entertain a motion by the plaintiff for appropriate sanctions, including but not limited to incarceration." (Entry # 268.00, pp. 15-16.) In February, 2020, after the last hearing and upon remand from the Appellate Court, the court ordered the defendant to continue paying the monthly fine of $25,000 up to the amount of $2,048,009.06. These payments would then serve as a credit against the underlying judgment of $2,360,000.00 plus interest. (Entry #318.00.)

There is no dispute that the defendant has not made a monthly payment since August, 2019. The court had previously ruled that the defendant had the ability to pay and that the court could consider the defendant's retirement accounts in making that determination. (Entry # 293.00). After today's hearing, the court continues to believe that the defendant has the ability to pay. The exhibits and the testimony of the defendant establish that the defendant has approximately $1 million in retirement funds. Further, over the past nine months, the defendant has liquidated approximately $216,000 in additional retirement funds, thus revealing the defendant's willingness to pay any applicable taxes and penalties and use funds that are nominally reserved for retirement. (Ex. 2, p. 5.)

Accordingly, the court enters the following orders:
1. The defendant shall pay the plaintiff $25,000 by September 15, 2020 and by the fifteenth of each succeeding month.
2. If the defendant has failed to make the September 15, 2020 payment, he shall report to Superior Court, 95 Washington St., Hartford, CT at 10:00 a.m. on September 15, 2020. The court is aware of the public health-related restrictions on travel from Florida, where the defendant apparently now lives, but the defendant will have to comply with those restrictions and appear in court on September 15, 2020.
3. If the defendant fails to make the payment at that time, he shall be incarcerated or otherwise confined for civil contempt. Pursuant to Practice Book § 1-21A, the purpose of such incarceration or confinement shall be to coerce payment from and not to punish the defendant. The defendant shall be immediately

released upon making payment.

4. If the defendant fails to appear as ordered in paragraph 2, the court will issue a capias for his arrest.

5. If the defendant fails to make a timely payment in any subsequent month, the court will entertain a motion from the plaintiff seeking appropriate remedies.

Judicial Notice (JDNO) was sent regarding this order.

414999
_____

Judge: CARL J SCHUMAN

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

# EXHIBIT H

Return to:
Florida Title & Guarantee Agency
14050 NW 14th Street, Suite 110
Sunrise, FL 33323

This Instrument Prepared
under the supervision of:

Jeff Hall
Florida Title & Guarantee Agency
14050 NW 14th Street, Suite 110
Sunrise, FL 33323

Property Appraisers Parcel Identification (Folio) No.:
71915000687

Our File No.: 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

## WARRANTY DEED

This Warranty Deed made this _13th_ day of August, 2020  by Timo Petermichl and Mandy Petermichl, as husband and wife, whose mailing address is c/o Belinda Petermichl, Im Vogelsang 57, 71083 Herrenberg Germany, hereinafter called the grantor(s), to Kelly A. Rousseau, a married woman, whose post office address is 15919 Secoya Reserve Circle, Naples, FL 34110, hereinafter called the grantee:

> (Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

WITNESSETH: That the grantor(s), for and in consideration of the sum of $10.00 (ten) and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee all that certain land situate in Collier County, State of Florida, viz:

> Lot 29, SANDALWOOD, according to Plat thereof, as recorded in Plat Book 50, Page 55 through 58, of the Public Records of Collier County, Florida.

SUBJECT TO: covenants, conditions, restrictions, reservations, limitations, easements and agreements of record, if any; taxes and assessments for the year 2020 and subsequent years; and to all applicable zoning ordinances and/or restrictions and prohibitions imposed by governmental authorities, if any,

TOGETHER, with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD, the same in Fee Simple forever.

AND the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons.

IN WITNESS WHEREOF, the said grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

First Witness Signature

Michelle Allen
Printed Signature

Timo Petermichl

Mandy Petermichl

Second Witness Signature

Susan B. Platt
Printed Signature

State of Florida

County of Collier

The foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this _13th_ day of August, 2020 by Timo Petermichl and Mandy Petermichl, Husband and Wife, who has produced _DR LICENSE_ as identification or is personally known to me to be the persons therein.

Notary Public, State of Florida

Michelle Allen

My commission expires:
Seal

MICHELLE C. ALLEN
MY COMMISSION # GG 065905
EXPIRES: March 9, 2021
Bonded Thru Notary Public Underwriters

Deed (Warranty - Individual)

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

# EXHIBIT I

INSTR 5915167 OR 5808 PG 1542 RECORDED 8/28/2020 9:41 AM PAGES 2
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
DOC@.70 $4,340.00   REC $18.50
CONS $620,000.00

Case 2:22-cv-02661-SPC-NPM Document 1-12 Filed 04/05/22   Page 99 of 126 PageID 99

Return to:
Florida Title & Guarantee Agency
14050 NW 14th Street, Suite 110
Sunrise, FL 33323

This Instrument Prepared
under the supervision of:

Jeff Hall
Florida Title & Guarantee Agency
14050 NW 14th Street, Suite 110
Sunrise, FL 33323

Property Appraisers Parcel Identification (Folio) No.:
71915000687

Our File No.: 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

## WARRANTY DEED

This Warranty Deed made this 25th day of August, 2020  by Timo Petermichl and Mandy Petermichl, as husband and wife, whose mailing address is c/o Belinda Petermichl, Im Vogelsang 57, 71083 Herrenberg Germany, hereinafter called the grantor(s), to Kelly Rousseau and William Martinez, Jr., wife and husband, whose post office address is 15919 Secoya Reserve Circle, Naples, FL 34110, hereinafter called the grantee:

(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

WITNESSETH:  That the grantor(s), for and in consideration of the sum of $10.00 (ten) and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee all that certain land situate in Collier County, State of Florida, viz:

Lot 29, SANDALWOOD, according to Plat thereof, as recorded in Plat Book 50, Page 55 through 58, of the Public Records of Collier County, Florida.

SUBJECT TO:  covenants, conditions, restrictions, reservations, limitations, easements and agreements of record, if any; taxes and assessments for the year 2020 and subsequent years; and to all applicable zoning ordinances and/or restrictions and prohibitions imposed by governmental authorities, if any,

TOGETHER, with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD, the same in Fee Simple forever.

AND the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons.

IN WITNESS WHEREOF, the said grantor has signed and sealed these presents the day and year first above written.

Deed (Warranty - Individual)                                                                      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

Signed, sealed and delivered in the presence of:

First Witness Signature

Michelle Allen
Printed Signature

Second Witness Signature

Susan B. Platt
Printed Signature

State of Florida

County of Collier

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this ____ day of August, 2020 by Timo Petermichl and Mandy Petermichl, Husband and Wife, who has produced _____ as Identification or is personally known to me to be the persons therein.

Notary Public, State of Florida

Michelle Allen

My commission expires:
Seal

Timo Petermichl

Mandy Petermichl

MICHELLE C. ALLEN
MY COMMISSION # GG 065905
EXPIRES: March 9, 2021
Bonded Thru Notary Public Underwriters

Deed (Warranty - Individual)                                    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

# EXHIBIT J

INSTR 5915168 OR 5808 PG 1544 RECORDED 8/28/2020 9:41 AM PAGES 13
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
DOC@.35 $1,680.00  INT@.002 $960.00 REC $112.00
OBLD $480,000.00  OBLI $480,000.00

Case 2:22-cv-00181-JES-NPM Document 1 Filed 04/05/22 Page 102 of 126 PageID 102

When recorded, return to:
Prosperity Home Mortgage, LLC
Attn: Final Document Department
14501 George Carter Way, Suite 300
Chantilly, VA 20151

This document was prepared by:
Prosperity Home Mortgage, LLC
14501 George Carter Way, Suite 300
Chantilly, VA 20151
855-644-0443

LOAN #: 1002344098

[Space Above This Line for Recording Data]

## MORTGAGE

MIN 1000830-1002343903-4
MERS PHONE #: 1-888-679-6377

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **August 25, 2020,** together with all Riders to this document.

**(B) "Borrower"** is **KELLY ROUSSEAU AND WILLIAM MARTINEZ JR., WIFE AND HUSBAND.**

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is **Prosperity Home Mortgage, LLC.**

Lender is  **a Limited Liability Company,** organized and existing under the laws of  **Virginia.**
Lender's address is **14501 George Carter Way, Suite 300, Chantilly , VA 20151**

**(E) "Note"** means the promissory note signed by Borrower and dated **August 25, 2020.** The Note states that Borrower owes Lender **FOUR HUNDRED EIGHTY THOUSAND AND NO/100************************************************************************ Dollars (U.S. **$480,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **September 1, 2050.**

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3010 1/01
Ellie Mae, Inc.

Page 1 of 10

FLEDEED  0120
FLEDEED (CLS)
08/20/2020 01:40 PM PST



**LOAN #: 1002344098**

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☒ Planned Unit Development Rider ☐ V.A. Rider
☐ 1-4 Family Rider ☐ Biweekly Payment Rider
☐ Other(s) [specify]

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L)** **"Escrow Items"** means those items that are described in Section 3.
**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
**County** of **Collier**
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 71915000687**

which currently has the address of **15919 Secoya Reserve Cir, Naples,**

Florida **34110**        ("Property Address"):                                         [Street] [City]
        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

FLORIDA -- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3010 1/01
Ellie Mae, Inc.                    Page 2 of 10                      FLEDEED  0120
                                                                     FLEDEED (CLS)
                                                                     08/20/2020 01:40 PM PST

LOAN #: 1002344098

Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay



**LOAN #: 1002344098**

to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,



**LOAN #: 1002344098**

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance



**LOAN #: 1002344098**

coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)  Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either

**FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3010 1/01**

Ellie Mae, Inc.

FLEDEED  0120
FLEDEED (CLS)
08/20/2020 01:40 PM PST



LOAN #: 1002344098

to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

**FLORIDA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3010 1/01**
Ellie Mae, Inc.                                                   Page 7 of 10

FLEDEED   0120
FLEDEED (CLS)
08/20/2020 01:40 PM PST



**LOAN #: 1002344098**

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**LOAN #: 1002344098**

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22.  Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23.  Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24.  Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25.  Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

_____
**Printed Name**

_____

_____
**Printed Name**

_____  8/25/2020 (Seal)
**KELLY ROUSSEAU**                              DATE
**22 Weatherstone**
**Avon, CT 06001**

**FLORIDA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   **Form 3010 1/01**
Ellie Mae, Inc.                                       Page 9 of 10                          FLEDEED   0120
                                                                                    FLEDEED (CLS)
                                                                                    08/20/2020 01:40 PM PST



LOAN #: 1002344098

_W M x_          8/25/2020 (Seal)
WILLIAM MARTINEZ JR.          DATE

State of FLORIDA          County of COLLIER

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online
notarization, this 25 day of AUGUST, 2020 by KELLY ROUSSEAU AND WILLIAM MARTINEZ JR.,
who is/are personally known to me or who has/have produced DL LICENSE as identification.

_____
Signature

Michelle Allen
Printed Name

_____
Title or Rank

_____
Serial Number (if any)

MICHELLE C. ALLEN
MY COMMISSION # GG 065905
EXPIRES: March 9, 2021
Bonded Thru Notary Public Underwriters

Lender: Prosperity Home Mortgage, LLC
NMLS ID: 75164
Loan Originator: Tammy Arrington
NMLS ID: 367773

NOTA CERTIFIED COPY

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010 1/01
Ellie Mae, Inc.          Page 10 of 10          FLEDEED 0120
FLEDEED (CLS)
08/20/2020 01:40 PM PST



**EXHIBIT A**
**LEGAL DESCRIPTION**

Lot 29, SANDALWOOD, according to Plat thereof, as recorded in Plat Book 50, Page 55 through 58, of the Public Records of Collier County, Florida.



Exhibit A (Legal Description)                                                                 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

**LOAN #: 1002344098**
**MIN: 1000830-1002343903-4**

## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **25th** day of **August, 2020** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **Prosperity Home Mortgage, LLC, a Limited Liability Company**

(the "Lender")
of the same date and covering the Property described in the Security Instrument and located at: **15919 Secoya Reserve Cir, Naples, FL 34110.**

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration").
The Property is a part of a planned unit development known as **Secoya Reserve**

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.
**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.
What Lender requires as a condition of this waiver can change during the term of the loan.
Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.
In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.
**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to ensure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 1/01
Ellie Mae, Inc. Page 1 of 2 F3150RDU 0115
F3150RLU (CLS)
08/20/2020 01:40 PM PST



**LOAN #: 1002344098**

   **D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

   **E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

   **F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____   _____(Seal)
**KELLY ROUSSEAU**                                                                                  DATE

_____   _____(Seal)
**WILLIAM MARTINEZ JR.**                                                                       DATE

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 1/01
Ellie Mae, Inc.                                              Page 2 of 2                                          F3150RDU   0115
                                                             F3150RLU (CLS)
                                                08/20/2020 01:40 PM PST

CERTIFIED COPY



# EXHIBIT K



Prepared by and Return to:
Laura Fitzgerald
Coastal Security Title, Inc.
3670 N. Access Road
Englewood, FL 34224

*REC 18.50*
*DS 1732.50*

File Number:     27137
Parcel ID:        412001177023

## Warranty Deed

THIS WARRANTY DEED dated October 13, 2020, by **Kelly Rousseau**,  whose address is 22 Weatherstone, Avon, CT 06001, (hereinafter referred to as "Grantor"), to **Joan Riswold**, whose address is 6231 Lomax Street, Englewood, FL 34224,  (hereinafter referred to as "Grantee"):

(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

WITNESSETH:  That the grantor, for and in consideration of the sum of $10.00 and other valuable consideration, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys, and confirms unto the grantee, all the certain land situated in Charlotte County, Florida to wit:

Lot 2, Block 3713, Port Charlotte Subdivision Section 63, a Subdivision according to the Plat thereof as recorded in Plat Book 5, Page 77, Public Records of Charlotte County, Florida.

Said property is not the homestead of the Grantor under the laws and constitution of the State of Florida in that neither the Grantor nor any members of the household of Grantor reside thereon.

Subject to easements, restrictions, reservations and limitations of record, if any.

TO HAVE AND TO HOLD the same in Fee Simple forever.

AND the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple, that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever, and that said land is free of all encumbrances, except taxes accruing subsequent to: December 31, 2019.

IN WITNESS WHEREOF, the said **Grantor**, has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Print Name: WILLIAM MARTINEZ
1st **Witness sign and print**

Kelly Rousseau

Print Name: Darla Zenuni
2nd **Witness sign and print**

STATE OF Florida
COUNTY OF Collier

The foregoing instrument was acknowledged before me by means of X physical presence or ___ online notarization, this 14th day of October, 2020 by Kelly Rousseau.

Signature of Notary Public
Print, Type/Stamp Name of Notary

Personally Known:_____ OR Produced Identification: ✓
Type of Identification
Produced: FL Drivers Licence

DARLA ZENUNI
NOTARY
My Comm. Expires
February 17, 2023
No. GG 302685
PUBLIC
STATE OF FLORIDA

**WARRANTY DEED**

File No.: 27137                                                                                    Page 2 of 2

# EXHIBIT L

PREPARED BY:
**ERIC FERGUSON**
**FIRST AMERICAN MORTGAGE SOLUTIONS**
**1795 INTERNATIONAL WAY**
**IDAHO FALLS, ID 83402**
AND WHEN RECORDED MAIL TO:
**FIRST AMERICAN MORTGAGE SOLUTIONS**
**1795 INTERNATIONAL WAY**
**IDAHO FALLS, ID 83402**
**FLORIDA**
COUNTY OF **CHARLOTTE**

# MORTGAGE RELEASE, SATISFACTION, AND DISCHARGE

The undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR BANK OF AMERICA, N.A., ITS SUCCESSORS AND ASSIGNS**, the Mortgagee of that certain Mortgage described below, does hereby release, discharge and reconvey, to the persons legally entitled thereto, all of its right, title, and interest in and to the real estate described in said Mortgage, forever satisfying, releasing, cancelling, and discharging the lien from said Mortgage.

Said Mortgage bearing the date **MARCH 03, 2020**, executed by **KELLY ROUSSEAU**, Mortgagor, and recorded in Public Records in the Office of the Clerk of the Circuit Court for **CHARLOTTE** County, State of **FLORIDA** on **MARCH 12, 2020** in Book **4550** at Page **1827** as Clerk's File No. **2795040**.

**AS DESCRIBED IN SAID MORTGAGE**

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on **OCTOBER 27, 2020**.
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE**

**ERIC FERGUSON, VICE PRESIDENT**

STATE OF **ARIZONA** COUNTY OF **MARICOPA** ) ss.

On **OCTOBER 27, 2020**, before me, **B ROBERSON**, Notary Public, personally appeared **ERIC FERGUSON, VICE PRESIDENT** of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE**, whose identity was proven to me on the basis of satisfactory evidence to be the person who me or she claims to be and whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signature on the instrument the person, or entity, who they acted on the behalf of, executed the instrument.

**B ROBERSON (COMMISSION EXP. 12/02/2022)**
NOTARY PUBLIC

B ROBERSON
Notary Public, State of Arizona
Maricopa County
Commission # 556289
My Commission Expires
December 02, 2022

**POD: 20201015**
**BA8050117IM - LR - FL**          **Page 1 of 1**          **MIN: 100015701000365217**

**MERS PHONE: 1-888-679-6377**

# EXHIBIT M

ORDER   414999

DOCKET NO: HHDCV106012959S

WELSH, D'ANNA
   V.
MARTINEZ, WILLIAM

SUPERIOR COURT

JUDICIAL DISTRICT OF HARTFORD
   AT HARTFORD

12/23/2020

<u>ORDER</u>

ORDER REGARDING:
11/06/2020 325.00 MOTION FOR ORDER

Plaintiff's Counsel Present. Defendant Present.

The foregoing, having been heard by the Court, is hereby:

ORDER:

The court finds, based on the hearing, the exhibits, and the testimony of the defendant, Dr. William
Martinez, that the defendant has failed to comply with the court order (Entry #321.86, para. 1) to pay the
$25,000 monthly fine in October, November, and December, 2020, and has failed, since August, 2020, to
comply with the court order (Entry #167.86, para. 2) to provide a detailed asset and financial disclosure
on a quarterly basis. The court also finds, based on the August, 2020 disclosure and the available
evidence at today's hearing, that the defendant has the ability to pay, based largely on money held in his
retirement accounts. Accordingly, the defendant remains in contempt of court and the court will issue a
capias for his arrest. The capias will identify the following conditions of release: 1) posting of a $75,000
bond, cash or surety, and 2) provision of a current asset and financial statement. Plaintiff's attorney shall
notify the court immediately if the defendant complies with these conditions so the court can take
appropriate action with regard to the capias.

414999
_____

Judge: CARL J SCHUMAN

This document may be signed or verified electronically and has the same validity and status as a document with a physical
(pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services–
Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193 of the
Connecticut General Statutes and Connecticut Practice Book Section 4-4.

**COPY CERTIFIED**

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

**COPY CERTIFIED**

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

**CAPIAS**

JD-CL-33, Rev. 11-16
C.G.S. §§ 46b-231, 52-143, 54-2a, 54-64d
P.B. §§ 38-21, 40-45, 44-9

STATE OF CONNECTICUT
**SUPERIOR COURT**
www.jud.ct.gov



| Court Use Only |
|---|
| CAPIAS - ISSUED |
| CAPEXE - EXECUTED |
| CAPRNE - RETURNED NOT EXECUTED |
| CPVC - VACATED |

**Instructions to Preparer**
1. Prepare in triplicate and keep a copy.
2. Clerk or Support Enforcement Officer must sign original and one copy must be placed in the court file.
3. Proper Officer to make return on signed original.

**To: Any Proper Officer of the State of Connecticut**

| Name of case (Plaintiff vs. Defendant) | | Docket number |
|---|---|---|
| D'ANNA WELSH v. WILLIAM MARTINEZ | | HHDCV10-6012959S |

| [X] Judicial District | [ ] Housing Session | [ ] Geographical Area Number | [ ] Small Claims Area | Address of court (Number, street, town, and zip code) 95 Washington Street, Hartford, CT 06106 |
|---|---|---|---|---|

| Name of person to be arrested WILLIAM V. MARTINEZ | Date of birth (If known) | Date failed to appear |
|---|---|---|

| Address of person to be arrested (If known) 15918 Secoya Reserve Circle, Naples, FL 34110 | email: b11161@comcast.net | Telephone number (If known) |
|---|---|---|

The person named above was summoned, ordered, subpoenaed or otherwise required by law to appear before this court on the above date, and that person failed to appear, and

The court orders the issuance of this capias and sets the condition(s) of release, specified below.

You are therefore commanded by authority of the State of Connecticut, to take the person named above and bring that person before this court without excessive delay. If a courthouse lockup operated by the judicial branch is available at the court that issued the capias and is operational at the time you bring the person taken into custody to the court, you shall transfer the custody of such person to a judicial marshal at the court unless such person requires medical attention or there is insufficient space for such person at such lockup. If the court is in session, the judicial marshal shall present such person before the court. If the court is not in session but the clerk's office is open, the judicial marshal shall present such person before the clerk or assistant clerk or a person designated by the Chief Court Administrator. If the court is not in session and the clerk's office is closed, and such person indicates to the judicial marshal that he or she can meet the conditions of release fixed by the court, the judicial marshal shall, without excessive delay, either (A) transport such person to a community correctional center within the judicial district, or, if there is no community correctional center within the judicial district, to the nearest community correctional center, for the purpose of entering into the condition of release fixed by the court, or (B) if more expedient, hold the person in custody until the clerk's office is open or the next session of the court,

for the purpose of entering into the condition of release fixed by the court. If such person does not indicate to the judicial marshal that he or she can meet the conditions of release fixed by the court, the judicial marshal shall hold the person in custody until the clerk's office is open or the next session of the court for the purpose of entering into the condition of release fixed by the court. If a courthouse lockup operated by the judicial branch is not available at the court that issued the capias, or is available but is not operational or has insufficient space, you shall, without excessive delay, transport such person to a community correctional center within the judicial district or, if there is no community correctional center within the judicial district, to the nearest community correctional center for the purpose of entering into the condition of release fixed by the court.

The clerk or assistant clerk or a person designated by the commissioner of correction shall order the person taken into custody on the capias to enter into the condition(s) of release set forth below, on the condition that such person shall appear before the next session of the Superior Court which issued the capias.

If such person fails to enter into the condition(s) of release set forth below, the person named above shall be held in the correctional center pursuant to the capias until the next session of court. In such case, a certified true copias shall be left with the designee of the commissioner of correction which shall be authority for keeping the person named above.

Therefore, you are commanded to make service and return of this capias according to law:

| **Conditions Of Release** COPY CERTIFIED | | For Court Use Only |
|---|---|---|
| Amount of bond (If any) $75,000.00 | Type of bond Cash or Surety | File Date |
| In addition, the defendant must also provide a current asset and financial statement. JAN -7 2021 JUDICIAL DISTRICT OF HARTFORD STATE OF CONNECTICUT | | |

| Name of Judge/Family Support Magistrate Carl J Schuman | By Order of the Court |
|---|---|
| Signed (Assistant Clerk/Support Enforcement Officer) Schuman JJ.  A Bulewich  AC | Date signed 12/23/2020 |

CAPIAS

329

## Optional Information

| Name And Address | Name of person to be arrested |
|---|---|
| | Address of person to be arrested |

| Physical Description | Age | Sex | Height | Weight | Eyes | Hair | Complexion |
|---|---|---|---|---|---|---|---|
| | Additional physical description *(Scars, marks, etc)* | | | | | | |

| Employer | Name of employer |
|---|---|
| | Address of employer |

| Motor Vehicle | Year | Make | Model | Color |
|---|---|---|---|---|
| | Registration number and state | | Additional description | |

## Return Of Service

| Place of arrest | Date of arrest | Date brought to court/community correctional center ☐ Court  ☐ Community Correctional Center |
|---|---|---|

**Then and there,** by virtue of the foregoing order of the court, I took the within named person into custody and brought him/her to the following ☐ Court  ☐ Community Correctional Center

Address of court or community correctional center

| Title *(Proper Officer)* | Signature | Date |
|---|---|---|

## Fees

**1. Itemized Fees** *(Do not complete this section if this is a IV-D Child Support case and you are claiming a negotiated fee for service, as indicated in Section 2 below.)*

Copy:

Endorsement:

Service:

Travel:

Total:

**COPY CERTIFIED**

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

**2. IV-D Child Support Fees** *(Check the relevant box only if this is a IV-D Child Support case in which a fee for service has been agreed between the State Marshal Commission and the Judicial Branch. If you complete this section, do not complete the Section 1 above.)*

☐ Community Arrest - One Proper Officer: $240

☐ Community Arrest - Two Proper Officers: $480

☐ Secure Facility Arrest - One Proper Officer: $150

**COPY CERTIFIED**

JAN - 7 2021

JUDICIAL DISTRICT OF
HARTFORD
STATE OF CONNECTICUT

A true and attested copy:

Attest _____

*(Proper Officer)*

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the Americans with Disabilities Act, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA.*

JD-CL-33 *(back)* Rev. 11-16

# EXHIBIT N

RETURN TO:
WORLDWIDE RECORDING, INC.
9001 W. 67th ST.
MERRIAM, KS 66202
1-800-316-4682

*Prepared By:*                              Commitment Number:

21NL37780 After Recording, ~~Return To:~~ Nations Lending Services 9001 W. 67th St.
Merriam, KS 66202  *Jasmin Harrington*

**PROPERTY APPRAISAL (TAX/APN) PARCEL IDENTIFICATION NUMBER
71915000687**

**QUITCLAIM DEED**      21WR41520

**Kelly Martinez, who acquired title as Kelly Rousseau** and **William Martinez, Jr.**, wife and husband, hereinafter grantors and also the grantees herein, whose tax-mailing address is **15919 Secoya Reserve Circle, Naples, FL 34110-1187**, without consideration paid, grant and quitclaim to **Kelly Martinez** and **William Martinez, Jr.**, wife and husband, as joint tenants with right of survivorship, hereinafter grantees, whose tax mailing address is **15919 Secoya Reserve Circle, Naples, FL 34110-1187**, with quitclaim covenants, all right, title, interest and claim to the following land in the following real property:

**All that certain land situate in Collier County, State of Florida, viz: Lot 29, Sandalwood, according to Plat thereof, as recorded in Plat Book 50, Page 55 through 58, of the Public Records of Collier County, Florida. Subject to: covenants, conditions, restrictions, reservations, limitations, easements and agreements of record, if any; taxes and assessments for the year 2020 and subsequent years; and to all applicable zoning ordinances and/or restrictions and prohibitions imposed by governmental authorities, if any. Being the same property conveyed to Kelly Rousseau and William Martinez, Jr., wife and husband by Warranty Deed from Timo Petermichl and Mandy Petermichl, as husband and wife as recorded 08/28/2020 in Book OR-5808 at Page 1542 as Document 5915167. Commonly Known As: 15919 Secoya Reserve Circle, Naples, FL 34110-1187 Tax ID: 71915000687**
**Property Address is: 15919 Secoya Reserve Circle, Naples, FL 34110-1187**

Prior instrument reference: **5915167**

        The real property described above is conveyed subject to and with the benefit of: All easements, covenants, conditions and restrictions of record; in so far as in force applicable.

        The real property described above is conveyed subject to the following:   All easements, covenants, conditions and restrictions of record; All legal highways; Zoning, building and other

laws, ordinances and regulations; Real estate taxes and assessments not yet due and payable; Rights of tenants in possession.

TO HAVE AND TO HOLD the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title interest, lien equity and claim whatsoever of the said grantors, either in law or equity, to the only proper use, benefit and behalf of the grantees forever.

Executed by the undersigned on __August 25__ , 20 21 :

| | |
|---|---|
| *Kelly Martinez* | *W M* |
| **Kelly Martinez** | **William Martinez, Jr.** |

Signed, Sealed and Delivered in the presence of these Witnesses (one of whom may be the Notary):

| Witness (signature on above line) | Printed Name |
|---|---|
| *Xiaxi nikesch* | *Xiaxi nikesch* |
| Witness (signature on above line) | Printed Name |
| *Carlos E Roggiero* | *Carlos E Roggiero* |

STATE OF __Florida__
COUNTY OF __Collier__

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this 25 day of __August__ , 20 21 , by **Kelly Martinez and William Martinez, Jr.**.

Personally Known ☐ OR Produced Identification ☒
Type of Identification Produced: __FL Driver's License__

```
┌─────────────────────────────┐
│        XIAXI NIKESCH          │
│  Notary Public - State of Florida │
│    Commission # GG 356403     │
│  My Comm. Expires Jul 17, 2023 │
│  Bonded through National Notary Assn. │
└─────────────────────────────┘
```

*Xiaxi nikesch*
(Signature of Notary Public)

*Xiaxi nikesch*
(Print, Type, or Stamp Commissioned Name of Notary Public)

My Commission expires: __Jul. 17. 2023__

Affix Notary SEAL

Online Notary: ☐ (Check Box if acknowledgment done by Online Notarization)

NOT A CERTIFIED COPY