UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| D'ANNA WELSH, | ) |
| | ) |
| Plaintiff, | ) Case No. 2:22-cv-00216-JLB-NPM |
| | ) |
| v. | ) |
| | ) |
| WILLIAM V. MARTINEZ, JR., and | ) |
| KELLY MARTINEZ f/k/a KELLY | ) |
| MRS. MARTINEZ, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON FIRST AMENDED COMPLAINT**

Plaintiff D'Anna Welsh respectfully files this Motion for Summary Judgment on the First Amended Complaint ("FAC"). The pleadings and summary judgment evidence demonstrate the absence of a genuine dispute of material fact and judgment should be entered for Plaintiff as a matter of law.

**STATEMENT OF RELIEF REQUESTED AND BASIS FOR REQUEST**

Plaintiff respectfully moves for summary judgment under Fed. R. Civ. P. 56 on her First Amended Complaint for fraudulent transfers. All elements of each claim are supported by undisputed material facts. All elements are satisfied and Plaintiff is entitled to judgment as a matter of law. Accordingly, summary judgment should be granted.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iii

STATEMENT OF UNDISPUTED MATERIAL FACTS....................................1

LEGAL STANDARD.................................................................................. 30

MEMORANDUM OF LAW ......................................................................... 31

    I.     Because he is a Fugitive from Justice Pursuant to the Domesticated Connecticut Capias, Dr. Martinez should be Barred from Presenting any Claim or Defense under the Fugitive Disentitlement Doctrine ................................................. 32

    II.    Because of their Blatant Discovery Violations, both Defendants should be Barred from Presenting Any Affirmative Defenses and the Court should Find that the Intent Elements of Counts I and II are Established as a Matter of Law.......................................................................... 39

    III.    Summary Judgment is Properly Granted on All Counts. ........... 41

        A.    Because Defendants Engaged in Actual Fraud and Constructive Fraud, Summary Judgment is Properly Granted on Count One for Violation of the Uniform Fraudulent Transfer Act § 726.105 Fla. Stat. Ann............ 42

            1.    Actual Fraud Exists Under § 726.105(1)(a), Fla. Stat. Ann., because Dr. Martinez's Transfers to Mrs. Martinez were Made with Actual Intent to Hinder, Delay or Defraud Plaintiff ........................... 42

            2.    Under § 726.105(1)(b), Fla. Stat. Ann., Dr. Martinez's Transfers to Mrs. Martinez were Constructively Fraudulent ....................................... 52

                i.    Dr. Martinez was Insolvent at the Time the Transfers were Made................................ 53

i

ii.     Dr. Martinez Made the Transfers without Receiving a Reasonably Equivalent Value in Exchange ...................................... 53

B.     Summary Judgment should be Granted on Count Two for Fraudulent Transfers in Violation of Fla. Stat. § 726.106. ................................................ 54

C.     Summary Judgment is Properly Granted on Count Three for Injunctive Relief. ................................ 55

     1.     Plaintiff will Suffer Irreparable Injury Unless the Injunction is Issued .............................. 56

     2.     Plaintiff Lacks an Adequate Remedy at Law........... 56

     3.     On Balance, the Hardships to Plaintiff far Outweigh any Purported Hardship to Defendants .............................................. 57

     4.     Enjoining Defendants from Further Dissipating Assets is in the Public's Interest.............................. 58

D.     Summary Judgment is Properly Granted on Count Four for Equitable Relief.................................... 58

E.     Summary Judgment should be entered against Dr. Martinez on Count Five for Fraudulent Asset Conversion Pursuant to § 222.30, Fla. Stat. Ann. ............. 64

F.     Summary Judgment should be entered on Count Six for Declaratory Judgment. ................................ 66

G.     Summary Judgment should be entered on Count Seven for Declaratory Judgment ....................... 68

IV.     None of Defendants' Affirmative Defenses Apply........................ 68

A.  Defendants' First Affirmative Defense Fails because Dr. Martinez's Retirement Accounts are Not Exempt from the Contempt Judgment and Lost whatever Exempt Status they had when Dr. Martinez made Voluntary Withdrawals ........................................................ 68

B.  Defendants' Second Affirmative Defense Fails because Dr. Martinez's Homestead is Not Protected due to his Reprehensible and Egregious Conduct.............................. 72

C.  Defendants' Third Affirmative Defense Fails for the Same Reasons Above and the Court Already Denied Defendants' Motion to Dismiss for Failure to State a Cause of Action ................................................................. 72

D.  Defendants' Fourth Affirmative Defense Fails because the Court can Enter a Declaratory Judgment under 28 U.S.C.A. § 2201 ....................................................................... 73

E.  Defendants' Fifth Affirmative Defense Fails because Plaintiff has a Reasonable Expectation of Future Injury from this Repeat Offender ....................................... 73

CONCLUSION............................................................................................... 74

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                      **Page(s)**

*A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*
    925 F.3d 1205, 1211 (11th Cir. 2019)……………………………………....73

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 248 (1986)……………………...…………………………....31

*Baby Buddies, Inc. v. Toys "R" Us, Inc.*
    611 F.3d 1308, 1314 (11th Cir. 2010)………...……………….………….…31

| **Cases** | **Page(s)** |
|---|---|

*Celotex v. Catrett*
        477 U.S. 317, 325 (1986))…….…………………………………………….31

*Clark v. Coats & Clark, Inc.*
        929 F.2d 604, 608 (11th Cir.1991)  …….………………………………..31

*Daytona Beach Riverhouse, Inc. v. Chubb Custom Ins. Co.*
        2014 WL 12611320, at *3 (M.D. Fla. Mar. 20, 2014)……………..67, 73

*Ellis Sarasota Bank & Tr. Co. v. Nevins*
        409 So. 2d 178, 180 (Fla. 2d DCA 1982)…….………………………….65

*Ener v. Martin*
        987 F.3d 1328, 1332 (11th Cir. 2021)…….……………………………..32

*F.D.I.C. v. Pharaon*
        178 F.3d 1159, 1161 (11th Cir. 1999)……....…………………….....32-33

*Gepfrich v. Gepfrich*
        582 So. 2d 743, 744 (Fla. 4th DCA 1991)...………………………60, 72

*Harkins v. Holt*
        169 So. 481, 482 (Fla. 1936)…….…………………………………….47

*Hofmann v. EMI Resorts, Inc.*
        689 F. Supp. 2d 1361, 1376 (S.D. Fla. 2010)...………………………..56-57

*Havoco of America, Ltd. v. Hill*
        197 F.3d 1135, 1139 (11th Cir. 1999)…….…………………….……65

*In re Able Body Temp. Services, Inc.*
        2018 WL 11206122 (Bankr. M.D. Fla. Sept. 4, 2018)……………...…49

*In re Anderson*
        561 B.R. 230, 240 (Bankr. M.D. Fla. 2016)…….………………...…65

*In Re: Daniel*
        771 F.2d 1352 (9th Cir. 1985)…….……………………………....70

| **Cases** | **Page(s)** |
|---|---|

*In re Fin. Federated Title & Tr. Inc.*
273 B.R. 706, 715 (Bankr. S.D. Fla. 2001)..............................................59

*In re Jennings*
332 B.R. 465, 469 (Bankr. M.D. Fla. 2005)...........................................64

*In re McFarland*
619 Fed. Appx. 962, 975 (11th Cir. 2015)..............................................47

*In re Miller*
188 B.R. 302 (Bankr. M.D. Fla. 1995)...................................................65

*In re Mongelluzzi*
587 B.R. 392, 409 (Bankr. M.D. Fla. 2018)...........................................49

*In re Universal Health Care Group, Inc.*
560 B.R. 594, 601 (Bankr. M.D. Fla. 2016)...........................................52

*In re Wilbur*
206 B.R. 1002, 1008 (Bank. M.D. Fla. 1997)........................................66

*In Re: Witwer*
148 B.R. 930 (Bankr. C.D. Cal. 1992)...................................................70

*In re World Vision Entertainment, Inc.*
275 B.R. 641 (M.D. Fla. 2002)..............................................................42

*In re Yerian*
927 F.3d 1223, 1231 (11th Cir. 2019)..............................................69-70

*Jackson v. Jackson*
98 So. 3d 112, 114 (Fla. 2d DCA 2012)................................................69

*Lamar v. Wells Fargo Bank*
597 Fed. Appx. 555, 556–57 (11th Cir. 2014) ......................................30

*Magluta v. Samples*
162 F.3d 662, 664 (11th Cir. 1998).......................................................33

**Cases**                                                                                              **Page(s)**

*Mane FL Corp. v. Beckman*
   48 Fla. L. Weekly D86 (Fla. 4th DCA Jan. 4, 2023)...........................44

*McGregor v. Chierico*
   206 F.3d 1378, 1385 (11th Cir. 2000)...........................................56

*Mishkin v. Jeannine Gurian Tr.No.One*
   2008 WL 708733 (S.D. Fla. Mar. 14, 2008)......................................33

*Partridge v. Partridge*
   912 So. 2d 649, 650 (Fla. 4th DCA 2005)..............................59, 62, 72

*Radin v. Radin*
   593 So. 2d 1231, 1233 (Fla. 3d DCA 1992)............................60, 62, 72

*Randazzo v. Randazzo*
   980 So. 2d 1210 (Fla. 3d DCA 2008).................................58-59, 72

*Reliance Ins. Co. v. Zeigler*
   938 F.2d 781 (7th Cir. 1991).......................................................70

*Rosenblatt v. Rosenblatt*
   635 So. 2d 132, 133 (Fla. 3d DCA 1994).........................................60

*Sell v. Sell*
   949 So. 2d 1108, 1113 (Fla. 3d DCA 2007).................................60, 72

*Siegel v. Siegel*
   700 So. 2d 414, 415 (Fla. 4th DCA 1997)........................................69

*Spector v. Spector*
   226 So. 3d 256 (Fla. 4th DCA 2017).............................................62

*Thomas J. Konrad & Associates, Inc., v. McCoy*
   705 So. 2d 948 (Fla. 1st DCA 1998)..............................................65

*United States v. Barnette*
   129 F.3d 1179, 1184 (11th Cir. 1997) ..........................................32

**Cases**                                                           **Page(s)**

*United States v. Horton*
    760 F.2d 1225 (11th Cir. 1985)………………………………………47

*United States v. Major*
    551 B.R. 531, 542 (M.D. Fla. 2016)……………..……………………48

*Universal Physician Services, LLC v. Zotto*
    2016 WL 6902354, at *5 (M.D. Fla. Nov. 2, 2016)………………..……71

*Wiand v. Cloud*
    919 F. Supp. 2d 1319, 1330 (M.D. Fla.2013)………………………..42

*Wiand v. Lee*
    753 F.3d 1194, 1200 (11th Cir. 2014)……..……………………………43

*Woods v. Deangelo Marine Exhaust, Inc.*
    2010 WL 11504374, at *1 (S.D. Fla. June 30, 2010)……..……………55

*Wix v. Wix*
    159 So. 3d 312, 315 (Fla. 2d DCA 2015)……..……………………..…68

**Statutes and Rules**

Fed. R. Civ. P. 37………………………………………..3-4, 10-11, 13-14, 18-21

Fla. Stat. § 726.105………………………………………………………..13

Fla. Stat. § 726.106………………………………………………………..13

M.D. Fla. Civil Discovery Handbook…………………………………10-11, 14, 16

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Plaintiff is a judgment-creditor as to a $2,360,000 judgment against Dr. Martinez dated December 5, 2012 entered by the Superior Court of Hartford County, Connecticut under Case No. CV-10-6012959-S (the "$2.3 Million Judgment Dated December 5, 2012").[1]

2.      On February 9, 2021, Plaintiff domesticated the $2.3 Million Judgment Dated December 5, 2012 as an active Florida judgment pursuant to Fla. Stat. § 55.505 under Collier County Circuit Court Case No. 11-2021-CA-000365-0001-XX.[2]

3.      In a 2015 reported opinion, the Appellate Court of Connecticut set forth the facts which led to the $2.3 Million Judgment Dated December 5, 2012. *Welsh v. Martinez*, 157 Conn. App. 223 (2015), *cert. denied*, 317 Conn. 922 (2015).

4.      Dr. Martinez was found to have installed spy cameras in Plaintiff's home including cameras in Plaintiff's bedroom pointed toward her bed, a camera positioned toward her bathroom shower, keystroke/spyware implanted on Plaintiff's computer and a GPS tracker on her vehicle. *Id.*

---

[1] Plaintiff respectfully requests that the Court take judicial notice of all orders and opinions of the Connecticut trial and appellate courts cited herein.
[2] Plaintiff respectfully requests that the Court take judicial notice of all orders and opinions of the Florida trial and appellate courts cited herein.

5.    In the second of two reported cases, in 2019, the Appellate Court of Connecticut set forth the facts which led to a 2017 contempt order against Dr. Martinez for fraudulently transferring assets to his then-wife. *Welsh v. Martinez*, 216 A.3d 718, 724 (Conn. App. Ct. 2019).

6.    After the jury returned the 2012 verdict in Plaintiff's favor, Plaintiff moved for prejudgment attachment and filed a "Motion to Prevent Defendant's Fraudulent Transfer of Property." *Id.* at 723. Plaintiff alleged that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property in violation of [the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq.]." *Id.* The Connecticut court granted Plaintiff's 2012 motion to prevent fraudulent transfers, allowed Plaintiff to attach up to $2 million of Dr. Martinez's property, ordered Dr. Martinez to disclose his assets and enjoined Dr. Martinez from "voluntarily transferring or encumbering any assets except business assets in the ordinary course of business and personal assets for ordinary living expenses, including court-ordered alimony and child support." *Id.*

7.    In 2017, the Connecticut trial court held Dr. Martinez in contempt for violating the asset standstill order dating back to 2012.

8.    In violation of that order, Dr. Martinez fraudulently transferred the entirety of his over $2 million in income from October 30, 2012 to March 24, 2016 to his then-wife's bank account. *Id.* at 869.

- 2 -

9.     Essentially, Dr. Martinez would deposit his money in his then-wife's account and his then-wife would pay the bills. Martinez Dep., 22:15-17, Jan 30, 2023.

10.     After Plaintiff instituted collections actions and froze Dr. Martinez's personal bank account, Dr. Martinez and his then-wife opened up a new account in only her name and began depositing the entirety of Dr. Martinez's wages into his wife's account to avoid the freezing of those funds. *Welsh*, 216 A.3d at 724.

11.     At that time, Dr. Martinez was employed as a heart surgeon earning approximately $700,000 per year net after taxes. *Id.* at 724-725. With respect to his liabilities, Dr. Martinez testified that he made monthly mortgage payments of $7,500 and monthly payments of $14,000 for his "divorce-related obligations." *Id.* Beyond that, Dr. Martinez acknowledged that he had no other long-term debt. *Id.*

12.     Dr. Martinez further testified that, after depositing his wages into his then-wife's account, those funds later were used to pay ordinary living expenses, including court-ordered alimony and child support. *Id.*

13.     In its memorandum of decision, the Connecticut trial court found that Dr. Martinez's conduct in "depositing the entirety of his wages into [his then-wife's] People's United Bank account for the period October 30, 2012

through March 24, 2016, constituted a series of wilful violations of the asset standstill order." *Id.* at 725.

14. At the contempt hearing, Dr. Martinez's wife's account statements at People's United Bank were entered into evidence. *Id.* The court found that although those statements provided specificity as to certain transactions, such as utility payments, they provided no explanation for numerous other transactions. *Id.*

15. The trial court found that because Dr. Martinez deposited all of his wages to an account held in the name of Cristina alone, he was deemed to have 'voluntarily transferr[ed] or encumber[ed]' his income (i.e., a personal asset) beyond what was necessary 'for ordinary living expenses, including court-ordered alimony and child support.'" *Id.*

16. The Connecticut appellate court affirmed these findings. *Id.* at 725-727.

17. The Connecticut appellate court noted the context in which the asset standstill order arose. *Id.* Immediately after the jury returned a verdict for Plaintiff for $2 million, Plaintiff filed a "Motion to Prevent the Defendant's Fraudulent Transfer of Property," in which she averred in relevant part that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property ...." *Id.* It was from this motion to prevent fraudulent transfers, that the asset standstill order arose. *Id.*

- 4 -

18.     The Connecticut appellate court agreed that the voluntary transfer of Dr. Martinez's wages in their entirety into his then-wife's account contravened the plain intent of the asset standstill order, irrespective of how those funds later were dispersed. *Id.*

19.     The appellate court agreed with the trial court that by doing so, Dr. Martinez "engaged in a gross exercise of self-help, which the law disallows, and wilfully disobeyed the asset standstill order by depositing the entirety of his wages ... into [his then-wife's] bank account, outside the reach of the plaintiff." *Id.* The appellate agreed that "[t]o exonerate [the defendant's] wages-related conduct would be an undue inducement to litigants' exercise of self-help." *Id.*

20.     The appellate court agreed that "this case, which does not involve the collection of a 'routine debt,' falls well outside the parameters of 'normal circumstances,' where the defendant has gone to great lengths to deprive the plaintiff of the ability to use statutory collection procedures" and therefore "extraordinary circumstances warrant the court's use of the contempt power in the present case." *Id.*

21.     The appellate court further agreed that Dr. Martinez had the ability to pay a $25,000 per month contempt fine issued by the trial court. *Id.*

22. His ability to pay was based on record evidence of Dr. Martinez's net income after taxes of $700,000 per year, his retirement account with Charles Schwab & Co., Inc. valued at $802,888.19 as of May 31, 2017, his retirement account at American Funds, administered by Capital Group, valued at $464,910.48 as of June 30, 2017 and the fact that Dr. Martinez had no long-term debt other than monthly mortgage payments of $7500 and monthly payments of $14,000 for his "divorce-related obligations." *Id.*

23. Although affirming in material part, the Connecticut appellate Court remanded to the trial court to liquidate a specific total damages calculation. *Id.* at 731.

24. Following the 2019 remand, the Connecticut Superior Court conducted proceedings in conformity with the Appellate Court of Connecticut's 2019 opinion. ECF No. 13-1, Ex. D.

25. On January 23, 2020, in the Connecticut Superior Court, Plaintiff filed a Statement of Amount of Judgment with Post-Judgment Interest and Attachment. ECF No. 13-1, ¶ 13. Eight days later on January 31, 2020, Dr. Martinez withdrew $120,000 from his American Funds retirement account. *Id.*

26. On February 19, 2020, the Honorable Carl J. Schuman of the Connecticut Superior Court entered a Ruling on Remand from the Appellate Court, finding that the total amount of Plaintiff's loss from Dr. Martinez's

fraudulent transfers to his then-wife was $2,048,009. ECF No. 13-1, Ex. D at ¶¶ 1-5.

27. On February 19, 2020, Judge Schuman expressly ordered Dr. Martinez to pay Plaintiff a compensatory contempt fine of $2,048,009 directly to the Plaintiff in the amount of $25,000 per month until paid in full. *Id*. at ¶ 6

28. Twelve days later on March 2, 2020, Martinez transferred approximately $120,000 as a gift on the house Mrs. Martinez purchased on March 4, 2020 located at 6231 Lomax St, Englewood, FL 34224 (the "Englewood Property"). ECF No. 13-1, ¶ 14.

29. The Warranty Deed for Mrs. Martinez's purchase of the Englewood Property is dated March 2, 2020. *Id.*, Ex. E. Mrs. Martinez signed the deed March 4, 2020 and it was recorded on March 12, 2020 in the Charlotte County Clerk of Circuit Court (OR Book: 4550, PGS: 1825-26). *Id.*

30. The purchase price for the Englewood Property was $238,200. *Id.* ¶ 18.

31. On March 3, 2020, Mrs. Martinez executed a mortgage as to the Englewood Property in favor of Bank of America, N.A. to secure a note for $108,200 pursuant to the purchase of the Englewood Property. *Id.*, Ex. F.

32. The mortgage was recorded on March 12, 2020 in the Charlotte County Official Records (OR Book: 4550, PGS: 1827-41). *Id.*

33.    Considering the purchase price of $238,200, the mortgage of $108,200 and Martinez's payment of $120,000, Martinez paid at least half of the purchase price of Mrs. Martinez's Englewood Property instead of paying any of that money to Plaintiff. *Id.*, ¶ 18.

34.    Dr. Martinez was never an owner of the Englewood Property. *Id.*, Ex. E.

35.    Dr. Martinez was never liable for the mortgage on the Englewood Property. *Id.*, Ex. F.

36.    Mrs. Martinez never claimed the homestead exemption for the Englewood Property.[3]

37.    Dr. Martinez never claimed the homestead exemption for the Englewood Property. *Id.*

38.    Dr. Martinez and Mrs. Martinez acknowledged in Mrs. Martinez's mortgage documents that Dr. Martinez paid the $120,000 for the Englewood Property as a "gift" to Mrs. Martinez. W. Martinez Dep., 42:6-13.

39.    Dr. Martinez was unemployed when he transferred $120,000 to Mrs. Martinez as a "gift" for the Englewood Property. *Id.* at 20:3-5. Dr. Martinez also stopped paying any child support during this time. *Id.*

---

[3] Plaintiff requests the Court take judicial notice of the official records of the Charlotte County Property Appraiser for 2020.
https://www.ccappraiser.com/RPSearchValueHistory.asp?yr=2020

40.    In 2019, Dr. Martinez failed to make his court-ordered $25,000 monthly contempt-fine payments to Plaintiff for September 2019, October 2019, November 2019 and December 2019. ECF No. 13-1, Ex. G.

41.    In 2020, Dr. Martinez failed to make his court-ordered $25,000 monthly contempt-fine payments to Plaintiff in January 2020, February 2020, March 2020, April 2020, May 2020, June 2020, July 2020, August 2020, October 2020, November 2020 and December 2020. *Id.*, Ex. G, Ex. M.

42.    Dr. Martinez failed to make any of his court-ordered $25,000 monthly contempt-fine payments to Plaintiff for the entire year of 2021, for the entire year of 2022 and thus far for the entire year of 2023. W. Martinez Dep., 87:16-18.

43.    Meanwhile, on March 18, 2020, Plaintiff filed an Affidavit of Non-Payment in the Connecticut Superior Court. ECF No. 13-1,¶ 21. Then on April 13, 2020, Plaintiff filed a Motion for Incarceration or in the Alternative for Other Sanctions Due to Failure to Comply. *Id.*

44.    Pursuant to Plaintiff's April 13, 2020 motion, on August 14, 2020, Judge Schuman entered an order holding that Dr. Martinez failed to make any of the $25,000 monthly payments dating back to August 2019 (the "August 14, 2020 Contempt Order"). *Id.*, Ex. G.

45.     In the August 14, 2020 Contempt Order, the court reaffirmed Dr. Martinez's ability to pay, holding that "the court continues to believe that the defendant has the ability to pay." *Id.* at 1.

46.     The court expressly held that "the exhibits and the testimony of the defendant establish that the defendant has approximately $1 million in retirement funds." *Id.*

47.     This amount was after Dr. Martinez had already withdrawn and transferred at least $120,000 as a "gift" to Mrs. Martinez for Mrs. Martinez's Englewood Property. *See id.*, W. Martinez Dep., 42:6-13.

48.     The court further found that between December 2019 and August 2020, while Dr. Martinez failed to make any of the $25,000 monthly payments as ordered, Defendant had "liquidated approximately $216,000 in additional retirement funds, thus revealing the defendant's willingness to pay any applicable taxes and penalties and use funds that are nominally reserved for retirement." ECF No. 13-1, Ex. G.

49.     Dr. Martinez has since admitted in deposition that he would use his retirement account to pay everyday living expenses. W. Martinez Dep., 60:2-4.

50.     Dr. Martinez has admitted that even after regaining his most recent employment, he has still withdrawn from his retirement account. *Id.* at 77:7-17.

- 10 -

51.     Pursuant to the August 14, 2020 Contempt Order, the court again expressly ordered that, "defendant shall pay the plaintiff $25,000 by September 15, 2020 and by the fifteenth of each succeeding month." ECF No. 13-1, Ex. G.

52.     The court expressly warned that upon noncompliance, Dr. Martinez "shall be incarcerated or otherwise confined for civil contempt." *Id.*

53.     The day before the court entered its August 14, 2020 Contempt Order, sellers Timo Petermichl and Mandy Petermichl signed a Warranty Deed dated August 13, 2020 transferring the real property at 5919 Secoya Reserve Circle, Naples, FL 34110 (the "Secoya Property") to Mrs. Martinez. *Id.*, Ex. H. Pursuant to that deed, title was taken in Mrs. Martinez's sole individual name. *Id.*

54.     The Secoya Property features four bedrooms, three and a half bathrooms, 3091 square feet and a pool. *Id.* ¶ 27.

55.     The Collier County property appraiser lists the date of the sale of the Secoya Property as August 13, 2020. *Id.* ¶ 28.

56.     The Warranty Deed for the Secoya Property recorded with the Clerk of Court and Comptroller for Collier County, however, is dated August 25, 2020 and was recorded on August 28, 2020 (OR 5808, PGS 1542-43). *Id.*, Ex. I. The recorded deed grants title of the Secoya Property to both Mrs. Martinez and Dr. Martinez as tenants by the entireties. *Id.* The recorded deed

- 11 -

has the seller's same signature page, which was signed and notarized on August 13, 2020, however the first page where title is taken was swapped out and replaced. *Id.*

57.    The purchase price of the Secoya Property was $620,000, per the Collier County Property Appraiser.   *Id.* ¶ 30.

58.    On August 28, 2020, Prosperity Home Mortgage, LLC ("Prosperity") recorded a $480,000 mortgage signed by Martinez and Mrs. Martinez on August 25, 2020 (OR 5808, PGS 1544-56). *Id.*, Ex. J.

59.    With a purchase price of $620,000 and a mortgage of $480,000, the purchase of the Secoya Property was funded with at least $140,000 in cash. *Id.* ¶ 32.

60.    Dr. Martinez is a judgment-debtor and Dr. Martinez's credit was not used pursuant to the Prosperity mortgage on the Secoya Property. *See* W. Martinez Dep., 126:24-127:1.

61.    Dr. Martinez, however, supplied the entirety of the $140,000 in cash for the purchase of the Secoya Property in August 2020. ECF No. 13-1, ¶ 33. This was a gift to Mrs. Martinez. W. Martinez Dep., 74:24-75:2. In a Gift Letter signed by both Defendants, they certified that Dr. Martinez gave Mrs. Martinez the $140,000 as a "bona fide gift." *Id.* at 75:17-25.

62.    Dr. Martinez was unemployed when he transferred $140,000 to Mrs. Martinez as a "gift" for the Secoya Property. *Id.* at 78:10-13.

- 12 -

63.     To obtain the $480,000 mortgage for the Secoya Property, Mrs. Martinez completed and signed a Uniform Residential Loan Application on August 25, 2020. ECF No. 13-1 ¶ 35. Therein, Mrs. Martinez asserted that she earned base employment income of $13,750 per month ($165,000 per year). *Id.* Mrs. Martinez also claimed she owned liquid assets in the bank in the amount of $147,994, which were likely the proceeds of a fraudulent transfer from Dr. Martinez. *Id.* Mrs. Martinez also asserted ownership of the Englewood Property which she valued at $250,000. *Id.* Therefore, on her application Mrs. Martinez claimed total assets of $397,994. *Id.*

64.     Additionally, Mrs. Martinez had $297,000 in her 401(k) at that time when she applied for the initial mortgage on the Secoya Property. Kelly Martinez Dep., 100:16-20, Jan 26, 2023.

65.     Mrs. Martinez's monthly payment pursuant to the $480,000 mortgage consisted of $1,991 in principal and interest, plus an estimated escrow amount for property taxes and insurance of $650 per month for a total of $2,641, against $13,750 per month in income. ECF No. 13-1 ¶ 36. With her salary of $165,000 per year and approximately $400,000 in assets, Mrs. Martinez qualified for the mortgage without Dr. Martinez. *Id.*

66.     Mrs. Martinez had the ability to pay the $2,641 monthly mortgage payments with her $13,750 monthly salary. K. Martinez Dep., 87:16-18.

- 13 -

67.    On August 28, 2020, less than two weeks after the Connecticut Superior Court ordered Dr. Martinez to continue paying Plaintiff $25,000 per month or face incarceration or confinement for civil contempt, Dr. Martinez transferred $380,000 to Prosperity through a check from his Bank of America account. ECF No. 13-1 ¶ 38.

68.    August 28, 2020 was also the same day on which the mortgage securing Mrs. Martinez's $480,000 note payable was recorded. *Id.* at 39. Accordingly, the same day that the $480,000 mortgage was recorded, Dr. Martinez paid Mrs. Martinez's note down by $380,000, from $480,000 to $100,000. *Id.*

69.    Dr. Martinez was unemployed when he transferred $380,000 to pay down Mrs. Martinez's mortgage. *Id.* ¶ 40.

70.    On October 14, 2020, Mrs. Martinez signed a Warranty Deed dated October 13, 2020 transferring the Englewood Property to buyer Joan Riswold. *Id.*, Ex. K. The Warranty Deed was recorded with the Charlotte County Clerk of Circuit Court on October 16, 2020 (OR Book: 4647, PGS: 1121-22). *Id.*

71.    The sale price for the Englewood Property was $247,500, per the Charlotte County Property Appraiser. *Id.* ¶ 48.

72.    With a $247,500 sale price and a $108,200 mortgage, before commission and closing costs, approximately $140,000 was available in cash from the proceeds of the sale. *See id.*

- 14 -

73. Defendants used none of the approximately $140,000 in sales proceeds to pay Plaintiff. *Id.* ¶ 50.

74. On December 23, 2020, the Honorable Carl J. Schuman of the Connecticut Superior Court entered an order holding Dr. Martinez in contempt (the "December 23, 2020 Contempt Order"). *Id.* ¶ 51. Ex. M.

75. Judge Schuman held as follows:

A. Defendant failed to comply with the court order (Entry #321.86, para. 1) to pay the $25,000 monthly fine in October, November, and December, 2020;

B. Defendant failed, since August, 2020, to comply with the court order (Entry #167.86 , para. 2) to provide a detailed asset and financial disclosure on a quarterly basis;

C. Defendant has the ability to pay, based largely on money held in his retirement accounts;

D. Defendant remains in contempt of court;

E. The court will issue a capias for his arrest;

F. The capias will identify the following conditions of release: 1) posting of a $75,000 bond, cash or surety, and 2) provision of a current asset and financial statement.

*Id.*

76. Accordingly, on December 23, 2020, Judge Schuman held that Dr. Martinez "remains in contempt of court" and separately issued a capias for his arrest. *Id.* To date, Dr. Martinez has refused to surrender in Connecticut or otherwise purge his contempt. W. Martinez Dep., 87:19-21.

- 15 -

77.     The December 23, 2020 Contempt Order and Capias were recorded in Collier County in the Florida state court case of *Welsh v. Martinez*, Case 21-CA-000369. The December 23, 2020 Contempt Order and the Capias are fully enforceable in Florida in the same manner as the judgment of a Florida state court anyway. *Welsh v. Martinez*, 350 So. 3d 811, 814 (Fla. 2d DCA 2022).

78.     On May 18, 2021, Plaintiff filed a separate action against Dr. Martinez for enforcement and contempt pursuant to Dr. Martinez's continuing violations of the Connecticut orders (*D'anna Welsh v. William V. Martinez, Jr.*, Case No. 2:21-cv-00396). That case is pending before this Honorable Court.

79.     A year after purchasing the Secoya Property, on August 25, 2021 Dr. Martinez and Mrs. Martinez executed another quitclaim deed, this time transferring the Secoya Property to themselves as joint tenants (instead of tenants by the entireties), and this time using Mrs. Martinez's name as Kelly "Martinez." ECF No. 13-1 ¶ 57, Ex. N. The quitclaim deed was recorded with the Clerk of Court and Comptroller for Collier County on September 20, 2021 (OR 6013, PGS 3663-64). *Id.*

80.     Also on August 25, 2021, Mrs. Martinez refinanced the mortgage on the Secoya Property. *Id.* ¶ 58. A Release of Mortgage signed September 13, 2021 for the mortgage on the Secoya Property was recorded on September 16, 2021. (OR 6012, PG 1980). *Id.* ¶ 59.

- 16 -

81.    On August 25, 2021, Mrs. Martinez and Dr. Martinez signed a new mortgage on the Secoya Property, this time for $202,000. *Id.*, Ex. P. The "Borrower" listed on the mortgage is "Kelly Martinez and William Martinez, Jr. Wife and Husband." *Id.* The new mortgage was recorded on September 20, 2021 (OR 6013 PGS 3665-86. As part of the refinance, Mrs. Martinez cashed out $96,000. K. Martinez Depo., 217:9-11.

82.    For all three mortgages in the last 3 years, including the mortgage for the Englewood Property, the original mortgage for the Secoya Property and the refinanced mortgage for the Secoya Property, Mrs. Martinez qualified for the mortgages on her own and her individual finances were sufficient to pay the mortgages. *Id.* at 85:7-22.

83.    Since January 1, 2020, the balance of Dr. Martinez's Charles Schwab IRA Rollover account decreased from $1,040,274 to $59,575. Fell Decl., Ex. A. Since January 1, 2020, the balance of Dr. Martinez's Capital Group American Funds IRA decreased from $270,472 to $0.00. ECF No. 13-1 ¶ 61.

84.    From November 2, 2021 to February 28, 2022, Dr. Martinez was employed as a locum tenens at Riverview Cardiac Surgery in Bradenton Florida. *Id.* ¶ 62. Dr. Martinez earned $1,300 per day worked, working an average of 3-4 days per week. *Id.*

85.     For this work, Dr. Martinez received the following payments from his employer: $11,700 on December 6, 2021, $14,300 on January 13, 2022, $19,500 on February 10, 2022, and $24,700 on March 14, 2022. Fell Decl., Ex. A.

86.     As of March 1, 2022, Dr. Martinez became employed full time at Riverview Cardiac Surgery. ECF No. 13-1 ¶ 62. Dr. Martinez's annual base salary is now $300,000, paid in monthly installments of $25,000 per month per month. *See id.* ¶ 63, Ex. Q; W. Martinez Dep. 110:8-10, 114:5-7. Moreover, Dr. Martinez receives 25% of the amount of actual collections of fees for his services, as defined in his employment agreement. *Id.*

87.     In March 2022, Dr. Martinez's gross compensation from his employer pursuant to his employment agreement was $20,833. W. Martinez, Dep. 110:19-111:4.

88.     In April 2022, Dr. Martinez's gross compensation from his employer was $38,708. *Id.*

89.     In May 2022, Dr. Martinez's gross compensation from his employer was $40,575. *Id.*

90.     In June 2022, Dr. Martinez's gross compensation from his employer was $35,940. *Id.*

91.     In July 2022, Dr. Martinez's gross compensation from his employer was $32,149. *Id.*

- 18 -

92.    In August 2022, Dr. Martinez's gross compensation from his employer was $33,494. *Id.*

93.    In September 2022, Dr. Martinez's gross compensation from his employer was $31,832. *Id.*

94.    In October 2022, Dr. Martinez's gross compensation from his employer was $35,672. *Id.*

95.    In November 2022, Dr. Martinez's gross compensation from his employer was $30,628. *Id.*

96.    Accordingly, from solely his income pursuant to his employment agreement, Dr. Martinez earned $299,834 for the 9 months from March 2022 to November 2022, an average of $33,314 per month. *Id.* at 116:1-5.

97.    It is safe to say that Dr. Martinez is making more than $300,000 per year and Mrs. Martinez makes at least $165,000 per year. *Id.* at 116:6-11.

98.    Dr. Martinez paid none of his compensation from his employer in 2021 or 2022 to Plaintiff. *Id.* at 111:7-9.

99.    After Dr. Martinez regained employment in December 2021, he opened up a new bank account at Regions Bank because his account at Wells Fargo was garnished. *Id.* at 129:10-20.

100.   In April 2022, Dr. Martinez opened up a joint account with Mrs. Martinez at PNC bank. *Id.* at 130:4-9. Dr. Martinez opened the account with Mrs. Martinez so that it would be easier for Mrs. Martinez to access Dr. Martinez's money. *Id.* at 130:6-9.

101.   Since opening the joint account at PNC bank, Dr. Martinez has been depositing the entirety of his employment checks into the PNC account. *Id.* at 130:10-12.

102.   However, aside from his credit card bills, Dr. Martinez does not pay any bills from the PNC bank account. *Id.* at 95:20-23. Instead, Mrs. Martinez uses the entirety of the PNC account. *Id.* at 95:24-25.

103.   Mrs. Martinez does not deposit her income into the joint PNC account. K. Martinez Dep., 139:10-22. Her income continues to go into her own personal account from which she continues to pay all the bills. *Id.*

104.   Before getting the joint PNC account, Dr. Martinez did not pay any of the monthly household bills. *Id.* at 144:5-7.

105.   All the bills, when Dr. Martinez was not working, would be paid out of Mrs. Martinez's individual personal account. *Id.* at 127:6-8.

106.   Mrs. Martinez did not close her individual account when the parties got the joint PNC account. *Id.* at 127:9-18. And even though the parties opened the joint account, Mrs. Martinez kept her salary going into her personal

account and still had the same access to pay all her bills she was paying before from her personal account. *Id.*

107. Before the joint account at PNC was opened, during the time frame when Dr. Martinez started working again, Mrs. Martinez had no trouble paying bills. *Id.* at 136:8-17.

108. According to Mrs. Martinez, her lifestyle has not changed in the last two years. *Id.* at 271:10-11.

109. After getting the joint PNC account, Mrs. Martinez claims she would ask Dr. Martinez for cash to pay her bills and would take cash from the joint PNC account and physically go to her bank at Wells Fargo to deposit the cash. *Id.* at 152:6-16.

110. Mrs. Martinez would not actually pay bills directly from the joint PNC account and instead she would take cash and transfer money from the joint PNC to her own personal account. *Id.* at 154:17-23.

111. According to Mrs. Martinez, her and Dr. Martinez's combined annual income for this current year is about $450,000 to $500,000. *Id.* at 185:2-13. Yet, Mrs. Martinez claims she has "no idea" whether any of that money could be used to pay the judgment owed to Plaintiff. *Id.*

112. According to Mrs. Martinez, she has had no conversations with Dr. Martinez about paying the judgement owed Plaintiff, she has had no conversations with Dr. Martinez about Dr. Martinez making any payments

toward the contempt judgment owed to Plaintiff, she has no intentions of ever having a conversation with Dr. Martinez about paying the contempt judgment, and as long as she lives, Mrs. Martinez will never ask Dr. Martinez about paying the contempt judgment owed to Plaintiff. *Id.* at 185:5-186:6.

113. Although Mrs. Martinez claims she has had an opportunity to ask Dr. Martinez about the open capias for his arrest, Mrs. Martinez claims she has not asked Dr. Martinez about the open capias for his arrest. *Id.* at 189:4-10.

114. Mrs. Martinez claims it would have no effect on her at all if Dr. Martinez were to be taken into custody pursuant to the capias. *Id.* at 190:9-23.

**UNACCOUNTED FOR TRANSFERS FROM PNC ACCOUNT**

115. Withdrawals from the parties PNC joint account for which Dr. Martinez and Mrs. Martinez have not accounted include without limitation the following:

| Date | Withdrawal | Description |
|------|------------|-------------|
| 5/9/2022 | $11,218.82 | Check No. 101 Made out to Kelly Martinez for "Bills." Signed WM. |
| 5/31/2022 | $10,186.10 | Check No 121 Made out to Kelly Martinez. "For" is blank. |

| 6/6/2022 | $6,000.00 | Withdrawal Reference No. 031440354 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |
|---|---|---|
| 6/6/2022 | $3,980.00 | Withdrawal Reference No. 031440354 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |
| 6/30/2022 | $11,650.00 | Withdrawal Reference No. 031714077 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |
| 7/13/2022 | $10,000.00 | Withdrawal Ref. No. 031382248 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |
| 7/29/2022 | $9,083.60 | Withdrawal Ref. No. 031622307 |

| | | |
|---|---|---|
| | | "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |
| 8/31/2022 | $9,187.29 | Withdrawal Reference No. 030776312 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |
| 9/14/2022 | $15,200.00 | Withdrawal Reference No. 031935211 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by WM. No reference as to purpose. |
| 10/3/2022 | $9,341.03 | Withdrawal Reference No. 032576845 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. |
| 10/31/2022 | $20,000.00 | Withdrawal Reference No. 031412304 "Checking/Savings Withdrawal Ticket" |

| Date | Withdrawal | Description |
|---|---|---|
| | | reflecting this withdrawal. Signed by KM. No reference as to purpose. |
| 11/30/2022 | $9,660.66 | Withdrawal Reference No. 031867311 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |
| 12/12/2022 | $10,000.00 | Withdrawal Reference No. 03500548189 "Checking/Savings Withdrawal Ticket" reflecting this withdrawal. Signed by KM. No reference as to purpose. |

Fell Decl., Ex. B.

## PAYMENTS TO AMEX FROM PNC ACCOUNT

116. Withdrawals from the parties' PNC joint account for payments to American Express ("Amex") include without limitation the following:

| Date | Withdrawal | Description |
|---|---|---|
| 4/19/2022 | $3,500.00 | Amex Account Not Named |
| 4/22/2022 | $1,250.00 | Amex Account Not Named |

| 6/1/2022 | $13,500.00 | Amex Account Not Named |
| 6/2/2022 | $2,500.00 | Amex Account Not Named |
| 7/1/2022 | $14,000.00 | Amex Account Not Named |
| 8/1/2022 | $11,500.00 | Amex Account Not Named |
| 9/1/2022 | $18,000.00 | Amex Account Not Named |
| 10/3/2022 | $13,000.00 | Amex Account Not Named |
| 11/1/2022 | $7,500.00 | Amex Account Not Named |
| 12/1/2022 | $6,500.00 | Amex Account Not Named |

Fell Decl., Ex. B.

## PARTIES' EXPENSES

117. Dr. Martinez does not own or lease a car. W. Martinez Dep., 102:7-19.

118. Dr. Martinez does not pay for any car insurance. *Id.* at 103:9-10.

119. Other than his credit card, Dr. Martinez does not pay any bills himself directly because all the bills are in Mrs. Martinez's name. *Id.* at 95:22-96:2.

120. Mrs. Martinez owns a 2015 BMW free and clear and owes no payments on it. K. Martinez Dep., 88:4-11.

121. Mrs. Martinez pays between $200 to $300 per month for her car insurance. *Id.* at 88:12-15.

122.   Mrs. Martinez pays around $300 per month for electricity on the Englewood Property. *Id.* at 89:20-23.

123.   Mrs. Martinez does not know how much she pays for homeowner's insurance. *Id.* at 90:12-13.

124.   Mrs. Martinez pays around $100 per month for her water bill. *Id.* at 91-14-15.

125.   Mrs. Martinez pays around $300 per month for the family cell phone plan. *Id.* at 91:17-21.

126.   Mrs. Martinez pays around $150 per month for home internet. *Id.* at 91:22-25.

127.   Mrs. Martinez pays around $350 per month for home cable TV. *Id.* at 92:12-14.

128.   Mrs. Martinez pays around $150 per month for pool maintenance. *Id.* at 92:16-20.

129.   Mrs. Martinez pays around $300 per month for homeowner's association (HOA) fees. *Id.* at 92:21-25.

130.   Mrs. Martinez pays $1,500 per month for her mortgage. *Id.* at 173:13-14.

131.   Dr. Martinez pays around $400 per week on meals outside the home in restaurants. W. Martinez Dep., 100:5-9.

132.   Dr. Martinez pays around $500 per month for gas. *Id.* at 102:25-103:3.

133.   Dr. Martinez pays nothing for his own health and dental insurance as he is covered under Mrs. Martinez's insurance. *Id.* at 104:5:-10.

134.   Dr. Martinez pays around $20.00 per week for Mrs. Martinez's minor child's lunch plan at public school. *Id.* at 104:1-4.

135.   Dr. Martinez pays around $30.00 per month for dry cleaning. *Id.* at 104:18-19.

136.   Dr. Martinez pays around $50.00 per month for unreimbursed prescription drugs. *Id.* at 104:25-105:2.

137.   Dr. Martinez pays around $55.00 per month for a haircut. *Id.* at 105:3-5.

138.   Dr. Martinez pays around $75.00 per month for dog food. *Id.* at 105:6-14.

139.   Dr. Martinez pays around $400 per month for golf during high season and $200 per month on golf during low season. *Id.* at 106:1-9. Dr. Martinez considers golf to be an ordinary living expense "for my mental health." *Id.*

140.   Dr. Martinez pays around $130.00 four times per year at comedy clubs. *Id.* at 106:10-19.

141. Dr. Martinez vacations once or twice per year and spends around $5,000 to $10,000 per vacation. *Id.* at 107:1-14.

142. For example, in July 2022, Dr. Martinez went "RV'ing," went to the Hoover Dam, went to Las Vegas, went to Horseshoe National Park, went to Lake Powell, and maybe one other place. *Id.* at 130:24-131:14.

143. For that trip, Dr. Martinez claims he gave Mrs. Martinez maybe $5,000 in cash, which was in addition to costs of the vacation. *Id.* at 131:5-14.

144. During that trip, Dr. Martinez stayed at a hotel in Las Vegas, which might have been the Mandalay Bay. *Id.* at 132:1-4. Dr. Martinez gambled and lost around $1,000 on Black Jack and Roulette. *Id.* at 132:7-19.

145. Aside from the expenses listed above, Dr. Martinez could not think of any other expenses that he pays. *Id.* at 108:15-16.

146. Meanwhile, Dr. Martinez has no documents supporting any claim that he lacked the ability to pay Plaintiff anything from January 2021 to present and no documents related to why he has paid Plaintiff no money since regaining employment in 2021. *Id.* at 139:24-142:2.

147. Dr. Martinez has not even sat down and looked at what expenses he has, what expenses he can cut out and has not even tried to determine what amount he has the ability to pay to Plaintiff. *Id.* at 124:11-20.

148.   Dr. Martinez admitted that given the fact that he had a retirement account of over a million dollars and then regained employment making at least $300,000 per year now, "sure, there's money that could be paid" to Plaintiff since January 1, 2020 but which Dr. Martinez failed to pay. *Id.* at 122:13-25.

149.   Dr. Martinez is waiting for a judge here in Florida to enter an order before he pays Plaintiff anything. *Id.* at 57:21-58:2.

## Dr. Martinez's Insolvency

150.   From January 1, 2020 to present, Dr. Martinez has been insolvent in that the sum of his debts has been greater than all of his assets at fair valuation and he has not been paying his debts as they became due. Fell Decl., Ex. A. Dr. Martinez owes Plaintiff over $2 million pursuant to the contempt judgment and must pay Plaintiff $25,000 per month which, aside from one $25,000 payment in September 2020, Dr. Martinez has failed to pay at all. ECF No. 13-1, Exs. D, G, M; W. Martinez Dep., 64:10-13. The sum of Dr. Martinez's assets does not exceed $2 million. *Id.*; Fell Decl., Ex. A.

## LEGAL STANDARD

Summary judgment should be entered when the evidence shows that "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see e.g., Lamar v. Wells Fargo Bank*, 597 Fed. Appx. 555, 556–57 (11th Cir. 2014). The movant must

- 30 -

inform the court of the basis for the motion and identify the parts of the record that demonstrate an absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). An issue of fact is "genuine" if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Baby Buddies, Inc. v. Toys "R" Us, Inc.*, 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may also carry its burden by showing an absence of evidence to support the nonmoving party's case. *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmovant to demonstrate that there is a genuine issue of material fact. *Coats*, 929 F.2d at 608. The nonmovant must present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial. *Celotex*, 477 U.S. at 324.

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Because he is a fugitive from justice pursuant to the domesticated Connecticut capias, Dr. Martinez should be barred from presenting any claim or defense under the fugitive disentitlement doctrine. Because of their blatant discovery violations, both Defendants should be barred from presenting any affirmative defenses and the Court should find that the intent elements of

- 31 -

Counts One and Two are established as a matter of law. Because all elements are conclusively established based on the undisputed facts, summary judgment is properly granted on all of the following: Count One (Violation of the Uniform Fraudulent Transfer Act § 726.105 Fla. Stat. Ann.), Count Two (Violation of the Uniform Fraudulent Transfer Act § 726.106, Fla. Stat. Ann.), Count Three (Injunctive Relief), Count Four (Equitable Relief), Count Five (Fraudulent Asset Conversion), Count Six (Declaratory Judgment), and Count Seven (Declaratory Judgment).

## I. Because he is a Fugitive from Justice Pursuant to the Domesticated Connecticut Capias, Dr. Martinez should be Barred from Presenting any Claim or Defense under the Fugitive Disentitlement Doctrine.

A party is a fugitive from justice if he intentionally avoids arrest by "remaining absent from the jurisdiction." *Ener v. Martin*, 987 F.3d 1328, 1332 (11th Cir. 2021). The defendant "may constructively flee by deciding not to return." *Id.* at 1184. Intent to flee or avoid arrest can be inferred "from a person's failure to surrender to authorities." *United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997)). The "fugitive disentitlement doctrine" limits access to the courts by fugitives from justice under principles of equity. *F.D.I.C. v. Pharaon*, 178 F.3d 1159, 1161 (11th Cir. 1999) (*citing Barnette*, 129 F.3d at 1183-84). A party's fugitive status "disentitles the [fugitive] to call upon the resources of the Court for determination of his claims." *Id.* (*citing Barnette*, 129

F.3d at 1184). The rationale behind the doctrine includes "the difficulty of enforcement against one not willing to subject himself to the court's authority; the inequity of allowing a fugitive to use court resources only if the outcome is an aid to him; and the need to avoid prejudice to the nonfugitive party." *Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir. 1998) (*citing Degen v. United States*, 517 U.S. 820, 824–25 (1996); *Barnette*, 129 F.3d at 1183.

In *Mishkin*, the Southern District of Florida applied the fugitive disentitlement doctrine to bar a debtor and his mother from presenting defenses in a collections case pursuant to a judgment entered against the debtor in the Southern District of New York. *Mishkin*, 2008 WL 708733, at \*1. The Southern District of New York issued an arrest warrant for the debtor's failure to abide by that court's order to appear and turn over $12 million dollars in assets. *Id.* The debtor failed to surrender to the New York arrest warrant, resulting in his fugitive status. *Id.* The Southern District of Florida barred the debtor's defenses and issued a default under the fugitive disentitlement doctrine. *Id.* at \*5-7. The court explained as follows:

> The facts in this case are supported by the reasons courts cite when applying the fugitive disentitlement doctrine to appeals. Those courts reason that a fugitive ought not have the luxury of asking a court to hear its position in any matter while he or she remains a fugitive. Since the fugitive decided to remove himself or herself from the Court's reach, the legal system ought not have the burden of concerning itself with whether or not the fugitive's rights have been properly adjudicated. To this end, courts of appeal apply the doctrine for the following reasons: to ensure that a decision will be

enforced and followed; to impose a penalty for refusing to participate in the judicial process; to discourage people from becoming fugitives; and to avoid prejudice to the opposing party in the lawsuit.

( . . . )

Here, both [Debtor] and [Debtor's mother] have absconded to other countries and have failed to participate in the proceedings, other than having their respective lawyers file voluminous pleadings explaining their position. As such this Court entered an Order of Contempt against [Debtor's mother] in this proceeding and the District Court in New York did the same against [Debtor]. Based on the principles explained by courts applying the fugitive disentitlement doctrine, both [Debtor's mother] and [Debtor] should be disenfranchised from using this Court to forward their views when they refuse to abide by any of this Court's orders. As such, there is no assurance that any of this Court's orders will be followed. A penalty is warranted.

*Id.* at *7.

The fugitive disentitlement doctrine allows a federal court to strike a defendant's answer and enter default. *Id.* at 6-7.[4] In *Mishkin*, the court rejected the defendant's argument that the fugitive disentitlement doctrine is inapplicable when the defendant seeks no affirmative relief. *Id.* at *6-7 (S.D. Fla. Mar. 14, 2008). The *Mishkin* court distinguished cases where the fugitive

---

[4] The *Mishkin* court explained how the fugitive disentitlement doctrine was historically used to decline consideration of a fugitive's appeal or a civil suit brought by a fugitive related to a criminal matter pursuant to which the person is a fugitive. *Id.* The idea is that a person who refuses to submit himself to the court's jurisdiction should not be permitted to benefit from court resources or "ask that the courts protect his interests." *Id.* (*citing F.D.I.C.* at 1161.; *U.S. v. Viomar Co.,* 616 F.Supp. 24, 27 (S.D.Fla.1985) (disallowing the entry of affidavits by fugitives to prove that two properties previously owned by the fugitives were conveyed to their daughter and therefore should not be subject to a preliminary injunction)).

status "arose from an entirely different proceeding." *Id.* at 7. The *Mishkin* court held that a "fugitive ought not have the luxury of asking a court to hear its position in any matter while he or she remains a fugitive." *Id.* Courts apply the fugitive disentitlement doctrine for the following reasons: (1) to ensure that a decision will be enforced and followed, (2) to impose a penalty for refusing to participate in the judicial process, (3) to discourage people from becoming fugitives, and (4) to avoid prejudice to the opposing party in the lawsuit. *Id.* (*citing Empire Blue Cross and Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2nd Cir.1997)).

Like in *Mishkin*, all four reasons favor application of the doctrine. As a matter of law, Dr. Martinez is *currently* a fugitive from justice. Dr. Martinez has remained absent from the jurisdiction which issued the capias, Connecticut, and he constructively fled that jurisdiction. Furthermore, Dr. Martinez has failed to surrender after both the Capias and the December 23, 2020 Contempt Order were domesticated in Florida and the Florida appellate court held they are fully enforceable. *Welsh v. Martinez*, 350 So. 3d 811, 814 (Fla. 2d DCA 2022).

Dr. Martinez has been in contempt of court since 2017 and he has showed an appalling pattern of disrespect for the judicial process. While already in contempt, he flouted the court's February 19, 2020 Ruling on Remand, *subsequently* absconded to Florida in March 2020, failed to pay the court-

- 35 -

ordered contempt fines and again violated the asset standstill order this time by transferring at least $120,000 to his new wife for her individual purchase of real her Englewood Property. On August 14, 2020, when the court again ordered Dr. Martinez to resume paying Plaintiff $25,000 per month by September 15, 2020 and on the 15th day of each month thereafter until the entire contempt fine was paid in full, the court warned that upon non-compliance, Dr. Martinez "shall be incarcerated or otherwise confined for civil contempt" (ECF No. 13-1, Ex. G).

But Dr. Martinez violated that court order too, thus disrespecting the court again as he "flouted" the August 14, 2020 Contempt Order, violated the asset standstill order and subsequently transferred $380,000 to pay down a mortgage on which he did not owe a dime while failing to pay a Plaintiff a penny for the past 23 months. ECF No. 13-1 at ¶ 38. The August 14, 2020 Contempt Order had no meaningful effect on Martinez's continuing noncompliance. Like the other orders, the December 23, 2020 Contempt Order contained findings that Martinez willfully violated the prior orders despite his ability to comply with them.

On December 23, 2020, the court issued a capias for Martinez's arrest (ECF No. 13-1, Ex. M). But Dr. Martinez flouted that order too and didn't surrender himself pursuant to the capias or comply with the court's order requiring monthly payments for the last 23 months since October 2020.

Showing that his willful noncompliance with court orders was not limited to financial matters, while already in contempt, Dr. Martinez refused to submit quarterly asset disclosures for a year without a semblance of a valid excuse.

Here, like in *Mishkin*, the facts and principles are analogous to those cited by courts when applying the fugitive disentitlement doctrine to appeals. Dr. Martinez already appealed two of the rulings from Connecticut and lost in 2015 and 2019. He failed to appeal the December 23, 2020 Contempt Order and Capias and Defendant failed to object to their domestication in Florida. Yet, in this court, Dr. Martinez obtusely projects a rogue end-around, seeking to unilaterally deny the enforceability of those orders in what is tantamount to an appeal if it were not completely rogue and lawless. As a fugitive with an open capias pursuant to the exact same December 23, 2020 Contempt Order, Dr. Martinez should be denied all rights to challenge the enforceability of the orders just as he would be denied the right to appeal if he had actually sought an appeal.

Moreover, like in *Mishkin*, clearly there is a sufficient nexus between this fraudulent transfer case and the judgment from the Superior Court in Connecticut from which the contempt orders and capias derive. This entire case proceeds from those Connecticut contempt orders and judgment. They are the judgment and orders pursuant to which Dr. Martinez's transfers were fraudulent. Furthermore, like the debtor in *Mishkin*, who failed to surrender

- 37 -

to the New York arrest warrant which resulted in his fugitive status, Dr. Martinez failed to surrender to the Connecticut capias which resulted in his fugitive status.

Even more than in *Mishkin*, the rationale for applying the fugitive disentitlement doctrine exists here to (1) ensure that the Connecticut court's decisions will be enforced and followed, (2) impose a penalty for Defendant's refusal to abide by those court orders, (3) discourage Defendant from remaining a fugitive and (4) avoid the prejudice to Plaintiff that has resulted from Defendant flatly refusing to abide by the Connecticut contempt orders, Asset Standstill Order and Capias for his arrest all while continuing to fraudulently transfer nearly all his assets to his wife Mrs. Martinez. Accordingly, the Court should bar Dr. Martinez from presenting any claims or defenses under the fugitive disentitlement doctrine.[5]

---

[5] Additional arguments for applying the fugitive disentitlement doctrine here are set forth in Plaintiff's Opposed Motion to Strike and Preclude All Claims and Defenses of Contemnor and Fugitive William V. Martinez, Jr. under the Fugitive Disentitlement Doctrine (ECF No. 43) and Plaintiff's Reply in Further Support of Plaintiff's Opposed Motion to Strike and Preclude All Claims and Defenses of Contemnor and Fugitive William V. Martinez, Jr. under the Fugitive Disentitlement Doctrine (ECF No. 62). In its Order dated January 30, 2023 (ECF No. 85), the Court denied Plaintiff's motion "without prejudice to Plaintiff briefing these issues in the ordinary course via dispositive motions."

**II.     Because of their Blatant Discovery Violations, both Defendants should be Barred from Presenting Any Affirmative Defenses and the Court should Find that the Intent Elements of Counts I and II are Established as a Matter of Law.**

Contemporaneously with this motion for summary judgment, Plaintiff files Plaintiff's Motion for Entry of Adverse Evidentiary Sanctions against Defendants due to Defendants' Willful Violations of a Court Order, Violations of The Discovery Rules and Spoliation of Evidence. For the reasons discussed therein, the Court should (1) find that the intent elements of Count One and Count Two are established per Rule 37(b)(2)(A)(i), (2) preclude Defendants from submitting evidence in opposition to Count One and Count Two per Rule 37(b)(2)(A)(ii), and (3) strike Defendants' answer, in part, by striking all of Defendants' affirmative defenses per Rule 37(b)(2)(A)(iii).

On November 18, 2022, the Court granted Plaintiff's motion to compel Defendants' discovery responses and ordered Defendants to "produce all responsive, non-privileged documents and a privilege log for any responsive documents withheld from production" by December 9, 2022. Defendants' Court-ordered December 9, 2022 discovery responses contained no objections, no invocation of privilege and no privilege log. In her January 26, 2023 deposition, Mrs. Martinez admitted that she inexplicably failed to search for any responsive documents whatsoever at any time, even after the Court ordered Defendants' discovery compliance pursuant to Plaintiff's motion to

compel. After discovering that there were responsive text messages between Defendants on Mrs. Martinez's cell phone during her deposition, the deposition was continued to February 3, 2022 to allow Mrs. Martinez to conduct a thorough search for additional responsive text messages and emails to supplement her incomplete production. However, during her February 3, 2023 deposition, Mrs. Martinez testified that she elected to decline to search for responsive texts or email. Mrs. Martinez further testified she had no plans to search for, or previously submit, any of her communications with Dr. Martinez.

During his January 30, 2023 deposition, Dr. Martinez went a step further and admitted that unlike Mrs. Martinez, who failed to look for any responsive text and email communications, Dr. Martinez *deleted* all of his responsive communications with Mrs. Martinez. During the deposition, Dr. Martinez testified that he had been regularly deleting communications regarding this case since February of 2022 when he gave a deposition in *Welsh v. Martinez*, Case No. 21-CA-000365 (Judgement Domestication Case in Collier County, Florida).

Defendants' behavior continues to demonstrate an attitude that compliance with a Court order is optional to them and that the Court's rules are advisory in nature. Mrs. Martinez refused to search for discoverable communications even after it was demonstrated that she possessed undisputedly discoverable and highly relevant communications. Dr. Martinez's

conduct is even worse because he deleted all responsive communications which he was required to preserve and which he was ordered by this Court to produce. This behavior has prejudiced Plaintiff.

Plaintiff respectfully asks the Court to hold Defendants to account. The Court should (1) find that the intent elements of Count One and Count Two are established per Rule 37(b)(2)(A)(i), (2) preclude Defendants from submitting evidence in opposition to Count One and Count Two per Rule 37(b)(2)(A)(ii), and (3) strike Defendants' answer, in part, by striking all of Defendants' affirmative defenses per Rule 37(b)(2)(A)(iii) and/or draw an adverse inference that the deleted communications would have supported Plaintiff's claims and detrimental to Defendants" defenses per Rule 37(e).

## III.  <u>Summary Judgment is Properly Granted on All Counts.</u>

Because all elements are conclusively established based on the undisputed facts, summary judgment is properly granted on all of the following counts: Count One - Violation of the Uniform Fraudulent Transfer Act § 726.105, Fla. Stat. Ann., Count Two - Violation of the Uniform Fraudulent Transfer Act § 726.106, Fla. Stat. Ann., Count Three - Injunctive Relief, Count Four - Equitable Relief, Count Five - Fraudulent Asset Conversion, Count Six - Declaratory Judgment, and Count Seven - Declaratory Judgment.

**A. Because Defendants Engaged in Actual Fraud and Constructive Fraud, Summary Judgment is Properly Granted on Count One for Violation of the Uniform Fraudulent Transfer Act § 726.105, Fla. Stat. Ann.**

To prove a fraudulent transfer under § 726.105, Fla. Stat. Ann., a plaintiff may proceed under two theories, actual fraud or constructive fraud. *See Wiand v. Cloud*, 919 F. Supp. 2d 1319, 1330 (M.D. Fla. 2013) (*citing Wiand v. Waxenberg*, 611 F.Supp.2d 1299, 1318–19 (M.D. Fla. 2009); *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (M.D. Fla. 2002). Section 726.105(1)(a) codifies actual fraud. *See id.* Section 726.105(1)(b) codifies constructive fraud. *See id.* Both are satisfied here.

**1. Actual Fraud Exists Under § 726.105(1)(a), Fla. Stat. Ann., because Dr. Martinez's Transfers to Mrs. Martinez were Made with Actual Intent to Hinder, Delay or Defraud Plaintiff.**

Under § 726.105(1)(a), Fla. Stat. Ann., a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation with "actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* Under § 726.102(5), Fla. Stat. Ann., a "creditor" means a person who has a claim. Under § 726.102(7), Fla. Stat. Ann., a "debtor" means a person who is liable on a claim. Under § 726.102(4), Fla. Stat. Ann., a "claim" means a right to payment.

To determine "actual intent to hinder, delay or defraud," the court considers, among other factors, whether:

- 42 -

(a) The transfer or obligation was to an insider.
(b) The debtor retained possession or control of the property transferred after the transfer.
(c) The transfer or obligation was disclosed or concealed.
(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
(e) The transfer was of substantially all the debtor's assets.
(f) The debtor absconded.
(g) The debtor removed or concealed assets.
(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

§ 726.105(2), Fla. Stat. Ann.

The existence of these statutory "badges of fraud" creates a prima facie case and rebuttable presumption that the transaction is void. *Wiand v. Lee*, 753 F.3d 1194, 1200 (11th Cir. 2014) (*citing Gen. Elec. Co. v. Chuly Int'l, LLC*, 118 So.3d 325, 327 (Fla. 3d DCA 2013)). Although "[a] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance [ ] several of them when considered together may afford a basis to infer fraud." *Id.* (*citing Johnson v. Dowell*, 592 So. 2d 1194, 1197 (Fla. 2d DCA 1992)). While § 726.105(2), Fla. Stat. Ann. lists 11 badges of fraud, the Court may consider factors other than those listed. *Id.* (*citing Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485,

- 43 -

1498 (11th Cir.1997)). Indeed, the Court can take into account all circumstances surrounding the alleged fraudulent transfer. *Id.* (*citing Gen. Elec. Co.*, 118 So.3d at 327); *see also Mane FL Corp. v. Beckman*, 48 Fla. L. Weekly D86 (Fla. 4th DCA Jan. 4, 2023) (*citing In re Jennings*, 332 B.R. 465, 469 (Bankr. M.D. Fla. 2005) ("The language of the statute makes clear that the badges of fraud are nonexclusive and that courts may consider other factors in determining a debtor's intent.")

Dr. Martinez's transfers of cash for the down payments and purchase of Mrs. Martinez's Englewood Property and Secoya Property, as well as Dr. Martinez's paydown of Mrs. Martinez's mortgage, were transfers made with actual intent to hinder, delay and defraud Plaintiff. Dr. Martinez's transfers of the entirety of his income from his employment as a cardiac surgeon to Mrs. Martinez were also fraudulent transfers made with actual intent to hinder, delay and defraud Plaintiff. Plaintiff is a creditor under § 726.102(5), Fla. Stat. Ann. Dr. Martinez is a debtor under § 726.102(7), Fla. Stat. Ann. Moreover, at least *10* statutory badges of fraud exist here, as well as other relevant circumstances showing fraudulent intent.

### Badge (a) The transfer or obligation was to an insider.

Under §§ 726.102(8), (13), Fla. Stat. Ann., Mrs. Martinez is an insider because she is a relative of Dr. Martinez as his wife.

- 44 -

## Badge (b) The debtor retained possession or control of the property transferred after the transfer.

Dr. Martinez retained possession or control of the property transferred after each transfer. Mrs. Martinez is his wife and the two work together as a fraudulent transfer team.

## Badge (c) The transfer or obligation was disclosed or concealed.

Dr. Martinez did not disclose the transactions to Plaintiff until after they occurred. Moreover, despite multiple court orders, Dr. Martinez failed to provide Plaintiff with quarterly financial statements after August 2020 until August 2021.

## Badge (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

Before Dr. Martinez made each transfer, he not only had been sued by Plaintiff but was already a judgment-debtor and was in contempt of court for non-compliance with payment orders. Moreover, Dr. Martinez's $120,000 transfer for Mrs. Martinez's Englewood Property was made on March 2, 2020, *12 days* after Connecticut trial court Judge Schuman expressly ordered in the February 19, 2020 Ruling on Remand that Dr. Martinez must pay Plaintiff a compensatory contempt fine of $2,048,009 in installments of $25,000 per month until paid in full. Dr. Martinez's $140,000 transfer for the Secoya Property and $380,000 transfer to pay down Mrs. Martinez's mortgage were each made in August 2020, *after* the Court entered the August 14, 2020

- 45 -

Contempt Order in which the Court again expressly ordered that, "defendant shall pay the plaintiff $25,000 by September 15, 2020 and by the fifteenth of each succeeding month" and warned that upon noncompliance, Dr. Martinez "shall be incarcerated or otherwise confined for civil contempt." Defendants' opening of the joint PNC account and transfers thereto began in April 2022, after Plaintiff filed the instant lawsuit on April 5, 2022.

**Badge (e) The transfer was of substantially all the debtor's assets.**

Each transfer was of a substantial amount of Dr. Martinez's assets.

**Badge (f) The debtor absconded.**

Furthermore, Dr. Martinez absconded. Dr. Martinez's $120,000 and $140,000 "gift" transfers for Mrs. Martinez's Englewood Property and the Secoya Property, as well as Dr. Martinez's $380,000 transfer to pay down Mrs. Martinez's mortgage, were made within less than a year of Dr. Martinez fleeing Connecticut and relocating to Florida. Moreover, the transfers to the joint account at PNC occurred while Dr. Martinez remains a fugitive from justice with an outstanding capias for his arrest.

**Badge (g) The debtor removed or concealed assets.**

Dr. Martinez has removed and concealed hundreds of thousands of assets, including as he admitted, by removing $1,069,428 from his retirement accounts since January 1, 2020 and aside from one $25,000 payment in September 2020, using it for reasons other than to pay Plaintiff. Moreover, as

- 46 -

mentioned, Dr. Martinez failed to provide his quarterly asset disclosures for a

year from August 2020 to August 2021.

<u>**Badge (h) The value of the consideration received by the debtor was
reasonably equivalent to the value of the asset transferred or the
amount of the obligation incurred.**</u>

In a suit to set aside a transfer from a husband to his wife as fraudulent,

not only does the debtor bear the burden of proving consideration proportionate

to the value of the property, but "clearer and fuller proof is required than if the

transactions had been between strangers." *Harkins v. Holt*, 169 So. 481, 482

(Fla. 1936). When a husband is insolvent, a rebuttable presumption arises that

the transfer to his wife was fraudulent. *Id. See also United States v. Horton*,

760 F.2d 1225 (11th Cir. 1985) (holding that at a minimum, transferee or

grantee of property has more than the ordinary burden of proof to rebut

presumption of fraud in connection with conveyance made by one spouse to

another in cases of insolvency)); *In re McFarland*, 619 Fed. Appx. 962, 975

(11th Cir. 2015) (construing the analogous bankruptcy fraudulent transfer

statute and holding "We scrutinize the value of transfers more closely where,

as here, the transfer was made to an insider.") In the Eleventh Circuit, "love

and affection" do not constitute reasonably equivalent value in exchange for a

transfer. *Id.* (*citing Walker v. Treadwell (In re Treadwell)*, 699 F.2d 1050, 1051

(11th Cir.1983) and noting that even the face of the deed identifies the transfer

as a "Gift"). So called "marital consideration" is insufficient to create a genuine

issue of fact precluding summary judgment. *United States v. Major*, 551 B.R. 531, 542 (M.D. Fla. 2016) (*citing Treadwell,* 699 F.2d at 1051).

Dr. Martinez received no consideration in exchange for each transfer. Moreover, for his payments toward Mrs. Martinez's Englewood Property and the Secoya Property, he and Mrs. Martinez signed "gift" letters clearly indicating that the transfers were gifts. Therefore, he received no consideration as a matter of law. Furthermore, his payments to the joint PNC account could not have used solely for his household expenses. Dr. Martinez and Mrs. Martinez's expenses are minimal and dwarfed by their gross annual income of nearly $500,000. Moreover, like in his previous contempt case, Dr. Martinez has failed to account for a myriad of large transfers out of the joint bank account. Furthermore, Mrs. Martinez was fully capable of paying the household bills on her own and qualified for each mortgage using her own assets and income. Accordingly, once Dr. Martinez regained employment as a surgeon earning $300,000 per year plus 25% of everything he brings in, all his income was already in excess of the parties' ordinary household living expenses. And it was all transferred to Mrs. Martinez.

### Badge (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

Dr. Martinez was unemployed and/or insolvent at the time of the transfer or became insolvent shortly after the transfer was made. Under §

726.103(1), Fla. Stat. Ann., a debtor is insolvent if the sum of his debts is greater than all of his assets at a fair valuation. *Id.* This is the "balance sheet test," under which the Court may determine that a debtor is insolvent if the value of his liabilities exceed the value of his assets. *In re Mongelluzzi*, 587 B.R. 392, 409 (Bankr. M.D. Fla. 2018), *on reconsideration in part sub nom. In re Able Body Temp. Services, Inc.*, 2018 WL 11206122 (Bankr. M.D. Fla. Sept. 4, 2018). Under § 726.103(2), Fla. Stat. Ann. a debtor who is generally not paying his debts as they become due is presumed to be insolvent. *Id.*

From January 1, 2020 to present, Dr. Martinez has been insolvent because the sum of his debts has exceeded all of his assets at fair valuation and he has not been paying his debts as they become due. Dr. Martinez owes Plaintiff over $2 million pursuant to the contempt judgment and must pay Plaintiff $25,000 per month which, aside from *one* $25,000 payment in September 2020, Dr. Martinez has failed to do. The sum of Dr. Martinez's assets does not exceed $2 million. Accordingly, Dr. Martinez satisfies the balance sheet test, is presumed to be insolvent and is actually insolvent under § 726.103, Fla. Stat. Ann.

### Badge (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

As discussed above in Badge (d), the transfers occurred in close temporal proximity to the entry of court orders and other court proceedings in which Dr.

Martinez incurred substantial debt. The gift transfer for Mrs. Martinez's Englewood Property occurred in March 2020 right after the Connecticut court liquidated Dr. Martinez's contempt fine and reaffirmed his obligation to pay $25,000 per month in February 2020. The gift transfers for the Secoya Property and to pay down Mrs. Martinez's mortgage occurred in August 2020, the same month the Connecticut court reaffirmed Dr. Martinez's contempt and ordered him to pay $25,000 per month or face jail time.

### Summary of Badges of Fraud

The following chart summarizes the statutory badges of fraud here.

| Badge of Fraud | Is the Badge Present? |
| --- | --- |
| (a) The transfer or obligation was to an insider. | Yes. |
| (b) The debtor retained possession or control of the property transferred after the transfer. | Yes. |
| (c) The transfer or obligation was disclosed or concealed. | Yes. |
| (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. | Yes. |
| (e) The transfer was of substantially all the debtor's assets. | Yes. |
| (f) The debtor absconded. | Yes. |
| (g) The debtor removed or concealed assets. | Yes. |

| | |
|---|---|
| (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. | Yes. |
| (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. | Yes. |
| (j) The transfer occurred shortly before or shortly after a substantial debt was incurred. | Yes. |
| **Total Statutory Badges Present** | **10** |

## Additional Factors

In addition to the statutory badges, the history of Dr. Martinez's willful disregard for court orders and his prior fraudulent transfers screams of fraud. Dr. Martinez is doing the exact same thing he did with his previous wife, for which he was *held in contempt* and found to have fraudulently transferred assets in violation of the Asset Standstill Order. Right after the jury verdict was entered in 2012, Plaintiff immediately moved to prevent Dr. Martinez from fraudulently transferring his assets and the court enjoined Dr. Martinez from using any of his assets other than for his ordinary living expenses. Yet, immediately after that order was entered, Dr. Martinez began fraudulently transferring essentially all of his assets to his then-wife. For this, Dr. Martinez was held in contempt. Neither the Connecticut trial court nor appellate court beleived Dr. Martinez's excuse that he was only transferring his assets to his

then-wife to pay for his ordinary living expenses. Dr. Martinez divorced that wife and got a new one, Mrs. Martinez. But Dr. Martinez is *still* doing essentially the exact same thing and with the exact same excuse.

This context is important. This case does not involve the collection of a routine debt. It falls well outside the parameters of normal circumstances. Dr. Martinez continues to engage in a gross exercise of self-help, which the law disallows. He continues to willfully disobey the asset standstill order by depositing the entirety of his wages into the joint account with his wife and outside the reach of creditors. To exonerate this conduct would be yet another undue inducement to litigants' exercise of self-help and blatant violation of court-orders, including contempt orders and a capias for arrest. Dr. Martinez continues to go to great lengths to deprive not only the Plaintiff of the ability to use statutory collection procedures, but to deprive the Plaintiff *and the Court* from enforcing its own contempt orders. This is blatant fraud. No reasonable jury could find otherwise. Accordingly, summary judgment is properly entered under § 726.105(1)(a), Fla. Stat. Ann.

### 2. Under § 726.105(1)(b), Fla. Stat. Ann., Dr. Martinez's Transfers to Mrs. Martinez were Constructively <u>Fraudulent.</u>

Under § 726.105(1)(b), Fla. Stat. Ann., a transfer made by a debtor is constructively fraudulent as to a creditor if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer,

and the debtor intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due. *Id.* To prevail under this constructive fraud theory, the Plaintiff must prove by a preponderance of evidence that the debtor was (1) "insolvent at the time the transfer was made" and (2) "received less than reasonably equivalent value in exchange for the transfer." *In re Universal Health Care Group, Inc.*, 560 B.R. 594, 601 (Bankr. M.D. Fla. 2016) (*citing Kapila v. SunTrust Mortgage, Inc. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014)).

#### i. Dr. Martinez was Insolvent at the Time the <u>Transfers were Made.</u>

As discussed, satisfies the balance sheet test for insolvent, is presumed to be insolvent and is actually insolvent under § 726.103, Fla. Stat. Ann.

#### ii. Dr. Martinez Made the Transfers without Receiving a Reasonably Equivalent Value in <u>Exchange.</u>

As discussed, Dr. Martinez received no consideration for his fraudulent transfers. The transfers for the acquisition of the Englewood Property and Secoya Property were memorialized with signed "gift" letters. Moreover, "marital consideration" is insufficient as a matter of law.

### B. Summary Judgment should be Granted on Count Two for Fraudulent Transfers in Violation of Fla. Stat. § 726.106.

Under § 726.106(1), Fla. Stat. Ann., a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. *Id.* Plaintiff's claims against Dr. Martinez under the contempt judgment and the original 2012 judgment arose far before Dr. Martinez made his transfers to Mrs. Martinez. Moreover, as discussed, Dr. Martinez received no reasonably equivalent value in exchange for the transfers to Mrs. Martinez and he was at all times insolvent as a matter of law.

Under § 726.106(2), Fla. Stat. Ann., a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. To the extent Defendants claim that Dr. Martinez's transfers to Mrs. Martinez were for payment of an antecedent debt, they would still be fraudulent. Mrs. Martinez is an insider. Moreover, she either knew or at the very minimum should have known as Dr. Martinez's wife that Dr. Martinez was insolvent when he was unemployed and owed Plaintiff over $2

- 54 -

million payable at $25,000 per month. Accordingly, summary judgment is appropriate on Count Two.

## C.   Summary Judgment is Properly Granted on Count Three for Injunctive Relief.

Under § 726.108(1)(c)(1), Fla. Stat. Ann., in an action for relief against a fraudulent transfer under sections 726.105 or 726.106, a creditor may obtain an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property. *Id.* Federal courts grant permanent injunctions when the plaintiff demonstrates the following four factors: (1) an irreparable injury, (2) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and (4) that the public interest would not be disserved by a permanent injunction. *Woods v. Deangelo Marine Exhaust, Inc.*, 2010 WL 11504374, at *1 (S.D. Fla. June 30, 2010) (*citing eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006)). Whether to "grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *Id.*

### 1.   Plaintiff will Suffer Irreparable Injury unless the Injunction is Issued.

Dr. Martinez is already in contempt and owes over two million dollars. Dr. Martinez already has a history of fraudulently transferring assets to his ex-wife to avoid paying Plaintiff. Dr. Martinez already has an open capias issued for his arrest. Dr. Martinez already has been dissipating assets and fraudulently transferring them to his new wife Mrs. Martinez through her Englewood Property, Secoya Property, the paydown of her Secoya mortgage and the transfer of Dr. Martinez's salary. Dr. Martinez's excuse for not paying Plaintiff was previously that he was unemployed. But Dr. Martinez has been employed since at least November 2021 and yet hasn't paid Plaintiff a penny. Dr. Martinez regained full-time employment and receives gross income easily exceeding $30,000.00 *per month*. Yet, he claimed he has essentially no money in the bank. To stop the metaphorical bleeding, an injunction is absolutely necessary to prevent Dr. Martinez from fraudulently transferring all his assets and income to avoid the Court's contempt powers.

### 2.   Plaintiff Lacks an Adequate Remedy at Law.

Plaintiff seeks to enforce the court's contempt orders against Defendant. Contempt is an equitable remedy. *See, e.g.*, *McGregor v. Chierico*, 206 F.3d 1378, 1385 (11th Cir. 2000) ("District courts are afforded wide discretion in fashioning an equitable remedy for civil contempt."); *Hofmann v. EMI Resorts,*

- 56 -

*Inc.*, 689 F. Supp. 2d 1361, 1376 (S.D. Fla. 2010) ("Civil contempt is remedial in scope to enforce compliance with a court order, and '[d]istrict courts enjoy wide discretion to fashion an equitable remedy for [civil] contempt that is appropriate to the circumstances.'") (*citing U.S. v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir.1999)). As indicated, if Dr. Martinez is not enjoined from further dissipating his assets, a remedy at law will not suffice as the assets will be gone and Plaintiff will be left with nothing to collect against. Furthermore, Plaintiff seeks other equitable remedies such as the imposition of an equitable lien on Defendants' property which will be meaningless if the asset no longer exists or is substantially encumbered.

### 3. On Balance, the Hardships to Plaintiff far Outweigh any Purported Hardship to Defendants.

Plaintiff is seeking essentially what the Connecticut court already ordered back in 2012. All Plaintiff wants is to prevent Dr. Martinez from fraudulently transferring his assets so he can use them to pay Plaintiff. There could not possibly be any hardship suffered by Defendants as all they would be enjoined from doing is what Dr. Martinez is already court-ordered to do. The only difference is that now Mrs. Martinez would be included because she has participated in the fraudulent transfers. Accordingly, *both* Defendants should be enjoined from transferring their assets other than in the ordinary course of business and to pay their ordinary living expenses. No hardship will result to

Defendants from doing so. Plaintiff will suffer immense hardship if an injunction is not entered because Dr. Martinez will have essentially succeeded through self-help in avoiding not only a $2 million money judgment but a $2 million contempt judgment and an open capias for his arrest.

### 4. Enjoining Defendants from Further Dissipating Assets is in the Public's Interest.

The Uniform Fraudulent Transfer Act statutes (§ 726.101, Fla. Stat. Ann. et seq.) confirmed that the legislature intended to prohibit prejudgment defendants from fraudulently transferring and dissipating their assets when faced with an impending judgment. Moreover, it is clearly in the public's interest to not allow an existing judgment-debtor and serial contemnor with an open capias to avoid the court's contempt power by absconding to Florida and fraudulently transferring essentially all of his assets with impunity. Accordingly, all four factors are satisfied and an injunction is properly granted.

### D. Summary Judgment is Properly Granted on Count Four for Equitable Relief.

Under § 726.108(1)(c)(3), Fla. Stat. Ann., in an action under sections 726.105 or 726.106, a creditor may obtain, among other things, "[a]ny other relief the circumstances may require." *Id.* Homestead property may be subjected to equitable liens where the defendant engages in fraud or reprehensible or egregious conduct. *Randazzo v. Randazzo*, 980 So. 2d 1210

- 58 -

(Fla. 3d DCA 2008); *see also In re Fin. Federated Title & Tr. Inc.*, 273 B.R. 706, 715 (Bankr. S.D. Fla. 2001), *subsequently aff'd sub nom. In re Fin. Federated Title & Tr., Inc.*, 347 F.3d 880 (11th Cir. 2003) (holding the Florida supreme court's *Havoco* decision upheld the equitable lien cases where funds obtained through fraud or egregious conduct can be directly traced to the investment, purchase or improvement of homestead). "**Contemptuous conduct may certainly be the functional equivalent of fraud, and it represents the kind of reprehensible conduct justifying foreclosure**" of homestead property. *Partridge v. Partridge*, 912 So. 2d 649, 650 (Fla. 4th DCA 2005) (emphasis added).

In *Randazzo*, a debtor-wife disregarded the court's final judgment and failed to pay, or make any attempt to pay, a $190,000 equitable distribution payment owed to the former husband. *Randazzo*, 980 So. 2d at 1212–13. The former wife failed to abide by the procedures in the marital settlement agreement for obtaining an extension of time to pay the equitable distribution, and represented that a sale on the marital residence was pending from which the former husband would be paid from the sale proceeds. *Id.* The former wife then filed for bankruptcy, stayed the dissolution proceedings, sold the residence, and used the sale proceeds to purchase a new homestead property. *Id.* The former wife blatantly disregarded her previous representations and made no payment to the former husband. *Id.* The Third District Court of

Appeal found the trial court properly entered an equitable lien on the former wife's homestead property due to her egregious conduct. *Id.*

In *Radin*, the appellate court affirmed the imposition of an equitable lien on a debtor-husband's homestead due to the egregious conduct of his contempt and pattern of non-payment. *Radin v. Radin*, 593 So. 2d 1231, 1233 (Fla. 3d DCA 1992). The debtor-husband had been adjudicated in contempt in February of 1990, August of 1990, and June of 1991. *Id.* The court found that on each occasion the debtor-husband failed to pay despite having the ability to pay. *Id.* The former husband would only pay when subject to incarceration. *Id.* Under these circumstances, the appellate court affirmed the imposition of an equitable lien on the debtor's homestead. *Id.*

In *Gepfrich*, the appellate court affirmed the imposition of an equitable lien on a debtor-husband's homestead where it was "incomprehensible" that the law would permit a debtor to purchase an expensive and luxurious home, live in the home with his girlfriend, maintain her and the house, and then cry poverty to avoid paying his alimony obligations to his former wife. *Gepfrich v. Gepfrich*, 582 So. 2d 743, 744 (Fla. 4th DCA 1991) (holding "[w]e certainly agree that the trial court should not sanction such a blatantly defrauding scheme by permitting the former husband to hide behind the homestead exemption laws"); *see also Rosenblatt v. Rosenblatt*, 635 So. 2d 132, 133 (Fla. 3d DCA 1994) (reversing order denying motion to impose equitable lien on

homestead property for failure to pay court-ordered support) (*citing Palm Beach Sav. & Loan Ass'n v. Fishbein*, 619 So.2d 267, 270 (Fla.1993) (holding "where equity demands it this Court has not hesitated to permit equitable liens to be imposed on homesteads beyond the literal language of article X, section 4.").

In *Sell*, the appellate court *reversed the denial* of a party's request for an equitable lien on homestead property to pay attorneys' fees. *Sell v. Sell*, 949 So. 2d 1108, 1113 (Fla. 3d DCA 2007). The appellate court found that the fees at issue were incurred as a direct result of the former-husband's reprehensible, egregious and consistently contemptuous conduct in attempting to nullify the trial court's property distribution, support, and fee awards. *Id.* The debtor-husband's purpose was to deplete the funds from which the former wife could be paid. *Id.* He ignored repeated orders to pay and instead utilized the funds that were to be paid to her to finance his share of the legal battle, thereby making her award meaningless. *Id.* He obstructed, hindered and delayed every action ordered by the trial court. *Id.* He was even jailed for contempt. *Id.* Yet, he was able to pay *his* attorneys and expenses. *Id.* The appellate court held that the failure to impose an equitable lien on the homestead property would "simply accomplish the goal the former-husband has undertaken." *Id.* The court held that this was "precisely the kind of 'the kind of reprehensible conduct' that justifies imposition of a lien on homestead property." *Id.*; *see also*

*Spector v. Spector*, 226 So. 3d 256 (Fla. 4th DCA 2017) (holding former husband's transfer of title to homestead real property to new wife was not protected from forced sale); *In re Court*, 2014 WL 3400521, at \*5 (Bankr. M.D. Fla. July 11, 2014) (confirming that egregious conduct permitting an equitable lien on homestead often involves a pattern of behavior in which the homeowner was found in contempt of court orders on multiple occasions, willfully refused to pay for a prolonged period, and had not shown any willingness to comply with court orders in the future) (*citing Radin*, 593 So.2d at 1231; *Partridge*, 912 So.2d at 650 (holding that **contemptuous conduct** may constitute the type of egregious conduct that justifies an equitable lien on homestead property)).

Here, Dr. Martinez's contemptuous conduct and blatant disregard for court orders is precisely the type of egregious conduct that justifies an equitable lien on homestead property. Like in *Randazzo*, Dr. Martinez has disregarded the court's contempt judgment. Aside from one payment in September 2020, he has failed to pay, or make any attempt to pay, the over $2 million contempt judgment or any of his $25,000 contempt installments. Moreover, he has failed to take any steps to an extension of time to pay the contempt payments he owes to Plaintiff.

- 62 -

Like in *Radin*, Dr. Martinez has been adjudicated in contempt a multitude of times, including most recently in August 2020 and December 2020. On each occasion, the court found that Dr. Martinez failed to pay despite having the ability to pay. Moreover, the only time Dr. Martinez actually paid, August 2020, was under the threat of incarceration. Dr. Martinez has admitted most recently in his deposition that he is waiting for the court in Florida to order him to pay and that he would pay to avoid incarceration. The courts have been attempting to *prevent* Dr. Martinez from making fraudulent transfers beginning right after the 2012 judgment was entered. Dr. Martinez has blatantly disregarded the court's orders, continues to do so, and will  continue to do so indefinitely until a court here in Florida puts him jail.

Like in *Gepfrich*, it is "incomprehensible" that the law would permit Dr. Martinez to purchase an expensive and luxurious home, live in the home with his new wife, maintain her and the house, and then cry poverty to avoid paying his contempt obligations to Plaintiff. The Court should not sanction such a blatantly defrauding scheme by permitting the former husband to hide behind the homestead exemption laws. Like in *Sell*, Dr. Martinez has forced Plaintiff to incur attorneys' fees as a direct result of Dr. Martinez's reprehensible, egregious and consistently contemptuous conduct in attempting to nullify the contempt judgment and contempt orders.

Further analogous to *Sell*, Dr. Martinez's purpose is to deplete the funds from which Plaintiff could be paid. Dr. Martinez has ignored repeated orders to pay Plaintiff and instead utilized the funds that were to be paid to her to finance his share of the legal battle, thereby making Plaintiff's award meaningless. Dr. Martinez has obstructed, hindered and delayed every action ordered by the trial court. A capias was even issued to jail him for non-payment of the contempt purge. Yet, Dr. Martinez has been able to pay his attorneys and expenses. The failure to impose an equitable lien on Dr. Martinez's homestead property would "simply accomplish the goal" he has undertaken. This is precisely the kind of the kind of reprehensible conduct that justifies imposition of a lien on homestead property. Accordingly, the Court should impose an equitable lien.

**E.    Summary Judgment Should be entered against Dr. Martinez on Count Five for Fraudulent Asset Conversion Pursuant to § 222.30, Fla. Stat. Ann.**

Florida Statute § 222.30 supplements the chapter 726 UFTA statutes and provides a cause of action for creditors to set aside "asset conversions" that cause a non-exempt asset to become exempt, when the conversion was made with the "actual intent to hinder, delay or defraud the creditor." *See* § 222.30(2), Fla. Stat. Ann.; *In re Jennings*, 332 B.R. 465, 469 (Bankr. M.D. Fla. 2005), *aff'd sub nom. Jennings v. Maxfield*, 2006 WL 6829886 (M.D. Fla. Apr.

- 64 -

5, 2006). The definitions of the chapter 726 UFTA statutes apply to fraudulent asset conversions. § 222.30(1), Fla. Stat. Ann.

Property owned as tenants by the entireties is only exempt where the original transfer into entireties status was *not* fraudulent. *See In re Anderson*, 561 B.R. 230, 240 (Bankr. M.D. Fla. 2016) (holding a subsequent transfer of exempt entities property cannot be avoided "*where the original transfer into entireties is not fraudulent*") (emphasis added); *see also Ellis Sarasota Bank & Tr. Co. v. Nevins*, 409 So. 2d 178, 180 (Fla. 2d DCA 1982) (holding the deposit of a husband's wages into an entireties account may constitute a fraudulent transfer and may be reached by the husband's creditors when the transfer into the entireties account is clothed with fraud); *accord In re Delson*, 247 B.R. 873, 876 (Bankr. S.D. Fla. 2000); *In re Miller*, 188 B.R. 302 (Bankr. M.D. Fla. 1995). A judgment debtor, such as Dr. Martinez, may not transfer property owned by himself individually to himself and his wife as tenants-by-the-entireties if that transfer will defraud creditors by putting the property beyond a creditors' reach. *Thomas J. Konrad & Associates, Inc., v. McCoy*, 705 So. 2d 948 (Fla. 1st DCA 1998) (*citing Valdivia v. Valdivia*, 593 So. 2d 1190, 1192 (Fla. 3d DCA 1992)). In other words, when tenancy-by-the-entireties property is created via a fraudulent conveyance, it may be avoided as such. *See Havoco of America, Ltd. v. Hill*, 197 F.3d 1135, 1139 (11th Cir. 1999); *In re Laing*, 242 B.R. 538 (Bankr. S.D. Fla. 1999).

Florida Statute §222.30 defines fraudulent conversion broadly, making every conversion of nonexempt assets to exempt assets a conversion if it is done with the actual intent to hinder, delay, or defraud the interests of creditors. *See In re Wilbur*, 206 B.R. 1002, 1008 (Bank. M.D. Fla. 1997) (*citing In re Mackey*, 158 B.R. 509, 512 (Bank. M.D. Fla. 1993)). When a creditor proves by a preponderance of the evidence that a debtor harbored the requisite intent, the court properly denies a debtor's claim of exemption. *Id*.

Dr. Martinez's conversion of his nonexempt assets to purchase the Secoya Property as tenants by the entireties with Mrs. Martinez and the conversion of his wages into the joint PNC account as tenants by the entireties with Mrs. Martinez were fraudulent asset conversations. The same badges of fraud from Dr. Martinez's fraudulent transfers under § 726.105(1)(a) set forth above apply here. As discussed, Dr. Martinez's transfers to the Secoya Property and the joint PNC account were all made with actual intent to hinder, delay and defraud Plaintiff. The transfers were fraudulent and violated § 222.30, Fla. Stat. Ann. Accordingly, summary judgment is properly granted on Count Five for Fraudulent Asset Conversion.

## F.    Summary Judgment should be Entered on Count Six for Declaratory Judgment.

Under the Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Daytona Beach Riverhouse, Inc. v. Chubb Custom Ins. Co.,* 2014 WL 12611320, at *3 (M.D. Fla. Mar. 20, 2014) (*citing* 28 U.S.C. § 2201(a)). A claim under the Declaratory Judgment Act must be definite, concrete, and include factual allegations that lead to an inference that a continuing and substantial controversy exists between the parties. *Id.* (*citing Malowney v. Fed. Collection Deposit Group*, 193 F.3d 1342, 1347 (11th Cir. 1999). Moreover, a court may issue a declaratory judgment based on a dispute that turns on a question of fact. *Id.*

A continuing and substantial controversy exists between the parties here regarding Dr. Martinez's rights to use his income for reasons other than to pay Plaintiff. Plaintiff's claims are definite and concrete and the essential facts are not disputed. The matter is ripe for a declaratory judgment stating whether Dr. Martinez was and is permitted to (1) transfer his money to Mrs. Martinez to pay down Mrs. Martinez's mortgage, (2) transfer essentially all of his wages to Mrs. Martinez via a joint account, and (3) use his income and assets for purposes other than to pay Plaintiff and pay for his ordinary living expenses. Plaintiff submits he is not permitted to do any of that. The Court should enter a declaratory judgment so stating.

G.   **Summary Judgment should be Entered on Count Seven for Declaratory Judgment.**

For the same reasons as set forth above, the Court should enter a declaratory judgment stating that Dr. Martinez's transfer to Mrs. Martinez to pay for the Englewood Property, pursuant to which both parties signed a "gift" letter and pursuant to which there are no loan documents, was *not* a loan. Under the circumstances, these parties are likely to continue to claim that interspousal transfers are loans pursuant to which Dr. Martinez can transfer his assets indefinitely to Mrs. Martinez without recourse. This transfer, and all transfers from Dr. Martinez to Mrs. Martinez, were *not* loans. The Court should enter a declaratory judgment so stating.

IV.   **None of Defendants' Affirmative Defenses Apply.**

A.   **Defendants' First Affirmative Defense Fails because Dr. Martinez's Retirement Accounts are Not Exempt from the Contempt Judgment and Lost whatever Exempt Status they had when Dr. Martinez made Voluntary Withdrawals.**

Assets that a court can look to for purposes of contempt include the contemnor's retirement accounts such as an IRA account. *Wix v. Wix*, 159 So. 3d 312, 315 (Fla. 2d DCA 2015) (holding 401k account was available for court to consider in determining whether contemnor had ability to pay); *Welsh v. Martinez*, 2019 WL 1503934, at *3 (Conn. Super. Ct. Feb. 27, 2019) (*citing Wix*, 159 So. 3d at 315); *Welsh*, 191 Conn. App. at 877 (holding that based on his retirement accounts, "the court's finding that defendant possessed 'sufficient

- 68 -

income and other assets' to pay that fine is supported by evidence in the record"); *Siegel v. Siegel*, 700 So. 2d 414, 415 (Fla. 4th DCA 1997) (holding "an IRA is not a safe haven where a former spouse can hoard assets while, at the same time, argue that he does not have the present ability to pay a purge amount in a contempt order arising from the non-payment of obligations due under the chapter" and "[b]ecause a person can obtain access to funds in an IRA account, a trial court may properly look to that account as a source of funds to satisfy a purge amount in a contempt order"); *Jackson v. Jackson*, 98 So. 3d 112, 114 (Fla. 2d DCA 2012) (holding trial court departed from the essential requirements of law in contempt proceedings by failing to consider, among other things, $70,500 in contemnor's IRA). Plaintiff is not merely an ordinary creditor. Plaintiff is pursuing a contempt judgment for which a capias was issued for Dr. Martinez's arrest. For purposes of contempt, his retirement accounts are *not* "generally exempt under nonbankruptcy law." *See* § 726.102, Fla. Stat. Ann. Accordingly, Defendants' First Affirmative Defense fails.

Moreover, even if Dr. Martinez's retirement account was exempt from the contempt judgment, it lost its exempt status when Dr. Martinez used it for self-dealing for his own personal, non-retirement benefit. When a debtor does not maintain a retirement account for retirement purposes, the retirement account loses its protection. *In re Yerian*, 927 F.3d 1223, 1231 (11th Cir. 2019). Use of the account for self-dealing purposes will destroy the retirement

- 69 -

account's exemption protections. *See id*. In *Yerian*, the Court held that the debtor forfeited his creditor exemption under section 222.21(2)(a)(2) because he engaged in self-dealing by purchasing a condominium in Puerto Rico with IRA funds, staying there "for an un-IRA-related purpose," and using retirement funds to buy two cars that were titled in his name and his wife's name. *Id*.; *see also In Re: Daniel*, 771 F.2d 1352 (9th Cir. 1985), *cert. denied*, 475 U.S. 1016, 106 S. Ct. 1199, 89 L. Ed. 2d 313 (1986) (holding evidence that funds in plan were used primarily for debtor's short-term needs established that funds were not principally used for retirement purposes); *Reliance Ins. Co. v. Zeigler*, 938 F.2d 781 (7th Cir. 1991) (*construing* ILL. REV. STAT. Ch. 110, ¶ 12-1006, providing exemptions for retirement plans "intended in good faith to qualify as a retirement plan under applicable provisions of the Internal Revenue Code.); *In Re: Witwer*, 148 B.R. 930 (Bankr. C.D. Cal. 1992) (Court must examine use of funds and administration of plan in determining whether plan was used primarily for retirement purposes.); *In Re: Bloom*, 839 F.2d 1376 (9th Cir. 1988) (holding use of plan primarily for tax-advantaged investing and creditor protection purposes fails to satisfy the requirement that plan be maintained primarily for retirement purposes, and plan which lacks a retirement purpose loses its state exemption in bankruptcy.).

Here, Dr. Martinez used his retirement accounts for self-dealing and essentially as his own bank account, rather than to save for retirement. Accordingly, the retirement account lost its exempt status. Dr. Martinez admitted that he would use his retirement account to pay everyday living expenses. Dr. Martinez admitted that even after regaining his most recent employment, he has still withdrawn from his retirement account. Dr. Martinez has not retired, yet he uses the account as if he had. None of Dr. Martinez's withdrawals were made to pay for retirement expenses. Like in *Yerian,* Dr. Martinez used the retirement funds to engage in self-dealing rather than for retirement purposes. Accordingly, Dr. Martinez's retirement accounts lost whatever exempt status they ever had and therefore are not exempt.

Furthermore, the funds from Dr. Martinez's retirement accounts certainly lost whatever exempt status they had once Dr. Martinez withdrew them from the retirement account and placed them in a non-exempt personal bank account. *Universal Physician Services, LLC* is instructive. *Universal Physician Services, LLC v. Zotto*, 2016 WL 6902354, at *5 (M.D. Fla. Nov. 2, 2016), *report and recommendation adopted*, 2016 WL 6879288 (M.D. Fla. Nov. 22, 2016). There, a debtor voluntarily liquidated her IRA and deposited the funds into a personal savings account. *Id.* Noting that the debtor did not "rollover" the liquidated funds into another IRA or other tax-exempt retirement account, and instead voluntarily withdrew and deposited the IRA

- 71 -

funds into an existing personal savings account, the Court found that the IRA funds lost their exempt status upon liquidation. *Id.* Similarly here, all of Dr. Martinez's allegedly exempt retirement funds lost their exempt status upon liquidation and deposit into his personal bank accounts. For all these reasons, Defendant's First Affirmative Defense fails.

**B.  Defendants' Second Affirmative Defense Fails because Dr. Martinez's Homestead is Not Protected due to his <u>Reprehensible and Egregious Conduct.</u>**

As discussed above in subsection III(D), a party's homestead is not protected from forced sale when the debtor engages in fraud or reprehensible or egregious conduct. *See e.g.*, *Randazzo*, 980 So. 2d at 1210; *Radin*, 593 So. 2d at 1233; *Gepfrich*, 582 So. 2d at 744; *Sell*, 949 So. 2d at 1113. "**Contemptuous conduct may certainly be the functional equivalent of fraud, and it represents the kind of reprehensible conduct justifying foreclosure**" of homestead property. *Partridge*, 912 So. 2d at 650 (emphasis added). Dr. Martinez's contemptuous, reprehensible and egregious conduct easily satisfies this standard. Accordingly, Defendants' Second Affirmative Defense fails.

**C.  Defendants' Third Affirmative Defense Fails for the Same Reasons Above and the Court Already Denied Defendants' <u>Motion to Dismiss for Failure to State a Cause of Action.</u>**

Dr. Martinez's retirement account is not exempt for purposes of enforcing the contempt judgment. Dr. Martinez's homestead is not exempt from an equitable lien due his contemptuous, fraudulent, egregious and reprehensible

conduct. Moreover, the Court already denied Defendants' motion to dismiss and found that Plaintiff has stated a cause of action. ECF No. 70.

### D. Defendants' Fourth Affirmative Defense Fails because the Court can Enter a Declaratory Judgment under 28 U.S.C.A. § 2201.

As discussed, the Declaratory Judgment Act, 28 U.S.C.A. § 2201, allows the Court to enter a declaratory judgment that declares the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. *Daytona Beach Riverhouse, Inc.*, 2014 WL 12611320, at \*3. Accordingly, the Court has jurisdiction over Plaintiff's claims for declaratory relief and Defendants' Fourth Affirmative Defense fails.

### E. Defendants' Fifth Affirmative Defense Fails because Plaintiff has a Reasonable Expectation of Future Injury from this Repeat Offender.

For the Court to issue a declaratory judgment, the Plaintiff must have "a reasonable expectation that the injury they have suffered will continue or will be repeated in the future." *Malowney*, 193 F.3d at 1347; *see also id.* at 1348 ("Injury in the past ... does not support a finding of an Article III case or controversy when the only relief sought is a declaratory judgment."); *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1211 (11th Cir. 2019). Plaintiff absolutely has a reasonable expectation that Dr. Martinez will continue to fraudulently transfer the entirety of his paychecks through a joint account with his wife and use them for expenses other than his ordinary

living expenses. He's done it in the past twice now with two different wives. Plaintiff will absolutely continue to suffer from Dr. Martinez fraudulently transferring assets to pay Mrs. Martinez's mortgage. Plaintiff absolutely will continue to suffer from Dr. Martinez claiming transfers to his wife were loans. Accordingly, Plaintiff has standing to bring claims for declaratory relief and Defendants' Fifth Affirmative Defense fails.

## CONCLUSION

No material facts are in dispute. The issues in this matter are decisions of law. Accordingly, summary judgment is appropriate on this record.


Respectfully submitted,


CHASE LAW & ASSOCIATES, P.A.


By:   */s/ Brian D. Fell*
Brian D. Fell
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, FL 33141
Tel: (954) 592-8846
Fax: (305) 402-2725
Email: bfell@chaselaw.com

*Counsel for Plaintiff D'Anna Welsh*

## <u>CERTIFICATE OF SERVICE</u>

I, Brian D. Fell, hereby certify that I served the foregoing via CM/ECF, which serves notice to all counsel of record, on March 2, 2023.

By:  */s/ Brian D. Fell*
Brian D. Fell