UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| D'ANNA WELSH, | ) |
| | ) |
| Plaintiff, | ) Case No. 2:22-cv-00216-JLB-NPM |
| | ) |
| v. | ) |
| | ) |
| WILLIAM V. MARTINEZ, JR., and | ) |
| KELLY MARTINEZ f/k/a KELLY | ) |
| ROUSSEAU, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF KENNETH E. CHASE

Kenneth E. Chase hereby declares as follows under penalty of perjury:

1. My name is Kenneth E. Chase and being of lawful age and sound mind hereby depose and state as follows.

2. I am counsel of record for Plaintiff in the above-captioned matter. I have personal knowledge of the facts stated herein. I submit this declaration in support of Plaintiff's Renewed Motion for Summary Judgment on her First Amended Complaint.

3. Attached as **Exhibit A** is a true and correct copy of the Affidavit of William V. Martinez dated January 4, 2023.

4. Attached as composite **Exhibit B** are true and correct copies of Dr. Martinez and Mrs. Martinez's joint PNC account statements from April 2022 to December 2022.

5.      Attached as **Exhibit C** is a true and correct copy of the transcript of Dr. Martinez's deposition on January 30, 2023.

6.      Attached as **Exhibit D** is a true and correct copy of the transcript of Mrs. Martinez's deposition on January 26, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2025.

By:     */s/ Kenneth E. Chase*
         Kenneth E. Chase

2

# EXHIBIT A

**Docket No.: HHDCV106012959S**

**D'ANNA WELSH,**

Plaintiff,

v.

WILLIAM V. MARTINEZ, JR.,

Defendant.

_____/

**State of Connecticut**

**Superior Court**

Judicial District of Hartford

## AFFIDAVIT OF WILLIAM V. MARTINEZ, JR

1. I am over the age of eighteen and believe in the obligation of an oath.

2. I am the Defendant in the above-entitled action.

3. I have reviewed the Court's Order dated June 24, 2013.

4. Attached hereto are documents that disclose the following:

(a) Any and all real property, personal property, title, rights, and things of value whatsoever, in which I have an interest from the period of July 9, 2012 through the date of disclosure;

(b) Any and all wages paid to me, including amounts, formulas, and their scheduled dates of disbursement, from the period of July 9, 2012, through the date of the disclosure;

(c) The financial institution, location, account number, and monthly balances of all

1

bank or trading accounts ever held by, in the name of, or for my benefit from the period of July

9, 2012 through the date of the disclosure.

5. Upon information and belief, there are no debts due and owing to me from the period of

July 9, 2012 through the date of disclosure.

6. My wages were determined by my employment agreement and the written

compensation policy adopted by the Cardiothoracic Surgery, P.C. on or about April 10, 2007.

This policy was modified on an annual basis, in consultation with our accountant, based on the

personal services of the members of the Cardiothoracic Surgery, P.C. from the prior year. A

true and accurate copy of these documents was provided by Cardiothoracic Surgery, P.C. on

June 21, 2013 in response to the discovery requests in the case captioned Welsh-Obey v.

Martinez, Docket # HHD-CV-13-6039911-S. The original policy called for the Physicians to

be paid 75% of the Net Income of the Corporation for that calendar year divided by the number

of Physicians; plus a Physician's allocable share as defined by the Policy of 25% of the

Corporations Net Income for that calendar year. A Physicians Allocable Share was defined as

the percentage which the fees received by the Corporation during the calendar year at issue with

respect to the professional services performed by that Physician are of all fees received by the

Corporation during that calendar year with respect to professional services performed by the

Physicians. On or about calendar year 2011, Cardiothoracic Surgery, P.C. modified the above

compensation policy so that the Physicians were paid 20% of the Net Income of the Corporation

2

for that calendar year divided by the number of Physicians; plus a Physicians allowable share as defined by the Policy of 80% of the Corporations Net Income for that calendar year.

7. In response to the discovery referenced above, Cardiothoracic Surgery, P.C. provided an Income Analysis Per Compensation Policy, Exhibit 4, that detailed my compensation for the years 2010 through 2013. To the best of my knowledge and belief, this Exhibit 4 is accurate.

8. I no longer work for Cardiothoracic Surgery, P.C.

9. I was employed at St. Francis Medical Group beginning on January 5, 2015 and was paid one hundred thousand ($100,000.00) dollars per month.

10. I am no longer employed at St. Francis Medical Group (n/k/a Trinity Health of New England Provider Network Organization, Inc.) as of October 22, 2018. St. Francis Medical Group agreed to continue payment of compensation and health benefits through January 20, 2019.

11. I was employed as a locum tenens at Riverview Cardiac Surgery, Bradenton, Florida, as of November 2, 2021 until February 28, 2022 at a rate of $1,300 gross salary per day worked. I have worked an average of 3-4 days per week.

12. I am currently employed full time at Riverview Cardiac Surgery, Bradenton, FL as of March 1, 2022 as per attached employment agreement

13. I swear under penalty of false statement that the information contained in the attached documents is true and accurate to the best of my knowledge.

3

FURTHER AFFIANT SAYETH NAUGHT.

William V. Martinez, Jr.

STATE OF FLORIDA

COUNTY OF _Lee_

SWORN TO AND SUBSCRIBED before me, by means of n physical presence or online notarization, this _4th_ day of_January_, 2023, by William V. Martinez, Jr. who is

personally known to me or produced_Drivers license_ as identification.

(seal)

Notary Public — State of Florida

My commission expires

_6/3/2025_

BRAD DUFF
Notary Public
State of Florida
Comm# HH137758
Expires 6/3/2025

| Date | Schwab | AM Funds | Date | BOA | Date | Salary | Date | Regions | Date | Wells Fargo | Date | PNC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/30/2020 | 942,663.98 | | | | | | | | | | | |
| 4/30/2020 | 1,003,784.26 | | | | | | | | | | | |
| 5/31/2020 | 1,020,972.82 | | | | | | | | | | | |
| 6/30/2020 | 1,017,775.27 | | | | | | | | | | | |
| 7/31/2020 | 911,757.43 | 82,857.48 | | | | | | | | | | |
| 8/31/2020 | 473,821.62 | Closed | 8/12/2020 | 631.94 | | 0 | | | | | | |
| 9/30/2020 | 474,612.97 | | 9/11/2020 | 75,578.90 | | 0 | | | | | | |
| 10/31/2020 | 474,616.86 | | 10/13/2020 | 42,646.63 | | 0 | | | | | | |
| 11/30/2020 | 474,629.49 | | 11/9/2020 | 1,383.66 | | 0 | | | | | | |
| 12/31/2020 | 474,629.49 | | 12/11/2020 | 2,991.42 | | 0 | | | | | | |
| 1/30/2021 | 474,633.38 | | 1/11/2021 | 2,006.36 | | 0 | | | | | | |
| 2/28/2021 | 474,637.40 | | 2/8/2021 | 4.24 | | 0 | | | | | | |
| 3/31/2021 | 241,311.74 | | 3/13/2021 | 1,392.24 | | 0 | | | | | | |
| 4/30/2021 | 241,316.43 | | 4/13/2021 | 180.24 | | 0 | | | | | | |
| 5/31/2021 | 241,318.41 | | 5/11/2021 | -12.00 | | 0 | | | | 5/1/2021 GARNISHED | | |
| 6/30/2021 | 241,318.41 | | 6/11/2021 | -24.00 | | 0 | | | | | | |
| 7/31/2021 | 241,320.44 | | 7/13/2021 | -36.00 | | 0 | | | | | | |
| 8/31/2021 | 241,320.44 | | Closed | | | 0 | | | | | | |
| 9/30/2021 | 241,320.44 | | | | | 0 | | | | | | |
| 10/31/2021 | 241,320.44 | | | | | 0 | | | | | | |
| 11/30/2021 | 241,320.44 | | | | | 0 | | | | | | |
| 1/1/2022 | 131,330.29 | | | | 12/6/2021 | 11700 | 1/1/2022 | 209.95 | | | | |
| 2/1/2022 | 131,333.41 | | | | 1/13/2022 | 14300 | 1/5/2022 | 189.7 | | | | |
| 3/1/2022 | 131,333.41 | | | | 2/10/2022 | 19500 | 2/5/2022 | 459.64 | | | | |
| 4/1/2022 | 133,333.41 | | | | 3/14/2022 | 24700 | 3/5/2022 | 30.64 | | | 4/14/2022 | 5000 |
| 5/1/2022 | 131,334.53 | 0 | | | 4/1/2022 | 11739.58 | 4/5/2022 | 170.22 | | | 5/10/2022 | 18425.31 |
| 6/1/2022 | 115,815.61 | | | | 5/1/2022 | 24399.57 | 5/5/2022 | 170 | | | 6/9/2022 | 6.08 |
| 7/1/2022 | 115,816.62 | | | | 5/4/2022 | 2597.91 | 6/5/2022 | 174.79 | | | 7/1/2022 | 46.77 |
| 8/1/2022 | 100,009.95 | | | | 6/1/2022 | 29971.8 | 7/1/2022 | -3.43 | | | 8/9/2022 | 2632.77 |
| 9/1/2022 | 100,026.95 | | | | 7/1/2022 | 25690.69 | | | | | 9/12/2022 | 775.56 |
| 10/1/2022 | 75,026.98 | | | | 8/1/2022 | 23505.03 | 10/1/2022 | -27.43 | | | 10/8/2022 | 1271.65 |
| 11/1/2022 | 75,047.33 | | | | 9/1/2022 | 25493.22 | 11/1/2022 | 32.79 | | | 11/9/2022 | 30.6 |
| 12/1/2022 | 75,072.83 | | | | 10/1/2022 | 23584.06 | 12/1/2022 | 22.79 | | | 12/7/2022 | 14418.86 |
| 1/1/2023 | 59,575.81 | | | | 11/1/2022 | 27333.92 | 1/1/2023 | 12.79 | | | 1/4/23 | 2966.58 |
| | | | | | 12/1/2022 | 22408.9 | | | | | | |
| | | | | | 1/1/2023 | 21538.82 | | | | | | |

*(handwritten annotation in Wells Fargo column: "WM 1/4/23"; handwritten PNC entry: "1/4/23  2966.58")*

| Date | Schwab | American Funds | Trinity 457B | Trinity 403B | Bank of America |
|---|---|---|---|---|---|
| 6/30/18 | 886942.99 | 469335.12 | | | 4/12/19-80179.27 |
| 9/30/18 | 906425.56 | 471231.87 | | | 5/13/19-1143.69 |
| 12/30/18 | 881496.58 | 472672.13 | | | 6/12/19-766.09 |
| 3/30/19 | 949071.59 | 475838.99 | | | 7/12/19-1043.95 |
| 6/30/19 | 995994.67 | 435360.26 | | | 8/12/19-878.01 |
| 9/30/19 | 1008850.31 | 370000.19 | | | 9/12/19-3110.33 |
| 12/30/19 | 1041355.04 | 270472.86 | | | 10/12/19-7497.77 |
| 3/30/20 | 930450.97 | 82845.99 | 38713.03 | | 11/9/19-2194.33 |
| | | | | | 12/12/19-208.93 |
| | | | | | 1/13/20-18785.88 |
| | | | | | 2/11/20-298.54 |
| | | | | | 3/13/20-1075.89 |
| | | | | | 4/13/20-962.76 |
| | | | | | 5/15/20-352.70 |
| | | | | | 6/15/20-325.93 |
| 7/29/20 | 915311.40 | 82857.48 | 0 | | 7/15/20-758.66 |

Salary    April 2020    —    0
          MAY 2020    —    0
          June 2020    —    0
          July 2020    —    0

WVM
8/1/2020

Case 2:22-cv-00216-KCD-NPM   Document 116-1   Filed 05/29/25   Page 10 of 621
Document ID 2a513603ef96dab8
Page 2 of 38

William Martinez Quarterly Disclosure
Page 2

| Dates | DATE | Schwab Education Acct | Schwab | Schwab | Schwab IRA Rollover | Farm Bank | Farm Bank | Farm Bank | People's | Wells Fargo | American Funds - 401E with Capital Group | | Pioneer Valley Credit Union Checking (246 Brookdale Drive Springfield, MA) | Transamerica Acct Trinity Health 403(b) Plan | | Transamerica Acct Trinity Health 457(b) Plan Date | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| February 2017 | 2/13/2017 | | | | | | | | | | 3/13/2017 | 464740.31 | 33128.97 | | | | |
| March 2017 | 3/13/2017 | 181640.74 | 0.13 | 1992.27 | 792524.43 | | | | | | | | 12613.02 | | | | |
| April 2017 | 4/13/2017 | | | | | | | | | | | | 10296.39 | | | | |
| May 2017 | 5/13/2017 | | | | | | | | | | 6/2017 | 461724.02 | 3668.12 | 6/28/2017 | 57761.71 | 6/28/2017 | 20052.84 |
| June 2017 | 6/13/2017 | 181772.59 | 0.13 | 1992.50 | 810072.25 | | | | | | | | 22062.06 | | | | |
| July 2017 | 7/13/2017 | | | | | | | | | | | | 7755.58 | | | | |
| August 2017 | 8/13/2017 | | | | | | | | | | 9/2017 | 465416.91 | 30468.70 | 9/20/2017 | 89701.99 | 9/20/2017 | 20237.62 |
| September 2017 | 9/13/2017 | 180916.22 | 0.13 | 1992.97 | 834352.47 | | | | | | | | 35118.27 | | | | |
| October 2017 | 10/13/2017 | | | | | | | | | | | | 20303.13 | | | | |
| November 2017 | 11/13/2017 | | | | | | | | | | 12/2017 | 446548.68 | 32358.03 | 12/2018 | 94793.94 | 12/2018 | 27024.90 |
| December 2017 | 12/13/2017 | 180225.23 | 0.13 | 1993.46 | 893265.41 | | | | | | | | 20075.21 | | | | |
| January 2018 | 1/14/2018 | | | | | | | | | | | | 18429.70 | | | | |
| February 2018 | 2/13/2018 | | | | | | | | | | 3/14/2018 | 467735.91 | 12076.03 | 3/2018 | 102754.03 | 3/2018 | 25501.92 |
| March 2018 | 3/14/2018 | | 0.13 | 1994.03 | 883496.72 | | | | | | | | 22491.03 | | | | |
| April 2018 | 4/25/2018 | | | | | | | | | | | | 23628.75 | | | | |
| May 2018 | 5/25/2018 | | | | | | | | | | 6/25/2018 | 460335.12 | 27580.09 | 6/30/2018 | 109662.46 | 6/30/2018 | 30190.91 |
| June 2018 | 6/25/2018 | | 0.13 | 1994.77 | 885928.9 | | | | | | | | 27314.58 | | | | |
| July 2018 | 7/19/2018 | | | | | | | | | | | | 3762.64 | | | | |
| August 2018 | 8/19/2018 | | | | | | | | | | 9/21/2018 | 470602.18 | 2925.21 | 9/21/2018 | 128480.31 | 9/21/2018 | 35999.77 |
| September 2018 | 9/19/2018 | | 0.13 | 1995.84 | 840334.58 | | | | | | | | 5351.91 | | | | |
| October 2018 | 10/17/2018 | | | | | | | | 140.00 | | | | 52618.10 | | | | |
| November 2018 | 11/17/2018 | | 0.13 | 1997.28 | 889407.57 | | | | 140.00 | | 12/17/2018 | 472672.13 | 1086.98 | 12/17/2018 | 123501.76 | 12/17/2018 | 37448.85 |
| December 2018 | 12/17/2018 | | | | | | | | | 14.00 | | | -535.60 | | | | |
| January 2019 | 1/15/2019 | | | | | | | | | 14.00 | | | Closed 2/1/2019 | | | | |
| February 2019 | 2/15/2019 | | | | | | | | | 14.00 | 3/29/2019 | 475013.23 | | 4/1/2019 | 134951.61 | 4/1/2019 | 41862.32 |
| March 2019 | 4/1/2019 | | 0.13 | 1998.85 | 947072.57 | | | | | | | | | | | | |
| April Initials | 2019 | | | | | | | | | | | | | | | | |

Salary (9/25/2013-4/5/2017)

| Date | Net Amount |
|---|---|
| 8/25/2016 | 26530.72 |
| 9/8/2016 | 26530.73 |
| 9/22/2016 | 26530.74 |
| 10/20/2016 | 26530.73 |
| 11/3/2016 | 26530.72 |
| 12/1/2016 | 26530.74 |
| 12/15/2016 | 26530.74 |
| 12/29/2016 | 26601.21 |
| 1/12/2017 | 24690.75 |
| 1/26/2017 | 24690.76 |
| 2/9/2017 | 25352.22 |
| 2/23/2017 | 27550.31 |
| 3/9/2017 | 27295.91 |
| 3/22/2017 | 27150.32 |
| 4/5/2017 | 731.00 |
| 4/5/2017 | 27150.32 |
| 4/19/2017 | 27330.32 |
| 4/26/2017 | 122923.04 |
| 5/3/2017 | 27150.33 |

Salary (1/19/2017 - present)

| Date | Net Amount |
|---|---|
| | *Earned Time Off |

Page 11 of 621

Case 2:22-cv-00246-CDP-NR Document 140 Filed 03/04/25 pg 33 of 55

Williams Martinez Quarterly Disclosure
Page 1

| Monies | DATE | Schwab Education | Schwab | Schwab | Schwab IRA Rollover | Farm Bank | Farm Bank | Farm Bank | People's | Wells Fargo | AF Date | AF Amount | Pioneer Valley Credit Union Checking (246 Brookdale Drive Springfield, MA) | Transamerica Trinity Health 403(b) Plan | 457(b) Date | 457(b) Amount | Salary (9/25/2013-4/5/2017) Date | Amount | Salary (4/19/2017 - present) Date | Net Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 3234.20 | 6/30/2012 | 224949.15 | | | | | | | 5/17/2017 | 27142.67 |
| July 2012 | | 219723.83 | 0.01 | 1991.04 | 535127.67 | 41943.64 | 4470.63 | | | 3230.42 | | | | | | | | | 5/31/2017 | 27142.67 |
| August 2012 | | 196373.32 | 0.13 | 1991.06 | 541297.77 | 47793.98 | 462.01 | | | 3226.59 | 9/30/2012 | 256240.91 | | | | | | | 6/14/2017 | 27142.68 |
| September 2012 | | 174184.46 | 0.13 | 1991.08 | 552977.88 | 40349.09 | 1144.93 | | | 3222.73 | | | | | | | | | 6/28/2017 | 27142.67 |
| October 2012 | | 177786.11 | 0.13 | 1991.10 | 557457.95 | 28202.55 | 1227.66 | | | 3215.04 | | | | | | | | | 7/12/2017 | 27142.68 |
| November 2012 | | 181352.51 | 0.13 | 1991.12 | 550319.23 | frozen | frozen | | | frozen | 12/31/2012 | 260950.38 | | | | | | | 7/26/2017 | 27142.67 |
| December 2012 | | 181354.06 | 0.13 | 1991.14 | 547341 | | | | | | | | | | | | | | 8/9/2017 | 27135.32 |
| January 2013 | | 181363.61 | 0.13 | 1991.16 | 549923.79 | | | | | | | | | | | | | | 8/23/2017 | 20011.16 |
| February 2013 | | 181364.36 | 0.13 | 1991.18 | 573575.45 | | | | | | | | | | | | | | 9/6/2017 | 27091.17 |
| March 2013 | | 181365.91 | 0.13 | 1991.20 | 578406.48 | | | | | | 3/31/2013 | 280764.4 | | | | | | | 9/20/2017 | 27936.16 |
| April 2013 | | 181367.31 | 0.13 | 1991.22 | 595445.58 | | | | | | | | | | | | | | 10/5/2017 | 27936.17 |
| May 2013 | | 181368.86 | 0.13 | 1991.24 | 611089.94 | | | | | | 6/30/2013 | 310329.83 | | | | | | | 10/19/2017 | 27091.17 |
| June 2013 | | 181370.36 | 0.13 | 1991.26 | 620942.88 | | | | | | | | | | | | | | 11/2/2017 | 27036.17 |
| July 2013 | | 181372.01 | 0.13 | 1991.28 | 610302.26 | | | | | | | | | | | | | | 11/16/2017 | 27091.16 |
| August 2013 | | 181373.41 | 0.13 | 1991.30 | 631957.51 | | | | | | 9/10/2013 | 338902.54 | | | | | 9/25/2013 | 45055 | 11/30/2017 | 21454.16 |
| September 2013 | | 181374.96 | 0.13 | 1991.32 | 610307.73 | | | | | | | | | | | | 10/30/2013 | 45055 | 12/14/2017 | 21906.17 |
| October 2013 | 10/8/2013 | 181376.00 | 0.13 | 1991.34 | 643330.05 | | | | | | | | | | | | 11/27/2013 | 45855 | 12/20/2017 | 21449.50 |
| November 2013 | 11/9/2013 | 181377.00 | 0.13 | 1991.36 | 649200.31 | | | | | | 12/12/2013 | 351836.51 | | | | | 12/31/2013 | 61050 | 1/10/2018 | 18781.00 |
| December 2013 | 12/10/2013 | 181379.56 | 0.13 | 1991.38 | 636085.45 | | | | | | | | | | | | 1/31/2014 | 39345 | 1/24/2018 | 18786.31 |
| January 2014 | 1/10/2014 | | | 1991.40 | | | | | | | | | | | | | 2/20/2014 | 40771 | 2/7/2018 | 20689.53 |
| February 2014 | 2/10/2014 | | | 1991.42 | | | | | | | 3/10/2014 | 367767.93 | | | | | 3/31/2014 | 43595 | 2/21/2018 | 21154.81 |
| | | 181390.34 | 0.13 | 1991.44 | 653869.32 | | | | | | | | | | | | 3/7/2014 | 43055 | 3/7/2018 | 20902.39 |
| March 2014 | 3/10/2014 | | | | | | | | | | | | | | | | 5/29/2014 | 43055 | 3/21/2018 | 20741.33 |
| April 2014 | 4/10/2014 | | | | | | | | | | | | | | | | 6/27/2014 | 43055 | 4/4/2018 | 20741.32 |
| May 2014 | 5/10/2014 | | | | | | | | | | 6/20/2014 | 406999 | | | | | 7/30/2014 | 45155 | 4/18/2018 | 20796.32 |
| June 2014 | 6/10/2014 | 181396.20 | 0.13 | 1991.52 | 692022.30 | | | | | | | | | | | | 8/27/2014 | 45855 | 5/2/2018 | 20741.31 |
| July 2014 | 7/10/2014 | | | | | | | | | | | | | | | | 9/30/2014 | 45855 | 5/16/2018 | 20796.33 |
| August 2014 | 8/10/2014 | | | | 702132.3 | | | | | | 9/15/2014 | 426719 | | | | | 10/27/2014 | 91710 | 5/30/2018 | 20741.33 |
| September 2014 | 9/10/2014 | 186620.6 | 0.13 | 199.56 | | | | | | | | | | | | | 11/19/2014 | 91710 | 6/13/2018 | 20796.32 |
| October 2014 | 10/17/2014 | | | | | | | | | | | | | | | | 12/24/2014 | 91710 | 6/27/2018 | 20741.32 |
| November 2014 | 11/17/2014 | | | | | | | | | | 12/17/2014 | 430635 | | | | | 1/8/2015 | 45707 | 7/12/2018 | 22154.33 |
| December 2014 | 12/17/2014 | 181403.9 | 0.13 | 1991.64 | 713383.2 | | | | | | | | | | | | 2/12/2015 | 59430 | 7/26/2018 | 22709.32 |
| January 2015 | 1/10/2015 | | | | | | | | | | | | | | | | 3/12/2015 | 60209.19 | 8/9/2018 | 22146.29 |
| February 2015 | 2/10/2015 | | | | | | | | | | 3/10/2015 | 458904 | | | | | 4/9/2015 | 60209.18 | 8/23/2018 | 22091.27 |
| March 2015 | 3/10/2015 | 181435.19 | 0.13 | 1991.68 | 696395.43 | | | | | | | | | | | | 5/14/2015 | 60209.18 | 9/6/2018 | 22146.28 |
| April 2015 | 4/24/2015 | | | | | | | | | | | | | | | | 6/11/2015 | 60209.18 | 9/20/2018 | 22091.28 |
| May 2015 | 5/24/2015 | | | | | | | | | | 6/31/2015 | 464171 | | | | | 7/9/2015 | 60209.18 | 10/4/2018 | 22091.29 |
| June 2015 | 6/24/2015 | 181441.08 | 0.13 | 1991.76 | 702265.61 | | | | | | | | | | | | 8/13/2015 | 60209.18 | 10/18/2018 | 22146.27 |
| July 2015 | 7/24/2015 | | | | | | | | | | | | | | | | 9/10/2015 | 59926.17 | 10/26/2018 | 3698.75 |
| August 2015 | 8/24/2015 | | | | | | | | | | 9/29/2015 | 464160.94 | | | | | 10/8/2015 | 59926.18 | 11/2/2018 | 10897.70 |
| September 2015 | 9/24/2015 | 181445.69 | 0.13 | 1991.82 | 660071.53 | | | | | | | | | | | | 11/12/2015 | 59926.18 | 11/5/2018 | 14743.83 |
| October 2015 | 10/21/2015 | | | | | | | | | | | | | | | | 12/10/2015 | 59926.18 | 11/16/2018 | 14743.83 |
| November 2015 | 11/24/2015 | | | | | | | | | | 12/22/2015 | 464150.94 | | | | | January '16 | 51012.30 | 11/20/2018 | 15619.07 |
| December 2015 | 12/22/2015 | 181448.79 | 0.13 | 1991.80 | 706331.72 | | | | | | | | | | | | February '16 | 55019.00 | 11/30/2018 | 27125.46 |
| January 2016 | 1/14/2016 | | | | | | | | | | | | | | | | 3/10/2016 | 28005.23 | 12/14/2018 | 2475.30 |
| February 2016 | 2/14/2016 | | | | | | | | | | 3/10/2016 | 464150.94 | | | | | 4/21/2016 | 27032.74 | 12/20/2018 | 28100.23 |
| March 2016 | 3/14/2016 | 181485.53 | 0.13 | 1991.94 | 725849.94 | | | | | | | | | | | | 5/5/2016 | 27932.75 | 1/10/2019 | 24859.25 |
| April 2016 | 4/14/2016 | | | | | | | | | | | | | | | | 5/19/2016 | 27932.73 | 1/24/2019 | 39544.35 |
| May 2016 | 5/14/2016 | | | | | | | | | | 6/14/2016 | 464150.94 | | | | | 6/2/2016 | 25340.38 | | |
| June 2016 | 6/14/2016 | 181490.13 | 0.13 | 1992 | 751171.49 | | | | | | | | | | | | 6/16/2016 | 26530.73 | | |
| July 2016 | 7/22/2016 | | | | | | | | | | | | | | | | 6/30/2016 | 26530.73 | | |
| August 2016 | 8/22/2016 | | | | | | | | | | 9/23/2016 | 464150.94 | | | | | 7/14/2016 | 26530.73 | | |
| September 2016 | 9/22/2016 | 181500.83 | 0.13 | 1992.06 | 767081.5 | | | | | | | | | | | | 7/28/2016 | 26530.73 | | |
| October 2016 | 10/11/2016 | | | | | | | | | | | | | | | | 8/13/2016 | 26530.73 | | |
| November 2016 | 11/10/2016 | | | | | | | | | | 1/3/2017 | 464240.31 | | | | | | | | |
| December 2016 | 12/10/2016 | 181591.78 | 0.13 | 1992.12 | 763092.21 | | | | | | | | | | | | | | | |
| January 2017 | 1/13/2017 | | | | | | | | | | | | | | | | | | | |

**Personal Property (Both exempt and non-exempt)**

Computer HP Pavilion HPE

Monitor

File cabinet

Plates, cups, tumblers

Wine glasses

Flatware

Couch

2 end tables

65" TV

Lamp

Chair

Bed

Dresser

2 nightstands

Kimber .375

Kimber .45

Savage .308

Ruger .44

Drill

Circular saw

Wrenches/screwdriver/hammer

Golf clubs

Interest in Property at:

15919 Secoya Reserve Circle

Naples FL 34110

WVM
1/4/23

# EXHIBIT B

# CERTIFICATION

I, Kayla Coombs, hereby certify that, to the best of my knowledge, information, and belief:

1. I am a Records Custodian for PNC Bank, National Association, a national banking association ("PNC").

2. As a Records Custodian, my responsibilities include identifying and authenticating records of PNC.

3. Attached to this certification is a record(s) of PNC ("Record(s)"), further identified in the attached inventory.

4. The Record(s) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters (subject to any redactions I have made relating to certain Personal Identifiable Information); was kept in the course of a regularly conducted activity; and was made by the regularly conducted activity as a regular practice of PNC.

5. I declare under penalty of perjury that the forgoing is true and correct.

Date:    01/06/2023

*Kayla Coombs*
Records Custodian



# INVENTORY

Prepared by:

Kayla Coombs
PNC Subpoena Processing
Fax: 888-678-1472
Phone: 216-257-4222
Email: kayla.coombs@pnc.com

**Re: WILLIAM MARTINEZ**
**PNC Bank File:** ███████████

In response to your subpoena or other request for customer records, PNC Bank has engaged in a search of bank records to identify responsive documents and/or information. Based on reasonable inquiry, to the best of PNC Bank's knowledge, information and belief:

☒    Enclosed are all documents requested.

☐    Enclosed is a portion of the documents requested.

| Name | Account Number | Documents Sent |
|---|---|---|
| KELLY A MARTINEZ<br>WILLIAM V MARTINEZ | ████████ | SIGNATURE CARD, STATEMENTS, CHECKS, DEPOSITS |

Please be advised that many records that are kept by PNC Bank are scheduled for destruction in the ordinary course of business. Because PNC Bank has provided you with copies of the enclosed records in response to your request, PNC Bank will no longer take any action to preserve the documents beyond the regularly scheduled destruction date.

**Notice to Recipient:** This correspondence is addressed to the attorney, office, or individual that sent the above-referenced request or legal process item to PNC Bank. The enclosed/attached documents may contain highly sensitive and confidential financial or personal information. Please ensure that the attached materials relate to the PNC Bank customer(s) whose information is subject to this request. If you have received these attachments in error, please return to, or advise, the sender immediately. The sender may instruct you to destroy the enclosures/attachments.

https://outlawebview.web-pncint.net/inquiry/SectorInquiry

PNC Bank, National Association
## Account Registration and Agreement

 **PNC BANK**

PL44524

☐ Certification Status on File

| Legal Title | TIN | Home Phone # | Work Phone # | Email Address |
|---|---|---|---|---|
| WILLIAM V MARTINEZ | ▮-1280 | ▮ | | ▮ |
| KELLY A MARTINEZ | XXXXX | XXXXX | | XXXXX |
| | | | | |

| Account Address | Foreign Address |
|---|---|
| 15919 SECOYA RESERVE CIR NAPLES, FL 34110-1187 | |

Check appropriate box for federal tax classification (required):

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trustee/Estate

☐ Limited liability company. Enter the tax classification (C = C corporation, S = S corporation, P = partnership) _____

**Note:** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) _____

**Certification of Owner:** Under penalties of perjury, I certify that:
(1) The number on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); **and**
(2) I am not subject to backup withholding because (a) I am exempt from backup withholding, (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; **and**
(3) I am a U.S. citizen or other U.S. person; **and**
(4) The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**If you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return, you must cross out item (2) in your certification.**

☐ Check this box if you are a non-resident alien and complete W-8BEN. By checking this box, the only purpose this document will serve for is a Signature Card for the account. It will not serve as a W-9.

By signing below, I agree that I have given PNC Bank permission to send my personal information to a third party reporting agency to verify my identity and credit worthiness.

**Account Agreement:** By signing this Account Registration and Agreement and/or by using the account, by requesting and/or using and/or later adding any account-related services, including but not limited to Debit Card/ATM Card, Overdraft Protection, and PNC Bank Online services, I agree to be bound by the terms and conditions of the "PNC Virtual Wallet Fine Print: What You Need to Know" and "PNC Virtual Wallet Features and Fees," as well as other terms and conditions that may apply to my PNC Bank account, account features and/or services. I agree that my account is subject to approval by PNC Bank. Where there is more than one account owner, the account is held as joint tenants with right of survivorship.

| Account # | Product | Branch | Effective Date | Application Date | Application # |
|---|---|---|---|---|---|
| ▮ | VIRTUAL WALLET WITH PERFORMANCE SELECT | 0000460 | 04/12/2022 | 04/12/2022 | ▮ |
| | | | | | |
| | | | | | |

The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

WILLIAM MARTINEZ _____   X _W M_____  Signature _____ Date

KELLY MARTINEZ _____   X _Kelly Martinez_____  Signature _____ Date

_____   X _____  Signature _____ Date

_____   X _____  Signature _____ Date

_____   X _____  Signature _____ Date

_____   X _____  Signature _____ Date

**PNC Bank internal use only instructions:** Please image this form via the MFD Scan to Folder process by selecting the Signature Card folder.

RDAOMS07-0221                     Page 1 of 1

| **Scan Date** | 2022 Apr 13 |
|---|---|
| **Orig Acct Number** | 0 |
| **Orig Bank Number** | 0 |
| **Converted Acct Flag** | |

# Virtual Wallet With Performance Select Statement
PNC Bank

Primary account ███████████
Page 1 of 2
Number of enclosures: 0

**For the period 04/12/2022 to 05/10/2022**

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

For 24-hour banking, and transaction or interest rate information, sign on to PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?** Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

Visit us at PNC.com

---

## Virtual Wallet With Performance Select Account Summary
**Account number:** ███████████

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Overdraft Protection**   has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage**   - Your account is currently **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions.
Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft Protection settings.

### Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| .00 | 34,394.14 | 15,968.83 | 18,425.31 |

| | Average monthly balance | | Charges and fees |
|---|---|---|---|
| | 8,881.75 | | .00 |

### Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 1 | 0 | 0 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 0 | 0 | 0 |

### Interest Summary

As of 05/10, a total of **$.06** in interest was paid this year.

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.01% | 29 | 8,195.55 | .06 |

| Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|
| .01 | .06 | .01 |

# Virtual Wallet With Performance Select Statement

For 24-hour information, sign on to PNC Bank Online Banking
on pnc.com.

**For the period 04/12/2022 to 05/10/2022**

KELLY A MARTINEZ

Primary account number: ▮▮▮▮▮▮▮▮▮

Account number: ▮▮▮▮▮▮▮ - continued

Page 2 of 2

## Activity Detail

### Deposits and Other Additions

There were 5 Deposits and Other Additions totaling **$34,394.14** .

| Date | Amount | Description |
|---|---|---|
| 04/14 | 5,000.00 | Deposit Reference No. 030554556 |
| 05/02 | 20,000.00 | Deposit Reference No. 034766638 |
| 05/04 | 6,796.17 | Direct Deposit - IRS Treas 310 XXXXXXXXXXX0928 |
| 05/04 | 2,597.91 | Direct Deposit - Payroll |
| | | Riverview Cardia XXXXXXXXXXX39-0 |
| 05/10 | .06 | Interest Payment |

### Checks and Substitute Checks

| Check number | Amount | Date paid | Reference number |
|---|---|---|---|
| 101 | 11,218.82 | 05/09 | 071260228 |

There is 1 check listed totaling **$11,218.82** .

### Online and Electronic Banking Deductions

There were 2 Online or Electronic Banking Deductions totaling **$4,750.00** .

| Date | Amount | Description |
|---|---|---|
| 04/19 | 3,500.00 | Web Pmt- Online Pmt |
| | | American Express Ckf613257994POS |
| 04/22 | 1,250.00 | Web Pmt- Online Pmt |
| | | American Express Ckf613257994POS |

### Other Deductions

There was 1 Other Deduction totaling **$.01** .

| Date | Amount | Description |
|---|---|---|
| 05/10 | .01 | Interest Withholding |

### Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 04/12 | .00 | 04/19 | 1,500.00 | 05/02 | 20,250.00 | 05/09 | 18,425.26 |
| 04/14 | 5,000.00 | 04/22 | 250.00 | 05/04 | 29,644.08 | 05/10 | 18,425.31 |

# Virtual Wallet With Performance Select Statement
PNC Bank

**For the period 05/11/2022 to 06/09/2022**

A

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

Primary account number: ███████

Page 1 of 4

Number of enclosures: 0

For 24-hour banking, and transaction or interest rate information, sign on to PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?** Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

Visit us at PNC.com

## IMPORTANT ACCOUNT INFORMATION

On June 4, 2022, PNC added a Public Injunctive Relief Waiver (the "Waiver") to the Arbitration Provision of the Virtual Wallet Fine Print (the "Agreement"). The Waiver is included below. All other information in your Agreement continues to apply to your account.

PLEASE READ THE WAIVER CAREFULLY: IT WILL IMPACT HOW LEGAL CLAIMS YOU AND PNC HAVE AGAINST EACH OTHER ARE RESOLVED.

THE ARBITRATION PROVISION WILL APPLY TO YOUR ACCOUNT(S) UNLESS YOU OPT OUT BY PROVIDING TIMELY NOTICE AS SET FORTH IN THE ARBITRATION PROVISION OR UNLESS YOU PREVIOUSLY OPTED OUT BY PROVIDING TIMELY NOTICE AS SET FORTH IN THE ARBITRATION PROVISION.

**PUBLIC INJUNCTIVE RELIEF WAIVER**
If either you or we elect to arbitrate a Claim, neither you nor we will have the right to seek a public injunction, if such a waiver is permitted by the FAA. If a court decides that such a waiver is not permitted, and that decision is not reversed on appeal, any request for the remedy of a public injunction will be decided in court after all other Claims to be decided in arbitration under this Arbitration Provision are arbitrated and the arbitration award regarding such Claims has been entered in court. In no event will an arbitrator be permitted to issue a public injunction.

## IMPORTANT ACCOUNT INFORMATION

Effective June 4, 2022, we are changing the "If we need to reclaim money" and "Closing your account" sections of your Virtual Wallet Fine Print "What You Need to Know" ("Agreement"). Starting June 4, 2022, the below provisions will replace the language currently in these sections of the Agreement. All other information in your Agreement continues to apply to your account. Please read this information and keep it with your records.

**THE FOLLOWING PROVISIONS WILL BE EFFECTIVE STARTING JUNE 4, 2022:**

**If we need to reclaim money**
If you receive payment from us for an item, such as a check, and we need to investigate a claim that the item contains a forged endorsement or alteration, we are allowed to place a hold on your account while the investigation is made. If we find that the item contains a forged endorsement or alteration, we are allowed to charge your account for the face value of the item.

You and any joint depositors grant us a security interest in the balance in the account(s) that comprise your Virtual Wallet and in any other individual and joint accounts in your name, including joint accounts owned by husband and wife, to pay all loans, overdrafts or other obligations or other indebtedness now or hereafter owing to us by you, either individually or jointly. We may exercise our right of set off without advance notice to you and without regard to any other right that we may have against you or any other person or entity. We may also freeze or place a hold on your account(s) without setting off in order to investigate any dispute or claim.

# Virtual Wallet With Performance Select Statement

🖥 For 24-hour information, sign on to PNC Bank Online Banking
on pnc.com.

**For the period 05/11/2022 to 06/09/2022**
KELLY A MARTINEZ
Primary account number: ▮▮▮▮▮▮▮
Page 2 of 4

Our security interest and right of set off shall continue even after the account(s) has been closed and will apply to any credit resulting from disputes you initiate or any items received for payment after the account(s) has been closed. We reserve the right to apply the proceeds of any credit received to the account(s), including credits received after the account(s) is closed, to reduce any outstanding balance you owe us.

Our security interest and right of set off shall prevail and take priority over any claim, change of ownership, pledge, attachment, garnishment, levy, court order or other legal process of any kind whatsoever. Should one of these events occur, we may take any action permitted or required by law.

FOR ACCOUNTS IN INDIANA: All joint account holders specifically agree that the provisions of Indiana Code 32- 17-11-17 and 32-17-11-27, regarding the proportion of net contribution by each joint account holder, shall not apply to any charge to an Account under this section, and we shall have the right to deduct from any such Account the amount of any indebtedness due and owing to us from any joint account holder up to and including the entire balance of any such Account without regard to the contribution to the Account.

**Closing your account**
You or the Bank can close the account(s) that comprise your Virtual Wallet at any time, for any reason, without advance notice. We may ask that you provide your request to close your account(s) in writing. We are not required to close the account(s) at your request until all known authorized or outstanding items (including, but not limited to, checks, ATM, point-of-sale, ACH and other electronic transactions) have been paid from your account(s) and any outstanding disputes (including but not limited to disputes regarding electronic transfers, ACH transactions or other unresolved internal research requests/disputes concerning the account(s)) have been resolved. After you or we close the account(s), if the account(s) has a positive balance, we will mail you a check for the final balance, reduced by any amount you owe us. You will still be responsible for any outstanding transactions, or service charges or overdrafts incurred before, during or after the time the account(s) is closed.

After your account(s) is closed, we may temporarily reopen your account(s) to resolve a dispute concerning the account(s), or to accept a debit or credit to your account(s), even if doing so results in your account(s) becoming overdrawn. If we temporarily reopen your account(s), we may exercise our discretion to return any debit or credit that is received to your account(s) while your account(s) is temporarily reopened.

Alternatively, if we receive a debit or credit to your account(s) after it is closed, we may, in our sole discretion, return to the payee any debit or return to the originator any additional deposits or electronic credits (including, but not limited to, Social Security, pension payments and automatic payroll deposits), and you will be liable for any associated charges.

## Virtual Wallet With Performance Select Account Summary

**Account number:** ▮▮▮▮▮▮▮

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Overdraft Protection**   has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage**   - Your account is currently   **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions.
Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft Protection settings.

## Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 18,425.31 | 40,087.12 | 58,506.35 | 6.08 |

| | Average monthly balance | Charges and fees |
|---|---|---|
| | 10,515.21 | .00 |

## Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 5 | 0 | 0 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 1 | 1 | 0 |

# Virtual Wallet With Performance Select Statement

**For the period 05/11/2022 to 06/09/2022**

KELLY A MARTINEZ

Primary account number: ▆▆▆▆▆▆▆

Page 3 of 4

For 24-hour information, sign on to PNC Bank Online Banking on pnc.com.

Account number: ▆▆▆▆▆▆ - continued

## Interest Summary

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.01% | 30 | 10,193.04 | .08 |

| | Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|---|
| | .01 | .14 | .02 |

As of 06/09, a total of **$.14** in interest was paid this year.

## Activity Detail

### Deposits and Other Additions

There were 7 Deposits and Other Additions totaling **$40,087.12** .

| Date | Amount | Description |
|---|---|---|
| 05/31 | 29,971.80 | Direct Deposit - Payroll Riverview Cardia XXXXXXXXXXX39-0 |
| 05/31 | 9,765.00 | Deposit Reference No.  032435488 |
| 06/07 | 150.00 | Reverse Check 0000000103 Effective  06-06-22 |
| 06/07 | .17 | Direct Deposit - Trial Dep Wells Fargo Ifi Td0Fjpssvv |
| 06/07 | .07 | Direct Deposit - Trial Dep Wells Fargo Ifi Td0Fjpssxx |
| 06/07 | 200.00 | Deposit Reference No.  032379409 |
| 06/09 | .08 | Interest Payment |

### Checks and Substitute Checks

| Check number | Amount | Date paid | Reference number | Check number | Amount | Date paid | Reference number |
|---|---|---|---|---|---|---|---|
| 102 | 11,990.00 | 05/20 | 077730537 | 121 * | 10,186.10 | 05/31 | 071689710 |
| 103 | 150.00 | 06/06 | 070637311 | | | | |

* Gap in check sequence

There were 3 checks listed totaling **$22,326.10** .

### Banking/Debit Card Withdrawals and Purchases

There was 1 Banking Machine Withdrawal totaling **$200.00** .

| Date | Amount | Description |
|---|---|---|
| 06/09 | 200.00 | ATM Withdrawal 9430 Bonita Beach Bonita Sprin Fl |

### Online and Electronic Banking Deductions

There were 3 Online or Electronic Banking Deductions totaling **$16,000.24** .

| Date | Amount | Description |
|---|---|---|
| 06/01 | 13,500.00 | Web Pmt- Online Pmt American Express Ckf613257994POS |
| 06/02 | 2,500.00 | Web Pmt- Online Pmt American Express Ckf613257994POS |
| 06/07 | .24 | Web Pmt- Trial Dep Wells Fargo Ifi Td0Fjpssvv |

### Other Deductions

There were 4 Other Deductions totaling **$19,980.01** .

| Date | Amount | Description |
|---|---|---|
| 05/31 | 10,000.00 | Withdrawal Reference No.  032435490 |
| 06/06 | 6,000.00 | Withdrawal Reference No.  031440354 |
| 06/06 | 3,980.00 | Withdrawal Reference No.  031440352 |
| 06/09 | .01 | Interest Withholding |

# Virtual Wallet With Performance Select Statement

**For the period 05/11/2022 to 06/09/2022**

For 24-hour information, sign on to PNC Bank Online Banking on pnc.com.

KELLY A MARTINEZ
Primary account number: ███████

Account number: ███████ - continued

Page 4 of 4

## Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|------|---------|
| 05/11 | 18,425.31 | 05/31 | 25,986.01 | 06/02 | 9,986.01 | 06/07 | 206.01 |
| 05/20 | 6,435.31 | 06/01 | 12,486.01 | 06/06 | 143.99 - | 06/09 | 6.08 |

# Virtual Wallet With Performance Select Statement
PNC Bank

**For the period 06/10/2022 to 07/12/2022**

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

Primary account number: ▮▮▮▮▮
Page 1 of 2
Number of enclosures: 0

For 24-hour banking, and transaction or interest rate information, sign on to PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?** Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

Visit us at PNC.com

## Virtual Wallet With Performance Select Account Summary
**Account number:** ▮▮▮▮▮

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Overdraft Protection** has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage** - Your account is currently **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions. Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft Protection settings.

### Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 6.08 | 35,655.25 | 25,650.00 | 10,011.33 |

| | Average monthly balance | Charges and fees |
|---|---|---|
| | 748.30 | .00 |

### Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 1 | 0 | 0 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 0 | 0 | 0 |

### Interest Summary

As of 07/12, a total of **$.15** in interest was paid this year.

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.02% | 33 | 449.39 | .01 |

| Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|
| .00 | .15 | .02 |

# Virtual Wallet With Performance Select Statement

**For the period 06/10/2022 to 07/12/2022**

💻 For 24-hour information, sign on to PNC Bank Online Banking
on pnc.com.

KELLY A MARTINEZ
Primary account number: ███████████

Account number: ███████████ - continued

Page 2 of 2

## Activity Detail

### Deposits and Other Additions

There were 3 Deposits and Other Additions totaling **$35,655.25** .

| Date | Amount | Description |
|------|--------|-------------|
| 06/30 | 25,690.69 | Direct Deposit - Payroll |
|  |  | Riverview Cardia XXXXXXXXXXX39-0 |
| 07/12 | 9,964.55 | Deposit Reference No.  030365438 |
| 07/12 | .01 | Interest Payment |

### Online and Electronic Banking Deductions

There was 1 Online or Electronic Banking Deduction totaling **$14,000.00** .

| Date | Amount | Description |
|------|--------|-------------|
| 07/01 | 14,000.00 | Web Pmt- Online Pmt |
|  |  | American Express Ckf613257994POS |

### Other Deductions

There was 1 Other Deduction totaling **$11,650.00** .

| Date | Amount | Description |
|------|--------|-------------|
| 06/30 | 11,650.00 | Withdrawal Reference No.  031714077 |

### Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|------|---------|
| 06/10 | 6.08 | 06/30 | 14,046.77 | 07/01 | 46.77 | 07/12 | 10,011.33 |

# Virtual Wallet With Performance Select Statement
PNC Bank

**For the period 07/13/2022 to 08/09/2022**

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

Primary account number: ██████████
Page 1 of 3
Number of enclosures: 0

For 24-hour banking, and transaction or interest rate information, sign on to PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?** Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

Visit us at PNC.com

## IMPORTANT ACCOUNT INFORMATION FOR VIRTUAL WALLET WITH PERFORMANCE SELECT AND PERFORMANCE SELECT CHECKING CUSTOMERS

The information below amends certain information in our Virtual Wallet Features and Fees and our Consumer Schedule of Service Charges and Fees ('Schedule'). All other information in our Schedule continues to apply to your account. Please read this information and retain it with your records.

Effective October 23, 2022, the following pricing changes will be in effect:

> There will no longer be a discount on the annual rental fee for Safe Deposit Boxes.
> The discount on select Checks and Deposit Tickets will be $10.00.
> Other financial institutions' ATM surcharge fees will be reimbursed up to $10.00 at the end of the statement period.

Effective July 2022, PNC expanded their ATM network by 41,000 across the United States. Refer to PNC.com for more details.

If you have any questions, please feel free to visit your local PNC Branch or Solution Center or call the Customer Care Center at 1-888-762-2265.

## IMPORTANT ACCOUNT INFORMATION FOR ALL PERSONAL CHECKING, SAVINGS, AND MONEY MARKET ACCOUNT CUSTOMERS

The information below amends certain information in our Consumer Schedule of Service Charges and Fees ('Schedule') and our PNC Virtual Wallet Features and Fees ('Schedule'). All other information in our Schedule continues to apply to your account. Please read this information and retain it with your records.

Effective August 6, 2022, the $36 Returned Item Fee will no longer be assessed for any consumer checking or savings account. A Returned Item (also known as Non-Sufficient Funds or NSF) fee occurs when an item is returned unpaid.

PNC will remove the references to Returned Item (NSF) fees charged to consumer accounts where they appear in the Consumer Schedule of Service Charges and Fees ('Schedule'), PNC Virtual Wallet Features and Fees ('Schedule'), Account Agreement for Personal Checking, Savings and Money Market Account, and PNC Virtual Wallet Fine Print.

If you have any questions, please feel free to stop by a local PNC Branch or call the Customer Care Center at 1-888-762-2265.

# Virtual Wallet With Performance Select Statement

For 24-hour information, sign on to PNC Bank Online Banking on pnc.com.

**For the period 07/13/2022 to 08/09/2022**
KELLY A MARTINEZ
Primary account number: ████████
Page 2 of 3

## Virtual Wallet With Performance Select Account Summary

Account number: ████████

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Overdraft Protection**    has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage**    - Your account is currently    **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions.
Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft Protection settings.

## Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 10,011.33 | 23,505.04 | 30,883.60 | 2,632.77 |

| | | Average monthly balance | Charges and fees |
|---|---|---|---|
| | | 2,441.94 | .00 |

## Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 3 | 0 | 0 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 0 | 0 | 0 |

## Interest Summary

As of 08/09, a total of **$.16**  in interest was paid this year.

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.01% | 28 | 2,441.94 | .01 |

| | Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|---|
| | .00 | .16 | .02 |

## Activity Detail

### Deposits and Other Additions

There were 2 Deposits and Other Additions totaling **$23,505.04** .

| Date | Amount | Description |
|---|---|---|
| 07/29 | 23,505.03 | Direct Deposit - Payroll Riverview Cardia XXXXXXXXXXX39-0 |
| 08/09 | .01 | Interest Payment |

### Checks and Substitute Checks

There is 1 check listed totaling **$300.00** .

| Check number | Amount | Date paid | Reference number |
|---|---|---|---|
| 105 | 300.00 | 08/05 | 074549104 |

### Online and Electronic Banking Deductions

There was 1 Online or Electronic Banking Deduction totaling **$11,500.00** .

| Date | Amount | Description |
|---|---|---|
| 08/01 | 11,500.00 | Web Pmt- Online Pmt American Express Ckf613257994POS |

# Virtual Wallet With Performance Select Statement

🖥 For 24-hour information, sign on to PNC Bank Online Banking
on pnc.com.

Account number: ██████████ - continued

**For the period 07/13/2022 to 08/09/2022**

KELLY A MARTINEZ

Primary account number: ███████████

Page 3 of 3

## Other Deductions

There were 2 Other Deductions totaling
**$19,083.60**        .

| Date | Amount | Description |
|------|--------|-------------|
| 07/13 | 10,000.00 | Withdrawal Reference No.  031382248 |
| 07/29 | 9,083.60 | Withdrawal Reference No.  031622307 |

## Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 07/13 | 11.33 | 08/01 | 2,932.76 | 08/09 | 2,632.77 |
| 07/29 | 14,432.76 | 08/05 | 2,632.76 | | |

# Virtual Wallet With Performance Select Statement
PNC Bank

**For the period 08/10/2022 to 09/12/2022**

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

Primary account number: ███████
Page 1 of 3
Number of enclosures: 0

For 24-hour banking, and transaction or interest rate information, sign on to PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?** Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

Visit us at PNC.com

## IMPORTANT ACCOUNT INFORMATION FOR VIRTUAL WALLET WITH PERFORMANCE SELECT AND PERFORMANCE SELECT CHECKING CUSTOMERS

The information below amends certain information in our Virtual Wallet Features and Fees and our Consumer Schedule of Service Charges and Fees ('Schedule'). All other information in our Schedule continues to apply to your account. Please read this information and retain it with your records.

Effective October 23, 2022, the following pricing changes will be in effect:

> There will no longer be a discount on the annual rental fee for Safe Deposit Boxes.
> The discount on select Checks and Deposit Tickets will be $10.00.
> Other financial institutions' ATM surcharge fees will be reimbursed up to $10.00 at the end of the statement period.

Effective July 2022, PNC expanded their ATM network by 41,000 across the United States. Refer to PNC.com for more details.

If you have any questions, please feel free to visit your local PNC Branch or Solution Center or call the Customer Care Center at 1-888-762-2265.

## IMPORTANT ACCOUNT INFORMATION FOR ALL PERSONAL CHECKING, SAVINGS, AND MONEY MARKET ACCOUNT CUSTOMERS

The information below amends certain information in our Consumer Schedule of Service Charges and Fees ('Schedule') and our PNC Virtual Wallet Features and Fees ('Schedule'). All other information in our Schedule continues to apply to your account. Please read this information and retain it with your records.

Effective August 6, 2022, the $36 Returned Item Fee will no longer be assessed for any consumer checking or savings account. A Returned Item (also known as Non-Sufficient Funds or NSF) fee occurs when an item is returned unpaid.

PNC will remove the references to Returned Item (NSF) fees charged to consumer accounts where they appear in the Consumer Schedule of Service Charges and Fees ('Schedule'), PNC Virtual Wallet Features and Fees ('Schedule'), Account Agreement for Personal Checking, Savings and Money Market Account, and PNC Virtual Wallet Fine Print.

If you have any questions, please feel free to stop by a local PNC Branch or call the Customer Care Center at 1-888-762-2265.

# Virtual Wallet With Performance Select Statement

For 24-hour information, sign on to PNC Bank Online Banking on pnc.com.

**For the period 08/10/2022 to 09/12/2022**
KELLY A MARTINEZ
Primary account number: ▮▮▮▮▮▮▮
Page 2 of 3

## Virtual Wallet With Performance Select Account Summary

**Account number:** ▮▮▮▮▮▮▮

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Overdraft Protection**    has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage**    - Your account is currently    **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions.
Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft Protection settings.

## Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 2,632.77 | 25,493.24 | 27,350.45 | 775.56 |

| | Average monthly balance | | Charges and fees |
|---|---|---|---|
| | 2,391.24 | | .00 |

## Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 3 | 1 | 2 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 1 | 1 | 0 |

## Interest Summary

As of 09/12, a total of **$.18**  in interest was paid this year.

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.01% | 34 | 2,391.24 | .02 |

| Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|
| .00 | .18 | .02 |

## Activity Detail

### Deposits and Other Additions

There were 2 Deposits and Other Additions totaling **$25,493.24** .

| Date | Amount | Description |
|---|---|---|
| 08/31 | 25,493.22 | Direct Deposit - Payroll Riverview Cardia XXXXXXXXXXX39-0 |
| 09/12 | .02 | Interest Payment |

### Checks and Substitute Checks

| Check number | Amount | Date paid | Reference number | Check number | Amount | Date paid | Reference number |
|---|---|---|---|---|---|---|---|
| 106 | 50.00 | 08/26 | 072879795 | 107 | 20.00 | 08/23 | 076842500 |

* Gap in check sequence

There were 2 checks listed totaling  **$70.00** .

# Virtual Wallet With Performance Select Statement

For 24-hour information, sign on to PNC Bank Online Banking on pnc.com.

**For the period 08/10/2022 to 09/12/2022**

KELLY A MARTINEZ
Primary account number: ███████
Page 3 of 3

Account number: ███████ - continued

## Banking/Debit Card Withdrawals and Purchases

| Date | Amount | Description |
|---|---|---|
| 08/11 | 20.00 | ATM Withdrawal 9430 Bonita Beach Bonita Sprin Fl |
| 08/12 | 39.51 | POS Purchase Wm Supercenter Naples Fl |
| 08/15 | 2.45 | 1327 Debit Card Purchase Dunkin #351159 Q35 |
| 08/16 | 31.20 | POS Purchase Seed To Table Naples Fl |

There was 1 Banking Machine Withdrawal totaling **$20.00** .

There were 2 Debit Card/Bank card PIN POS purchases totaling **$70.71** .

There was 1 other Banking Machine/Debit Card deductions totaling **$2.45** .

## Online and Electronic Banking Deductions

| Date | Amount | Description |
|---|---|---|
| 09/01 | 18,000.00 | Web Pmt- Online Pmt |
| | | American Express Ckf613257994POS |

There was 1 Online or Electronic Banking Deduction totaling **$18,000.00** .

## Other Deductions

| Date | Amount | Description |
|---|---|---|
| 08/31 | 9,187.29 | Withdrawal Reference No. 030776312 |

There was 1 Other Deduction totaling **$9,187.29** .

## Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 08/10 | 2,632.77 | 08/15 | 2,570.81 | 08/26 | 2,469.61 | 09/12 | 775.56 |
| 08/11 | 2,612.77 | 08/16 | 2,539.61 | 08/31 | 18,775.54 | | |
| 08/12 | 2,573.26 | 08/23 | 2,519.61 | 09/01 | 775.54 | | |

# Virtual Wallet With Performance Select Statement
PNC Bank

**For the period 09/13/2022 to 10/12/2022**

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

Primary account number: ▉▉▉▉▉▉
Page 1 of 2
Number of enclosures: 0

For 24-hour banking, and transaction or interest rate information, sign on to PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?** Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

Visit us at PNC.com

## IMPORTANT ACCOUNT INFORMATION FOR VIRTUAL WALLET WITH PERFORMANCE SELECT AND PERFORMANCE SELECT CHECKING CUSTOMERS

The information below amends certain information in our Virtual Wallet Features and Fees and our Consumer Schedule of Service Charges and Fees ('Schedule'). All other information in our Schedule continues to apply to your account. Please read this information and retain it with your records.

Effective October 23, 2022, the following pricing changes will be in effect:

> There will no longer be a discount on the annual rental fee for Safe Deposit Boxes.
> The discount on select Checks and Deposit Tickets will be $10.00.
> Other financial institutions' ATM surcharge fees will be reimbursed up to $10.00 at the end of the statement period.

Effective July 2022, PNC expanded their ATM network by 41,000 across the United States. Refer to PNC.com for more details.

If you have any questions, please feel free to visit your local PNC Branch or Solution Center or call the Customer Care Center at 1-888-762-2265.

## Virtual Wallet With Performance Select Account Summary

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Account number:** ▉▉▉▉▉▉

**Overdraft Protection** has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage** - Your account is currently **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions. Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft Protection settings.

## Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 775.56 | 39,334.08 | 38,837.97 | 1,271.67 |

| | Average monthly balance | | Charges and fees |
|---|---|---|---|
| | 3,647.11 | | .00 |

# Virtual Wallet With Performance Select Statement

For 24-hour information, sign on to PNC Bank Online Banking on pnc.com.

Account number: ▮▮▮▮▮▮▮ - continued

**For the period 09/13/2022 to 10/12/2022**
KELLY A MARTINEZ
Primary account number: ▮▮▮▮▮▮▮
Page 2 of 2

## Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 4 | 0 | 0 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 0 | 0 | 0 |

## Interest Summary

As of 10/12, a total of **$.20** in interest was paid this year.

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.01% | 30 | 3,125.45 | .02 |

| Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|
| .00 | .20 | .02 |

## Activity Detail

### Deposits and Other Additions

There were 3 Deposits and Other Additions totaling **$39,334.08** .

| Date | Amount | Description |
|---|---|---|
| 09/13 | 15,750.00 | Deposit Reference No. 036719703 |
| 09/30 | 23,584.06 | Direct Deposit - Payroll Riverview Cardia XXXXXXXXXXX39-0 |
| 10/12 | .02 | Interest Payment |

### Checks and Substitute Checks

There is 1 check listed totaling **$240.00** .

| Check number | Amount | Date paid | Reference number |
|---|---|---|---|
| 108 | 240.00 | 09/27 | 074308437 |

### Online and Electronic Banking Deductions

There were 2 Online or Electronic Banking Deductions totaling **$13,756.94** .

| Date | Amount | Description |
|---|---|---|
| 09/22 | 756.94 | Web Pmt- Transfer Wefabk Ck Webxfr 5624367437 |
| 10/03 | 13,000.00 | Web Pmt- Online Pmt American Express Ckf613257994POS |

### Other Deductions

There were 3 Other Deductions totaling **$24,841.03** .

| Date | Amount | Description |
|---|---|---|
| 09/13 | 300.00 | Withdrawal Reference No. 036719705 |
| 09/14 | 15,200.00 | Withdrawal Reference No. 031935211 |
| 10/03 | 9,341.03 | Withdrawal Reference No. 032576845 |

### Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 09/13 | 16,225.56 | 09/22 | 268.62 | 09/30 | 23,612.68 | 10/12 | 1,271.67 |
| 09/14 | 1,025.56 | 09/27 | 28.62 | 10/03 | 1,271.65 | | |

# Virtual Wallet With Performance Select Statement

**PNC Bank**

**For the period 10/13/2022 to 11/09/2022**

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

Primary account number: █████████
Page 1 of 2
Number of enclosures: 0

For 24-hour banking, and transaction or interest rate information, sign on to PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?** Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

Visit us at PNC.com

## Virtual Wallet With Performance Select Account Summary

**Account number:** █████████

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Overdraft Protection** has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage** - Your account is currently **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions. Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft Protection settings.

## Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 1,271.67 | 27,333.93 | 28,575.00 | 30.60 |

| | Average monthly balance | Charges and fees | |
|---|---|---|---|
| | 942.71 | .00 | |

## Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 2 | 0 | 0 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 0 | 0 | 0 |

## Interest Summary

As of 11/09, a total of **$.21** in interest was paid this year.

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.01% | 28 | 942.71 | .01 |

| Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|
| .00 | .21 | .02 |

# Virtual Wallet With Performance Select Statement

**For the period 10/13/2022 to 11/09/2022**

For 24-hour information, sign on to PNC Bank Online Banking
on pnc.com.

KELLY A MARTINEZ
Primary account number ▬▬▬▬▬

Account number: ▬▬▬▬▬ - continued

Page 2 of 2

## Activity Detail

### Deposits and Other Additions

There were 2 Deposits and Other Additions totaling **$27,333.93** .

| Date | Amount | Description |
|---|---|---|
| 10/31 | 27,333.92 | Direct Deposit - Payroll |
| | | Riverview Cardia XXXXXXXXXXX39-0 |
| 11/09 | .01 | Interest Payment |

### Checks and Substitute Checks

| Check number | Amount | Date paid | Reference number |
|---|---|---|---|
| 109 | 1,075.00 | 10/27 | 075796588 |

There is 1 check listed totaling **$1,075.00** .

### Online and Electronic Banking Deductions

There was 1 Online or Electronic Banking Deduction totaling **$7,500.00** .

| Date | Amount | Description |
|---|---|---|
| 11/01 | 7,500.00 | Web Pmt- Online Pmt |
| | | American Express Ckf613257994POS |

### Other Deductions

There was 1 Other Deduction totaling **$20,000.00** .

| Date | Amount | Description |
|---|---|---|
| 10/31 | 20,000.00 | Withdrawal Reference No.  031412304 |

### Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 10/13 | 1,271.67 | 10/31 | 7,530.59 | 11/09 | 30.60 |
| 10/27 | 196.67 | 11/01 | 30.59 | | |

# Virtual Wallet With Performance Select Statement
PNC Bank

**For the period 11/10/2022 to 12/09/2022**

KELLY A MARTINEZ
WILLIAM V MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES FL 34110-1187

Primary account number: ████████
Page 1 of 2
Number of enclosures: 0

🖳 For 24-hour banking, and transaction or
interest rate information, sign on to
PNC Bank Online Banking at pnc.com.

☎ For customer service call 1-888-PNC-BANK
PNC accepts Telecommunications Relay Service (TRS) calls.

Para servicio en espanol, 1-866-HOLA-PNC

**Moving?**   Please contact us at 1-888-PNC-BANK

✉ Write to: Customer Service
PO Box 609
Pittsburgh PA 15230-9738

🖳 Visit us at PNC.com

---

## Virtual Wallet With Performance Select Account Summary
**Account number:**   ████████

KELLY A MARTINEZ
WILLIAM V MARTINEZ

**Overdraft Protection**   has not been established for this account.
Please contact us if you would like to set up this service.

**Overdraft Coverage**   - Your account is currently   **Opted-Out.**
You or your joint owner may revoke your opt-in or opt-out choice at any time.

To learn more about PNC Overdraft Solutions visit us online at pnc.com/overdraftsolutions.
Call 1-877-588-3605, visit any branch, or Sign on to PNC Online Banking , and select the "Overdraft
Solutions" link under the Account Services section to manage both your Overdraft Coverage and Overdraft
Protection settings.

### Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 30.60 | 32,173.92 | 17,785.66 | 14,418.86 |

| | Average monthly balance | | Charges and fees |
|---|---|---|---|
| | 3,442.84 | | .00 |

### Transaction Summary

| Checks paid/ withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions |
|---|---|---|
| 3 | 1 | 0 |

| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions |
|---|---|---|
| 0 | 0 | 0 |

### Interest Summary

As of 12/09, a total of **$.23**  in interest was paid this year.

| Annual Percentage Yield Earned (APYE) | Number of days in interest period | Average collected balance for APYE | Interest Earned this period |
|---|---|---|---|
| 0.01% | 30 | 3,120.68 | .02 |

| Withholding this period | Interest earned year-to-date | Withholding year-to-date |
|---|---|---|
| .00 | .23 | .02 |

# Virtual Wallet With Performance Select Statement

For 24-hour information, sign on to PNC Bank Online Banking on pnc.com.

**For the period 11/10/2022 to 12/09/2022**

KELLY A MARTINEZ

Primary account number ▮▮▮▮▮▮▮

Account number: ▮▮▮▮▮▮▮ - continued

Page 2 of 2

## Activity Detail

### Deposits and Other Additions

| Date | Amount | Description |
|---|---|---|
| 11/30 | 22,408.90 | Direct Deposit - Payroll |
| | | Riverview Cardia XXXXXXXXXXX39-0 |
| 12/06 | 9,765.00 | Deposit Reference No.  030651205 |
| 12/09 | .02 | Interest Payment |

There were 3 Deposits and Other Additions totaling **$32,173.92**    .

### Checks and Substitute Checks

| Check number | Amount | Date paid | Reference number |
|---|---|---|---|
| 110 | 200.00 | 12/09 | 073864153 |

There is 1 check listed totaling    **$200.00**    .

### Banking/Debit Card Withdrawals and Purchases

| Date | Amount | Description |
|---|---|---|
| 12/07 | 225.00 | 1327 Debit Card Purchase Merry Christmas Trees |

There was 1 other Banking Machine/Debit Card deductions totaling  **$225.00**    .

### Online and Electronic Banking Deductions

| Date | Amount | Description |
|---|---|---|
| 12/01 | 6,500.00 | Web Pmt- Online Pmt |
| | | American Express Ckf613257994POS |

There was 1 Online or Electronic Banking Deduction totaling  **$6,500.00**    .

### Other Deductions

| Date | Amount | Description |
|---|---|---|
| 11/30 | 9,660.66 | Withdrawal Reference No.  031867311 |
| 12/06 | 1,200.00 | Withdrawal Reference No.  030651207 |

There were 2 Other Deductions totaling **$10,860.66**    .

### Daily Balance Detail

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 11/10 | 30.60 | 12/01 | 6,278.84 | 12/07 | 14,618.84 |
| 11/30 | 12,778.84 | 12/06 | 14,843.84 | 12/09 | 14,418.86 |





**Posting Date**      2022 May 09

**Account Number**    █████████

**WILLIAM V. MARTINEZ**
**KELLY A. MARTINEZ**
15919 SECOYA RESERVE CIR
NAPLES, FL 34110-1187

102

63-8419/2670
460

Date  5/1./122

Pay to the Order of  Weather Control Air Conditioning INC    $ 11,990 ⁰⁰/₁₀₀

eleven thousand nine hundred ninety and ⁰⁰/₁₀₀ Dollars

**PNCBANK**

PNC Bank, N.A.   001

For  Invoice # 104922

Kelly Martinez

0102

20220520 8634368111 E462883 6
FTFL043 00218 242612055 1608
5/3 Bank >042000314<

PAY TO THE ORDER OF
FIFTH THIRD BANK
06709171719
FOR DEPOSIT ONLY
WEATHER CONTROL AIR CONDITIONING INC.
7974790649

**Posting Date**        2022 May 20

**Account Number**

## ⊘ PNC BANK

ACCOUNT NUMBER

REGIONAL ID

**Checking/Savings Withdrawal Ticket**

Date 5/31/22

1 2 4 4 1 3 9 2 2 2

**NON-NEGOTIABLE**   FORM162753

$ 10000.00

FORM162753-1015

William Martinez _____ Hereby Requests the

The Undersigned

Amount Of 10 thousand and XX/100 _____ Dollars

WM

Signature

∎?╟∎∎∎╟∎

Brian Finn

20220531  003200435490  00100460003

10501 Six Mile Cypress Parkway

20220531 003200435490 00100460003

fort Meyers, fl   33966

**Posting Date**    2022 May 31

**Account Number**    ▇▇▇▇▇▇

WILLIAM V. MARTINEZ
KELLY A. MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES, FL 34110-1187

121

63-8419/2670
460

Date  5/31/22

Pay to the
Order of  Kelly Martinez                    $ 10,186.10

Ten Thousand one hundred eighty six and 10/100 Dollars

**PNCBANK**

PNC Bank, N.A.  001

For

WMJ

⑆267084199⑆ 1244139222⑆ 0121

**ENDORSE HERE**

x Kelly Martinez

☐ CHECK BOX FOR MOBILE/REMOTE DEPOSIT

WRITE NAME OF FINANCIAL INSTITUTION ON LINE ABOVE

**Posting Date**    2022 May 31

**Account Number**    ▮▮▮▮▮▮▮

## PNC BANK

Checking/Savings Withdrawal Ticket

ACCOUNT NUMBER    REGIONAL ID    Date 6/4/22

$ 3980 . 00

**NON-NEGOTIABLE**    FORM162753

Kelly Martinez _____ Hereby Requests the
The Undersigned

Amount Of three thousand nine hundred eighty ___ Dollars

Kelly Martinez _____
Signature

FORM162753-1015

20220606 003100440352 00100460006

20220606 003100440352 00100460006

**Posting Date**    2022 Jun 06

**Account Number**

**⊘ PNCBANK**

Checking/Savings Withdrawal Ticket

ACCOUNT NUMBER          REGIONAL ID          Date 6/4/22

$  6000  .00

**NON-NEGOTIABLE**          FORM162753

Kelly Martinez _____ Hereby Requests the
The Undersigned

Amount Of Six thousand _____ Dollars

Kelly Martinez
Signature

FORM162753-1015

20220606  003100440354  00100460006

20220606  003100440354  00100460006

**Posting Date**        2022 Jun 06

**Account Number** ▮▮▮▮▮▮



**Posting Date**      2022 Jun 06

**Account Number**    ████████████

## PNC BANK

Checking/Savings Withdrawal Ticket

ACCOUNT NUMBER          REGIONAL ID          Date 6/30/22

**NON-NEGOTIABLE**          FORM162753          $ 11,650 .00

FORM162753-1015

Kelly Martinez _____ Hereby Requests the
The Undersigned

Amount Of _eleven thousand six hundred fifty_____ Dollars

Kelly Martinez
Signature

20220630  003100714077  00100250003

20220630  003100714077  00100250003

**Posting Date**      2022 Jun 30

**Account Number**

## PNC BANK

ACCOUNT NUMBER

**Checking/Savings Withdrawal Ticket**

REGIONAL ID    Date 7/13/22

$ 10,000.00

**NON-NEGOTIABLE**    FORM162753

Kelly Martinez _____ Hereby Requests the
The Undersigned

Amount Of ten thousand _____ Dollars

Kelly Martinez
Signature

FORM162753-0122

To: Brian Zinn

20220713 003100382248 00100460002

20220713 003100382248 00100460002

**Posting Date**    2022 Jul 13

**Account Number**



20220729 003100622307 00100460001

20220729 003100622307 00100460001

**Posting Date**     2022 Jul 29

**Account Number**





**Posting Date**    2022 Aug 05

**Account Number**    ██████████



**Posting Date**       2022 Aug 23

**Account Number**   ████████

**WILLIAM V. MARTINEZ**
**KELLY A. MARTINEZ**
15919 SECOYA RESERVE CIR
NAPLES, FL 34110-1187

106

53-8419/2670
460

8/15/22
Date

Pay to the Order of  North Naples middle School  $ 50 00/100

fifty dollars and ___ ___  Dollars  Photo Safe Deposit

**PNCBANK**
PNC Bank N A  061

For Betre School Study Hall  Kelly Martinez

0 06

20220826 8321531908 E460114 3
FTFL043 00353 253876099 1002
5/3 Bank >042000314<

PAY TO THE ORDER OF
FIFTH THIRD BANK
06709171 9
FOR DEPOSIT ONLY
0700409000
NORTH NAPLES MIDDLE SCHOOL

**Posting Date**       2022 Aug 26

**Account Number**



**Posting Date**     2022 Aug 31

**Account Number**

**⊘ PNC BANK**

**Checking/Savings Withdrawal Ticket**

ACCOUNT NUMBER          REGIONAL ID          Date  9/13/22

$   300.00

**NON-NEGOTIABLE**   FORM162753

FORM162753-0122

William Machner
The Undersigned        Hereby Requests the

Amount Of  three hundred dollers        Dollars

W.M.
Signature

20220913  003600719705  00100460001

20220913 003600719705  00100460001

**Posting Date**      2022 Sep 13

**Account Number**

## PNC BANK

ACCOUNT NUMBER ▓▓▓▓▓▓▓

REGIONAL ID

Checking/Savings Withdrawal Ticket

Date 9/14/2022

$ 15200.00

**NON-NEGOTIABLE** FORM162753

FORM162753-0122

William Martinez _____ Hereby Requests the
The Undersigned

Amount Of fifteen thousand two hundred and XX/100 Dollars

WM ▭

Signature

20220914 003100935211 00100460004

20220914 003100935211 00100460004

Brian Zinn 15,000.00

**Posting Date** 2022 Sep 14

**Account Number** ▓▓▓▓▓



**Posting Date**     2022 Sep 27

**Account Number**   ████████



**Checking/Savings Withdrawal Ticket**

**PNC BANK**

ACCOUNT NUMBER    REGIONAL ID    Date 10/1/80 22

2 6 7 0 8 4 1 9 9

$ 9 341 .03

**NON-NEGOTIABLE**    FORM162753

FORM162753-0122

Kelly A. Martinez

The Undersigned ———— Hereby Requests the

Amount Of _nine thousand three hundred forty one + 03/100_ Dollars

Kelly Martinez
Signature

⑆7409⑈9909⑉

20221003  003200576845  00100460001

20221003 003200576845 00100460001

C. Kelly martinez

**Posting Date**       2022 Oct 03

**Account Number**





**Posting Date** 2022 Oct 27

**Account Number** ███████

## PNC BANK

ACCOU ▮▮ ▮▮ REGIONAL ID

Checking/Savings Withdrawal Ticket

Date 10/29/22

$ 20,000 . 0 0

## NON-NEGOTIABLE

FORM162753

FORM162753-0122

Kelly Martinez ____ Hereby Requests the
The Undersigned

Amount Of twenty thousand and ⁰⁰⁄₁₀₀ Dollars

Kelly Martin
Signature

20221031  003100412304  00100460003

20221031  003100412304  00100460003

**Posting Date**      2022 Oct 31

**Account Number** ▮▮▮▮▮▮

# PNC BANK

ACCOUNT NUMBER

**Checking/Savings Withdrawal Ticket**

REGIONAL ID     Date____11-30-2022____

**NON-NEGOTIABLE**     FORM162753

$ 9660 . 6 6

Kelly Martinez _____ Hereby Requests the
The Undersigned

Amount Of _nine thousand six hundred sixty and 66/100_____ Dollars

Kelly Martinez
Signature

FORM162753-0122

20221130  003100867311  00100250002

20221130 003100867311  00100250002

**Posting Date**     2022 Nov 30

**Account Number**

## PNC BANK

**Checking/Savings Withdrawal Ticket**

ACCOUNT NUMBER                    REGIONAL ID          Date 12441392222

$ 1200 .00

**NON-NEGOTIABLE**          FORM162753

FORM162753-0122

William Marhnez _____ Hereby Requests the
                The Undersigned
Amount Of _Twelve hundred and xx/100_____ Dollars

                        (W)M _____
                                          Signature

20221206  003000651207  00100460003

20221206  003000651207  00100460003

**Posting Date**      2022 Dec 06

**Account Number**    ▮▮▮▮▮



WILLIAM V. MARTINEZ
KELLY A. MARTINEZ
15919 SECOYA RESERVE CIR
NAPLES, FL 34110-1187

Pay to the
Order of ___ GCT

two hundred and

PNC BANK
PNC Bank, N.A.  001

For

110

12/9/22

$ 200.00

Dollars



**Posting Date**     2022 Dec 09

**Account Number**    ███████

## PNC BANK

**ACCOUNT NUMBER**

**REGIONAL ID**

Checking/Savings Withdrawal Ticket

Date 12/12/22

**$ 10,000 .00**

## NON-NEGOTIABLE    FORM162753

FORM162753-1015

Kelly Martinez
The Undersigned                          Hereby Requests the

Amount Of ten thousand and          no Dollars

Kelly Martinez
Signature

20221212  003500548189  001002510027

**Posting Date**      2022 Dec 12

**Account Number**

**PNC BANK**

ACCOUNT NUMBER

Checking/Savings Withdrawal Ticket

REGIONAL ID        Date  12/21/22

**NON-NEGOTIABLE**        FORM162753

$    250.00

FORM162753-0122

William Machner

The Undersigned        Hereby Requests the

Amount Of  Two Hundred fifty and  xx/100        Dollars

WMof
Signature

⬛7ᴴ⬛⬛ ⬛⬛⬛⬛:

20221221  003100861132  00100460001

~??21??1  007100961132  00100460001

**Posting Date**      2022 Dec 21

**Account Number**





**Posting Date** 2022 Apr 14

**Account Number** 0





**Posting Date**     2022 Apr 14

**Account Number**





**Posting Date**      2022 May 02

**Account Number**   ███████





**Posting Date**  2022 May 02

**Account Number**  0



ABSENCE OF ENDORSEMENT GUARANTEED
PNC Bank - Bonita Springs 460
For Deposit to the Credit of
the within named payee
DO NOT WRITE, STAMP OR SIGNATURE BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

20220531  003200435489   00100460003

20220531  003200435489   00100460003

**Posting Date**       2022 May 31

**Account Number**   0





**Posting Date** 2022 May 31

**Account Number** ▮▮▮▮▮▮—





**Posting Date**    2022 Jun 07

**Account Number**



**Posting Date**     2022 Jun 07

**Account Number**     ▮▮▮▮▮▮▮



**Posting Date**    2022 Jul 12

**Account Number**  ▓▓▓▓▓▓





**Posting Date** 2022 Jul 12

**Account Number** 0



20220913 003600719704 00100460001

20220913 003600719704 00100460001

**Posting Date**      2022 Sep 13

**Account Number**  0



**Posting Date**     2022 Sep 13

**Account Number**     ███████



**DEPOSIT TICKET**

**PNC BANK**

ACCOUNT NUMBER    REGIONAL ID

CASH

CHECKS    9765 00

CHECK OR TOTAL FROM OTHER SIDE

FOR CREDIT TO THE ACCOUNT NAMED HEREON

DATE  12/6/22

SUB TOTAL

NAME  William Marholz

LESS CASH RECEIVED

☑ CHECKING    ☐ SAVINGS    FORM162269
☐ CONSUMER    ☐ BUSINESS

**NET DEPOSIT $**    9765.00

THIS DEPOSIT IS ACCEPTED SUBJECT TO VERIFICATION AND TO THE RULES AND REGULATIONS OF THIS BANK. DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL.

FORM162269

TOTAL (CARRY FORWARD TO OTHER SIDE)

PLEASE LIST EACH CHECK SEPARATELY

20221206 003000651205 00100460003

DOLLARS

20221206 003000651205 00100460003

CENTS

**Posting Date**    Dec 06

**Account Number**





**Posting Date** 2022 Dec 06

**Account Number** 0

# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION


D'ANNA WELSH,

    Plaintiff,

        vs.                    Case No.:  2:22-CV-00216-JLB-NPM

WILLIAM V. MARTINEZ, JR., and

KELLY MARTINEZ f/k/a

KELLY ROUSSEAU,

    Defendants.




        DEPOSITION OF DR. WILLIAM V. MARTINEZ, JR




    DATE:          January 30, 2023

    TIME:          1:00 p.m. to 4:54 p.m.

    LOCATION:      Fairfield Inn & Suites

                      3808 White Lake Blvd

                   Naples, FL 34117

    SETTING FIRM:  Chase Law & Associates

    REPORTER:      Jill Saravis-Regan, Court

                   Reporter and Notary Public for

                      The State of Florida at Large

    FILE:          5687378

Veritext Legal Solutions
800-726-7007                                             305-376-8800

Page 2

APPEARANCES:


FOR THE PLAINTIFF:

Brian Fell, Esquire

Chase Law & Associates, P.A.

1141 71st Street

Miami Beach, FL 33141

Tel: (305) 402-9800

Fax: (305) 402-2725

kchase@chaselaw.com



FOR THE DEFENDANTS:

Brian Zinn, Esquire

ZinnLaw, PLLC

10501 6 Mile Cypress Parkway

Suite 114

Fort Myers, FL 33966

Page 3

EXAMINATION INDEX

DR. WILLIAM V. MARTINEZ, JR

DIRECT BY MR. FELL . . . . . . . . . .    4

------------------------------------------------------------

EXHIBIT INDEX

Exhibit

Exhibit 1   The Second Re-Notice of Retaking              14
            Deposition of Defendant William Martinez, Jr

Exhibit 2   First Amended Complaint                      18

Exhibit 3   Asset Standstill Order, 6-25-2012            18

Exhibit 4   Uniform Residential Application              41

Exhibit 5   Charles Schwab Account Information           49

Exhibit 6   Gift Letter                                  74

Exhibit 7   Copies of Pay Stubs                          109

Page 4

THEREUPON,

DR. WILLIAM V. MARTINEZ, JR.,

a witness, having been first duly sworn, upon his oath,

testified as follows:

DIRECT EXAMINATION

BY MR. FELL:

Q.   Hi, Dr. Martinez, how are you?

A.   Good, how are you?

Q.   Good, good.  This is the deposition of William
Martinez, this is in the case of Welsh versus Martinez.
Case number 2:22cv-00216.  I'm just going to show you the
notice of taking deposition.

This is the Second Re-Notice of Retaking Deposition of
Defendant William Martinez, Jr.

MR. CHASE:  I marked it as Exhibit 1.  A copy for
Counsel.

(The document referred to was marked for identification as
Exhibit No. 1.)

BY MR. CHASE:

Q.   All right.  Now, I know you have had your
deposition taken before, but when was the last time?

A.   February.

Q.   Was it in a case involving Ms. Welsh?

A.   It was with your partner.

Q.   Okay.

Page 5

A.    So.

Q.    Okay.  And before that, when was the last time you had your deposition taken?

A.    I don't remember, but it was about this case.

Q.    Okay.  Have you had your deposition taken in something other than this case?

A.    In my life.

Q.    Yes.

A.    I think I have, but I'm not a hundred percent sure.  I may have, during a malpractice case, but the case never went to trial, so I don't remember if I was ever deposed.  I probably haven't ever been deposed, but I could be wrong.

Q.    Okay.

A.    But if it was, it was a long time ago.

Q.    Are you -- let me just go over some quick ground rules, which you may already know, but we have a court reporter taking down everything that we're saying, so please try to answer audibly.  Try not to shake your head no, or nod your head yes.  If you want to say yes or no, say yes or no.  And you can always explain your answer if you need to.

It's not a sprint.  I don't think that we're going to be here, you know, for all day.  I guess -- it's starting at one, so.  But if you ever need to take a break,

Page 6

obviously, let me know and we can take a break.

Are you on any medications that would prohibit you from testifying truthfully today?

A.   No.

Q.   Okay.  Do you have any questions for me before we begin?

A.   No.

Q.   Okay.  Did you speak to anybody other than your lawyer in preparation for your deposition today?

A.   In preparation for it, no.

Q.   Yeah, did you speak to you wife?

A.   Yes.

Q.   What did you speak about.

MR. ZINN:  I'll object on the grounds of privilege.  There is the husband-wife privilege.

MR. CHASE:  Okay.  Are you instructing him not to answer?

MR. ZINN:  Well, I'm not exactly sure about the subject matter, so.

BY MR. CHASE:

Q.   Did you speak to your wife about her deposition?

A.   I spoke to her about how traumatic it was for her.  But in terms of details, no.  Not many details at all.

Q.   As far as being traumatic, what do you mean by

Page 7

that?

A.   She said she was petrified.  She'd never been through anything like that.

Q.   Okay.  And so this is -- is this your first marriage?

A.   No.

Q.   Okay.  How many times have you been married?

A.   Your partner asked me that question at the last deposition, so I would say, "asked and answered," --

Q.   Okay.  So that --

A.   It's -- it's three.  You see, what I don't want to do is just ask questions that I've already been through.

Q.   Okay, so that's another thing.  So, in the deposition, I'm asking the questions, you answer the questions unless your lawyer -- you have a lawyer sitting next to you -- a very competent lawyer -- unless he instructs you not to answer the question, you still have to answer the question, okay?

A.   I hear what your saying, yes.

Q.   Okay.

A.   Then I may have to confer with him.  Is that allowed?

Q.   No.  I mean, only if it's something that -- in order to invoke a privilege.

Page 8

A.   Okay.  So if I kick you, that's what it means.

Q.   Okay, I assume that was a joke.

A.   Yes, it's a joke.  But you see, again, to get back to the real point, I'm paying for this and I don't want to go over stuff I've already answered.

Q.   Okay, so you've been married three times?

A.   Yes.

Q.   Okay.  In those previous two marriages, did you have your deposition taken?

A.   My second one.

Q.   Okay.  So when I asked you before if you ever had your deposition taken, you mentioned a malpractice case, but you didn't mention your divorce case.  So you --

A.   I don't think I had a deposition in my divorce case.  As a matter of fact, I'm fairly certain I didn't have a deposition in my divorce case.

Q.   Okay.  So then why did you just testify that you did, in the second one?

A.   No, I didn't.  My -- I was married to my wife, that second wife, when this case was going on.

Q.   Okay.  Did your -- did any of your divorce cases go to a trial?

A.   No.

Q.   Okay.  So do you --

A.   Well, when you say "trial," what do you mean?

Page 9

Q.   Like a final hearing in order to determine the divorce.

A.   Yes.  We -- I mean, that's how you get divorced. You go to the court, and they say "you are divorced."

Q.   Did you have a settlement?

A.   We did that through mediation.

Q.   Okay.  So did you -- you settled the case.  And did you go to a uncontested final hearing for you divorce?

A.   I guess that's what you would call it.

Q.   So the Judge didn't make any contested rulings in your cases?

A.   No.

Q.   Okay.  And you're saying you were not deposed in those two cases?

A.   No.

Q.   Okay.  Alright, other than your wife and your lawyer, did you speak to anybody else to prepare for your deposition today?

A.   No.

Q.   Okay.  All right.  How old are you?

A.   62.

Q.   Where do you live?

A.   15919 Secoya Reserve Circle.

Q.   Okay.  How long have you lived there?

A.   Since August of 2020.

Page 10

Q.    Okay.  Where did you live before that?

A.    Englewood, Florida.

Q.    And what's the address?

A.    I believe it was 6231 Lomax Street.

Q.    When did you move there?

A.    Probably April; late March, April.

Q.    Of what year?

A.    2020.

Q.    Where did you live before that?

A.    22 Weatherstone, Avon, Connecticut.

Q.    When you moved to Englewood in April or late March of 2020, did your current wife move there with you?

A.    Yes.

Q.    When did she move?

A.    We both moved together.

Q.    At the same time?

A.    Yes.

Q.    Okay, so she didn't continue living in Connecticut during that time?

A.    You said Weatherstone.

Q.    Englewood.

A.    Oh, in Englewood?  I moved down -- I mean, we can parse what "moving" means, but I moved down, I was retired.  I mean, I didn't have a job, there was nothing I could do, so I moved down and she was still working.  And

Page 11

she would come down periodically.

Q.    Okay, so she was still working where?

A.    In Hartford.

Q.    Okay, you just said you were retired, what do you mean by that?

A.    Well, I mean I didn't have a job.

Q.    Were you retired?  What does "retired" mean?

A.    Retired means, I looked for a job, I have no job, I have no job opportunities.  There is nothing I can do. That's what I considered retired.

Q.    Okay, so it's not like you were -- stopped working intentionally for good, as in the normal sense of the word "retired?"

A.    Well, I considered myself retired because I couldn't find a job.  I was very frustrated by the fact that I couldn't get a job in Connecticut.  And I felt as if there was no chance of me working again.

Q.    Okay, did you give up looking for a job?

A.    I wouldn't say I gave up, but once I moved down to Florida, I knew that I didn't want to move out of the state because Kelly and Sophia were very happy down here. There was potentially an opportunity for me to do locums; however, I could never get a locums job either.

Q.    Okay, so why did you move down to Florida?

A.    Kelly wanted to move down there.  Her Dad wanted

Page 12

her to move down there.  So we moved literally one street
away from where he lived.

Q.    Okay, and Kelly is your wife?

A.    Yes.

Q.    And you mentioned another name.  What was the
other name?

A.    Sophia.

Q.    Who is Sophia?

A.    Kelly's daughter.

Q.    How old is Sophia?

A.    Twelve.

Q.    Okay.  All right.  So the move down to Florida
was not to -- for you to look for work?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  The move to Florida was, I couldn't
find a job, I had no prospects for a job.  She wanted
to move to Florida; and as it turns out, her ex
husband wanted to move to Florida.  Her dad was
already living down here part time.  Her mom wanted to
live down there, so her whole side of the family
wanted to move to Florida.  So there was nothing
that -- I had no roots that were stopping me from
moving down here.

BY MR. CHASE:

Page 13

Q.   Okay.  Did moving down here have anything to do with this case?

A.   No.

Q.   Not at all?

A.   Not in the slightest.  I just told you, we moved literally one street away from her dad.

Q.   Okay.  You mentioned Kelly, your wife's ex husband?

A.   Yes.

Q.   What does he do for a living?

A.   I don't really know what he does.  He does something with restaurants, but I don't know what it is. It's -- the name -- is TriMark -- I don't know if that's a restaurant thing.  I -- I don't know what he does.  He does something with opening new restaurants and furnishing them, or -- I don't know.

Q.   Okay.  Does he pay alimony or child support to your wife?

A.   You would have to ask her, but I don't think so.

Q.   Okay.  Is there like a -- sorry.  When were they divorced, do you know?

A.   No, you would have to ask her.

Q.   Okay.  Was there a property settlement agreement for their divorce?

A.   I don't know.

Page 14

Q.   Okay, what's your E-mail address?

A.   "B" as in boy, 11161@comcast.net.

Q.   How long have you had that one?

A.   Since the 90s.

Q.   Okay.  Is that your primary E-mail that you use?

A.   That's my primary.  I have another one that I use for fantasy football.

Q.   What is that E-mail address?

A.   Williammartinez83@yahoo.com.

Q.   Okay, any others?

A.   No, not that I know of.

Q.   What about -- what about for work?

A.   I don't know what my work E-mail is.

Q.   You don't know what your work E-mail is?

A.   No, I never access it, and I don't know what it is.

Q.   But you know that you have one?

A.   I don't know if I have one, to tell you the truth.  See, I'm not an employee for the hospital, and I work in a small group, and I don't think any of us have work E-mails.

Q.   How do you guys communicate?

A.   Usually by phone.  We never communicate by E-mail, so I would say it's always by phone.

Q.   Okay, where do you work?

Page 15

A.    I work for a place called "Riverview Cardiac Surgery," and I predominantly work at Fawcett Hospital in Port Charlotte.

Q.    How do you spell Fawcett?

A.    F-a-w-c-e-t-t.

Q.    Okay.  Do you have privileges there?

A.    Yes.

Q.    When did you get those privileges?

A.    I want to say in the beginning of February of last year.

Q.    Of 2021?

A.    Yes -- no, 2022.

Q.    I'm sorry.  Yeah, you're right.  So February of 2022.  And do you have privileges anywhere else?

A.    At Manatee Hospital and Bradenton.  And Blake Hospital in Bradenton.

Q.    Okay.  What's your cell phone number?

A.    860-402-9669.

Q.    Okay.  How long have you had that number?

A.    Well, it's 860, so I'm going to guess whenever cell phones came out.

Q.    Okay.

A.    You're too young to know when that was.

Q.    All right.  What carrier is it?

A.    It's AT&T, I believe now.

Page 16

Q.   Okay.  Do you have any other cell phone numbers?

A.   No.

Q.   Have you had any other cell phone numbers in the last 10 years?

A.   No.

Q.   Okay.  All right.  So you're married to whom?

A.   Kelly.

Q.   What's her last name?

A.   Her maiden name was Rousseau, her last name is Martinez.

Q.   When did she change her name?

A.   I don't remember.

Q.   Was it within the last year?

A.   I couldn't tell you.  I mean, we got married, she didn't change her name right away, and then she eventually changed her name.

Q.   Why did she take some time to change her name?

A.   Well, there's all the things that -- see, I don't know these things because I'm a male, and I don't have to go through these things.  Females, apparently, it's a big deal to have to go through; so, you know, her diplomas are in one name, and her medical license is in a different -- I mean, there's a lot of things you have to change.

Q.   Okay.  Do you have any siblings?

A.   Yes.

Page 17

Q.   How many?

A.   I have six.

Q.   Okay.  Are you close with them?

A.   Not really.

Q.   Where do they live ?

MR. ZINN:  I'll object to the -- I know I can't object to relevancy, but -- you know, where is this line of questioning going?  Are we going to take a half-hour talking about irrelevant stuff?

BY MR. CHASE:

Q.   Do you have any siblings -- sorry.  Where do your siblings live?

A.   One lives in Lakeland Florida.  Three live in New Jersey.  One lives in Austin.  One lives in Annapolis.

Q.   All right.  We'll get to the -- more of the merits.

All right.  So you were found by a jury to be liable for a judgment of $2,000,000, correct?

A.   Correct.

Q.   Okay, and what year was that?

A.   2012.

Q.   Okay.  All right, and right around that same time, Ms. Welsh filed a motion to prevent you from fraudulently transferring property.  Do you remember that?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  No, I don't remember that.

BY MR. CHASE:

Q.   Okay.  Do you remember a Judge entering an asset standstill order?

A.   Yes.  That was Judge Graham, he wasn't the judge on the case.  It was before a final judgment was rendered because my attorneys asked for a remittitur.

Q.   I'm going to hand you what's been marked as "Exhibit No. 2."  This is our first amended complaint.

MR. CHASE:  Copy for counsel.

(The document referred to was marked for identification as Exhibit No. 2.)

BY MR. CHASE:

Q.   All right.  I may be referring to this at various times, so.

All right.  So would you agree that the asset standstill order -- let me just give you a copy of that as well.  This has been marked as "Exhibit No. 3."

(The document referred to was marked for identification as Exhibit No. 3.)

BY MR. CHASE:

Q.   All right.  Are you familiar with this order?

A.   Yes.

Q.   Okay.  So in your perspective, what does this

Page 19

order mean?  What does it say, what does it tell you to do?

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  It said that I am enjoined from voluntarily transferring or encumbering any assets except business aspects in the ordinary course of business, and personal assets for ordinary living expenses, including court-ordered alimony and child support.

BY MR. CHASE:

Q.  Okay, so at the time this was entered, were you paying alimony and child support?

A.  Yes.

Q.  Are you currently paying alimony and child support?

A.  No.

Q.  Okay.  When did you stop paying alimony and child support?

A.  I forget.  I'm going to say March of 2020 or April of 2020.

Q.  Okay.  Is that when your child -- how many children do you have?

A.  Nine.

Q.  Is that -- in April or March of 2020, is that

Page 20

when your youngest child graduated from high school?

A.   It's college in Connecticut, first off.  And, no.

Q.   So why did you stop paying in March or April of 2020?

A.   I was unemployed.  I had no money.

Q.   Have you paid anything since?

A.   No.

Q.   You are currently employed, right?

A.   Yes.

Q.   Do you owe any alimony or child support?

A.   I do.

Q.   Okay, do you plan on paying it?

A.   I have been in discussions with my wife and we're working through that -- ex wife.

Q.   Okay, but you haven't paid any of that since April of 2020?

A.   Correct -- or March, some place around there.

Q.   Okay.  All right.  As far as the order is concerned, the asset standstill order, you are found to have violated that order, correct?

A.   I don't -- I don't know the answer to that, so.

Q.   Why not?

A.   Because I don't know if this is what I violated, or if it was a fraudulent transfer; so it's like a trick question you're asking me.  I don't know.

Page 21

Q.    Tell me what you mean by you don't know if it was this or a fraudulent transfer.  What do you mean by that?

A.    My lawyers -- let me stop for a second.

Q.    Before you answer, you don't have to tell me communications with your lawyers.

A.    I understand that.

Q.    Okay.

A.    But we had this order issued in July.  We were in settlement discussions with the plaintiff and her lawyer. Your client decided behind both firms' backs to get another firm for financial recouping of money.  So this other firm then decided to garnish my bank account.  It was a joint bank account with my now ex-wife and myself. And my lawyer at the time, John Droney, wrote multiple scathing E-mails, of which I have them, about how improper that was.

And I asked my lawyer, what am I supposed to do?  And he didn't have an answer for me.  So it was right about the time that I was, I think, changing a job or changing the way that my money was going to be deposited.  So I deposited it into my wife's account, her sole account, with the complete and full knowledge of both lawyers that I was dealing with in the firm, and they said it was perfectly fine.  And then at a court hearing, in, I guess, 2017, they said, you are not allowed to do that.  So

Page 22

that's -- that was the court order.  I don't know that it had anything to do with this.

Q.   Okay, I'll tell you that it did.  It was this order that you were found to have violated what we call the "Asset Standstill Order," that the Connecticut Appellate court refers to it as the "Asset Standstill Order."

When you said you would deposit your money into your wife's sole account, tell me about that.  So how would that work?  You would put your money in your wife's sole account, and then how would you pay for your expenses?

A.   Ultimately, she would have to pay for them.  I mean, from a technical standpoint.  And she would write a check to my first ex-wife for child support and alimony.

Q.   Okay, so you would deposit your money into your wife's account, your wife would then --

A.   Pay the bills.

Q.   Pay the bills?

A.   Uh-huh.

Q.   Okay.  And you were found to have violated the Asset Standstill Order for that?

A.   I guess.  Like I said, one of the issues that I have is, my lawyers knew what I was doing and never told me that, hey, you know what, you're not allowed to do that.

Page 23

Q.   Okay.  Were you -- where were you working -- you were working at the time, I guess?

A.   Yes, in Hartford.

Q.   Okay.  And approximately how much money were you making then?

A.   I had a base salary of 1.2 million a year.  And when that order came down, it was close to 1.4 for that year.

Q.   Okay.  And how would you compare your everyday ordinary -- let's say ordinary living expenses at that time, compared with your ordinary living expenses now, today?  Is it the same, higher, lower, you changed your lifestyle.

A.   I have changed my lifestyle.  You're making 1.2 million, 1.4 million, you live completely differently than now.  I mean, I had what I considered back then a very good lifestyle.

Q.   And how would you describe it now?

A.   Not very good.

Q.   Why?

A.   Because there's a lot of expenses, that's why.

Q.   Okay.  But before, you were saying that you had more expenses when you were making more money.

A.   Well, yeah.  You know, you have -- I had a mortgage back then of close to $8,000 a month, property

Page 24

taxes of $26,000 a year.  Everything was more expensive.

Q.   Okay, and things are less expensive now?

A.   Yes, compared to that.

Q.   Okay.  All right.  Now, when you were found to have violated the asset standstill order, do you recall the Court finding that you had the ability to pay a contempt amount from your retirement accounts?

MR. ZINN:  I'll object to the form.

But you can answer it.

THE WITNESS:  I recall that is a partial answer, yes.

BY MR. CHASE:

Q.   Okay.  Tell me generally, what is your understanding of your obligations to use your retirement account to pay the contempt moneys owed to Ms. Welsh?

A.   Well, the Judge -- unfortunately, there have been, in Connecticut, a multitude of judges.  They do things -- and I don't know the you do the same way in Florida, but there were probably five different judges that dealt with the same case, not counting appellate.  And the judge that wrote that order said that he's not going to liquidate my retirement account.

And again, these are questions that I have gone over with Mr. Chase in February.

Q.   Okay.

Page 25

A.   All of them.

Q.   So is it your understanding -- let me ask you this.

Is it -- are you willing to use your retirement account to pay the contempt amounts owed to Ms. Welsh?

A.   Am I willing to?

Q.   Yes.

A.   If I liquidate my retirement account, what am I supposed to do during retirement?

Q.   Okay.  So is that a no?

A.   I didn't say no.  I said, what am I supposed to do?

Q.   So are you willing to use your retirement account to pay the contempt amounts owed to Ms. Welsh?

A.   I need clarification as to what I'm supposed to do.  I know this, I don't have $25,000 a month, nor do I have $1.7 million.

Q.   Okay.  Let's say the court orders you to pay $75,000 to Ms. Welsh as part of the contempt amounts owed, or you'll to jail.

Are you willing to use your retirement account to pay that $75,000?

MR. ZINN:  I'll object to the form.

You can answer.

THE WITNESS:  I don't have $75,000 in my

Page 26

retirement account.

BY MR. CHASE:

Q.   Are you willing -- how much do you have in your retirement account?

A.   I don't know, like, 60.  I don't know exactly.

Q.   Are you willing to use the $60,000 in your retirement account to pay Ms. Welsh the contempt fine owed in order to not go to jail?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  I don't want to go to jail, but -- am I willing?  It's unclear to me how a Judge can say he's not going to liquidate my retirement account and then it gets liquidated.

BY MR. CHASE:

Q.   What if the Judge says that you have the ability to pay from your retirement account, I'm going to order that you go to jail, but you have the key to your own cell; so, therefore, all you have to do is use your own retirement account, take it out of your retirement account, and you can get out of jail.

Are you willing to use your retirement account to pay a contempt purge for that?

MR. ZINN:  I'll object to the form.

You can answer it.

THE WITNESS:  That's a hypothetical question, and I'm not going to answer a hypothetical question. Because what if the judge said, hey, listen, you pay $55,000 or whatever you have in your retirement account, and then you have nothing to worry about.  I mean, I would have to see what's going on.

BY MR. CHASE:

Q.   Is it not your understanding that the Court has already ordered exactly that, that you pay $75,000 in order to not go to jail?

MR. ZINN:  I'll object to the form.

You can answer it.

THE WITNESS:  The issue that I have with that order is twofold.  Number one, I was living in Florida at the time, but the biggest problem that I have is -- and unfortunately it's not on the court record, but the judge is talking to the plaintiff's attorney, and both of them aren't even sure if they're allowed to do that.

BY MR. CHASE:

Q.   I don't understand.  What do you mean by that?

A.   The Judge was talking to the plaintiff's attorney and said, literally, I don't know if I can order a capias for somebody that's not living in the state.  That's what that judge said, literally.

Page 28

Q.    Okay.  So are you aware that a capias actually was entered?

A.    Yes.

Q.    Are you aware that that capias has been domesticated here in Florida?

A.    Yes.

Q.    Are you aware that the Appellate Court has just, recently within the last month or so, ordered that it is enforceable here in Florida as if it were a Connecticut order?

MR. ZINN:  I'll object to the form, but you can answer.

THE WITNESS:  I understand that that is now in front of the Supreme Court, deciding whether they're going to take the case up.

BY MR. CHASE:

Q.    Okay, so if the Florida Supreme Court -- let's say the Florida Supreme Court does not take the case, are you, at that point going to follow the Connecticut order that orders you to pay $75,000 to stay out of jail?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  I will do what I can to protect my rights in what I'm doing, but I don't want to go to jail.

Page 29

BY MR. CHASE:

Q.   Okay, I understand that.  All right.

During the time when this -- the asset standstill was ordered, back in 2012, were you contributing to a retirement account?

A.   Yes.

Q.   Tell me generally, as far as from 2012 to, let's say, present, what retirement accounts did you have, what retirement accounts were you contributing to?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  I, in essence, had one retirement account.  When I worked in my group, we had, had a retirement account.  That group broke up so we had to have an another retirement account.  Then I worked for the hospital, they had a different retirement account; but in essence, it's one retirement account that I had that I contributed to, wherever I worked.

So while there may be quote, unquote, four of them, they were essentially all the same, as far as I was concerned.

BY MR. CHASE:

Q.   Okay, so what were the four?

A.   One was my Schwab account; one was an American Funds; one was Capitol Group.  And when I worked for the

Page 30

hospital, they had sort of -- they had like a 401(k) --

no, it was called a "403(b"), and a "457," something like

that.  I don't -- I'm not a financial guy, so I don't know

all those things, but that's, in essence, what I had.

Q.   Okay.  And were you contributing to those from

2012 to present, let's say.

A.   Yes.

Q.   Are you still contributing to a retirement

account?

A.   No.

Q.   When did you stop?

A.   When I stopped working.

Q.   But you're working now.

A.   I don't think I have a retirement account there.

And if I do, I'm unaware of it.

Q.   Okay.  Are you contributing to any other account

that you have, say, like an IRA or something?

A.   No.

Q.   Okay, so during the time that you were working,

from 2012 through -- when did you stop working?

A.   The end of 2018 -- I guess, technically, January

of 2019.

Q.   Okay, so from 2012 to January of 2019, were you

contributing to a retirement account?

A    Yes.

Page 31

Q.   Okay.  How so?  Is this something that automatically gets taken out of your paycheck?  Were you --

A.   Yes.

Q.   Okay.  Was it mandatory retirement, or was it voluntary retirement?

A.   I honestly don't know.

Q.   Okay, but it wasn't something -- it's not like a pension or something like a -- were you part of any union that required you to contribute to a retirement account?

A.   No.

Q.   Okay.

MR. ZINN:  Whenever you have a logical break, let me know.

MR. CHASE:  Yeah.  Sure.

BY MR. CHASE:

Q.   All right.  And how much were you contributing to your retirement account during that time, 2012 to 2019?

A.   I always contributed the maximum.

Q.   Okay.  All right.  And do you remember which retirement account it was that you were contributing to?

MR. ZINN:  I'll object to the form.

You can answer.

THE WITNESS:  Again, I don't remember, but I think in 2012, I was done with the Schwab one, that

Page 32

got rolled over.  And so it was probably American
Funds for a while.  And then 403(b) and the 457.

BY MR. CHASE:

Q.   Okay.  Well, did you consider those contributions
to be part of your ordinary living expenses?

A.   Yes.

Q.   Why?

A.   I don't know.  I don't know how you guys do these
things.  That's -- I contributed because that's what
normal people do.

Q.   Okay.

A.   I mean, you have a job, you have a retirement
account, you take advantage of the retirement account, so
I would consider that, yes.

Q.   Okay.  Did you ever think of the asset standstill
order and think this may be a violation of the order?

A.   No.  Because nobody told me about it.  So,
absolutely, unequivocally, no.

Q.   Why would somebody have to tell you about it in
order for you to think about it?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  Well, how would I know this stuff?
You see, here is what the problem is, you're asking me
questions that are very technical that are based on

Page 33

financial stuff.  I don't know anything about financial stuff.  If I started talking to you about medical stuff, you would have absolutely no idea what I'm talking about.

BY MR. CHASE:

Q.   It depends.  No, I don't want to get into a medical versus financial debate.

All right.  So -- okay.  So, throughout that whole time, from 2012 to January 2019, you were contributing the max to your retirement account, correct?

A.   Uh-huh.

Q.   That's yes?

A.   Yes.

Q.   Okay.  All right.

MR. ZINN:  Quick break?

MR. CHASE:  Sure.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Q.   All right.  So in December of 2019, the Connecticut court held a hearing on the damages to be awarded to Ms. Welsh for your contempt.

Do you recall that?

A.   Yes.

Q.   Okay.  And then in --

A.   It wasn't 2019, though.

Page 34

Q.   I -- you may be thinking of a different order.
I'm talking about after the Appellate Court issued a
ruling saying to the trial court, to recalculate the
damages for the contempt amount, right?

A.   Right.

Q.   Okay.  So then, in February -- I'm sorry, in
December of 2019, the court held a hearing, the
Connecticut court had a hearing, and then the Court
entered an order in -- February 19 of 2020 on the amount
of contempt damages.  Do you recall that?

A.   I remember those two hearings, but -- okay.

Q.   Okay.  And do you recall that the Court found
that the total amount of the Connecticut -- I'm sorry, the
contempt damages was $2,048,009.  Does that sound --

A.   I believe you.

Q.   And the Court ordered that you pay that to
Ms. Welsh in increments of $25,000 per month, right?

A.   In 2019?  You're saying 2020?

Q.   Yes.

A.   Okay, I believe you.  I don't remember that, but
okay.

Q.   Okay.  Did you --

A.   See, in February of -- are you sure it wasn't
February of 2020?

Q.   No, that's what I'm saying.  February of 2020.

Page 35

A.   Okay.  February -- okay, yeah.  Because I had heart surgery in February of 2020, and -- that's why this is sort of vague, but okay.

Q.   Okay, so in February of 2020, did you understand that you had to pay $25,000 per month to Ms. Welsh for the contempt fine?

A.   And I think that's when the judge said he was not going to liquidate my retirement account.

Q.   No.  But do you recall in February of 2020 having to pay $25,000 a month to Ms. Welsh?

A.   Okay, I believe you.

Q.   Do you recall it, though?  Not that you believe me, but do you remember --

A.   No, I don't remember February of 2020.  I remember February of 2019.

Q.   So you're saying you thought that the $25,000 per month started in February of 2019?

A.   See, again, I don't -- I don't remember the dates.

Q.   Okay.  All right.

MR. ZINN:  We don't want you to guess.  Don't guess.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Q.   Okay.  So in your Exhibit 2, you can turn to

Page 36

page 68 of 209.

MR. ZINN:  Do you have it?

THE WITNESS:  Yes.

BY MR. CHASE:

Q.   This is what I'm referring to as far as "Ruling on Remand from the Appellate Court."

A.   Okay.

Q.   This is the one that liquidated the amount that you owe.

A.   Okay.

Q.   And then it ordered you to pay $25,000 per month?

A.   Okay.

Q.   Okay.  Do you recall back in February of 2020, having to pay Ms. Welsh $25,000 per month?

A.   I do now.

Q.   Did you recall -- did you know back then -- in other words, is this something that you knew about when you -- back in February of 2020, was it in your mind that, hey, I've got to pay Ms. Welsh $25,000 per month pursuant to the court order?

A.   Like I said, I had questions about that because Probably the December 2019 court case.  February 19th, that's when the order came out, because I was going to say, I was still in the hospital.

Q.   So when were you in the hospital?

Page 37

A.    I think February 14 to February 20, someplace like that.

Q.    Of what year?

A.    2020.

Q.    And what were you in the hospital for?

A.    I had open heart surgery.

Q.    Okay.  And you got out -- you know you got out February 20th?

A.    I was there for five days, so I think those where were the days.

Q.    Okay.

A.    I mean, I could be off by a few days, but it was something like that.

Q.    Okay, so how long after you got out of the hospital, did you give your wife the $120,000 for the Englewood property?

A.    I don't remember, probably sometime in March.  I don't remember.  You guys have all of the records, so.

Q.    Okay.

A.    Instead of me guessing, you have it.  You have my bank accounts, you have when I withdrew money, you have when the money went into her account.  I mean, to ask me the exact time, I don't remember.

Q.    Okay.

A.    I remember that we looked at the house.  I don't

Page 38

even remember when we decided that we were going to buy it. I think we settled sometime in March, so I'm going to assume prior to that order is when I transferred it, but I don't remember.

Q. Okay. Well, would it surprise you that you transferred the money 12 days later on March 2, 2020, after the order was entered?

A. It could have been. You know I was pro se then, so I don't even know how I got the order. I think I got the order through snail mail.

Q. Okay, so when you transferred the 120,000 to your wife, did it cross your mind that you shouldn't be sending 120,000 to your wife, you need to send $25,000 to Ms. Welsh?

MR. ZINN: I'll object to the form, but you can answer.

THE WITNESS: Well, when you say, "cross my mind," what was crossing my mind then was, where am I going to live, because I was in a rental house, and what am I going to do with the rest of my life, I can't find a job. That was on the forefront of my mind.

BY MR. CHASE:

Q. Could you have moved down to Florida and rented a place down here, without paying $120,000 in a down

Page 39

payment?

A.   If you are asking if that is a hypothetical thing to do, yes, you can do that.  However, when you rent and you have no money, then what do you do?

Q.   Well, wouldn't you have had the extra money that you put the $120,000 down for?

A.   It doesn't last forever.  I am a relatively young guy who, theoretically, should be alive until 80.  I mean, that's 18 more years.

Q.   Okay.  So you could have used the $120,000 for Englewood to pay Ms. Welsh the $25,000, but you chose otherwise?

MR. ZINN:  I'll object to the form.

But you can answer it.

THE WITNESS:  I didn't think that would be the most prudent thing to protect my family at the time.

BY MR. CHASE:

Q.   What about obeying the court order, though?

MR. ZINN:  I'll object to the form, but you can answer.

THE WITNESS:  I understand the court order.  I had no income -- no job, no income.  When that order was made, originally, I was making over 1.2 million a year.  When that order was made, it said that I had sufficient income and assets.  In Connecticut, your

Page 40

retirement account is not considered an asset.  I don't know what it is down here, but I never had enough money without a job to be paying $25,000 a month.

BY MR. CHASE:

Q.  Would it surprise you that the court in Connecticut considered your retirement account -- expressly considered your retirement account -- as a source from which you could pay the contempt fine?

MR. ZINN:  I'll object to the form.

But you can answer it.

THE WITNESS:  Again, my understanding is that the original order was about assets; and, subsequently, it became about ability to pay.

BY MR. CHASE:

Q.  Okay, and so the court found that you had the ability to pay from your retirement accounts?

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  And they also said that they weren't going to liquidate my retirement account. Again, we're going over old information.  I went through the -- I know you're frustrated, I'm more frustrated.  I've gone over this.  Have you read my deposition from February?

Page 41

BY MR. CHASE:

Q.    All right.  So the $120,000 that you gave to your wife was a gift, wasn't it?

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  No.

BY MR. CHASE:

Q.    Why not?

A.    It's a gift, because they call it a "gift." That's the way these things work.  I don't know the legalese.  And I'm not interested -- you're going to show it to me anyway -- of it saying it's a gift letter.  I know, that's what they call.  However, it's not a gift when it's a house that I'm going to own.  It wasn't like I was giving my wife $120,000.

MR. CHASE:  Okay, this will be the next exhibit. It's Exhibit 4.

(The document referred to was marked for identification as Exhibit No. 4.)

BY MR. CHASE:

Q.    All right.  This is the your wife's loan application for the Englewood property.  And if you on -- under Assets on the second page, it says 120,000 gift letter.

Do you see that?

Page 42

A.   Yes.

MR. ZINN:  I'm sorry, where is this?

MR. CHASE:  The second page under Assets Description.

BY MR. CHASE:

Q.   So this was considered a gift to your wife, correct?

MR. ZINN:  Object to the form; asked and answered.

You can answer it.

THE WITNESS:  As I stated previously, this is, I guess, the nomenclature that they make you go through.

BY MR. CHASE:

Q.   Okay.  And you said that this was -- this was a -- going to be your house.  The title of this house was never in your name, was it?

A.   The title was never in my name.  And the only reason the title was never in my name is the because the mortgage company never let us know that I was able to be on the title despite not having the mortgage.  The only reason my name is on the title in the Naples house is because, at the last hour, the mortgage companies came up and said, hey, do you want your husband on the title?  And I was like, absolutely -- I told Kelly, absolutely.

Q.   Okay.  The Englewood property, your wife -- it

Page 43

was never her homestead, was it?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  I don't remember the homestead process in Englewood.

BY MR. CHASE:

Q.   Okay.  Do you recall ever declaring the property to be your or your wife's homestead?

A.   Again, you're taking advantage of somebody who has no knowledge of any of this and acting as if it's willful and malicious.  None of it was like that.  This was, okay, we're going to move down to Florida.  We're going to move a street away from her dad.  She can be close to her dad, and that's what we're going to do.  She gets a mortgage because I can't.  I owe $200,000 to Peoples Bank up in Connecticut, so I can't get a mortgage.

Q.   Just one second on that one.

What do you owe $200,000 to Peoples Mortgage for?

A.   Well, I had -- there was a foreclosure on the property and the bank offered me a Deed in Lieu of foreclosure, and because the plaintiff, your client had a lien on the house, they refused to allow me to have a Deed in Lieu of foreclosure.  And because of that, they go through the foreclosure process and, however they do whatever they do, they say I owe them, I think, 117,000.

Page 44

Q.   Okay, when was that, approximately?

A.   2018, 2019.

Q.   Did you pay that off?

A.   No, I don't have $117,000 to pay them.

Q.   So you still owe Peoples Mortgage -- is it
Peoples -- what's the name of the bank?

A.   I think it's Peoples Bank, Peoples whatever, yes.

Q.   You owe them 117,000?

A.   Yes.

Q.   Okay.

A.   And I owe -- we went through all these things
with your partner.  I owe some other bank 45,000.

Q.   What other bank?

A.   I don't remember the name.  You can go back to
the February deposition.

Q.   What do you owe that for?

A.   It was a personal loan that I took out.

Q.   Okay, so instead of paying either one of those or
paying Ms. Welsh anything, you transferred $120,000 to a
property that you don't own?

        MR. ZINN:  Object to the form.

        You can answer again.

        THE WITNESS:  First off, it was from my
   retirement account.  Secondly, as far as I was
   concerned, I was going to be a co-owner of it.  I was

Page 45

living in the house.

BY MR. CHASE:

Q.   But you never ended up being a co-owner?

MR. ZINN:  Objection; asked and answered.

You can answer it again.

THE WITNESS:  Maybe from a technical standpoint that's the way it is.  I don't know if I would have moved into that house; and five years later, I get divorced, what my rights would be to that house.

BY MR. CHASE:

Q.   Were you on the mortgage for that house?

A.   No.  I told you, I get a mortgage.

Q.   Okay.

A.   I can't get a loan.

Q.   So again -- so instead of paying my client anything or the other two debts that you say you owe, you paid 120,000 on a house that you didn't own and for a mortgage that you weren't even on?

MR. ZINN:  Objection to the form; asked and answered.  If you ask it again, I will instruct him not to answer.

You can answer one more time.

MR. CHASE:  It's a different question.

MR. ZINN:  Not as far as I'm concerned.

THE WITNESS:  If you're going to put things down

Page 46

there, you might as well put down I owe between 20 and 30,000 of child support and alimony, in terms of my debts.

BY MR. CHASE:

Q.    Okay.  So the answer is yes?

MR. ZINN:  I'll object to the question.

MR. CHASE:  He didn't answer it.

MR. ZINN:  Can you ask the question again?

BY MR. CHASE:

Q.    Okay.  Instead of paying any money to my client pursuant to the contempt order, instead of paying any of those debts that you just mentioned, and instead of paying your child support and alimony, you decided to transfer $120,000 for a property that you never owned and for a mortgage that you were never on?

MR. ZINN:  Objection to form.

You can answer.

THE WITNESS:  As far as I'm concerned, I was a co-owner of the property.  And maybe from a legal perspective, I wasn't.  But the only reason for that is because I was never offered that.  It was going to be my primary residence.

BY MR. CHASE:

Q.    At that time, were you -- when you were living in the Englewood property, were you also paying for any rent

Page 47

in Connecticut?

A.   I believe I was, for a few months.

Q.   How many is "a few"?

A.   I don't remember, but Kelly had to live in that house.

Q.   Which house?

A.   In the Weatherstone, Avon house, because she worked there.  I didn't have a job, I didn't have to live there, so she also didn't have any money to pay.  I think it was 4,000 a month was the rent.

Q.      Okay, so in addition to transferring the $120,000, you were also paying $4,000 a month in Connecticut?

MR. ZINN:  Objection to form.

You can answer.

THE WITNESS:  Until that lease ran out or until we got rid of the lease.

BY MR. CHASE:

Q.   Why not use any of that money to pay Ms. Welsh?

MR. ZINN:  Objection to form.

You can answer it.

THE WITNESS:  I had no money as it was.

BY MR. CHASE:

Q.   What do you mean?  We're talking about $120,000 and $4,000 a month.

Page 48

A.   There is no possibility that I can live paying $25,000 a month to your client and survive.

Q.   But you didn't pay any of it, nothing.

MR. ZINN:  Objection to form.  You can answer.

Actual, it's not a question.  Wait for a question.

BY MR. CHASE:

Q.   You didn't pay any of it, did you?

A.   No.

Q.   Okay.  What about at that time, how much was in your retirement account, approximately?

A.   I don't remember.

Q.   Was it a million dollars?

A.   I don't remember.  And when is the question from?

Q.   The time when you were transferring the $120,000 for the property in Englewood and continuing to pay $4,000 a month for another property in Connecticut?

MR. ZINN:  Objection to form.

There is no question pending.

THE WITNESS:  He asked what time.

MR. ZINN:  Okay.  Is there a question, though?

I've been lost.

MR. CHASE:  Sorry, I forget.  I forgot the last -- Madam Court Reporter, can you repeat the last one?

(Thereupon, the requested testimony was published by the Court Reporter.)

Page 49

BY MR. CHASE:

Q.   So you had around a million dollars in your retirement account then?

A.   If you say so.

I'm showing you what's marked as "Exhibit No. 5" to your deposition.

(The document referred to was marked for identification as Exhibit No. 5.)

BY MR. CHASE:

Q.   This is your Charles Schwab IRA statement account ending in 9322, for January 2020, and it shows an account value as of January 31st, 2020, of $1,054,310.77.

Does that refresh your recollection?

A.   This statement refreshes my recollection of what was in my roll-over IRA as of January 31, 2020.

Q.   Okay, so this was before you transferred the 120,000, correct?

A.   Yes, that was before --

MR. ZINN:   Object to the form.  Sorry.

BY MR. CHASE:

Q.   So at that time, you had approximately a hundred -- I'm sorry -- approximately a million dollars in your retirement account, correct?

A.   Yes.

Q.   Okay, and you use none of that money to pay

Page 50

Ms. Welsh, correct?

A.   Refresh my memory as to when the order was that said that I had to pay 25,000 a month.

Q.   I will, but answer my question first.

You used none of that money to pay Ms. Welsh, did you?

A.   I believe the order that you showed you me at the very beginning of this deposition was February 19 of 2020. Is that correct?

Q.   That is correct.

A.   Okay.

Q.   But you were ordered back in 2017 to pay $25,000 per month.  Do you recall that?

A.   I recall that in December of 2019, there was a hearing, and the order came out in February of 2020.  You are showing me something from January.

Q.   Is it your understanding that before February of 2020, you were not obligated to pay Ms. Welsh $25,000 per month?

A.   Correct.

Q.   Okay.  I will represent to you that that's not correct, that you were ordered to pay $25,000 per month, that you tried to stay that $25,000 per month payment and the court rejected that.

Do you recall anything of that?

MR. ZINN:  I'll object to the form.

Page 51

But you can answer.

THE WITNESS:  That was in 2019, January of 2019.

BY MR. CHASE:

Q.  Okay.  Right, exactly.  That -- okay.

A.  And then in August or September of 2019, the Appellate Court, remanded it back to the trial court.  The trial court had a hearing in December on damages.  This is according to you.  I mean, my recollection may not be exactly correct, but you had me read an order from February 19 of 2020.

Q.  That's correct.  Was there -- to your understanding, was there any time between when the original contempt order was entered in 2017, I guess, to the present where you were not required to pay $25,000 per month to Ms. Welsh?

A.  When the Appellate Court came back and said it was remanded back to the trial court.

Q.  That was when what?

A.  I wasn't required to pay 25,000 a month.

Q.  Why do you say that?

A.  Because my appellate lawyers at the time said I don't have to pay, that's why.

Q.  So you are saying -- so you are saying that the reason that you didn't pay $25,000 per month was that your lawyers told you, you didn't have to pay it.

Page 52

MR. ZINN:  I'll object to the form.

But you can answer.

BY MR. CHASE:

Q.  I don't want you to tell me attorney-client privilege, but I mean, you volunteered that.

A.  Well, first off, you can talk to them, I fired them.  The issue is, when the Appellate Court ruling came down, they specifically told me I do not have to pay $25,000 a month.

Q.  When was the first time that you realized that you did have to pay $25,000 per month?

A.  I think in December of 2017.

Q.  Okay, so why have you not been paying the 25,000 per month?

A.  I don't think you understand this case.  When the Appellate Court came back and said that it gets remanded to the trial court in August or September of 2019.  At that point, I was no longer required to pay 25,000 a month.

Q.  According to what?  Are you saying according to your lawyers?

A.  And nobody said anything since then about it.  And when I appeared in court of 2019, it wasn't a problem.

Q.  So from -- okay.  So let's just start with December of 2019 when you appeared in court.  From then

Page 53

forward, when did you know that you had to pay $25,000 per month?

A.    February of 2020.

Q.    Okay, and did you pay that $25,000 per month?

A.    Not every month, no.

Q.    How many months did you pay?

A.    One.

Q.    Why only one month?

A.    Because there was a hearing in July of 2020 that the judge said that, you have to pay, I believe, by September 1st, or you are going to have to appear in front of me.  And that was during COVID.  COVID started in March of 2020, so all of those trials, the one in April and the one in July was virtual.  And so that's when I paid the one in August --

Q.    It was --

A.    -- or September.  Whenever it was -- whatever -- he gave me a deadline and I paid by the deadline.

Q.    But why?  Was it to avoid traveling for COVID?

A.    No.

Q.    But why -- I'm saying, why only that one random payment?

A.    Again, this particular judge never elucidated to me about how long I had to pay.  These are questions I asked.  I was pro se.  So I know absolutely nothing about

Page 54

this, and so I asked the judge normal questions.

How can we have a judgment on a contempt fine that I can't purge. When is the end date of the purge? What do I have to do to fulfill my requirements? I get no answers from him. You would think that he would say, well, when the entirety of your retirement account is gone, that's when the contempt fine is over.

He doesn't say that. As a matter of fact, he said something the exact opposite, I am not going to liquidate your retirement account; so that's where all the confusion comes from. I have -- the only legal representation I had was myself. I ask questions, which are all in the transcripts and I get no answers.

Q. Okay, so we can dissect that a little bit.

First of all, you didn't answer the question, though. Why only in September of 2020, why that month?

A. Because he gave me a deadline.

Q. But you have -- after that, you got a deadline from the same judge, I believe in Connecticut in December of 2020, ordering you to pay $75,000 or go to jail.

MR. ZINN: I'll object to the form, but you can answer it.

BY MR. CHASE:

Q. It's the same Judge, why didn't you pay that one?

A. Again, I had the exact same questions. I wanted

Page 55

to know what my requirement was to get rid of this fine.
Now, it may be that -- you're a lawyer -- again, you know
all of the little nuances I don't.  Maybe I was supposed
to write some motion that asked for elucidation on what
was going on, so that then we could have a proper order
that I could understand.

Q.   Okay.  So you are saying you did not understand
the order in December, but you did understand the order
from August of 2020 where the Judge said to pay by
September, you understood that, and you paid that.  You
did not understand the December order ordering you to pay
75,000?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  Again, I already answered that.
That was when the judge and the plaintiff's lawyer
almost sounded like they were in cahoots about, well,
we're going to issue a capias and the judge is like,
well, I don't know if we can do that.  And the
plaintiff's lawyers, yeah, I don't know what we do
when somebody lives in an outside state, I'll talk to
some of my attorney friends.  That's how that
conversation went.

BY MR. CHASE:

Q.   Okay.  Now that issue's been resolved, it's on

Page 56

appeal to the Florida Supreme Court?

A.    It's before us now.

Q.    And so, are you waiting to pay Ms. Welsh for the -- are you waiting until the Florida Supreme Court rules in order to pay Ms. Welsh?

A.    I want to know what my obligation is to pay her and how it's going to go forward.  Okay?  That's what I want to know.

Q.    Okay, isn't it your obligation to pay $25,000 per month?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  It was 1.7 million dollars.  I don't have that.  I don't make $25,000 a month.  There is no end date, nor is there an ability for me to know what my ultimate obligation is in terms of this quote, unquote, $25,000 a month.  It's really 1.7 million dollars.

BY MR. CHASE:

Q.    What would you say you need clarification of?

MR. ZINN:  Objection; asked and answered.

You can answer it again.

THE WITNESS:  I need clarification of when the contempt fine ends, what I have to do to fulfill it.

BY MR. CHASE:

Page 57

Q.    Okay.  If the answers to those questions are, it ends when it's paid in full, and you have to pay $25,000 per month, does that answer your questions?

MR. ZINN:  Objection to the form.

You can answer it.

THE WITNESS:  I don't have $25,000 a month to pay, so no, that's not going to answer the question.

BY MR. CHASE:

Q.    Is it your position or your understanding that if you don't have what you consider to be $25,000 per month to pay in full, that you don't have to pay a single penny?

A.    I have no idea what I'm supposed to do, okay? Zero.  I literally have zero idea of what I'm supposed to do.  Do I send -- I pay my bills, my monthly bills; and at the end of that month, I have this much money left over, do I send it to her.  Is that the way that I'm going to proceed?  I have no idea.

Q.    What's preventing you from figuring that out?

A.    I haven't heard a Judge here tell me what I have to do.

Q.    A judge here tell you that?  So are you waiting for a Judge here to enter an order, in order to pay Ms. Welsh?

MR. ZINN:  Objection to the form.  You can answer.

Page 58

THE WITNESS:  Yes, I'm -- you guys brought this down here, I didn't bring it down here.

BY MR. CHASE:

Q.   Okay.  All right.  All right.  So when you transferred the 120, other than the 120,000 back in Match of 2020, when you transferred that to your wife, other than the 4,000 per month mortgage, tell me generally, what expenses were you paying?

A.   I would have to look at my credit card and my bank accounts.  I forget, way back then.

Q.   Did you have -- did you have a car?

A.   I was using a car.

Q.   Who owned the car?

A.   Kelly owned the car.

Q.   Okay, so you were not paying for a car?

A.   No.

Q.   Were you paying for -- what, just generally, what expenses were you paying for, if any.

MR. ZINN:  What period of time?  I'm sorry.

MR. CHASE:  When he transferred the 120.  This is March of 2020.

MR. ZINN:  Okay.  I'll object to the form of that question, but okay, thank you.

THE WITNESS:  I don't honestly remember.  I paid to fix up the house, to do things, to go shopping for

Page 59

groceries, for whatever.  I think I paid, I want to say, 3,000 a month -- or something like that -- is how much I was taking out at that time.

BY MR. CHASE:

Q.   Taking out from what?

A.   My retirement account.

Q.   Okay.  When you said, "you fixed up the house," what do you mean?

A.   Well, we bought this new house and there were things that had to get done.  I forget.  I had to do something to the bedroom, we had to put -- mount a TV, we had to just do odds and ends, paint a room.

Q.   Okay, it wasn't like a renovation?

A.   No, it wasn't a big renovation.

Q.   Okay.  And so -- all right, so how were you paying all of those expenses?  You would withdraw money from your retirement account as you needed?

A.   Back then -- I would have to look at the withdrawals from the retirement account to figure out how often I was doing it, and then I could be able to tell you, okay, this is how much money I spent during those months.  I have credit cards, which will take care of some of that, you know, and you have the records of that.

I mean, it's all there what I did.  It's not like I took money out and stuck it under the mattress.  I was

Page 60

using it for everyday things.

Q.   Right, so that's what I'm saying.  So you would use your retirement account for these everyday living expenses?

A.   Correct.

Q.   Okay.  Why couldn't you use your retirement account to pay Ms. Welsh then?

MR. ZINN:  Objection to form.

You can answer.

THE WITNESS:  Because $25,000 a month was an unsustainable amount of money.

BY MR. CHASE:

Q.   Why not -- sorry.  Were you finished?

A.   No.  You -- well, you're a financial guy.  When you take money out of your retirement account, you have to pay taxes on that.  So $25,000 a month is $300,000 a year; and on top of that, you are paying taxes.  That doesn't last very long.  And in terms of liquidating your account, it's going to be liquidated.

Q.   But those same issues -- let's say, we'll call them -- those would occur when you're taking out money to fix up your house, to do those -- to pay your miscellaneous expenses, the same issues would occur then, right?

A.   Not in my wildest dreams would I have, in

Page 61

retirement, thought I would need $300,000 a year.

Q.   I don't understand.  What -- how does that answer the question?

Those same, you know, penalties, taxes.  Those you're incurring when you take out money pay your ordinary expenses, correct?

MR. ZINN:  Objection to form.

But you can answer it.

THE WITNESS:  Yes, but it's going to be gone in a short period of time, and then what happens?  It's gone.

BY MR. CHASE:

Q.   How does that differ, that same argument, let's say, differ from paying for your ordinary expenses and paying for Ms. Welsh?

A.   Your ordinary expenses are not $300,000 a year.  Well, they're not $450,000 a year or whatever it would be with taxes.

Q.   Why not pay 5,000 a month?

A.   Because that's not what you guys let us do.

Q.   Who -- did somebody -- okay.  Is somebody saying that you were going to pay money, write a check for $5,000 per month, and somebody said, I'm not accepting that?

A.   Yeah, in essence, yeah.

Q.   How?  Tell me.

Page 62

A.    This will, obviously, never be admissible in court because of settlement discussions.  At no point did they ever say, you know what, I understand that you have "x" number of dollars in your retirement account.  I understand that you have to live.  And this court order that was done in 2017, was when you were making -- made 1.4 million for the year, and now you're making zero.

At no point was there a discussion that, hey, you know what, I'll take whatever you can give me every month, just give me something.  That was never part of the discussion.

Q.    Well, why does it -- why does it have to be part of a discussion?  Why can't you just voluntarily pay the maximum amount that you can after your -- you said earlier, after you pay all your other expenses, your ordinary expenses.  Why can't you just pay the maximum amount that you have left over?

A.    The main reason is, is because the way that your partner is and the way the client is, it's like, oh, no, you're only paying $3500 a month.  That's ridiculous, you're supposed to pay $25,000 a month.  And it's like, okay, then, you know what, we have to wait for a judge to tell me how much to pay.

Q.    All right.

A.    And as an aside, so that you know, during our settlement discussions, we talked about how you are

Page 63

putting my name out in the media.  And you can say what you want about it, but we talked about it in February, about it being a problem.  And in April, it appears in law.com and they get ahold of it, where I'm working at Fawcett, and they wanted me gone.

Q.  Okay.

A.  And then you're going to have zero.  So then you're going to have somebody who not only has no job, but he has next to nothing in his retirement account.

Q.  But none of that prevented you from paying the maximum amount that you could possible pay to Ms. Welsh every month.  None of that prevented you from doing that.

MR. ZINN:  Objection; asked and answered.  He can answer it again.

BY MR. CHASE:

Q.  Right?

A.  It doesn't prevent me from doing it, it's the fact that there is -- it's going to be looked down upon, because that's how you guys have acted the entire time.  I mean, when I asked, don't put anything in the newspaper, and you put something in there two months later -- and that's crazy.

Q.  So does -- does the newspaper articles affect your willingness to pay anything to Ms. Welsh?

A.  It affects the -- my trust in what you guys are

Page 64

about, because I have a job, I'm making 1.4 million doing cardia surgery in Connecticut.  I had a job offer the day I was let go.  They called me literally the next day. Like, I don't even know how they knew.

The next day, I get a call from the competing hospital, and your client goes to administration and says, you can't hire him.  Now, you have to ask them how stupid are you.  He would have been making enough money so that you still would have been making 25,000 a month.

Q.   All right.  In August of 2020, that was when the judge ordered you to pay $25,000 by September, and that the one you actually paid, correct?

A.   Correct.

Q.   Okay.  And that's the only one you've paid, to my knowledge, I mean --

A.   Since it was --

Q.   When was the -- let me just ask you.  Before that September payment, when was the last one you paid?

A.   When the Appellate Court ruled that it had to get remanded back to the trial court.

Q.   And why pay then?  I'm trying to figure out your thinking of.  Why pay now, what made you pay then?

A.   Because the Judge said I was going to have to appear in front of him and he didn't care about the COVID rules, he didn't care about anything.  I was going to have

Page 65

to go up there.

Q.   Okay.  All right.  And in that August order, do you recall the court saying that you had approximately a million dollars in retirement funds?  This is the August 2020 order.

A.   I don't think I had a million dollars then.  And again, you have all of the records, so what did I have on the August 31st Charles Schwab.  Do you have that?

Q.   So this is --this is Exhibit G in your Exhibit 2. Let me see which one it is.  That is on page 92.

And I'll just read the -- I think it's the, one, two, three, fourth paragraph.  It starts, "There is no dispute that the defendant has not made a monthly payment since August 2019.  The Court had previously ruled that defendant had the ability to pay; and that the Court could consider the defendant's retirement accounts in making that determination.  After today's hearing, the Court continues to believe that the defendant has the ability to pay.  The exhibits and testimony of the defendant established that defendant has approximately one million dollars in retirement funds.  Further, over the past nine months, the defendant has liquidated approximately 216,000 in additional retirement funds, thus revealing defendant's willingness to pay any applicable taxes and penalties and use funds that are nominally reserved for retirement.

Page 66

Do you see that?

A.   Yes.

Q.   Okay, so does that refresh your recollection of the court holding, in August of 2020, that you had approximately a million dollars in retirement?

A.   I see the order.

Q.   All right.  And that was after you already transferred the $120,000 for your wife's property in Englewood, correct?

MR. ZINN:  I'll object to the form.

But you can answer it.

THE WITNESS:  Yes.

BY MR. CHASE:

Q.   So even after -- so after that, you still had a million dollars in your retirement account, and you paid Ms. Welsh only the $25,000 the month after the court entered that order?

A.   I don't think I had a million dollars in my retirement account then.  We can look, but I paid your client in September or August, whenever that was.

Q.   Okay.  Alright, and pursuant to that same order, do you recall that the Court said that you shall pay the plaintiff 25,000 by September 15, 2020, and by the 15th of each succeeding month?

A.   Yes.

Page 67

Q.   Did you do that?

A.   I paid that one month; and then after that, no.

Q.   Okay.  Why didn't you pay anything after that month?

A.   Because -- because again, I had discussion with Judge Schuman about, if I had one million dollars in my retirement, and my retirement funds aren't going to be liquidated, how am I going to purge this fine?

Q.   Why would you think that your retirement funds were not going to be liquidated.  When you say "liquidated," do you mean the court liquidating them for you, as opposed to you doing it voluntarily?

A.   No.  Liquidated means gone.

Q.   Okay.  So when the court enters these orders, and says that you have the ability to pay by using your retirement account, what does that mean to you?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  The court feels I have the ability to pay with my retirement account.  And the court also says that they're not going to liquidate my account.  And my question was, and continues to be, how can I get rid of the contempt fine?  What has to happen, because I don't have 1.7 million dollars.

BY MR. ZINN:

Page 68

Q.   Have you filed any motion or petition to modify the contempt order?

A.   I moved down here -- see, that's part of what's going on.  I moved down here.  I am not going back up to Connecticut.  So for me to file a motion, I would have to get an attorney.  For me to get an attorney, I would have to pay.  For me to be able to pay -- I have enough trouble down here with an attorney that I have to pay.

Q.   While we're on that, how much have you paid Mr. Zinn?

A.   I'm not going to ask him.  I don't know.

Q.   Over a hundred thousand?

A.   No, I don't think so.

Q.   Over 50,000?

A.   I do think so.

Q.   Why not use that money to pay Ms. Welsh?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  Mr. Zinn would be very upset with me.  He doesn't work for free.

BY MR. CHASE:

Q.   Aren't you concerned with the court being upset with you?

A.   I need to know what my rights are in this proceeding.  I know you guys think I should have no

Page 69

rights.  You guys think I should be homeless.  You guys think I should be on the street begging for food on state welfare and Medicaid.  That's what you guys think.  And there is no question that you guys think that.

Q.   There's absolutely no way that, that's true.  We want you to pay the money that you owe.  I mean, it is clear that we want you to pay all the money that you owe out of whatever money you have left over.  Is that not clear?  And I don't mean that, like, you know, in a contentious way.

I'm just saying, is that not clear to you that we want you to pay everything, we want you to pay whatever money you have left over, anything that you have.  Is that not clear?

A.   Anything that I have?

Q.   Anything --

A.   Question mark?

Q.   Anything -- well, okay.

Your retirement account, your -- anything other than your ordinary living expenses, anything you have in excess.  Is that not clear to you?  I totally mean that respectfully.

A.   If -- if you -- we'll have a chance to talk about that tomorrow.

Q.   Okay, so when you -- if you -- let me ask you

this.

If you go in front of the judge, okay.  Let's say the Florida Supreme Court comes down and dismisses Mr. Zinn's appeal.  The December 23, 2020 contempt order and capias are not officially Florida orders and capias.

Are you going to go in front of the Judge and make these same arguments, that you don't know what you're supposed to pay, and that you're not sure what you're supposed to do, and that's reason why you haven't been paying?

MR. ZINN:  Object to the form, but you can answer.

THE WITNESS:  I would ask the Judge how I'm supposed to pay it, given what I have.

BY MR. CHASE:

Q.  And if the Judge asks, why haven't you paid a single penny, what are you going to say?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  We've discussed this for the last hour.

BY MR. CHASE:

Q.  Okay.  And that -- in the August 2020 contempt order, you're aware that the court said that if you -- upon noncompliance, you, quote, shall be incarcerated or

Page 71

confined for civil contempt.

You're aware of that?

A.    Yes.

Q.    Okay.  Does that concern you?

A.    That's why I paid.

Q.    But doesn't that same logic apply to the ongoing -- to the December 2020 orders and everything else?  That you're still subject to being confined for civil contempt?

MR. ZINN:  I'll object to the form.

But you can answer.

THE WITNESS:  As I said, I have never gotten any clarification from the court of Connecticut.  They gave me a contempt fine of 2.1 million dollars of which I owed over 450,000 in court ordered child support and alimony, and they did not even take that into consideration.

BY MR. CHASE:

Q.    Okay.  Alright, so now, two weeks after that August ordered was entered, ordering you to pay $25,000 per month or you go to jail, you bought a house?

A.    I forget the day that the house was bought or closed on.

Q.    So it's Exhibit I to the first amended complaint, I believe, is a deed that was recorded.

MR. ZINN:  What page?

Page 72

MR. CHASE:  98.

BY MR. CHASE:

Q.   Do you see that "I"?

A.   I see that, but that means that's the day that we closed, right?

Q.   Yeah.  That's what I'm saying, two --

A.   Two weeks?

Q.   That's what I'm saying.  So two weeks after the Connecticut court orders you and says, pay $25,000 per month or you're going to be confined for civil contempt, you went out and bought a house?

MR. ZINN:  Object to the form, but you can answer.

THE WITNESS:  See, one of the things that bothers me about these type of questions is, that house was -- the buying of the house was initiated before that. That's the day -- how long does it take to settle on a house?  Is it 90 days, is it 60 days, 75 -- I have no idea how long it took us.

But your inference is, he just bought a house after he knew this order came out.  That's not what happened.  What happened was, everything started before that.

BY MR. CHASE:

Q.   Okay, so for that house, we'll call it -- this is

Page 73

the Secoya property.  So that was -- $620,000 was the purchase price, and then you got a -- not you, sorry -- then your wife got a $480,000 mortgage, correct?

A.   Yes.

Q.   Okay.  And then --so that leaves approximately $140,000 for the down payment?

A.   Yes.

Q.   And who paid that?

A.   I did.

Q.   Okay.  So, again, instead of paying $25,000 per month to Ms. Welsh, you spent $140,000 for another property in Secoya, correct?

        MR. ZINN:  Object to the form.

        But you can answer it.

        THE WITNESS:  I think I paid her $25,000 that month, didn't I?

BY MR. CHASE:

Q.   This was August of 2020.  You paid in September. Either way, instead of paying the additional months, you could have used that $140,000 to pay Ms. Welsh, correct?

A.   No, because then I wouldn't have been able to live.

Q.   Why not?  You had your Englewood house.

A.   That house was on the market to be sold.

Q.   So that's actually -- so during that same time,

Page 74

the court orders you to continue paying Ms. Welsh 25,000 per month or go to jail.  You already had a house in Englewood for which you paid at least $120,000; and now you are buying -- you're spending another $140,000 for another house.  Is that correct?

A.   Yes.  However the caveat to that is, that 120,000, I was going to get back, and I owed taxes.

Q.   Okay.  But at that time, you didn't get it back, right?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  Not on that particular day.

BY MR. CHASE:

Q.   All right.

MR. ZINN:  Do you want to take a break?

MR. CHASE:  Let's just do one more exhibit.

This one.  This will be Exhibit No. 6.

(The document referred to was marked for identification as

Exhibit No. 6.)

BY MR. CHASE:

Q.   Tell me if you recognize that.

A.   Yes.

Q.   What is it?

A.   The title is Gift Letter.

Q.   Okay.  Is this a gift letter that you signed

Page 75

regarding your $140,000 towards the Secoya property?

A.   Yes.

Q.   Okay.  And did you represent that this was a gift to your wife?

A.   Again, my understanding of this is, in order for somebody to get a mortgage, and when they fill out their assets, if they don't have that accounted for, it's allowed to be accounted for by calling it a "gift."

Q.   Okay, so you represented that this was a gift?

MR. ZINN:  Object to the form.

You can answer.

THE WITNESS:  No, it's not a gift as in, here, have some money for you to do whatever you want with. It is, here, have this money so that we can buy this house for ourselves as a family.

BY MR. CHASE:

Q.   Okay.  So when it says, in the second paragraph, "This is a bona fide gift and there is no obligation, expressed or implied for the applicant to repay this sum in the form of cash or future services now or in the future," what does that mean to you?

A.   That means that she doesn't have to pay it back to me; however, as part of the purchase price of the house, and then when we get divorced, she's going to have to pay it back to me.

Page 76

Q. When you get divorced? Are you guys getting divorced?

A. No. I'm just saying that's what's going to happen.

Q. I don't understand. So you're saying, like, if it comes down to it, and you have to sue Kelly, you're going to use this gift letter and say that you want that money back?

MR. ZINN: Object to the form.

But you can answer.

THE WITNESS: As part of the -- if we had to divide assets, I don't know what a court would say, but I would hope that they would say that's my money that I put into the house. This is just so that she can get a mortgage.

In order to get an 80/20 mortgage, you have to put 20 percent down. She doesn't have 20 percent to put down.

BY MR. CHASE:

Q. So this was -- this was for her mortgage, right, not yours?

MR. ZINN: Object to the form.

You can answer it.

THE WITNESS: Again, technically speaking, it's her name on the mortgage.

Page 77

BY MR. CHASE:

Q.   Okay, and why not pay any of this to Ms. Welsh?

A.   I did.

Q.   The 25,000?

A.   Yeah.

Q.   This is -- you paid this to Kelly's mortgage company?

A.   Yeah, and then I -- didn't I pay your client that month?

Q.   You didn't use -- no.  This is in addition to the amount that you paid, that one month of $25,000.

Why didn't you use this $140,000 to pay Ms. Welsh?

MR. ZINN:  Objection to form.

THE WITNESS:  Oh, so I should pay everything to her.  See, this is what we're talking about.  Your expectation is for me to be homeless, jobless, sitting on the street with absolutely no money, living on state's dime.  That's what you want so that you can get your money.

BY MR. CHASE:

Q.   How does any of that prevent you from paying anything from to Ms. Welsh?

MR. ZINN:  I'll object; asked and answered numerous times.

BY MR. CHASE:

Page 78

Q.   Just answer that question, and we can take a break.

A.   I paid her that month, and I need a place to live, my family needs a place to live.  That's what my retirement account is for.

Q.   Sorry, one follow-up to that.

Your retirement is for you to pay for your ordinary ongoing living expenses, like, right now when you're not retired?

A.   You're not really asking that question.  Because during that time, I was unemployed; no job, no prospects for a job.  I looked and looked and looked and looked.  No job, no prospects.

Q.   Have you withdrawn from your retirement account after you got employed?

A.   Yes.

Q.   Okay.

MR. CHASE:  We'll take a break.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Q.   Alright, so for the mortgage on the Secoya property, your wife qualified to get that on her own, correct?

A.   Yes.

Q.   Okay.  So your wife did not need any of your

Page 79

income to pay the mortgages?

A.    According to the bank.

Q.    Okay.  Alright, and then for the Secoya property, basically the day after she got the mortgage, you immediately paid it down.  You transferred $380,000 towards your wife's mortgage?

A.    Correct.

MR. ZINN:  Object to the form.

BY MR. CHASE:

Q.    Why didn't you just use that money -- if you're going to pay for you own house, why didn't you just pay -- use that 380 for the down payment as opposed to paying down your wife's mortgage?

MR. ZINN:  Object to the form.

THE WITNESS:  Firstly, it was -- is our house. It's not her house, or my house.  And the reason is the monthly mortgage was going to be an unsustainable situation, given her salary.

BY MR. CHASE:

Q.    You just said she qualified and she could pay it on her own.

A.    That's what the bank said.

Q.    Okay, but my main question in this line is, why do it -- in other words, why not pay down the principal of the house as a down payment as opposed to getting the

Page 80

mortgage and then turning around and paying $380,000 to pay down the mortgage right away?

A.   I don't think I was aware of how much that monthly payment was going to be, between the mortgage, home insurance, and the HOA fees.  The HOA fees are not even included in that.  And if I'm not working, it was going to be impossible for us to be able to afford that.

Q.   So from what I'm hearing, you basically -- you disagree with the mortgage company, as far as your wife's ability to pay the mortgage herself?

A.   If you want to characterize it in that way, fine.

Q.   Okay.  Did she actually pay the mortgage while you were unemployed?

A.   Yes.

Q.   Okay, so she was able to do it.

A.   I think she only paid that one month; and then after that, it was down to a thousand a month.

Q.   Okay.  And so the note for that mortgage was only in your wife's name, right?

A.   For the mortgage.

Q.   Right, so you paid down your wife's liability for that 380,000?

MR. ZINN:  Objection to form.

THE WITNESS:  The title of the house is in both of our names, so I was making it easier for both of us

Page 81

to live in that house.

BY MR. CHASE:

Q.   Right.  But just answer my question.  You paid down your wife's liability, correct?

MR. ZINN:  Objection to the form.

THE WITNESS:  Again, if you want to characterize it that way, that's fine.  That is not the way that I look at it.

BY MR. CHASE:

Q.   Okay.  Now, wasn't that the same month, August of 2020, that you stopped providing your mandatory quarterly asset disclosures?

A.   No.

Q.   What was the month that you stop providing your quarterly asset disclosures?

A.   December of 2020.  Okay, let me go back again for a second very quickly.

I'm getting a little frustrated.  These are the same questions for the last hour-and-a-half that I went through in February.  Not different in any way, shape, or form.  I don't think that's right to waste my time like this.

Getting to your answer again, it's -- I paid that, mortgages.  I had no income, I didn't have a job until December of 2021, November of 2021.

Q.   Okay.  So what -- you're saying that you provided

Page 82

an asset disclosure for the -- let's call it "the third quarter of 2020"?

A.    I don't remember the last time that I did the asset disclosure.  I know that I did one in August 2020. If that was when I had the Judge and the court hearing via Zoom when I was in the Englewood house, the opposing attorney had the asset disclosure.  Because if you look at the transcript, he never brought it up.

Q.    Okay.  Why did you not provide disclosures from that point until the next one you provided was August of 2021?

A.    Well, there was a court hearing in December of 2020.  And the reason I didn't have that asset disclosure is because I don't know how much I owed in taxes.  And if I didn't know how much I owed in taxes, I wasn't going to be able to have an accurate asset disclosure.  And I didn't pay taxes until the end of April of 2021.

Q.    Okay.  Did you provide asset disclosures all the other years when you had to pay taxes?

A.    Yes.  However, I didn't have a huge tax burden pack then.  I didn't pay any taxes in 2019.

Q.    How does not knowing what you're going to pay in taxes prevent you from providing a current asset disclosure as of that particular date?

In other words, it's like a balance sheet.  It's like

Page 83

a snapshot of what you have at that time.  How does owing money in the future prevent you from providing the asset disclosure today?

A.   Two reasons.  First off, the government has to get paid.  And secondly, as I've stated multiple time in this deposition and in the previous deposition, the Judge said he was not going to liquidate my retirement account.

Q.   What does that have to do with providing the asset disclosure order -- I mean the asset disclosure?

A.   Again, I didn't know how much money I had.

Q.   All right.  And you ended up -- or your wife ended up selling the Englewood property in October of 2020, correct?

A.   Yes.

Q.   And how much money did you guys get?

A.   I don't remember; 120,000 something like that.

Q.   Would it refresh your recollection, it was the sales price of 247,500, and the mortgage was 108.  Does that sound familiar?

A.   Again, if you're going to play games with numbers that you like to play, 247 minus 108 is not what we got back, because you have to pay the real estate person.  So I think we got around 120,000.

Q.   Did you use any of that money to pay Ms. Welsh?

A.   I used it to pay the government.

Page 84

Q.   Why didn't you use it to pay Ms. Welsh?

A.   Because the government doesn't like it when you don't pay them.

Q.   Do you think Ms. Welsh does?

A.   Well, the government likes it a lot less.

Q.   In what respect?  In other words -- and I'm being serious about this.  There is already a court order to put you in jail if you don't pay Ms. Welsh.

MR. ZINN:  Objection.  I'm sorry.

BY MR. CHASE:

Q.   So how is that not superior to an order to pay taxes?  Well, there's actually no actual order to pay taxes.

MR. ZINN:  Objection to form.

THE WITNESS:  Are you saying I don't have to pay taxes?

BY MR. CHASE:

Q.   That's not what I'm saying.  I'm saying, why pay the government first, when there's already a contempt order ordering you to pay Ms. Welsh $75,000 or go to jail?

MR. ZINN:  Object to form.

THE WITNESS:  Because the government the a lot nastier than Ms. Welsh.

BY MR. CHASE:

Q.   But isn't the court the government?

Page 85

MR. ZINN:  Objection to form.

THE WITNESS:  I don't consider them the same.

BY MR. CHASE:

Q.   In what respect?

A.   The government is the government.

Q.   What do you -- I -- what do you consider the government?  The court is not the government?

MR. ZINN:  Objection to form.

THE WITNESS:  The court is a part of the government.

BY MR. CHASE:

Q.   Okay.  So all of that money for Englewood went to pay taxes?

A.   Yes.

Q.   Okay.  Could you have used it to pay Ms. Welsh?

A.   No.

MR. ZINN:  Objection to form.

BY MR. CHASE:

Q.   You could not?

MR. ZINN:  Objection to form.

BY MR. CHASE:

Q.   What prevented you from using it?

MR. ZINN:  Objection to form; asked and answered.

You can answer it again.

THE WITNESS:  I wouldn't be able to live.

Page 86

BY MR. CHASE:

Q.  Why?

A.  That is a limited resource for somebody who has no job.

Q.  I don't understand.  What do you mean by that?

A.  The retirement account is a limited resource.

Q.  No, I'm talking about the money that you got back from the sale of your wife's Englewood property.  Nothing prevented you from using that money to pay Ms. Welsh, correct?

MR. ZINN:  Objection to form.

THE WITNESS:  I owed the government that money.

BY MR. CHASE:

Q.  For what year's taxes?

A.  2019 and 2020.

Q.  Was there -- were you being audited?

A.  No.

Q.  Okay.  Alright, so in December of 2020, you are back in court, and the court orders you to pay $75,000 or be held in civil contempt and arrested, correct?

MR. ZINN:  Objection to form.

THE WITNESS:  Can you repeat the question? Because it seems like I've gone over this already.

BY MR. CHASE:

Q.  December 2020, right, court orders that you

Page 87

failed to pay since August 2020, you failed to provide your -- this is what the court says -- you failed to provide your detailed asset and financial disclosure on quarterly basis; that you've had the ability to pay, based largely on money from your retirement accounts; that you failed to comply with the court order to pay the $25,000 monthly fine in October, November, and December of 2020; that you remain in contempt of court; that the court will issue you a capias for your arrest, and with the conditions of posting a $75,000 bond, and providing your asset financial statement.

        MR. ZINN:  Is there a question?

BY MR. CHASE:

    Q.   Do you recall that?

    A.   Yes, we've talked about this.

    Q.   Okay.  And after that, you've still paid Ms. Welsh nothing, correct?

    A.   Correct.

    Q.   And you've also failed to surrender to the capias to be arrested in Connecticut, correct?

        MR. ZINN:  Objection to form.

        THE WITNESS:  Correct.

BY MR. CHASE:

    Q.   Have you been to Connecticut since then?

    A.   No.

Page 88

Q.   When was the last time you were in Connecticut?

A.   Sometime in 2020.

Q.   Before December?

A.   Probably.

Q.   Okay.  Alright, so then about a year later -- not a year -- six months later in August of 2021, you refinanced the -- your home if Secoya, correct?

A.   Yes.

Q.   Why?

A.   Because my retirement account was frozen and I needed a lawyer.

Q.   So you refinanced to pay for your lawyer?

A.   I had no money.  I had no ability to have any money.  The only way for us to deal with the situation was for Kelly to front me some money that I told her I would pay her back.

Q.   Explain that.

MR. ZINN:  Object to form.

THE WITNESS:  What do you mean, "explain that"?

BY MR. CHASE:

Q.   So I'm trying to figure out why you refinanced the Secoya property.  And you're telling me something about Kelly had to loan you money to pay back?  I don't understand.

A.   I had no money for anything, and I needed a

Page 89

lawyer, so how is the lawyer going to get paid?

Q.   Sir, are you saying that you refinanced your property to pay for you lawyer?

A.   I didn't refinance it.  My wife refinanced it so that there would be money for me to be able to get a lawyer.

Q.   Okay, so your wife refinanced the Secoya property to give you money to pay for your lawyer?

A.   Yes.

Q.   How much did you cash out or did your wife cash out?

A.   I think a 100,000.

Q.   And all of that went to your lawyer?

A.   No.

Q.   Okay.  What else did you use the money for?

A.   I didn't use the money.  She gave me money for a lawyer and money for a reputation defender so that I could clean my Internet name up.

Q.   How much did she give you for the lawyer -- how much did she give you for the reputation defender?

A.   I honestly don't remember.  But whatever she gave me, she keeps records of that, and I'm sure that she told your partner last week.

Q.   Was it more than 50,000?

A.   Again, I don't know.  I seem to remember

something in the neighborhood of 40,000 for the lawyer and 10,000 for reputation defender -- or 8,000, something like that, but I don't remember exactly.

Q.   Okay.  Did you ask her to do that, to give you that money, or did she just do that on her own?

A.   No, I asked her to do it because I needed to get money to un-garnish my retirement account that the Connecticut court system said was not garnishable.  And apparently, the Florida court system said the same thing.  And apparently the Florida law and the Connecticut law -- funny that it is -- is the same, that you can't garnish a retirement account, but I guess it didn't stop you guys from doing it.

Q.   Who was paying the bills during that time in August of 2020 when your wife refinanced?

A.   If I wasn't working, she was.

Q.   Okay.  So help me understand this.  So when you are not working, how do you guys go about paying for household bills?  Do you transfer money to her and she -- from your retirement account -- and then she pays the bills.  Does she pay all of the bills herself?  How does what work?  We're talking about the time then you are not employed.

A.   If you are talking about time not employed, and my retirement account garnished, then she has to pay the

Page 91

bills.

Q. Okay, so let's break that down. So let's go pre-garnishment, to the time when you're unemployed, but to the point where before your retirement account gets garnished, how would you pay the bills?

A. I think she paid the majority of, like, utilities and things like that. And I think I paid groceries and, you know, other miscellaneous things.

Q. And to do that, you -- how would you do that? Would you take from your retirement account?

A. Yes.

Q. Okay. And would you take out lump sums from your retirement account, or how would you -- how would you do that?

A. Again, I would have to look. You have all the records and, you know, if I would take it out every three months, then whatever I took out would last three months. If I took it out every two months, then it would be two months. I know that I didn't take it out every month.

Q. Were they any bills -- and we're talking about what we were talking before -- post -- when you lost you job to garnishment of the retirement account.

Were there certain bills that, you know, you were responsible for paying and that you actually paid, and certain bills that she was responsible for paying that she

Page 92

paid, or would it be that you give her money and she pays all the bills?

A.   The only way that I can answer this correctly is, when I was working, I paid all of the bills.  When I had my retirement account, I paid some of the bills.  When the retirement account was garnished, I paid none of the bills.

Q.   Okay.  How would you guys divide up who pays what?

MR. ZINN:  Object to form.

You can answer.

THE WITNESS:  Like I said, I was the one who paid everything.  I have done it my entire life.  And then when I didn't have a job, we had to divvy it up into whatever worked.

BY MR. CHASE:

Q.   What I'm trying to understand, how did you divvy that up?  who paid what?

A.   I forget the exact nuances of what we did.  I think during the time in Weatherstone, I paid the majority of everything, and she paid some things, but not very much.  Then when I moved down to Florida, I think I continued paying the rent because she paid the mortgage in the Englewood house.  So, I mean, it was just a "mish-mosh" of whatever.

Page 93

Q.   Were there any bills in Florida that you were paying?

A.   Not in my name, no.

Q.   All right.  So she was able to pay for her own bills by herself?

A.   For the Englewood house?

Q.   Let's start with the Englewood house, yeah.

A.   Like I said, I contributed some things, but I don't remember what I did.  We would have to look back and see how much I took out of my retirement account to see what it is that I was paying.

Q.   Okay, and then for the Secoya property, she was able to pay those bills herself, right?

A.   When we had -- that was the main reason that I put the 380,000 into the house, was to lower that payment from, like, 2700 to a thousand so that we could be able to pay the bills.

Q.   Okay, so my question was, she was able to pay for the bills for the Secoya property by herself, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  When the mortgage was a $1,000, yes.

BY MR. CHASE:

Q.   Okay, and she qualified for even when it wasn't a $1,000, correct?

Page 94

A.   We all know about the games that banks play, which is why there are so many defaults on mortgages.  You know this, let's not.

Q.   All right, so since January of 2020, the balance in your American Funds, which I think is also the same thing as Capitol Group, it went down to zero, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  All of my retirement accounts went down to zero, except for my current Schwab account.

BY MR. CHASE:

Q.   Okay.  Did you use any of that money, other than the 25,000 in September of 2020, did you use any of that over million dollars to pay Ms. Welsh?

MR. ZINN:  Object to form.

THE WITNESS:  From which time period?

BY MR. CHASE:

Q.   Let's say January 1, 2020, to present.

A.   25,000.

Q.   I'm saying, other than that, zero, correct?

A.   Uh-huh.

Q.   That's a yes?

A.   Correct.

Q.   Okay, and is it your position that you used all of that money for your ordinary living expenses?

A.   Yes.

Page 95

Q.   So your ordinary living -- how much are your ordinary living expenses per year?

A.   Per year?

Q.   Actually, let's -- let's -- let me do this.

Let's break it down.  What is your current monthly mortgage amount?

A.   As embarrassing as it is, I don't know the exact amount.  Kelly tells me what I have to pay her, and that's what I pay her.

Q.   Okay.  Is the mortgage -- so who pays the mortgages?

MR. ZINN: Object to form.

THE WITNESS:  Right now, I do.

BY MR. CHASE:

Q.   How?

A.   I give her money.

Q.   How much do you give her?

A.   She adds up the bills, and whatever they are, I pay.

Q.   So that's what I was trying to get at earlier.  So you don't actually -- do you pay any bills yourself, directly?

A.   Only my credit card bill.

Q.   Okay, so all of the other bills, your wife pays?

A.   Well, they're in her name.

Page 96

Q.   Okay, right, so she would pay those bills?

A.   Yes.

Q.   Does she have the ability to pay those bills on her own?

MR. ZINN:  Object to form.

THE WITNESS:  Firstly, you would have to ask her. And secondly, I doubt she would have the ability to pay them.

BY MR. CHASE:

Q.   Why?

A.   Because her salary is whatever it is, and she has expenses, actually, that she pays herself.

Q.   That's what I'm talking about.  So are you saying that she's not able to pay for her own expenses?  She can't cover that with her own salary?

MR. ZINN:  Object to form.

THE WITNESS:  When you say "her own expenses," what are you talking about?

BY MR. CHASE:

Q.   Well, let's break that down, too.  What do you consider her expenses, and what do you consider not her expenses?

A.   I consider anything with the family to be our expenses.  I pay the majority of them.  She doesn't like for me to, we'll say, have to pay when she goes out with

her girlfriends drinking or going to dinner or something like that.  She pays that herself.

Q.   Okay.  And by that, you mean, she doesn't ask you for the money for you to pay her so that she can pay those bills?

A.   Correct.

Q.   Okay.  So you don't -- you're saying you don't know how much your monthly mortgage is?

A.   I think it's 1600, but I don't know the exact amount.

Q.   How much do you pay for property taxes?

A.   Again, I don't know.

Q.   Who pays the property taxes?

A.   Well, she does.  She comes back, she tells me how much I owe her and that's what I pay her.

Q.   So you don't know how much your property taxes are?

A.   No.

Q.   Okay.  How much is the insurance?  The home insurance?

A.   I don't know.

Q.   How much is your homeowner's association?

A.   I think it's 450 a quarter, but don't quote me on that.

Q.   Do you guys have, like, a pool and a clubhouse?

Page 98

A.   No.

Q.   So what is that -- you live in a neighborhood?

A.   It's I guess for landscaping and other miscellaneous stuff.  I don't even really know what it's for.  I just know that we have to pay it.

Q.   How much do you pay for electricity?

A.   I literally have no idea.

Why do you shake your head?  I told you, she has the bills in her name, she likes paying the bills, okay?  It makes her feel fulfilled or whatever.  And I just say, okay, how much do I owe you this month, and then I give it to her.

Q.   Okay.  How much do you pay for -- do you pay anything for water, garbage, and sewer?

A.   I don't know if we do.  Maybe that's part of HOA. I don't know.

Q.   How much do you pay for your phone?

A.   It's in her name.  When I was paying it, it was like $350 a month, but I don't know what it is, she got a new plan that was cheaper.

Q.   So the phone plan is in her name?

A.   Yes.

Q.   And you don't know how much she pays?

A.   Well, the phone plan is in her name because she was a first responder, they had this great deal.

Page 99

Q.   Okay.  Do you know, is it more than a hundred dollars a month?

A.   I would say it's maybe 250.  I believe we went from 350 to 250.

Q.   And that's for a family plan?

A.   Yes.

Q.   Okay.

MR. ZINN:  By the way, we don't want you to just make guesses.

THE WITNESS:  Okay.

MR. ZINN:  It's okay to approximate, but if you don't know, you should say you don't know.

MR. CHASE:  Okay, no more speaking objections.

BY MR. CHASE:

Q.   How much do you pay -- do you have any, like, natural gas for your house?

A.   No.

Q.   Okay.  How much do you spend approximately for general repairs and maintenance on the house?

A.   No idea.

Q.   Do you have lawn care service?

A.   I think it's part of the HOA.

Q.   Okay.  Pool maintenance?

A.   I don't know.

Q.   Do you have pool maintenance?

Page 100

A.   Yes.

Q.   Okay.  You don't know how much it is?

A.   See, again, if I'm going to get in trouble for telling you one number -- and I'm guessing, because I'm guessing -- I think it's 125 a month, but I don't know.

Q.   Okay.  Do you have -- do you pay for, like, pest control?

A.   Yes.

Q.   How much do you pay for that, approximately?

A.   60 a month.

Q.   Okay.  What about for your food?

A.   No idea.  That's a lot.

Q.   That's a lot?  Why is that a lot?

A.   I consider it a lot.  I don't know.

Q.   How often do you guys eat out, like, at restaurants?

A.   I would say probably, on average, twice a week.

Q.   Okay.  And otherwise, how do you do food?

A.   I cook.

Q.   You cook?

A.   Yeah.

Q.   Okay.  So you go to the grocery store, Publix?

A.   Yeah.  Not Publix so much, Walmart.

Q.   Okay.  Walmart is cheaper; so how much do you spend at Walmart?

Page 101

A.   I have no -- I'd have to look at my American Express statements.

Q.   About a thousand?

A.   I couldn't even tell you.  I have no idea.

Q.   Okay.  And how much do you spend on meals outside the home, like, in restaurants?

A.   I would say an average meal is $200.

Q.   So that's 400 a week?

A.   Right.

Q.   Okay.  Do you consider that an ordinary living expense?

A.   Yes, because if I'm working all week, I'm on call.  In essence, 20 out of 30 days every month.  So there are days that I have no ability to come home and cook, and we are forced to eat out.  Kelly can't even cook a hamburger.  And I'm not kidding.  So that's what we're forced to do.

Q.   Alright, what about for your cable TV, your Internet at home, how much do you pay for that?

A.   No idea.  It's separated.  Internet is different from cable, so there are two separate charges.

Q.   More than 250 a month?

A.   Maybe one is 250 and the other is a hundred.  I have no idea.

Q.   Do you have an alarm?

Page 102

A.   We do, but we don't use it.

Q.   Do you pay for it?

A.   No.

Q.   Do you have a maid?  Someone that comes and cleans?

A.   No.  I think we should get one, though.

Q.   All right.  As far as your car, what car do you have, are you -- do you own a car?  Do you lease it?

A.   I am currently renting a car.

Q.   What does that mean?

A.   Renting a car.  Like, renting it from Hertz.

Q.   Why?

A.   Because my car died.

Q.   What do you mean, your "car died"?

A.   It died.  It can't be fixed.

Q.   Okay.

A.   So, actually, it was Kelly's car, but it died.

Q.   Okay, so you don't have a car?

A.   I rent a car now.

Q.   Right, that's what I'm saying.  So you don't own a car?

A.   I rent it.

Q.   Why not -- so this is like a temporary --

A.   Yes.

Q.   -- solution?

Page 103

A.   Yes.

Q.   What are you going to do?

A.   I'm going to have to lease a car.

Q.   Okay.  How much are you budgeting for leasing a car?

A.   I don't know, 500, I don't know.

Q.   Okay.  And who pays -- do you have car insurance?

A.   Yes.

Q.   Who pays the car insurance?

A.   Kelly does.

Q.   How much is that?

A.   No idea.

Q.   Alright, before you -- before your car died, was that something -- a car that you owned?

A.   Actually, Kelly owned it.

Q.   Oh, okay.  Was it paid off?

A.   Yes.

Q.   Okay, so you had no car payment?

A.   No.

Q.   And what -- okay.  Was that the BMW?

A.   Yes.

Q.   Do you know how much -- do you pay anything for tolls?

A.   No, just gas.

Q.   How much do you pay for gas?

Page 104

A.    A lot.

Q.    How much?

A.    I would say a month, 500.

Q.    Okay.  And why is that?

A.    Because it's Florida Fawcett, and if I have to drive to Bradenton, it's even further.

Q.    All right.  You don't have -- so you and Kelly have no children together, correct?

A.    Correct.

Q.    Okay.  Do you pay anything for her child?

A.    Sure.

Q.    What do you pay for her child?

A.    I don't know, random stuff.

Q.    Like what?

A.    Well, when we go out to eat, I'll pay for her meal.  Just random stuff.  It's not -- I don't pay a lot of stuff for her, but.

Q.    Okay.  Does she have -- does she go to private school?

A.    No.  Should I have her go to private school?

Q.    Not unless you pay my client.  All right.
So just random stuff for the child?

A.    Yeah.

Q.    There's no ongoing expenses that you pay for the child?

Page 105

A.   I think the only thing that I really pay for her is her lunch program, but she hardly uses it.

Q.   How much is that?

A.   I'm going to guess $20 a week.

Q.   Who pays for your health insurance?

A.   Kelly.

Q.   How much does she pay for your health insurance?

A.   I have no idea.

Q.   Are you on her plan at her work?

A.   Yes.

Q.   What about life insurance, do you have life insurance?

A.   No.  I'm worth nothing if I die, so can you tell your client that?

Q.   How about dental?  Same thing, you're on Kelly's plan?

A.   Yes.

Q.   All right.  Dry cleaning?

A.   Minimal, $30 a month maybe.  Maybe.

Q.   Clothing?

A.   Do you see how I'm dressed?

Q.   I do.  You are wearing a blue Polo shirt and khaki pants.

A.   Not a lot.

Q.   Okay.  What about for any un-reimbursed

prescription drugs?

A.   Probably, maybe, 50 a month, something like that.

Q.   Okay.  How about haircut?

A.   Every four weeks, it's $45 plus $5 tip.  No, I pay more than that, but I -- like $55.

Q.   Okay.  Do you have a dog, pet, anything like that?

A.   Yes.

Q.   Okay.  What?

A.   Two dogs.

Q.   How much do you pay for them per month?

A.   I don't know, what is their food.  It's like $30 for a big bag, and two bags in a month, so that's $60. I'll just say -- let's just say $75 a month.

Q.   Okay.  What about entertainment, sports, hobbies?

A.   Yeah, we do that.  We go out and -- but we don't go out a lot, so I can't answer that one.  I don't know.

Q.   When -- okay.  Like, what kind of -- do you have any hobbies?  What kind of hobbies do you do?

A.   Well, I play golf.  I like to go to Off the Hook, which is a comedy club over here.  And then, you know, on some Friday or Saturday nights, we'll go to some of the local trendy spots and whatever, we'll have a few drinks and stuff like that.

Q.   Okay.  How much do you spend per month on that?

Page 107

How much do you spend per month on golf?  How much per --

A.   Well, high season or low season?  Since you guys do this --

Q.   Let's start with high season.

A.   High season is probably, maybe 400 a month.  Low season is about 200 a month.

Q.   Would you consider that an ordinary living expense?

A.   For my mental health, yes.

Q.   How much do you spend at Off the Hook?

A.   I'd say we go there, maybe, four times a year, and it's, like, $35 -- so $70 for tickets and then you buy some drinks, which are like $30, so whatever that adds up to.

Q.   So basically, like --

A.   And it's four times a year, so.

Q.   A hundred and 30 bucks each time, four times a year?

A.   Yeah.

Q.   All right.  Do you have any other hobbies or anything like that?

A.   I like to go fishing, but I haven't been really doing that.

Q.   Okay.

A.   But that doesn't cost a lot.

Page 108

Q.    All right.  What about vacations?

A.    We generally vacation once a year, sometimes twice, since I've been working at this job.  And the vacation is probably going to cost any place from five to 10,000, depending on where we go.  And previously, I used to vacation five times a year, so the problem I have now -- and I haven't been able to figure it out yet in terms of vacation is.  I work 20 days out of 30 when I'm on call.  And for me to be -- get any length of time is difficult, so I'm working through that.

Q.    Okay.  Would you consider the vacations ordinary living expense?

A.    Well, yeah when you have a family, sure. Everybody goes on vacation.

Q.    All right.  Can you think of any other expenses that we haven't gone over?

A.    No, but I will definitely do my homework and think about expenses, because I haven't thought of them; so I will leave that open-ended.

Q.    "Open-ended," what do you mean by that?

A.    Well, because I -- I mean, these are all off-the-cuff answers, so it's a general ballpark.  I haven't looked at credit card statements -- you know, how they have the year-end summary?  I mean, those are things I have to look at to see how accurate my approximations

Page 109

are.

Q.   Yeah, okay.   But it sounds to me that you guys are relatively frugal.   Would you consider yourselves frugal?

A.   I am.   I mean, look at me.

Q.   Okay.

A.   Don't forget, I'm a heart surgeon.

Q.   I know.

A.   Look at me, okay, that's frugal.

Q.   Okay.   All right.

MR. CHASE:   I'm going to mark this one as "Exhibit no. 7."

(The document referred to was marked for identification as

Exhibit No. 7.)

BY MR. CHASE:

Q.   It's the composite of your pay stubs.   Those are your pay stubs from Riverview Cardiac Surgery?

A.   Uh-huh, yes.

Q.   All right, so when did you start working for Riverview?

A.   As an employee?

Q.   In any capacity.

A.   November of 2021.   November of 2021.

Q.   Okay.   And then you were working per diem?

A.   Yes, locums.

Page 110

Q.   Locums; and how much were you making?

A.   I think -- now I forget.  I was making -- I forget.  It was I think 1500 a day, but I -- don't hold me to that.

Q.   All right.  And then -- so when did you become full-time employed?

A.   It must have been, by looking at this, March 1st.

Q.   Okay, so tell me, what is your pay structure?

A.   I get paid 25,000 a month, and 25 percent of what I bring in.

Q.   What does that mean, what you "bring in?"

A.   Well, you have receipts that come back to the office, and whatever my receipts are, they take 25 percent of that and give it back to me.

Q.   Okay, of the gross amount of the receipts?

A.   I believe that's how they do it, yes.

Q.   Okay.  How often does that get calculated?

A.   Every month.

Q.   Okay.  All right.  So if you look at your pay stubs, your pay for March of 2022 was -- I'm talking gross -- was 20,833?

A.   Uh-huh.

Q.   Okay.  And then April of 2022 gross was $34,542, right?

A.   Yes.

Page 111

Q.   May of 2022, I think there's two of these.  One is dated the 2nd, and it's a gross of 4,166?

A.   Uh-uh.

Q.   That's a yes?

A.   Yes.

Q.   Okay.  And then --

A.   That's because in April, I got privileges at Blake, and in the contract it said that when I got privileges at all of the hospitals, I would get 25,000 a month.  Prior to, that I would make 20,833.33, which is 250,000.  So in April, was the first month that I was fully privileged, and I asked them why I didn't get paid the fully-privileged amount, and they made it up to me, that's what that's from.

Q.   Okay.  So then in -- May 31, 2022, you got paid gross of $40,575?

A.   Yes.

Q.   All right, June 2022, you got paid gross $35,940?

A.   Yes.

Q.   July of 2022, you got paid 32,149?

A.   Yes.

Q.   August 31 of 2022, you got paid 33,494?

A.   Yes.

Q.   September 2022, 31,832?

A.   Yes.

Page 112

Q.   October 2022, 35,672?

A.   Yes.

Q.   November 2022, 30,628?

A.   Yes.

Q.   Okay.

A.   It was gross pay prior to taxes.

Q.   Okay.  And you used none of that to pay Ms. Welsh, correct?

A.   Correct.

Q.   Okay.  And from what we went over, as far as your expenses, it really doesn't sound like you have a lot of monthly expenses.

So what are you doing with the excess, above your expenses?

MR. ZINN:  Object to form.

THE WITNESS:  Again, I would have to see what the credit cards are, and then what Kelly has for monthly expenses, and they're all there.  And you guys have them, and it's not a secret.  Everything is as transparent as transparent can be.

You see how much comes into the bank account. Then you see whatever the withdrawals are.  You see how much is paid to American Express, and then you can say, okay, was this money spent?  And there's going to be an answer?

Page 113

BY MR. CHASE:

Q.   When is there going to be an answer?

MR. ZINN:   Object to the form.

You can answer.

THE WITNESS:   There is an answer, and it's all there.   There is nothing that is not in those documents that will says, oh, we put this money away and hid it some place.   There is going to be an attached expense to everything that is there.

BY MR. CHASE:

Q.   Okay.   So, do you -- do you run -- with your wife, do you run a monthly deficit each month, or do you have a surplus each month?

A.   Well, it's a deficit.   I know I owe her money that, at this rate, I'm never going to get to pay.   I have expenses to my left that --

Q.   You are talking about your lawyer?

A.   Correct, that need to get paid, which is why I still have to withdraw periodically from my retirement account.

Q.   So even now that you're employed, you still withdraw from your retirement account to pay for your legal fees?

A.   Yes.

Q.   Why can't you withdraw to pay Ms. Welsh?

Page 114

MR. ZINN:  Object to form.

THE WITNESS:  Because I am drowning right now,
that's why.

BY MR. CHASE:

Q.  Okay, so you make, obviously, at least $300,000 a
year, correct?

A.  Correct.

Q.  And how much does your wife make?

A.  See, again, it's like a 160.

Q.  I think it's more than that.

A.  Well, why don't you tell me what it is, then?

Q.  I believe it's closer to 200 when you count
everything.

A.  There is no possibility --

MR. ZINN:  I'll object to form, and there's also
no question pending.

MR. CHASE:  Okay, that's fine.

BY MR. CHASE:

Q.  So it's your understanding that your wife makes
160?

A.  Yes.

Q.  Okay.  So -- I'm not even counting your bonus.
Let me ask you this.  Has there been a month since you're
bonus eligible that you have not received a bonus?

A.  When you say "bonus," it's not a bonus.  It is

Page 115

part of an employment agreement.

Q.   I'm talking about -- when I stay "bonus," I'm talking about how your pay stubs -- can you look at your pay stub?

A.   Yeah.

Q.   For example, look at August 2022.

A.   Okay.

Q.   Do you see how your pay is broken down into salary of 25,000 per month, and then bonus?

A.   They -- again, they can call it a bonus, it's not a bonus.

Q.   Okay, that's what I'm referring to when I talk about bonus.

A.   See, I've honestly never looked at it, so.

Q.   Okay, right.  So what I'm trying to say is, you get more than just the 25,000 per month, there's always -- you've always -- so far, you've always gotten additional money than the $25,000 per month?

A.   Correct.

Q.   Okay.  Let me see the --

MR. ZINN:  Brian, can we take a quick?

MR. CHASE:  Sure.

MR. ZINN:  Just give me two minutes.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Page 116

Q.   All right.  So, looking at your pay stubs, the last one that you provided, which is November of 2022, you have year-to-date total pay, which is 299,834.  And that is for only the months of March through November, correct?

A.   Correct.

Q.   Okay.  So, safe to say, you are going to be making more than $300,000 per year, correct?

A.   Correct.

Q.   And your wife makes at least $160,000 per year, correct?

A.   Correct.

Q.   Okay.  And are you saying on -- just on those salaries alone, you don't run a monthly surplus?

A.   Well, we haven't, and I mean, I would like for us to have, but we haven't.  I'm hoping that we do.

Q.   Why haven't you?

A.   I have a really expensive lawyer.

Q.   Other than your lawyer?  Is -- I mean, your lawyer is approximately 50.

A.   You know what, I don't know.  Again, I would have to look at all of these things.  You guys have all of the stuff that we spend money on.  So, again, it's not like a secret what the money is getting spend on.  And --

Q.   Can -- go ahead.

A.   And it is what it is.

Q.   It is what it is.  So, like I said, we just went through a financial affidavit of -- I'll represent to you that that's the family law financial affidavit, a standard one that they use in divorce cases, and it didn't sound to me like you had a lot of monthly expenses.

It sounds to me like you live a frugal life, and you don't have a lot of monthly expenses.  It doesn't sound like you have, you know, net after taxes, hundreds of thousands of dollars in expenses.  Where is this money going?

MR. ZINN:  I object to the form.

You can answer it.

THE WITNESS:  Well, you know, like I said, what I'm going to find out after leaving here is how clueless I am as to what we spend money on, okay.  That's what's going to happen because I gave you what I perceive what we pay.  And then I'm going to go home and look at it and go, oh my God, we spend this much money, how do we do that?  That's what I'm going to find out.

BY MR. CHASE:

Q.   Okay.  And you would consider not running a surplus on the salaries that you and your wife make, you would consider that's all ordinary living expenses?

A.   Well, for the stuff that we spend, for sure.  I

Page 118

mean, I don't know what all the money that we spent are,
but you know, you're fixing up the house, or you have a
friggin' -- the car died and, like, $6,000 gone.  Like, is
that the craziest thing ever?  It is for me.

Q.   What do --

A.   Any of you guys want to sue Fort Myers BMW for
me?

Q.   So what do you mean by that?  You paid $6,000 --

A.   For a car that didn't work.

Q.   Okay.

A.   I got literally a mile-and-a-half away, and they
tried to tell me then that, well, it needs a new engine
and you have to pay, like, $30,000 for a new engine.  I'm
like, well, how can you charge me 6,000 for a car that
doesn't work?

Q.   Okay.  This is for your wife's car?

A.   Yes.  So I mean, those things come up, and then
it's like, you know, what the heck?

Q.   All right.  Did you use any of your ongoing
salary to pay Ms. Welsh?

A.   No.

Q.   Why not?

A.   I can't even pay for all the stuff we have.  I
have to get to a point where at least I don't have to dip
into my retirement account.

Q.   But you said you only dipped into your retirement account to pay for you lawyer?

A.   Well, we can make it paying for my lawyer, or we can make it paying for household expenses and my lawyer is paid out of something else.

Q.   Okay, or how about not going on a vacation?

A.   The vacation that we went on was in July, and it was sort of a special vacation.  But I mean, I could -- I've already gone on less vacations than I ever do, ordinarily.

Q.   Did your expenses change at all from when you were not employed to when you were employed?

A.   Yeah.

Q.   How so?

A.   Well, I have to pay for gas, I had more car expenses.  We were able to pay for things in the house that we weren't able to do before.

Q.   Like what?

A.   Like our air conditioner.  Our air conditioner was on the fritz, and we had no money to pay for a new air conditioner, so we had them fix it.

Q.   How much?

A.   To fix it, then, versus buy a new one?

Q.   Well, how much did you pay?

A.   Well, to fix it, I forget.  Maybe it was a

Page 120

thousand dollars, but then to get a new air conditioner was, like, 12,000.

Q.   So you bought a new air conditioner, 12,000?

A.   Yeah, we had to.  They said that's what we had to do.

Q.   Okay, and you didn't use any of that money to pay Ms. Welsh?

MR. ZINN:  Objection to form.

THE WITNESS:  I would have been hot and never able to do anything.  It probably wouldn't have been able to go to work.

BY MR. CHASE:

Q.   How much does your wife contribute to these expenses?  It is like a half-and-half, or how does it work?

A.   It's not half-and-half.  She doesn't make half of the money in order to make it half-and-half.  And like I've told you, I've always paid all of the expenses. That's the way it works, if I'm able to.  If I'm not able to, then it's -- I can't do it.  And, you know, there was a period of time when I felt horrible because I couldn't pay anything, and I had a completely garnished retirement account.

Q.   Other than your car expenses for gas increasing, was there any difference in your monthly expenses before

Page 121

getting your new job, and after?

A.    I would have to -- to look at things.  I mean, I bought some new clothes, I've -- I would have to look and see, you know, what the differences are; but, I mean, obviously, when you're making money, you're able to do things that you used to always do that you can't do.

Q.    What about paying Ms. Welsh?

MR. ZINN:  Object to the form.

THE WITNESS:  Again, you see, if Ms. Welsh would be a reasonable individual, I'm sure we could have worked something out, but she doesn't like to do that. She would rather me be homeless, penniless, out on the street, under state Medicaid.  That's her goal.

BY MR. CHASE:

Q.    So that's why you haven't paid her?

A.    I don't have money to pay her.

Q.    But you just said that now that you have a job, you can afford some things that you weren't able to afford before.

MR. ZINN:  Object to form.

THE WITNESS:  I don't have 25,000 a month, and that seems to be the only thing you guys are interested in.

BY MR. CHASE:

Q.    All right.  So, again, your position is, you're

Page 122

not going to pay the $25,000 a month, don't pay anything at all.  It's like, if you can't say something nice, don't say anything at all?

MR. ZINN:  Object to form.

THE WITNESS:  That's not any position, that's your position.

BY MR. CHASE:

Q.  Oh, okay.  All right.  What's the total amount -- and your understanding -- what is the total amount of money that you've had the ability to pay Ms. Welsh since January 1, 2020?

MR. ZINN:  Objection to form.

THE WITNESS:  Since January 1st, the total amount of ability I had to pay?

BY MR. CHASE:

Q.  Yeah.  Like, what -- like, obviously, you paid one payment of $25,000; you had, you know, a retirement account of over a million; you've been making at least $300,000 per year now.  From your perspective, what is the total amount that you've had the ability to pay?  Is it just the 25,000?

A.  If there was some reasonableness on your side, sure, there's money that could be paid; but, you know, you guys want to go to a Judge, then that's what we'll do, we'll go to the Judge.  This is not what I want.

Page 123

Q.    Okay, so is there a number, as far as your ability to pay, from January 1, 2020, to present?

MR. ZINN:  Object to form.

THE WITNESS:  I would have to think about it, but tomorrow I'll have an answer for you.

BY MR. CHASE:

Q.    Okay.  So as we sit here today for your deposition, you can't say how much money you've had the ability to pay?

A.    Not when we're on the eve of a mediation session.

Q.    Okay, but you are under oath at your deposition.

A.    Correct.

Q.    So what's going to change between now and tomorrow?

A.    I'm going to see what your side has to say.

Q.    That's how you would determine how much money you've had the ability to pay since January, 2020?

MR. ZINN:  Object to form.

THE WITNESS:  I have not sat down and looked at all of my expenses and everything that we have and what we owe and who we owe it to, to be able to say with any degree of certainty, you know what, I have this much money that I could offer and say this is a fair amount.

BY MR. CHASE:

Q.   Okay, but I'm not necessarily talking about offers or anything like that.  I'm talking about to be in compliance with the court orders from January 1st to present.  You've only paid $25,000.

Are you saying -- what I'm trying to say is, are you saying you've had the ability to pay more and -- but you've chosen not to?

MR. ZINN:  Object to form.

THE WITNESS:  No, I'm not saying that at all.

BY MR. CHASE:

Q.   So how much have you had the ability to pay?

MR. ZINN:  Object to form.

THE WITNESS:  To go over it for, it seems like the 50th time, I don't have 1.7 million dollars; I don't have $25,000 a month to pay.  So those two things I don't have.  And you're asking me a hypothetical question that I have not been able to sit down and look at, these are what the expenses are, these are the expenses that can be cut out, this is what I have can pay.  I have not done that.

BY MR. CHASE:

Q.   Okay, I understand what you're saying.  What I'm asking is, not what's going on, going forward, okay.  I'm talking about from the past, from January 1, 2020, to the present, have you done any of those calculations that

Page 125

you're talking about?  Have you done a calculation of, oh, this is what I'm able to pay, and I'm going to pay Ms. Welsh this amount.

Have you done any of that before -- or are you going to do that, in other words, for the first time tonight before the mediation tomorrow?

A.    Don't forget, we've had mediation before, and the way that your side talks about it is, it's all or nothing; we want 25,000, we want a huge lump sum payment, and we're not going to take anything else.

And when you're put in that position of, you owe us -- I give you $3,000, well, you owe us 22 more thousand in the month, come up with the 22,000.  It makes it very difficult to pay anything.  And particularly when, again, I have to take money out of my retirement account in order to make ends meet.

Q.    What are you going to do when your retirement account runs out?

MR. ZINN:  Object to form.

THE WITNESS:  I have no idea.  I hope I win the lottery.  I don't know.

BY MR. CHASE:

Q.    Are you going to lower your monthly expenses?

MR. ZINN:  Object to form.

THE WITNESS:  I have no idea what I'm going to

Page 126

do.

BY MR. CHASE:

Q.   Are you going to be able to sustain yourself?

MR. ZINN:  Object to form.

THE WITNESS:  I hope I can, but I don't know.  I mean, those are things that we're going to have to figure out.

BY MR. CHASE:

Q.   How much is left in your retirement account?

MR. ZINN:  Objection; asked and answered.

You can answer it again.

THE WITNESS:  I think 60 or 55,000.

BY MR. CHASE:

Q.   Okay.  And you haven't thought about what you are going to do when that money runs out?

A.   There's nothing I can do.  When it runs out, it runs out.

Q.   Are you going to go into debt?

MR. ZINN:  Object to form.

THE WITNESS:  Unfortunately, for me, I can't get things that going to put me in debt.

BY MR. CHASE:

Q.   I don't understand.

A.   I can't get loans.  For me to be able to do anything that requires monthly payments is a very

Page 127

difficult thing.  My credit score is absolutely horrific.

Q.   Right, so you'll need to lower your monthly expenses.

A.   Okay.

MR. ZINN:  Object to form.

BY MR. CHASE:

Q.   So why don't you do that now?

MR. ZINN:  Object to form.

BY MR. CHASE:

Q.   Why don't you do that now, lower your monthly expenses?

MR. ZINN:  Object to form.

THE WITNESS:  I'm trying to survive with what I'm doing.

BY MR. CHASE:

Q.   Alright, I'm just going to go through a list of our request for production just to clarify that you produced everything.

All right.  Have you produced your bank account statements that we asked for?

A.   Yes.

Q.   Have you produced all of your retirement account statements that we asked for?

A.   Yes.

Q.   Have you produced all of your brokerage account

Page 128

statements -- do you have a brokerage account?

A.   I don't have -- I only have a retirement account.

Q.   Okay.  When was the last time you had a brokerage account?

A.   A long time ago, I don't remember.  A long time ago.

Q.   Okay.  Do you have any the whole life account statements?

A.   No.

Q.   You have produced your pay stubs through November, correct?

A.   Yes.

Q.   All right.  Do you have any other sources of income?

A    No.

Q.   Do you have any interest in a business?

A.   No.

Q.   Okay.  You produced all of your credit card statements that we asked?

A.   Yes.

Q.   So your credit cards, you only have the AmEx?

A.   Now, yeah.  I think that's -- that's the only one I use.  It's --my Master Card was booted.

Q.   What does that mean?

A.   I don't know, they kicked me out.

Page 129

Q.   When?

A.   Relatively recently, but I don't use the account. I haven't -- that's probably why they kicked me off of it.

Q.   Okay.  All documents showing any payments you made to plaintiff?  I guess that would just be the 25,000?

A.   Yeah, it was a short list.

Q.   Okay.  All documents showing any transfers of money to your wife?

A.   It's all in the bank statements.

Q.   Let me ask you about -- so after you got employed again, you opened up a new bank account?

A.   Yes.

Q.   Where?

A.   Regions?

Q.   Why?

A.   Because I needed a bank account.

Q.   Didn't you have a bank account -- you had Wells Fargo, right?

A.   Yeah, that was garnished.  And I had a garnished retirement account, so I had no need for a bank.

Q.   Okay.  And in whose name was the Regions account?

A.   My name.

Q.   Your wife wasn't on it?

A.   No.

Q.   How long did you make deposits into that account?

Page 130

A.   Until we opened up the PNC account.

Q.   Which was when?

A.   I don't even know.

Q.   Around April of 2022?

A.   Could be, yes.

Q.   Why did you open up the PNC account?

A.   Because she wanted a joint account, and it was going to be easier for her to access money.  With my hours, it's very difficult for me to get to a bank.

Q.   Okay.  And so, have you been putting the entirety of your -- your employment checks into that PNC joint account?

A.   Yes.

Q.   Do you happen to know, is that a tenant by entireties account?

A.   I honestly have no idea.  I know that that is a possibility.  I know that the physician's statement or whatever they call it, it's not.  According -- if you look at their website, it's not.

Q.   What do you mean by that, "if you look at their website"?

A.   They have a statement on -- they don't do tenants of entirety.

Q.   How did you find that out?

A.   Well, I read it.

Page 131

Q. Okay. Alright, have you had any other bank accounts since then?

A. No.

Q. So, right now, what bank accounts do you actually use?

A. I only have one, PNC.

Q. Okay. And what does you wife have?

A. Whatever you guys asked her. She has, I think, Wells Fargo and PNC, and I don't know if she has Bank of America, maybe she -- I don't know.

Q. Okay. But as far as -- as far as you, your concern, your money goes directly into that PNC joint account and then it gets dispersed from there?

A. Yes.

Q. Okay. Have you withdrawn any money in cash and given it to your wife?

MR. ZINN: Object to form.

BY MR. CHASE:

Q. Anything over a thousand dollars?

A. No. I --

Q. Have you given your wife any -- sorry, go ahead.

A. I may have, before we went on vacation.

Q. Which was when?

A. I think we went on vacation in July.

Q. Of what year?

Page 132

A.   Of last year.

Q.   2022?

A.   Yeah, we went to the Hoover Dam and a bunch of places out there.

Q.   And how much did you give her?

A.   I want to say maybe 5,000.

Q.   Okay, other than that?

A.   No.

Q.   Was that in addition to the money that you spent on the vacation, or did that money cover the vacation?

A.   No, that was in addition because we also went to Vegas.  So we went to Vegas, we went to Hoover Dam, we went to Horseshoe National Park, we went to Lake Powell, and there may have been one other place in there.

Q.   Sounds nice.

A.   We went RV'ing.  They've never gone, which is what we did.

Q.   So did you rent an RV?

A.   Yes.

Q.   How much was the RV?

A.   I honestly forget.  I'm going to guess -- no, I don't want to guess.  It wasn't, like, one of those huge ones.  I think they call it a "Class 1C".  I don't know anything about RV's, but it was going to be less than hotels the whole time.

Page 133

Q.   Did you stay in any hotels?

A.   In Vegas, we did.

Q.   Where did you stay?

A.   I forget.  Mandalay Bay, maybe.

Q.   How much was that?

A.   I don't know.  It' son the credit cards.

Q.   Did you gamble?

A.   Yes.

Q.   How much did you spend on that?

A.   I don't know.

Q.   More than a thousand?

A.   Probably right around a thousand.

Q.   Did you make money or lose it?

A.   I did what everybody else does.

Q.   You lost it.  All right.

A.   But it wasn't on slots, okay.

Q.   What was it on?

A.   It was on Black Jack and Roulette.  And don't make fun of me for Roulette.

Q.   All right.  Have you produced all documents showing any checks paid to your wife?

A.   Yes, I mean --

Q.   Yeah, ACH transfers?

A.   Yeah, they're all in the bank statements.

Q.   Wire transfers?

A.   Yes.

Q.   Other than depositing money in the joint account, do you guys transfer money, like, by wire transfer or by, you know, ACH transfer, do you write each other checks?

A.   You mean, between PNC and someplace else?

Q.   Between you and your wife.

A.   Well, the only -- I would say, no, we don't do that.

Q.   Okay.  Alright, payments showing liability in your wife's name?

A.   You mean, like, electric?

Q.   Yeah, your payments to her, for her liabilities?

A.   Well, that's -- that's what household expenses are.  They're in her name.

Q.   Are there any of the household expenses in your name?

A.   No.

Q.   And I'm sorry, I may have asked this, so, Mr. Zinn might get on me, but how do you determine whose percentage of the household expenses is paid by whom?

A.   I pay the vast majority of it.  I personally would like to pay all of it; however, she does some things.

Q.   But is there like a conversation that you have of, this is going to be my half, this is going to be your

Page 135

half.

A.    No, we don't have those because, again, my entire life, I paid everything.  With my first wife, my second wife, and now my third wife.

Q.    All right.  All documents showing checks from your employer?

A.    Yes.

Q.    All documents showing direct deposits from your employer?

A.    Yes.

Q.    So is your money -- your money is direct deposited into the PNC?

A.    Yes.

Q.    All documents showing any money received from your employer?

A.    Yes.

Q.    Do you get any in-kind benefits paid by your employer?

A.    No.

Q.    Because your wife pays for your health insurance?

A.    Correct.

Q.    Okay.  Do you get, like, a company car or anything like that?

A.    I wish.  Can you get them to get me one?

Q.    What about -- do you pay for you cell phone?

Page 136

A.   No.

Q.   You don't get reimbursed for that?

A.   No.  I don't -- they have a different compensation model than the one that I had when I ran the group up in Connecticut, so the answer is no.

Q.   All documents showing your ownership in any companies?

A.   Yeah, I don't have any.

Q.   Documents showing any payments you made for the Englewood property?

A.   Yes, you have everything.

Q.   So other than the 120 for the down payment, did you pay for the mortgage on the Englewood, or did your wife pay for that?

A.   My wife did.

Q.   All documents showing any payments you made for any mortgage on the Englewood property?

A.   Yeah, you have everything.

Q.   All documents showing any payments you made for the Secoya property?

A.   Yes, you have everything.

Q.   So for the -- same thing or that one.  Other than the 440 down payment and the 380 towards your wife's mortgage, would your wife pay for the mortgage or did you pay for the mortgage?

Page 137

A.    I pay now, the mortgage.

Q.    Starting when?

A.    Maybe February of last year.

Q.    Of 2022?

A.    Yeah.  I think.

Q.    And how do you know that?  Like, your wife tells you, I'm paying the mortgage with your money?

A.    No, she tells me what the household expenses are, what that the bills are.  She tells me what the amount is, and I just give her a check; or she'll figure out what it is, and I either will take money out or she will take money out of PNC.

See, that's the main reason that we have a joint account is so that she can look at the end of the month, see what the bills are and say, okay, I'm taking this money out.

Q.    Okay.  So does she tell you before she does that?

A.    Oh, yeah; yes.

Q.    Okay, so she tells you, I'm going to take out money to pay the mortgage?

A.    Well, she tells me what everything is.  The electric, you know, what the monthly household bills are, this much this month.

Q.    How does she do that?  Like, she just tells you verbally, does she write it down for you?

Page 138

A.    She tells me verbally.

Q.    Okay.  Do you guys have, like, monthly meetings or something where she tells you this?

A.    Yeah, we have a monthly meeting that she says, you owe me this much money, and I say, okay, and I trust her.

Q.    Oh, you're being serious?

A.    Yeah.

Q.    Oh, okay.  You  have a monthly meeting and she says --

A.    It's not a meeting.

Q.    Right.

A.    She just tells me how much I owe her.  She says -- she'll say to me, this is what the bills are for this month.  And then it's, okay, I'm going to take this much out of PNC.

Q.    But does she break it down for her you?

A.    I don't ask her to, but she would.

Q.    Okay, so that's what I'm saying.  So how do you know what gets paid for what, what portion of your money gets paid for what?

A.    The amount of money that I'm paying is, again, for household stuff that we're doing.  I don't pay for her nights out with her girlfriends, I don't pay when she goes and cavorts off doing something.  I don't pay those

Page 139

things.  But things that have to do with the house, I pay.

Q.  Right.  I got that.  What I'm saying is, how do you know that?

A.  Because I trust her.

Q.  Okay, so it's just based on trust?

A.  Yeah.

Q.  She doesn't give you a break down?

A.  She better not be skimming off the top, I'll tell you that, or she's in trouble.

Q.  All right.  All documents showing any payments you made for the Secoya property?

A.  Yes.

Q.  All documents showing any payments you made for any mortgage on the Secoya property?

A.  Yes.

Q.  All documents showing any net sales, proceeds received from the sale of the Englewood property?

A.  Yes.

Q.  Okay.  And how did that work, as far as -- your wife received the proceeds from the sale of the Englewood property, right?  Yes?

A.  Yes.

Q.  Okay, and then how did she pay you?

A.  She either wrote me a check or had it transferred somehow.  She must have -- I don't know how she -- it's

Page 140

going to be -- you have the records if how it occurred.
Because it's going to be, suddenly a hundred and something
thousand taken out, and then all of a sudden in my account
-- I think I had Wells Fargo back then.

Q.   Okay, and then you used that money to pay the
IRS?

A.   Yes.

Q.   All documents showing your efforts to comply with
the August 2020 contempt order?

A.   Yes.

Q.   Which is just the 25,000.  All documents showing
your efforts to comply with the December 2020 order?

A.   Yes.

Q.   That's nothing, right?

A.   Correct.

Q.   Okay.  All documents showing any transfers of any
assets except business assets in the ordinary course of
business and personal assets for ordinary living expenses,
including court-ordered alimony and child support?

A.   Correct.

Q.   Anything that would show that would be in the
documents that you produced?

A.   Correct.

Q.   All documents related to why you have not
plaintiff any money since regaining employment in 2021?

Page 141

A.   Yes.

Q.   I guess their is nothing?

MR. ZINN:  Object to the form.

THE WITNESS:  Correct.

BY MR. CHASE:

Q.   To the extent you claim you lack the ability to pay plaintiff anything in January 2021, all documents supporting that claim?

A.   Yes.

Q.   That's -- is that -- that's nothing, I guess, right?

A.   Correct.

Q.   These are the -- going to be the same thing, but for all of the different months.

So February 2021, nothing.

A.   Yes.

Q.   You produced, but there is nothing?

A.   Yes.

Q.   March 2021?

A.   Yes.

Q.   April 2021?

A.   Yes.

Q.   June 2021?

A.   yes.

Q.   July 2021?

Page 142

A.    Yes.

Q.    August 2021?

A.    Yes.

Q.    September 2021?

A.    Yes.

Q.    October 2021?

A.    Yes.

Q.    November 2021?

A.    Yes.

Q.    December 2021?

A.    Yes.

Q.    January 2022?

A.    Yes.

Q.    February 2022?

A.    Yes.   Can we just go right to the end, I will say
yes.

MR. ZINN:   The reporter would appreciate it.

BY MR. CHASE:

Q.    So this will be through July of 2022.

A.    Yes.

Q.    So there's nothing that would show that you lack
the ability to pay plaintiff anything in all of those
months?

MR. ZINN:   Object to form.

BY MR. CHASE:

Page 143

Q.   Correct?

A.   Yes.

Q.   All documents related to any -- I'll skip that one.  Any defenses in this case, that's probably real broad.

MR. ZINN:  Are you saying that you don't have the answers that we provided to these things?

MR. CHASE:  No, I'm saying -- I'm confirming with your client because these are not under oath, so I'm confirming with your client whether he actually produced any of these documents, whether they all exist.

MR. ZINN:  Okay.

BY MR. CHASE:

Q.   All right.  All unprivileged communications with Defendant Rousseau regarding plaintiff?

A.   Yes.

Q.   What - these are all going to be communication documents.  Let me just ask you generally about communications.

What did you do to search for those communications?

A.   Well, I looked at my E-mails and my text messages.  I don't have text messages from her, because they all get erased because, at my hospital, they have my passcode.  If I get text from a physician, I found and

Page 144

employee who went through my personal stuff.

So because of that, I have -- and this was February --
as soon as I started there -- February of 2021.  I got rid
of everything personal.  So any of my kids' stuff, my
wife, all gone.

Q.    All right.  So you are saying, in February of
2021, you deleted all of your text messages?

A.    From family.

Q.    Okay.  From family.

A.    Because there's people that read my stuff.  They
have access to my passcode.  This didn't happen at my
previous place of employment.  At this place of
employment, what happens when I get a text message is,
because that's how the physicians down here like to
communicate, they go into my phone and they tell me,
Dr. "so-and-so" has a consult for you, Dr. "so-and-so" has
a question; and, so, then I answer them.  But what I found
is, they snoop in my phone.

Q.    Who is "they"?  Who are these people?

A.    Employees that are -- particularly in the OR.  In
the OR is when this happens.  I'm scrubbed.  I'm sterile,
I'm -- I can't be bothered with a lot of this stuff.

Q.    Okay.

MR. ZINN:  I think you mentioned the wrong year
before.

Page 145

MR. CHASE:  For which?

MR. ZINN:  I think it's February 2022.

MR. CHASE:  For which?

MR. ZINN:  I think you said '21 of -- for erasing the text.

MR. CHASE:  Oh.  Is it for -- no, I didn't -- he said --

BY MR. CHASE:

Q.  When did you erase the text?

A.  February of 2022, right around there.  It could have been April of -- it doesn't matter.  It was a relatively short period of time after I went to Fawcett.

Q.  Okay.

A.  So I and keep no text messages from any family members.

Q.  Okay.  I'm pretty sure you said February of 2021.

A.  Oh, then -- no, I wasn't working then, was I?  February of 2022.  February of 2022.

Q.  February of 2022 is when you're saying your deleted --

A.  Yeah, yeah.

Q.  Who -- when you say you deleted with family members, who did you delete?  Like, which --

A.  Well, I have nine kids who may or may not be texting me.  I have a wife who texts me.  And the way it

Page 146

came up was, my son and his wife are having a baby, and there was a text thread about it, and she blurts out in the middle of the OR that, so, you are going to be a granddad.

I'm, like, what are you talking about?  And it was very unnerving seeing that.  And I'm, like, you have no business reading my text messages.

Q.   Okay.

A.   So that's what happened.

Q.   Okay, so then how do you -- so that's from that point backwards.

A.   And so, periodically, I will just delete them so that there is nothing on there that they're going to read about my life that they have no business reading.

Q.   Okay, and when was the last time you deleted them?

A.   I don't know, a week ago, two weeks ago.

Q.   So that includes text messages with your wife?

A.   Correct.

Q.   What about E-mails?

A.   The only E-mail -- I don't communicate with my wife in E-mails.  I will forward things from Mr. Zinn to her, but we don't communicate via E-mail.

Q.   Did you search your E-mail for communications with her?

Page 147

A.    With her?

Q.    Yeah.

A.    I don't have any.  I can guarantee you that.  And if I do, they're all erased.

Q.    Why would they be erased?

A.    Because I delete them.  You have too many E-mails.  Do you know how many E-mails I get a day?  I literally get a hundred and 50 E-mails a day.

Q.    So you delete the E-mails and the text messages?

A.    Yeah.  Well, yeah.  I mean, I have too many E-mails.  I spend -- it's not a long time; but I mean, I spend time sitting there deleting all the E-mails, and then if I have things from my kids, I get rid of them.  I don't need to memorialize them, if that's what your question is.

Q.    So how often do you delete the E-mails?

A.    Every day.

Q.    You delete your E-mails every day?

A.    Yeah.  The only ones I save -- if you looked at my E-mails, would be Mr. Zinn, Tracy, Beatrice -- she's with you, right -- so Beatrice, and then if I have, like, receipts from Society of Thoracic Surgery, or my DEA thing, or -- things like that.  Those are the only E-mails that I have.

Q.    Why aren't you concerned that these workers are

Page 148

going to look at your communications with your lawyer?

A.   In terms of my E-mails?

Q.   Yeah, like -- in other words, you say you delete these because -- the ones with your family -- because the workers look at them.  Why wouldn't that also apply to your communications with your lawyer?

MR. ZINN:  Object to form.

You can answer it.

THE WITNESS:  I would say, they clearly would have no business looking at my E-mails.  I mean, nobody communicates -- well, you're right.  Maybe they are looking at my E-mails.  That could definitely be something that's going on.

BY MR. CHASE:

Q.   So why do you not delete those?

A.   Because I want to see my -- I have columns of Zinn all over the place.

Q.   Okay.  Alright, so these are all -- these requests are -- is 47 through -- well, let's just go one at a time.

All unprivileged communications with Defendant Rousseau regarding plaintiff, those would be deleted?

A.   For texts, yes.

Q.   E-mail.  Text and E-mails.

A.   Yeah.  I don't have -- we don't communicate with

Page 149

E-mail.

Q.   Okay, but the texts are deleted.

All unprivileged communications with Defendant Rousseau regarding transfers of money.  Deleted?

A.   Transfers of money, you have them all.

Q.   Communications regarding transfers.

A.   Oh, yeah.  No, they're all deleted.

Q.   Deleted.  All unprivileged communications with Defendant Rousseau regarding payment of liabilities, titled solely in Defendant Rousseau's name.  Deleted?

A.   Deleted.

Q.   All unprivileged communications with anyone regarding plaintiff?

A.   Yeah, I don't talk to anybody.

Q.   Other than Mr. Zinn?

A.   I don't like anybody knowing anything about this. My closest friends don't know anything about this, except what they read in the newspaper, and they don't talk to me about it.

Q.   Does your -- I mean, obviously your employer knows about this.

A.   Correct, from the newspaper.

Q.   What do they have to say about that?

A.   They say it's a private thing, it's out of work. However, it's a bad look, and I thought you told me that

Page 150

this was all done.

Q.   Did you tell them that this was all done?

A.   No.   What I said was, the judgment was in 2012.
And then I said some, maybe, not nice things about your
client and how she is a litigious individual who has sued
my mother, sued my son Christopher, sued my son Nicholas,
sued my son Dominic, sued my daughter Elizabeth, sued my
daughter Angela, sued my daughter Katie, her previous
place of employment, has sued a previous place in
San Diego's employment, and who knows what other things
she sued; so that's what I said.

Q.   Did you tell them that you owed the 25,000 per
month and the two million dollars?

A.   No.

MR. ZINN:   Object to form.

BY MR. CHASE:

Q.   Did you tell them that there is a capias for your
arrest?

A.   No.

Q.   What do you think would happen if they found out
about that?

A.   I'm not arrested, but I can tell you this, if I
am arrested, you guys will have no money.

Q.   Do you think you'll get fired?

A.   Oh, 100 percent, not even remotely questionable.

Page 151

Q.  Is that, like, part of a deal or something, or you just --

A.  No, that's what they do.  These places -- being arrested is a very bad thing, so.  So that is a definite no employment.

Q.  What about -- are there any obligations to report to, like, your medical board about things like this?  Like, money that you owe to people?

A.  No.

Q.  You know, arrest warrants, let's say?

A.  No.

Q.  No?

A.  No.

Q.  The medical boards, they don't care about that?

A.  They may care about it, but that's not how they phrase, have you been arrested.  Do you have a felony charge against you, those are the questions.  They don't ask, do you have an open capias.

Q.  Okay.  What -- I mean, that would be an arrest warrant.

A.  Okay, I don't think I've ever read that as a question.

Q.  Okay.  But is it -- to your knowledge, is that something that you would have to report to them?

MR. ZINN:  Objection; asked and answered.

Page 152

THE WITNESS:  I don't know the answer.  Ignorance is bliss, right?

BY MR. CHASE:

Q.  Until you get in trouble for it.

A.  Well, then you get fired, right.  That's what will happen.

Q.  All right.  So you don't -- what did you do to search for any communications with anyone regarding plaintiff?  Did you search your E-mails?  In other words, you know, you can go under "E-mails" and do a search in the search box.  Did you do that?

A.  I don't have enough E-mails to go searching through because I delete everything.

Q.  Okay.

A.  I want to say I have -- I don't know how many E-mails.  I do all my E-mails through my phone, and I have, like, seven unread, and the maybe 40 or 50.  I don't even have all of Mr. Zinn's E-mails.  I sort of -- some of them have fallen off.

Q.  Do you delete them, like, every day?

A.  Every day.

Q.  Every day, you delete all your E-mails?

A.  Every day, because I get a 150.  It is not a little number.

Q.  What about what's important, do you save that?

Page 153

A.   If it's important, I'll save it.  But most of those things that are important, aren't really that important, if you know what I mean.  They're -- like, when you are saying, well, if something's important.  Yes, if something's important, I'll save it.  But what's important in an E-mail?

Q.   What about things that are related to this case?

A.   I don't -- I don't have anything, it's him.

Q.   No, I know, but would you save that or would you delete it?

MR. ZINN:  Objection to form.

THE WITNESS:  It's a hypothetical question, so I would have to see what the E-mail was that was related to this case, that I was like, oh, wow, look at this great E-mail, let me save it.  But I haven't found any of those.

BY MR. CHASE:

Q.   So, safe to say that there were communications regarding this case that you've deleted?

A.   No.  I don't know what -- see, outside of my communication with him and outside of me forwarding stuff to Kelly, there's nothing there.

Q.   And the stuff that you've forwarded to Kelly, you've deleted?

A.   Yeah.  It was -- or it was something that I kept

Page 154

because it pertained to her.  I'll forward stuff that
pertains to her.  That's all I'll forward to her.

Q.   When you say "her," who do you mean?

A.   Kelly.

Q.   What about that pertain to this case and that
pertain to Ms. Welsh?

MR. ZINN:  Objection to form.

THE WITNESS:  This case pertains to Kelly.  So if
there's something that pertains to Kelly, I will
forward it to her.  I don't forward her very much
anymore because Mr. Zinn has her E-mail.

BY MR. CHASE:

Q.   Okay.

A.   So there's no reason for me to do that.

Q.   Okay.  But the ones that you have, they've all
been deleted?

MR. ZINN:  I'll object to the form.

THE WITNESS:  The only ones I have are from him,
and that's it.

BY MR. CHASE:

Q.   Okay.  But text messages, you -- that's how you
communicate with your wife, and those text messages, those
get deleted?

A.   Those get deleted on a regular basis, because
some of them are inappropriate for people to see.

Page 155

Q.   You've never had -- I guess without revealing any attorney-client privileged information, but you weren't under the impression that you needed to not delete your text messages during this case?

A.   No.  I --

Q.   Okay.

A.   I'll tell you this, I had no idea about text messages being a thing.  E-mails, of course.

Q.   What about -- do you happen to communicate by WhatsApp?

A.   No.

Q.   Okay.  Alright, how about all unprivileged communications with anyone regarding transfers of money to Defendant Rousseau?

A.   No.

Q.   All unprivileged communications with anyone regarding payment of liabilities titled solely in Defendant Rousseau's name?

A.   You guys have everything that you've asked for that I have in my possession.

Q.   So for example, if you communicate, you know, with your friend, with your son, with -- anybody -- with Defendant Rousseau, you delete those; but anybody else, you communicate with them, regarding any liabilities in Defendant Rousseau's name?

Page 156

A.   They don't know any -- they know the bare minimum about this case.  They don't -- I don't like talking about it.  I don't talk about it to my children.  They want the whole thing to go away, the younger ones that were involved in it.  The younger ones that are owed child support, they want nothing to do with it.

Q.   When you say, "the younger ones that were involved in it," what do you mean by that?

A.   That were -- had a subpoena brought to them.

Q.   Okay.

A.   I mean, that's a traumatic thing for a kid.

Q.   And do you communicate with them about this?

A.   No, not at all.

Q.   And if you did, I guess those would be deleted?

MR. ZINN:  Object to form.

THE WITNESS:  I don't communicate with them about it.

BY MR. CHASE:

Q.   But if you did, they would be deleted because you delete your communications with your children?

MR. ZINN:  Object to form.

THE WITNESS:  You're deleting something that's not there.

BY MR. CHASE:

Q.   Okay.  I guess, obviously, then you wouldn't have

Page 157

searched for these documents.

A.   Well, I know for a fact that I have never remotely talked to my kids about this case.

Q.   All communications with your employer, regarding payment to you?

A.   Yeah, you have everything.

Q.   What communications are those?

A.   Well we don't communicate -- by E-mail?

Q.   By anything, e-mail, text.

A.   We don't communicate.

Q.   How do you -- just by -- verbally?.

A.   Yeah.

Q.   You don't write -- no E-mails, no texts to your employer?

A.   Well, the only texts to my employer or other people in my group are about work-related stuff.

Q.   What about payment to you?

A.   When you say "payment to me," what do you mean?

Q.   Like, e-mailing your boss, hey, can you send me my paycheck; or for example, hey boss, you know, don't pay me this month, pay me next month.

Any communications with your employer regarding payment to you?

A.   I don't -- I don't think I have any of those kind of communications.  I can look for that.

Page 158

Q.    Did you do anything to look for it previously?

A.    No, because you are asking me if I -- I have communicated the fact that, you know, I needed to have my check, the one where I got the extra 4,000, I communicated with them, but I think I did it by phone.

Q.    Okay, well, you need the look for that.

A.    I'll look for that.  See, I -- it'll be with the office manager, so.

Q.    Okay.  Because otherwise, would those also get deleted from your end?

A.    No, because that's some nebulous person, so.  The people that I leave on my text chains are either doctors or device people, salesmen.  I'm constantly getting advertisements, you know, like Polo shop.  I mean, those things will stay on there just because they're annoying.  But if I get family stuff, no, they don't need to know family stuff.  I could care less if they found out that Polo Factory Outlet has a 10 percent sale.

Q.    Okay.  What if that -- so the communications with your employer, they would not been deleted?

A.    No.

Q.    Okay, so then you definitely need to look for those.

A.    Right.

Q.    Communicatons with any mortgage company

Page 159

regarding plaintiff?

A.    I don't have any.

Q.    Communications with any mortgage company regarding your obligations to pay plaintiff?

A.    No.

Q.    Documents -- well, okay.  All right.  So -- let me just -- give me one second to see if I've gone through everything.

A.    I'm sure you could find a few more things.

Q.    You've given me enough.

MR. CHASE:  All right.  I think that's all I have for now.  I will reserve the right to pose anymore on those documents that he searches for in the events he finds them.

THE WITNESS:  I will look for them.

MR. CHASE:  And we know the discovery order is extended until February something.

So that's it for now.

MR. ZINN:  Okay.  Thank you.

MR. CHASE:  All right.

MR. ZINN:  I have no questions.

And he will read.

MR. CHASE:  We will order the transcript.

MR. ZINN:  I will order a copy.

(Thereupon, the deposition concluded.)

Page 160

CERTIFICATE OF OATH

STATE OF FLORIDA)

COUNTY OF COLLIER)

I, the undersigned authority, certify that Dr. William V. Martinez, Jr., personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 9th day of February, 2023.

Jill Saravis-Regan

Notary Public-State of Florida

My Commission No: GG 921513

Expires:  10-09-2023

Page 161

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)

COUNTY OF COLLIER)

I, Jill T. Saravis-Regan, Certified Shorthand Reporter,

and Notary Public, certify that I was authorized to and

did stenographically report the deposition of Dr. William

V. Martinez, Jr.; that a review of the transcript was not

requested and that transcript is a true and complete

record of my stenographic notes.

I further certify that I am not a relative, employee,

attorney, or counsel of any of the parties; nor am I a

relative or employee of any of the parties' attorney or

counsel connected with the action; nor am I financially

interested in the action.

DATED this 9th day of February, 2023

_____

Jill T. Saravis-Regan, CSR

Page 162

Brian D. Zinn

brian@zinn.law

February 9th, 2023

RE: Welsh, D'anna vs Martinez, William V. Jr, Et Al.

January 30th, 2023/William V Martinez/Job #5687378

The above-referenced transcript is available for

review.

(The witness/You) should read the testimony to

verify its accuracy. If there are any changes,

(the witness/you) should note those with the reason

on the attached Errata Sheet.

(The witness/You) should, please, date and sign the

Errata Sheet and email to the deposing attorney as well as

to Veritext at Transcripts-fl@veritext.com and copies will

be emailed to all ordering parties.

It is suggested that the completed errata be returned 30

days from receipt of testimony, as considered reasonable

under Federal rules*, however, there is no Florida statute

to this regard.

If the witness fails to do so, the transcript may be used

as if signed.

Yours,

Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure

Rule 1.310(e).

Page 163

Welsh, D'anna vs Martinez, William V. Jr, Et Al.

January 30th, 2023/William V Martinez/Job #5687378

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____    _____
          (WITNESS NAME)                    DATE

**[& - 2022]**                                                                 Page 164

| & | 12  38:6 | 2 | 34:9,18,24,25 |
|---|---|---|---|

**&**   1:17,19 2:4

**0**

**00216**   1:6 4:11

**1**

**1**   3:13 4:15,18
  94:17 122:11
  123:2 124:24
**1,000**   93:21,25
**1,054,310.77.**
  49:12
**1.2**   23:6,14
  39:23
**1.310**   162:25
**1.4**   23:7,15 62:7
  64:1
**1.7**   25:17 56:13
  56:17 67:24
  124:14
**10**   16:4 158:18
**10,000**   90:2
  108:5
**10-09-2023**
  160:21
**100**   150:25
**100,000**   89:12
**10501**   2:12
**108**   83:18,21
**109**   3:20
**11161**   14:2
**114**   2:12
**1141**   2:5
**117,000**   43:25
  44:4,8

**12,000**   120:2,3
**120**   58:5,20
  136:12
**120,000**   37:15
  38:11,13,25
  39:6,10 41:2,15
  41:23 44:19
  45:17 46:14
  47:12,24 48:14
  49:17 58:5 66:8
  74:3,7 83:16,23
**125**   100:5
**14**   3:13 37:1
**140,000**   73:6,11
  73:20 74:4 75:1
  77:12
**15**   66:23
**150**   152:23
**1500**   110:3
**15919**   9:23
**15th**   66:23
**160**   114:9,20
**160,000**   116:9
**1600**   97:9
**18**   3:15,16 39:9
**19**   34:9 50:7
  51:10
**19th**   36:22
**1:00**   1:16
**1c**   132:23
**1st**   53:11 110:7
  122:13 124:3

**2**   3:15 18:10,13
  35:25 38:6 65:9
**2,000,000**   17:18
**2,048,009**   34:14
**2.1**   71:13
**20**   37:1 46:1
  76:17,17 101:13
  105:4 108:8
**20,833**   110:21
**20,833.33**
  111:10
**200**   101:7 107:6
  114:12
**200,000**   43:15
  43:18
**2012**   17:21 29:4
  29:7 30:6,20,23
  31:18,25 33:9
  150:3
**2017**   21:25
  50:11 51:13
  52:12 62:6
**2018**   30:21 44:2
**2019**   30:22,23
  31:18 33:9,19
  33:25 34:7,18
  35:15,17 36:22
  44:2 50:13 51:2
  51:2,5 52:17,23
  52:25 65:14
  82:21 86:15
**2020**   9:25 10:8
  10:12 19:20,21
  19:25 20:4,16

34:9,18,24,25
35:2,4,9,14
36:13,18 37:4
38:6 49:11,12
49:15 50:7,14
50:17 51:10
53:3,9,13 54:16
54:20 55:9 58:6
58:21 64:10
65:5 66:4,23
70:4,23 71:7
73:18 81:11,16
82:2,4,13 83:13
86:15,18,25
87:1,7 88:2
90:15 94:4,12
94:17 122:11
123:2,17 124:24
140:9,12
**2021**   15:11
  81:24,24 82:11
  82:17 88:6
  109:23,23
  140:25 141:7,15
  141:19,21,23,25
  142:2,4,6,8,10
  144:3,7 145:16
**2022**   15:12,14
  110:20,23 111:1
  111:15,18,20,22
  111:24 112:1,3
  115:6 116:2
  130:4 132:2
  137:4 142:12,14
  142:19 145:2,10

**[2022 - 60,000]**                                                                                Page 165

145:18,18,19
**2023**  1:15
  160:15 161:19
  162:3,4 163:2
**209**  36:1
**20th**  37:8
**21**  145:4
**216,000**  65:22
**22**  10:10 125:12
**22,000**  125:13
**23**  70:4
**247**  83:21
**247,500**  83:18
**25**  110:9,13
**25,000**  25:16
  34:17 35:5,10
  35:16 36:11,14
  36:19 38:13
  39:11 40:3 48:2
  50:3,11,17,21
  50:22 51:14,19
  51:24 52:9,11
  52:13,18 53:1,4
  56:9,14,17 57:2
  57:6,10 60:10
  60:16 62:20
  64:9,11 66:16
  66:23 71:19
  72:9 73:10,15
  74:1 77:4,11
  87:6 94:12,18
  110:9 111:9
  115:9,16,18
  121:21 122:1,17
  122:21 124:4,15

125:9 129:5
  140:11 150:12
**250**  99:3,4
  101:22,23
**250,000**  111:11
**26,000**  24:1
**2700**  93:16
**299,834**  116:3
**2:22**  1:6
**2:22cv**  4:11
**2nd**  111:2

**3**

**3**  3:16 18:19,21
**3,000**  59:2
  125:12
**30**  1:15 101:13
  105:19 106:12
  107:13,17 108:8
  162:16,24
**30,000**  46:2
  118:13
**30,628**  112:3
**300,000**  60:16
  61:1,16 114:5
  116:7 122:19
**305**  2:6,6
**30th**  162:4
  163:2
**31**  49:15 111:15
  111:22
**31,832**  111:24
**31st**  49:12 65:8
**32,149**  111:20
**3209**  160:18
  161:21

**33,494**  111:22
**33141**  2:5
**33966**  2:13
**34,542**  110:23
**34117**  1:18
**35**  107:12
**35,672**  112:1
**35,940**  111:18
**350**  98:19 99:4
**3500**  62:19
**380**  79:12
  136:23
**380,000**  79:5
  80:1,22 93:15
**3808**  1:17

**4**

**4**  3:5,17 41:17
  41:19
**4,000**  47:10,12
  47:25 48:15
  58:7 158:4
**4,166**  111:2
**40**  152:17
**40,000**  90:1
**40,575**  111:16
**400**  101:8 107:5
**401**  30:1
**402-2725**  2:6
**402-9800**  2:6
**403**  30:2 32:2
**41**  3:17
**440**  136:23
**45**  106:4
**45,000**  44:12

**450**  97:23
**450,000**  61:17
  71:14
**457**  30:2 32:2
**47**  148:19
**480,000**  73:3
**49**  3:18
**4:54**  1:16

**5**

**5**  3:18 49:5,8
  106:4
**5,000**  61:19,22
  132:6
**50**  106:2 116:19
  147:8 152:17
**50,000**  68:14
  89:24
**500**  103:6 104:3
**50th**  124:14
**55**  106:5
**55,000**  27:4
  126:12
**5687378**  1:22
  162:4 163:2

**6**

**6**  2:12 3:19
  74:17,19
**6,000**  118:3,8,14
**6-25-2012**  3:16
**60**  26:5 72:18
  100:10 106:13
  126:12
**60,000**  26:6

**62** 9:21
**620,000** 73:1
**6231** 10:4
**68** 36:1

**7**

**7** 3:20 109:12,14
**70** 107:12
**71st** 2:5
**74** 3:19
**75** 72:18 106:14
**75,000** 25:19,22
25:25 27:9
28:20 54:20
55:12 84:20
86:19 87:10

**8**

**8,000** 23:25 90:2
**80** 39:8
**80/20** 76:16
**860** 15:20
**860-402-9669**
15:18

**9**

**90** 72:18
**90s** 14:4
**92** 65:10
**921513** 160:20
**9322** 49:11
**98** 72:1
**9th** 160:14
161:19 162:3

**a**

**ability** 24:6
26:16 40:14,17
56:15 65:15,18
67:15,19 80:10
87:4 88:13 96:3
96:7 101:14
122:10,14,20
123:2,9,17
124:6,11 141:6
142:22
**able** 42:19 59:20
68:7 73:21 80:7
80:15 82:16
85:25 89:5 93:4
93:13,16,18
96:14 108:7
119:16,17
120:10,11,19,19
121:5,18 123:21
124:17 125:2
126:3,24
**above** 112:13
162:6
**absolutely**
32:18 33:3
42:24,24 53:25
69:5 77:17
127:1
**accepting** 61:23
**access** 14:15
130:8 144:11
**account** 3:18
21:12,13,21,21
22:9,11,16

24:15,22 25:5,8
25:13,21 26:1,4
26:7,13,17,20
26:21,22 27:5
29:5,13,14,15
29:16,17,24
30:9,14,16,24
31:10,18,21
32:13,13 33:10
35:8 37:22 40:1
40:7,8,21 44:24
48:10 49:3,10
49:11,23 54:6
54:10 59:6,17
59:19 60:3,7,15
60:18 62:4 63:9
66:15,19 67:16
67:20,21 69:19
78:5,14 83:7
86:6 88:10 90:7
90:12,20,25
91:4,10,13,22
92:5,6 93:10
94:9 112:21
113:20,22
118:25 119:2
120:23 122:18
125:15,18 126:9
127:19,22,25
128:1,2,4,7
129:2,11,16,17
129:20,21,25
130:1,6,7,12,15
131:13 134:2
137:14 140:3

**accounted** 75:7
75:8
**accounts** 24:7
29:8,9 37:21
40:17 58:10
65:16 87:5 94:8
131:2,4
**accuracy** 162:9
**accurate** 82:16
108:25
**ach** 133:23
134:4
**acted** 63:19
**acting** 43:10
**action** 161:16
161:17
**actual** 48:5
84:12
**actually** 28:1
64:12 73:25
80:12 84:12
91:24 95:4,21
96:12 102:17
103:15 131:4
143:10
**addition** 47:11
77:10 132:9,11
**additional**
65:23 73:19
115:17
**address** 10:3
14:1,8
**adds** 95:18
107:13

**[administration - approximate]**                    Page 167

**administration**
  64:6
**admissible** 62:1
**advantage**
  32:13 43:9
**advertisements**
  158:14
**affect** 63:23
**affects** 63:25
**affidavit** 117:2
  117:3
**afford** 80:7
  121:18,18
**ago** 5:15 128:5,6
  146:17,17
**agree** 18:17
**agreement**
  13:23 115:1
**ahead** 116:24
  131:21
**ahold** 63:4
**air** 119:19,19,20
  120:1,3
**al** 162:4 163:1
**alarm** 101:25
**alimony** 13:17
  19:9,13,15,18
  20:10 22:14
  46:2,13 71:15
  140:19
**alive** 39:8
**allow** 43:22
**allowed** 7:23
  21:25 22:24
  27:18 75:8

**alright** 9:16
  66:21 71:18
  78:21 79:3
  86:18 88:5
  101:18 103:13
  127:16 131:1
  134:9 148:18
  155:12
**amended** 3:15
  18:10 71:23
**america** 131:10
**american** 29:24
  32:1 94:5 101:1
  112:23
**amex** 128:21
**amount** 24:7
  34:4,9,13 36:8
  60:11 62:13,16
  63:11 77:11
  95:6,8 97:10
  110:15 111:13
  122:8,9,13,20
  123:24 125:3
  137:9 138:22
**amounts** 25:5
  25:14,19
**angela** 150:8
**annapolis** 17:14
**annoying**
  158:15
**answer** 5:19,21
  6:17 7:15,18,19
  12:15 18:1 19:4
  20:21 21:4,18
  24:9,10 25:24

  26:10,25 27:2
  27:12 28:12,22
  29:11 31:23
  32:22 38:16
  39:14,20 40:11
  40:19 41:5
  42:10 43:3
  44:22 45:5,21
  45:22 46:5,7,17
  47:15,21 48:4
  50:4 51:1 52:2
  54:15,22 55:14
  56:12,22 57:3,5
  57:7,25 60:9
  61:2,8 63:14
  66:11 67:18
  68:18 70:12,19
  71:10 72:13
  73:14 74:11
  75:11 76:10,23
  78:1 81:3,22
  85:24 92:3,11
  106:17 112:25
  113:2,4,5
  117:12 123:5
  126:11 136:5
  144:17 148:8
  152:1
**answered** 7:9
  8:5 42:9 45:4,20
  55:15 56:21
  63:13 77:23
  85:23 126:10
  151:25

**answers** 54:4,13
  57:1 108:22
  143:7
**anybody** 6:8
  9:17 149:14,16
  155:22,23
**anymore** 154:11
  159:12
**anyway** 41:12
**apparently**
  16:20 90:9,10
**appeal** 56:1
  70:4
**appear** 53:11
  64:24
**appearances** 2:1
**appeared** 52:23
  52:25 160:10
**appears** 63:3
**appellate** 22:6
  24:20 28:7 34:2
  36:6 51:6,16,21
  52:7,16 64:19
**applicable**
  65:24
**applicant** 75:19
**application** 3:17
  41:22
**apply** 71:6
  148:5
**appreciate**
  142:17
**approximate**
  99:11

[approximately - based]                                             Page 168

**approximately**
  23:4 44:1 48:10
  49:21,22 65:3
  65:20,22 66:5
  73:5 99:18
  100:9 116:19
**approximations**
  108:25
**april**  10:6,6,11
  19:21,25 20:3
  20:16 53:13
  63:3 82:17
  110:23 111:7,11
  130:4 141:21
  145:11
**argument**  61:13
**arguments**  70:7
**arrest**  87:9
  150:18 151:10
  151:19
**arrested**  86:20
  87:20 150:22,23
  151:4,16
**articles**  63:23
**aside**  62:24
**asked**  7:8,9 8:11
  18:8 21:17 42:8
  45:4,19 48:19
  53:25 54:1 55:4
  56:21 63:13,20
  77:23 85:23
  90:6 111:12
  126:10 127:20
  127:23 128:19
  131:8 134:18

  151:25 155:19
**asking**  7:15
  20:25 32:24
  39:2 78:10
  124:16,23 158:2
**asks**  70:16
**aspects**  19:7
**asset**  3:16 18:4
  18:17 20:19
  22:5,6,21 24:5
  29:3 32:15 40:1
  81:12,15 82:1,4
  82:7,13,16,18
  82:23 83:2,9,9
  87:3,11
**assets**  19:6,8
  39:25 40:13
  41:23 42:3 75:7
  76:12 140:17,17
  140:18
**associates**  1:19
  2:4
**association**
  97:22
**assume**  8:2 38:3
**at&t**  15:25
**attached**  113:9
  162:11
**attorney**  27:17
  27:22 52:4
  55:22 68:6,6,8
  82:7 155:2
  161:14,15
  162:13

**attorneys**  18:8
**audibly**  5:19
**audited**  86:16
**august**  9:25
  51:5 52:17
  53:15 55:9
  64:10 65:2,4,8
  65:14 66:4,20
  70:23 71:19
  73:18 81:10
  82:4,10 87:1
  88:6 90:15
  111:22 115:6
  140:9 142:2
**austin**  17:14
**authority**  160:9
**authorized**
  161:7
**automatically**
  31:2
**available**  162:6
**average**  100:17
  101:7
**avoid**  53:19
**avon**  10:10 47:7
**awarded**  33:21
**aware**  28:1,4,7
  70:24 71:2 80:3

**b**

**b**  14:2 30:2 32:2
**baby**  146:1
**back**  8:4 23:16
  23:25 29:4
  36:13,16,18
  44:14 50:11

  51:6,16,17
  52:16 58:5,10
  59:18 64:20
  68:4 74:7,8
  75:22,25 76:8
  81:16 83:22
  86:7,19 88:16
  88:23 93:9
  97:14 110:12,14
  140:4
**backs**  21:10
**backwards**
  146:11
**bad**  149:25
  151:4
**bag**  106:13
**bags**  106:13
**balance**  82:25
  94:4
**ballpark**  108:22
**bank**  21:12,13
  37:21 43:16,20
  44:6,7,12,13
  58:10 79:2,22
  112:21 127:19
  129:9,11,16,17
  129:20 130:9
  131:1,4,9
  133:24
**banks**  94:1
**bare**  156:1
**base**  23:6
**based**  32:25
  87:4 139:5

[basically - cardiac]                                                           Page 169

**basically** 79:4
80:8 107:15
**basis** 87:4
154:24
**bay** 133:4
**beach** 2:5
**beatrice** 147:20
147:21
**bedroom** 59:11
**begging** 69:2
**beginning** 15:9
50:7
**believe** 10:4
15:25 34:15,20
35:11,12 47:2
50:6 53:10
54:19 65:18
71:24 99:3
110:16 114:12
**benefits** 135:17
**better** 139:8
**big** 16:20 59:14
106:13
**biggest** 27:15
**bill** 95:23
**bills** 22:17,18
57:14,14 90:14
90:19,21,21
91:1,5,20,23,25
92:2,4,5,7 93:1
93:5,13,17,19
95:18,21,24
96:1,3 97:5 98:9
98:9 137:9,15
137:22 138:14

**bit** 54:14
**black** 133:18
**blake** 15:15
111:8
**bliss** 152:2
**blue** 105:22
**blurts** 146:2
**blvd** 1:17
**bmw** 103:20
118:6
**board** 151:7
**boards** 151:14
**bona** 75:18
**bond** 87:10
**bonus** 114:22,24
114:24,25,25
115:2,9,10,11
115:13
**booted** 128:23
**boss** 157:19,20
**bothered**
144:22
**bothers** 72:14
**bought** 59:9
71:20,21 72:11
72:20 120:3
121:3
**box** 152:11
**boy** 14:2
**bradenton**
15:15,16 104:6
**break** 5:25 6:1
31:13 33:15,17
35:23 74:15
78:2,18,19 91:2

95:5 96:20
115:24 138:17
139:7
**brian** 2:4,11
115:21 162:1,2
**bring** 58:2
110:10,11
**broad** 143:5
**broke** 29:14
**broken** 115:8
**brokerage**
127:25 128:1,3
**brought** 58:1
82:8 156:9
**bucks** 107:17
**budgeting** 103:4
**bunch** 132:3
**burden** 82:20
**business** 19:7,8
128:16 140:17
140:18 146:7,14
148:10
**buy** 38:1 75:14
107:12 119:23
**buying** 72:16
74:4

**c**

**c** 15:5
**cable** 101:18,21
**cahoots** 55:17
**calculated**
110:17
**calculation**
125:1

**calculations**
124:25
**call** 9:9 22:4
41:9,13 60:20
64:5 72:25 82:1
101:13 108:9
115:10 130:18
132:23
**called** 15:1 30:2
64:3
**calling** 75:8
**capacity** 109:22
**capias** 27:23
28:1,4 55:18
70:4,5 87:9,19
150:17 151:18
**capitol** 29:25
94:6
**car** 58:11,12,13
58:14,15 102:7
102:7,8,9,11,13
102:14,17,18,19
102:21 103:3,5
103:7,9,13,14
103:18 118:3,9
118:14,16
119:15 120:24
135:22
**card** 58:9 95:23
108:23 128:18
128:23
**cardia** 64:2
**cardiac** 15:1
109:17

**[cards - civil]** Page 170

**cards** 59:22
112:17 128:21
133:6
**care** 59:22
64:24,25 99:21
151:14,15
158:17
**carrier** 15:24
**case** 1:6 4:10,11
4:23 5:4,6,10,10
8:12,13,15,16
8:20 9:7 13:2
18:7 24:20
28:15,18 36:22
52:15 143:4
153:7,14,19
154:5,8 155:4
156:2 157:3
**cases** 8:21 9:11
9:14 117:4
**cash** 75:20
89:10,10 131:15
**caveat** 74:6
**cavorts** 138:25
**cell** 15:17,21
16:1,3 26:19
135:25
**certain** 8:15
91:23,25
**certainty**
123:22
**certificate** 160:1
161:1
**certified** 161:6

**certify** 160:9
161:7,13
**chains** 158:12
**chance** 11:17
69:23
**change** 16:11,15
16:17,23 119:11
123:13 163:4,7
163:10,13,16
**changed** 16:16
23:12,14
**changes** 162:9
**changing** 21:19
21:19
**characterize**
80:11 81:6
**charge** 118:14
151:17
**charges** 101:21
**charles** 3:18
49:10 65:8
**charlotte** 15:3
**chase** 1:19 2:4
4:15,19 6:16,20
12:25 17:10
18:3,11,14,22
19:11 24:12,24
26:2,15 27:7,20
28:16 29:1,22
31:15,16 32:3
33:5,16,18
35:24 36:4
38:23 39:17
40:5,15 41:1,7
41:16,20 42:3,5

42:13 43:6 45:2
45:10,23 46:4,7
46:9,23 47:18
47:23 48:6,22
49:1,9,20 51:3
52:3 54:23
55:24 56:19,25
57:8 58:3,20
59:4 60:12
61:12 63:15
66:13 68:21
70:15,22 71:17
72:1,2,24 73:17
74:13,16,20
75:16 76:19
77:1,20,25
78:18,20 79:9
79:19 81:2,9
84:10,17,24
85:3,11,18,21
86:1,13,24
87:13,23 88:20
92:16 93:23
94:10,16 95:14
96:9,19 99:13
99:14 109:11,15
113:1,10 114:4
114:17,18
115:22,25
117:21 120:12
121:14,24 122:7
122:15 123:6,25
124:10,21
125:22 126:2,8
126:13,22 127:6

127:9,15 131:18
141:5 142:18,25
143:8,14 145:1
145:3,6,8
148:14 150:16
152:3 153:17
154:12,20
156:18,24
159:11,16,20,23
**chaselaw.com**
2:7
**cheaper** 98:20
100:24
**check** 22:14
61:22 137:10
139:24 158:4
**checks** 130:11
133:21 134:4
135:5
**child** 13:17 19:9
19:13,15,18,22
20:1,10 22:14
46:2,13 71:14
104:10,12,22,25
140:19 156:5
**children** 19:23
104:8 156:3,20
**chose** 39:11
**chosen** 124:7
**christopher**
150:6
**circle** 9:23
**civil** 71:1,8
72:10 86:20
162:24,24

[claim - consideration]                                        Page 171

claim 141:6,8
clarification
  25:15 56:20,23
  71:12
clarify 127:17
class 132:23
clean 89:18
cleaning 105:18
cleans 102:5
clear 69:7,9,11
  69:14,21
clearly 148:9
client 21:10
  43:21 45:15
  46:10 48:2 52:4
  62:18 64:6
  66:20 77:8
  104:21 105:14
  143:9,10 150:5
  155:2
close 17:3 23:7
  23:25 43:14
closed 71:22
  72:5
closer 114:12
closest 149:17
clothes 121:3
clothing 105:20
club 106:21
clubhouse 97:25
clueless 117:15
college 20:2
collier 160:5
  161:4

columns 148:16
comcast.net.
  14:2
come 11:1
  101:14 110:12
  118:17 125:13
comedy 106:21
comes 54:11
  70:3 76:6 97:14
  102:4 112:21
commission
  160:20
communicate
  14:22,23 144:15
  146:21,23
  148:25 154:22
  155:9,21,24
  156:12,16 157:8
  157:10
communicated
  158:3,4
communicates
  148:11
communication
  143:18 153:21
communicatio...
  21:5 143:15,20
  143:21 146:24
  148:1,6,21
  149:3,6,8,12
  152:8 153:18
  155:13,16
  156:20 157:4,7
  157:22,25
  158:19,25 159:3

companies
  42:22 136:7
company 42:19
  77:7 80:9
  135:22 158:25
  159:3
compare 23:9
compared 23:11
  24:3
compensation
  136:4
competent 7:17
competing 64:5
complaint 3:15
  18:10 71:23
complete 21:22
  161:10
completed
  162:16
completely
  23:15 120:22
compliance
  124:3
comply 87:6
  140:8,12
composite
  109:16
concern 71:4
  131:12
concerned
  20:19 29:21
  44:25 45:24
  46:18 68:22
  147:25

concluded
  159:25
conditioner
  119:19,19,21
  120:1,3
conditions
  87:10
confer 7:22
confined 71:1,8
  72:10
confirming
  143:8,10
confusion 54:10
connected
  161:16
connecticut
  10:10,19 11:16
  20:2 22:5 24:17
  28:9,19 33:20
  34:8,13 39:25
  40:7 43:16 47:1
  47:13 48:16
  54:19 64:2 68:5
  71:12 72:9
  87:20,24 88:1
  90:8,10 136:5
consider 32:4
  32:14 57:10
  65:16 85:2,6
  96:21,21,23
  100:14 101:10
  107:7 108:11
  109:3 117:22,24
consideration
  71:16

**[considered - dam]**                                                    Page 172

**considered**
  11:10,14 23:16
  40:1,7,8 42:6
  162:17
**constantly**
  158:13
**consult** 144:16
**contempt** 24:7
  24:15 25:5,14
  25:19 26:7,23
  33:21 34:4,10
  34:14 35:6 40:9
  46:11 51:13
  54:2,7 56:24
  67:23 68:2 70:4
  70:23 71:1,8,13
  72:10 84:19
  86:20 87:8
  140:9
**contentious**
  69:10
**contested** 9:10
**continue** 10:18
  74:1
**continued** 92:23
**continues** 65:18
  67:22
**continuing**
  48:15
**contract** 111:8
**contribute**
  31:10 120:13
**contributed**
  29:18 31:19
  32:9 93:8

**contributing**
  29:4,9 30:5,8,16
  30:24 31:17,21
  33:9
**contributions**
  32:4
**control** 100:7
**conversation**
  55:23 134:24
**cook** 100:19,20
  101:15,15
**copies** 3:20
  162:14
**copy** 4:15 18:11
  18:18 159:24
**correct** 17:18,19
  20:17,20 33:10
  42:7 49:17,23
  50:1,8,9,19,21
  51:9,11 60:5
  61:6 64:12,13
  66:9 73:3,12,20
  74:5 78:23 79:7
  81:4 83:13
  86:10,20 87:17
  87:18,20,22
  88:7 93:19,25
  94:6,19,22 97:6
  104:8,9 112:8,9
  113:18 114:6,7
  115:19 116:4,5
  116:7,8,10,11
  123:12 128:11
  135:21 140:15
  140:20,23 141:4

  141:12 143:1
  146:19 149:22
**correctly** 92:3
**cost** 107:25
  108:4
**counsel** 4:16
  18:11 161:14,16
**count** 114:12
**counting** 24:20
  114:22
**county** 160:5
  161:4
**course** 19:7
  140:17 155:8
**court** 1:1,20
  5:17 9:4 19:9
  21:24 22:1,6
  24:6 25:18 27:8
  27:16 28:7,14
  28:17,18 33:20
  34:2,3,7,8,8,12
  34:16 36:6,20
  36:22 39:18,21
  40:6,16 48:23
  48:25 50:23
  51:6,6,7,16,17
  52:7,16,17,23
  52:25 56:1,4
  62:2,5 64:19,20
  65:3,14,15,17
  66:4,17,22
  67:11,14,19,20
  68:22 70:3,24
  71:12,14 72:9
  74:1 76:12 82:5

  82:12 84:7,25
  85:7,9 86:19,19
  86:25 87:2,6,8,8
  90:8,9 124:3
  140:19
**cover** 96:15
  132:10
**covid** 53:12,12
  53:19 64:24
**craziest** 118:4
**crazy** 63:22
**credit** 58:9
  59:22 95:23
  108:23 112:17
  127:1 128:18,21
  133:6
**cross** 38:12,17
**crossing** 38:18
**csr** 161:22
**cuff** 108:22
**current** 10:12
  82:23 94:9 95:5
**currently** 19:15
  20:8 102:9
**cut** 124:19
**cv** 1:6
**cypress** 2:12

**d**

**d** 162:1
**d'anna** 162:4
  163:1
**dad** 11:25 12:19
  13:6 43:13,14
**dam** 132:3,12

**[damages - differently]** Page 173

**damages** 33:20 34:4,10,14 51:7
**date** 1:15 54:3 56:15 82:24 116:3 162:12 163:23
**dated** 111:2 161:19
**dates** 35:19
**daughter** 12:9 150:7,8,8
**day** 5:24 64:2,3 64:5 71:21 72:4 72:17 74:12 79:4 110:3 147:7,8,17,18 152:20,21,22,23 160:14 161:19
**days** 37:9,10,12 38:6 72:18,18 101:13,14 108:8 162:17
**dea** 147:22
**deadline** 53:18 53:18 54:17,18
**deal** 16:21 88:14 98:25 151:1
**dealing** 21:23
**dealt** 24:20
**debate** 33:7
**debt** 126:18,21
**debts** 45:16 46:3 46:12
**december** 33:19 34:7 36:22

50:13 51:7 52:12,25 54:19 55:8,11 70:4 71:7 81:16,24 82:12 86:18,25 87:7 88:3 140:12 142:10
**decided** 21:10 21:12 38:1 46:13
**deciding** 28:14
**declare** 163:20
**declaring** 43:7
**deed** 43:20,22 71:24
**defaults** 94:2
**defendant** 3:14 4:14 65:13,15 65:18,19,20,22 143:16 148:21 149:3,9,10 155:14,18,23,25
**defendant's** 65:16,23
**defendants** 1:9 2:10
**defender** 89:17 89:20 90:2
**defenses** 143:4
**deficit** 113:12 113:14
**definite** 151:4
**definitely** 108:17 148:12 158:22

**degree** 123:22
**delete** 145:23 146:12 147:6,9 147:16,18 148:3 148:15 152:13 152:20,22 153:10 155:3,23 156:20
**deleted** 144:7 145:20,22 146:15 148:22 149:2,4,7,8,10 149:11 153:19 153:24 154:16 154:23,24 156:14,19 158:10,20
**deleting** 147:12 156:22
**dental** 105:15
**depending** 108:5
**depends** 33:6
**deposed** 5:12,12 9:13
**deposing** 162:13
**deposit** 22:8,15
**deposited** 21:20 21:21 135:12
**depositing** 134:2
**deposition** 1:12 3:14 4:9,12,13 4:21 5:3,5 6:9 6:21 7:9,15 8:9

8:12,14,16 9:18 40:25 44:15 49:6 50:7 83:6,6 123:8,11 159:25 161:1,8
**deposits** 129:25 135:8
**describe** 23:18
**description** 42:4
**despite** 42:20
**detailed** 87:3
**details** 6:23,23
**determination** 65:17
**determine** 9:1 123:16 134:19
**device** 158:13
**die** 105:13
**died** 102:13,14 102:15,17 103:13 118:3
**diego's** 150:10
**diem** 109:24
**differ** 61:13,14
**difference** 120:25
**differences** 121:4
**different** 16:22 24:19 29:16 34:1 45:23 81:20 101:20 136:3 141:14
**differently** 23:15

**[difficult - employed]**                                                   Page 174

**difficult** 108:10 125:14 127:1 130:9
**dime** 77:18
**dinner** 97:1
**dip** 118:24
**diplomas** 16:21
**dipped** 119:1
**direct** 3:5 4:5 135:8,11
**directly** 95:22 131:12
**disagree** 80:9
**disclosure** 82:1 82:4,7,13,16,24 83:3,9,9 87:3
**disclosures** 81:12,15 82:9 82:18
**discovery** 159:16
**discussed** 70:20
**discussion** 62:8 62:10,12 67:5
**discussions** 20:13 21:9 62:2 62:25
**dismisses** 70:3
**dispersed** 131:13
**dispute** 65:12
**dissect** 54:14
**district** 1:1,1
**divide** 76:12 92:8

**division** 1:2
**divorce** 8:13,14 8:16,21 9:2,8 13:24 117:4
**divorced** 9:3,4 13:21 45:9 75:24 76:1,2
**divvy** 92:14,17
**doctors** 158:12
**document** 4:17 18:12,20 41:18 49:7 74:18 109:13 163:20
**documents** 113:7 129:4,7 133:20 135:5,8 135:14 136:6,9 136:16,19 139:10,13,16 140:8,11,16,22 140:24 141:7 143:3,11,19 157:1 159:6,13
**dog** 106:6
**dogs** 106:10
**doing** 22:23 28:24 59:20 63:12,17 64:1 67:12 90:13 107:23 112:13 127:14 138:23 138:25
**dollars** 48:12 49:2,22 56:13 56:18 62:4 65:4

65:6,21 66:5,15 66:18 67:6,24 71:13 94:13 99:2 117:9 120:1 124:14 131:19 150:13
**domesticated** 28:5
**dominic** 150:7
**doubt** 96:7
**dr** 1:12 3:4 4:2,7 144:16,16 160:10 161:8
**dreams** 60:25
**dressed** 105:21
**drinking** 97:1
**drinks** 106:23 107:13
**drive** 104:6
**droney** 21:14
**drowning** 114:2
**drugs** 106:1
**dry** 105:18
**duly** 4:3 160:11
**d'anna** 1:4

|       e       |

**e** 14:1,5,8,13,14 14:21,24 15:5 21:15 143:22 146:20,21,22,23 146:24 147:7,7 147:8,9,11,12 147:16,18,20,23 148:2,10,12,24 148:24 149:1

152:9,10,12,16 152:16,18,22 153:6,13,15 154:11 155:8 157:8,9,13,19 162:24,25 163:3 163:3,3
**earlier** 62:14 95:20
**easier** 80:25 130:8
**eat** 100:15 101:15 104:15
**efforts** 140:8,12
**either** 11:23 44:18 73:19 137:11 139:24 158:12
**electric** 134:11 137:22
**electricity** 98:6
**eligible** 114:24
**elizabeth** 150:7
**elucidated** 53:23
**elucidation** 55:4
**email** 162:13
**emailed** 162:15
**embarrassing** 95:7
**employed** 20:8 78:15 90:23,24 110:6 113:21 119:12,12 129:10

**[employee - express]**                                         Page 175

employee  14:19
  109:21 144:1
  161:13,15
employees
  144:20
employer  135:6
  135:9,15,18
  149:20 157:4,14
  157:15,22
  158:20
employment
  115:1 130:11
  140:25 144:12
  144:13 150:9,10
  151:5
encumbering
  19:6
ended  45:3
  83:11,12 108:19
  108:20
ends  56:24 57:2
  59:12 125:16
enforceable
  28:9
engine  118:12
  118:13
englewood  10:2
  10:11,21,22
  37:16 39:11
  41:22 42:25
  43:5 46:25
  48:15 66:9
  73:23 74:3 82:6
  83:12 85:12
  86:8 92:24 93:6

93:7 136:10,13
  136:17 139:17
  139:20
enjoined  19:5
enter  57:22
entered  19:12
  28:2 34:9 38:7
  51:13 66:17
  71:19
entering  18:4
enters  67:14
entertainment
  106:15
entire  63:19
  92:13 135:2
entireties
  130:15
entirety  54:6
  130:10,23
erase  145:9
erased  143:24
  147:4,5
erasing  145:4
errata  162:11
  162:13,16
esquire  2:4,11
essence  29:12
  29:17 30:4
  61:24 101:13
essentially
  29:20
established
  65:20
estate  83:22

et  162:4 163:1
eve  123:10
events  159:13
eventually
  16:15
everybody
  108:14 133:14
everyday  23:9
  60:1,3
ex  12:18 13:7
  20:14 21:13
  22:14
exact  37:23 54:9
  54:25 92:19
  95:7 97:9
exactly  6:18
  26:5 27:9 51:4,9
  90:3
examination  3:2
  4:5
example  115:6
  155:21 157:20
except  19:7 94:9
  140:17 149:17
excess  69:21
  112:13
exhibit  3:10,12
  3:13,15,16,17
  3:18,19,20 4:15
  4:18 18:10,13
  18:19,21 35:25
  41:16,17,19
  49:5,8 65:9,9
  71:23 74:16,17
  74:19 109:12,14

exhibits  65:19
exist  143:12
expectation
  77:16
expense  101:11
  107:8 108:12
  113:9
expenses  19:9
  22:11 23:10,11
  23:21,23 32:5
  58:8,18 59:16
  60:4,23 61:6,14
  61:16 62:14,15
  69:20 78:8
  94:24 95:2
  96:12,14,17,21
  96:22,24 104:24
  108:15,18
  112:11,12,14,18
  113:16 117:5,7
  117:9,24 119:4
  119:11,16
  120:14,18,24,25
  123:20 124:18
  124:19 125:23
  127:3,11 134:13
  134:15,20 137:8
  140:18
expensive  24:1
  24:2 116:17
expires  160:21
explain  5:21
  88:17,19
express  101:2
  112:23

**[expressed - follow]**                                                    Page 176

**expressed** 75:19
**expressly** 40:8
**extended** 159:17
**extent** 141:6
**extra** 39:5 158:4

**f**

**f** 1:7 15:5
**fact** 8:15 11:15
  54:8 63:18
  157:2 158:3
**factory** 158:18
**facts** 163:20
**failed** 87:1,1,2,6
  87:19
**fails** 162:20
**fair** 123:24
**fairfield** 1:17
**fairly** 8:15
**fallen** 152:19
**familiar** 18:23
  83:19
**family** 12:21
  39:16 75:15
  78:4 96:23 99:5
  108:13 117:3
  144:8,9 145:14
  145:22 148:4
  158:16,17
**fantasy** 14:7
**far** 6:25 20:18
  29:7,20 36:5
  44:24 45:24
  46:18 80:9
  102:7 112:10

115:17 123:1
131:11,11
139:19
**fargo** 129:18
  131:9 140:4
**fawcett** 15:2,4
  63:5 104:5
  145:12
**fax** 2:6
**february** 4:22
  15:9,13 24:24
  34:6,9,23,24,25
  35:1,2,4,9,14,15
  35:17 36:13,18
  36:22 37:1,1,8
  40:25 44:15
  50:7,14,16
  51:10 53:3 63:2
  81:20 137:3
  141:15 142:14
  144:2,3,6 145:2
  145:10,16,18,18
  145:19 159:17
  160:15 161:19
  162:3
**federal** 162:18
  162:24
**feel** 98:10
**feels** 67:19
**fees** 80:5,5
  113:23
**fell** 2:4 3:5 4:6
**felony** 151:16
**felt** 11:16
  120:21

**females** 16:20
**fide** 75:18
**figure** 59:19
  64:21 88:21
  108:7 126:7
  137:10
**figuring** 57:18
**file** 1:22 68:5
**filed** 17:23 68:1
**fill** 75:6
**final** 9:1,8 18:7
**financial** 21:11
  30:3 33:1,2,7
  60:14 87:3,11
  117:2,3
**financially** 161:16
**find** 11:15 12:17
  38:21 117:14,20
  130:24 159:9
**finding** 24:6
**finds** 159:14
**fine** 21:24 26:7
  35:6 40:9 54:2,7
  55:1 56:24 67:8
  67:23 71:13
  80:11 81:7 87:7
  114:17
**finished** 60:13
**fired** 52:6
  150:24 152:5
**firm** 1:19 21:11
  21:12,23
**firms** 21:10

**first** 3:15 4:3
  7:4 18:10 20:2
  22:14 44:23
  50:4 52:6,10
  54:15 71:23
  83:4 84:19
  98:25 111:11
  125:5 135:3
**firstly** 79:15
  96:6
**fishing** 107:22
**five** 24:19 37:9
  45:8 108:4,6
**fix** 58:25 60:22
  119:21,23,25
**fixed** 59:7
  102:15
**fixing** 118:2
**fl** 1:18 2:5,13
  162:14
**florida** 1:1,21
  10:2 11:20,24
  12:12,16,18,19
  12:22 17:13
  24:19 27:14
  28:5,9,17,18
  38:24 43:12
  56:1,4 70:3,5
  90:9,10 92:22
  93:1 104:5
  160:4,20 161:3
  162:18,24
**follow** 28:19
  78:6

**[follows - garnishment]**                                    Page 177

**follows** 4:4
**food** 69:2
  100:11,18
  106:12
**football** 14:7
**forced** 101:15
  101:17
**foreclosure**
  43:19,21,23,24
**forefront** 38:21
**foregoing**
  163:20
**forever** 39:7
**forget** 19:20
  48:22 58:10
  59:10 71:21
  92:19 109:7
  110:2,3 119:25
  125:7 132:21
  133:4
**forgot** 48:22
**form** 12:14
  17:25 19:3 24:8
  25:23 26:9,24
  27:11 28:11,21
  29:10 31:22
  32:21 38:15
  39:13,19 40:10
  40:18 41:4 42:8
  43:2 44:21
  45:19 46:16
  47:14,20 48:4
  48:17 49:19
  50:25 52:1
  54:21 55:13

  56:11 57:4,24
  58:22 60:8 61:7
  66:10 67:17
  68:17 70:11,18
  71:9 72:12
  73:13 74:10
  75:10,20 76:9
  76:22 77:13
  79:8,14 80:23
  81:5,20 84:14
  84:21 85:1,8,17
  85:20,23 86:11
  86:21 87:21
  88:18 92:10
  93:20 94:7,14
  95:12 96:5,16
  112:15 113:3
  114:1,15 117:11
  120:8 121:8,20
  122:4,12 123:3
  123:18 124:8,12
  125:19,24 126:4
  126:19 127:5,8
  127:12 131:17
  141:3 142:24
  148:7 150:15
  153:11 154:7,17
  156:15,21
**fort** 1:2 2:13
  118:6
**forward** 53:1
  56:7 124:23
  146:22 154:1,2
  154:10,10

**forwarded**
  153:23
**forwarding**
  153:21
**found** 17:17
  20:19 22:4,20
  24:4 34:12
  40:16 143:25
  144:17 150:20
  153:15 158:17
**four** 29:19,23
  106:4 107:11,16
  107:17
**fourth** 65:12
**fraudulent**
  20:24 21:2
**fraudulently**
  17:24
**free** 68:20
**friday** 106:22
**friend** 155:22
**friends** 55:22
  149:17
**friggin** 118:3
**fritz** 119:20
**front** 28:14
  53:11 64:24
  70:2,6 88:15
**frozen** 88:10
**frugal** 109:3,4,9
  117:6
**frustrated**
  11:15 40:23,24
  81:18

**fulfill** 54:4
  56:24
**fulfilled** 98:10
**full** 21:22 57:2
  57:11 110:6
**fully** 111:12,13
**fun** 133:19
**funds** 29:25
  32:2 65:4,21,23
  65:25 67:7,9
  94:5
**funny** 90:11
**furnishing**
  13:15
**further** 65:21
  104:6 161:13
**future** 75:20,21
  83:2

**g**

**g** 65:9
**gamble** 133:7
**games** 83:20
  94:1
**garbage** 98:14
**garnish** 21:12
  90:7,11
**garnishable**
  90:8
**garnished** 90:25
  91:5 92:6
  120:22 129:19
  129:19
**garnishment**
  91:3,22

| | | | |
|---|---|---|---|
| **gas**  99:16<br>103:24,25<br>119:15 120:24 | 27:10 28:24<br>42:12 43:23<br>44:14 54:20 | 44:25 45:25<br>46:21 53:11<br>54:9 55:5,18 | **good**  4:8,9,9<br>11:12 23:17,19<br>**gotten**  71:11 |
| **general**  99:19<br>108:22 | 56:7 58:25 64:3<br>65:1 70:2,6 | 56:7 57:7,16<br>60:19 61:9,22 | 115:17<br>**government** |
| **generally**  24:13<br>29:7 58:7,17<br>108:2 143:19 | 71:20 74:2<br>81:16 84:20<br>90:18 91:2 | 63:7,8,18 64:23<br>64:25 67:7,8,10<br>67:21 68:4,4,11 | 83:4,25 84:2,5<br>84:19,22,25<br>85:5,5,7,7,10 |
| **getting**  76:1<br>79:25 81:18,22<br>116:23 121:1<br>158:13 | 100:22 104:15<br>104:18,20<br>106:16,17,20,22<br>107:11,22 108:5 | 70:6,17 72:10<br>74:7 75:24 76:3<br>76:7 79:11,17<br>80:4,7 82:15,22 | 86:12<br>**graduated**  20:1<br>**graham**  18:6<br>**granddad**  146:4 |
| **gg**  160:20<br>**gift**  3:19 41:3,9<br>41:9,12,13,23<br>42:6 74:24,25<br>75:3,8,9,12,18<br>76:7 | 116:24 117:17<br>117:18 120:11<br>122:24,25<br>124:13 126:18<br>127:16 131:21<br>142:15 144:15 | 83:7,20 89:1<br>97:1 100:3<br>103:2,3 105:4<br>108:4 109:11<br>112:24 113:2,8<br>113:15 116:6 | **great**  98:25<br>153:15<br>**groceries**  59:1<br>91:7<br>**grocery**  100:22<br>**gross**  110:15,21 |
| **girlfriends**  97:1<br>138:24 | 148:19 152:10<br>152:12 156:4 | 117:10,14,16,17<br>117:19 119:6 | 110:23 111:2,16<br>111:18 112:6 |
| **give**  11:18 18:18<br>37:15 62:9,10<br>89:8,19,20 90:4<br>92:1 95:16,17<br>98:11 110:14<br>115:23 125:12<br>132:5 137:10<br>139:7 159:7 | **goal**  121:13<br>**god**  117:18<br>**goes**  64:6 96:25<br>108:14 131:12<br>138:24<br>**going**  4:11 5:23<br>8:20 15:20 17:8 | 122:1 123:13,15<br>124:23,23 125:2<br>125:4,10,17,23<br>125:25 126:3,6<br>126:15,18,21<br>127:16 130:8<br>132:21,24<br>134:25,25 | **ground**  5:16<br>**grounds**  6:14<br>**group**  14:20<br>29:13,14,25<br>94:6 136:5<br>157:16<br>**guarantee**  147:3 |
| **given**  70:14<br>79:18 131:16,21<br>159:10 | 17:8 18:9 19:20<br>21:20 24:22<br>26:13,17 27:2,6<br>28:15,19 35:8 | 137:19 138:15<br>140:1,2 141:13<br>143:18 146:3,13<br>148:1,13 | **guess**  5:24 9:9<br>15:20 21:24<br>22:22 23:2<br>30:21 35:21,22 |
| **giving**  41:15<br>**go**  5:16 8:5,22<br>9:4,8 16:20,21<br>26:8,11,18 | 36:23 38:1,2,19<br>38:20 40:21,22<br>41:11,14 42:15<br>43:12,13,14 | **golf**  106:20<br>107:1 | 42:12 51:13<br>90:12 98:3<br>105:4 129:5<br>132:21,22 141:2 |

**[guess - household]**                                    Page 179

141:10 155:1
156:14,25
**guesses** 99:9
**guessing** 37:20
100:4,5
**guy** 30:3 39:8
60:14
**guys** 14:22 32:8
37:18 58:1
61:20 63:19,25
68:25 69:1,1,3,4
76:1 83:15
90:12,18 92:8
97:25 100:15
107:2 109:2
112:18 116:21
118:6 121:22
122:24 131:8
134:3 138:2
150:23 155:19

**h**

**h** 163:3
**haircut** 106:3
**half** 17:8 81:19
118:11 120:14
120:14,16,16,16
120:17,17
134:25 135:1
**hamburger**
101:16
**hand** 18:9
160:14
**happen** 67:23
76:4 117:16
130:14 144:11

150:20 152:6
155:9
**happened** 72:22
72:22 146:9
**happens** 61:10
144:13,21
**happy** 11:21
**hartford** 11:3
23:3
**head** 5:19,20
98:8
**health** 105:5,7
107:9 135:20
**hear** 7:20
**heard** 57:19
**hearing** 9:1,8
21:24 33:20
34:7,8 50:14
51:7 53:9 65:17
80:8 82:5,12
**hearings** 34:11
**heart** 35:2 37:6
109:7
**heck** 118:18
**held** 33:20 34:7
86:20
**help** 90:17
**hertz** 102:11
**hey** 22:24 27:3
36:19 42:23
62:8 157:19,20
**hi** 4:7
**hid** 113:8
**high** 20:1 107:2
107:4,5

**higher** 23:12
**hire** 64:7
**hoa** 80:5,5
98:15 99:22
**hobbies** 106:15
106:19,19
107:20
**hold** 110:3
**holding** 66:4
**home** 80:5 88:7
97:19 101:6,14
101:19 117:17
**homeless** 69:1
77:16 121:12
**homeowner's**
97:22
**homestead** 43:1
43:4,8
**homework**
108:17
**honestly** 31:7
58:24 89:21
115:14 130:16
132:21
**hook** 106:20
107:10
**hoover** 132:3,12
**hope** 76:13
125:20 126:5
**hoping** 116:15
**horrible** 120:21
**horrific** 127:1
**horseshoe**
132:13

**hospital** 14:19
15:2,15,16
29:16 30:1
36:24,25 37:5
37:15 64:6
143:24
**hospitals** 111:9
**hot** 120:9
**hotels** 132:25
133:1
**hour** 17:8 42:22
70:21 81:19
**hours** 130:9
**house** 37:25
38:19 41:14
42:15,15,21
43:22 45:1,8,9
45:11,17 47:5,6
47:7 58:25 59:7
59:9 60:22
71:20,21 72:11
72:15,16,18,20
72:25 73:23,24
74:2,5 75:15,24
76:14 79:11,15
79:16,16,25
80:24 81:1 82:6
92:24 93:6,7,15
99:16,19 118:2
119:16 139:1
**household**
90:19 119:4
134:13,15,20
137:8,22 138:23

**[huge - judge]**                                                                   Page 180

**huge**  82:20
  125:9 132:22
**huh**  22:19 33:11
  94:20 109:18
  110:22
**hundred**  5:9
  49:21 68:12
  99:1 101:23
  107:17 140:2
  147:8
**hundreds**  117:8
**husband**  6:15
  12:19 13:8
  42:23
**hypothetical**
  27:1,2 39:2
  124:17 153:12

**i**

**idea**  33:3 57:12
  57:13,17 72:19
  98:7 99:20
  100:12 101:4,20
  101:24 103:12
  105:8 125:20,25
  130:16 155:7
**identification**
  4:17 18:12,20
  41:18 49:7
  74:18 109:13
**ignorance**  152:1
**immediately**
  79:5
**implied**  75:19
**important**
  152:25 153:1,2

153:3,4,5,5
**impossible**  80:7
**impression**
  155:3
**improper**  21:15
**inappropriate**
  154:25
**incarcerated**
  70:25
**included**  80:6
**includes**  146:18
**including**  19:9
  140:19
**income**  39:22,22
  39:25 79:1
  81:23 128:14
**increasing**
  120:24
**increments**
  34:17
**incurring**  61:5
**index**  3:2,10
**individual**
  121:10 150:5
**inference**  72:20
**information**
  3:18 40:22
  155:2
**initiated**  72:16
**inn**  1:17
**instruct**  45:20
**instructing**  6:16
**instructs**  7:18
**insurance**  80:5
  97:19,20 103:7

103:9 105:5,7
  105:11,12
  135:20
**intentionally**
  11:12
**interest**  128:16
**interested**  41:11
  121:23 161:17
**internet**  89:18
  101:19,20
**invoke**  7:25
**involved**  156:5
  156:8
**involving**  4:23
**ira**  30:17 49:10
  49:15
**irrelevant**  17:9
**irs**  140:6
**issue**  27:13 52:7
  55:18 87:9
**issue's**  55:25
**issued**  21:8 34:2
**issues**  22:22
  60:20,23
**it'll**  158:7

**j**

**jack**  133:18
**jail**  25:20 26:8
  26:11,18,21
  27:10 28:20,25
  54:20 71:20
  74:2 84:8,20
**january**  1:15
  30:21,23 33:9
  49:11,12,15

50:15 51:2 94:4
  94:17 122:11,13
  123:2,17 124:3
  124:24 141:7
  142:12 162:4
  163:2
**jersey**  17:14
**jill**  1:20 160:19
  161:6,22
**jlb**  1:6
**job**  10:24 11:6,8
  11:8,9,15,16,18
  11:23 12:17,17
  21:19 32:12
  38:21 39:22
  40:3 47:8 63:8
  64:1,2 78:11,12
  78:13 81:23
  86:4 91:22
  92:14 108:3
  121:1,17 162:4
  163:2
**jobless**  77:16
**john**  21:14
**joint**  21:13
  130:7,11 131:12
  134:2 137:13
**joke**  8:2,3
**jr**  1:7,12 3:4,14
  4:2,14 160:10
  161:9 162:4
  163:1
**judge**  9:10 18:4
  18:6,6 24:16,21
  26:12,16 27:3

**[judge - lawyers]**                                                                   Page 181

27:17,22,25
35:7 53:10,23
54:1,19,24 55:9
55:16,18 57:19
57:21,22 62:21
64:11,23 67:6
70:2,6,13,16
82:5 83:6
122:24,25
**judges** 24:17,19
**judgment** 17:18
18:7 54:2 150:3
**july** 21:8 53:9
53:14 111:20
119:7 131:24
141:25 142:19
**june** 111:18
141:23
**jury** 17:17

**k**

**k** 1:7 30:1
**katie** 150:8
**kchase** 2:7
**keep** 145:14
**keeps** 89:22
**kelly** 1:7,8 11:21
11:25 12:3 13:7
16:7 42:24 47:4
58:14 76:6
88:15,23 95:8
101:15 103:10
103:15 104:7
105:6 112:17
153:22,23 154:4
154:8,9

**kelly's** 12:9 77:6
102:17 105:15
**kept** 153:25
**key** 26:18
**khaki** 105:23
**kick** 8:1
**kicked** 128:25
129:3
**kid** 156:11
**kidding** 101:16
**kids** 144:4
145:24 147:13
157:3
**kind** 106:18,19
135:17 157:24
**knew** 11:20
22:23 36:17
64:4 72:21
**know** 4:20 5:17
5:24 6:1 13:11
13:12,13,14,16
13:21,25 14:11
14:13,14,15,17
14:18 15:23
16:19,21 17:6,7
20:21,23,25
21:1 22:1,24
23:24 24:18
25:16 26:5,5
27:23 30:3 31:7
31:14 32:8,8,23
33:1 36:16 37:7
38:8,9 40:2,23
41:10,13 42:19
45:7 53:1,25

55:1,2,19,20
56:6,8,15 59:23
61:4 62:3,8,21
62:24 64:4
68:11,24,25
69:9 70:7 76:12
82:4,14,15
83:10 89:25
91:8,16,19,23
94:1,3 95:7 97:8
97:9,12,16,21
98:4,5,15,16,19
98:23 99:1,12
99:12,24 100:2
100:5,14 103:6
103:6,22 104:13
106:12,17,21
108:23 109:8
113:14 116:20
116:20 117:8,13
118:1,2,18
120:20 121:4
122:17,23
123:22 125:21
126:5 128:25
130:3,14,16,17
131:9,10 132:23
133:6,10 134:4
137:6,22 138:20
139:3,25 146:17
147:7 149:17
151:10 152:1,10
152:15 153:3,9
153:20 155:21
156:1,1 157:2

157:20 158:3,14
158:16 159:16
**knowing** 82:22
149:16
**knowledge**
21:22 43:10
64:15 151:23
**knows** 149:21
150:10

**l**

**lack** 141:6
142:21
**lake** 1:17 132:13
**lakeland** 17:13
**landscaping**
98:3
**large** 1:21
**largely** 87:5
**late** 10:6,11
**law** 1:19 2:4
90:10,10 117:3
**law.com** 63:4
**lawn** 99:21
**lawyer** 6:9 7:16
7:16,17 9:17
21:9,14,17 55:2
55:16 88:11,12
89:1,1,3,6,8,13
89:17,19 90:1
113:17 116:17
116:18,19 119:2
119:3,4 148:1,6
**lawyers** 21:3,5
21:22 22:23
51:21,25 52:21

**[lawyers - lunch]**  Page 182

55:20

**lease** 47:16,17 102:8 103:3

**leasing** 103:4

**leave** 108:19 158:12

**leaves** 73:5

**leaving** 117:14

**left** 57:15 62:16 69:8,13 113:16 126:9

**legal** 46:19 54:11 113:23 162:23

**legalese** 41:11

**length** 108:9

**letter** 3:19 41:12 41:24 74:24,25 76:7

**liabilities** 134:12 149:9 155:17,24

**liability** 80:21 81:4 134:9

**liable** 17:17

**license** 16:22

**lien** 43:22

**lieu** 43:20,23

**life** 5:7 38:20 92:13 105:11,11 117:6 128:7 135:3 146:14

**lifestyle** 23:13 23:14,17

**likes** 84:5 98:9

**limited** 86:3,6

**line** 17:7 79:23 163:4,7,10,13 163:16

**liquidate** 24:22 25:8 26:13 35:8 40:21 54:9 67:21 83:7

**liquidated** 26:14 36:8 60:19 65:22 67:8,10,11,13

**liquidating** 60:18 67:11

**list** 127:16 129:6

**listen** 27:3

**literally** 12:1 13:6 27:23,25 57:13 64:3 98:7 118:11 147:8

**litigious** 150:5

**little** 54:14 55:3 81:18 152:24

**live** 9:22 10:1,9 12:21 17:5,12 17:13 23:15 38:19 47:4,8 48:1 62:5 73:22 78:4,4 81:1 85:25 98:2 117:6

**lived** 9:24 12:2

**lives** 17:13,14 17:14 55:21

**living** 10:18 12:20 13:10 19:8 23:10,11 27:14,24 32:5 45:1 46:24 60:3 69:20 77:17 78:8 94:24 95:1 95:2 101:10 107:7 108:12 117:24 140:18

**loan** 41:21 44:17 45:14 88:23

**loans** 126:24

**local** 106:23

**location** 1:17

**locums** 11:22,23 109:25 110:1

**logic** 71:6

**logical** 31:13

**lomax** 10:4

**long** 5:15 9:24 14:3 15:19 37:14 53:24 60:18 72:17,19 128:5,5 129:25 147:11

**longer** 52:18

**look** 12:13 58:9 59:18 66:19 81:8 82:7 91:15 93:9 101:1 108:25 109:5,9 110:19 115:3,6 116:21 117:18

121:2,3 124:18 130:18,20 137:14 148:1,5 149:25 153:14 157:25 158:1,6 158:7,22 159:15

**looked** 11:8 37:25 63:18 78:12,12,12,12 108:23 115:14 123:19 143:22 147:19

**looking** 11:18 110:7 116:1 148:10,12

**lose** 133:13

**lost** 48:21 91:21 133:15

**lot** 16:23 23:21 84:5,22 100:12 100:13,13,14 104:1,16 105:24 106:17 107:25 112:11 117:5,7 144:22

**lottery** 125:21

**low** 107:2,5

**lower** 23:12 93:15 125:23 127:2,10

**lump** 91:12 125:9

**lunch** 105:2

[madam - meetings]                                                        Page 183

**m**

**madam** 48:23
**made** 39:23,24
  62:6 64:22
  65:13 111:13
  129:5 136:9,16
  136:19 139:11
  139:13
**maid** 102:4
**maiden** 16:9
**mail** 14:1,5,8,13
  14:14,24 38:10
  146:21,23,24
  148:24 149:1
  153:6,13,15
  154:11 157:8,9
**mailing** 157:19
**mails** 14:21
  21:15 143:22
  146:20,22 147:7
  147:7,8,9,11,12
  147:16,18,20,23
  148:2,10,12,24
  152:9,10,12,16
  152:16,18,22
  155:8 157:13
**main** 62:17
  79:23 93:14
  137:13
**maintenance**
  99:19,23,25
**majority** 91:6
  92:20 96:24
  134:21

**make** 9:10
  42:12 56:14
  70:6 99:9
  111:10 114:5,8
  117:23 119:3,4
  120:16,17
  125:16 129:25
  133:13,19
**makes** 98:10
  114:19 116:9
  125:13
**making** 23:5,14
  23:23 39:23
  62:6,7 64:1,8,9
  65:16 80:25
  110:1,2 116:7
  121:5 122:18
**male** 16:19
**malicious** 43:11
**malpractice**
  5:10 8:12
**manager** 158:8
**manatee** 15:15
**mandalay** 133:4
**mandatory** 31:5
  81:11
**march** 10:6,12
  19:20,25 20:3
  20:17 37:17
  38:2,6 53:12
  58:21 110:7,20
  116:4 141:19
**mark** 69:17
  109:11

**marked** 4:15,17
  18:9,12,19,20
  41:18 49:5,7
  74:18 109:13
**market** 73:24
**marriage** 7:5
**marriages** 8:8
**married** 7:7 8:6
  8:19 16:6,14
**martinez** 1:7,7
  1:12 3:4,14 4:2
  4:7,10,10,14
  16:10 160:10
  161:9 162:4,4
  163:1,2
**master** 128:23
**match** 58:5
**matter** 6:19
  8:15 54:8
  145:11
**mattress** 59:25
**max** 33:10
**maximum** 31:19
  62:13,15 63:11
**meal** 101:7
  104:16
**meals** 101:5
**mean** 6:25 7:24
  8:25 9:3 10:22
  10:24 11:5,6,7
  16:14,23 19:1
  21:1,2 22:13
  23:16 27:6,21
  32:12 37:12,22
  39:8 47:24 51:8

  52:5 59:8,24
  63:20 64:15
  67:11,16 69:6,9
  69:21 75:21
  83:9 86:5 88:19
  92:24 97:3
  102:10,14
  108:20,21,24
  109:5 110:11
  116:14,18 118:1
  118:8,17 119:8
  121:2,4 126:6
  128:24 130:20
  133:22 134:5,11
  147:10,11
  148:10 149:20
  151:19 153:3
  154:3 156:8,11
  157:18 158:14
**means** 8:1 10:23
  11:8 67:13 72:4
  75:22
**media** 63:1
**mediation** 9:6
  123:10 125:6,7
**medicaid** 69:3
  121:13
**medical** 16:22
  33:3,7 151:7,14
**medications** 6:2
**meet** 125:16
**meeting** 138:4,9
  138:11
**meetings** 138:2

**members** 145:15,23

**memorialize** 147:14

**memory** 50:2

**mental** 107:9

**mention** 8:13

**mentioned** 8:12 12:5 13:7 46:12 144:24

**merits** 17:16

**message** 144:13

**messages** 143:23,23 144:7 145:14 146:7,18 147:9 154:21,22 155:4,8

**miami** 2:5

**middle** 1:1 146:3

**mile** 2:12 118:11

**million** 23:6,15 23:15 25:17 39:23 48:12 49:2,22 56:13 56:17 62:7 64:1 65:4,6,20 66:5 66:15,18 67:6 67:24 71:13 94:13 122:18 124:14 150:13

**mind** 36:18 38:12,18,18,22

**minimal** 105:19

**minimum** 156:1

**minus** 83:21

**minutes** 115:23

**miscellaneous** 60:23 91:8 98:4

**mish** 92:25

**model** 136:4

**modify** 68:1

**mom** 12:20

**money** 20:5 21:11,20 22:8 22:10,15 23:4 23:23 37:21,22 38:6 39:4,5 40:3 46:10 47:9,19 47:22 49:25 50:5 57:15 59:16,21,25 60:11,15,21 61:5,22 64:8 68:16 69:6,7,8 69:12 75:13,14 76:8,13 77:17 77:19 79:10 83:2,10,15,24 85:12 86:7,9,12 87:5 88:13,14 88:15,23,25 89:5,8,15,16,16 89:17 90:5,7,19 92:1 94:11,24 95:16 97:4 112:24 113:7,14 115:18 116:22

116:23 117:9,15 117:19 118:1 119:20 120:6,17 121:5,16 122:10 122:23 123:8,16 123:23 125:15 126:15 129:8 130:8 131:12,15 132:9,10 133:13 134:2,3 135:11 135:11,14 137:7 137:11,12,16,20 138:5,20,22 140:5,25 149:4 149:5 150:23 151:8 155:13

**moneys** 24:15

**month** 23:25 25:16 28:8 34:17 35:5,10 35:17 36:11,14 36:19 40:4 47:10,12,25 48:2,16 50:3,12 50:18,21,22 51:15,19,24 52:9,11,14,19 53:2,4,5,8 54:16 56:10,14,17 57:3,6,10,15 58:7 59:2 60:10 60:16 61:19,23 62:9,19,20 63:12 64:9 66:16,24 67:2,4

71:20 72:10 73:11,16 74:2 77:9,11 78:3 80:16,17 81:10 81:14 91:19 98:11,19 99:2 100:5,10 101:13 101:22 104:3 105:19 106:2,11 106:13,14,25 107:1,5,6 110:9 110:18 111:10 111:11 113:12 113:13 114:23 115:9,16,18 121:21 122:1 124:15 125:13 137:14,23 138:15 150:13 157:21,21

**monthly** 57:14 65:13 79:17 80:4 87:7 95:5 97:8 112:12,17 113:12 116:13 117:5,7 120:25 125:23 126:25 127:2,10 137:22 138:2,4,9

**months** 47:2 53:6 59:22 63:21 65:22 73:19 88:6 91:17,17,18,19 116:4 141:14

**[months - numbers]** Page 185

142:23

**mortgage** 23:25 42:19,20,22 43:15,16,18 44:5 45:11,12 45:18 46:15 58:7 73:3 75:6 76:15,16,20,25 77:6 78:21 79:4 79:6,13,17 80:1 80:2,4,9,10,12 80:18,20 83:18 92:23 93:21 95:6,10 97:8 136:13,17,24,24 136:25 137:1,7 137:20 139:14 158:25 159:3

**mortgages** 79:1 81:23 94:2 95:11

**mosh** 92:25

**mother** 150:6

**motion** 17:23 55:4 68:1,5

**mount** 59:11

**move** 10:5,12,14 11:20,24,25 12:1,12,16,18 12:19,22 43:12 43:13

**moved** 10:11,15 10:22,23,25 11:19 12:1 13:5 38:24 45:8 68:3

68:4 92:22

**moving** 10:23 12:24 13:1

**multiple** 21:14 83:5

**multitude** 24:17

**myers** 1:2 2:13 118:6

**n**

**name** 12:5,6 13:13 16:8,9,9 16:11,15,16,17 16:22 42:16,17 42:18,21 44:6 44:14 63:1 76:25 80:19 89:18 93:3 95:25 98:9,18 98:21,24 129:21 129:22 134:10 134:14,16 149:10 155:18 155:25 163:23

**names** 80:25

**naples** 1:18 42:21

**nastier** 84:23

**national** 132:13

**natural** 99:16

**nebulous** 158:11

**necessarily** 124:1

**need** 5:22,25 25:15 38:13

56:20,23 61:1 68:24 78:3,25 113:18 127:2 129:20 147:14 158:6,16,22

**needed** 59:17 88:11,25 90:6 129:16 155:3 158:3

**needs** 78:4 118:12

**neighborhood** 90:1 98:2

**net** 117:8 139:16

**never** 5:11 7:2 11:23 14:15,23 22:23 40:2 42:16,17,18,19 43:1 45:3 46:14 46:15,21 53:23 62:1,10 71:11 82:8 113:15 115:14 120:9 132:16 155:1 157:2

**new** 13:15 17:13 59:9 98:20 118:12,13 119:20,23 120:1 120:3 121:1,3 129:11

**newspaper** 63:20,23 149:18 149:22

**nice** 122:2 132:15 150:4

**nicholas** 150:6

**nights** 106:22 138:24

**nine** 19:24 65:21 145:24

**nod** 5:20

**nomenclature** 42:12

**nominally** 65:25

**noncompliance** 70:25

**normal** 11:12 32:10 54:1

**notary** 1:20 160:20 161:7

**note** 80:18 162:10

**notes** 161:11

**notice** 3:13 4:12 4:13

**november** 81:24 87:7 109:23,23 112:3 116:2,4 128:11 142:8

**npm** 1:6

**nuances** 55:3 92:19

**number** 4:11 15:17,19 27:14 62:4 100:4 123:1 152:24

**numbers** 16:1,3 83:20

**[numerous - okay]** Page 186

| | | | |
|---|---|---|---|
| **numerous** 77:24 | 142:24 148:7 | **offer** 64:2 | 24:13,25 25:10 |
| **o** | 150:15 154:17 | 123:23 | 25:18 28:1,17 |
| **oath** 4:3 123:11 | 156:15,21 | **offered** 43:20 | 29:2,23 30:5,16 |
| 143:9 160:1 | **objection** 45:4 | 46:21 | 30:19,23 31:1,5 |
| **obeying** 39:18 | 45:19 46:16 | **offers** 124:2 | 31:8,12,20 32:4 |
| **object** 6:14 | 47:14,20 48:4 | **office** 110:13 | 32:11,15 33:8 |
| 12:14 17:6,7,25 | 48:17 56:21 | 158:8 | 33:14,24 34:6 |
| 19:3 24:8 25:23 | 57:4,24 60:8 | **official** 160:14 | 34:11,12,20,21 |
| 26:9,24 27:11 | 61:7 63:13 | **officially** 70:5 | 34:22 35:1,1,3,4 |

obeying 39:18
object 6:14
12:14 17:6,7,25
19:3 24:8 25:23
26:9,24 27:11
28:11,21 29:10
31:22 32:21
38:15 39:13,19
40:10,18 41:4
42:8 43:2 44:21
46:6 49:19
50:25 52:1
54:21 55:13
56:11 58:22
66:10 67:17
68:17 70:11,18
71:9 72:12
73:13 74:10
75:10 76:9,22
77:23 79:8,14
84:21 88:18
92:10 93:20
94:7,14 95:12
96:5,16 112:15
113:3 114:1,15
117:11 121:8,20
122:4 123:3,18
124:8,12 125:19
125:24 126:4,19
127:5,8,12
131:17 141:3

142:24 148:7
150:15 154:17
156:15,21
objection 45:4
45:19 46:16
47:14,20 48:4
48:17 56:21
57:4,24 60:8
61:7 63:13
77:13 80:23
81:5 84:9,14
85:1,8,17,20,23
86:11,21 87:21
120:8 122:12
126:10 151:25
153:11 154:7
objections
99:13
obligated 50:17
obligation 56:6
56:9,16 75:18
obligations
24:14 151:6
159:4
obviously 6:1
62:1 114:5
121:5 122:16
149:20 156:25
occur 60:21,23
occurred 140:1
october 83:12
87:7 112:1
142:6
odds 59:12

offer 64:2
123:23
offered 43:20
46:21
offers 124:2
office 110:13
158:8
official 160:14
officially 70:5
oh 10:22 62:18
77:14 103:16
113:7 117:18
122:8 125:1
137:18 138:7,9
145:6,17 149:7
150:25 153:14
okay 4:25 5:2,5
5:14 6:5,8,16
7:4,7,10,14,19
7:21 8:1,2,6,8
8:11,17,21,24
9:7,13,16,20,24
10:1,18 11:2,4
11:11,18,24
12:3,12 13:1,7
13:17,20,23
14:1,5,10,25
15:6,17,19,22
16:1,6,24 17:3
17:20,22 18:4
18:25 19:12,18
19:22 20:12,15
20:18 21:7 22:3
22:15,20 23:1,4
23:9,22 24:2,4

24:13,25 25:10
25:18 28:1,17
29:2,23 30:5,16
30:19,23 31:1,5
31:8,12,20 32:4
32:11,15 33:8
33:14,24 34:6
34:11,12,20,21
34:22 35:1,1,3,4
35:11,20,25
36:7,10,12,13
37:7,11,14,19
37:24 38:5,11
39:10 40:16
41:16 42:14,25
43:7,12 44:1,10
44:18 45:13
46:5,10 47:11
48:9,20 49:16
49:25 50:10,20
51:4,4 52:13,24
53:4 54:14 55:7
55:25 56:7,9
57:1,12 58:4,15
58:22,23 59:7
59:13,15,21
60:6 61:21
62:21 63:6
64:14 65:2 66:3
66:21 67:3,14
69:18,25 70:2
70:23 71:4,18
72:25 73:5,10
74:8,25 75:3,9
75:17 77:2

**[okay - owe]**                                                                                    Page 187

78:17,25 79:3
79:23 80:12,15
80:18 81:10,16
81:25 82:9,18
85:12,15 86:18
87:16 88:5 89:7
89:15 90:4,17
91:2,12 92:8
93:12,18,24
94:11,23 95:10
95:24 96:1 97:3
97:7,19 98:9,11
98:13 99:1,7,10
99:11,13,18,23
100:2,6,11,18
100:22,24 101:5
101:10 102:16
102:18 103:4,7
103:16,18,20
104:4,10,18
105:25 106:3,6
106:9,15,18,25
107:24 108:11
109:2,6,9,10,24
110:8,15,17,19
110:23 111:6,15
112:5,7,10,24
113:11 114:5,17
114:22 115:7,12
115:15,20 116:6
116:12 117:15
117:22 118:10
118:16 119:6
120:6 122:8
123:1,7,11

124:1,22,23
126:14 127:4
128:3,7,18
129:4,7,21
130:10 131:1,7
131:11,15 132:7
133:16 134:9
135:22 137:15
137:17,19 138:2
138:5,9,15,19
139:5,19,23
140:5,16 143:13
144:9,23 145:13
145:16 146:8,10
146:15 148:18
149:2 151:19,21
151:23 152:14
154:13,15,21
155:6,12 156:10
156:25 158:6,9
158:19,22 159:6
159:19
**old** 9:20 12:10
  40:22
**once** 11:19
  108:2
**ones** 132:23
  147:19 148:4
  154:15,18 156:4
  156:5,7
**ongoing** 71:6
  78:8 104:24
  118:19
**open** 37:6
  108:19,20 130:6

151:18
**opened** 129:11
  130:1
**opening** 13:15
**opportunities**
  11:9
**opportunity**
  11:22
**opposed** 67:12
  79:12,25
**opposing** 82:6
**opposite** 54:9
**order** 3:16 7:25
  9:1 18:5,18,23
  19:1 20:18,19
  20:20 21:8 22:1
  22:4,5,7,21 23:7
  24:5,21 26:8,17
  27:10,14,23
  28:10,19 32:16
  32:16,20 34:1,9
  36:20,23 38:3,7
  38:9,10 39:18
  39:21,22,24
  40:13 46:11
  50:2,6,14 51:9
  51:13 55:5,8,8
  55:11 56:5
  57:22,22 62:5
  65:2,5 66:6,17
  66:21 68:2 70:4
  70:24 72:21
  75:5 76:16 83:9
  84:7,11,12,20
  87:6 120:17

125:15 140:9,12
159:16,23,24
**ordered** 19:9
  27:9 28:8 29:4
  34:16 36:11
  50:11,21 64:11
  71:14,19 140:19
**ordering** 54:20
  55:11 71:19
  84:20 162:15
**orders** 25:18
  28:20 67:14
  70:5 71:7 72:9
  74:1 86:19,25
  124:3
**ordinarily**
  119:10
**ordinary** 19:7,8
  23:10,10,11
  32:5 61:5,14,16
  62:15 69:20
  78:7 94:24 95:1
  95:2 101:10
  107:7 108:11
  117:24 140:17
  140:18
**original** 40:13
  51:13
**originally** 39:23
**outlet** 158:18
**outside** 55:21
  101:5 153:20,21
**owe** 20:10 36:9
  43:15,18,25
  44:5,8,11,12,16

**[owe - pay]**                                                    Page 188

45:16 46:1 69:6
69:7 97:15
98:11 113:14
123:21,21
125:11,12 138:5
138:13 151:8
**owed**  24:15 25:5
25:14,19 26:7
71:14 74:7
82:14,15 86:12
150:12 156:5
**owing**  83:1
**own**  26:18,19
41:14 44:20
45:17 78:22
79:11,21 90:5
93:4 96:4,14,15
96:17 102:8,20
**owned**  46:14
58:13,14 103:14
103:15
**owner**  44:25
45:3 46:19
**ownership**
136:6

**p**

**p.a.**  2:4
**p.m.**  1:16,16
**pack**  82:21
**page**  36:1 41:23
42:3 65:10
71:25 163:4,7
163:10,13,16
**paid**  20:6,15
45:17 53:14,18

55:10 57:2
58:24 59:1
64:12,14,18
66:16,19 67:2
68:9 70:16 71:5
73:8,15,18 74:3
77:6,11 78:3
79:5 80:16,21
81:3,22 83:5
87:16 89:1 91:6
91:7,24 92:1,4,5
92:6,12,18,20
92:21,23 103:16
110:9 111:12,15
111:18,20,22
112:23 113:18
118:8 119:5
120:18 121:15
122:16,23 124:4
133:21 134:20
135:3,17 138:20
138:21
**paint**  59:12
**pants**  105:23
**paragraph**
65:12 75:17
**park**  132:13
**parkway**  2:12
**parse**  10:23
**part**  12:20
25:19 31:9 32:5
62:10,11 68:3
75:23 76:11
85:9 98:15
99:22 115:1

151:1
**partial**  24:10
**particular**
53:23 74:12
82:24
**particularly**
125:14 144:20
**parties**  161:14
161:15 162:15
**partner**  4:24 7:8
44:12 62:18
89:23
**passcode**  143:25
144:11
**past**  65:21
124:24
**pay**  3:20 13:17
22:11,12,17,18
24:6,15 25:5,14
25:18,21 26:7
26:17,22 27:3,9
28:20 34:16
35:5,10 36:11
36:14,19 39:11
40:9,14,17 44:3
44:4 47:9,19
48:3,7,15 49:25
50:3,5,11,17,21
51:14,19,22,24
51:25 52:8,11
52:18 53:1,4,6
53:10,24 54:20
54:24 55:9,11
56:3,5,6,9 57:2
57:7,11,11,14

57:22 60:7,16
60:22 61:5,19
61:22 62:12,14
62:15,20,22
63:11,24 64:11
64:21,22,22
65:15,19,24
66:22 67:3,15
67:20 68:7,7,8
68:16 69:6,7,12
69:12 70:8,14
71:19 72:9
73:20 75:22,25
77:2,8,12,14
78:7 79:1,11,11
79:20,24 80:2
80:10,12 82:17
82:19,21,22
83:22,24,25
84:1,3,8,11,12
84:15,18,20
85:13,15 86:9
86:19 87:1,4,6
88:12,16,23
89:3,8 90:21,25
91:5 93:4,13,17
93:18 94:13
95:8,9,19,21
96:1,3,8,14,24
96:25 97:4,4,11
97:15 98:5,6,13
98:13,17 99:15
100:6,9 101:19
102:2 103:22,25
104:10,12,15,16

**[pay - plaintiff]**                                                                Page 189

104:21,24 105:1
105:7 106:5,11
109:16,17 110:8
110:20,20 112:6
112:7 113:15,22
113:25 115:3,4
115:8 116:1,3
117:17 118:13
118:20,23 119:2
119:15,16,20,24
120:6,22 121:16
122:1,1,10,14
122:20 123:2,9
123:17 124:6,11
124:15,20 125:2
125:2,14 128:10
134:21,22
135:25 136:13
136:14,24,25
137:1,20 138:23
138:24,25 139:1
139:23 140:5
141:7 142:22
157:20,21 159:4
**paycheck** 31:2
157:20
**paying** 8:4
19:13,15,18
20:3,12 38:25
40:3 44:18,19
45:15 46:10,11
46:12,25 47:12
48:1 52:13 58:8
58:15,17,18
59:16 60:17

61:14,15 62:19
63:10 70:10
73:10,19 74:1
77:21 79:12
80:1 90:14,18
91:24,25 92:23
93:2,11 98:9,18
119:3,4 121:7
137:7 138:22
**payment** 39:1
50:22 53:22
64:18 65:13
73:6 79:12,25
80:4 93:15
103:18 122:17
125:9 136:12,23
149:9 155:17
157:5,17,18,23
**payments**
126:25 129:4
134:9,12 136:9
136:16,19
139:10,13
**pays** 90:20 92:1
92:8 95:10,24
96:12 97:2,13
98:23 103:7,9
105:5 135:20
**penalties** 61:4
65:24 163:20
**pending** 48:18
114:16
**penniless**
121:12

**penny** 57:11
70:17
**pension** 31:9
**people** 32:10
144:10,19 151:8
154:25 157:16
158:12,13
**peoples** 43:16
43:18 44:5,6,7,7
**perceive** 117:17
**percent** 5:9
76:17,17 110:9
110:13 150:25
158:18
**percentage**
134:20
**perfectly** 21:24
**period** 58:19
61:10 94:15
120:21 145:12
**periodically**
11:1 113:19
146:12
**perjury** 163:20
**person** 83:22
158:11
**personal** 19:8
44:17 140:18
144:1,4
**personally**
134:21 160:10
**perspective**
18:25 46:20
122:19

**pertain** 154:5,6
**pertained** 154:1
**pertains** 154:2,8
154:9
**pest** 100:6
**pet** 106:6
**petition** 68:1
**petrified** 7:2
**phone** 14:23,24
15:17 16:1,3
98:17,21,24
135:25 144:15
144:18 152:16
158:5
**phones** 15:21
**phrase** 151:16
**physician**
143:25
**physician's**
130:17
**physicians**
144:14
**place** 15:1 20:17
38:25 78:3,4
108:4 113:8
132:14 144:12
144:12 148:17
150:9,9
**places** 132:4
151:3
**plaintiff** 1:5 2:3
21:9 43:21
66:23 129:5
140:25 141:7
142:22 143:16

**[plaintiff - providing]**    Page 190

148:22 149:13
152:9 159:1,4
**plaintiff's** 27:17
27:22 55:16,20
**plan** 20:12
98:20,21,24
99:5 105:9,16
**play** 83:20,21
94:1 106:20
**please** 5:19
162:12
**pllc** 2:11
**plus** 106:4
**pnc** 130:1,6,11
131:6,9,12
134:5 135:12
137:12 138:16
**point** 8:4 28:19
52:18 62:2,8
82:10 91:4
118:24 146:11
**polo** 105:22
158:14,18
**pool** 97:25
99:23,25
**port** 15:3
**portion** 138:20
**pose** 159:12
**position** 57:9
94:23 121:25
122:5,6 125:11
**possession**
155:20
**possibility** 48:1
114:14 130:17

**possible** 63:11
**post** 91:21
**posting** 87:10
**potentially**
11:22
**powell** 132:13
**pre** 91:3
**predominantly**
15:2
**preparation** 6:9
6:10
**prepare** 9:17
**prescription**
106:1
**present** 29:8
30:6 51:14
94:17 123:2
124:4,25
**pretty** 145:16
**prevent** 17:23
63:17 77:21
82:23 83:2
**prevented** 63:10
63:12 85:22
86:9
**preventing**
57:18
**previous** 8:8
83:6 144:12
150:8,9
**previously**
42:11 65:14
108:5 158:1
**price** 73:2 75:23
83:18

**primary** 14:5,6
46:22
**principal** 79:24
**prior** 38:3
111:10 112:6
**private** 104:18
104:20 149:24
**privilege** 6:15
6:15 7:25 52:5
**privileged**
111:12,13 155:2
**privileges** 15:6
15:8,14 111:7,9
**pro** 38:8 53:25
**probably** 5:12
10:6 24:19 32:1
36:22 37:17
88:4 100:17
106:2 107:5
108:4 120:10
129:3 133:12
143:4
**problem** 27:15
32:24 52:23
63:3 108:6
**procedure**
162:24,24
**proceed** 57:17
**proceeding**
68:25
**proceeds** 139:16
139:20
**process** 43:5,24
**produced**
127:18,19,22,25

128:10,18
133:20 140:22
141:17 143:11
**production**
127:17
**program** 105:2
**prohibit** 6:2
**proper** 55:5
**property** 13:23
17:24 23:25
37:16 41:22
42:25 43:7,20
44:20 46:14,19
46:25 48:15,16
66:8 73:1,12
75:1 78:22 79:3
83:12 86:8
88:22 89:3,7
93:12,19 97:11
97:13,16 136:10
136:17,20
139:11,14,17,21
**prospects** 12:17
78:11,13
**protect** 28:23
39:16
**provide** 82:9,18
87:1,3
**provided** 81:25
82:10 116:2
143:7
**providing** 81:11
81:14 82:23
83:2,8 87:10

**[prudent - refinanced]**                                                Page 191

**prudent**  39:16
**public**  1:20
  160:20 161:7
**published**  48:24
**publix**  100:22
  100:23
**purchase**  73:2
  75:23
**purge**  26:23
  54:3,3 67:8
**pursuant**  36:19
  46:11 66:21
**put**  22:10 39:6
  45:25 46:1
  59:11 63:20,21
  76:14,17,18
  84:7 93:15
  113:7 125:11
  126:21
**putting**  63:1
  130:10

**q**

**qualified**  78:22
  79:20 93:24
**quarter**  82:2
  97:23
**quarterly**  81:11
  81:15 87:4
**question**  7:8,18
  7:19 20:25 27:1
  27:2 45:23 46:6
  46:8 48:5,5,13
  48:18,20 50:4
  54:15 57:7
  58:23 61:3

67:22 69:4,17
78:1,10 79:23
81:3 86:22
87:12 93:18
114:16 124:17
144:17 147:15
151:22 153:12
**questionable**
  150:25
**questioning**
  17:8
**questions**  6:5
  7:12,15,16
  24:23 32:25
  36:21 53:24
  54:1,12,25 57:1
  57:3 72:15
  81:19 151:17
  159:21
**quick**  5:16
  33:15 115:21
**quickly**  81:17
**quote**  29:19
  56:16 70:25
  97:23

**r**

**r**  163:3,3
**ran**  47:16 136:4
**random**  53:21
  104:13,16,22
**rate**  113:15
**rather**  121:12
**read**  40:24 51:9
  65:11 130:25
  144:10 146:13

149:18 151:21
159:22 162:8
163:20
**reading**  146:7
  146:14
**real**  8:4 83:22
  143:4
**realized**  52:10
**really**  13:11
  17:4 56:17
  78:10 98:4
  105:1 107:22
  112:11 116:17
  153:2
**reason**  42:18,21
  46:20 51:24
  62:17 70:9
  79:16 82:13
  93:14 137:13
  154:14 162:10
  163:6,9,12,15
  163:18
**reasonable**
  121:10 162:17
**reasonableness**
  122:22
**reasons**  83:4
**recalculate**  34:3
**recall**  24:5,10
  33:22 34:10,12
  35:9,12 36:13
  36:16 43:7
  50:12,13,24
  65:3 66:22
  87:14

**receipt**  162:17
**receipts**  110:12
  110:13,15
  147:22
**received**  114:24
  135:14 139:17
  139:20
**recently**  28:8
  129:2
**recognize**  74:21
**recollection**
  49:13,14 51:8
  66:3 83:17
**record**  27:16
  161:11
**recorded**  71:24
**records**  37:18
  59:23 65:7
  89:22 91:16
  140:1
**recouping**  21:11
**referenced**
  162:6
**referred**  4:17
  18:12,20 41:18
  49:7 74:18
  109:13
**referring**  18:15
  36:5 115:12
**refers**  22:6
**refinance**  89:4
**refinanced**  88:7
  88:12,21 89:2,4
  89:7 90:15

**[refresh - retirement]**

**refresh** 49:13
50:2 66:3 83:17
**refreshes** 49:14
**refused** 43:22
**regaining**
140:25
**regan** 1:20
160:19 161:6,22
**regard** 162:19
**regarding** 75:1
143:16 148:22
149:4,6,9,13
152:8 153:19
155:13,17,24
157:4,22 159:1
159:4
**regions** 129:14
129:21
**regular** 154:24
**reimbursed**
105:25 136:2
**rejected** 50:23
**related** 140:24
143:3 153:7,13
157:16
**relative** 161:13
161:15
**relatively** 39:7
109:3 129:2
145:12
**relevancy** 17:7
**remain** 87:8
**remand** 36:6
**remanded** 51:6
51:17 52:16

64:20
**remember** 5:4
5:11 16:12
17:24 18:2,4
31:20,24 34:11
34:20 35:13,14
35:15,18 37:17
37:18,23,25
38:1,4 43:4
44:14 47:4
48:11,13 58:24
82:3 83:16
89:21,25 90:3
93:9 128:5
**remittitur** 18:8
**remotely** 150:25
157:3
**rendered** 18:7
**renovation**
59:13,14
**rent** 39:3 46:25
47:10 92:23
102:19,22
132:18
**rental** 38:19
**rented** 38:24
**renting** 102:9
102:11,11
**repairs** 99:19
**repay** 75:19
**repeat** 48:23
86:22
**report** 151:6,24
161:8

**reporter** 1:20
1:20 5:18 48:23
48:25 142:17
161:6
**reporter's** 161:1
**represent** 50:20
75:3 117:2
**representation**
54:11
**represented**
75:9
**reputation**
89:17,20 90:2
**request** 127:17
**requested** 48:24
161:10
**requests** 148:19
**required** 31:10
51:14,19 52:18
**requirement**
55:1
**requirements**
54:4
**requires** 126:25
**reserve** 9:23
159:12
**reserved** 65:25
**residence** 46:22
**residential** 3:17
**resolved** 55:25
**resource** 86:3,6
**respect** 84:6
85:4
**respectfully**
69:22

**responder** 98:25
**responsible**
91:24,25
**rest** 38:20
**restaurant**
13:14
**restaurants**
13:12,15 100:16
101:6
**retaking** 3:13
4:13
**retired** 10:24
11:4,7,7,8,10,13
11:14 78:9
**retirement** 24:7
24:14,22 25:4,8
25:9,13,21 26:1
26:4,7,13,17,20
26:20,22 27:4
29:5,8,9,12,14
29:15,16,17
30:8,14,24 31:5
31:6,10,18,21
32:12,13 33:10
35:8 40:1,7,8,17
40:21 44:24
48:10 49:3,23
54:6,10 59:6,17
59:19 60:3,6,15
61:1 62:4 63:9
65:4,16,21,23
65:25 66:5,15
66:19 67:7,7,9
67:16,20 69:19
78:5,7,14 83:7

86:6 87:5 88:10
90:7,12,20,25
91:4,10,13,22
92:5,6 93:10
94:8 113:19,22
118:25 119:1
120:22 122:17
125:15,17 126:9
127:22 128:2
129:20
**returned** 162:16
**revealing** 65:23
155:1
**review** 161:9
162:7
**rid** 47:17 55:1
67:23 144:3
147:13
**ridiculous** 62:19
**right** 4:20 9:20
12:12 15:13,24
16:6,15 17:15
17:17,22,22
18:15,17,23
20:8,18 21:18
24:4 29:2 31:17
31:20 33:8,14
33:19 34:4,5,17
35:20 41:2,21
51:4 58:4,4
59:15 60:2,24
62:23 63:16
64:10 65:2 66:7
72:5 74:9,14
76:20 78:8 80:2

80:19,21 81:3
81:21 83:11
86:25 93:4,13
94:4 95:13 96:1
101:9 102:7,20
104:7,21 105:18
107:20 108:1,15
109:10,19 110:5
110:19,24
111:18 114:2
115:15 116:1
118:19 121:25
122:8 127:2,19
128:13 129:18
131:4 133:12,15
133:20 135:5
138:12 139:2,10
139:21 140:14
141:11 142:15
143:15 144:6
145:10 147:21
148:11 152:2,5
152:7 158:24
159:6,11,12,20
**rights** 28:24
45:9 68:24 69:1
**riverview** 15:1
109:17,20
**roll** 49:15
**rolled** 32:1
**room** 59:12
**roots** 12:23
**roulette** 133:18
133:19

**rousseau** 1:8
16:9 143:16
148:22 149:4,9
155:14,23
**rousseau's**
149:10 155:18
155:25
**rule** 162:24,25
**ruled** 64:19
65:14
**rules** 5:17 56:4
64:25 162:18
**ruling** 34:3 36:5
52:7
**rulings** 9:10
**run** 113:11,12
116:13
**running** 117:22
**runs** 125:18
126:15,16,17
**rv** 132:18,20
**rv'ing** 132:16
**rv's** 132:24

**s**

**s** 163:3
**safe** 116:6
153:18
**salaries** 116:13
117:23
**salary** 23:6
79:18 96:11,15
115:9 118:20
**sale** 86:8 139:17
139:20 158:18

**sales** 83:18
139:16
**salesmen** 158:13
**san** 150:10
**saravis** 1:20
160:19 161:6,22
**sat** 123:19
**saturday** 106:22
**save** 147:19
152:25 153:1,5
153:9,15
**saying** 5:18 7:20
9:13 23:22 34:3
34:18,25 35:16
41:12 51:23,23
52:20 53:21
55:7 60:2 61:21
65:3 69:11 72:6
72:8 76:3,5
81:25 84:15,18
84:18 89:2
94:19 96:13
97:7 102:20
116:12 124:5,6
124:9,22 138:19
139:2 143:6,8
144:6 145:19
153:4
**says** 26:16 41:23
64:6 67:15,21
72:9 75:17 87:2
113:7 138:4,10
138:13
**scathing** 21:15

| | | | |
|---|---|---|---|
| **school**  20:1 | **secret**  112:19 | 66:23 73:18 | **showed**  50:6 |
| 104:19,20 | 116:23 | 94:12 111:24 | **showing**  49:5 |
| **schuman**  67:6 | **see**  7:11 8:3 | 142:4 | 50:15 129:4,7 |
| **schwab**  3:18 | 14:19 16:18 | **serious**  84:7 | 133:21 134:9 |
| 29:24 31:25 | 27:6 32:24 | 138:7 | 135:5,8,14 |
| 49:10 65:8 94:9 | 34:23 35:18 | **service**  99:21 | 136:6,9,16,19 |
| **score**  127:1 | 41:25 65:10 | **services**  75:20 | 139:10,13,16 |
| **scrubbed** | 66:1,6 68:3 72:3 | **session**  123:10 | 140:8,11,16 |
| 144:21 | 72:4,14 77:15 | **setting**  1:19 | **shows**  49:11 |
| **se**  38:8 53:25 | 93:10,10 100:3 | **settle**  72:17 | **siblings**  16:24 |
| **seal**  160:14 | 105:21 108:25 | **settled**  9:7 38:2 | 17:11,12 |
| **search**  143:21 | 112:16,21,22,22 | **settlement**  9:5 | **side**  12:21 |
| 146:24 152:8,9 | 114:9 115:8,14 | 13:23 21:9 62:2 | 122:22 123:15 |
| 152:10,11 | 115:20 121:4,9 | 62:25 | 125:8 |
| **searched**  157:1 | 123:15 137:13 | **seven**  152:17 | **sign**  162:12 |
| **searches**  159:13 | 137:15 148:16 | **sewer**  98:14 | **signature** |
| **searching** | 153:13,20 | **shake**  5:19 98:8 | 160:18 161:21 |
| 152:12 | 154:25 158:7 | **shape**  81:20 | **signed**  74:25 |
| **season**  107:2,2,4 | 159:7 | **she'd**  7:2 | 162:21 |
| 107:5,6 | **seeing**  146:6 | **she'll**  137:10 | **single**  57:11 |
| **second**  3:13 | **seem**  89:25 | 138:14 | 70:17 |
| 4:13 8:10,18,20 | **seems**  86:23 | **sheet**  82:25 | **sir**  89:2 |
| 21:3 41:23 42:3 | 121:22 124:13 | 162:11,13 | **sit**  123:7 124:17 |
| 43:17 75:17 | **selling**  83:12 | **shirt**  105:22 | **sitting**  7:16 |
| 81:17 135:3 | **send**  38:13 | **shop**  158:14 | 77:16 147:12 |
| 159:7 | 57:14,16 157:19 | **shopping**  58:25 | **situation**  79:18 |
| **secondly**  44:24 | **sending**  38:12 | **short**  33:17 | 88:14 |
| 83:5 96:7 | **sense**  11:12 | 35:23 61:10 | **six**  17:2 88:6 |
| **secoya**  9:23 73:1 | **separate**  101:21 | 78:19 115:24 | **skimming**  139:8 |
| 73:12 75:1 | **separated** | 129:6 145:12 | **skip**  143:3 |
| 78:21 79:3 88:7 | 101:20 | **shorthand** | **slightest**  13:5 |
| 88:22 89:7 | **september**  51:5 | 161:6 | **slots**  133:16 |
| 93:12,19 136:20 | 52:17 53:11,17 | **show**  4:11 41:11 | **small**  14:20 |
| 139:11,14 | 54:16 55:10 | 140:21 142:21 | **snail**  38:10 |
| | 64:11,18 66:20 | | |

**snapshot** 83:1
**snoop** 144:18
**society** 147:22
**sold** 73:24
**sole** 21:21 22:9
  22:10
**solely** 149:10
  155:17
**solution** 102:25
**solutions** 162:23
**somebody** 27:24
  32:19 43:9
  55:21 61:21,21
  61:23 63:8 75:6
  86:3
**someplace** 37:1
  134:5
**something's**
  153:4,5
**son** 133:6 146:1
  150:6,6,7
  155:22
**soon** 144:3
**sophia** 11:21
  12:7,8,10
**sorry** 13:20
  15:13 17:11
  34:6,13 42:2
  48:22 49:19,22
  58:19 60:13
  73:2 78:6 84:9
  131:21 134:18
**sort** 30:1 35:3
  119:8 152:18

**sound** 34:14
  83:19 112:11
  117:4,7
**sounded** 55:17
**sounds** 109:2
  117:6 132:15
**source** 40:9
**sources** 128:13
**speak** 6:8,11,13
  6:21 9:17
**speaking** 76:24
  99:13
**special** 119:8
**specifically** 52:8
**spell** 15:4
**spend** 99:18
  100:25 101:5
  106:25 107:1,10
  116:22,23
  117:15,18,25
  133:9 147:11,12
**spending** 74:4
**spent** 59:21
  73:11 112:24
  118:1 132:9
**spoke** 6:22
**sports** 106:15
**spots** 106:23
**sprint** 5:23
**standard** 117:3
**standpoint**
  22:13 45:6
**standstill** 3:16
  18:5,18 20:19
  22:5,6,21 24:5

  29:3 32:15
**start** 52:24 93:7
  107:4 109:19
**started** 33:2
  35:17 53:12
  72:22 144:3
**starting** 5:24
  137:2
**starts** 65:12
**state** 1:21 11:21
  27:24 55:21
  69:2 121:13
  160:4,20 161:3
**state's** 77:18
**stated** 42:11
  83:5 163:21
**statement** 49:10
  49:14 87:11
  130:17,22
**statements**
  101:2 108:23
  127:20,23 128:1
  128:8,19 129:9
  133:24
**states** 1:1
**statute** 162:18
**stay** 28:20 50:22
  115:2 133:1,3
  158:15
**stenographic**
  161:11
**stenographica...**
  161:8
**sterile** 144:21

**stop** 19:18 20:3
  21:3 30:11,20
  81:14 90:12
**stopped** 11:11
  30:12 81:11
**stopping** 12:23
**store** 100:22
**street** 2:5 10:4
  12:1 13:6 43:13
  69:2 77:17
  121:13
**structure** 110:8
**stub** 115:4
**stubs** 3:20
  109:16,17
  110:20 115:3
  116:1 128:10
**stuck** 59:25
**stuff** 8:5 17:9
  32:23 33:1,2,3
  98:4 104:13,16
  104:17,22
  106:24 116:22
  117:25 118:23
  138:23 144:1,4
  144:10,22
  153:21,23 154:1
  157:16 158:16
  158:17
**stupid** 64:7
**subject** 6:19
  71:8
**subpoena** 156:9
**subsequently**
  40:13

**[succeeding - testimony]**                                              Page 196

**succeeding**
  66:24
**sudden** 140:3
**suddenly** 140:2
**sue** 76:6 118:6
**sued** 150:5,6,6,7
  150:7,7,8,9,11
**sufficient** 39:25
**suggested**
  162:16
**suite** 2:12
**suites** 1:17
**sum** 75:19 125:9
**summary**
  108:24
**sums** 91:12
**superior** 84:11
**support** 13:17
  19:10,13,16,19
  20:10 22:14
  46:2,13 71:15
  140:19 156:6
**supporting**
  141:8
**supposed** 21:17
  25:9,11,15 55:3
  57:12,13 62:20
  70:8,9,14
**supreme** 28:14
  28:17,18 56:1,4
  70:3
**sure** 5:10 6:18
  27:18 31:15
  33:16 34:23
  70:8 89:22

104:11 108:13
115:22 117:25
121:10 122:23
145:16 159:9
**surgeon** 109:7
**surgery** 15:2
  35:2 37:6 64:2
  109:17 147:22
**surplus** 113:13
  116:13 117:23
**surprise** 38:5
  40:6
**surrender** 87:19
**survive** 48:2
  127:13
**sustain** 126:3
**sworn** 4:3
  160:11
**system** 90:8,9

**t**

**t** 15:5,5 161:6
  161:22 163:3,3
**take** 5:25 6:1
  16:17 17:8
  26:20 28:15,18
  32:13 59:22
  60:15 61:5 62:9
  71:15 72:17
  74:15 78:1,18
  91:10,12,16,19
  110:13 115:21
  125:10,15
  137:11,11,19
  138:15

**taken** 4:21 5:3,5
  8:9,12 31:2
  33:17 35:23
  78:19 115:24
  140:3
**talk** 52:6 55:21
  69:23 115:12
  149:14,18 156:3
**talked** 62:25
  63:2 87:15
  157:3
**talking** 17:9
  27:17,22 33:2,4
  34:2 47:24
  77:15 86:7
  90:22,24 91:20
  91:21 96:13,18
  110:20 113:17
  115:2,3 124:1,2
  124:24 125:1
  146:5 156:2
**talks** 125:8
**tax** 82:20
**taxes** 24:1 60:16
  60:17 61:4,18
  65:24 74:7
  82:14,15,17,19
  82:21,23 84:12
  84:13,16 85:13
  86:14 97:11,13
  97:16 112:6
  117:8
**technical** 22:13
  32:25 45:6

**technically**
  30:21 76:24
**tel** 2:6
**tell** 14:18 16:14
  19:1 21:1,4 22:3
  22:9 24:13 29:7
  32:19 52:4
  57:19,21 58:7
  59:20 61:25
  62:22 74:21
  101:4 105:13
  110:8 114:11
  118:12 137:17
  139:8 144:15
  150:2,12,17,22
  155:7
**telling** 88:22
  100:4
**tells** 95:8 97:14
  137:6,8,9,19,21
  137:24 138:1,3
  138:13
**temporary**
  102:23
**tenant** 130:14
**tenants** 130:22
**terms** 6:23 46:2
  56:16 60:18
  108:8 148:2
**testified** 4:4
**testify** 8:17
**testifying** 6:3
**testimony** 48:24
  65:19 162:8,17

**[text - told]**                                                                                                Page 197

| | | | |
|---|---|---|---|
| **text** 143:22,23 143:25 144:7,13 145:5,9,14 146:2,7,18 147:9 148:24 154:21,22 155:4 155:7 157:9 158:12 | 124:16 126:6,21 134:23 139:1,1 143:7 146:22 147:13,23 150:4 150:10 151:7 153:2,7 158:15 159:9 | 158:5 159:11 **thinking** 34:1 64:22 **third** 82:1 135:4 **thoracic** 147:22 **thought** 35:16 61:1 108:18 126:14 149:25 | 74:8 78:11 81:21 82:3 83:1 83:5 88:1 90:14 90:22,24 91:3 92:20 94:15 107:17 108:9 110:6 120:21 124:14 125:5 |

text 143:22,23
143:25 144:7,13
145:5,9,14
146:2,7,18
147:9 148:24
154:21,22 155:4
155:7 157:9
158:12
texting 145:25
texts 145:25
148:23 149:2
157:13,15
thank 58:23
159:19
theoretically
39:8
thing 7:14 13:14
39:2,16 90:9
94:6 105:1,15
118:4 121:22
127:1 136:22
141:13 147:23
149:24 151:4
155:8 156:4,11
things 16:18,19
16:20,23 24:2
24:18 30:4 32:9
41:10 44:11
45:25 58:25
59:10 60:1
72:14 91:7,8
92:21 93:8
108:24 116:21
118:17 119:16
121:2,6,18

124:16 126:6,21
134:23 139:1,1
143:7 146:22
147:13,23 150:4
150:10 151:7
153:2,7 158:15
159:9
think 5:9,23
8:14 13:19
14:20 21:19
30:14 31:25
32:15,16,20
35:7 37:1,9 38:2
38:9 39:15
43:25 44:7 47:9
52:12,15 54:5
59:1 65:6,11
66:18 67:9
68:13,15,25
69:1,2,3,4 73:15
80:3,16 81:21
83:23 84:4
89:12 91:6,7
92:20,22 94:5
97:9,23 99:22
100:5 102:6
105:1 108:15,18
110:2,3 111:1
114:10 123:4
126:12 128:22
131:8,24 132:23
137:5 140:4
144:24 145:2,4
150:20,24
151:21 157:24

158:5 159:11
thinking 34:1
64:22
third 82:1 135:4
thoracic 147:22
thought 35:16
61:1 108:18
126:14 149:25
thousand 68:12
80:17 93:16
101:3 120:1
125:12 131:19
133:11,12 140:3
thousands
117:9
thread 146:2
three 7:11 8:6
17:13 65:12
91:16,17
tickets 107:12
time 1:16 4:21
5:2,15 10:16,19
12:20 16:17
17:23 19:12
21:14,19 23:2
23:11 27:15
29:3 30:19
31:18 33:9
37:23 39:16
45:22 46:24
48:9,14,19
49:21 51:12,21
52:10 58:19
59:3 61:10
63:19 73:25

74:8 78:11
81:21 82:3 83:1
83:5 88:1 90:14
90:22,24 91:3
92:20 94:15
107:17 108:9
110:6 120:21
124:14 125:5
128:3,5,5
132:25 145:12
146:15 147:11
147:12 148:20
times 7:7 8:6
18:16 77:24
107:11,16,17
108:6
tip 106:4
title 42:15,17,18
42:20,21,23
74:24 80:24
titled 149:10
155:17
today 6:3,9 9:18
23:12 83:3
123:7
today's 65:17
together 10:15
104:8
told 13:5 22:23
32:17 42:24
45:12 51:25
52:8 88:15
89:22 98:8
120:18 149:25

**[tolls - unsustainable]**

Page 198

**tolls** 103:23
**tomorrow** 69:24
  123:5,14 125:6
**tonight** 125:5
**took** 44:17
  59:25 72:19
  91:17,18 93:10
**top** 60:17 139:8
**total** 34:13
  116:3 122:8,9
  122:13,20
**totally** 69:21
**towards** 75:1
  79:6 136:23
**tracy** 147:20
**transcript** 82:8
  159:23 161:9,10
  162:6,20
**transcripts**
  54:13 162:14
**transfer** 20:24
  21:2 46:13
  90:19 134:3,3,4
**transferred**
  38:3,6,11 44:19
  49:16 58:5,6,20
  66:8 79:5
  139:24
**transferring**
  17:24 19:6
  47:11 48:14
**transfers** 129:7
  133:23,25
  140:16 149:4,5
  149:6 155:13

**transparent**
  112:20,20
**traumatic** 6:22
  6:25 156:11
**traveling** 53:19
**trendy** 106:23
**trial** 5:11 8:22
  8:25 34:3 51:6,7
  51:17 52:17
  64:20
**trials** 53:13
**trick** 20:24
**tried** 50:22
  118:12
**trimark** 13:13
**trouble** 68:7
  100:3 139:9
  152:4
**true** 69:5 161:10
  163:21
**trust** 63:25
  138:5 139:4,5
**truth** 14:19
**truthfully** 6:3
**try** 5:19,19
**trying** 64:21
  88:21 92:17
  95:20 115:15
  124:5 127:13
**turn** 35:25
**turning** 80:1
**turns** 12:18
**tv** 59:11 101:18
**twelve** 12:11

**twice** 100:17
  108:3
**two** 8:8 9:14
  34:11 45:16
  63:21 65:11
  71:18 72:6,7,8
  83:4 91:18,18
  101:21 106:10
  106:13 111:1
  115:23 124:15
  146:17 150:13
**twofold** 27:14
**type** 72:15

**u**

**uh** 22:19 33:11
  94:20 109:18
  110:22 111:3,3
**ultimate** 56:16
**ultimately** 22:12
**un** 90:7 105:25
**unaware** 30:15
**unclear** 26:12
**uncontested** 9:8
**under** 41:23
  42:3 59:25
  121:13 123:11
  143:9 152:10
  155:3 162:18
  163:20
**undersigned**
  160:9
**understand**
  21:6 27:21
  28:13 29:2 35:4
  39:21 52:15

  55:6,7,8,11 61:2
  62:3,5 76:5 86:5
  88:24 90:17
  92:17 124:22
  126:23
**understanding**
  24:14 25:2 27:8
  40:12 50:16
  51:12 57:9 75:5
  114:19 122:9
**understood**
  55:10
**unemployed**
  20:5 78:11
  80:13 91:3
**unequivocally**
  32:18
**unfortunately**
  24:16 27:16
  126:20
**uniform** 3:17
**union** 31:9
**united** 1:1
**unnerving**
  146:6
**unprivileged**
  143:15 148:21
  149:3,8,12
  155:12,16
**unquote** 29:19
  56:17
**unread** 152:17
**unsustainable**
  60:11 79:17

**[upset - welsh]** Page 199

**upset** 68:19,22
**use** 14:5,6 24:14
  25:4,13,21 26:6
  26:19,22 47:19
  49:25 60:3,6
  65:25 68:16
  76:7 77:10,12
  79:10,12 83:24
  84:1 89:15,16
  94:11,12 102:1
  117:4 118:19
  120:6 128:23
  129:2 131:5
**used** 39:10 50:5
  73:20 83:25
  85:15 94:23
  108:5 112:7
  121:6 140:5
  162:20
**uses** 105:2
**using** 58:12 60:1
  67:15 85:22
  86:9
**usually** 14:23
**utilities** 91:6

**v**

**v** 1:7,12 3:4 4:2
  160:10 161:9
  162:4,4 163:1,2
**vacation** 108:2
  108:4,6,8,14
  119:6,7,8
  131:22,24
  132:10,10

**vacations** 108:1
  108:11 119:9
**vague** 35:3
**value** 49:12
**various** 18:15
**vast** 134:21
**vegas** 132:12,12
  133:2
**verbally** 137:25
  138:1 157:11
**verify** 162:9
**veritext** 162:14
  162:23
**veritext.com**
  162:14
**versus** 4:10 33:7
  119:23
**violated** 20:20
  20:23 22:4,20
  24:5
**violation** 32:16
**virtual** 53:14
**voluntarily** 19:6
  62:12 67:12
**voluntary** 31:6
**volunteered**
  52:5
**vs** 1:6 162:4
  163:1

**w**

**w** 15:5
**wait** 48:5 62:21
**waiting** 56:3,4
  57:21

**walmart** 100:23
  100:24,25
**want** 5:20 7:11
  8:5 11:20 15:9
  26:11 28:24
  33:6 35:21
  42:23 52:4 56:6
  56:8 59:1 63:2
  69:6,7,11,12
  74:15 75:13
  76:7 77:18
  80:11 81:6 99:8
  118:6 122:24,25
  125:9,9 132:6
  132:22 148:16
  152:15 156:3,6
**wanted** 11:25
  11:25 12:17,19
  12:20,22 54:25
  63:5 130:7
**warrant** 151:20
**warrants**
  151:10
**waste** 81:21
**water** 98:14
**way** 21:20 24:18
  41:10 45:7
  57:16 58:10
  62:17,18 69:5
  69:10 73:19
  80:11 81:7,7,20
  88:14 92:3 99:8
  120:19 125:8
  145:25

**we've** 70:20
  87:15 125:7
**wearing** 105:22
**weatherstone**
  10:10,20 47:7
  92:20
**website** 130:19
  130:21
**week** 89:23
  100:17 101:8,12
  105:4 146:17
**weeks** 71:18
  72:7,8 106:4
  146:17
**welfare** 69:3
**wells** 129:17
  131:9 140:4
**welsh** 1:4 4:10
  4:23 17:23
  24:15 25:5,14
  25:19 26:7
  33:21 34:17
  35:5,10 36:14
  36:19 38:14
  39:11 44:19
  47:19 50:1,5,17
  51:15 56:3,5
  57:23 60:7
  61:15 63:11,24
  66:16 68:16
  73:11,20 74:1
  77:2,12,22
  83:24 84:1,4,8
  84:20,23 85:15
  86:9 87:17

[welsh - working]                                                    Page 200

94:13 112:8
113:25 118:20
120:7 121:7,9
122:10 125:3
154:6 162:4
163:1
**went** 5:11 37:22
40:22 44:11
55:23 72:11
81:19 85:12
89:13 94:6,8
99:3 112:10
117:1 119:7
131:22,24 132:3
132:11,12,12,13
132:13,16 144:1
145:12
**whatsapp**
155:10
**white** 1:17
**wife** 6:11,15,21
8:19,20 9:16
10:12 12:3
13:18 20:13,14
21:13 22:14,16
37:15 38:12,13
41:3,15 42:6,25
58:6 73:3 75:4
78:22,25 83:11
89:4,7,10 90:15
95:24 113:12
114:8,19 116:9
117:23 120:13
129:8,23 131:7
131:16,21

133:21 134:6
135:3,4,4,20
136:14,15,24
137:6 139:20
144:5 145:25
146:1,18,22
154:22
**wife's** 13:7
21:21 22:9,10
22:16 41:21
43:8 66:8 79:6
79:13 80:9,19
80:21 81:4 86:8
118:16 134:10
136:23
**wildest** 60:25
**willful** 43:11
**william** 1:7,12
3:4,14 4:2,9,14
160:10 161:8
162:4,4 163:1,2
**williammartin...**
14:9
**willing** 25:4,6
25:13,21 26:3,6
26:12,22
**willingness**
63:24 65:24
**win** 125:20
**wire** 133:25
134:3
**wish** 135:24
**withdraw** 59:16
113:19,22,25

**withdrawals**
59:19 112:22
**withdrawn**
78:14 131:15
**withdrew** 37:21
**witness** 4:3
12:16 18:2 19:5
24:10 25:25
26:11 27:1,13
28:13,23 29:12
31:24 32:23
36:3 38:17
39:15,21 40:12
40:20 41:6
42:11 43:4
44:23 45:6,25
46:18 47:16,22
48:19 51:2
55:15 56:13,23
57:6 58:1,24
60:10 61:9
66:12 67:19
68:19 70:13,20
71:11 72:14
73:15 74:12
75:12 76:11,24
77:14 79:15
80:24 81:6
84:15,22 85:2,9
85:25 86:12,22
87:22 88:19
92:12 93:21
94:8,15 95:13
96:6,17 99:10
112:16 113:5

114:2 117:13
120:9 121:9,21
122:5,13 123:4
123:19 124:9,13
125:20,25 126:5
126:12,20
127:13 141:4
148:9 152:1
153:12 154:8,18
156:16,22
159:15 160:14
162:8,10,12,20
163:23
**word** 11:13
**words** 36:17
79:24 82:25
84:6 125:5
148:3 152:9
**work** 12:13
14:12,13,14,20
14:21,25 15:1,2
22:10 41:10
68:20 90:22
105:9 108:8
118:9,15 120:11
120:15 139:19
149:24 157:16
**worked** 29:13
29:15,18,25
47:8 92:15
121:11
**workers** 147:25
148:5
**working** 10:25
11:2,12,17

**[working - zoom]**                                                    Page 201

20:14 23:1,2
30:12,13,19,20
63:4 80:6 90:16
90:18 92:4
101:12 108:3,10
109:19,24
145:17
**works** 120:19
**worry** 27:5
**worth** 105:13
**wow** 153:14
**write** 22:13 55:4
61:22 134:4
137:25 157:13
**wrong** 5:13
144:24
**wrote** 21:14
24:21 139:24

**x**

**x** 62:4

**y**

**yahoo.com.** 14:9
**yeah** 6:11 15:13
23:24 31:15
35:1 55:20
61:24,24 72:6
77:5,8 93:7
100:21,23
104:23 106:16
107:19 108:13
109:2 115:5
119:13 120:4
122:16 128:22
129:6,19 132:3

133:23,24
134:12 136:8,18
137:5,18 138:4
138:8 139:6
145:21,21 147:2
147:10,10,19
148:3,25 149:7
149:14 153:25
157:6,12
**year** 10:7 15:10
16:13 17:20
23:6,8 24:1 37:3
39:24 60:16
61:1,16,17 62:7
88:5,6 95:2,3
107:11,16,18
108:2,6,24
114:6 116:3,7,9
122:19 131:25
132:1 137:3
144:24
**year's** 86:14
**years** 16:4 39:9
45:8 82:19
**young** 15:23
39:7
**younger** 156:4,5
156:7
**youngest** 20:1

**z**

**zero** 57:13,13
62:7 63:7 94:6,9
94:19
**zinn** 2:11 6:14
6:18 12:14 17:6

17:25 19:3 24:8
25:23 26:9,24
27:11 28:11,21
29:10 31:13,22
32:21 33:15
35:21 36:2
38:15 39:13,19
40:10,18 41:4
42:2,8 43:2
44:21 45:4,19
45:24 46:6,8,16
47:14,20 48:4
48:17,20 49:19
50:25 52:1
54:21 55:13
56:11,21 57:4
57:24 58:19,22
60:8 61:7 63:13
66:10 67:17,25
68:10,17,19
70:11,18 71:9
71:25 72:12
73:13 74:10,15
75:10 76:9,22
77:13,23 79:8
79:14 80:23
81:5 84:9,14,21
85:1,8,17,20,23
86:11,21 87:12
87:21 88:18
92:10 93:20
94:7,14 95:12
96:5,16 99:8,11
112:15 113:3
114:1,15 115:21

115:23 117:11
120:8 121:8,20
122:4,12 123:3
123:18 124:8,12
125:19,24 126:4
126:10,19 127:5
127:8,12 131:17
134:19 141:3
142:17,24 143:6
143:13 144:24
145:2,4 146:22
147:20 148:7,17
149:15 150:15
151:25 153:11
154:7,11,17
156:15,21
159:19,21,24
162:1
**zinn's** 70:3
152:18
**zinn.law** 162:2
**zinnlaw** 2:11
**zoom** 82:6

800-726-7007                                                    305-376-8800

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION


D'ANNA WELSH,

    Plaintiff,

       vs.              Case No.:  2:22-CV-00216-JLB-NPM

WILLIAM V. MARTINEZ, JR., and

KELLY MARTINEZ f/k/a

KELLY ROUSSEAU,

    Defendants.




                 DEPOSITION OF KELLY ROUSSEAU




    DATE:          January 26, 2023

    TIME:          9:05 a.m. to 3:00 p.m.

    LOCATION:      Fairfield Inn & Suites

                   3808 White Lake Blvd

                   Naples, FL 34117

    SETTING FIRM:  Chase Law & Associates

    REPORTER:      Jill Saravis-Regan, Court

                  Reporter and Notary Public for

                   The State of Florida at Large

    FILE:          5687369

Page 2

APPEARANCES:


FOR THE PLAINTIFF:

Kenneth E. Chase

Chase Law & Associates, P.A.

1141 71st Street

Miami Beach, FL 33141

Tel: (305) 402-9800

Fax: (305) 402-2725

kchase@chaselaw.com



FOR THE DEFENDANTS:

Brian Zinn, Esquire

ZinnLaw, PLLC

10501 6 Mile Cypress Parkway

Suite 114

Fort Myers, FL 33966

Page 3

EXAMINATION INDEX

KELLY MARTINEZ
        DIRECT BY MR. CHASE . . . . . . . .    4


--------------------------------------------------------------
EXHIBIT INDEX


Exhibit

Exhibit 1  A photocopy of an Englewood, Florida drivers    5
           license
Exhibit 2  A photocopy of a Naples, Florida drivers        5
           license

Exhibit 3  A gift letter                                  42

Exhibit 4  Uniform Residential Loan Application           49

Exhibit 5  A copy of a Fidelity check                    101

Exhibit 6  Retirement Savings Statement                  102

Exhibit 7  Copies of Pay Stubs                           123

Page 4

THEREUPON,

KELLY MARTINEZ,

a witness, having been first duly sworn, upon her oath,

testified as follows:

DIRECT EXAMINATION

BY MR. CHASE:

Q.   Good morning.  How are you today?

A.   I'm okay.  How are you?

Q.   Can you please state your name?

A.   Kelly Martinez.

Q.   Have you gone by any other names?

A.   Yes.

Q.   Have you given a deposition before?

A.   No.

Q.   Okay.  So the rules of a deposition are as follows.  I will ask a question, if you don't understand the question or if you'd like me to rephrase it or clarify it, let me know.

A.   Okay.

Q.   Is you need to take a break at any time, let me know and we can take a break.

A.   Okay.

Q.   Answers have to be given audibly, not nodding.

A.   Okay.

Q.   So I'm going to mark --

Page 5

MR. CHASE:  If we could mark this as Exhibit 1, that would be good.

(The document referred to was marked for identification as Exhibit No. 1.)

BY MR. CHASE:

Q.  All right.  Is that your current driver's license?

A.  No.

Q.  Okay.  What's -- why isn't that your current driver's license?

A.  I got married and changed my name, so I had to get a new one.

MR. CHASE:  Okay.  So we'll mark this as No. Exhibit No. 2.

(The document referred to was marked for identification as Exhibit No. 2.)

BY MR. CHASE:

Q.  Okay.  Take a look at Exhibit No. 2.  What is that?

A.  My driver's license.

Q.  Is that your current driver's license?

A.  I believe so, yes.

Q.  Okay.

A.  I just don't see the date; but, yes, I'm sure it is.

Page 6

Q.   If you take a look at Exhibit No. 1, what is the effective date of that?

A.   6-12-2020.

Q.   When did you get that driver's license?

A.   In 2020.

Q.   Okay.  Was it on or about June 12?

A.   Yes.

Q.   Did you lose this license?

A.   No.

Q.   Did you get another driver's license in 2020?

A.   Not that I'm aware of.

Q.   Okay.

A.   Wait.  Not -- whenever I changed my name, I got a new driver's license.  I don't remember exactly when that was, though.

Q.   When did you change your name?

A.   I got married in 2019, so sometime in 2020.  So yes, I did get a new driver's license in 2020.

Q.   Is Exhibit No. 2 your current driver's license?

A.   Yes.

Q.   Was it replaced at some point?

A.   Not that I know of.

Q.   Do you still have Exhibit 1?

A.   No.

Q.   Okay.  What happened to that driver's license?

Page 7

A.   I shredded it.

Q.   You shredded it.  Okay.  And Exhibit 2, do you still have that driver's license?

A.   Yes.

Q.   Okay.  All right.  Let me back up a little bit. Where did you grow up?

A.   Fairhaven, Massachusetts.

Q.   All right.  And where did you go to high school?

A.   Fairhaven High School.

Q.   All right.  And what was the -- did you graduate from high school?

A.   Yes.

Q.   What year?

A.   1999.

Q.   Alright, and I assume you are still living in Fairhaven at that time?

A.   Yes.

Q.   What did you do after high school graduation?

A.   I went to college, undergrad, in Massachusetts.

Q.   And where did you go?

A.   UMass, Amherst.

Q.   All right.  Did you graduate?

A.   I did.

Q.   What year?

A.   I transferred a few times, so I would say 2004,

Page 8

around.  I don't know exactly what year, but around 2004.

Q.  All right.  What was the first post-high school graduate institution you attended?

A.  University of Massachusetts, Amherst.

Q.  Okay, so you started out at UMass, Amherst?

A.  Correct.

Q.  Okay.  And then did you go to a different institution after that?

A.  I did.  I transferred to actually Florida International University for one year.

Q.  Okay.  Did you start at UMass in 1999?

A.  Yes, yeah.

Q.  And what year did you go to FIU?

A.  So I spent years at UMass Amherst, so that would be 2001.  And then 2002, I went to Florida International University for one year.  And then -- do you want me to continue, or --

Q.  Yeah.

A.  Okay.

Q.  What -- where did you go after that?

A.  Okay.  Then I moved back to Massachusetts, but I went to University of Massachusetts, Lowell, and I graduated from there.

Q.  Okay.  So after FI -- I'll call it "FIU" -- Florida --

Page 9

A.   Yes, Florida International.  Yes.

Q.   Okay.  You went to UMass, Lowell for the next how many years?

A.   Until I graduated.  I think it took me two years because I lost credits in transferring, but, roughly, two years.  I can't be exact because I don't know exactly.

Q.   Okay.  Why did you transfer to FIU?

A.   My boyfriend at the time had graduated with me from University of Massachusetts Amherst and wanted to get out of the area so we moved to Florida.

Q.   Okay.  Alright, and I assume -- why did you move back?

A.   Funny story.  Not funny, but I injured my back, and I needed to have surgery, and I wanted to be closer to home for that.

Q.   Okay.  After you graduated -- well, what did you study in college?

A.   My major switched a few times; but I was premed, and then I went into nursing.  And ultimately, I graduated with exercise physiology, was my undergrad degree -- or Bachelor of Science in Exercise Physiology.

Q.   Okay.  Did you have any jobs while you were attending college?

A.   Yes.

Q.   What jobs?  You don't have to name every single

Page 10

one.

A.  Okay.  All right.

Q.  What meaningful ones?

A.  I was a physical therapy assistant, through undergrad.  I was a waitress.  I was a bartender.  Those are really the only ones I can remember.

Q.  Okay.  What was the last address that you had in college at UMass Lowell, if you recall?

A.  I don't know.

Q.  What town were you living in?

A.  Lowell.

Q.  In Lowell?

A.  Yes.

Q.  Upon graduation from UMass Lowell in 2004, was it?

A.  Around there, yes.

Q.  Okay.  What did you do?

A.  I went to PA school -- or grad school.

Q.  At what institution?

A.  Quinnipiac University.

Q.  What type of a program is that?

A.  Physician assistant, it's a master's program in -- physician assistant.

Q.  How many years is that?

A.  It's two-and-half years.

Q.   Okay, and where were you living at the time?

A.   Hamden, Connecticut.

Q.   Okay.  Did you graduate from that program?

A    I did.

Q.   What year?

A.   2007.

Q.   Okay.  Upon graduation, what did you do?

A.   I started working as a physician assistant.

Q.   And what year was that?

A.   2007.

Q.   Who was your employer at that time?

A.   Saint Francis Hospital and Medical Center.

Q.   What was the job title?

A.   Physician assistant.

Q.   How long did you hold that title for, starting in 2007?

A.   Approximately 13 years.

Q.   In 2007, what was your starting salary?

A.   I don't know exactly.  I can give you an estimate.

Q.   Generally.

A.   I would say $90,000.

Q.   And you said 13 years, that would bring you to about 2019, 2020?

A.   Correct.  I stayed there for my entire year until

Page 12

I moved here.

Q.   Okay.  And what was the date -- what was your -- what was the last date that you were employed by Saint Francis?

A.   I don't know exactly.  It was 2020, right before I got my job here in Naples.

Q.   Okay.  Did you get your job in Naples before you gave notice?

A.   Yes.

Q.   All right.  And what was your ending salary in 2020?

A.   Either 170 or 175 was my base salary.

Q.   And including bonus, what would that equate to?

A.   Well, we didn't get bonuses, but additional salary, I guess, would be overtime that I worked.  And I would have to say somewhere around 190,000.

Q.   Okay, so somewhere around 190, total package?

A.   Yeah.

Q.   Okay.  And you also had a -- have -- or had at the time, a 401(k), then?

A.   Yes.  Yeah.

Q.   With Fidelity?

A.   I'm not sure who -- it switched multiple times because I started in 2007 with my 401(k) and it's -- so, honestly, I don't know exactly what group.

Page 13

Q.   Okay.  Do you recall, generally, what your retirement account balance was as of 2020?

A.   Roughly, around 300,000.

Q.   So what is your date of birth?

A.   10-1-80.

Q.   Okay.  So by the time you were 40, you had about $300,000 of retirement savings?

A.   Yes.

Q.   And you were making nearly $200,000 a year?

A.   Correct.

Q.   Okay.  Let's go back to 2007.

Did you get married at some point in 2007?

A.   Yes.

Q.   And who did you marry?

A.   Steven Biafore.  B-I-a-f-o-r-e.

Q.   What year did you marry Mr. Biafore?

A.   Honestly, I don't know.  Sometime during PA school.  So sometime between 2005 and 2007.

Q.   Did you change your name to take Mr. Biafore's last name?

A.   Yes.

Q.   What year?

A.   Right around the same year that I got married I would say.

Q.   All right.  And do you have any children?

Page 14

A.   Yes.

Q.   What is the name -- but you can give initials if you want --

A.   Okay.

Q.   -- and age.

A.   SB, and 12.

Q.   Where does SB live?

A.   With me in --

Q.   Where do you live --

A.   The address?

Q.   Yeah.  Where do you live now?

A.   15919 Secoya, S-e-c-o-y-a, Reserve Circle, Naples, Florida.

Q.   And what is your telephone number?  Your cell phone.

A.   508-207-6795.

Q.   And who is your provider?

A.   AT&T.

Q.   Has it been AT&T continuously for some time?

A.   Yes.

Q.   Okay.  Is that the only cell phone number that you've had for the last 10 years?

A.   Yes.

Q.   And have you had AT&T for the last ten years?

A.   I believe so.

Page 15

Q.   Do you have test messaging on your phone?

A.   Yes.

Q.   Okay.  Do you use WhatsApp?

A.   Not that I know of, no.

Q.   Do you use any other messaging on your phone?

A.   No.

Q.   Okay, so just texting?

A.   Texting, yeah.  And like, social media.

Q.   And social media, but.

A.   Yeah.

Q.   -- no other messaging service?

A.   No.

Q.   Okay.  Alright, let's go back to 2005, 2007.  At some point, do you and Mr. Biafore get divorced?

A.   Yes.

Q.   What year was that?

A.   Again, I don't know exactly.  But my daughter was born in 2010, and we got divorced when she was either two or three, so I would say somewhere between 2010 and 2012.

Q.   What state did you receive a marriage certificate from, as to Mr. Biafore?

A.   Actually, Rhode Island.

Q.   Where was the -- did you have a wedding?

A.   Yes.

Q.   Where was the wedding?

Page 16

A.   In Massachusetts.  I don't remember the exact name of the place.

Q.   Who was the officiant, if you recall?

MR. ZINN:  I'll object to this line of questioning.  It's bordering on the verge of harassment.  Can you tell me what the relevance is of all this personal information?

MR. CHASE:  There aren't speaking objections allowed under the federal rules, so I'll admonish you nicely to not do that.  Thank you.

BY MR. CHASE:

Q.   Who was the officiant, if you recall?

MR. ZINN:  I'll object.  And if you continue to ask these personal irrelevant questions, I'll instruct her not to answer.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   Do you recall the officiant?

A.   No.

Q.   All right.  And do you -- did you sign a marriage certificate?

A.   Yes.

Q.   Okay.  Marriage application?

A.   Yes.

Q.   Okay.  That was filed with the state of Rhode

Page 17

Island?

    A.   Yes.

    Q.   And what year did you get married to Mr. Biafore?

    A.   I think I told you I didn't --

    Q.   Between 2005 and 2007?

    A.   -- remember exactly, but there was a range that I gave you.

    Q.   Okay.  Was there a marriage certificate filed in a court house?

    A.   I don't know, to be honest.

    Q.   And in -- around 2010 to 2012, you and Mr. Biafore, you said got divorced?

    A.   After that, so 2012 or '13, I would say, we got divorced, correct.

    Q.   And where was the divorce proceeding filed?

    A.   Connecticut.

    Q.   And at the time you were a resident of Connecticut?

    A.   Yes.

    Q.   Okay.  Did you obtain a final divorce decree --

    A.   Yes.

    Q.   -- to Mr. Biafore?  Okay.

Have you seen that divorce decree?

    A.   When I got divorced, yes.  But since that time, I don't -- no, I haven't looked at it.

Page 18

Q.   Did you subsequently change your name from having Mr. Biafore's last name?

A.   Yes.

Q.   Okay, you changed it to?

A.   Rousseau, my maiden name.

Q.   Right, to Russo.  Okay.

At some point, did you ever meet somebody by the name of William Martinez?

A.   Yes.

Q.   Okay.  When did you meet Dr. Martinez?

A.   2007.

Q.   Okay.  Do you remember the first time you met him?

A.   At the hospital that I worked at, he was a physician there.

Q.   Okay, and this was Saint Francis?

A.   Correct, yes.

Q.   Okay.  In 2007, what was your relationship with Dr. Martinez?

A.   I worked at the same institution doing -- in the same program as him.  So he was a surgeon, I was a physician assistant, for heart surgery --

Q.   Just colleagues at the --

A.   -- at the same hospital.  What?

Q.   Colleagues.

Page 19

A.   Yes.  Correct, yes.  Yes.

Q.   Okay.  At some point, did you begin a romantic relationship Dr. Martinez?

A.   Yes.

Q.   All right.  When did that begin?

A.   Probably 2018.

Q.   2018?

A.   Yeah.

Q.   Okay, so you were work colleagues with Dr. Martinez from 2007 to 2018?

A.   Correct.

Q.   And he also worked Saint Francis?

A.   Correct.

Q.   Okay.  And what was the level of communication? What's -- I'm just going to break it down by year.

A.   Sure.

Q.   So from 2007 to 2010, how frequently would you see Dr. Martinez?

A.   Every day that I worked.

Q.   Okay.  You saw him every day?

A.   Yes.

Q.   And can you give a little more detail about what context you saw him in?

A.   We would have to do rounds on patients every morning, so -- his patients.  He would tell us what orders

Page 20

to put in on his patients, I guess.  Not initially, but once I was trained in the operating room, I would first assist him on his surgeries in the operating room.

Q.   Okay.

A.   That would be it.

Q.   Okay.  Do you know D'Anna Welsh?

A.   No.

Q.   You didn't -- have you ever met her?

A.   No.

Q.   Okay.  Have you ever had a conversation with Dr. Martinez about her?

MR. ZINN:  I'll object to the form, but you can answer.

THE WITNESS:  Yes.

BY MR. CHASE:

Q.   Okay.  When was the first time you had a conversation with Dr. Martinez about Ms. Welsh?

A.   I would say sometime after 2018, after we started dating.

Q.   Okay.  So Ms. Welsh -- you never discussed Ms. Welsh with Dr. Martinez until 2018?

A.   Correct.

Q.   Okay.  And do you know what month -- I'm not going to ask you details, but --

A.   Okay.

Page 21

Q.   -- what month of 2018 did you begin dating Dr. Martinez --

A.   I don't know.

Q.   -- just generally.

A.   The beginning of -- honestly, I don't know.

Q.   Did you become aware of legal situations involving Dr. Martinez between 2007 and 2018?

A.   Yes.

Q.   Okay.  And what -- what was your understanding at that time?

A.   That she had sued him for money, and he lost that, and had to pay her money.

Q.   Okay.  And to gauge your familiarity with the legal system at that time, you had been a party in a lawsuit before --

A.   Can you --

Q.   -- in your divorce.

A.   Can you repeat that?  Sorry.

Q.   To gauge your familiarity with the legal system, you knew --

A.   Yeah.

Q.   -- you -- do you have a general understanding of how litigation works?

A.   No.  No, not really.

Q.   So let me go back to your understanding at that

Page 22

time.

A.   Okay.

Q.   So I'm talking about the time frame 2007 to 2018 --

A.   Yes.

Q.   -- right before you started a romantic relationship with Dr. Martinez.

A.   Yes.

Q.   You were of the understanding that Ms. Welsh sued him and succeeded in her lawsuit against him?

A.   Correct.

Q.   Okay.  What else did you understand at that time?

A.   That was it.

Q.   That was the long and short of it; that's all you knew?

A.   Correct, yeah.

Q.   Okay.  Did you know what the lawsuit was about?

A.   No.  At that time, no.

Q.   Do you now know what the lawsuit was about?

A.   Yes.

Q.   Okay.  And I'm going to go back to something here.

So, before you came into this deposition, did you speak to anybody about the deposition?

A.   Yes.

Page 23

Q.   Who did you speak to?

A.   My lawyer, Brian Zinn.

Q.   Okay.  And when did you retain -- is Mr. Zinn representing?

A.   Yes.

Q.   Okay.  When did you retain him?

A.   Whenever I was named as a defendant in this suit, which I don't know exactly when that was.

Q.   Alright, so you did not retain him until 2022?

A.   Correct.  Is that -- can I ask a question?  Is that when I was named as a defendant, then yes.

Q.   Yeah, it was not until the second Federal Court case in 2022?

A.   Yes.

Q.   Okay.  So you did not have a lawyer-client relationship with Mr. Zinn prior to the time that you were --

A.   No.

Q.   -- named in the lawsuit?

MR. ZINN: I'll object to the form.  But you can answer.

THE WITNESS:  Yes.

BY MR. CHASE:

Q.   Did you ever communications with Mr. Zinn prior to the time that you retained him?

Page 24

A.   No.

Q.   Okay.  In preparing for this deposition, have you spoken to anybody else, other than Mr. Zinn?

A.   No.

Q.   Did you speak to Dr. Martinez about this deposition?

A.   Other than the location and how to get here and how to pick up my daughter and get her back from school, no.

Q.   Did you look at any documents in preparation for this deposition?

A.   Yes.

Q.   What did you look at?

A.   Credit card statements, bank statements, and mortgage statements, I guess, you would call them.

Q.   Okay.  Credit card statements, bank statements, and mortgage statement.

When did you look at these documents?

A.   I would say, roughly, over the past week.

Q.   Prior to the past week, had you ever looked at documents in connection with this case?

A.   Other than providing the documents that you guys had requested, no.

Q.   Okay.  You looked at documents in serving discovery responses?

Case 2:22-cv-00216-KCD-NPM   Document 146-1   Filed 05/20/25   Page 306 of 621
PageID 3680

Page 25

A.   Correct, yes.  Yes.

Q.   Other than that, the only other time was in preparation for the deposition --

A.   Correct.

Q.   -- in the past week?

A.   Yes.

Q.   Okay.  I'm going to back up now to 2018.

A.   Okay.

Q.   When was the first conversation that you had after you began a romantic relationship with Dr. Martinez prior to -- did you get married to Dr. Martinez?

A.   Yes.

Q.   When was that?

A.   2019.  Do you want the --

Q.   Yeah.  When?

A.   Okay.  November 22, 2019.

Q.   Where was that -- did you have a wedding?

A.   No.  No.

Q.   No ceremony?

A.   Correct, it was him and I and a justice of the peace.

Q.   Okay.  Was there a document that was produced, a marriage certificate?

A.   Yes.

Q.   Have you seen that document?

800-726-7007                                                    305-376-8800

Page 26

A.   Yes.

Q.   And the justice -- was it signed?

A.   Yes.

Q.   Okay.  Was it filed?

A.   Yes.

Q.   Where was it filed?

A.   In Connecticut at wherever you file marriage certificates.

Q.   Connecticut marriage?

A.   Yes.

Q.   Are you still married to Dr. Martinez?

A.   Yes.

Q.   Okay.  So between --

MR. ZINN:  Just a reminder.  Wait until he finishes his answer before you answer.

THE WITNESS:  Sorry.  Okay.

BY MR. CHASE:

Q.   Between 2018, when your romantic relationship with Dr. Martinez began, and November 21, 2019, did you have conversations with Dr. Martinez about Ms. Welsh?

A.   2018 to 2019?  The first conversation that I had was when we -- he was foreclosing on the home that we were living in, so I don't know what year that was.  I want to say in 2019.

Q.   The first conversation you had with Dr. Martinez

Page 27

was in 2019, with regard to Ms. Welsh?

A.   Correct.  If that's when we were foreclosing on the home that we were living in.

Q.   Which home was that?

A.   It was in Avon, Connecticut.

Q.   Okay.  And what's the address?

A.   92 North Gate.

Q.   Who owned that home?

A.   He did, my husband.

Q.   Okay, and it was a foreclosure pursuant to the judgment?

A.   It was a foreclosure because he had lost his job and he didn't have money to pay for everything.

Q.   Okay.  He didn't have money to pay the mortgage?

A.   Correct.

Q.   Okay.  Did you understand what Dr. Martinez's salary was during the years 2007 to 2018?

A.   No.

Q.   Did you ever talk to Dr. Martinez about his salary?

A.   No.

Q.   Never discussed how much he earned?

A.   No.  He paid the bills, he paid for the house, and that's all I knew.

Q.   Okay.  In 2018 -- well, let me back up.

Page 28

A.   Okay.

Q.   What was the frequency of communication between you and Dr. Martinez between 2007 and 2018?

MR. ZINN:  I'll object to the form.  But you can answer it.

BY MR. CHASE:

Q.   Did you ever have conversations with him outside of the workplace?

A.   No.

Q.   Okay.  How -- how did it come to pass that you began a romantic relationship with him?

A.   He was getting a divorce from his wife at the time, and we just started talking more at work.  We would sit, talk about patients, talk about my daughter.  We just start becoming more friendly.

Q.   Were you aware of a contempt proceeding?

A.   No.

Q.   Okay.  Are you aware now of a -- contempt proceedings?

A.   Yes.

Q.   Okay.  When did you become aware of the contempt proceedings?

A.   Once the lawsuit that I'm now involved in came about.

Q.   Okay.  So prior to, let's say April or May of

Page 29

2022, you did not know there was any contempt?

A.   No.

Q.   Okay.  Were you -- were you surprised?

A.   Yes.

Q.   Well, I mean, I'm asking you.

A.   I mean, I don't know.  It's a legal process that I try not to involve myself in to be completely honest, so.

Q.   Okay.  But it's -- it was something that you were not told?  It was something that you found out from the court papers?

A.   We did not discuss his legal issues with Ms. Welsh, is what I would say, so.  No, I knew very little about what was going on, other than he lost a lawsuit, he owed her money.  But the ins and outs of what seems to be now, what, ten, 11 years, no -- I don't know the details.

Q.   Okay.

A.   We don't really talk about it.

Q.   Did you talk about financial matters with Dr. Martinez?

A.   Once finances became difficult after he lost his job, then yes.

Q.   Okay.  When was the first time you discussed financial matters with Dr. Martinez?

Page 30

A.   Like I said, when he was concerned that he wasn't going to be able to afford the house anymore, and we were going to have to move.

Q.   And you said that's when he lost his job?

A.   Yes.

Q.   Okay.  And he lost his job when?

A.   2018, I believe.

Q.   And did you know how long he was receiving salary until?

A.   No.

Q.   Did he ever tell you?

A.   No.

Q.   Okay.  Did someone tell you that he wasn't able to pay bills at some point?

A.   He did.

Q.   Okay.  What did he say?

A.   He said, I may need you to start paying the bills because I might not be able to afford them anymore.

Q.   What date or year did he say that?

A.   I would -- roughly, around 2019.

Q.   Okay.

A.   The beginning of 2019, I would say.

Q.   Did you move in with him at some point?

A.   Yeah, in 2018.

Q.   You moved in 2018.  When in 2018?

Page 31

A.    I -- I'm sorry.  I don't know exact -- the middle I would say, of 2018.

Q.    Okay, and you moved to the 912 North Gate address?

A.    Correct, yes.

Q.    Okay.  And then Dr. Martinez lost his job in 2018?

A.    Correct.

Q.    Okay.  And what -- do you know what the mortgage was at the North Gate property?  Did you ever talk to Dr. Martinez about it?

A.    No.

Q.    No.  Okay, so --

A.    He paid the bills.

Q.    Okay.  Alright, and so did you know what those bills were?  What bills --

A.    Can you be more specific about what he was --

Q.    Did you know what bills he was paying?

A.    I would assume all of the bills, electricity, water, mortgage, anything that goes along with a household, I would assume.

Q.    Okay.  Do you know how a judgment works?

A.    As far as -- what do you mean by that?

Q.    Do you know -- do you know what a judgment is?

A.    Yes, you owe someone money.

Page 32

Q.  Okay.  And do you know what a civil judgment is?

A.  You owe someone money.

Q.  Okay.  But it's more than a -- oh, it's a judgment.

A.  Okay.

Q.  It's not just a claim, it's a judgment.

A.  Right, you owe someone money.

Q.  Okay.  Do you understand the difference between a judgment and an assertion that someone owes money?

A.  Yes.

Q.  Its a legal --

A.  Yes.

Q.  -- judicial termination.

A.  Yes, yes.

Q.  Okay.  All right.  And do you know what contempt is?

A.  Not exactly, no.

Q.  Okay.  Do you know what a court order is?

A.  Yes.

Q.  Have you seen a court order from -- have you seen any court order involving Dr. Martinez?

A.  Since I've been involved in this lawsuit, yes.  I looked at the documents that have been involved in this lawsuit, yes.

Q.  Okay.  And you hadn't seen those before?

Page 33

A.   No.

Q.   And you hadn't seen any of those documents up until April, May or June, 2020-- 2022, that is?

A.   Correct.

Q.   Okay.  Did these documents comport with your understanding of the legal circumstances involving Dr. Martinez?

A.   I don't understand the question.

Q.   The day before you saw the documents, what was your understanding of the legal situation involving Ms. Welsh and Dr. Martinez?

A.   That he owed her money, per the court, and that she was trying to collect that money.

Q.   And did you have any idea of contempt?

A.   No.

Q.   Okay.  So you did not know that Dr. Martinez has been in contempt of court since 2017?

A.   Now, I do.

Q.   Okay.  When did you find that out?

A.   I just answered that.  Once I got involved in this lawsuit.

Q.   Do you remember -- were you handed papers, when did you see it?

A.   After I was involved in the lawsuit, I started looking through all of the documents that are involved in

Page 34

the lawsuit.  I think you wrote a complaint or whatever --

Q.    Okay.  So you read the complaint?

A.    Yes.

Q.    Okay.  Alright, and you saw in the complaint there were a number of contempt orders, correct?

MR. ZINN:  I'll object to the form.  But you can answer it.

THE WITNESS:  I saw that you said there are, yes.

BY MR. CHASE:

Q.    Do you think that those orders of the court are not actual court orders?

A.    I'm not a lawyer or a Judge.  And, honestly, it's not anything that I'm involved in, so I don't know what it means or doesn't mean.

Q.    Did somebody tell you that those court orders are not actual court orders?

A.    No.

Q.    Okay.  Do you have any reason to believe that those are not court orders?

A.    Well, to be frank, I'm not going to take your word for it.  I don't know, it does not matter to me whether they are or they're not, so.

Q.    It is irrelevant to you whether court orders are actual court orders or not?

A.    That don't involve me, correct.

Page 35

Q.   Okay.  So it doesn't matter to you whether a court order is real or not if you say it doesn't involve you?

A.   If it's not my -- if it has nothing to do with me, no.  I'm not involving myself in anyone else's legal matters, no.

Q.   Okay.

MR. ZINN:  Ms. Martinez, please wait until he finishes his question.

THE WITNESS:  Sorry.

BY MR. CHASE:

Q.   You believe that you are not involved at all in circumstances as to Dr. Martinez's finances?

A.   I never said that I wasn't involved in the circumstances of his finances.  What I said was, I'm not involved in his court proceedings or his judgments or his contempt from something that happened before I even knew him, no.

Q.   Okay.  Do you know that he was ordered by a court multiple times to pay $25,000 per month?

A.   I've read that in your claim.

Q.   Do you believe that to be what the court ordered?

A.   I have no idea.

Q.   Okay.  But you read the court order, correct?

MR. ZINN:  I'll object to the form, but you can

Page 36

answer it.

THE WITNESS:  The actual order, no.

BY MR. CHASE:

Q.   So you didn't read the court order?

A.   No.

Q.   Okay.  You looked at it?

MR. ZINN:  I'll object to the form of the
question.  If you can answer it.

THE WITNESS:  Okay.

BY MR. CHASE:

Q.   Okay.  So there's several orders, okay?

A.   Sure.

Q.   There's an order dated February 19, 2020.

A.   Okay.

Q.   There's an order dated August 14, 2020.

A.   Okay.

Q.   There is an order dated December 23, 2020.

A.   Okay.

Q.   Have you looked at those?

A.   Not in any detail, no.

Q.   Okay.  You looked at them, but you didn't read
them?

A.   Correct.

Q.   Okay.  Did you read any of the judicial opinions
involving Dr. Martinez and Ms. Welsh, the Appellate

Page 37

opinions?

A. From Connecticut?

Q. Yes. There were two of Appellate opinions. Did you read those?

A. Not in any detail.

Q. Okay. Are you aware of their existence?

A Yes. Yes.

Q. Okay. So if you wanted to learn more about the circumstances, you could have read those orders?

A. I could, yes.

Q. And you could have read those opinions.

A. Sure.

Q. You chose not to?

A. Correct.

Q. Okay. And why is that?

A. Because they don't involve me.

Q. Okay. Have you had an opportunity to read those materials?

A. Yes.

Q. Alright, and you made the intentional decision to not read them?

A. Correct.

Q. Okay. And your reason is because you think it doesn't involve you?

A. Correct.

Page 38

Q.  Alright, and you read the claims in the amended complaint in this case?

A.  Yes, I read your entire complaint because I was named in it, so yes.

Q.  You're a defendant in that?

A.  Correct.

Q.  So it does involve you?

A.  Just the complaint against me, not his court orders from Connecticut; yes.

Q.  Okay.  Have you ever received a gift from Dr. Martinez?

MR. ZINN:  I'll object to the form of the question.

But you can answer it.

THE WITNESS:  What do you define as a "gift"?

BY MR. CHASE:

Q.  What do you define as a "gift"?

A.  A cup of coffee in the morning, clothes.

Q.  Have you ever received a monetary gift from Dr. Martinez?

MR. ZINN:  I'll object to the form.  But you can answer it.

THE WITNESS:  Again, you would have to define that, because if he gives me $20 for a cup of coffee, are you considering that a gift to me?

3455353333333

Page 39

BY MR. CHASE:

Q.   How do you define a "gift of monetary value"?

A.   I don't know; that's why I'm asking you.

Q.   Do you -- do I seem like I'm asking about a cup of coffee?

A.   I don't know what you're asking.

Q.   Okay.  Have you ever received a gift, a financial gift, from Dr. Martinez of over a thousand dollars?

MR. ZINN:  I'll object to the form.

But you can answer it.

THE WITNESS:  Not that I'm aware of, no.

BY MR. CHASE:

Q.   Have you received a gift from Dr. Martinez of over $10,000?

MR. ZINN:  Same objection.

THE WITNESS:  No.

BY MR. CHASE:

Q.   Have you ever received a gift from Dr. Martinez of over $50,000?

MR. ZINN:  Same objection.

THE WITNESS:  No.

BY MR. CHASE:

Q.   Have you ever received a gift from Dr. Martinez of over $100,000?

MR. ZINN:  Same objection.

Page 40

THE WITNESS:  No.

BY MR. CHASE:

Q.   Have you ever had -- your definition of a gift is what?

A.   I don't -- honestly I don't know what you would define as a "gift."

Q.   Okay.  You have a Master's degree?

A.   Yes.

Q.   Okay.  You graduated from college?

A.   Yes.

Q.   You have been employed by the same -- you're employed somewhere else now?

A.   Correct.

Q.   But you held a steady job for 13 years?

A   Correct.

Q.   Okay.  And your salary was approaching $200,000?

A.   Uh-huh.

Q.   Would you consider yourself an educated person?

A.   Sure.

Q.   Okay.  Do you know what a gift is?

MR. ZINN:  I'll object to the form of the question, but you can answer it.

THE WITNESS:  There is no definition for a gift, so it could be anything you want it to be.

BY MR. CHASE:

Page 41

Q.   Are there definitions for "words"?

MR. ZINN:  I'll object to the form of the question.  You can answer it.

THE WITNESS:  I don't understand that question.

BY MR. CHASE:

Q.   Okay.  So you know what some words mean, but "gift" is a word you don't know the meaning of?

MR. ZINN:  Objection.  You can answer it.  Objection to form.

THE WITNESS:  Again, that's to everyone's interpretation.

BY MR. CHASE:

Q.   Okay.  So you just aren't aware of -- well, what is your interpretation of a "gift"?

THE WITNESS:  You've asked me that before, and I keep telling you I don't know.

MR. ZINN:  Objection; asked and answered.

BY MR. CHASE:

Q.   You don't know what a gift is?

A.   No.

Q.   Have you ever signed a sworn statement saying that you have not received a gift from Dr. Martinez?

A.   I don't recall signing anything.  I don't know.

Q.   Have you ever signed a sworn statement saying that you have received a gift from Dr. Martinez?

Page 42

A.    Not that I'm aware of.

Q.    Okay.  If you didn't understand what a gift meant, would you have been able to ask somebody if there was a sworn statement that you were attesting to?

A.    Sure.

Q.    Okay, and would you have done that?

A.    I don't know what I would have done.

Q.    If you don't understand a legal word --

A.    Yes.

Q.    -- are you the type of person that would ask what it means?

A.    If I had someone to ask, sure.

Q.    Before -- for example, if you were attesting to something under oath, and there was the word "gift" in there, would you be the type of person that would ask what that means?

A.    May -- it would depend on the circumstance.  I don't know.

Q.    Okay.

MR. CHASE:  I'm going to mark this as Exhibit No. 3.

(The document referred to was marked for identification as Exhibit No. 3.)

BY MR. CHASE:

Q.    Okay.  Do you see Exhibit 3?

Page 43

A.   Yes.

Q.   All right.  And that's -- what's the title of that document?

A.   Oh, now I know where you're going.  "Gift letter."

Q.   Okay.  And what -- did you know what a gift was when you signed this document?

MR. ZINN:  Objection to the form, but you can answer it.

THE WITNESS:  I know -- knew what they meant by "gift," yes.

BY MR. CHASE:

Q.   Okay.  Did you sign Exhibit 3?

A.   Yes.

Q.   That's your signature?

A.   Correct.

Q.   And that's -- did you write the date?

A.   Yes.

Q.   What's the date?

A.   8-9-2020.

Q.   What's today's date?

A.   The 24th, I believe, of 2023.

Q.   January 26, 2023.

A.   January 26th, so.

Q.   Okay.  So August 9, 2020, was over two years ago,

Page 44

correct?

A.    Correct.

Q.    And so did you know what a gift meant on August 9, 2020?

A.    Not a gift.  I knew what this gift meant.

Q.    Okay.

A.    Yes.

Q.    And was this gift a gift?

A.    Yes.

Q.    Okay, so you have received a gift from Dr. Martinez?

A.    Yes.

Q.    Okay, and, so, why did you say that you haven't?

A.    Because I didn't understand what you were talking about, and I asked you to explain what you meant by gift, and you couldn't give me an example; so, no, I did not consider this nor remember this.

Q.    Okay.  Did you ever loan money to Dr. Martinez?

A.    What do you mean by "loan"?

Q.    Do you not know what a loan is?

A.    No.

Q.    You don't know what a loan is?

A.    I don't know what you mean by a "loan."

Q.    What do you -- what is a loan to you?

A.    A written document saying that you have to pay

Page 45

someone back for money that they gave you.

Q.  Okay.  Do you have -- did you ever loan money to Dr. Martinez?

A.  I did not write a written contract saying that my husband had to pay me back for any money, no.

Q.  Did you loan money to Dr. Martinez?

MR. ZINN:  Objection; asked and answered.

You can answer it again.

THE WITNESS:  My definition of a loan would be a written document saying he has to pay me back for money I gave him.  I did not do that.

BY MR. CHASE:

Q.  So you're saying that you didn't enter into a written agreement whereby Dr. Martinez would pay you money back, correct?

A.  Correct.

Q.  Did you enter into a verbal agreement whereby Dr. Martinez would repay you for a loan?

A.  No.

Q.  Okay.  So have you ever loaned money to Dr. Martinez?

MR. ZINN:  Objection; form.

THE WITNESS:  I just answered that.

BY MR. CHASE:

Q.  Well, you said you've never entered into a

Page 46

written agreement --

A   Correct.

Q.   -- that would be a loan.

A.   Uh-huh.

Q.   And you said you've never entered into a verbal agreement that would be a loan.

A.   Correct.

Q.   Have you ever entered into any agreement that would be a loan --

A.   No.

Q.   -- with Dr. Martinez?

A.   No.

Q.   Would there be any reason for someone to say that you had?

A.   I have no idea.

Q.   Okay.  When -- why did you receive this gift from Dr. Martinez on or about August 9, 2020?

A.   It says here, "for the purchase of 15919 Secoya Reserve Circle, Naples, Florida.

Q.   And at that time, did you receive a gift of -- let's just confirm the amount -- it's $119,970, correct?

A.   Not correct.

Q.   Well -- then there's another one, correct?

A.   Correct.

Q.   So it's $119,970.  Do you see that number?

Page 47

A.   Yes.

Q.   Okay.  Then it says "and $20,160."

A.   Correct.

Q.   Okay.  So it's over $139,000, correct?

A.   Yes.

Q.   Okay.  So you received a gift of over $139,000 from Dr. Martinez on or around August 9, 2020, correct?

A.   For the purchase of our home, yes.

Q.   Okay.  I just need you to answer the question, just clearly.

A.   I did.

Q.   Did you receive a gift from Dr. Martinez of approximately 139,000 on or about August 9, 2020?

A.   For the purchase of our home in Naples, yes.

Q.   But you did receive the gift?

A.   For the purchase of our home in Naples, yes.

Q.   Okay.  Why did you receive a gift?

A.   For the purchase of our home.

Q.   Well, at that time, you were -- it was -- about $240,000 was the purchase price?

A.   No.

Q.   Of -- this is for Secoya, for the Englewood property, did you receive -- did you purchase a home in Englewood, Florida?

A.   Yes.

Page 48

Q.   Okay.  Did you receive a gift pursuant to that purchase?

A.   I don't know.

Q.   You don't know?

A.   No.

Q.   Okay.  Well, how -- did you -- did there come a time when you purchased real property in Englewood, Florida?

A.   Yes.

Q.   And you purchased it in your individual name, correct?

A.   Yes.

Q.   Even though you were already married to Dr. Martinez, correct?

A.   Yes.

Q.   And why did you purchase it in your individual name?

A.   Because he had foreclosed on a previous home, and we were concerned that he -- we wouldn't get accepted for the mortgage if his name was on it.

Q.   Okay, so it was individually your obligation, correct?

A.   Legally --

MR. ZINN:  I'll object to the form.

THE WITNESS:  Legally, yes.

Page 49

BY MR. CHASE:

Q.   And you signed a mortgage for the Englewood property?

A.   Yes.

Q.   In your mortgage application, you attested to some assets?

A.   I believe so, yes.

MR. CHASE:   So why don't we mark this as Exhibit No. 4.

(The document referred to was marked for identification as

                    Exhibit No. 4.)

BY MR. CHASE:

Q.   Five months earlier, in March 2020, before you received the $139,000 gift, you signed some statements under oath, didn't you?

A.   I don't know.

Q.   All right.   You attested to the gift letter under oath, correct?   You signed -- well, let me ask it this way.

You signed a separate document in connection with your mortgage as to the Secoya property confirming that all the statements that you signed were under oath and under penalty of perjury, correct?

A.   I don't know.

Q.   And that's -- you --

Page 50

A.   I don't know.

Q.   Okay.  Were your loan documents that you provided to the lender in connection with the Secoya property true and accurate?

A.   Yes.

Q.   Okay.  Were the loan documents that you signed pursuant to the loan as to the Englewood property true and accurate?

A.   Yes.

Q.   Okay.  Let's take a look at Exhibit No. 4.

A.   Sure.

Q.   Take a look at the second page.

A.   Okay.

Q.   Do you see on the left-hand column something that says "gift letter"?

A.   Yes.

Q.   What's that?

A.   That is the money that my husband put towards the purchase of our house in Englewood.

Q.   That was another gift?

A.   It was money that he gave towards the purchase of our house, yes.

Q.   Okay, and you signed this statement under oath, right?

A.   Correct.

Page 51

Q.   Okay.  And you wrote "gift"?

A.   Can I -- I don't know if I signed this under oath
or not.

Q.   All right.  Go to page 4.

A.   Okay.

Q.   Is that your signature?

A.   Yes.

Q.   Alright, and you do see the acknowledgement and
agreement right above your signature?

A.   Yes.

Q.   And do you see where it says, "each of the
undersigned, specifically represents to lender and
lender's actual or potential agents, brokers, processors,
attorneys, insurers, servicers, successors and assigns,
and agrees and acknowledges that the information provided
in this application is true and correct as of the date set
forth opposite my signature.  And that any intentional or
negligent misrepresentation of information contained in
this application may result in civil liability, including
monetary damages, to any person who may suffer a loss due
to any reliance on any misrepresentation that I have made
in this application and or criminal penalties, et cetera,
et cetera, including a fine or imprisonment pursuant to
title 18 of the United States Code Section 1001.

A.   Yes.

Page 52

Q.   Do you see that?

A.   Yes.

Q.   Okay, and so was your -- were your statements on March 3, 2020, accurate?

A.   Yes.

Q.   Okay.  And they were under oath, correct?

MR. ZINN:  I'll object to the form, but you can answer it.

THE WITNESS:  I guess I don't understand what "under oath" means.  I signed them -- I signed them.

BY MR. CHASE:

Q.   Okay.  And you signed a document indicating that there --

A.   Accurate.

Q.   -- is a $120,000 gift letter?

A.   Yes.

Q.   Okay.  And that was separate from the 139,000 gift that occurred five months later?

A.   Correct.

Q.   Okay.  And why did you receive a gift on or around March 3, 2020?

A.   For the purchase of our Englewood home.

Q.   And why didn't you say that when you were asked if you received a gift?

A.   Because again, I didn't understand what you were

Page 53

talking about when you were talking about gift.  And I honestly never really equated the gift to the purchase of our home; so, yes, it does say gift.

Q.   Did you read Exhibit No. 4 before you signed it?

A.   Did I read the exhibit, yes.

Q.   Did you know what a "gift" meant on March 3, 2020?

A.   I knew what --

MR. ZINN:  Object to the form.  But you can answer it.

THE WITNESS:  I knew what they meant by gift in that context, yes.

BY MR. CHASE:

Q.   What did they mean by gift in that context?

A.   They meant money given for the purchase of this house to me.

Q.   Okay.  And did you read the -- okay.  Go back to Exhibit No. 3, if you could.

A.   Uh-huh.

Q.   Can you read the second paragraph?  Can you read it out loud into the record?

A.   I don't like reading out loud, but yes.

"This a bonified gift and there is no obligation expressed or implied for the applicant to repay this sum in the form of cash or future services now or in the

Page 54

future.  I understand that Prosperity is required to confirm that my account has or had sufficient funds to cover the gift.  Further, if the funds are transferred at settlement, I understand that Prosperity must document that I gave the closing agent the gift funds in the form of a certified check, a cashier's check, or other official check.  I agree to provide the documentary evidence to confirm the gift funds to Prosperity."

Q.   Okay.  Was there any ambiguity as to what a gift meant on August 9, 2020?

A.   What this gift meant, no.

Q.   Okay.  Did the August 9, 2020, gift differ in its meaning from the March 3, 2020, gift?

A.   March 3.

Q.   That's Exhibit 4.

A.   Did it differ?  I mean, I don't have a document stating this for the March 3rd one, no.

Q.   There is no gift letter for the March 3 one?

A.   Not that I see.

Q.   Okay.  Do you remember signing a gift letter for the March 3 one?

A.   I don't remember.

Q.   Okay.  Did you discuss -- before -- let's talk about the two gifts.

A.   Sure.

Page 55

Q.   Before the March 3, 2020 gift, did you discuss with Dr. Martinez whether he was going to give you a gift?

A.   No.

Q.   Okay.  Did you know he was going to give you a gift before he gave you the gift?

A.   We never discussed the money that he paid towards the house as a gift.  He said he was going to pay $120,000 for the purchase of our home.

Q.   So he did say --

A.   He never said "gift," and I never said "gift."

Q.   Okay.

A.   That's a mortgage company word.

Q.   Oh, it's the word you signed under oath?

A.   Yes.  Correct.

Q.   So --

MR. ZINN:  I'll object to the form.  Mischaracterizing.

MR. CHASE:  What's mischaracterizing?  Are you denying that that form is under oath?

MR. ZINN:  Yes.

MR. CHASE:  Really?

MR. ZINN:  Yes.  It calls for a legal conclusion.

MR. CHASE:  Oh, okay.  All right.

BY MR. CHASE:

Q.   So you did know that you were going to receive

Page 56

the gift before you got it, correct?  In March 3, 2020?

A.   I knew that my husband was going to pay $120,000 for us to purchase our home in Englewood, yes.

Q.   And before you received the gift on or about August 9, 2020, you knew that was coming in advance as well?

A.   I knew that my husband was going to give me approximately $140,000 for the purchase of our home in Secoya, yes.

Q.   You knew it in advance of the day that it happened, correct, on both occasions?

A.   That he was going to pay that money for the house, yes.

Q.   You knew that he was going to give you a gift before he gave you the gift on or about March 3, 2020, correct?

A.   I knew he was going to pay that amount of money for us to purchase the home.  I didn't know how he was going to give that amount of money; but, yes, we discussed he was going to pay that amount of money for us to buy our house.

Q.   Okay.  And the then next thing you knew, the money was just in your account?

A.   Yeah.

Q.   Okay.  And at the time -- let's talk about

Page 57

March 3, 2020.

You were aware that Dr. Martinez owed a substantial amount of money to Ms. Welsh, correct?

A.   I didn't know how much he still owed to her, no.

Q.   Did you have an idea as to the ballpark --

A.   No.

Q.   -- as of March 3, 2020?

A.   No.

Q.   Did you know it was over two million dollars?

A.   I knew the original amount was over two million dollars, I didn't know what he owed, no.

Q.   Did you ever discuss --

A.   I actually still don't know what he owes.

Q.   Okay.  Have you had a conversation with him recently about what he owes?

A.   No.

Q.   Okay.  Is it a topic that the two of you intentionally avoid discussing?

A.   No.

Q.   It just doesn't come up?

A.   Correct.

Q.   Did it come up -- did the debt to Ms. Welsh come up in connection with any conversations that you had with Dr. Martinez on or about March 3, 2020, in connection with your receipt of a $120,000 gift?

Page 58

A.   No.

Q.   So did you put it together in your heed that you were going to receive a gift, but Dr. Martinez also owes a judgment to somebody else, did you know that?

A.   Well, that never came into my head.  The thought process in my head was, we're buying a home, he is going to give money to buy that home, this is the amount of money.  No, Ms. Welsh never came into my head, not did "gift" ever come into my head.

Q.   But you knew about the debt to Ms. Welsh prior to your receiving the gift on March 3, 2020?

A.   I didn't know what his debt was to Ms. Welsh was prior to that.  I knew ten years ago, he had a debt to her.  I didn't know what was going on after that, no.

Q.   Is it your testimony that you thought the debt was paid as of March 3, 2020?

A.   I didn't have any thoughts about the debt.

Q.   Did you inquire?

A.   No.

Q.   Okay.  So you're going to receive a gift, and you had been under the understanding prior to that time that there was a debt owed and you didn't clarify?

A.   You are making statements that I never made.

Q.   Well, did you clarify?

MR. ZINN:  I'll object to the form of the

Page 59

question.

You can answer.

THE WITNESS:  You said that I was aware that I was going to receive a gift.  I never considered it a gift.

BY MR. CHASE:

Q.   You didn't consider the gift that you attested to, a gift?

MR. ZINN:  I'll object to the form.

But you can answer.

BY MR. CHASE:

Q.   Which gift -- which gift did you not think is a gift?

A.   Either the money used to purchase the Englewood house and the money used to purchase Prosperity.

Q.   So you signed the document, indicating that it's a gift, but you believed in your mind that it was not?

A.   Correct.

Q.   Okay, so you were making a true statement or not a true statement on March 3, 2020?

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  My thought process was, my husband is giving money to buy our house.  What they call it, as a "gift," sure, if they want to call it a "gift,"

Page 60

I'll say it was a gift.

BY MR. CHASE:

Q. Well, it's what you signed. Oh, okay.

So if you get a benefit from it, you can call it whatever you want, right?

MR. ZINN: Object to the form.

You can answer.

THE WITNESS: Not in any way, shape, or form.

BY MR. CHASE:

Q. Okay, so if you weren't going to receive a benefit from the March 3, 2020 transaction, would you have been willing to call it a gift?

MR. ZINN: Object to the form.

But you can answer.

THE WITNESS: No, it's completely irrelevant. I don't understand.

BY MR. CHASE:

Q. You don't understand?

A. Not at all.

Q. You had a Master's degree as of 2020, correct?

A. Yes.

Q. Okay. So let me go back to the time frame of March 2020.

A. Sure.

Q. You still understood in your mind that

Page 61

Dr. Martinez owed a debt, correct?

A.   In March of 2020?

Q.   Yes.

A.   I assumed he did, I didn't know for a fact, one way or the other.

Q.   Did it strike you as perhaps a legal issue, that you were receiving a gift, even though he owed a judgment to somebody else?

A.   No.

Q.   No?

A.   No.

Q.   Okay.  Did you have counsel in March of 2020?

A.   No.

Q.   No?

A.   No.

Q.   So it never occurred to you there could be something legally problematic --

A.   Correct.

Q.   -- about receiving a gift from somebody who owes a judgment to somebody else?

A.   Correct.

Q.   Okay.  And your testimony is that you didn't know that he had been in contempt of court since 2017 until 2022?

A.   Correct.

Page 62

Q.   Upon you finding out that Dr. Martinez had been in contempt of court since 2017, did you confront him about that?

A.   What do you mean by "confront?"

Q.   Did you ask him why he hadn't previously told you?

A.   No.

Q.   You never inquired to say, hey, how come you didn't tell me about that?

A.   No.

Q.   Okay, and why not?

A.   I didn't want to.

Q.   you didn't want to know?

A.   No.

Q.   Okay.  Why not?

A.   Because it doesn't involve me.  I have enough stress and other things going on in my own life.  I don't need to worry about his personal issues.

Q.   Okay.  So you wanted to -- it was your own stress management technique to not inquire?

A.   No.  I just --

MR. ZINN:  I'll object to the form of the question.  You can answer it.

THE WITNESS:  No.

MR. ZINN:  Sheesh.

Page 63

THE WITNESS:  I didn't want to ask him.

BY MR. CHASE:

Q.   Okay.

A.   It never occurred me to.

Q.   And he never told you any further detail?

A.   No.

Q.   So you found out about the contempt that dated back to 2017 in 20 -- let's say April or May of 2022, correct?

A.   Yes.

Q.   Okay.  How many conversations have had with Dr. Martinez about the contempt?

A.   About contempt, I don't know.

Q.   More than --

A.   Not many.

Q.   More than one?

A.   No.

Q.   Less than one?

A.   I don't -- I don't know that we've ever really talked in detail about specific contempt, no.

Q.   Do you know what contempt is?

A.   You asked me that already.

Q.   Well, do you know?

A.   No.

Q.   Okay.  You don't know what contempt is?

Page 64

A.   Not the legal aspect of contempt, no.

Q.   Okay.

A.   I know it has something to do with court and legal issues.

Q.   Okay.  Are you aware of the concept of a support order in family law context?

A.   No.

Q.   Have you ever inquired as to what contempt means?

A.   No.

Q.   But you saw the term "contempt" in the 2022 papers?

A.   Correct.

Q.   And you -- were you curious to know what that meant?

A.   No.

Q.   Okay.  It would -- there was no curiosity?

A.   No.

Q.   Okay.  And why?

A.   Because it doesn't involve me.  My name is not on any contempt or judgment, so.

Q.   So you made the assessment that it doesn't involve you; so, therefore, you didn't look into it?

A.   Correct.

Q.   Okay, even though you're a defendant in a federal lawsuit?

Page 65

A.   No, having to do with contempt of a judgment.

Q.   So if -- you believe that if the contempt wasn't

holding you in contempt --

A.   Correct.

Q.   -- then you're not involved at all?

A.   Correct.

Q.   Okay.  Did you ever discuss the court ordered

obligation of Dr. Martinez to pay $25,000 a month to

Ms. Welsh?

A.   Did -- can you repeat that?  I missed the first

part, sorry.

Q.   Were you -- are you aware of the court ordered

obligation as a contempt sanction whereby Dr. Martinez was

ordered, and still is under the order, to pay Ms. Welsh

$25,000 a month?

A.   I have read that in your claim -- what do you

call it?

Q.   You've read the court order?

A.   No.  I've read your filing.

Q.   And attached to my filing, did you see the copies

of the court orders?

         MR. ZINN:  Objection; asked and answered.

         You can answer it again.

         THE WITNESS:  Did I see them,  yes.

BY MR. CHASE:

Q.   Okay.  Did you understand what it means for a court to order something has a contempt sanction?

A.   No.

Q.   Okay.  And you were a defendant in that lawsuit --

A.   No.

Q.   -- that that was attached to?  You are --

A.   This lawsuit?

Q.   In this lawsuit that that court order was attached to as exhibit?

A.   Yes.

Q.   And you still thought it didn't involve you?

A.   Correct.

Q.   Did somebody tell you it doesn't involve you?

A.   No.

Q.   Okay.  At what point do you determine that something involves you?

A.   When I have any legal responsibility to it.

Q.   Okay.  And you don't think you have a legal responsibility so a pending federal lawsuit?

A.   My --

MR. ZINN:  I'll object to the form.

But you can answer it.

THE WITNESS:  My name is not on that order, so, no.

Page 67

BY MR. CHASE:

Q.   Okay.  So you believe that you can receive any amount of gifts from Dr. Martinez, despite any contempt sanction that he is subject to and any judgment he's --

A.   I never said that.

Q.   So what's the scope of what you think you can just receive as gifts?

MR. ZINN:  Object to the form.  But you can answer it.

THE WITNESS:  I believe that I can receive money to pay for my home, my family's home, and any family obligations, responsibilities, from my husband.

BY MR. CHASE:

Q.   And what about money even over and above that?

A.   What would that be?  I don't understand.

Q.   Have you ever received other gifts from Dr. Martinez?

MR. ZINN:  Object to the form, again.

THE WITNESS:  Clothes; sure, yes.

BY MR. CHASE:

Q.   Have you received any other monetary gifts from Dr. Martinez, other than these two gifts that you've attested to?

A.   No, not that --

MR. ZINN:  Object to the form.

Page 68

But you can answer it.

THE WITNESS:  No, not that I'm aware of.

BY MR. CHASE:

Q.   Okay.  So bank transfers, have you received gifts of bank transfers from Dr. Martinez?

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  I've received money from my husband to pay household expenses.

BY MR. CHASE:

Q.   Okay.

A.   If that's what you mean.

Q.   What are your monthly household expenses?

A.   They vary month to month.

Q.   Okay.  Let's start talking about that.

A.   Sure.

MR. ZINN:  When can we take a break?

MR. CHASE:  Do you need to take a break?

MR. ZINN:  Yes.

MR. CHASE:  Sure.  We can take a break.  Five minutes?

I ask that testimony not be discussed with the witness during the breaks.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Page 69

Q.   Okay.  So you testified that you did not know that Dr. Martinez was in contempt of court until 2022, correct?

A.   Correct.

Q.   Did you ever help him prepare asset disclosure forms?

A.   What do you mean by "prepare"?

Q.   Do you know what asset disclosure forms are?

A.   Now I do.

Q.   When did you find out what those are?

A.   Since this lawsuit.

Q.   In 2022, you found out about the disclosure?

A.   Correct, yes; yes.

Q.   Did you ever help Dr. Martinez prepare an asset disclosure form?

A.   Yes.

Q.   And why did you -- what was your understanding of why that was happening?

A.   I honestly didn't really understand what the document was.  What -- my understanding was, he was frustrated in the office trying to do something, and I asked him if he needed help.  And he said, yes, I'm trying to create this document and I don't know how to put in everything I need to.  And I said, would you like me to help you, and he said yes.

Page 70

Q.   What year was this?

A    Twenty -- either 2021 or 2020, sometime after we lived here in Naples.

Q.   So after 2020, but before 2022?

A.   Probably, yes.

Q.   Because you testified that you didn't know about the contempt until after the April 2020 lawsuit.

A.   Correct.

Q.   So when you were helping him with the asset disclosures, why did you think that was happening?

A.   I didn't know what he was preparing, other than he asked me to create this document.

Q.   Did you look at the document?

A.   Did I look at it, yes.

Q.   Okay.  So when you looked at it, did you get a sense of what it was?

A.   No.

Q.   So you looked at it, but you didn't know what it was?

A.   Correct.

Q.   Did you look at the content in it?

A.   I typed in numbers, yeah.

Q.   Okay.  Did you ask him why it was -- why you were doing it?

A.   No.

Page 71

Q.   Okay.  What was the -- the first time that you -- well, did you assist him in repairing asset disclosures? Dr. Martinez, that is.

MR. ZINN:  Objection; asked and answered.

But you can answer it.

THE WITNESS:  Like I said, he asked me to create columns and numbers and put things into a document.

BY MR. CHASE:

Q.   Okay.  And did you do that?

A.   Yes.

Q.   And those things that you put into the document were what?

A.   I don't remember now, but numbers and -- and he would have me put -- make columns and put numbers in, and dates.

Q.   Okay.  And your testimony is that you didn't ask him why he was doing that?

A.   Correct.

Q.   How many times did you engage in this column data entry?

A.   Two.  Honestly, I don't know; a few.

Q.   All right.  And what was the data that was being put into the columns?

A.   Numbers.  What do you mean?

Q.   Well, what numbers?

Page 72

A.    Whatever he told me.  I don't know.

Q.    Okay.

A.    He had a list said, here, put this here, this here, and this here.  I said okay.

Q.    So he was dictating numbers --

A.    Correct.

Q.    -- for you to type.

A.    Correct.  Yes.

Q.    Okay.  And why -- did he say he wasn't able to type?

A.    He didn't know -- he didn't know how to get things into certain columns and organize it, he said.

Q.    He didn't know how to type numbers into a spreadsheet?

A.    You'd have to ask him, I don't know.

Q.    What was your understanding of why he couldn't do that himself?

A.    Other than him sighing in the other room and being frustrated and me saying, do you need help with something; and him saying, yes, can you type this in for me.

Q.    Okay.  And Dr. Martinez is a surgeon?

A.    Correct.

Q.    Okay.  And has very good dexterity with his hands to be a surgeon?

Page 73

A.   Yeah, sure.

Q.   And similar dexterity to type in numbers on a keyboard?

MR. ZINN:  Objection to the form.

THE WITNESS:  They need to go in a certain spot, so that's unrelated.

BY MR. CHASE:

Q.   Okay.  Have you ever seen -- was it a laptop or a desktop that --

A.   Desktop.

Q.   Okay.  Was there a mouse?

A.   I'm sure, yes.

Q.   Well --

A.   I don't remember, this was months ago; but, yes, I'm sure there was a mouse on the computer.

Q.   What house was it in?  What house were you --

A.   Secoya.

Q.   It was Secoya, okay.

A.   Uh-huh.

Q.   Is there a particular room that has a desktop?

A.   Yes.

Q.   How many desktops are in Secoya?

A.   One.

Q.   Okay, and whose is it?

A.   Ours.

Page 74

Q.   Joint.  When was it purchased?

A.   I have no idea.

Q.   It was brought from before Secoya?

A.   Correct.  Yes.

Q.   And was it Dr. Martinez's laptop or yours -- or desktop?

A.   Honestly, I think we bought a new one because the other one wasn't working.  I don't know.

Q.   It's the same one that came down to Secoya from Connecticut?

A.   Correct.  Yes.

Q.   Okay.

A.   It was not bought here in Florida.

Q.   Okay.  Had you seen Dr. Martinez at the computer typing before?

A.   Yeah.

Q.   Okay, and have you seen him using the mouse before?

A.   Uh-huh.

Q.   Okay.  And have you seen him applying to jobs with his resume?

A.   No.

Q.   Okay.  Have you ever seen Dr. Martinez apply for a job?

A.   Seen him?  No.

Page 75

Q.   Okay.   Did you ever talk about a job search with him?

A.   Yes.

Q.   Okay.   How -- what was the conversation?

A.   The conversation was, he needed to find a job, and the conversation was, he wanted a job.   And I would periodically ask him how it was going, and he would say, bad, or good, or, you know, whatever.

Q.   Okay.   Have you ever E-mailed with Dr. Martinez?

A.   E-mailed with him?

Q.   What's your E-mail address that you use?

A.   Kelly; K-e-l-l-y-r-o-u-s@yahoo.com.

Q.   How long have you had that E-mail address for?

A.   A long time.   I don't know.

Q.   Back when selected Yahoo addresses?

A.   Correct.

Q.   Do you use any other E-mail addresses?

A.   I have a work E-mail that I only use at work.

Q.   Okay.   And what's that work E-mail?

A.   Kelly_rousseau1@physiciansregional.com.

Q.   Okay.   What is Dr. Martinez's E-mail address?

A.   The one that I know --

Q.   Yeah.

A.   -- he has?   B11161@comcast.

(Thereupon, a short break was taken.)

Page 76

BY MR. CHASE:

Q.   Back on the record.  And we're talking about E-mails.

A.   Yes.

Q.   Are there any other E-mail addresses that you're aware of as to Dr. Martinez?

A.   I don't know.

Q.   Have you ever E-mailed with Dr. Martinez at the b11161@comcast.com address?

A.   I honestly can't recall.  I don't know why I would E-mail him anything, so, unlikely.  I don't know.

Q.   Not sure?

A.   Not sure.

Q.   Okay.  Do you know Dr. Martinez's telephone number?

A.   Yes.

Q.   And what's that?

A.   860-402-9669.

Q.   And do you text him?

A    Yes.

Q.   How often do you text with him?

A.   Daily.

Q.   And in any of those text messages, have you ever mentioned the plaintiff?

A.   No.

Page 77

Q.   Has he ever mentioned the plaintiff?

A.   No.

Q.   Have you ever talked about litigation?

A.   No.

Q.   Have you ever talked about litigation verbally?

A.   What do you mean by "litigation," I guess?

Q.   Well, I'll get back to the written communications shortly.

A.   Okay.

Q.   Have you guys ever talked about this case?

A.   Yeah.

Q.   Okay.  When was the first time?

A.   When it came about -- when you filed the complaint.

Q.   Okay, so there's a first case in 2021, and then this is -- are you aware that there are two federal lawsuits?

A.   Against me?

Q.   The only one where you were named as a defendant?

A.   I mean, I know that there's other lawsuits, yes.

Q.   Okay, so when was the first time that Florida litigation came up in conversation with Dr. Martinez?

A.   I don't know.  Whenever he got a lawyer, I guess.

Q.   Okay, so what was the conversation when you had a conversation with Dr. Martinez?

Page 78

A.   That -- for this case, or?

Q.   Well, let's open up the floor to the scope of communications between the two of you as to any Florida litigation.

A.   Okay, any Florida litigation?

Q.   Any Florida litigation, right?

A.   When he said that he was going to need money to get a lawyer because the plaintiff in his prior case was trying to bring lawsuits against him in Florida.

Q.   Okay.  And then what was said?

A.   Essentially, okay, we'll have to figure out how to get money.

Q.   All right.  And what was your understanding of what lawsuits in Florida would be, given that you already knew there was a judgment?

A.   I knew it had to do with the Connecticut lawsuits.  Exactly what, I don't know.

Q.   Okay.  Had you been under the understanding that moving to Florida would be -- you wouldn't have to deal with the judgment anymore?

A.   No.  I never -- like I said, we never talked about the lawsuit.  I didn't think it had any bearing on anything, to be honest.

Q.   Have you ever read the United States Constitution?

Page 79

A.   Maybe when I was in high school, I don't know.

Q.   Most people have.

A.   I don't know.

Q.   Okay.  Have you ever heard of the Full Faith and Credit Clause?

A.   No.

Q.   Okay.  Are you aware that there is a clause in the United States Constitution that's called the "Full Faith and Credit Clause"?

A.   Now that you're saying it, yes.

Q.   Okay, and did you have a belief that because there was a move to Florida there would be -- the judgment wouldn't be in effect or anything like that?

A.   I honestly never even thought about the judgment. We moved prior to when we moved -- if -- I never thought about it.

Q.   Okay.  How much financial planning did you discuss with Dr. Martinez?

A.   When?

Q.   In your life.

MR. ZINN:  I'll object to the form.

But you can answer it.

THE WITNESS:  How much?

BY MR. CHASE:

Q.   Well, I think you're --

Page 80

A.    Did we discuss it?  Yes.

Q.    Well, let's -- let's break it down, then.

A.    Okay.

Q.    2018, 2019, 2020, 2021, 2022.

A.    Okay.

Q.    Okay, in 2018, did you discuss --

A.    Not essentially.

Q.    Okay, 2019, how much?

A.    It definitely came up because he had lost his job; so, yes, we would talk about finances.

Q.    Maybe it also came up because you got married that year?

A.    No, I don't think marriage had anything to do with whether we did or didn't -- we were living together. So I think that's --

Q.    Okay, so when you started living together, did you discuss financial planning?

A.    Originally, no.

Q.    Okay.  Was there a date when one of you proposed to the other?

A.    Yes.

Q.    Okay.  What -- I'm not going to ask about details.

A.    Okay.

Q.    But just when did that happen, what month and

Page 81

year?

A.   Year, 2019.  What month, I don't know.  Summer.

Q.   Okay, so sometime before November 2019?

A.   No -- yes.  Yes.

Q.   Okay.  During the time between the proposal and the wedding, was there any discussion of financial planning?

A.   Yes.

Q.   All right.  And you were aware that there was a judgment at that time?

A.   Yes.

Q.   And did you have an idea of the amount of the judgment?

A.   The original judgment, yes.

Q.   Okay.  And what was your understanding as to the amount?

A.   Approximately, two million dollars.

Q.   Okay.  And what was your understanding of the balance as of 2019?

A.   I had none.

Q.   Did you inquire as to Dr. Martinez?

A.   No.

Q.   Okay.  Have you ever talked to him about, hey, maybe we should pay this, or maybe he should pay it?  Did you ever talk to him about that?

Page 82

A. No.

Q. Okay. Has there -- have you ever had a discussion with Dr. Martinez about paying the judgment?

A. No.

Q. Has he ever expressed to you his intention to pay it?

A. No.

Q. Okay. Have you ever expressed to him a preference that he pay it?

A. No.

Q. Why -- do you have is a preference whether he pays it?

A. I don't know anything about it, so, no, I don't have an opinion because I don't have enough information on it.

Q. Okay. But the information is available to you if you were to read it, correct?

A. Sure, yes.

Q. Okay. You're declining to ascertain the information?

A. Yes.

Q. And you have -- have you ever been a defendant in a lawsuit other than this case?

A. No.

Q. So you have never been a party to a judgment.

Page 83

A.   No.

Q.   And if you were sued for something, what would you do?  For -- if someone said that you owed money?

MR. ZINN:  I'll object to the form.

But you can answer it.

BY MR. CHASE:

Q.   Let me give you a more concrete question.

A.   Okay.

Q.   If you misplaced credit card bill or something like that --

A.   Okay.

Q.   -- and you got sued by the credit card company --

A.   Uh-huh.

Q.   -- and it became a judgment against you, would you pay it?

A.   It would depend on my circumstances at the time. I can't answer that, it's a rhetorical -- I don't know what I would do.

Q.   Okay.  Hypothetical.

A.   Hypothetical, yes.  Sorry, yes.

Q.   If you were in contempt of court and ordered to pay $25,000 a month and had more than a million dollars in your retirement account, would you pay $25,000 a month?

MR. ZINN:  Object to the form.  But you can answer it.

Page 84

THE WITNESS:  It would depend.

BY MR. CHASE:

Q.   On?

A.   A lot of things.

Q.   Such as?

A.   Other responsibilities I had, that would be it, I guess; other responsibilities I had.

Q.   Dr. Martinez does not have any minor children, correct?

A.   He has a stepdaughter, yes.

Q.   None of his children are minors, correct?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  Biological children?

BY MR. CHASE:

Q.   Correct.

A.   Correct.

Q.   Okay, and he has not adopted your child?

A.   Isn't that a given when you get married -- or, I don't know.  I don't know if there has to be any legal --

Q.   Has he signed any adoption papers to become a guardian?

A.   He's her guardian, yeah, but he hasn't signed papers.  I guess I don't understand.

Q.   Okay.

Page 85

A.    He's her stepfather.

Q.    Okay.  Is he under any court order to make any payments as to your child?

A.    Child support?  No, we're married.

Q.    Okay, and what is your current salary?

A.    165,000.

Q.    All right.  And you qualified for two mortgages -- actually, three mortgages in the last three years, correct?

A.    Several --

Q.    You qualified for a mortgage for Englewood, correct?

A.    Correct.

Q.    You qualified for a first mortgage for Secoya.

A.    Correct.

Q.    You qualified for a second mortgage of Secoya?

A.    I don't know if that was --

Q.    A refinance?

A.    Yes.  Yes.

Q.    So, three times, your individual finances had been sufficient to pay a mortgage?

A.    According to the mortgage company.

Q.    According -- did you think that your financial circumstances were insufficient to cover those mortgage payments?

Page 86

A.   To cover the mortgage payments, no.

Q.   So they were sufficient?

A.   For just the mortgage with no other financial responsibility, yes.

Q.   So $165,000 a year is something like $13,000-and-change per month?

A.   Before they take out taxes, health insurance, eye insurance, dental insurance, and everything else, yeah.

Q.   Okay.  And the net payments per month, your net is about 8,000 a month?

A.   Correct.

Q.   And so the mortgage was $2,641 at Secoya, originally, right?

A    I don't know.

Q.   Okay.  Was that a manageable amount?

A.   At the time, no.

Q.   So $8,000 net a month was not a sufficient income to afford a $2,641 mortgage?

A.   Not along with all of my other financial responsibilities, no.

Q.   And that $2,641 a month included escrow, correct?

A.   I don't know.

Q.   It was a -- it was a set -- it was a --

A.   Everything was rolled into the mortgage, I guess, yes.

Page 87

Q.   Right.

A.   But I don't know exactly how much that was.

Q.   So it was not a cut-rate mortgage, it was a regular, standard, secondary-market-eligible mortgage from an accredited lender, correct?

A.   Yes.

Q.   Okay.

MR. ZINN:  Ms.  Martinez, don't -- try not to talk over him --

THE WITNESS:  Oh, sorry.

MR. ZINN:  -- because she won't be able to take it down.

MR. CHASE:  I'll slow down as well.

THE WITNESS:  Okay.

BY MR. CHASE:

Q.   You signed mortgage applications, attesting to your ability to make -- to fulfill those obligations, yes?

A.   Yes.

Q.   And did you have the ability to fulfill those obligations?

A.   Like I just answered, to pay the mortgage without any other financial responsibilities, yes.

Q.   Okay.  Wouldn't there be another $5500 a month to take care of your other responsibilities if $2600 was going to the mortgage?

Page 88

A.   Yes.

Q.   Okay.  So what -- tell me about the 5500.

A.   Okay.

Q.   Do you own a car?

A.   Yes.

Q.   Do you -- what type of car?

A.   2015 BMW.

Q.   All right.  Do you owe any payments on it?

A.   No.

Q.   Alright, so, free and clear?

A.   Yes.

Q.   Is there car insurance?

A.   Yes.

Q.   How much is that?

A.   Three hundred dollars a month, $200 a month --

Q.   Three hundred?

A.   Yes.

Q.   Okay.  Alright, and what other expenses do you have?

A.   At that time, I was still paying the mortgage on the Englewood property.

Q.   Okay.  How long was there payments on Englewood and Secoya, how many months?

A.   I don't know what -- I'm not sure if you have the closing documents for Englewood, but whenever we sold it.

Page 89

Q.   But that's the first thing that came to mind, is that you would be paying two mortgages?

A.   Correct.

Q.   And that's the first thing you wanted to testify to?

A.   Testify to?

Q.   Right.  I asked what are the payments?  And you said, well, I had two mortgages.

A.   No.  That -- I'm started with mortgages, yes.

Q.   Alright, what else -- what else --

MR. ZINN:  I'll object to the characterization.

Go ahead.

BY MR. CHASE:

Q.   What else were -- let's talk about the time frame now, and I'll go back a little bit.

So right now, it might be more fresh in your mind as to what your monthly obligations are.  No car payments.  Do you have car insurance?

A.   Yes.

Q.   What about electricity?

A.   Yes.

Q.   How much is that?

A.   It varies month to month, three hundred.

Q.   All right.  What about homeowners insurance?

A.   Yes.

Page 90

Q.   All right.  How much is that?

A.   I don't know.

Q.   Okay.  Say, maybe, like, 200 --

A.   Five hundred -- I don't know.  I honestly have no idea.  I don't know.

Q.   A couple thousand dollars a year, at most?

A.   Okay.

MR. ZINN:  I'll object to the form.

MR. CHASE:  We'll call it three --

MR. ZINN:  It's not even a question, so.

BY MR. CHASE:

Q.   Do you know how much homeowners insurance is?

A.   No.

Q.   Do you have a homeowners insurance policy?

A.   Yes.

Q.   Okay, as to Secoya?

A.   Yes.

Q.   You just don't know how much it is?

A.   Correct.

Q.   Okay.  Would it be fair to say -- if I call it "$300 a month," would that be somewhat fair?

A.   I don't know.

Q.   Okay.  What's your car insurance company?

A.   USAA.

Q.   And that's a discounted rate because that's for

Page 91

people that are connected to the military, right?

A.   Discounted compared to what, I --

Q.   People that aren't eligible to get USAA.

A.   Well, you can only get it if you have a military family, correct.

Q.   Right, and there's a benefit to it because it's a lower priced, right?

A   I don't know.

Q.   Okay.  What other monthly expenses are there?

A.   What did we do so far?

Q.   We have car insurance, we have electricity, and we have homeowners insurance.

A.   Water.

Q.   Water.  How much would water be?

A.   A hundred dollars.

Q.   Okay.  All right.

A.   What else?  Phone, cell phones.

Q.   Cell phones.

A.   For the family.

Q.   Okay.  How much is that?

A.   Like, 300.

Q.   Three hundred.  All right.  What else?  Internet?

A.   Internet.

Q.   How much is that?

A.   Maybe 150 --

Page 92

Q.   We'll say Internet plus cable.

A.   Oh, no, because cable is way different.

Q.   So Internet, we'll say 150.  Cable?

A.   Like 300, I would say.

MR. ZINN:  I'm sorry.  Did she -- did you say 150, or did he just say it for you?

THE WITNESS:  No, I did.

MR. ZINN:  Okay.

BY MR. CHASE:

Q.   Internet, one -- is that 150?

A.   Roughly, yes.

Q.   Okay.  And how much is cable?

A.   Roughly, either 300 or 350.

Q.   Let's call it 350.

A.   Okay.

Q.   What else?

A.   Pool maintenance.

Q.   all right.  How much is that?

A.   I believe 150 -- somewhere between 100 and 150.

Q.   Okay, call it 150.  What else?

A.   I know I'm missing things, but -- HOA fees.

Q.   Alright, how much is that?

A.   It's or eight or 900 every three months.

Q.   So about 300 a month?

A.   Yes.

Page 93

Q.   All right.

A.   I don't -- I don't know.

Q.   Alright, so, so far we have 300 a month for car insurance, 300 a month for electricity, 300 a month for homeowners insurance, 100 a month for water?

A.   Sure.

Q.   Okay, that's a thousand.  Then we have 300 for cell phone.  We have 150 for Internet.  We have 350 for cable, and then we have pool maintenance 150.  I'm going to call that 200, okay?

A.   Okay.

Q.   That's going to be another thousand, okay.  And then HOA fees is 300.

A.   Yes.

Q.   So, so far, we have 2300 a month.

A.   Uh-huh.

Q.   Okay, and you have 8,000 a month in after-tax income.

A.   Uh-huh.

Q.   And you had 2641 in a mortgage, right?

A.   Uh-huh.

Q.   So you have 2641 and then 2300.  It gets to 5,000, so you're in the black, 3,000 a month.

What else do you -- what other expenses are there?

          MR. ZINN:  I'll object to the form.

Page 94

THE WITNESS:  Currently or then, when my mortgage was 2600?

BY MR. CHASE:

Q.   Well, now it's lower, right?

A.   Right.

Q.   Okay, but let's say when it was 2600, what other expenses are there?

A.   Credit cards.

Q.   Credit cards, okay.  Well, what -- what do you spend -- what do you purchase on the credit card?

A.   All sorts of -- almost everything.

Q.   Okay, such as what?

A.   Food.

Q.   Food, okay.

A.   Clothes.

Q.   All right.

A.   Things that are needed for the house, like, our barstools broke so we had to buy new ones of those.

Q.   Okay.  How much would you say your monthly budget is for new clothes?

A.   I don't know.

Q.   Three hundred?

A.   Between me, my daughter, and my husband, honestly, I don't know.

Q.   Well, I'm talking about just for you, now.

Page 95

A.   Oh, me, a couple hundred dollars.

Q.   We'll say 300?

A.   Sure.

Q.   Okay.  And household, barstools, what do you think per month?

A.   Well, that is going to vary greatly.  Our air conditioner broke, so that was, you know, maybe $30,000.  And other months, it could be a couple hundred, so it depends.

Q.   That $30,000 is to replace an air conditioner?

A.   Two.

Q.   They're 30,000?

A.   I don't know, roughly.  It was multiple tens of thousands, yes.  Correct.

Q.   And food -- I have to ask these questions.  What do you generally eat?  Do you have a breakfast, you have a lunch, you have a dinner?

A.   I know you're not going to like this, but it varies.

Q.   No problem.

A.   It really does depending on work and --

Q.   That's totally understandable.  What time do you go to work in the morning?

A.   That varies, too, but generally, I leave around 7 a.m.

Page 96

Q.   7 a.m., okay.  Do you generally have breakfast before?  Do you eat anything before?

A.   I'll typically stop on my way in to work to get something or I'll eat at work or I won't eat at all, depending on what the day is like.

Q.   Okay.  What -- when you eat at work, what would you have for breakfast?

A.   Eggs, sausage --

Q.   Regular breakfast food?

A.   Yes.

Q.   And that would be how much?

A.   Five dollars, I don't --

Q.   Let's say five dollars -- let's say ten.

A.   Okay.

Q.   Okay.  Alright, and then lunch, what would you typically have for lunch?

A.   It depends on what's at the cafeteria, but I eat at work.

Q.   At work.  Alright, so you'd have a work lunch at work, and how much would that typically cost?

A.   Ten dollars maybe, if I had to guess.

Q.   Ten dollars -- let's call it 20.

A.   Okay.

Q.   Alright, and dinner.  What time would you get home from work?

Page 97

A.   It varies --

Q.   It varies.

A.   -- but typically, I'm home for dinner.

Q.   All right.  And dinner, what's a -- I know it varies day to day, but what's a average, typical dinner?

A.   Some kind of meat or fish, a protein, and a vegetable.

Q.   Alright, and do you have a health background?

A.   Yes.

Q.   Okay, and so what would it cost to make a dinner?

A.   I don't cook, as embarrassing as that is.

Q.   Okay.

A.   Nor do I typically do the groceries.

Q.   Let's say 30, thirty for dinner.

A.   Okay.

Q.   Alright, so about $50 a day in food.

A.   During the week, sure.

Q.   During the week.

A.   If we don't go out for dinner, sure.

Q.   But that would include -- well, we'll take dinners out another time.

So $50 a day would be, what $1500 a month in food?

A.   Yes.

Q.   Okay, so that's 1500.  Anything else?  Any other expenses?

Page 98

A.   Yes, I don't know them off the top of my head, but yes.

Q.   Okay, could you name some?

MR. ZINN:  Objection.  She asked and answered.

THE WITNESS:  I can't think of any more off the top of the my head, but I know that my bills are more than that, so.

BY MR. CHASE:

Q.   Okay.  So you can't think of anything else, other than what we discussed here?

A.   Currently, no.

Q.   And you signed a loan application where you attested to your expenses, right?

A.   I don't know.

Q.   Your monthly expenses.  Let's take a look at Exhibit No. 4.

A.   Okay, oh, not page 4.

Q.   Exhibit 4.

A.   Okay.

Q.   Do you see in the upper left-hand corner where it says "base income 14,880"?

A.   Yes.

Q.   Was that your base income?

A.   Yes.

Q.   So it was about 15,000 a month, not 13?

Page 99

A.    Like I said, before insurance, retirement, taxes, everything else comes out, yes.

Q.    You signed a sworn statement saying it was 14,880, correct?

A.    Yes.

Q.    All right.  Did you get pre qualified before you signed this mortgage application?

A.    I would assume so.

Q.    Did you provide data to a lender of sorts pursuant to a pre-qualification?

A.    If I had to go through a pre-approval to get the mortgage, then, yes, I would have done that.

Q.    Would you have given accurate and truthful information to that person that would be giving your pre-approval?

A.    Yes.

Q.    Same accurate and truthful information that you gave under your sworn statement, correct?

A.    Yes.

Q.    And under both of those metrics, you were able to qualify for a $2,641 monthly payment?

A.    We talked about this.  According to the mortgage company, I was able to pay that.  They don't take into account any other financial responsibilities that I have.

Q.    Were there the other expenses that you weren't

Page 100

disclosing to them?

A.    They didn't ask for my monthly bills, so no, I didn't disclose that if they didn't ask for it.

Q.    Alright, and you've purchased property -- have you purchased property prior to 2020?

A.    Yes.

Q.    Okay, and so you know what paying a mortgage entails?

A.    Yes.

Q.    Have you ever been deficient on a mortgage payment?

A.    Yes.

Q.    Okay, and what happened with that?

A.    It was during my first mortgage, but I don't know.  I don't remember.

Q.    Okay.  But you were confident -- and you also had, as a buffer, if you got into any financial trouble, you had $297,00 in your 401(k) at that time?

A.    I never considered my 401(k) as a way to pay my monthly bills.

Q.    Alright, so when should somebody use a IRA to pay bills?

A.    When they need to, or when they want to, for that matter.

Q.    Alright, and it never occurred to you to use a

Page 101

401(k) to pay bills?

A.   My bills, no.

Q.   Okay.

A.   I was working.

Q.   Okay, and why did you so quickly say that you would not use a retirement account to pay bills?

A.   My retirement account.

Q.   Okay.  Do you -- have you --

A.   Because I was working.

Q.   Has this been something that you thought about?

A.   No.

Q.   You never thought about it?  You're just very clear on saying that?

        MR. ZINN:  I'll object to the form, but you can answer it.

        THE WITNESS:  Yes.

BY MR. CHASE:

Q.   Have you ever taken money from your retirement account and given it to Dr. Martinez?

A.   No.

        MR. CHASE:  Alright, if we could mark this as No. 5.

(The document referred to was marked for identification as
                    Exhibit No. 5.)

BY MR. CHASE:

Page 102

Q.   Fidelity Investments is the investment company associated with your retirement account, correct?

A.   I believe so.  I -- honestly, I don't know which company owns it, currently, because I've had it for a long time and it switched multiple times.

Q.   In the time that you were doing the data entry for Dr. Martinez, did you ever see Fidelity on any of those disclosures?

A.   I don't remember.  I don't know.

MR. CHASE:  Okay.  Let's mark this as No. 6.

(The document referred to was marked for identification as Exhibit No. 6.)

BY MR. CHASE:

Q.   Alright, do you recognize Exhibit No. 6?

A.   Yes.

Q.   Okay.  What's the date of that statement?

A.   There's a period -- a statement period.  1-1-2020 through 7-17-2020.  Is that what you're looking for?

Q.   Yes.

A.   Okay.

Q.   Where were you living as of 7-17-2020?

A.   Naples.

Q.   All right.  Do you see the address on Exhibit 6?

A.   Yeah.

Q.   Why -- what is that address reflecting?

Page 103

A.    That is addressing my old Connecticut address.

Q.    Okay.  Is that address accurate?

A.    Currently?  No.

Q.    Was it accurate on 7-17-2020?

A.    No.  It was accurate on 1-1-2020.

Q.    Okay, but didn't you move in with Dr. Martinez to 92 North Gate in 2018?

A.    Yeah.

Q.    So how could you be living at 22 Weatherstone in Avon as of 2020?

A.    Because he foreclosed on the Avon house and we had to move out of it, so we moved to 22 Weatherstone.

Q.    So you moved to 22 Weatherstone after when?

A.    After he lost his job and had to foreclose on the house.  So I would say -- I don't know.  January of -- he stopped working in 2018, so I would say January of 2019, maybe.  In that time frame.

Q.    Okay.  What was 22 Weatherstone?  That was a lease, correct?

A.    Correct.

Q.    All right.  And who was the tennant?

A.    Me, my husband, and my daughter.

Q.    All right.  And did you disclose that on the sworn statement to the lender?

A.    I have no idea.

Page 104

Q.   What did you say was your address in this sworn statement?

A.   22 Weatherstone.

Q.   Did you disclose the rent?  How much was the rent at 22 Weatherstone?

A.   Four thousand dollars.

Q.   Did you disclose that?

A.   If they asked for it, I would have.  I don't know what they asked for.

Q.   All right.  And so what's the balance here on the first page of Exhibit 6?

A.   The beginning balance or end balance?

Q.   Any balance.

A.   $297,178.22.

Q.   All right.  And if you were short on -- you don't want so -- you said you've been in a foreclosure situation before, it's not something you want to do again, I assume?

A.   I didn't foreclose, my husband did, but --

Q.   Okay.

A.   -- I was living with him at the time.

Q.   It's not a situation that you want to be in, true?

A.   Correct.

Q.   Okay, so if you were in a situation where you were having trouble paying the bills, would you choose

Page 105

foreclosure, or would you choose taking out money from the 297,000 in your 401(k)?

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  That's a rhetorical question.

BY MR. CHASE:

Q.    It's not, but it's hypothetical, but --

A.    Hypothetical.  I would ask my husband if he would help me.

Q.    So you would have a conversations?

A.    Yeah.

Q.    Do you have conversation with Dr. Martinez about finances?

A.    I told you I did.

Q.    You do?  Okay, so let's go back to the conversations with Dr. Martinez about finances.

2018, not much.

A.    None.

Q.    None.  2019, still --

A.    Yes, because that's when he was foreclosing on the house and we had to move.

Q.    Okay, so let me just break down the foreclosing. He elected to stop making payments, yes?

A.    No.  He tried to do a short sale and the plaintiff in this case refused to allow him to do that, so

Page 106

he was forced to foreclose.

Q.   How do you know that?

A.   Because he told me.

Q.   So you did talk about the plaintiff?

A.   At -- like now, yeah.

Q.   When did you become of the perspective that the plaintiff had involvement in Dr. Martinez's nonpayment of his mortgage?

A.   During this whole process.

Q.   Of 2022?

A.   Yes, correct.

Q.   Oh, okay.  Who told you that?

A.   My husband.

Q.   Dr. Martinez told you that the reason he stopped paying his mortgage in Connecticut was the plaintiff's fault?

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  He never said he stopped paying the mortgage.  He said he foreclosed on the house.

BY MR. CHASE:

Q.   Okay.  How do you understand the term "foreclosed on"?

A.   Gave it to the bank, or the bank took it, I guess.

Page 107

Q.   A foreclosure -- generally, a foreclosure is when the lender initiates judicial action to retake the property.

A.   Okay.

Q.   and why would a lender do that?

A.   I -- there's probably a bunch of reasons.  I don't know.

Q.   What do you think is the most common reason?

A.   Not paying it.

Q.   Was it your understanding that Dr. Martinez stopped paying the mortgage in Connecticut?

A.   No.

Q.   No?

A.   I don't know.  I have no idea.

Q.   Masters degree, right?

A.   Yes, correct.

Q.   Okay, so if a person is still paying the mortgage, does a foreclosure usually happen?

A.   Not --

MR. ZINN:  Object to the form.

But you can answer it.

THE WITNESS:  I don't know.

BY MR. CHASE:

Q.   Okay, so when you say a "foreclosure" occurred with respect to the Connecticut property, you didn't think

Page 108

it was for nonpayment of the mortgage?

A.   I didn't really think what it was for.

Q.   Okay.  And it was -- the explanation given to you by Dr. Martinez was, it was the plaintiff's fault?

A.   Now, yes --

MR. ZINN:  Object to the form.

THE WITNESS:  -- then, he couldn't afford it, he said.

BY MR. CHASE:

Q.   He couldn't afford it.  Okay.  And so --

A.   He lost his job, and he couldn't afford it.

Q.   He couldn't afford it.  And so, at the time, from let's say 2015 to January 2019, do you have an idea of what Dr. Martinez's salary was?

A.   You asked me that already.

Q.   You have no idea?

A.   No.

Q.   Okay.  Did you know he was making over a million dollars a year?

A.   I didn't know what he was making.

Q.   Do you know now?

A.   Exactly, no.

Q.   You file joint tax returns with him, yes?

A.   He does.  He did the joint tax returns.

Q.   You signed it?

Page 109

A.    Sure.

Q.    And in 2019, the two of you reported about $475,000 of income.

A.    I find that hard to believe, because he had no income, and my income was the only income, so.

Q.    And in 2020, the two of you reported over $900,000 dollars of income.

A.    In what year?

Q.    2020, your tax return.

A.    Again, he --

MR. ZINN:    Object to the form; there's no question pending.

BY MR. CHASE:

Q.    What -- did you know that in the year 2020, your joint tax return, over $900,000 of income was reported?

A.    No.

Q.    Did you sign --

A.    Yes.

Q.    -- your tax return in 2019?

A.    Yes.

Q.    Did you sign your tax return in 2020?

A.    Yes.

Q.    Okay, and you thought that your joint income was what?

A.    A hundred and sixty-five thousand.

Page 110

Q.    You thought there was no income as to Dr. Martinez in 2019?

A.    Correct, he wasn't working.

Q.    Okay, and you thought there was no income as to Dr. Martinez in 2020?

A.    Correct.  He wasn't working, I don't think.  When -- if he started working, it was the end of that year.  I don't know if it was 2020 or 2021, but.

Q.    In 2019, did you become aware at any point that Dr. Martinez had withdrawn money from his retirement account?

A.    In when?

Q.    2019.

A.    No.

Q.    Okay.  In 2020, did you become aware that Dr. Martinez had withdrawn money from his retirement accounts?

A.    Yes.

Q.    You did, okay.  When did you first become aware that Dr. Martinez was withdrawing money from his retirement accounts?

A.    When we were going to buy the Englewood home.

Q.    All right.  The Englewood home, which was a -- about $240,000 was the purchase price?

A.    Yes.

Page 111

Q.   And what was your salary at the time?

A.   In Connecticut?  It was 170 or 175.

Q.   And you had an offer letter as of the summer of 2020 to start work at around the same salary.  165 was the base, right?

A.   Correct.  Yeah.

Q.   Okay.  So your salary was pretty much the same, Connecticut to Florida, substantially the same?

A.   Yes.  Well --

MR. ZINN:  Wait until he finishes the question. The two of you keep talking over each other.

THE WITNESS:  Okay.

MR. ZINN:  I would hate to be the reporter.

THE WITNESS:  Sorry, you can yell at me.  It's okay.

BY MR. CHASE:

Q.   The purchase price of the Englewood home was about 240,000?

A.   Yes.

Q.   You were earning over 160,000?

A.   Yes.

Q.   The mortgage was going to be something like $1500 a month?

A.   Yes.

Q.   Which included all of the escrow, correct?

Page 112

A.   Actually, I don't -- with no down payment, you are saying the mortgage would have been 1500?  I don't know.

Q.   Well, you got the gift, right?

A.   My husband put $120,000 towards the home.

Q.   Right.  Did you need that gift to afford a mortgage of around 200,000?

A.   We felt we did.

Q.   You didn't feel like you could pay a mortgage of about 200,000 on a $165,000 a year salary?

A.   It wasn't "could," did we want to, no.

Q.   Why not?

A.   Because we wanted money to be able to live comfortably and to save for retirement and to have -- of emergencies come up.

Q.   So if you wanted to have more money to save for retirement, would it make sense to withdraw from a retirement account?

A.   It's not my retirement account.

Q.   Well, if you said that one of the values that you had was to save for retirement, right?  You said --

A.   My --

Q.   Yours.

A.   Yes, correct.

Q.   Well, you're discussing this jointly with

Page 113

Dr. Martinez, right, because you were married at the time?

A. Yeah.

Q. And you're planning this purchase of Englewood together with him, right?

A. Yes.

Q. And so one of your goals, as a discussion with Dr. Martinez, is to save for retirement?

A. Yeah.

Q. Did you become aware that he withdrew money from his retirement account?

A. Yes.

Q. Why would he do that if the goal was to save for retirement?

A. Because he didn't have anything to put into that retirement account.

Q. Okay, so the money is already in the retirement account?

A. Right.

Q. And you want to maximize money in the retirement account, and so money was taken out?

A. Money that goes into a home that we own is also earning money.

Q. How is it earning money?

A. In the market. What do you mean? People put money into their homes all the time.

Page 114

Q.   Okay.

A.   I guess I don't understand the question.

Q.   The question is, do you understand what was happening?  Okay?  So you qualified --

A.   Yes.

Q.   -- in August of 2020 for a mortgage for 480,000?

A.   Yes.

Q.   And in March, your salary was basically the same as it was in August of 2020, correct?

A.   Base salary, but like we said, with overtime and everything that I was working up North, no.  It was probably $30,000 less.

Q.   Okay.  Your base salary was 165?

A.   Here.

Q.   Here.  And you testified that your base salary in Connecticut was?

A.   175, and then you asked about bonuses and anything else, and I said, with overtime.  And you asked how much that was, and I think I said 200 or 190, something like that.

Q.   Okay.  And your base salary in Connecticut was 170 to 175?

A.   Yes.

Q.   Okay, and then your base salary in Florida was going to be 165?

Page 115

A.   Yes.

Q.   Pretty similar.

A.   Except I wasn't doing overtime to get that extra $30,000.

Q.   Well, you hadn't started yet.  Did you know whether you were going --

A.   There was no opportunity for overtime.  I knew that when I took the job.  Which is fine, but --

Q.   Do you ever get overtime at this job?

A.   No.

Q.   None?

A.   No.  Zero.  We're salary.

Q.   Okay, so you qualified for a $480,000 mortgage in August of 2020, on your own?

A.   Yes.

Q.   And you were --

A.   Well, not -- yes, but I had to have the 140 given by my husband to qualify.

Q.   Well, he gave you the 120, 140 for both.

A.   Right.

Q.   For each one.  There's two different ones, right?

A.   Right.

Q.   Okay.  You say -- why do you say that you wouldn't be able to qualify for a $200,000 mortgage for Englewood?

A.   I never said I couldn't.

Q.   Okay, so could you -- do you think you would have been able to qualify for a $200,000 mortgage?

A.   Yes.

Q.   Why wouldn't you have done that instead of going for a $100,000 mortgage plus a gift?

MR. ZINN:  Objection; asked and answered.

You can answer it again.

THE WITNESS:  I answered that already.  And I said so that I would have extra money for emergencies, for retirement, for paying bills, and to make things more comfortable.

BY MR. CHASE:

Q.   All right.  So the delta in a $200,000 mortgage versus a $100,000 mortgage is how much per month?

A.   Delta 200 to -- a hundred thousand.

Q.   Let's say it's a difference of a thousand a month.  It's much less, but let's just say --

A.   Oh, a month.

Q.   You're going to save a hundred thousand dollars a month -- a thousand dollars a month.

Let's say you were going to save a thousand dollars a month.

A.   Uh-huh.

Q.   You knew that Dr. Martinez was willing to give

Page 117

you gifts in the six-figure range --

MR. ZINN:  Objection to the form.

You can answer it.

BY MR. CHASE:

Q.  -- right?

A.  No.

Q.  No?  Did he give you a gift in the six-figure

range?

MR. ZINN:  Object to form.

You can answer.

THE WITNESS:  He gave me money to buy the home

that we live in.

BY MR. CHASE:

Q.  Okay.  The gift?

A.  No, to buy our home, which would reduce my

monthly bills.

Q.  Okay, but you knew he was willing to give you

gifts in the six-figure range, correct?

MR. ZINN:  Object to form.

BY MR. CHASE:

Q.  Because he did do that, right?

MR. ZINN:  Object to form.

THE WITNESS:  No.

MR. ZINN:  Object to form.

THE WITNESS:  He gave me money to buy the home,

Page 118

so I would have more available money to pay bills, if need me.

BY MR. CHASE:

Q.   Are you denying that you received a gift now?

MR. ZINN:  Object to form.

THE WITNESS:  I received money to buy the home, which is what this gift letter says, for the purpose of the 15919 Secoya Reserve Circle in Naples.

BY MR. CHASE:

Q.   Okay.  Did you have a conversation with Dr. Martinez whereby he would only give you gifts for buying homes, but not for anything else?

MR. ZINN:  Object to form.

THE WITNESS:  We never had that conversation.

BY MR. CHASE:

Q.   Okay, so how did you know that you wouldn't be able to get a gift for something else?

MR. ZINN:  Object to form.

THE WITNESS:  I wouldn't know what's going on in his head.  You have to ask him what he is and isn't willing to do.  I don't know.

BY MR. CHASE:

Q.   Okay.  Well, have you ever asked him?

A.   No.

Q.   You never asked him what he's willing to do with

Page 119

regard to gifts?

A.   No.

Q.   Why not?

A.   Why would -- why would anyone ask their husband or wife what gifts they're willing to give them.  It never occurred to me.

Q.   Okay, so you didn't coordinate the receipt of the gift?

A.   We coordinated buying our homes, yes.

Q.   Did you know that Dr. Martinez withdrew $352,000 from his retirement account between June 30, 2019, and March 30, 2020?

A.   No.

Q.   You didn't know what?

A.   No.

Q.   Did you ever talk to him about withdrawals from his retirement account?

A.   Only for the purposes of buying these two homes.

Q.   All right.  So you -- as we it here today, is that news to you, that he withdrew that money from his retirement account?

A.   That number?  Yes.

Q.   Did you have an understanding that he had withdrawn money from his retirement account in 2019 or 2020?

A.   I just answered that.

Q.   Contemporaneous?

A.   I just answered that.  I knew that he withdrew money from his retirement account to buy these two houses.

Q.   So you did know?

A.   To buy these two houses?  Yes.

Q.   Okay.  But that number doesn't match the 120 and -- the 139 and the 120?

A.   I just said I didn't know he withdrew that number.

Q.   Okay.  Did you know that between June 2020 and July 2021, Dr. Martinez withdrew 779,000 from his Schwab account?

A.   No.

Q.   Okay, so you didn't know that 352,000 was withdrawn from the American Funds account between June 2019 and March 2020.  You didn't know that?

A.   No.

Q.   And you didn't know that 779,000 was withdrawn from the Schwab account between June 2020 and July 2021?

A.   No.

Q.   As we sit here today, that is a surprise to you, you did not know that?

A.   Correct.

Q.   Okay.  Despite signing the tax returns?

Page 121

A.   Correct.

Q.   Okay.  Despite knowing what AGI means?

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know what AGI means.

BY MR. CHASE:

Q.   Do you know what adjusted gross income means?

A.   No.

Q.   Did you ever talk with Dr. Martinez about ways to avoid his payment to plaintiffs -- to plaintiff?

A.   No.

Q.   Never came up?

A.   Never.

Q.   Never strategize about how to structure financial transactions between the two of you so that he would avoid paying the plaintiff the contempt sanction?

A.   Absolutely not.

Q.   How are you so certain of that?

A.   Because I know I never had that conversation.

Q.   Okay, and if he had brought up that very conversation, what would have been your reaction?

MR. ZINN:  Object to the form.

You can answer it.

THE WITNESS:  He never did.

BY MR. CHASE:

Q.   Right.  But if he had, if he said, hey, let's

Page 122

think of a way for us to structure our financial dealings with one another so that I can avoid paying this contempt sanction that was issued in 2017, if he had said that to you, what would have been your response?

MR. ZINN:  Object to the form.

You can answer it.

THE WITNESS:  I don't want any part of that.

BY MR. CHASE:

Q.  Okay, so if you were of the understanding that the structure of these financial transactions between the two of you were undertaken -- if you had the understanding that it was undertaken specifically to avoid payment of a court ordered contempt sanction --

A.  Correct.

Q.  -- you wouldn't want any part of it?

A.  Correct.

MR. ZINN:  Object to the form.

BY MR. CHASE:

Q.  And you would have given the gifts back?

MR. ZINN:  Object to the form.

THE WITNESS:  No, I never would have had him give me money for our homes if that was his intent,  and I knew that was his intent.

BY MR. CHASE:

Q.  Did it strike you as unusual that there were

Page 123

gifts being given to you, despite a judgment owed to another?

MR. ZINN:  Object to the form.

THE WITNESS:  No.

BY MR. CHASE:

Q.   It didn't strike -- have you ever been in a legal situation where there's a judgment owed to person A, and then person B is paying person C instead of paying person A?

A.   No.  That -- again, our interaction with any money that goes between my husband and I are for the purpose of paying our family bills, supporting our family. It's never come into account, ever, anything to do with the plaintiff.

Q.   She's not even talked about?

A.   Correct.

Q.   Even after this lawsuit?

A.   Not when it comes to do with our family finances, no.

Q.   Okay.  All right.  Taking a look at Exhibit No. 7, you are aware, are you not, that at some point in April of 2022, a joint account at PNC was created?

A.   Yes.

(The document referred to was marked for identification as
                    Exhibit No. 7.)

Page 124

BY MR. CHASE:

Q.   Why did that happen?

A.   So we could pay bills, pay our bills --

Q.   Okay.  But you --

A.   -- more easily, I would say.

Q.   More easily.  Okay.  What was the difficulty in paying the bills before?

A.   Because I didn't have access to -- now that he was working, we wanted an account where I could use money that he makes to pay our family bills.

Q.   Okay.  And what are those bills again, other than the ones that we talked about?

MR. ZINN:  Objection; asked and answered.

THE WITNESS:  I answered that.  There's those, plus others that I can't remember.

BY MR. CHASE:

Q.   Okay, so the ones that we discussed, it's about ten bills a month?

A.   Like I said, there's more, but I don't remember them all.

Q.   And you're a fairly sophisticated person, right?

A.   Yeah.

Q.   You saved in your retirement account?

A.   Yes.

Q.   You have not been sued for nonpayment of an

Page 125

obligation before this case?

A.   Correct.

Q.   Okay, you've paid your bills?

A.   To the best of my ability.

Q.   You haven't had trouble in paying bills?

A.   False.

Q.   Okay.  Aside from a situation up north, you had problems paying bills?

A.   Yes.  Here, you're saying?

Q.   In -- let's say --

A.   Yes, I have had issues paying bills, yes.

Q.   Okay.  With your 170 to $190,000 salary, you've had issues paying bill?

A.   Yes.

Q.   What type of expenditures were you incurring?

A.   When I was divorced, I was a single mom supporting a daughter, having to pay expensive rent in Connecticut, all of my other bills.  So, yeah, it was difficult.

Q.   And you made that work?

A.   Kind of.

Q.   You have never been sued for nonpayment?

A.   I've never been sued, correct.

Q.   Okay, and you are sophisticated with technology to the point where you can put your bills on auto-pay?

Page 126

A.   Yeah.

Q.   And in fact, some of these bills, you don't even know how much they are?

A.   Correct.

Q.   But you know that they're paid?

A.   Correct.

Q.   So where is the difficulty in paying bills?

A.   What do you mean?

Q.   What's the difficulty in your payment of bills?

MR. ZINN:   Object to the form.

But you can answer.

THE WITNESS:   I currently don't have any difficulties.

BY MR. CHASE:

Q.   Okay, but you didn't have any difficulties in 2019, correct, 2020, 2021, right?

A.   Are you saying financial difficulties?

Q.   Just trouble -- trouble.  Like, what's the problem with paying bills?  Are you having -- did you have any problems at that time?

A.   Funds were tight, yeah.

Q.   But were you able to pay the bills?

A.   Yes.

Q.   Okay, so why did you need a joint account to do something that you were already able to do?

Page 127

A.   Because we were married and we decided that we were going to use my husband's income along with mine to jointly pay bills.

Q.   Well, why couldn't you do that -- you kept your personal account, you didn't close that down, right?

A.   Because all of the bills, when he wasn't working, were coming out of that account.  It was too much work to change everything and switch everything.

Q.   You didn't close down your personal account --

A.   Correct.

Q.   -- correct --

A.   Correct, yes.

Q.   -- when you entered the joint account, and you kept your salary going into that personal account?

A.   Yeah.

Q.   Okay, so you still had access to pay all of the bills you were paying before from that personal account?

A.   Yes.

Q.   Okay, so why did you need this joint account?

A.   So that he could contribute to the family bills.

Q.   Couldn't he just contribute from his own individual account?

A.   That would require us switching all the bills to a new account, which I didn't feel like going through.

Q.   Well, the April 2020 establishment of the new

Page 128

account was brand new, correct?

A.   Yeah.

Q.   There was no joint account before April 2022?

A.   He had no income, so no.

Q.   April 2022 was the same month that this lawsuit was filed, correct?

A.   I don't know.

Q.   Alright, did opening this new account coincide with this lawsuit?

A.   No.

Q.   Okay.  When was the first time you first discussed opening a join account with Dr. Martinez?

A.   Once he started getting a regular paycheck.

Q.   Which was far before April 2022, right?

A.   What are you define as "far before"?

Q.   When did he start getting a regular paycheck?

A.   I believe March was when he signed his full-time contract for a job.

Q.   March of 2022?

A.   Oh.  No -- I don't know.

Q.   He had been receiving regular payments for some time before April of 2022, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know.  He's -- wait.  Can I think for a second?

Page 129

BY MR. CHASE:

Q. No, I'm kidding. Yes, you can.

A. I believe he started working part time or per diem the end of 2021, and he didn't get a -- what I would consider a consistent or a real job until March of 2022, I'm pretty sure.

Q. What's your understanding of how much Dr. Martinez is earning now?

A. Around $300,000 a year.

Q. Now?

A. Yeah.

Q. What about in 2021 and 2022?

MR. ZINN: Object to the form.

But you can answer it.

THE WITNESS: I don't think he was working in 2021. If he started working, it was part time in, like, December. It was like a month.

BY MR. CHASE:

Q. All right. So if your salary is pretty close to 200,000, okay?

A. 165.

Q. 165, your base salary. You didn't earn a dime above that?

A. Correct.

Q. Okay, and Dr. Martinez's salary is, let's say

300, but it might be a little bit more.

A.   Okay.

Q.   Let's just say it's 300.  That's $465,000 a year, correct?

A.   Starting in 2020 -- after the beginning of 2022, yes -- it will be, yes, for the full year.

Q.   Okay.  And we add to that the 1.3 million that Dr. Martinez took out from his retirement accounts in the time frame 2019 to 2021, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know when he took out any --

BY MR. CHASE:

Q.   You don't know anything about that?

A.   -- correct.

Q.   Okay.  Are you able to pay household bills with $465,000 a year?

A.   Yes.

Q.   And the mortgage is about $1500 a month?

A.   Yes, I believe so.

Q.   All right, so you're in the black quite a bit per month, right?

A.   No, because we're really not saving, so, no, we're not.  We're about even I would say, because --

Q.   About even?

Page 131

A.    Oh, I know another thing, legal fees.

Q.    Oh, okay.  And what are legal fees per month?

A.    Per month, I don't know, but we've paid, I would say, hundreds of thousands of dollars since the beginning of this Florida legal situation.

Q.    To Mr. Zinn's office?

A.    Correct.

Q.    Hundreds of thousands.  Do you have an approximate amount?

A.    Over the past two years, no, I don't have an approximate amount.

Q.    Okay, there's been a few $10,000 payments, so is there a different source of income paying Mr. Zinn?

A.    My husband now pays Mr. Zinn.  I paid, I think out of my account, roughly, 40,000.  And since then, the rest has been paid by my husband.

MR. ZINN:  When we have a chance to break, let me know.  I need a break, another restroom break.

MR. CHASE:  Okay, it will be fairly soon.

MR. ZINN:  Okay.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Q.    Okay.  With the $465,000 adjusted gross income as of 2022 --

A.    Okay.

Page 132

Q.   -- are you able to consult with as many attorneys as you need?

A.   No.

Q.   Are you able to afford an attorney?

A.   An attorney, yes.

Q.   Okay.  Are you able to consult with a Connecticut attorney?

A.   Am I, there would be no reason.

Q.   Well, the two of you.

MR. ZINN:  I'll object to the form.

THE WITNESS:  There would -- I don't understand.

BY MR. CHASE:

Q.   If you wanted to understand the legal obligations and legal statuses of the various parties, is there anything stopping you from retaining an attorney in Connecticut?

A.   No.

Q.   Okay.  Has Dr. Martinez ever told you that he doesn't understand what his obligations are?

A.   No.

Q.   Has there been -- do you know people in Connecticut still?

A.   Yes.

Q.   Okay.  You were working there for 13 years?

A.   Yes.

Page 133

Q.   If you needed to find a Connecticut lawyer, would you be able to do it?

A.   Yes.

Q.   There's nothing stopping you, you're not out of cell phone service --

A.   No.  Correct.

Q.   -- in the Sahara Desert, you can get an attorney in Connecticut if you wanted to?

A.   Yes.

Q.   Okay.  And is there anything that you're aware of that prevents Dr. Martinez from retaining a Connecticut attorney?

A.   I don't know.  You would have to ask him that.  I honestly have no idea.

Q.   Do you know who his cell phone provider is?

A.   Yeah.  The same as mine, AT&T.

Q.   Do you know if he has long-distance calling?

A.   Yes.

Q.   Okay.  So he can call the 860 area code --

A.   Yes.

Q.   -- and look for an attorney out there?

A.   Yes.

Q.   In fact, he's -- do you know that -- he's had attorneys in Connecticut, correct?

A.   I'm sure he has.

Page 134

Q.   Okay.  So if it was stated that there hasn't been an opportunity to consult with a Connecticut attorney, would you have anything to contribute as to that notion?

MR. ZINN:  Object to the form.  But you can answer.

THE WITNESS:  I don't know why I would.  I only --

BY MR. CHASE:

Q.   Okay, has Dr. Martinez ever told you, I can't find a Connecticut attorney?

A.   I have never talked to him about attorneys --

Q.   Okay.

A.   -- other than Mr. Zinn.

Q.   Okay.  Before April of 2022, you never had a joint bank account with Dr. Martinez?

A.   Actually, false.

Q.   You had a joint bank account with him?

A.   One of the People's accounts was a joint account when we lived in Connecticut.

Q.   Okay.  That was closed, though?

A.   Yes.

Q.   When was that closed?

A.   I don't know.  Sometime after we moved to Florida.

Q.   How did you know it was on this side?

Case 2:22-cv-00216-KCD-NPM   Document 146-1   Filed 05/20/25   Page 416 of 621
PageID 3790

Page 135

A.   What is?  The bug?

Q.   The Peoples.

A.   Oh.

Q.   Why did you open that?

A.   Because I was paying the health insurance and, honestly, they needed proof that we had a joint account for him to be able to be on my health insurance.

Q.   Was it closed?

A.   Is it closed now?  Yes.

Q.   Yes.  When was it closed?

A.   I don't know.

Q.   Why was it closed?

A.   Because People's is a Connecticut bank and we moved to Florida.

Q.   Okay.  And you didn't want to pay the $3 transaction fee for ATMs?

A.   They don't have -- right.  And I couldn't make deposits because it was Connecticut, I couldn't -- if I needed cash, I -- yes, it was very inconvenient to have a Connecticut only small bank while living in Florida, yes.

Q.   And the reason is because you were not able to do what?

A.   Easily do transactions, deposits, go to a bank teller if I needed to, anything.

Q.   Okay.  You are not running in the red as of March

800-726-7007                                              305-376-8800

Page 136

2022, correct?  You were not racking up a credit card balance?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  I've always had a credit card balance, I believe, yes.

BY MR. CHASE:

Q.   Before a joint account was opened at PNC, during the time frame of, let's say, 2021 -- late 2021 to early 2022.

A.   Ye.

Q.   The time frame after Dr. Martinez started working again --

A.   Yes.

Q.   -- and before the joint account was opened, were you having trouble paying bills?

A.   I don't know.  No.

Q.   Okay.  And in fact, it was easier, as of the end of 2021, after Dr. Martinez started making money again?

A.   Correct.

Q.   Okay.  And so, what was the difficulty in paying bills at that time?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  Like, technicality?  I guess I

Page 137

don't understand what you're saying.

BY MR. CHASE:

Q.    Why did you open a joint account in April of 2022?

A.    So that we could pay bills with his income, with the money he was making.

Q.    But why would you need a joint account for that?

A.    Because the bills came out of a different account.  So I could have access to be able to take that money without him having to write me a check or do whatever and pay the bills with it.

Q.    Okay.  So the existence of the joint account was so that he wouldn't have to write you a check?

A.    The purpose of the joint account was, we were married, he was working, we were paying bills jointly as a family.

Q.    Okay.

A.    So I needed access to his income.

Q.    Okay, so the bills were to be paid from the joint account?

A.    No.  The bills were going to remain in my account because I didn't feel like switching them all to the joint account.

Q.    Okay.  So the switch that was going to occur, with regard to payment of bills, in April of 2022,0 was

Page 138

that bill were going to be still paid from your account?

A.    Yes.

Q.    Okay, so why was there a joint account needed?

A.    Because we were going to use his income to pay the bills.

Q.    But wouldn't they be paid from your account?

A.    His income wasn't in my account.

Q.    Okay.  Were you going to pay the bills from your account or from the joint account?

A.    Can -- you can say no, obviously, but can I just describe how we do bills?  It may be easier if I just --

Q.    Yes, please.  Please.

A.    Okay.  I was paying all the of the bills when he wasn't working, so 2008 -- I don't know.  When he wasn't working.  So all of the bills were coming out of my bank account.  They were set up to auto come out of my bank account every month.

Then he started making money and was going to contribute to the family bills.  Instead of switching each and every single bill and all of the about payments, we opened up a joint account so that I could easily have access to his income to pay our bills with that come out of my account -- my bank account.

Q.    Okay, so you were going to send money from the joint account to your individual account --

Page 139

A.   Right.

Q.   -- for you to pay the bills?

A.   Correct.  Yes.

Q.   And you thought that was easier than putting the bills in the joint account?

A.   Yes.  There's too many of them to switch, yes.

Q.   Okay.  So you weren't going to use your income to pay anymore bills?

A.   Yeah.  My income goes into that account, too.

Q.   Your income goes into the joint account?

A.   No.  Into my account.  It already had been -- that had all been set up.  My income went into my account, all of the bills came out of my account.  The only thing we needed to was to be able to now use some of his income to also pay the bills.

Q.   Okay, so all of the bills were going to be paid from your individual account?

A.   Yes.

Q.   Which was receiving --

A.   They always were.

Q.   Always were, right.

A.   Yes.

Q.   And so you're saying that he needed to switch from an individual account to a joint account in order to send money to your individual account?

Page 140

A.   I guess he didn't technically have to, but it was easier, because I could just do it myself.

Q.   Okay.

A.   If my name is on the account --

Q.   Okay.

A.   -- he doesn't technically have to do it, I can do it if I want.

Q.   So he didn't need to set up a joint account?

A.   Did he absolutely have to and there was no other way to do it, no.  There's multiple ways to pay your bills.  That's the way we chose to do it.

Q.   And he hasn't had trouble transferring money from his individual account to your individual account in the past?

MR. ZINN:  Object to the form.

But you can answer.

THE WITNESS:  He hasn't had to on a monthly basis, so I don't know.

BY MR. CHASE:

Q.   Okay.  But you can set an auto-payment on a monthly basis, right?

A.   Auto-payment from bank to bank?  What do you mean?

Q.   Yeah.  Couldn't you send an automatic payment from one bank to another bank to just hit at the same time

Page 141

every month?

    A.   I don't think so, not that I know of.  I don't know.

    Q.   Okay.  Do you think each big transaction has to be specifically manually done?

    A.   Yeah.

    Q.   You can't set an auto-pay?

    A.   From bank to bank, not that I know of, no.

    Q.   Don't you have bills on auto-pay?

    A.   Yeah.

    Q.   Okay.

    A.   That's not bank to bank.  I was unaware of that, that's my answer.

    Q.   Okay.  So how would you decide -- okay, so you're saying the transfers from the joint account would be done by you or Dr. Martinez into your account?

    A.   Yes, but typically, the daily amount is -- because we do it on a month-to-month basis, what the bills are, so there's a limit on how much you can do directly bank to bank every month.  So typically, he'll write a check, I'll write a check, we'll take out cash -- however -- whatever the easiest way is for us to take that money for the bills that month.

    Q.   All right.  Let's take a look at exhibit 7.

    A.   Okay.

Page 142

Q.   And I'd like you to turn to where the checks start.  It's at page 3877 on the bottom right-hand corner.  3899.  3899.

A.   Okay.

Q.   Alright, that's a check.  Who signed that?

A.   My husband.

Q.   And that's made out to who?

A    Me.

Q.   What's the amount?

A.   $11,218.82.

Q.   And what's that for?

A.   Household bills -- or expenses.

Q.   For what time frame?

A.   I don't know.  The prior month, likely.

Q.   So there was $11,000 of bills in a given month?

A.   Yeah.

Q.   Alright, so we talked about all of the things that contribute to monthly expenses.  What -- how did we get to 11,000?

A.   Well, we've had the air conditioner break, the car break multiple times, we've had the pool heater break, we've had to have an electrician, so I don't know what month those things occurred in, but we've had other expenses besides your normal every expenses.

Q.   So where do you get the number 11,218?

Page 143

A.   I don't know.

Q.   Did you --

A.   We added up the bills -- or the cost of the
expenses for the month.

Q.   Who added that up?

A.   Me.

Q.   On what type of device?

A.   A piece of paper.

Q.   And how did you tally it?

A.   What do you mean?  I look at the bills for the
month and I add them up, and the costs for the months, and
add them -- yeah, with my phone calculator, I guess.

Q.   Okay, so you wrote out a piece of paper --

A.   Yes.

Q.   -- and you -- where did you get the data to put
the bills -- the entries on?

A.   From my bank account, my credit card.  I guess
those would be the only two places that I would pay
anything out of, so.

Q.   Where is that piece of paper now?

A.   In the garbage.

Q.   You threw it away?

A.   Yeah.

Q.   Okay.  So --

A.   It was, like, a scrap piece of paper.

Page 144

Q.   Is that how you do it every month now?

A.   Yeah.

Q.   And did you do it that way before?

A.   Before he started contributing to the bills?

Q.   Before you suddenly got a joint account.

A.   He didn't pay any of the monthly household bills until we got a joint account.

Q.   So what did he spend the 1.3 million on?

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know what 1.3 million you're talking about.

BY MR. CHASE:

Q.   All right.  If you go to the next page, 3900, that's a separate check for the air conditioning, isn't it?

A.   Oh, yeah.

Q.   So none of this 11,218.82 on 3899 went to the air conditioning, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  Correct.

BY MR. CHASE:

Q.   All right.  So when you said, maybe it was the air conditioning, was that mistaken?

A.   I think I listed, like, five different thing that it could be, and I said I wasn't sure exactly what it was.

Page 145

But those were some of the big expenses that I could remember.

Q. So as we sit here, you can't testify to what that 11,218 consists of because you threw away the paper?

A. Family -- no, I can testify.

Q. Okay. What does it consist of?

A. Family expenses.

Q. Such as?

A. I just told you. I don't know exactly what those expenses were for that particular month, but I can tell you, under oath, I have only received money to pay family expenses with it.

Q. Well, what is the non family expense, then, in your view?

A. My student loans.

Q. Okay. Anything else?

A. Not that I can think of off the top of my head.

Q. So everything is a family expense, in your view, except for student loans?

A. No. I never said that.

Q. Is there anything else that's not?

A. I don't know.

Q. Okay. Let's go to the next page 3901. That's a payment to Mr. Zinn?

A. Yes.

Page 146

Q.   Alright, and that's a withdrawal?

A.   Yes.

Q.   Is that in cash?

A.   I don't know, I didn't make it.

Q.   All right.  Let's go to the next one, page 3902.
There's another check, May 31, 2022, and do you see the
amount?

A.   Yes.

Q.   What's that amount?

A.   $10,186.10.

Q.   Okay.  And that's within less than a month of the
11,218.82, correct?

A.   Yes.

Q.   And it's also extrinsic of the air conditioning,
right?

A.   Yes.

Q.   So what's the 18,186.10 for?

A.   One of those two, for the month of May, was
taxes; so I was a 1099 employee at the time and had to pay
quarterly taxes, so he would figure out how much those
taxes were, and we would put them into an account that
then went to the IRS.

Q.   This is a payment to you.

A.   Yeah, the account that we made for the taxes was
an account that I made.

Page 147

Q.   You deposited this in -- which account did you deposit this in?

A.   It would be a Wells Fargo one.

Q.   Was it the same one that you deposited the money for the bills?

A.   No.

Q.   So you have two different individual accounts?

A.   I actually have three because one is my daughter's.  A little savings account for her.  Christmas presents and stuff.

Q.   How are you sure that -- well, are you sure that this 10,186 is not for bills, it's for "blank"?

A.   I said one of those two checks from that month was for taxes.  The other --

Q.   Okay.  So you're not sure --

A.   -- one was for bills.  I don't know which one is which, correct.

Q.   Okay, and, again, why would he give you money for his taxes for a 1099?

A.   Because I do all the bills, for everything.

Q.   But you didn't know how much you declared for your tax return in 2019 or 2020.

A.   That had to do with what he stated his income was.  No, I didn't.

Q.   Did you file jointly in 2020?

Page 148

A.   Yes.

Q.   Okay, so when did you become the person that sequestered and escrowed money for Dr. Martinez's taxes?

A.   Forever.

Q.   So would you make the payment directly to the IRS?

A.   Yes.

Q.   For him?

A.   Uh-huh.

Q.   Why would you do that?

A.   Because I do all of the bills.

Q.   How did you calculate this amount?

A.   Like I said, he calculated what it was and he's say, this is what I owe this month in taxes, and I'd say, okay.  And then he would give me a check, I'd put it into the account, and then I gave it to the IRS.

Q.   On a monthly basis?

A.   What do you mean?  Yes.

Q.   On a monthly basis, Dr. Martinez transferred money to you --

A.   Yes.

Q.   -- and then you paid the IRS for Dr. Martinez's taxes?

A.   Yes.

Q.   Did an accountant advise you that that's how you

Page 149

should do it?

A.    No, I think he looked up how to pay your taxes for a 1099, and it said that you had to pay them quarterly.

Q.    Okay.  And if he was able to calculate the amount, wouldn't he just make the payment to the IRS?

A.    No, I did it.

Q.    Did you find that to be unusual?

A.    No.

Q.    You've never -- have you ever paid someone else's taxes from your individual account before?

A.    My spouse, yeah.  I used to pay all the bills in my first marriage, too.

Q.    And your other spouse would pay money into your individual account and then you would -- was this your idea?

A.    To pay all of the bills, yeah.

Q.    Was it your idea to have Dr. Martinez take his money and transfer it into your account so that you could pay the IRS?

A.    It was our joint decision, yes.

Q.    Okay, Did you come up with the idea?

A.    I don't know who -- we both did together.  I don't know.

Q.    Alright, let's go to the next page 3909.

Page 150

What's that?

A.   That is a checking/savings withdrawal ticket from 6-4-2022.

Q.   Alright, why did that happen?

A.   I'm going to assume to pay bills.

Q.   Was it withdrawn in cash?

A.   I don't know.

Q.   Why would you need to withdraw money to pay bills when you can just pay by check?

A.   Well, because the bills come out of my Bank of America account.  So --

Q.   Why wouldn't you just --

A.   -- I take money from PNC, put it into Bank of America to then pay the bills.

Q.   Alright, so this is three times in a month money has bas been transferred into your account, and you're saying this is also for just generalized bills?

A.   This is a different month.

MR. ZINN:  Object to the form.

BY MR. CHASE:

Q.   March -- May 7, 2022, to June 4, 2022 is less than a month.

A.   May 7 to June is 4 days less than a month.

Q.   Well, within 30 days, three different payments to you, okay.  And the 3,980, why wasn't that encompassed in

Page 151

the May payment?

A.   We do it on a monthly basis.

Q.   Okay.

A.   I don't --

Q.   And why was it done as a cash withdrawal instead of a check?

A.   A check into my account, you mean?  I don't --

Q.   Yeah.  Is there a check to correspond with this $3,980 on June 4, 2022?

A.   I don't know.

Q.   That's document 3903.  Is there a check?

A.   This say, checking/savings withdrawal ticket is all I know.

Q.   Okay, and that's different from a check, correct?

A.   Yes.

Q.   A withdrawal -- and this was you that did this, right?

A.   Uh-huh.

Q.   And this was less than a year ago.

A.   Uh-huh.

Q.   Okay, so this is recent, about six months ago?

A.   Yeah.

Q.   You went into the bank --

A.   Yes.

Q.   -- and you asked for cash.

Page 152

A.   Yeah.  Apparently, yes.

Q.   Well, did you?

A.   According to this, I did, yes.

Q.   Why?

A.   To pay my bills.

Q.   Why did you ask for cash to pay your bills?

A.   Why not?

Q.   Do you pay bills in cash?

A.   I deposit cash into my bank account to pay the bills.

Q.   So you took the money from PNC bank in cash --

A.   Uh-huh.

Q.   -- and physically went to Wells Fargo?

A.   Apparently, yes.

Q.   Well, you tell me.

A.   Yes, I did.

Q.   And then you deposited the same 3,980 in Wells Fargo?

A.   I would have to assume so, because I don't remember the exact transaction.

MR. ZINN:  I'm sorry, just a point of clarification.  Was it Wells Fargo or Bank of America?

THE WITNESS:  Oh.  Sorry.  Wells Fargo.  Sorry. I don't have Bank of America.  That's my fault.

MR. ZINN:  Oh.  Okay.

Page 153

THE WITNESS:  It's Wells Fargo.

MR. ZINN:  Okay.

BY MR. CHASE:

Q.  Okay.  So you went --

MR. CHASE:  She was saying Wells Fargo --

THE WITNESS:  Was I?

BY MR. CHASE:

Q.  Yeah.

A.  Okay.

Q.  Well, I'm not trying to trick you.

A.  Yes, thank you.  Nor am I trying to --

Q.  No.  I was just trying to find out, logistically, what the circumstances are.

A.  Yes.  Yes.

Q.  Okay.  Did you do it the same day?

A.  I don't remember.

Q.  All right.  But this is recent.  Within the last six months?

MR. ZINN:  Object to form.

THE WITNESS:  Well, yeah.  I don't remember my financial transactions exactly, on a day-to-day basis six months ago, no.  I don't know.

BY MR. CHASE:

Q.  Your memory is better in June of 2022 than it is in August of 2020, correct?

Page 154

A.   Yes.

Q.   Because that's closer in time to now?

A.   It depends on what the event is that I'm trying to remember.  If it was important or not.

Q.   Okay.  So, shuttling cash from one bank to another, would that be important enough to remember?

MR. ZINN:  Object to the form.  You can answer it.

THE WITNESS:  Paying my bills, no, not as important to remember.

BY MR. CHASE:

Q.   This isn't paying your bills.  This is taking cash from one account and depositing it into the other.

MR. ZINN:  Object to the form.

THE WITNESS:  To pay my bills.

BY MR. CHASE:

Q.   Right, but this act is not paying a bill.  This act is transferring money from a joint account into an individual account, correct?

A.   Correct.

Q.   No bills were paid there, it was just a transfer of money, correct?

A.   Correct.

Q.   The alleged payment of bills is some other transaction at some other time, correct?

Page 155

A.   Which requires this to occur.

Q.   What was your balance?  Were you low?

A.   I have no idea.

Q.   Okay.  So you took the 3980 without knowing whether your account was low?

A.   No, I currently don't know if it was low at that time.  I don't know.

Q.   Would it matter?

A.   No.

Q.   You had the time to go from one bank and take cash and bring it to another.

A.   Yes.

Q.   Okay.  Well, that same day, as to page 3904 of exhibit 7, there was another $6,000 that you took and shuttled over somewhere, what --

MR. ZINN:  Object to the form.

BY MR. CHASE:

Q.   --  what did you do with that money?

A.   I don't know exactly, but -- this was cash, you're saying?

Q.   Well, you tell me.  Do you -- I mean, this is recently, right?  Within the last six or seven months.

A.   Well, you keep saying "recent," but -- I mean --

Q.   More recent than anything else you've been testifying to today, by and large.

Page 156

A.   But paying bills is not really a memorable thing, so.

Q.   Okay.  Is your memory clear as to paying bills, or is it not so clear?

A.   That I pay them every month?  Yeah.

Q.   Okay.  But the logistics of this is -- this is a little unusual, is it not?

A.   Again, I -- I don't remember every transaction and every expense that we've had.  I mean, we had the upstairs painted, that required cash.  I would -- we would take out cash if we went on vacation and we wanted cash on us.  We -- I mean, I don't know exactly what this withdrawal was --

Q.   I got it.  Alright, so, did you have the $3,980 in one pocket, and then the 6,000 in the other pocket, on June 4, 2022?

A.   If I didn't remember what that was for, I definitely wouldn't remember what pocket it was in.

Q.   And you would remember that it's under the $10,000 limit, right?

MR. ZINN:  Object to the form.

THE WITNESS:  What's the $10,000 limit?

BY MR. CHASE:

Q.   Well, let's -- let's do a little addition.  3,980 plus 6,000 is what?

Page 157

A.    9,000.

Q.    Just south of 10,000, isn't it?

A.    What's the importance of 10,000?

Q.    Do you know about any importance of $10,000 as a bank transaction?

A.    No.

Q.    Couldn't you have, considering these two transactions were on the same day, just taking out $9,980 in cash instead of two different denominations of cash in the same day?

A.    Well, I would assume that they were for two different purposes, but.

Q.    Wouldn't -- if they were for a specific purpose, wouldn't you just denote that on a check?

MR. ZINN:  Object to the form.

BY MR. CHASE:

Q.    Wouldn't that be a better way to do it?

MR. ZINN:  Object to the form.

THE WITNESS:  Can you repeat that?  I don't understand.

BY MR. CHASE:

Q.    If you were going to denote a purpose for a transfer of money, wouldn't denoting it in writing on a check be a better way than moving cash around?

A.    Why would I need to denote a purpose?

Page 158

Q.   What is the purpose of the 6,000?

MR. ZINN:  Objection.  Asked and answered.

THE WITNESS:  It clearly was for something that my family needed at that point in time.

BY MR. CHASE:

Q.   And do you know what it was?

MR. ZINN:  Objection.  Asked and answered.  You can answer it again for the third time.

THE WITNESS:  No.

BY MR. CHASE:

Q.   Okay.  So you can't explain what these -- what this money -- what occurred with this money?

MR. ZINN:  Objection.  Fourth time.

THE WITNESS:  I can tell you that all money that I have taken out, my husband has taken out, that we have spent, have gone to some form of family expense. Can I tell you exactly what each transaction went to? No.

BY MR. CHASE:

Q.   Do you have any of the documentation that would give those answers?

A.   No.  What -- I don't -- what kind of document would you -- I mean, I could go through all my bills and expenses and everything that we paid, sure.

Q.   And this was deposited in Wells Fargo, this

Page 159

6,000?

A.   I don't know.

Q.   You don't know, okay.  Did you say before, there was?

A.   I don't believe so.  I said it went to family expenses.

Q.   Okay.  Did you deposit the 6,000 from June 4, 2022, reflected at Bates number 3904, in Wells Fargo?

MR. ZINN:  Objection.  Asked and answered.

THE WITNESS:  I don't know.

BY MR. CHASE:

Q.   Okay.  Did you deposit the 3980 at Bates number 3903 pursuant to the withdrawal on 6-4-2022 at Wells Fargo?

A.   I would have to look at my Wells Fargo bank account to know.

Q.   But did you just testify earlier that you did deposit it?

A.   I said I likely did.

Q.   Likely did.  And so you would have gone and driven to the other bank?

A.   Yes.

Q.   Okay.  Let's turn to Bates number 3906.

A.   Okay.

Q.   And here's a withdrawal on June 30, 2022, of

Page 160

$11,650.

A.   Uh-huh.

Q.   Alright, what's that for?

A.   I, again, would have to look at my Wells Fargo account to know, but I'm going to assume either taxes or bills.

Q.   Okay, so is it your testimony that your monthly bills are in the 11,000-a-month range?

A.   Some months, yeah.

Q.   Okay.  Well, back when you were earning $165,000 and paying all of the bills, how was that possible if you were paying $11,000 a month in monthly bills?

A.   I didn't own a home, I rented it, so I didn't have a lot of the added expenses.

Q.   Turn to the next page, 3907, there's a $10,000 withdrawal, and it says, on 7-13-2022.

You signed this.  You signed all of these, right?

A.   Yes.

Q.   Okay.  Was that withdrawn in cash?

A.   According to a checking/savings withdrawal ticket, I would think yes.

Q.   Well --

A.   Is there another way you can get one of those tickets?  I don't know.

Q.   Your signature is on that document, is it not?

Page 161

A.    Yes.

Q.    Okay.  And there's a date on the document.

A.    Uh-huh.

Q.    And there's a number?

A.    Yes.

Q.    On July 13, 2022, did you go into PNC bank?

A.    According to this, yes.

Q.    Well, do you have an independent recollection of going into PNC bank on --

A.    No.

Q.    You don't have an independent recollection?

A.    No.

Q.    Okay.  Do you have an independent recollection of what happened with this $10,000?

A.    No.

Q.    Okay.  And it says, "To Brian Zinn," is that your writing?

A.    Yes.

Q.    Okay.  Did you --

A.    Okay.  So there you go.  There's the answer.  It went to Brian Zinn.

Q.    Did you deliver money to Brian Zinn?

A.    I don't know.

Q.    Did you --

A.    This could have been a cashier's -- can a

Page 162

cashier's check come out with a checking/savings withdrawal ticket?  I don't know.

Q.   Do you know?

A.   No, I don't.

Q.   You don't know what manner in $10,000 left the joint account?

A.   No.

Q.   Okay.  All right.  And 7-29-2022, this is Bates number 3908, there's another withdrawal of $9,083.60?

A.   Uh-huh.

Q.   What's that for?

A.   Without having my bank statements, I don't know for sure, but I would assume to pay family expenses for the month.

Q.   All right.  Is that different than the other -- but there are multiple transactions in a given month, then?

A.   Yes.

Q.   Are you doing these calculations on this scrap paper that you threw away, twice a month?

A.   No.

Q.   How many times a month?

A.   Once.

Q.   Once.  And what day of the month would you be doing them?

Page 163

A.   It varies, depending on when I have time, but sometime before the end of the month.

Q.   Before the end of the month?

A.   Yeah.  Well, before the start of the next month, I guess.  I don't know.

Q.   Okay.  Document 3912 is dated August 31, 2022.

A.   Uh-huh.

Q.   $9,187.

A.   Yeah.

Q.   What's that?

A.   Again, I don't remember any specific bank transactions, but that would be for some family expense per month.

Q.   Well, it's payable to you?

A.   Right.

Q.   It's not payable to any particular bill, it's just payable to you?

A.   Right.

Q.   Okay.  And there's no documentation that you can produce that indicates what that $9,187 would have correlated to?

MR. ZINN:  Object to the form.  But you can answer it.

THE WITNESS:  Yes.  My Wells Fargo bank accounts to show everything that came out of it and everything

that went in.

BY MR. CHASE:

Q.   Okay.  But you can't testify what this 9,187 corresponds to because you threw away the paper, right?

MR. ZINN:  Object to the form.

THE WITNESS:  If I went to my Wells Fargo bank account and I added up the bills for that month, and then I saw whether or not that was the deposited for the same amount into the account, then yes, I would be able to tell you every bill it went to.

BY MR. CHASE:

Q.   Okay.  So once Dr. Martinez started making money, he started paying all the of the bills?

A.   Yes.

Q.   And you are paying none of the bills?

A.   No.  False.

Q.   Okay.  What bills are you paying?

A.   Health insurance, eye, dental, my student loan, I have a small personal loan.  I'll pay for dinner sometimes if we go out.  Random other things.

Q.   But this type of lifestyle is not what was reflected on the mortgage applications.

MR. ZINN:  I'll object to the form.  You can answer.

THE WITNESS:  I didn't declare any lifestyle on

Page 165

my mortgage application, so it's unclear.

BY MR. CHASE:

Q. All rights. Page 3914, September 14, 2022, what's that for?

A. It says Brian Zinn.

Q. Okay. And that looks like -- well, no, it's not a check. Why wasn't that given to you to give to Mr. Zinn?

A. I don't know.

Q. But wasn't this account supposed to be just an account that's a repository, and then you pay all the bills?

A. Yeah, he pays Brian sometimes, though.

Q. Okay. So there are exceptions to that?

A. Yeah.

MR. CHASE: All right. Why don't we stop, because this looks like lunch.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Q. Page 3916 of exhibit 7 is a withdrawal of $9,341.03. You signed that.

A. Yes.

Q. Okay. It's dated 10-1 -- I think that's supposed to be 2022.

A. Oh, that's my birthday, that's why I put 80.

Page 166

That's embarrassing.

Q.   What's this for?

A.   Without having my bank statements, I don't know exactly, but family bills -- or expenses.

Q.   Would you consider yourself an insider as to family expenses with Dr. Martinez?

MR. ZINN:   Object to the form.

THE WITNESS:   What do you mean by an "insider"?

BY MR. CHASE:

Q.   Well, do you consider yourself an insider?

MR. ZINN:   Object to the form.

BY MR. CHASE:

Q.   You guys are married.

A.   Yes.

Q.   Do you have a functional marriage relationship?

A.   Yes.

Q.   Okay.  All right.  Page 3918, 10-29-2022.

A.   Yes.

Q    That's another withdrawal.

A.   Uh-huh.

Q.   How much is that for?

A.   Yes.  It's another withdrawal.

Q.   What is the amount?

A.   20,000.

Q.   Why did that happen?

Page 167

A.    Family expenses for the month.

Q.    Again, now within the month of October 2022,
there's $29,341 in so-called "family expenses" transferred
to you.

What's that for?

MR. ZINN:  Object to the form.

THE WITNESS:  Family expenses.

BY MR. CHASE:

Q.    Like what?

A.    I don't recall.  I don't have my bank statements.
I couldn't tell you.

Q.    Did you have an opportunity to review your bank
statements before your deposition?

A.    Yes.  I would have.

Q.    Did you in fact review your bank statements?

A.    Briefly, yes.

Q.    Okay.  Take a look at page 3919.

A.    Yes.

Q.    $9,660.

A.    Yes.

Q.    What is that for?

A.    Family expenses.

Q.    Okay.  That's payable to you, correct?

A.    Yes.

Q.    Thirteen days later, page 3922, what happens

Page 168

then?

A.    $10,000 withdrawn.

Q.    To who?

A.    Me.  Oh, for Brian Zinn.  It says over on the right.

Q.    Is that a deposit, or that's just a notation that you made?

A.    I have no idea.

Q.    Can you go to page -- and this -- these deposits into this account were from the salary that Dr. Martinez was receiving?

A.    Correct.

Q.    No other source?

A.    Not that I'm aware of.

Q.    You were receiving the statements?

A.    Yes.

Q.    Because it was joint now?

A.    Yes, but I don't review every statement every month.

Q.    Okay.

A.    Most of them go in the garbage.

Q.    If you take a look at page 3934.  There's a check for $15,750.

A.    Yes.

Q.    Who is the payor?

Page 169

A.    Charles Schwab.

Q.    What do you understand Charles Schwab to be?

A.    I don't know if brokerage firm is the right word. An investment firm, or a bank, I don't know.  Having to do with finances.

Q.    Okay.  Is there any reason why a Charles Schwab account would be used to deposit money into this joint account?

A.    I didn't do it, so I don't know.

Q.    All right.  Take a look at page 3937.

A.    Yes.

Q.    That's a check for $9,765.

A.    Yes.

Q.    And that's also paid by?

A.    Charles Schwab.

Q.    Do you know why that happened?

A.    No.

Q.    All right.  Turn to the beginning of this document if you could.  And we're going to go statement by statement, and I'm just going to confirm the amounts.

Take a look at page 3882, if you would.

MR. ZINN:  I'm sorry.  Which one?

MR. CHASE:  It's 3882.  It looks like we're missing April in this one.  No, April is there.  No, it's there.

Page 170

BY MR. CHASE:

Q.   Turn to page 3878 first.

A.   Okay.

Q.   Okay.  Is that your signature?

A.   Yes.

Q.   And there's an E-mail address for Dr. Martinez, correct?

A.   Yes.

Q.   What's that E-mail?

A.   Williammartinez83@yahoo.com.

Q.   Are you aware of that E-mail address?

A.   No.

Q.   Have you ever seen that E-mail before?

A.   No.

Q.   You signed that document, correct?

A.   Yes.

Q.   This is the establishment of a joint account at PNC bank.

Did you have a prior banking relationship with PNC?

A.   No.

Q.   Why was PNC bank chosen?

A.   It was right up the road from us.  No particular reason.

Q.   You lived in Naples for two years, by that time?

A.   Yes.

Page 171

Q.   About.

A.   Uh-huh.

Q.   Okay.  And you selected PNC bank two years after you moved to Naples, why?

A.   No particular -- because it was close to us.  I have no idea why PNC.  No particular reason.

Q.   All right.  If you look at page 3879.

A.   Yes.

Q.   The amount of money deposited into the account during the dates of the statement period, which are April 12, 2022, to May 10, 2022.  So a month.

A.   Yes.

Q.   There $34,394.154 deposited.

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   All right.  That's quite a bit more than your -- the money that you were earning, right?  Correct?

A.   Yes.

Q.   And you were able to make ends meet with the -- with your salary, correct?

A.   Not --

MR. ZINN:  I'll object to the form.

BY MR. CHASE:

Q.   You were not able to make ends meet?

Page 172

A.    No.

Q.    With your salary?

A.    My salary alone?  No.

Q.    Okay.  We went over the expenses, right?

A.    Yes.

Q.    Where's the -- so now -- let's see if we understand this here.

You're still earning your salary of $14,800 a month, correct?  That's what you wrote on your sworn --

A.    I take home $8,000 a month, yes.

Q.    Okay.  You wrote on your application, 14, right?

A.    Because they were asking prior to any deductions. So what I actually see from my -- that I can use to pay bills is $8,000 a month.

Q.    And so, net of taxes, because we were talking about the taxes situation before.

A.    Yes.

Q.    And the taxes actually were deducted, so I'm just going to put that to the side.

A.    No.  They weren't.

Q.    Well, I'm going to put that to the side for now.

A.    Okay.

Q.    The deposits in addition to what you're earning, the $8,000 that you're earning --

A.    Yes.

Page 173

Q.   -- there's an additional 34,394.

A.   Yes.

Q.   Okay.  So that's 42,000 a month.

A.   Yes.  For that month.

Q.   Yeah.  For that month, yeah.  And was that enough to cover your monthly expenses?

A.   That whole amount combined?  Yes.

Q.   All right.

A.   I believe so.

Q.   Right.  And your monthly expenses -- this is 2022.

A.   Yes.

Q.   Your monthly expenses -- your mortgage by this time was -- is what, $1500 now?

A.   Yes.

Q.   Okay.  So it's not even the 2,641, it's the 1500.

A.   1500.

Q.   Okay.  So you have 1500, then you have the other expenses that we talked about that totaled another 2300, right?

A.   Not including legal fees, yes.

Q.   All right.  So we have the 1,500 plus the 2,300, so that's going to be 4,000.

A.   Uh-huh.

Q.   And then we have another 38,000 a month.

Page 174

A.    No.  That month.

Q.    Right.  That month.

A.    Yes.

Q.    Okay.  So was an additional 38,000 spent in April to May of 2022?

A.    April to May, depends what the ending balance is. No.  Not according to this statement.

Q.    Well, are -- were your monthly expenses in the $40,000-a-month range?

A.    Has there ever been a month that it has been? Yes.

Q.    Well, I'm going to ask you for the average, and the time frame I'm going to ask you is April of 2022 to December of 2022.  Okay?

A.    Okay.

Q.    All right.  And so, yes, there's going to be one that's more.  Yes, there's going to be one that's less. Okay.  I'm asking for the average.  You're still earning $8,000 a month, and Dr. Martinez is earning something north of $30,000 a month.

A.    No, not that I'm aware of.

Q.    All right.  We'll go through it.

A.    Okay.

Q.    What was your understanding of what he was earning a month?

A.    Well, now, what I see?

Q.    Sure.

A.    Roughly, 20,000.

Q.    Twenty a month, after taxes?

A.    Yes.

Q.    Okay.  If that were the amount --

A.    Yes.

Q.    -- $28,000 a month, is that amount of money spent every month?

A.    I don't know about every month.  I have no idea.

Q.    Okay.  Well, how would be possible get to a $28,000 a month number when we've talked about what the actual expenses are?

MR. ZINN:  Object to the form.

THE WITNESS:  I answered this already.  Legal costs, air conditioner, pool heater, electrician, painting the upstairs.  I mean, we've had multiple car repairs, I feel like every other month.  We've had a lot of expenses, so.

BY MR. CHASE:

Q.    Are the renovations with the house done?

A.    We didn't renovate, we painted the upstairs -- or had someone else pain the upstairs.  That is done, yes.

Q.    All right.  So the scope -- since the day that you closed on the Secoya property, what would have been

Page 176

the scope of renovations to the house, if any?

A.   Painting, power-washing, replacing screens after the hurricane, doing renovations to the pool area, that's it -- buying new chairs, upkeep of a house.

Q.   No significant expenditures, is that fair?

A.   Well -- oh, the air conditioners.  We had to replace both of those.  That was a big expenditure.  I can't think of anything else off the top of my head.

Q.   All right.  The house is about 3500 square feet?

A.   Yes.

Q.   Okay.  And the air conditioners are standard?

A.   I assume so.  I don't know.

Q.   How much did they cost?  $5,000?

A.   I thought 30, but apparently not, so I don't -- I don't know exactly.

Q.   It was 11,00 --

A.   Check, so yes.

Q.   11 -- off by 20,000.

A.   Yes.

Q.   Okay.  All right.  So if we go up to page 3882.

A.   Yes.

Q.   This time, in addition to your 8,000, there was $40,087 deposited to this account.

A.   Okay.

Q.   Do you see that?

Page 177

A.   Yes.

Q.   Okay.  So that's over 48,000 in income between the two of you in this time frame?

A.   Yes.

Q.   All right.  Was that all spent?

A.   Yes.  That month, it was.  Minus $6.08.

Q.   And that's the time frame where there were multiple transfers to you, correct?

A.   I --

MR. ZINN:  I'll object to the form.  You can answer.

THE WITNESS:  I don't know.

BY MR. CHASE:

Q.   Well --

A.   What is this time frame?  I'm sorry.

Q.   May 11, 2022, to June 9, 2022.

A.   Yes.

Q.   And it was the --

A.   No, that's -- no, that's not that time frame, actually.

Q.   Well, there was a check to you on May 31, 2022, for $10,186, correct?

A.   I don't know.

MR. ZINN:  What page are we looking at?  I'm sorry.  You lost me.

Page 178

BY MR. CHASE:

Q.   Well, it's in my summary, but it's also reflected in the checks that we went over before.  It shows what it shows.

A.   Right.

Q.   Let's go to page 3883.

A.   Three eight -- okay.

Q.   All right.  You see the deposit payroll for 29,971?

A.   Yes.

Q.   All right.  That's net of taxes because that's -- that's payroll, right?

A.   That -- this is 2022?  Yes.  Correct.

Q.   So there's no -- there's no sequestering any --

A.   We did not take taxes out of that money, no.

Q.   So it's approximately $30,000 a month post-tax?

MR. ZINN:  Object to the form.

THE WITNESS:  Yes.

BY MR. CHASE:

Q.   All right.  And so that would be $360,000 a year post-tax, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  The income varies on a month-to-month basis.  There is not one month that is the same as the next month, so I can't say.

Page 179

BY MR. CHASE:

Q. Did you study the bank records to determine what it is per month?

A. No. He tells me that it varies month to month because he gets -- I don't know if you call it commission, but he gets a percentage every month of what he brings into the company and that's going to vary every month, so.

Q. And so this month, this May 11, 2022, to June 9, 2022, there was also another deposit on 5-31.

A. Yes.

Q. All right. So not only do we have the 30 from the salary, which is post-tax --

A. Yes.

Q. -- your eighth which is post-tax, and then we have another 9,765, right?

A. Yes.

MR. ZINN: I'll object to the form.

BY MR. CHASE:

Q. And you said that money was being transferred to you so that you could pay bills, true?

A. Family expenses, yes.

Q. And that would include credit cards, right?

A. Yes.

Q. Credit cards were not paid from this joint account, correct?

Page 180

A.    Correct.

Q.    All right.  So take a look at page 3883.

A.    Yes.  On it.

Q.    And see where it says 13,500 web payment, American Express?

A.    Yes.

Q.    All right.  So, do you want to revise your testimony?

A.    No, because I didn't make that payment. Q

Q.    Okay.  So they were made from this account, just not by you is your testimony now?

A.    That's not my credit card, because I don't pay any credit cards out of this account, so --

Q.    Okay.  Would --

A.    -- that would have to be a credit card that is only in my husband's name, that he chose to pay through that account.

Q.    Okay.  So payments to credit cards are made through this joint account?

A.    One was, apparently.

Q.    Well, two were.  Because you see in the next one, June 2, another $2,500 also to AmEx, right?

A.    Wait.  Where?

Q.    Page 3883.

A.    Oh.  Same page.  Yes, same account number.

Page 181

Q. Okay. And what were those expenditures?

A. Like I said, they weren't mine, so I don't know. You'll have to ask my husband.

Q. Did you talk to him about this expenditure of $16,000?

A. No.

Q. Okay. So in that statement that we just looked at --

A. Yes.

Q. -- $40,087 went into that account that month, correct?

A. Where do you see that number? Yes.

Q. Okay. All right. The next month, starting on page 3885 --

A. Yes.

Q. -- the money that went into that account is $35,655?

A. Yes.

Q. All right. So it's pretty close to 40.

A. I guess --

MR. ZINN: I'll object to the form.

THE WITNESS: -- it depends on how you defines "close."

BY MR. CHASE:

Q. Okay. Well, you have the first statement that's

Page 182

34,394.

A.   Yes.

Q.   The second one that 40,087 --

A.   Yes.  That's a difference of 10,000.

Q.   34,000 and then 40,000, so it's 6,000.

A.   Okay, 6,000.

Q.   And then the next one is 35,655.

A.   A difference of roughly 5,000, yes.

Q.   All right.  So the average amount those three months is somewhere between 35,000 and 40,000?

A.   Yes.

Q.   And adding your 8,000 --

A.   No.  Sorry.

Q.   Adding your 8,000 after tax, we're talking about over 40,000 a month?

A.   Yes.

Q.   Alright,

A.   For those three months.

Q.   For those three months?

A.   Yes.

Q.   And there's another -- there were more payment to American Express, weren't there?

A.   I don't know.  I didn't make any payments to American Express, that I pay.

Q.   Well, in fact, each month there's large payments

Page 183

to American Express.

A.    Okay.

Q.    Were you paying American Express from your individual account?

A.    Yes.

Q.    Okay.  So both of you were both paying American Express to the tune of what?

A.    We have two different American Express accounts.

Q.    What is that money being spent on, because if we look at this, these payments to American Express are over $10,000 a month out of the joint account.  And then also $10,000 to you.

A.    We disclosed all the statements, so you can see every purchase we made on all of the accounts.  I don't have them in front of me, so I don't know.

Q.    We'll get to that.

A.    Okay.  Sure.

Q.    You're saying that you have a completely different American Express than the American Express that's being paid from this joint account, is that what you're saying?

A.    Yes.

Q.    All right.  And which one's for the family?

A.    Both.

Q.    Okay.  Why is it that you're not paying any

Page 184

expenses?

A.   I am paying expenses, as I've stated multiple times already.

Q.   So you're paying expenses, but you're also receiving another -- an -- the additional -- about $10,000 a month to pay more expenses?

MR. ZINN:  Object to the form.

THE WITNESS:  None of that is put into a savings account or accumulating anywhere.  It is all spent on family expenses.

BY MR. CHASE:

Q.   Would you say that you live a frugal, medium, or extravagant lifestyle?

A.   It depends who you're comparing it to.

Q.   No, I'd say the average American.

A.   The people in this room, average.

Q.   Well, the average American in the country that might owe a seven-figure debt.

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know who owes what debt, so I don't know.

BY MR. CHASE:

Q.   All right.  So your income plus Dr. Martinez's income is income of -- would you like to revise the number?  More like 500,000, the two of you?

Page 185

A.    You never asked me our combined income.

Q.    What's your combined income?

A.    For this coming up year, I would say about 450 to 500,000, this upcoming year.

Q.    Okay.  And are you testifying that there's not a single dime that could be paid to a judgment?

MR. ZINN:  Object to the form.

THE WITNESS:  I never answered that question.

BY MR. CHASE:

Q.    Okay.  Could some of that money be put towards a judgment?

MR. ZINN:  Object to the form.

THE WITNESS:  I have no idea.

BY MR. CHASE:

Q.    Okay.  Have you discussed with Dr. Martinez paying some money per month towards the judgment?

A.    I answered that and told you no.

Q.    You never had a conversation?

A.    No.

Q.    All right.  And when you became aware that Dr. Martinez is in contempt of court and has been in contempt of court since 2017, did you then have a conversation with him about making payments?

A.    No.  I answered that already.

Q.    Do you intend to have a conversation with him

Page 186

about that?

A.   No.

MR. ZINN:  Object to the form.

BY MR. CHASE:

Q.   So, as long as you live, you will never ask him?

A.   No.

Q.   Okay.  And did you guys agree to not talk about it?

A.   No.

Q.   It's just a decision that you made that you're just not going to ask?

A.   Correct.

Q.   And why did you come to make that decision?

A.   Because I have no desire to know about it.

Q.   Okay.  No desire to know about it, meaning if you had knowledge of it, you think it could be negative for you?

MR. ZINN:  Object to the form.

THE WITNESS:  No.

BY MR. CHASE:

Q.   You make the choices that you think are in your best interest, right?

A.   Not necessarily.

Q.   Okay.  Well, you wouldn't have taken an action against interest, would you?

Page 187

MR. ZINN:  Form.

THE WITNESS:  If it was to help my daughter, sure.

BY MR. CHASE:

Q.    Okay.  If it would help your daughter, would knowing more about what the legal situation is as to Dr. Martinez be helpful?

A.    No.

Q.    No.  So you think it's better for you and your daughter to not know about it?

MR. ZINN:  Form.

THE WITNESS:  I think it's completely irrelevant whether I know or not.  If it has zero to do with me, I have no responsibility to pay it.  It was from before I even knew my husband, so no, I don't.  It's his responsibility, his problem.  Not mine.

BY MR. CHASE:

Q.    Well, I must inform you that -- you were married in November 2019, correct?

A.    Correct.

Q.    And there was a contempt order entered on February 19, 2020, after you were married --

A.    Not against me.

Q.    Well, you know about the contempt order entered against Dr. Martinez during your marriage.

Page 188

A.    Now I do.

Q.    Okay.  And there are two more contempt orders.

A.    Yes.

MR. ZINN:  Object to form.

THE WITNESS:  Or -- yeah.  I mean, I don't know. I'm just answering yes, but I really don't know how many.

BY MR. CHASE:

Q.    What an unusual testimony that you don't know, but okay.

A.    Yes.

MR. ZINN:  Try not to talk over him because I can't get an objection in if you're talking over him.

THE WITNESS:  Okay.

BY MR. CHASE:

Q.    Do you know what a capias is

A.    No.

Q.    Do you know what an arrest warrant is?

A.    Yes.

Q.    Okay.  Do you know what a writ to bodily attachment is?

A.    No.

Q.    Do you know that there's a capias that has been issued for Dr. Martinez?

A.    Now I do, yes.

Page 189

Q.   Okay.  When did you find out about that?

A.   When I read it in your court document filed against me.

Q.   And did you have an opportunity to ask Dr. Martinez about the capias that was issued?

A.   An opportunity, or did I?

Q.   Did you have an opportunity to?

A.   Yes.

Q.   Okay.  And did you

A.   No.

Q.   All right.  So a capias -- is it your understanding that a capias is, in fact, a legal document, a legal instrument, whereby Dr. Martinez may be taken into custody?

A.   I don't know what a capias is.

Q.   All right.  Did you have an opportunity to learn what it is?

A.   An opportunity, yes.

Q.   All right.  And did you, in fact, learn what it is?

A.   No.

Q.   All right.  Was there anything stopping you from learning what it is?

A.   No.

Q.   You didn't -- you don't want to know what it is?

Page 190

MR. ZINN:  Object to the form.

THE WITNESS:  I don't want to know, and I don't not want to know.  It's -- I have not learned about it.

BY MR. CHASE:

Q.    All right.  Is it -- does it differ from your -- whatever understanding you have, to say that a capias is a warrant for someone's arrest?

A.    I answered the question.  I don't know what a capias is.

Q.    Okay.  But if -- it was your understanding that it is a order for someone's arrest, and that someone is Dr. Martinez, would that affect you?

MR. ZINN:  Form.

THE WITNESS:  No.

BY MR. CHASE:

Q.    It would have no effect on you if Dr. Martinez was taken into custody?

MR. ZINN:  Form.

THE WITNESS:  No.

BY MR. CHASE:

Q.    No effect at all?

A.    No.

MR. CHASE:  Let's mark this as exhibit 8.

(The document referred to was marked for identification as

Exhibit No. 8.)

THE WITNESS:  Can I put this one away?

MR. CHASE:  Unless you want to keep talking about it.

THE WITNESS:  Not really.

BY MR. CHASE:

Q.   Do you recognize this document?

A.   Yes.

Q.   Is it the Peoples United Bank account?

A.   I do not know.

Q.   Okay.  If you could turn, please, to the fifth page.

A.   Where --

Q.   Where it says --

A.   Yeah.

Q.   There's a -- a transfer of -- yeah, you're on it. Yeah, that's it.  That's it.

A.   That's it, okay.  It's just numbered 1 of 1.

Q.   Oh, yeah.  That's the correct page.  The page says, "Statement savings *0022 all transactions for the last 60 days."

Directing your attention to 8-7-2020.  It says "Wire transfer, CR Domestic, 20,160."

A.   Oh, there it is.  Okay.

Q.   Yeah.  Do you see the deposits?  This is your

Page 192

account, correct?

A.    Yes.  I believe so.  Yes.

Q.    Okay.  That --

A.    Wire transfer -- yes.

Q.    That wire was from Dr. Martinez, correct?

A.    I would assume so, but I don't know for sure, because it just says "wire transfer."

Q.    Right.  Okay.

A.    I don't know.

Q.    And you see two -- or three cells down, where it says "online phone, transfer in, 120,000"?

A.    Yes.

Q.    Okay.  Those two amounts total $140,160?

A.    Yes.

Q.    Okay.  If you can turn to exhibit 3.  And just compare that.  It's in the stack.

A.    Okay.  Yes.

Q.    Those are the gifts that you refer to in exhibit 3 that you signed -- pursuant to the statement you signed on --

A.    Extremely close in amounts, yes.

Q.    Right.  But it's those two, correct?

        MR. ZINN:  Object to the form.

BY MR. CHASE:

Q.    It's not a different one --

A.   I would think it is the same, yes.

Q.   Okay.  Any reason to believe it's not?

A.   No.

Q.   Okay.  That's all with that.

A.   Okay.  With that whole exhibit?

Q.   For now.

A.   Okay.

MR. CHASE:  We can mark this as nine.

(The document referred to was marked for identification as

Exhibit No. 9.)

BY MR. CHASE:

Q.   Do you recognize this.

A.   I just need to look at it for a minute, because

--

Q.   I'll direct your attention to the second to last

page, at the bottom.

MR. ZINN:  I don't believe she answered the

question.

MR. CHASE:  Oh, that she recognized it?  I'm just

directing her to her signature.

THE WITNESS:  I'm just trying to figure out

exactly what -- I don't know exactly what this

document is.

BY MR. CHASE:

Q.   Okay.  Do you see your signature on this

Page 194

document?

A.  Yes.

Q.  All right.  This is a uniform residential loan application for Prosperity Home Mortgage.

A.  Okay.

Q.  That's what it says on the top, correct?

A.  Yes.

Q.  And the loan amount is 480,000.

A.  Yes.

Q.  And you signed this on 7-21-2020, correct?

A.  Yes.

Q.  It's the same day you received the $120,000 wire, correct?

A.  I have to go back and look at the --

Q.  Look at exhibit 8.

A.  Yeah.  What page, though?

Q.  It's about the fifth page.  It is the fifth page.

A.  It is.  Okay.  Oh, yeah.  Well, there are two separate days.

Q.  Right.  7-21-2020 is when you received a $120,000 wire.

A.  Yes.

Q.  That's the same day that you signed the mortgage application.

A.  Yes.

Page 195

Q.   And the mortgage application was signed at 7:23 PET, which would be 10:23 Easter, correct?

A.   Yes.

Q.   So you would have received the wire earlier in the day?

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know.

BY MR. CHASE:

Q.   You were on the mortgage --

A.   Oh --

Q.   Go ahead.

A.   Sorry.  It does say a time.  So 9:47.

Q.   All right.  It'd probably be a.m., correct, the wire?

A.   Yes.

Q.   You put in the mortgage application -- I'm just going to direct your attention to something on the bottom right-hand corner of the first page.

A.   Okay.

Q.   There's a Mohel Laurel Road Band under B, under Liabilities.

A.   Second page?

Q.   Second page, yes.

A.   Okay.  Yes.

Q.   What's that?

A.    Student loans.

Q.    Okay.  Do you still have those?

A.    Yes.

Q.    And it's $882 a month?

A.    Yes.

Q.    And the 107 is -- 107,836, that's your then existing balance on the Englewood property?

A.    I don't know, but I would assume so.  Yes, because Bank of -- yes, it is.

Q.    And you list -- if you look at the second page, if you look at Real Estate Owned, it says 250,000.  Third page.  Third page.

A.    Oh.  250,000 you said?

Q.    That's what it says in -- where it says Real Estate Owned, the upper left-hand corner.

A.    I think I'm looking at a different page.  Am I?

Q.    It's page 3 of five.

A.    Yes.

Q.    Okay.  And you reflected on that same page a couple squares up, a bank account balance of 141.

A.    Yes.

Q.    So your total assets, as you represented them under penalty of felony, $651,414?

MR. ZINN:  Object to the form.

THE WITNESS:  Yes.

Page 197

BY MR. CHASE:

Q.   Your liabilities, as you reflected them, were $446,446, correct?

A.   Say that amount again?

Q.   Well, actually, no.  Let me strike that, actually.  That isn't what you said.  You said something slightly different.

You actually said that your liabilities are $204,968?

A.   Yes.

Q.   So your assets, as you swore they were, were 651,414, correct?

A.   Yes.

Q.   Your liabilities, according to your sworn statement, 204,968, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  Yes.

BY MR. CHASE:

Q.   So your net worth as of 7-21-2020 was $446,446?

A.   Yes.

Q.   And that doesn't include your retirement account?

A.   I don't know if it does or it doesn't.

Q.   Well, did you mention your retirement account in this mortgage application?

A.   I don't know.  I haven't looked through the whole mortgage application, so.

Page 198

Q.   And your mortgage payment, actually, for
Englewood was actually $829 --

A.   Okay.

Q.   -- a month, per page 3 of five, correct?

A.   Yes.

Q.   All right take a look at page 4 of five.
Actually, let me back up for a second.

A.   Okay.

Q.   You owned Englewood -- when you owned Englewood,
only in your individual name, correct?

A.   Yes.

Q.   Page 4 of five, there's a declaration, and it
says, "Have you had an ownership interest in a property in
the last three years," and you checked off "no," do you
see that?

A.   Yes.

Q.   All right.  Why did you do that?

A.   I don't know.  I'm going to have to say I didn't
mean to.  I don't know.

Q.   Did you see the square on page 5 of five where it
says "Co-borrower's signature"?

A.   Yes.

Q.   And you see how there's -- is there any
co-borrower?

A.   Not on this form, no.

Page 199

Q.   Okay.

A.   Oh.  Yes.

Q.   Is there a co-borrower?

A.   No.  No.

     MR. CHASE:  I'm going to mark this as 10.

(The document referred to was marked for identification as

                    Exhibit No. 10.)

BY MR. CHASE:

Q.   Do you recognize exhibit 10?

A.   Yes.

Q.   What's that?

A.   Closing disclosure for the Secoya house.

Q.   Okay.  And do you see the monthly principle and
interest?

A.   Yes.

Q.   What's that?

A.   $1,991.48.

Q.   Okay.  Did you see the total estimated monthly
payment including escrow?

A.   Yes.

Q.   And what is that?

A.   $2,641.73.

Q.   Is that a manageable sum for you per month with
the income that you reflected on exhibit 9 as 13,750 a
month?

Page 200

A.    Including all my other bills, it was going to be tight.  I could do it, but it was going to be difficult.

Q.    Okay.  And you didn't reflect any credit card debt, other than $2,808 on your mortgage application, exhibit 9, page --

A.    For that month?  Yes.

Q.    That snapshot in time.

A.    Correct.

Q.    Did you have a balance that was higher than that?

A.    Yes.

Q.    Did you pay it down to -- before you did the application, or was it [?]?

A.    This was -- yes.

Q.    This mortgage that you entered into on or around August 25, 2020, was going to obligate you to pay $2,641 a month, correct?

A.    Yes.

Q.    Did you have any intention of a pre-payment at that time?

A.    I didn't have money to do a pre-payment at that time, no.

Q.    And "that time," I'm going to say is August 25, 2020?

A.    Yes.

Q.    Did you ever discuss with Dr. Martinez a

Page 201

pre-payment of the Prosperity mortgage?

A.   We never said pre-payment of mortgage, no.

Q.   Okay.  And the rate on the Prosperity mortgage, is 2.75 percent.

A.   Yes.

Q.   Pretty good rate?

A.   I have a good credit rating, yes.

Q.   Not a unmanageable mortgage, correct?

MR. ZINN:  Object to the form.  You can answer.

THE WITNESS:  Well, I answered that saying I could manage, but it was going to be difficult with all my other expenses.

BY MR. CHASE:

Q.   It was a 30-year fixed mortgage?

A.   Yes.

Q.   A 2.875 percent?

A.   Percent has nothing to do with amount I need to pay and other bills I need to pay.  I don't --

Q.   Is it 2.875 percent?

A.   Yes.

Q.   Okay.  What are rates now?

A.   I have no idea.

Q.   Okay.  Did you become aware at some point that Dr. Martinez had pre-paid this mortgage?  This Prosperity mortgage?

Page 202

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know what you mean by "pre-pay."  If you're asking whether I was aware that he was going to put more money down on the house to lower our monthly payment, then yes.

BY MR. CHASE:

Q.   Do you know what a pre-payment is?

A.   No.

Q.   Okay.  When did you become aware that Dr. Martinez made a payment pursuant to your mortgage?

A.   Right around the time that he did it.

Q.   And you said he was unemployed at that time.

A.   Yes.

Q.   And was that a gift?

MR. ZINN:  Object to the form.

THE WITNESS:  No.  It was a payment towards our home.

BY MR. CHASE:

Q.   Did Dr. Martinez ask for you to do anything in return for his payment of $380,000 for the Prosperity mortgage?

A.   No.

Q.   Okay.  Did he -- did you have an implied expectation that you would do anything for him as a result of that?

Page 203

A.   The purpose of the payment was to help our family's financial situation.  It wasn't -- that was the purpose of the payment.  It wasn't for me, it was for our family, and me and my daughter.

Q.   Okay.  But you can say that about anything.  That's what you said about everything, okay.

A.   Because that's the truth.

Q.   Okay.  I beg to differ.

A.   Well, you can have your opinion.

Q.   Yeah.

A.   I'm the one doing it.

Q.   I know.

A.   That is my reasoning and my husband's reasoning for doing it.

Q.   Right.  Okay.  And so, in the best interest of the family, conversation occurred before or after the $380,000 payment?

A.   Before.

Q.   Okay.  So you did know it was going to be made?

A.   Yes.

Q.   Okay.  When did you -- when did you become aware that there was going to be a $380,000 payment made on this mortgage?

A.   I answered that just a minute ago and said, right around the time that it was made.

Q.   Okay.  You entered into this mortgage on 8-25-2020, correct?

A.   Yes.

Q.   And the payment of $380,000 was the very next day, wasn't it?

A.   I don't know.

Q.   Do you know?

A.   I don't know.

Q.   Okay.  So you have no idea how close in time it was?

A.   I know it was very close, but no, I don't know exactly, no.

Q.   So why didn't you, if it was discussed in advance of you closing on this mortgage, only take out a mortgage for a hundred thousand instead, put that $380,000 as a down payment?

A.   We didn't think that far in advance and, ultimately, it probably would have been easier to do it that way, instead of having to do two, but the end result was the same, so.

Q.   When you say, "we didn't think that far in advance," you did plan it with Dr. Martinez, correct?

MR. ZINN:  Object to the form.

THE WITNESS:  Plan what?

BY MR. CHASE:

Page 205

Q.   Plan to have him make a payment the day after you close on a mortgage, pre-paying about 80 percent of it.

A.   We did not plan for the day after we closed. When we were going through the process of getting the mortgage, applying for the mortgage, then the reality of having to pay the mortgage, we started discussing how we're going to pay everything.

And we decided that one, we could have either put down more, or just wait and pay it.  It didn't matter to us whether the down payment was for the whole amount or it was paid in two separate payments.  It didn't matter, as long as it lowered our monthly payment to a more manageable amount.

Q.   Well, your monthly payments didn't change for another year.

A.   Yes, they did.

Q.   They didn't change until this refinance, a year later, correct?

A.   False.

Q.   A year later, you did refinance, correct?

A.   Correct.

Q.   And you took more cash out.

A.   Yes.

Q.   Okay.  And that went to you.

A.   Yes.

Page 206

Q. Okay. So Dr. Martinez put 380,000 -- first, he put $120,000 in as the down payment to this purchase?

A. Yes.

Q. Okay. Then you put $380,000 in?

A. Yes.

Q. Okay. And this is all when you're having trouble paying bills?

A. When we're concerned about our ability to, yes.

Q. All right. So there was liquidity of $500,000 that was all within two days in August of 2020, correct?

A. Yes.

Q. And you had liquidity concerns?

MR. ZINN: Object to the form.

THE WITNESS: What do you mean by "liquidity"?

BY MR. CHASE:

Q. We talked about truthfulness.

A. Yeah.

Q. Your testimony is that you were concerned about paying $2,500 a month on a 30-year fixed mortgage of 2.875 percent?

A. Yes.

Q. And yet, at the same time, it was a liquidity of $500,000?

MR. ZINN: Object to the form.

THE WITNESS: To pay this mortgage.

Page 207

BY MR. CHASE:

Q.   Right.

A.   That I was concerned about.

Q.   And so if there was every any difficulty, any of that $380,000 that was just dumped into there could have been used to backstop any kind of shortfall, correct?

A.   What does "backstop" mean?

Q.   Support.  If you were having trouble paying the $2641 a month, and you only had, let's say 1500 instead of the 2600 --

A.   Yes.

Q.   -- any of those $380,000 could have been used to contribute the extra 1,000 in a month, correct?

A.   And then he has to go through a monthly withdrawal from a retirement account, get the check, have it deposited -- no.  That was not the way we wanted to do it.

Q.   So you had an in-depth discussion with him about it?

A.   No, we didn't.  That's what I'm telling you right now.  There was no reason to not lower our monthly payment.

Q.   Walk us through the conversation that you had.

A.   I don't remember the conversation I had --

Q.   Okay.  And you didn't --

Page 208

A.    -- three years ago.  Three and a half years ago.

Q.    Okay.  But you did remember that -- why you wanted to do something a certain way?

A.    I'm telling you now why that would be a ridiculous thought.  We would -- why would we do it that way?

Q.    It would be "ridiculous" you say to -- if you're short on a mortgage payment, use a retirement account, but it would be smarter to take out more money from the retirement account to make the payment lower?

A.    Yes.

Q.    Why would that make sense?

A.    Because I don't have to worry every single month about what bills we can pay, what bills we can't, whether we need to make withdrawals.  We made out monthly bills as low as we could so that we could afford them.

Q.    The say you signed this mortgage and these mortgage applications, you knew full -- you fully knew that Dr. Martinez was going to pay $380,000 the day after you closed, correct?

A.    No.  Not the day after I closed.

Q.    You knew it was going to be right close in time?

A.    I knew that he was going to put $380,000 towards our home, to lower that monthly payment, yes.  I didn't know what day, I didn't know when, I didn't know how soon,

Page 209

but yes.

Q. You knew it in advance?

A. Yes.

Q. Before you closed on the mortgage?

A. Yes.

Q. And so why didn't you take out a mortgage for a lower amount if it was so important to you?

A. Because we would have had to restart the whole process. My daughter was starting school, I was starting a new job. We were almost done with this process and we wanted to close.

Q. So when in the process -- because you signed the application in -- on 7-21 and you closed about a month later, when did it come to pass that it was going to be a pre-payment of 80 percent of it?

MR. ZINN: Object to form.

THE WITNESS: I don't know.

BY MR. CHASE:

Q. Well, when in the process?

A. Sometime between initiating it and ending it.

Q. Okay. And did you speak to any of the mortgage individuals about whether it would delay the process?

A. No.

Q. Okay. So you made an assumption that it would delay the process to say that you were going to actually

Page 210

put more money down?

A.   Yes.

Q.   And what was that assumption based on?

A.   All the paperwork we had to fill out already, and to have to redo it all.

Q.   So you would have more of a gift given into your account instead of the 120, it would have 500?

MR. ZINN:  Form.

THE WITNESS:  We would have put more money towards the house at the beginning, or paid it after we closed.  Either way, when it happened, how it happened, our goal was to make the bill more manageable for us to pay.

BY MR. CHASE:

Q.   And you're testifying under oath that you knew about the judgment to Ms. Welsh, at that time?

A.   I knew there was a judgment 12 years prior, yes.

Q.   Did you have any reason to believe that that judgment wasn't in effect?

A.   I had no reason to know anything about that judgment.

Q.   And when Dr. Martinez was appearing for his Connecticut hearings, did he appear by Zoom in 2020?

A.   I have no idea.

Q.   Did he ever tell you that he -- did you ever see

Page 211

him appearing by Zoom at a court hearing that occurred in Connecticut?

A.   No.

Q.   All right.  And did you know what was happening with the court case in Connecticut around August 2020?

A.   No.

Q.   Did you ask Dr. Martinez about it?

A.   I told you we never discussed anything to do with it until I was named in this case.

Q.   So did it slip your mind that there was a judgment owed to another person when you were receiving these gifts?

MR. ZINN:  Objection.

A.   It was never on my mind to begin with.

Q.   Okay.  So you knew about it, but you just pushed it out of your mind?

MR. ZINN:  Objection.  Asked and answered numerous times now.

THE WITNESS:  I never knew what he owed, what he didn't owe.  Nor did I know at this point in time what he owed or what he didn't owe.

BY MR. CHASE:

Q.   Are you a forgetful person?

A.   No.  I never knew.  I never asked.

Q.   So -- okay.  But you did know there was a

Page 212

judgment?

MR. ZINN:  Objection.  Asked and answered.

THE WITNESS:  I just answered it.  I'm not going to answer that question again.  I've answered it a million times.

BY MR. CHASE:

Q.   You knew there was a judgment, and you didn't forget it, correct?

MR. ZINN:  Objection.  Asked and answered.

THE WITNESS:  I never thought about the judgment.

BY MR. CHASE:

Q.   Okay.  You never thought about it, but you knew?

MR. ZINN:  Objection.  Asked and answered.

BY MR. CHASE:

Q.  I didn't ask you whether you thought about it.  I asked you if you knew it.

A.   You did ask me that, and I've already answered it.

MR. ZINN:  Objection.  Asked and answered.

BY MR. CHASE:

Q.   If somebody owed you money, and that someone that owed you money just decided to pay somebody else, what would your thought process be?

MR. ZINN:  Object to form.

Page 213

THE WITNESS:  I would need to know the details of it.  I don't know.  I know nothing about the other person's reasons.

BY MR. CHASE:

Q.   The other person meaning, like, the judge?

A.   No.  You just asked me if someone paid someone else who owed me money.  I don't why they would do that.

Q.   To avoid payment to the creditor.

MR. ZINN:  Form.

THE WITNESS:  No.  If they owe money to multiple spots, they can pick who they're going to pay what to.

BY MR. CHASE:

Q.   Since your testimony is that you never had a conversation with Dr. Martinez about really anything of substance as to his case --

A.   Correct.

Q.   -- you can't testify as to what his intent was?

A.   Correct.

Q.   And you have no idea what his intent was?

A.   Correct.  Nor am I in his head.

Q.   Right.  And your testimony is that he never told you what his intent was?

A.   Intent with what?

Q.   The reason that he would transfer $380,000 to pre-pay your mortgage?

Page 214

A.   Yes.  He said he was giving --

MR. ZINN:  Form.  Form.  Let me make my
objection.  I object to the form of that question.
You can answer.

THE WITNESS:  My husband told me that the reason
he was going to pay more money towards the home is to
lower out monthly payment to make the bills more
manageable.

BY MR. CHASE:

Q.   And with that lower payment, you decided to refi
to and take more cash out, which raised your payment,
correct?

A.   That was done because we had no other choice,
financially.

Q.   Okay.  So you decided that you needed a lower
payment.  And then a year later, you said, well, I just
want cash out, and I'll take a higher payment.

A.   I didn't want cash out, we had to have cash out.

Q.   Why?

A.   Because all of his money was frozen, now that I
know that, by you, and we had legal bills that we had to
pay.

Q.   All of his money was frozen by me?  Who told you
that?

A.   He did.

Page 215

Q.   Oh, so you did talk about the case?

A.   Now.

Q.   When were you told that the reason that you refinanced in 2021 was because his money was allegedly frozen?

A.   Now.  He said he needed money then.  He didn't have enough money for legal fees and everything else, and he needed money.  So I said, okay, then I'll take money out of the house and we can use that money.

Q.   In 2023, you had this conversation?  Or in 2021?

A.   Yeah.  2022.

Q.   2022?

A.   Yes.

Q.   So in 2022, you had a conversation with Dr. Martinez --

A.   Yes.

Q.   -- about the reason that you refinanced in 2021?

A.   That I cashed -- that I took money out.  What he needed that money for, yes.

Q.   Did you ask him contemporaneous in 2021 when the money was taken out?

A.   The money was taken out in 2022, wasn't it?

Q.   2021.

A.   Or 2021.  He said he needed money for legal fees.

Q.   But did you wait a year later to have that

Page 216

conversation, or did the conversation happen --

A.   No.   That conversation, we had then.   The reason he needed money for legal fees, come to find out, is he didn't -- he couldn't use any of his retirement money.

Q.   He couldn't use any of his retirement money for legal fees?

A.   Correct.

Q.   Who told you that?

A.   He did.

Q.   Okay.   And you believe that to be true?

A.   Yeah, because he told me that it was frozen at the time.

Q.   He told you his retirement account was frozen and he couldn't --

A.   Yes.   Now, he told me that at that point in time, his retirement account was frozen which is why he couldn't use that money, which is why I took money out of the house for him to use.

Q.   And when that retirement account became unfrozen, then what?

A.   Nothing.   I don't -- what do you mean?

Q.   Well, then -- then, was the pre-payment of $380,000 a bright idea --

MR. ZINN:   Object to the form.

BY MR. CHASE:

Page 217

Q.   -- considering there's alleged liquidity problems after that?

A.   I don't understand your question.

Q.   Well, it's because the testimony is nonsensical, that's why.

MR. CHASE:  Let's take a break.

(Thereupon, a short break was taken.)

BY MR. CHASE:

Q.   In 2021, August that is, a refinance occurred, and it was a cash-out amount of $96,000 --

A.   Yes.

Q.   -- that went in to your Wells Fargo account, correct?

A.   Yes.

Q.   And that was August 30, 2021, correct?

A.   Sometime around there, yes.  Yes.

Q.   It was $96,048.80.

A.   Okay.

Q.   And that cash-out refinance went to you.

A.   Yes.

Q.   Okay.  And it was, you say, for what reason?

A.   My husband being concerned about not having money to represent himself, I believe.

Q.   So why didn't that go to him if it was his problem?  Because it wasn't your problem, right?

Page 218

A.   Because I'm the one on the mortgage.

Q.   Right.  But couldn't you have just transferred that to him?

A.   Oh.  Sure.  I never thought about it that way.

Q.   Okay.  So you decided to cover what you said was -- well, you didn't put in any equity into the Englewood property -- or actually, into any of the property.  You didn't put in any equity into Secoya?

A.   What do you mean by equity -- "put in equity"?

Q.   A hundred and 20 thousand dollars for the down payment came from Dr. Martinez.

A.   Right.

Q.   And then a $380,000 pre-payment came from Dr. Martinez the next day, correct?

A.   Wait -- on Secoya, yes.

Q.   And then there was cash-out taken --

A.   Yes.

Q.   -- and you reaped the benefit of that as well, because you got the 96,000.

A.   Well, I wouldn't look at it as "I" did, we were married, the money is out money.  I never looked at it as, I was taking out a hundred thousand dollars for me to go spend, no.

Q.   It went into your individual account, correct?

A.   Yes.

Page 219

Q.   And you could have had a joint account at that time?

A.   We didn't.

Q.   You could have.

A.   We didn't.

Q.   Well, my question is not whether you did or didn't, but you could have, correct?

MR. ZINN:   Object to the form.

THE WITNESS:   Yes.

BY MR. CHASE:

Q.   Was there anything stopping you from having a joint account?

A.   No.

Q.   Okay.  And if was given to you, correct?

A.   Yes.

Q.   All right.  And was there any discussion that you had with Dr. Martinez whereby if you held it, then the creditor can't get to it?

A.   No.

Q.   That would be preposterous.

A.   Correct.

Q.   Okay.  And why would that be so preposterous?

A.   Because one, I never even thought about the creditor, as you call it.  Two, that was never the purpose of taking the money out.  It never came across my mind at

Page 220

all, no.

Q.   Okay.  And when you say --

A.   I didn't even know that you could prevent someone from -- none of that ever crossed my mine, no.

Q.   When you say that you were informed that the account was frozen --

A.   Yes.

Q.   -- what do you think that means?

A.   He couldn't use it.

Q.   Okay.  What do you think that's pursuant to?

A.   Now what do I think that's pursuant to?

Q.   Do you know what frozen is pursuant to?  Do you know what a garnishment is?

A.   Yes.

Q.   Okay.  So did you understand there was a garnishment?

A.   No.

Q.   Okay.  Do you know what a garnishment is now?

A.   Yes.

Q.   Okay.  And so a garnishment happens to the debtor, correct?

A.   Yes.

Q.   Okay.  So the money went to you, you weren't a debtor, correct ?

MR. ZINN:  Object to the form.

Page 221

THE WITNESS:  I didn't know what any of that, at that time -- nor was that any reason why we took out the money and it went into my bank account, no.  The purpose of it was, he needed money to pay things.  I had the mortgage, I had my bank account information, I did the refinance and took it out with the intent of him being able to use it for whatever he needs to use it for.

MR. CHASE:  If we could mark this as 11 and 12.

(The document referred to was marked for identification as Exhibit Nos. 11 and 12.)

BY MR. CHASE:

Q.   Okay.  Have you ever seen either of these documents?

A.   Yes.

Q.   Okay.  Did you -- when is the first time you saw exhibit 11?

A.   Eleven -- when --

Q.   I'll represent to you that on page 10 is the certificate of service of August 5, 2022.

A.   So within -- I don't know.  I'm sure Brian received it, he gave it to me, I don't know how long that took, but soon after, I would say.

Q.   You received it somewhere -- you think sometime

Page 222

in August of 2022?

A.    Yes, probably.

Q.    And this was the time that all those bigger payments were coming into the joint account, correct?

A.

A.    August -- yes.

Q.    All right.  Did you search for documents that were responsive to these requests for production?

A.    Yes.

Q.    And I'm going to direct your attention to response number 29, and I'm going to show you on exhibit 12 on the third page, your responses.

So these are actually supposed to be on the same document, someone didn't put them on the same document.

A.    Three?

Q.    Yeah.  The third page of exhibits 12 and the ninth page of exhibit 11.

A.    Okay.

Q.    Specific to question number 28, did you search --

MR. ZINN:  Twenty-eight or 29?

MR. CHASE:  I'm going to start with 28.

BY MR. CHASE:

Q.    Did you search for communications with Dr. Martinez regarding Ms. Welsh?

A.    No.

Page 223

Q.   What do you call Ms. Welsh when you talk to
Dr. Martinez about her?

A.   The plaintiff.

Q.   You call her the plaintiff?

A.   Yeah.

Q.   Does he call her D'Anna?

A.   She, her -- no.

Q.   The two of you know who you are referring to when
you call her "she"?

A.   If we're stalking about this court case, yes.

Q.   Okay.  Did you search for documents where the two
of you are communicating about her, meaning the plaintiff?

A.   No.

Q.   Okay.  And so in the modern era that we're in,
searching for documents, most -- specifically, meaning
searching your electronic devices.  Okay?

A.   Okay.

Q.   Electronic devices are cell phones, smart phones,
and computers, generally --

A.   Okay.

Q.   -- there's other ones, but those are the two
applicable ones, probably, here.

A.   Okay.

Q.   What cell phone do you have?  Just what kind?  Do
you have an iPhone?

Page 224

A.   Apple.   Yeah.

Q.   Is it an iPhone?

A.   Yes.

Q.   Which iPhone is it?

A.   It's probably two back from the new-ish --  yeah.

Q.   Have you had the same iPhone now that you had in August of 2022?

A.   Yes.

Q.   And do you delete messages?

A.   Sometimes, yeah.  But usually, spam, but yes.

Q.   Have you ever deleted any messages as it relates to Ms. Welsh?

A.   I don't have -- I'm not aware of any messages I have regarding Ms. Welsh.

Q.   Did you search for messages?

A.   No.

Q.   Did you search your E-mails for communications about Ms. Welsh?

A.   Between me and my husband?

Q.   Between you and your husband, A.  And then also between you and anyone.

A.   Specifically search?  No.  Did I know that I had E-mails from my lawyer in regards to it?  Yes.

Q.   I'm going to separate those into a different basked.

Page 225

A.    Okay.

Q.    I will ask you about that, okay?

A.    Okay.

Q.    So you do have communications -- electronic communications, and I think you said E-mails --

A.    Yes.

Q.    -- with Mr. Zinn about Ms. Welsh.

A.    This case.

Q.    This case.

A.    Well, not her in particular, but this case, yes.

Q.    I'm going to put those into one basket.

A.    Okay.

Q.    Have you communicated about -- with anyone else regarding Ms. Welsh or this case?

A.    No.

Q.    Have you communicated with Dr. Martinez regarding Ms. Welsh or this case?

A.    In writing, e-mails text?  No.

Q.    And you text him every day?

A.    Yes.

Q.    Does he know you're coming here today?

A.    Yes.

Q.    Okay.  Did you text about it?

A.    No.

Q.    Do you specifically not text about plaintiff?

Page 226

A.   No.  We -- no.  We just don't.

Q.   Do you try to keep things out of writing?

A.   No.

Q.   No?

A.   No.

Q.   That's preposterous.

A.   We see each other every day, we don't need to text about it or --

Q.   Or talk about it.

A.   We do talk about this case, I told you that.

Q.   You do?  Okay.  When was the most recent time you talked about it?

A.   This morning in talking about the address, what time I needed to be here, how to get here, traffic, dropping my daughter off, getting her picked up.

Q.   Logistics?

A.   Yes.

Q.   But what about the substance of the case?

A.   No.

Q.   Oh.  You don't talk about the substance?

A.   Today?  No.

Q.   Oh.  Ever.

MR. ZINN:  Object to the form.

THE WITNESS:  I don't understand, I guess, your question.  Have we ever talked about this?  Yes.

Page 227

BY MR. CHASE:

Q.   Okay.  What conversations have you had?

MR. ZINN:  Object to the form.

THE WITNESS:  I don't know.  Just that it sucks
that we have to be part of this.  He feels bad that
I'm being called in this.  And that, we'll see what
happens in court, I guess.  Nothing, other -- nothing
specific, I guess.

BY MR. CHASE:

Q.   Nothing specific.  Okay.  Did he ever tell you
that he doesn't understand that what he's supposed to do?

A.   You asked me that already.  No.

Q.   Okay.  So you've had conversations, and he's
never indicated to you that he doesn't know what he's
supposed to do?

A.   He's never implied one way or the other, no.

Q.   Did he ever tell you that he intends to make any
of the court-ordered payments?

A.   Again, we don't talk about what he is and is not
going to do in his original lawsuit, no.

Q.   Well, the court-ordered payments are the subject
of, not just one --

A.   Not this lawsuit.  This is the lawsuit we talk
about.  This one.

Q.   Oh, so you differentiate between the lawsuits?

Page 228

A.   Yes.

Q.   Okay.  So you're aware of the other lawsuit too?

A.   I've answered this question literally ten times. I knew that he had a judgment against him, that is the extent of my knowledge of that lawsuit.  I do not know the ins and outs, court appearances, what he does and doesn't have to do, any of that, no.

Q.   Let me just tell you a few things.  There's litigation in Connecticut.

A.   Right.

Q.   There's two domestications in Florida State court, and there are two Federal Court cases.

A.   Okay.

Q.   Did you know that?

A.   No.  Not all of those details, no.

Q.   Okay.  Have you ever read the complaint in the first Federal Court case?

A.   The only complaint I've read is this complaint for this --

Q.   Just the second one?

A.   No.  For this case that I am named in.  I have not read complaints from any other court cases that involve my husband.

Q.   Okay.  Has he ever talked about other cases related to the plaintiff with you?

Page 229

A.    No.    Other than he was concerned about money for a lawyer, but no.

Q.    Did you pay the $96,000 to Mr. Zinn?

A.    No.

Q.    What did you do with that?

A.    We didn't end up -- well, some of it went to Mr. Zinn, yes, but we didn't need all of it.

Q.    So it -- but you retained the 96?

MR. ZINN:    Object to the form.

THE WITNESS:    I retained whatever didn't go to Mr. Zinn or that my husband didn't need for other expenses, yes.

BY MR. CHASE:

Q.    Okay.    So, nominally, it was asserted that $96,000 that you received in -- 8-30-2021 pursuant to the refi --

A.    Yes.

Q.    You say that was supposed to go to Mr. Zinn, but it didn't?

A.    I didn't say it was supposed to go to Mr. Zinn. It was supposed to go to anything my husband needed it to go to, one of which things he said was Mr. Zinn.    He didn't say Mr. Zinn, but his lawyer.

Q.    From your Wells Fargo account, did you make payments to Mr. Zinn?

Page 230

A.   I believe I did.  I either made them directly to Mr. Zinn or I gave them to my husband who then gave them to Mr. Zinn.  I don't remember the logistics of it, but yes, that money was used.  Some of it.

Q.   Not 96,000?

A.   No.

Q.   But you retained the rest of it?  It wasn't used.

A.   We have, yes.

Q.   Okay.  But you have, in the Wells Fargo account?

A.   Well, we have -- my husband is able to use that money as well if he needs to.

Q.   It's your account, the Wells Fargo, correct?

A.   Correct.  And I'm married to my husband, yes.

Q.   Okay.  But you own that account individually, correct?

A.   Yes.

Q.   So you did not do a search on E-mail or text for the word "Welsh," correct?

A.   Correct.

Q.   You did not do a search on E-mail or text for the word "D'Anna,"  D apostrophe A-n-n-a?

A.   No.

Q.   Okay.  Did you do a search for anything on text or E-mail for any documents in this case?

A.   Well, search, like type in under the search bar?

Case 2:22-cv-00216-KCD-NPM  Document 146-1  Filed 05/20/25  Page 512 of 621
PageID 3886

Page 231

No.

Q.  Okay.

A.  Did I look on my E-mail?  Yes, and there are E-mails with my lawyer in regards to it.

Q.  Okay.  There was no privilege log produced in this case, correct?

A.  What's a privilege log?

Q.  Are you aware of whether a privilege log was produced?

A.  I don't know.

Q.  Are you aware of whether objections were served, pursuant to discovery?

A.  No.

Q.  Okay.  Have you communicated with anybody about transfers of money from Dr. Martinez to you?

A.  No.

Q.  Never talked about --

A.  To who?  No.

Q.  To anybody.

A.  No.

Q.  All right.  So do you have any brothers and sisters?

A.  I have a brother.

Q.  Okay.  Older or younger.

A.  Younger.

Page 232

Q.    All right.  Where does -- what's his name?

A.    Jerry.

Q.    Jerry.  Where does Jerry live?

A.    New Jersey.

Q.    All right.  How often do you talk to him?

A.    Honestly, not as much as we should.  Every few months.

Q.    Okay.  Does he know about the case -- this case?

A.    No.

Q.    Do you have close personal friends?

A.    Yeah.  A couple.

Q.    Have you ever discussed this litigation with any of your friends?

A.    No.

Q.    Have you ever discussed this litigation with your brother?

A.    No.

Q.    So, that, you are a defendant in a case pending in Federal Court, you've told not a soul?

A.    Correct.

Q.    Okay.  You have not told anyone other than your attorney?

A.    And my husband, yes.

Q.    And Dr. Martinez?

A.    Yes.

Page 233

Q.   All right.  And have you communicate about this case in writing with Dr. Martinez?

A.   No.

Q.   Okay, even logistics?

A.   Correct.  Like, the address of where I'm driving today?  Yes.

Q.   Anything regarding the case.

A.   No

Q.   Okay.  Would you mind taking a quick search of your phone?  Would you mind?

A.   Yes.

Q.   All right.  If you could go to your messages, and then pull down the little tool bar to get a search field, and if you could type In the word Welsh, that would be good.

A.   Yes.

Q.   All right.  Do you see anything come up?

A.   A copy of this.

Q.   If you could just put it down on the table so we can all see it.  Can you just pivot it so that we can all see it?  Okay.  Can you hit "done," so I can see the search results?

Okay.  And that's stored in your documents in your phone?

A.   I guess.  I don't know, yes.  These?

Page 234

Q.   Okay.  So if you hit "cancel," and then just type in Welsh, and then before you hit search, let me just see what you're searching.

It's coming up in photos.  Okay.  So you received a photo.  Is it stored?

A.   No.  I took a photo of these.

Q.   You took a photo.  When did you do that?

A.   I don't know hot to tell.  I don't know.

Q.   Okay.  Could you type in -- so you took a photo -- I guess you could look at the date.

Did you send that photo to anybody?

A.   Not that I'm aware of.

Q.   Do you know why you took a photo?

A.   Of these?

Q.   Yeah.

A.   probably to look at it and write answers, I -- no, I don't know.

Q.   All right.  Could you type in "contempt"?

A.   Under messages?

Q.   Yeah.

A.   How do I -- oh.

Q.   If you could, just show the results.

A.   Yeah, actually I did.

Q.   If you could put that flat on the table.  I want Mr. Zinn to be able to see it too.

Page 235

If you just put this here, and if you click on the first one -- so just put it so we can all see it.  Put it on the first one.

Could you read that into the record?

A.   He's responding to --

Q.   Could you put it on the table so I can see it too?

A.   He's responding to a question about the court saying, "You are held in contempt in August 2020, and attached the Connecticut order they were referring to, but to me, it still isn't contempt on a motion for an order that if you didn't pay the 25,000 by September, you would be in contempt."

Q.   All right.  What's the date on it?

A.   November 11.

Q.   Of?

A.   2022.

Q.   November 11 of 2022?

A.   Yes.

Q.   Okay.  All right.  What's -- could you put that on the table so I could see what your -- can you just put it -- just pivot it, and just put it.  Like, right there?

A.   Sure.

Q.   Okay.  All right.  You mind if I just look at it?

Okay.  And who is the speaker here in the blue?

A.    Me.

Q.    That's you?  Okay.  So you're saying, "He's responding to question about the court, saying you were held in contempt in August 2020, and attached the CT order they were referring to, but to me, it still isn't a contempt order on a motion for order, and that if you didn't pay the 25,000 by September, you would be in contempt."

You said that?

A.    Yes.

Q.    All right.  Well, what's that statement based on?

A.    All this stuffed in here.

Q.    So you did analyze some of these legal matters?

A.    What do you mean by "analyze"?

Q.    Was that -- that legal opinion, that was your thoughts?

A.    Yeah.

Q.    Okay.  Let's look at the other statements that are in there.  You can just put that flat on the -- okay, that was the first one?

A.    The same day.

Q.    All right.  Let's go to the second one.  If you want to just pivot --

A.    Do I have to show my personal text messages?

MR. ZINN:  Only the ones that have to do with

this case because it says contempt.

MR. CHASE:  These are the ones that should have been produced in discovery.

BY MR. CHASE:

Q.  All right.  If you could put that on the table.

A.  I just want to make sure there's nothing personal in here.

Q.  I'm not looking at anything personal.

A.  I'm not touching it, I'm just reading.  Okay. Yeah, there's nothing personal there.

Q.  Okay.  So I'm reading from the top of the screen. What day is this?

A.  Same day.

Q.  Okay.  All right.  It says -- you're saying, "lol.  That only pisses Zinn off more, makes him fight harder."

THE WITNESS:  Sorry.

BY MR. CHASE:

Q.  And then Dr. Martinez says, "What did it say? I'm driving home now."  Okay.  And then you said --

A.  Oh.  "He's trying to file a motion against Zinn for contempt of court, and that statute is that a lawyer can be held responsible for needlessly increasing litigation costs."

Q.  And the response?

Case 2:22-cv-00216-KCD-NPM   Document 146-1   Filed 05/20/25   Page 519 of 621
PageID 3893

Page 238

A.   "Lol.  They tried the same thing in Connecticut and they lost.  We have a much better case than they do."

Q.   And then what was said?

A.   "Correct.  And Zinn says he now wants to file that same motion against Chase."

This is lawyer stuff, though.  Can I read this?

MR. ZINN:  I'd rather not.

BY MR. CHASE:

Q.   Well, it's not communications with the lawyer.

A.   "Correct.  And Zinn said he now wants to file that same motion against Chase because we actually have a case for that against him."

Q.   All right.  Can you go to the next one?

A.   One more.

Q.   If you don't mind, just put it flat on the table.

A.   Yeah.  I get -- can I click that?  I don't know what that is.

MR. ZINN:  Do these text messages have conversations -- or repeating conversations between me and my client.

MR. CHASE:  Well, we haven't even seen what they are.

MR. ZINN:  Right.  So I'd like to review that first.

MR. CHASE:  Well, this should have been produced

Page 239

in discovery.  It's a willful discovery violation.

MR. ZINN:  No, it's not.  It's could be --

THE WITNESS:  I have no idea.  It's a copy of one of the documents.  And then it says, "First paragraph says order at issue in this appeal is after Mr. Martinez violated a prior contempt order issued on August 14, 2020.

BY MR. CHASE:

Q.   Okay.  And you said that?

A.   Yes.

Q.   And what's the response?

A.   "Look at your E-mail."

Q.   Oh.  Okay, so you maybe have E-mails about this case too.

A.   Well, that would be from my attorney, yes.  He's telling he to look at the E-mail in regards to this case.

Q.   Okay.  And can you scroll up a little bit to -- can you scroll up to the --

A.   It says, "but maybe closer to six because we'll stop at Seed to Table for cheese."

Q.   All right.  That's fine.  Can we see the context around the other ones?

A.   It was "look at your E-mail," and then I said okay.  And I must have looked at it.

Q.   All right.  And then scroll down -- scroll

Page 240

further down when he's talking about -- Mr. Zinn is
talking about --

A.   "A new E-mail for you to read."  "Okay."

Q.   Okay.

A.   And what the E-mail was --

Q.   Well, can you -- can you --

A.   We just read this one.  That was the first one we
read.

Q.   Okay.  And what happens after?

A.   The dog pooped.

Q.   And then?

A.   "Peter got in the garbage again because
Sophie --"

Q.   Okay.  That's from the text messages.

A.   Yes.

Q.   Can you type in D, apostrophe --

A.   Under?

Q.   Under texts still.  We're going to do E-mails
after.

A.   D, apostrophe --

Q.   A-n-n-a.

A.   Okay.

Q.   All right.  Can you type in "lawsuit"?

A.   Nothing, just -- oh.  My cousin Lynn, different
lawsuit.

Page 241

Q.   No problem.

A.   Yeah.

Q.   Judgment.

A.   Nothing.

Q.   J -- try without the E.  J-u-d-g- -- okay.  Did you hit search?

A.   Yeah.

Q.   Okay.  Type in "Chase."

A.   Okay.

Q.   All right.  So can you click on the first one?

A.   Yeah.  Do I have to read the whole thing?

Q.   If it's something that's personal -- not if it's personal.  You don't have to read any personal parts.

A.   Okay.  "I spoke with Zinn and he actually said that with the" --

MR. ZINN:  Hold on.  Hold on.

THE WITNESS:  Should I read -- because this is, like, lawyer stuff.

MR. ZINN:  I think something that Bill Martinez may have said to me or I said to him is not responsive to any of these requests.  Because you asked for all unprivileged communications.

MR. CHASE:  You didn't invoke any privilege. Your objection is waived.

MR. ZINN:  No, that's -- that was your request.

Page 242

It doesn't say "all communications."  It says all "unprivileged communications."

MR. CHASE:  I don't think it's privileged.  You didn't designate any privilege.

MR. ZINN:  But you didn't ask for privileged.  You asked for all unprivileged.

MR. CHASE:  There's nothing that's privileged.  You haven't designated any privilege.  Your objections are waived.

MR. ZINN:  You tell me what request you think this is responsive to.  Give me a request number.

MR. CHASE:  All of the -- you have no privilege argument.  Your objections are waived, and the court has ordered a production.

MR. ZINN:  You didn't ask for all communications.  You asked for all unprivileged communications.

MR. CHASE:  And none are privileged because you didn't --

MR. ZINN:  Exactly.

MR. CHASE:  You invoked privilege zero times, and you served zero privilege log.  You have no privilege.

MR. ZINN:  I have no --

MR. CHASE:  You don't even have attorney-client privilege.

MR. ZINN:  I don't have to invoke privileged if

Page 243

you're not asking for privileged communications.

MR. CHASE:  Nothing is privileged.  You haven't invoked any privilege.  It can't be invoked because it's a rule.

THE WITNESS:  Can I invoke privilege now?  The conversations with my attorney.

MR. CHASE:  I'll tell you when a privilege could have been invoked, September 5, 2022.  And that date, that ship sailed, and this is the other one.

MR. ZINN:  Can I take a look at that?

THE WITNESS:  Yeah.  Sure.

MR. ZINN:  Okay.  This has nothing to do with the plaintiff and it has nothing to do with transfers of money.

MR. CHASE:  Well, I think -- I'll be the judge of that.

MR. ZINN:  No, you won't.  It has nothing to do with payment of liabilities.  What other request are you referring to?

MR. CHASE:  Well, how can you make representations about what it pertains to without showing I?

MR. ZINN:  Because I'm looking at it.  What request are you asking about?  What number?

MR. CHASE:  Communications regarding the case.

Page 244

MR. ZINN:  Where is that request?

MR. CHASE:  I mean --

MR. ZINN:  Where is the request?

MR. CHASE:  I mean, there's like, several of them there that's responsive --

MR. ZINN:  I can tell you this actually has to do with the deposition schedule.  Okay?

MR. CHASE:  Oh, that.  You don't want to show that.  Interesting.

THE WITNESS:  It's not that we don't want to, it has nothing to do with what we're doing right now.

MR. ZINN:  I won't do it, as far as this request.  Okay.  Go to the next one.

MR. CHASE:  In the Federal Court, the obligation to provide discovery is continuing.

MR. ZINN:  If you tell me the request if would fall under, I'd be happy to have you read it.

MR. CHASE:  Well, you're just going to argue it.  So we'll file a motion.

THE WITNESS:  This is the same thing.  It's about trying to find a date for the deposition.

MR. ZINN:  For a deposition date?  Okay.

MR. CHASE:  We can skip over that for now.

THE WITNESS:  And then -- hold on.  Same thing.

MR. ZINN:  Deposition dates?

Page 245

THE WITNESS:  Yeah.

MR. ZINN:  Okay.

THE WITNESS:  They're -- yes.

BY MR. CHASE:

Q.    Okay.  can you type in "refinance"?

Nothing under refinance?

A.    No.

Q.    Type in "refi,"  r-e-f-I.

A.    This -- these are work people, I don't why refi would -- oh, "refill," because it's prescriptions.

Q.    Okay.  All right, how about "transfer"?

A.    Paula, who's my co-worker, Chrissy, my daughter.

Q.    Anything else?

A.    No.

Q.    Okay.  "Fraud."

A.    Okay.

Q.    All right.  Can you put it on the table?

A.    Can I read it first?  Thank you.

Q.    Audibly, I'll answer, yes, you may read it first.

A.    Thank you.  Okay.  Do you want me to read it?

Q.    If you could just place it that flat on the table, and then just form the -- this 90 degree thing, and then if you could read it.

A.    But their -- this is me.  "But their entire argument in the first line is they need the emergency

Page 246

order to prevent further fraudulent transfers intended to dissipate his assets from reach of the plaintiff, yet the Florida court already said that you could spend your retirement, and he has no legal access to take it, so they can't even ask for it again."

Q.   You said that?

A.   Yeah.

Q.   Okay.  And when did you say that?

A.   I don't know.  Oh, shoot.  Let me find it.  I don't know.  Hold on.  Can I go back and reopen it?

Q.   Yeah.

A.   Okay.  April 28.

Q.   April 28 of 2022?

A.   2022.

Q.   Okay.  All right.  And so, can you put it flat on the table?

A.   Yeah.

Q.   Can you go back to what you were just reading?

A.   Yeah.

Q.   All right.  And then what happened?  What was the response?

A.   "Yep."

Q.   Okay.  And then the response to that?

A.   "And" --

Q.   Would you mind just putting it flat on the table?

Page 247

A.   Yes.  "And it impossible to do something to prevent the plaintiff from take money if the plaintiff never had the ability to take it to begin with."  "I agree," was his response.  And then I said, "at the airport waiting to go through security."

Q.   All right.  Is there any more conversation about this?

A.   "Nice.  Our flight's delayed."  No.

Q.   All right.  So you did discuss the case?

A.   Apparently, yeah.

Q.   Can you go to the next one?

A.   Yeah.  This has a video.

Q.   Can you just take a look?

A.   Oh, sorry.  I was mad at Zinn.  I'm sorry.

Q.   All right.  If we could read that, please.

MR. ZINN:  I just want to make sure there's no attorney-client thing.

THE WITNESS:  Oh this was trying to get the Farmington Bank -- or Peoples Bank, which used to be Farmington and how I couldn't get it.

BY MR. CHASE:

Q.   All right.  Let's go through what you've seen, I haven't seen this.

MR. ZINN:  This is a very long text.  I don't know if you --

Page 248

MR. CHASE:  I'll take a picture of it and we can deal with it that way.

BY MR. CHASE:

Q.   If you could just place the phone on the table, that would be great.

MR. ZINN:  Okay, just one second.

THE WITNESS:  Oh, this is what we were just reading here.

MR. ZINN:  Oh, so that was the other thing?

THE WITNESS:  Yeah.

MR. ZINN:  So it goes into the conversation we were just talking about?

THE WITNESS:  Yeah.

MR. ZINN:  Let's go back to that.  There's more at the top.

MR. CHASE:  If you wouldn't mind just putting the phone flat on the table.

MR. ZINN:  I'm looking out for the beginning conversation.

MR. CHASE:  Well, you can do that while you're scrolling on the table.

MR. ZINN:  I think it starts here.

MR. CHASE:  All right.  Well, it's okay if there's a little bit of unresponsiveness.

BY MR. CHASE:

Page 249

Q.    Do you mind if I put it just right here at 90 degrees?

A.    Yes.

Q.    All right.  I'm just going to take a photo of it.

A.    Well, I just want to make sure there's nothing personal in here before you start touching my phone.

Q.    I don't want to touch it.

A.    Thank you.

Q.    All right.  If you can scroll up again. Actually, a little bit down.  One more, there we go.  All right, scroll up again.  Who said law wasn't fun?

All right.  Scroll a little more.  All right.  One more.

A.    Yeah.  This is the bank stuff.

Q.    All right.  I'll just get it for you.  All right, then scroll up a little more.  Keep going.

A.    Oh, okay.  Oh, boy.

Q.    Just keep going.

A.    Oh, okay.

Q.    If you wouldn't mind putting it on the table?

A.    I'm not doing anything.

Q.    I'm not saying you are.  I'm just saying it's easier just to have it be on the table.

A.    Okay.

Q.    If you could scroll up a little more.  It's

Page 250

better if it's just flat on the table.

A.    I understand.

Q.    Did that -- did we get everything there?  Because there might have been something in between there?

A.    "Please."  No.

Q.    Well, if you scroll up just a little bit more. The last thing I have is where it says, "Please."  Okay. All right.  Scroll up one more.

A.    This is about the airport, so I am going to stop right there.

Q.    Let me take a look at this.

A.    Okay.

Q.    There was one more thread right there?

A.    No, that was -- it was all connected.

Q.    Okay.  Do you mind just putting it flat, just so I can see it?  There's three different threads, right?

A.    Right.  This one and this one is connected, and we already did this one.

Q.    Okay.  Let me ask you a few questions about this. I'm trying to mitigate he prejudice here.

        MR. ZINN:  Do we have time for a bathroom break while you're doing that?

        MR. CHASE:  Yeah.  We can go off the record.

            (Thereupon, a short break was taken.)

BY MR. CHASE:

Page 251

Q. All right. If you don't mind just putting your phone down for now.

A. Yeah.

Q. All right. So when we were off the record, and before we went off the record, I took some photos of the text messages that were exchanged with Dr. Martinez, and I have a few questions about them.

A. Sure.

Q. It was established that those were not previously searched for?

A. Yes.

Q. Okay. And so you had previously testified -- I'm paraphrasing -- that the two of you didn't have really substantive discussions about the case and the cases, does this change your testimony?

A. About this case?

Q. Sure.

A. Yes. Yes.

Q. Okay. All right. And you, in fact, are -- the text messages that you're exchanging, you know quite a bit about this case. You're fairly sophisticated in --

A. This case. Yes.

Q. Okay. So you're not unaware. You're intelligent, master's degree, you're very with it.

A. Yes. Correct.

Page 252

Q.   Okay.  All right.  So let's do another search, if we could, because this is incredibly fun.

All right.  If you don't mind, just put it flat on the thing -- just 90 degrees so that Mr. Zinn can see, too.  Okay.

A.   Well --

Q.   All right.  If you could type in "payment."

A.   They're to Naples Women's Health.  Naples Women's Health and Clean Cans of Collier.

Q.   Okay.  Could you type in "plaintiff?"

A.   Yes.

Q.   All right.  If you could click on the first one.

A.   Yeah.  Can I look at it?

Q.   Yeah.  But if you could look at it with it on the -- I won't be able to see if you just look at it flat.

MR. ZINN:  I can't see.

THE WITNESS:  I know; I can't either.

BY MR. CHASE:

Q.   While you look at that, I'm just going to make a little bit of the record.

I'm doing what I believe the court would want us to do, which is mitigate the prejudice of non production of discoverable documents.

A.   This -- it's one text message and it's about setting up the deposition.  What your E-mail said, what

Page 253

our E-mail responses were.  There's drama.

Q.    That's unnecessary, though, I'll have us all know.

MR. ZINN:  Are you talking about subpoenas that you served on financial institutions?  Did you ask for that in your request to produce?  I don't see that.

MR. CHASE:  It very much involves the case.  It involves the plaintiff, it involves any defenses, it involves transfers of money, and it involves contempt. It involves documents referred to interrogatory answers.  Denials of requests for admissions.

MR. ZINN:  All right.  I guess we can show that.

THE WITNESS:  Okay.

MR. ZINN:  I don't agree that it's --

MR. CHASE:  If it's not to relevant, I'll just take a picture and we'll move on.

BY MR. CHASE:

Q.    Okay.  If you can scroll up.  Alright,

A.    That's the first one.

MR. ZINN:  So just click on the second one.

THE WITNESS:  This one, he already has.

MR. ZINN:  Yes, this is part of that same one you took before.

THE WITNESS:  It's the same date.

MR. ZINN:  Because he mentions the word

Page 254

"plaintiff" in that same text.  And you have to go to the third one.

THE WITNESS:  That -- it was the same date, the same one.

BY MR. CHASE:

Q.  Okay.  That's all for plaintiff0?

A.  Yeah.

Q.  If you could type in "exempt," e-x-e-m-p-t.

A.  Okay.

Q.  All right.  Got a --

A.  Two of these are the same -- they're all from that same text thread.

Q.  Okay.  If you could type in "retirement."

A.  Retirement.  So one if from the same date. Another one -- one is from a co-worker, Marie.  And then this was July 29th, just an article.

Q.  Okay.  All right.  If you could type in "joint."

A.  My ex husband -- oh, scaffolding and joint work text message.

Q.  All right.  If you could just put it flat.

A.  Yeah.

Q.  So, under "joint," it shows -- what does it show?

A.  So my ex husband -- he is not in here, yes.

Q.  Could you type in "summary"?

A.  This is summary for his daughter Veronica.  There

Page 255

are times and then two co-workers.

Q.   If you could type in "deposition."

A.   Okay.  Yep.  So, do you want me to click on them?

Q.   Yeah.  How many are there?

A.   Three.

MR. ZINN:  I think that you just showed him, right?

THE WITNESS:  Yes.

BY MR. CHASE:

Q.   So you're saying there some that you haven't shown me that have to do with the deposition schedule?

I'll go ahead and --

A.   No, the one that you already took a picture of that was under a different search item talks about depositions, so it's coming up.

MR. ZINN:  Yeah, this is a whole thing about scheduling Dr. Martinez's deposition.  The second one?

THE WITNESS:  Yeah.  All of this one, I didn't even -- well, I kind of looked at it, but --

BY MR. CHASE:

Q.   This one that I'm seeing -- I didn't -- the top is cut off.  It says sending subpoenas.  This one?

A.   Did you scroll back to -- because you took two of it.

Q.   Alright,

Page 256

A. So this one is -- a lot of it has nothing to do with this, but the first one does. "Did you get the E-mail from Zinn? Needs to talk about how to proceed with deposition dates." "Haven't looked yet. What did it say? Can you talk real quick" "Yes."

Q. I'm going to make a judgment call and say, I'm okay moving on.

A. Okay.

Q. As long as it's only about scheduling depositions.

A. Yeah. That was literally all of it, what I just read.

Q. Okay. We might come back to the.

A. Okay.

Q. Can you go to your E-mail?

A. Sure.

Q. And I haven't gone --

A. Sorry. Yes.

Q. I haven't gone into the communications with Zinn, I'm going to put that to the side.

A. Okay.

Q. If you could type in -- we'll go through this list again.

A. Sure.

Q. We can start with Welsh. W-e-l-s-h. Do you have

Page 257

any nicknames for the plaintiff?

A.   No.

Q.   Or DW -- okay.

A.   So there's photos, which again, is a picture of this.

Q.   Okay.  All right.  That's all that comes up under Welsh?

A.   Hang on.  And document.

Q.   That E-mail is searching your Yahoo?

A.   Yes.  Yeah, yeah, yeah.  Which is the notice for the deposition, it's a copy of the notice.

Q.   Okay.  That's fine.  I don't need that.

A.   Okay.

Q.   All right.  That's all that's under Welsh?

A.   Oh, wait.  I was on the wrong thing.

Q.   Yeah.  I would think there's more.

MR. ZINN:  Well, the subject of every E-mail where I may be CCd on or sent second an E-mail on will have probably Welsh versus Martinez in the subject line.

BY MR. CHASE:

Q.   I think what we can do as to attorney-client communications is, I'm willing to -- and we're on the record here -- I'm willing to meet and confer with you about what the legal landscape looks like as to that.

Page 258

It's my position that that is all waived.  No privilege log is produced is all waived.  It's all discoverable, it's prejudicial, it should have been produced. Definitely a strong motion.

But I'm willing to meet and confer with you on it and I'm not going to make the witness do it on the record. All attorney-client privileged communications are what would have been or what could have been if it was raised, but it wasn't, it was waived.

A.  Yeah.

Q.  And it was the privilege log.  So I'm willing to meet and confer on that and not make anything that's to or from Zinn, we can skip over that for now.

A.  Okay.

Q.  But any --

A.  In an E-mail you're saying?

Q.  In e-mail.  But any E-mail that he's not on --

A.  Okay.

Q.  -- that I think is responsive to these key terms.

A.  Okay.  I'll do a search.  And honestly, I apologize, I didn't know that I even should have done a search.

Q.  It's okay.

A.  Okay.

Q.  Well, maybe it's okay, but maybe it's not.  We'll

see.

A.   Okay.

Q.   But not -- it's not --

A.   It wasn't purposeful, put it that way.

Q.   It wasn't like you were pretending like you didn't know about the lawsuit or anything.  I'm just kidding.

All right.  Could you type in -- okay.  So, Under Welsh, what came up?  Because there's a --

A.   Nothing on it.

Q.   Nothing?

A.   No.

Q.   Are you spelling it right?  W-e-l-s-h?

A.   Subject.  Alright,

Q.   It should be contains.  You might have to be on wifi or something.  Look at your last 15 days.

A.   Didn't we just agree to do this later, no?

Q.   Well, as to attorney-client privilege.

A.   Oh.

Q.   So anything with Zinn, I'm punting that for us to talk about, but other -- okay.

Why don't I do this.  Because of the time --

A.   Yes.

Q.   -- I want to do a couple of searches, but we'll wrap this up by 3:00.

Page 260

A.    Okay.

Q.    And if we could agree on the record -- I don't want to put you on the spot -- to complete any supplemental deposition by Zoom, I'll get you out of here by 3:00, and we could potentially wrap this stuff up.

A.    Okay.

MR. ZINN:  Okay.  That's a new one.  You mean supplemental deposition.

MR. CHASE:  Well, I want to end this by three.  I don't want any child care to be implicated.  I do think that we need to do the E-mail searches, and I do have the opportunity to ask the witness questions on it.  I do have a couple other things to ask about.

If we can agree, and I can step out of the room if you guys want to talk about it off the record.  If we can agree to a short supplement of a deposition, if needed, after we do these searches, I think we can end by three, and we can do these searches, and then we can see what we have, take the pictures, and then break for the day.

When I say supplemental deposition, I mean, like, 30 to 60 minutes, maybe, by Zoom.

MR. ZINN:  Okay.  As long as it's no longer than an hour, that's fine.

MR. CHASE:  An hour max.

Page 261

MR. ZINN:  Okay.

THE WITNESS:  Okay.

MR. CHASE:  Are we agreeable?  I don't need to step out?

THE WITNESS:  No.

BY MR. CHASE:

Q.  All right.  So let's go back to the searches because this is fun, right?

A.  Wait, I thought we were doing this after the --

Q.  Well, we're doing everything that -- any hits with Zinn --

A.  Right.

Q.  -- we're punting that for he and I to meet and confer.

A.  Okay.

Q.  But other than that, I want to see if we can go through it.

A.  Okay.

Q.  Let's see what else you were talking about, if that's the case.

All right.  Well, maybe -- could you try "contempt?"

A.  Yes.  I sent an E-mail to my mom about my daughter, shows up.

Q.  Are you on wifi?

A.  Yeah.  I just connected.

Page 262

Q.   Mine is popping right.  Just to test if it's on there, could you type in Zinn?  I don't want to see any of those, I just want to see if it pops anything up.

A.   All right.  Zinn, right?

Q.   Or just Z-I-n-n.  Nothing's coming up?

A.   No.

MR. ZINN:  Well, you're searching my whole name, just search my last name.

THE WITNESS:  People, or?

BY MR. CHASE:

Q.   If you just -- if you put that flat on there, I think I can figure it out.  If you go back to your E-mail box, just go -- push that thing up, there you go.  In the -- this is all your E-mails -- in the inbox?

A.   Yeah.  It's my inbox, yeah.

Q.   Okay.  So if you -- in the search field, if you just type in "contempt."  And then search.

A.   That's my mom.

Q.   Type in all mailboxes, maybe.

A.   Oh, maybe.

Q.   There it is.

A.   Oh, okay.  Okay.

Q.   All right.  There's the "motherload".

A.   Okay.  So, E-mails I've sent to myself, articles about things.  All right.  You want to know E-mail

Page 263

communication with my husband?

Q.   With him or anyone else.

A.   All right.  Okay.

Q.   Except Zinn, because we'll met and confer on that.

A.   This -- I mean, it comes up "to Bill," but it's from Zinn.  It has his thing on the bottom.

Q.   I'm going to be charitable and say that if you're forwarding an E-mail from Zinn, let's meet and confer on that.

A.   This is another forward.

Q.   Well, the actual part of it that is your communication to Dr. Martinez that doesn't involve Zinn. If you just put it to the screen on that --

A.   Yes.

Q.   Okay.  If we could just look at that.

A.   I'll have to look through all of them.

MR. ZINN:  Do you say something in your E-mail?

THE WITNESS:  No.  They're forwarded -- no.

BY MR. CHASE:

Q.   If it's just forwarding, then --

A.   Being forward -- okay.  So it will say it right here, being forwarded.  This one is being forwarded.

Q.   Just so we have an idea of the scope, how many are there that we're talking about here?

Page 264

A.   One, two, three, four, five, six, seven, eight, nine, ten.  But again, these are to all of us.  Ten, eleven, twelve, thirteen.

Q.   Thirteen under contempt?

A.   Yeah.

Q.   All right. How many under Welsh?

A.   Zinn, these are forwarded, but one, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23.

Q.   Twenty-three.  All right.  And D'Anna, D, apostrophe, A-n-n-a.

A.   A-n-n-a?

Q.   D, apostrophe, A-n-n-a.  So just Anna, but D apostrophe.

A.   One, two, three, four, five, six, seven.

Q.   Seven.  Okay.  How about "judgment"?  J-u-d-g-m-e-n-t.

A.   It's probably going to say none, but -- none.

Q.   None.  Okay.  How about "fraud"?

A.   One -- oops, wait.  One, two, three, four.  Although that doesn't -- three.  That doesn't pertain to the --

Q.   All right.

A.   Hold on.  I'm not done yet.  Most of these don't have to do with us.  Three.

Page 265

Q.   Three.  All right.  How about "exempt"?

A.   One, two, three, four, five, six, seven, eight, nine, ten, 11, 12 -- 25.

Q.   Alright, "Joint."

A.   Sorry.  It takes a little while to load.

Q.   Actually, they're might be a lot out of that.

A.   Okay.

Q.   If you do in quotes, joint account.

A.   Okay.

Q.   And then in quotes.

A.   It's coming up with, like, AT&T and --

Q.   Under joint account?

A.   None.

Q.   None?  Under joint account?

A.   No.

Q.   Okay.  "Summary."

A.   Oh.  Like, credit card statements --

Q.   Try summary judgment in quotes.

A.   Okay.  None.

Q.   None?  All right.  Try "plaintiff."

A.   Sorry.  It keeps reloading.  13.

Q.   How about "transfer"?

A.   Something more specific?  It's Pottery Barn, Expedia --

Q.   How about "refi," r-e-f-I.

Page 266

A.   Okay.  One.  Oh, wait.  Hold on.  It just refreshed.  One.

Q.   All right.  How about "380,000."

A.   Sorry.  It just refreshed.   Three.

Q.   All right.  Let's start with the 380.

A.   Oh.  Go back --

Q.   To look at them.

A.   Sure.  Uh-huh.

Q.   All right.  If you could click on the first one.

A.   It's searching.  Not anything to do with Zinn, right?

Q.   Well, if it's -- if it's the E-mail from Zinn, pump the brakes on it.  But if it's --

A.   This is to you, so.  All right.  This one is a forward.

Q.   All right.  Here.

A.   No.  Because this is a forward of one of Zinn's E-mails, right?

MR. ZINN:  Right.

THE WITNESS:  It says, "this is for you," from Brian, and then --

MR. ZINN:  Yeah.  It says, "this is for you," and he's forwarding my E-mail.

MR. CHASE:  I mean, I think it should be produced.  I think the objections are waived.  I'm

willing to meet and confer on it so you can actually do a privilege log, if you are going to do one.

MR. ZINN:  We can talk about it.

MR. CHASE:  We can talk about it -- we can talk about it.

BY MR. CHASE:

Q.  But any E-mail that's not the actual E-mail between you and Zinn that's responsive to all of these.  Let's see what we can do with the 11 minutes.

MR. ZINN:  See if you can find any E-mail between you and Bill or anyone that has nothing to do with me.

THE WITNESS:  That's another forward.  Another forward.  This is the Prosperity mortgage.  So this must be the actual refinance.

BY MR. CHASE:

Q.  All right.  Why don't we meet and confer on this, and we'll talk about a production --

A.  Okay.

Q.  -- and we can -- as long as we agree on the record here that we can do a supplemental deposition with post-production, and we can meet and confer on the scope.

A.  Okay.

MR. ZINN:  Okay.

MR. CHASE:  I think that's fair.  Is everyone okay with that?

Page 268

MR. ZINN:  Yeah.

THE WITNESS:  Yeah.

MR. CHASE:  I'm being nicer than I otherwise would be.

BY MR. CHASE:

Q.  Okay.  Question.  In the time since the litigation, at least the first case was filed.

A.  Yes.

Q.  You have increased your retirement contributions?

A.  Repeat the beginning part again.

Q.  You have a retirement account at Fidelity?

A.  Yes.

Q.  Okay.  And then it became a rollover?

A.  No.  I left it there and then I have a different one through my current employer.  I didn't do anything with it.

Q.  Well, the 401(k) becomes a rollover, but it stays there.

A.  Okay.

Q.  Then your new employer, you have a different 401(k)?

A.  Correct.  Yes.

Q.  And you're making contributions that are being matched by the employer?

A.  Corr -- I don't -- yes.  They match at some

Page 269

point.  I don't know how long, as a new employee, it takes for them to start the match, but yes.

Q.   You have also made other independent contributions to your retirement account in the last two years, have you not?

A.   No.

Q.   No?

A.   What do you mean by -- no.

Q.   Have you made any contributions to your retirement account in the last two years?

A.   Above and beyond what comes out of my paycheck?

Q.   Well, you're max'ing out your retirement account, right?

A.   Correct.  And that's all I do, yes.

Q.   Okay.  Even though you said you were having trouble paying bills?

A.   Yes.

Q.   When was the last time you had trouble paying a bill?

A.   Paying a bill.  I don't know.

Q.   And the approximate $40,000 a month that is being spent, that was being spent as of one or two years ago?

MR. ZINN:  I'll object to the form.

BY MR. CHASE:

Q.   When you were the sole person paying the bills,

Page 270

correct?  Per month.

A.   I was not spending $40,000 on bills.

Q.   Right.

A.   I don't know what my husband's part of bills were.  I don't know what he was spending on bills.  I personally was not.

Q.   Right.  And you were spending the bills on the household and family things, correct?

A.   Then?

Q.   With your $8,000 in post-tax income --

A.   Yes.

Q.   -- you were not spending 40,000 a month, correct?

A.   Correct.

Q.   But now, recently, we're looking at $40,000 month expenditures.

MR. ZINN:  Object to the form.

THE WITNESS:  Some months, yes.

BY MR. CHASE:

Q.   Okay.  That has been an increase in expenditures in the last two years.

A.   I don't know what the total expend --

Q.   Well, it's your finances, so.

A.   I don't know what my husband was spending on a monthly basis for household expenses.  I can only tell you what I was spending.

Page 271

Q.    Okay.

A.    Does that make sense?

Q.    And it was no where near 40,000?

A.    What I was spending, correct.  Yes.

Q.    And you weren't receiving these $11,000 a month payments that you are now?

A.    To pay the bills that I'm currently paying?  No. I don't know if he was paying other household expenses on his own.  I don't know.

Q.    Has your lifestyle changed in the last two years?

A.    No.  I mean, I own a house now, but no.

Q.    And you have shared expenditures with regard to the minor child, with your ex husband?

A.    No.  Not really.

Q.    Does he live down in Florida?

A.    He does, yes.

Q.    Okay.  So he's taking care of at least some parental expenditures?

A.    Very minimal.

Q.    But some?

A.    Yes.

Q.    Okay.  So you're not the sole person that's providing for the minor child?  Both parents have financial responsibility?

A.    He -- no, he doesn't.  Other than she sleeps at

Page 272

his house every other weekend.

Q.   Okay.  But you're not the only one providing for the minor child?

MR. ZINN:  Objection.  Asked and answered.

THE WITNESS:  Yeah.

BY MR. CHASE:

Q.   And there's no -- there's no other dependants other than the one minor child?

A.   Correct.

Q.   Okay.  So it's just you, Dr. Martinez, and whatever --

A.   Yes.

Q.   -- responsibilities you have to the minor child?

A.   Yes.

Q.   Okay.  And you just have the one property?

A.   Yes.

Q.   Okay.  And so what are these monthly expenditures -- how often do you go out to eat a week?

A.   Once -- twice -- depends.  Once or twice.  On average.

Q.   Okay.  And it's just the two or the three of you?

A.   Yes.

Q.   So what would be --

A.   I mean, sometimes my mom --

Q.   Right.  Generally.  It's not like you're hosting

Page 273

40-person parties.

A.   No.

Q.   Okay.  So what would be a typical once-a-week out-to-dinner excursion, in terms of cost?

A.   A couple hundred dollars.

Q.   A couple hundred dollars, okay.  So let's say that's a $1,000 a month in going out to eat.

A.   Yes.

Q.   Okay.  So, based on those numbers and the other numbers that we were looking at, how do we get from less than 8,000 -- still in the black there -- to 40,000?

A.   Again, we've had other expenses each month that are reflected in the bank --

Q.   Yeah.  I know.  We talked about the air conditioner --

MR. ZINN:  She wasn't finishing her answer.

BY MR. CHASE:

Q.   Okay, we can talk about the air conditioner.

MR. ZINN:  Do you want to finish your answer?

THE WITNESS:  The pool heater.

BY MR. CHASE:

Q.   Okay.  Pool heater.

A.   Legal fees.  Going to visit my brother, I still have family up north that we'll visit.  Things like that.

Q.   There's certainly enough money to be making some

Page 274

payments to the plaintiff, correct?

A.   I don't -- you'd have to ask my husband that.  I don't -- I'm not a lawyer.  I don't know anything about it.  I don't know what he feels he can and can't pay.  I don't have to pay the plaintiff, so.

Q.   Well, there's a joint -- I am going to put that to the side.

There's a joint account that you are taking money out of that is sourced with Dr. Martinez's salary.

A.   My husband, yes.

Q.   Right.  And so it's being transferred from his salary to a joint account --

A.   For family expenses.  Can I put this away?

Q.   Yeah.

A.   Okay.

Q.   All right.  I'm going to suspend the deposition for now.

A.   Okay.

MR. CHASE:  And we can further discuss -- unless you have questions for the witness right now.

MR. ZINN:  No.

MR. CHASE:  All right.  So we can go off the record.  Thank you.

THE COURT REPORTER:  Before we go off the record, read or waive?

Page 275

MR. ZINN:  We'll read.

THE COURT REPORTER:  And did you want to order the transcript?

MR. CHASE:  Yeah.

THE COURT REPORTER:  Copy?

MR. ZINN:  Yeah.

(Thereupon, the deposition concluded.)

Page 276

CERTIFICATE OF OATH


STATE OF FLORIDA)

COUNTY OF COLLIER)




        I, the undersigned authority, certify that Kelly Martinez personally appeared before me and was duly sworn.


        WITNESS my hand and official seal this 8th day of January, 2023.




                                Jill Saravis-Regan

                                Notary Public-State of Florida

                                My Commission No: GG 921513

                                Expires:  10-09-2023

Page 277

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)

COUNTY OF COLLIER)

I, Jill T. Saravis-Regan, Certified Shorthand Reporter,

and Notary Public, certify that I was authorized to and

did stenographically report the deposition of Kelly

Martinez; that a review of the transcript was requested

and that transcript is a true and complete record of my

stenographic notes.

I further certify that I am not a relative, employee,

attorney, or counsel of any of the parties; nor am I a

relative or employee of any of the parties' attorney or

counsel connected with the action; nor am I financially

interested in the action.

DATED this 8th day of January, 2023

*Jill Saravis Regan*

Jill T. Saravis-Regan, CSR

Page 278

Brian D Zinn Esq.

brian@zinn.law

February 8th, 2023

RE: Welsh, D'anna vs Martinez, William V. Jr, Et Al.

January 26th, 2023/Kelly Martinez/Job #5687369

The above-referenced transcript is available for

review.

(The witness/You) should read the testimony to

verify its accuracy. If there are any changes,

(the witness/you) should note those with the reason

on the attached Errata Sheet.

(The witness/You) should, please, date and sign the

Errata Sheet and email to the deposing attorney as well as

to Veritext at Transcripts-fl@veritext.com and copies will

be emailed to all ordering parties.

It is suggested that the completed errata be returned 30

days from receipt of testimony, as considered reasonable

under Federal rules*, however, there is no Florida statute

to this regard.

If the witness fails to do so, the transcript may be used

as if signed.

Yours,

Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure

Rule 1.310(e).

Page 279

Welsh, D'anna vs Martinez, William V. Jr, Et Al.

January 26th, 2023/Kelly Martinez/Job #5687369

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have

read the foregoing document and that the facts

stated in it are true.


_____   _____

        (WITNESS NAME)                     DATE

**[& - 19]** Page 280

| **&** | **10-1** 165:23 | **1141** 2:5 | **140,000** 56:8 |
|---|---|---|---|
| **&** 1:17,19 2:4 | **10-1-80** 13:5 | **119,970** 46:21 | **140,160** 192:13 |
| **0** | **10-29-2022** 166:17 | 46:25 | **141** 196:20 |
| **00216** 1:6 | **100** 92:19 93:5 | **12** 6:6 14:6 | **15** 259:16 264:9 |
| **0022** 191:20 | **100,000** 39:24 | 171:11 210:17 | **15,000** 98:25 |

**&**

**&** 1:17,19 2:4

**0**

**00216** 1:6
**0022** 191:20

**1**

**1** 3:12 5:1,4 6:1
6:23 191:18,18
**1,000** 207:13
273:7
**1,500** 173:22
**1,991.48.** 199:17
**1-1-2020** 102:17
103:5
**1.3** 130:7 144:8
144:10
**1.310** 278:25
**10** 14:22 171:11
199:5,7,9
221:20
**10,000** 39:14
131:12 156:20
156:22 157:2,3
157:4 160:15
161:14 162:5
168:2 182:4
183:11,12 184:5
**10,186** 147:12
177:22
**10,186.10.**
146:10
**10-09-2023**
276:20

**10-1** 165:23
**10-1-80** 13:5
**10-29-2022**
166:17
**100** 92:19 93:5
**100,000** 39:24
116:6,15
**1001** 51:24
**101** 3:17
**102** 3:18
**10501** 2:12
**107** 196:6
**107,836** 196:6
**1099** 146:19
147:19 149:3
**10:23** 195:2
**11** 29:16 176:18
177:16 179:8
221:9,12,18
222:17 235:15
235:18 264:8
265:3 267:9
**11,00** 176:16
**11,000** 142:15
142:19 160:8,12
271:5
**11,218** 142:25
145:4
**11,218.82**
144:17 146:12
**11,218.82.**
142:10
**11,650** 160:1
**114** 2:12

**1141** 2:5
**119,970** 46:21
46:25
**12** 6:6 14:6
171:11 210:17
221:9,12 222:12
222:16 264:8
265:3
**120** 115:19
120:7,8 210:7
**120,000** 52:15
55:7 56:2 57:25
112:5 192:11
194:12,20 206:2
**123** 3:19
**13** 11:17,23
17:13 40:14
98:25 132:24
161:6 264:8
265:21
**13,000** 86:5
**13,500** 180:4
**13,750** 199:24
**139** 120:8
**139,000** 47:4,6
47:13 49:14
52:17
**14** 36:15 165:3
172:11 239:7
264:8
**14,800** 172:8
**14,880** 98:21
99:4
**140** 115:17,19

**140,000** 56:8
**140,160** 192:13
**141** 196:20
**15** 259:16 264:9
**15,000** 98:25
**15,750** 168:23
**150** 91:25 92:3,6
92:10,19,19,20
93:8,9
**1500** 97:22,24
111:22 112:2
130:19 173:14
173:16,17,18
207:9
**15919** 14:12
46:18 118:8
**16** 264:9
**16,000** 181:5
**160,000** 111:20
**165** 111:4
114:13,25
129:21,22
**165,000** 85:6
86:5 112:10
160:10
**17** 264:9
**170** 12:12 111:2
114:22 125:12
**175** 12:12 111:2
114:17,22
**18** 51:24 264:9
**18,186.10**
146:17
**19** 36:13 187:22
264:9

**[190 - 2022,0]**                                          Page 281

**190** 12:17 114:19
**190,000** 12:16 125:12
**1999** 7:14 8:11

**2**

**2** 3:14 5:14,16 5:18 6:19 7:2 180:22
**2,300** 173:22
**2,500** 180:22 206:19
**2,641** 86:12,18 86:21 99:21 173:16 200:15
**2,641.73.** 199:22
**2,808** 200:4
**2.75** 201:4
**2.875** 201:16,19 206:19
**20** 38:24 63:8 96:22 218:10 264:9
**20,000** 166:24 175:3 176:18
**20,160** 47:2 191:23
**200** 88:15 90:3 93:10 114:19 116:16
**200,000** 13:9 40:16 112:7,10 115:24 116:3,14 129:20

**2001** 8:15
**2002** 8:15
**2004** 7:25 8:1 10:14
**2005** 13:18 15:13 17:5
**2007** 11:6,10,16 11:18 12:24 13:11,12,18 15:13 17:5 18:11,18 19:10 19:17 21:7 22:3 27:17 28:3
**2008** 138:14
**2010** 15:18,19 17:11 19:17
**2012** 15:19 17:11,13
**2015** 88:7 108:13
**2017** 33:17 61:23 62:2 63:8 122:3 185:22
**2018** 19:6,7,10 20:18,21 21:1,7 22:4 25:7 26:18 26:21 27:17,25 28:3 30:7,24,25 30:25 31:2,7 80:4,6 103:7,16 105:17
**2019** 6:17 11:24 25:14,16 26:19 26:21,24 27:1 30:20,22 80:4,8

81:2,3,19 103:16 105:19 108:13 109:2,19 110:2,9,13 119:11,24 120:17 126:16 130:9 147:22 187:19
**2020** 6:5,10,17 6:18 11:24 12:5 12:11 13:2 33:3 36:13,15,17 43:25 44:4 46:17 47:7,13 49:13 52:4,21 53:7 54:10,12 54:13 55:1 56:1 56:5,15 57:1,7 57:24 58:11,16 59:20 60:11,20 60:23 61:2,12 70:2,4,7 80:4 100:5 103:10 109:6,9,14,21 110:5,8,15 111:4 114:6,9 115:14 119:12 119:25 120:11 120:17,20 126:16 127:25 130:5 147:22,25 153:25 187:22 200:15,23 206:10 210:23 211:5 235:9

236:4 239:7
**2021** 70:2 77:15 80:4 110:8 120:12,20 126:16 129:4,12 129:16 130:9 136:9,9,19 215:4,10,17,20 215:23,24 217:9 217:15
**2022** 23:9,13 29:1 33:3 61:24 63:8 64:10 69:2 69:12 70:4 80:4 106:10 123:22 128:3,5,14,19 128:22 129:5,12 130:5 131:24 134:14 136:1,10 137:4 146:6 150:21,21 151:9 153:24 156:16 159:8,25 161:6 163:6 165:3,24 167:2 171:11,11 173:11 174:5,13 174:14 177:16 177:16,21 178:13 179:8,9 215:11,12,14,22 221:21 222:1 224:7 235:17,18 243:8 246:13,14
**2022,0** 137:25

**[2023 - 3980]**                                                                 Page 282

**2023**  1:15 43:22
 43:23 215:10
 276:14 277:19
 278:3,4 279:2
**204,968**  197:8
 197:14
**21**  26:19 264:9
**22**  25:16 103:9
 103:12,13,18
 104:3,5 264:9
**23**  36:17 264:9
**2300**  93:15,22
 173:19
**240,000**  47:20
 110:24 111:18
**24th**  43:22
**25**  200:15,22
 265:3
**25,000**  35:20
 65:8,15 83:22
 83:23 235:12
 236:7
**250,000**  196:11
 196:13
**26**  1:15 43:23
**2600**  87:24 94:2
 94:6 207:10
**2641**  93:20,22
 207:9
**26th**  43:24
 278:4 279:2
**28**  222:19,21
 246:12,13
**28,000**  175:8,12

**29**  222:11,20
**29,341**  167:3
**29,971**  178:9
**297,00**  100:18
**297,000**  105:2
**297,178.22.**
 104:14
**29th**  254:16
**2:22**  1:6

**3**

**3**  3:15 42:21,23
 42:25 43:13
 52:4,21 53:6,18
 54:13,14,18,21
 55:1 56:1,15
 57:1,7,24 58:11
 58:16 59:20
 60:11 135:15
 192:15,19
 196:17 198:4
**3,000**  93:23
**3,980**  150:25
 151:9 152:17
 156:14,24
**30**  97:14 119:11
 119:12 150:24
 159:25 176:14
 179:11 201:14
 206:19 217:15
 260:22 278:16
 278:24
**30,000**  95:7,10
 95:12 114:12
 115:4 174:20
 178:16

**300**  90:21 91:21
 92:4,13,24 93:3
 93:4,4,7,13 95:2
 130:1,3
**300,000**  13:3,7
 129:9
**305**  2:6,6
**31**  146:6 163:6
 177:21
**3209**  276:17
 277:23
**33141**  2:5
**33966**  2:13
**34,000**  182:5
**34,394**  173:1
 182:1
**34,394.154**
 171:13
**34117**  1:18
**35,000**  182:10
**35,655**  181:17
 182:7
**350**  92:13,14
 93:8
**3500**  176:9
**352,000**  119:10
 120:15
**360,000**  178:20
**38,000**  173:25
 174:4
**380**  266:5
**380,000**  202:20
 203:17,22 204:4
 204:15 206:1,4
 207:5,12 208:19

 208:23 213:24
 216:23 218:13
 266:3
**3808**  1:17
**3877**  142:2
**3878**  170:2
**3879**  171:7
**3882**  169:21,23
 176:20
**3883**  178:6
 180:2,24
**3885**  181:14
**3899**  142:3,3
 144:17
**3900**  144:13
**3901**  145:23
**3902**  146:5
**3903**  151:11
 159:13
**3904**  155:13
 159:8
**3906**  159:23
**3907**  160:15
**3908**  162:9
**3909**  149:25
**3912**  163:6
**3914**  165:3
**3916**  165:20
**3918**  166:17
**3919**  167:17
**3922**  167:25
**3934**  168:22
**3937**  169:10
**3980**  155:4
 159:12

**[3:00 - 92]**                                                                                      Page 283

**3:00** 1:16
259:25 260:5
**3rd** 54:17

**4**

**4** 3:5,16 49:9,11
50:10 51:4 53:4
54:15 98:16,17
98:18 150:21,23
151:9 156:16
159:7 198:6,12
**4,000** 173:23
**40** 13:6 181:19
273:1
**40,000** 131:15
174:9 182:5,10
182:15 269:21
270:2,12,14
271:3 273:11
**40,087** 176:23
181:10 182:3
**401** 12:20,24
100:18,19 101:1
105:2 268:17,21
**402-2725** 2:6
**402-9800** 2:6
**42** 3:15
**42,000** 173:3
**446,446** 197:3
197:18
**450** 185:3
**465,000** 130:3
130:17 131:23
**475,000** 109:3
**48,000** 177:2

**480,000** 114:6
115:13 194:8
**49** 3:16

**5**

**5** 3:12,14,17
101:22,24
198:20 221:21
243:8
**5,000** 93:23
176:13 182:8
**5-31** 179:9
**50** 97:16,22
**50,000** 39:19
**500** 210:7
**500,000** 184:25
185:4 206:9,23
**508-207-6795**
14:16
**5500** 87:23 88:2
**5687369** 1:22
278:4 279:2

**6**

**6** 2:12 3:18
102:10,12,14,23
104:11
**6,000** 155:14
156:15,25 158:1
159:1,7 182:5,6
**6-12-2020** 6:3
**6-4-2022** 150:3
159:13
**6.08.** 177:6
**60** 191:21
260:22

**651,414** 196:23
197:11

**7**

**7** 3:19 95:25
96:1 123:21,25
141:24 150:21
150:23 155:14
165:20
**7-13-2022**
160:16
**7-17-2020**
102:18,21 103:4
**7-21** 209:13
**7-21-2020**
194:10,20
197:18
**7-29-2022** 162:8
**71st** 2:5
**779,000** 120:12
120:19

**8**

**8** 190:24 191:1
194:15
**8,000** 86:10,17
93:17 172:10,14
172:24 174:19
176:22 182:12
182:14 270:10
273:11
**8-25-2020** 204:2
**8-30-2021**
229:15
**8-7-2020** 191:22

**8-9-2020** 43:20
**80** 165:25 205:2
209:15
**829** 198:2
**860** 133:19
**860-402-9669**
76:18
**882** 196:4
**8th** 276:13
277:19 278:3

**9**

**9** 43:25 44:4
46:17 47:7,13
54:10,12 56:5
177:16 179:8
193:10 199:24
200:5
**9,000** 157:1
**9,083.60** 162:9
**9,187** 163:8,20
164:3
**9,341.03.** 165:21
**9,660** 167:19
**9,765** 169:12
179:15
**9,980** 157:8
**90** 245:22 249:1
252:4
**90,000** 11:22
**900** 92:23
**900,000** 109:7
109:15
**912** 31:3
**92** 27:7 103:7

**[921513 - adding]**                                    Page 284

| | | | |
|---|---|---|---|
| **921513** 276:19 | **access** 124:8 | 152:9 154:13,18 | **accuracy** 278:9 |
| **96** 229:8 | 127:16 137:9,18 | 154:19 155:5 | **accurate** 50:4,8 |
| **96,000** 217:10 | 138:22 246:4 | 159:16 160:5 | 52:4,14 99:13 |
| 218:19 229:3,15 | **account** 13:2 | 162:6 164:7,9 | 99:17 103:2,4,5 |
| 230:5 | 54:2 56:23 | 165:10,11 | **acknowledge...** |
| **96,048.80.** | 83:23 99:24 | 168:10 169:7,8 | 51:8 |
| 217:17 | 101:6,7,19 | 170:17 171:9 | **acknowledges** |
| **9:05** 1:16 | 102:2 110:11 | 176:23 179:25 | 51:15 |
| **9:47** 195:12 | 112:18,19 | 180:10,13,17,19 | **act** 154:17,18 |

| | |
|---|---|
| **a** | 113:10,15,17,20 | 180:25 181:10 | **action** 107:2 |

| | | | |
|---|---|---|---|
| **a.m.** 1:16 95:25 | 119:11,17,21,24 | 181:16 183:4,11 | 186:24 277:16 |
| 96:1 195:13 | 120:4,13,16,20 | 183:20 184:9 | 277:17 |
| **ability** 87:17,19 | 123:13,22 124:9 | 191:9 192:1 | **actual** 34:11,16 |
| 125:4 206:8 | 124:23 126:24 | 196:20 197:20 | 34:24 36:2 |
| 247:3 | 127:5,7,9,13,14 | 197:22 207:15 | 51:13 175:13 |
| **able** 30:2,13,18 | 127:17,19,22,24 | 208:8,10 210:7 | 263:12 267:7,14 |
| 42:3 72:9 87:11 | 128:1,3,8,12 | 216:13,16,19 | **actually** 8:9 |
| 99:20,23 112:13 | 131:15 134:15 | 217:12 218:24 | 15:22 57:13 |
| 115:24 116:3 | 134:17,18 135:6 | 219:1,12 220:6 | 85:8 112:1 |
| 118:17 126:22 | 136:8,15 137:3 | 221:3,5 222:4 | 134:16 147:8 |
| 126:25 130:16 | 137:7,9,12,14 | 229:24 230:9,12 | 172:13,18 |
| 132:1,4,6 133:2 | 137:20,21,23 | 230:14 265:8,12 | 177:20 197:5,6 |
| 135:7,21 137:9 | 138:1,3,6,7,9,9 | 265:14 268:11 | 197:8 198:1,2,7 |
| 139:14 149:5 | 138:16,17,21,23 | 269:4,10,12 | 209:25 218:7 |
| 164:10 171:20 | 138:23,25,25 | 274:8,12 | 222:13 234:23 |
| 171:25 221:7 | 139:5,9,10,11 | **accountant** | 238:11 241:14 |
| 230:10 234:25 | 139:12,13,17,24 | 148:25 | 244:6 249:10 |
| 252:15 | 139:24,25 140:4 | **accounts** 110:17 | 265:6 267:1 |
| **above** 51:9 | 140:8,13,13 | 110:21 130:8 | **add** 130:7 |
| 67:14 129:23 | 141:15,16 | 134:18 147:7 | 143:11,12 |
| 269:11 278:6 | 143:17 144:5,7 | 163:24 183:8,14 | **added** 143:3,5 |
| **absolutely** | 146:21,24,25 | **accredited** 87:5 | 160:14 164:7 |
| 121:16 140:9 | 147:1,9 148:16 | **accumulating** | **adding** 182:12 |
| **accepted** 48:19 | 149:11,15,19 | 184:9 | 182:14 |
| | 150:11,16 151:7 | | |

**[addition - answer]**                                                                 Page 285

| | | | |
|---|---|---|---|
| **addition** 156:24 172:23 176:22 | **agents** 51:13 | 37:20 38:1 51:8 88:10,18 89:10 | 166:23 171:9 173:7 175:6,8 |
| **additional** 12:14 173:1 174:4 184:5 | **agi** 121:2,4 | 92:22 93:3 96:15,19,24 | 182:9 194:8 197:4 201:17 |
| **address** 10:7 | **ago** 43:25 58:13 73:14 151:19,21 153:22 203:24 208:1,1 269:22 | 97:8,16 100:4 100:21,25 | 205:10,13 209:7 217:10 |
| 14:10 27:6 31:4 75:11,13,21 76:9 102:23,25 103:1,2 104:1 170:6,11 226:13 233:5 | **agree** 54:7 186:7 247:4 253:14 259:17 260:2,14,16 267:19 | 101:21 102:14 128:8 142:5,17 146:1 149:25 150:4,15 156:14 160:3 182:17 253:18 255:25 259:14 265:4 | **amounts** 169:20 192:13,21 |
| **addresses** 75:15 75:17 76:5 | **agreeable** 261:3 | **ambiguity** 54:9 | **analyze** 236:13 236:14 |
| **addressing** 103:1 | **agreement** 45:14,17 46:1,6 46:8 51:9 | **amended** 38:1 | **anna** 264:13 |
| **adjusted** 121:6 131:23 | **agrees** 51:15 | **america** 150:11 150:14 152:22 152:24 | **answer** 16:15 20:13 23:21 |
| **admissions** 253:11 | **ahead** 89:12 195:11 255:12 | **american** 120:16 180:5 182:22,24 183:1 183:3,6,8,10,19 183:19 184:15 184:17 | 26:15,15 28:5 34:7 36:1,8 38:14,22 39:10 40:22 41:3,8 43:9 45:8 47:9 52:8 53:10 59:2 59:10,22 60:7 60:14 62:23 |
| **admonish** 16:9 | **air** 95:6,10 142:20 144:14 144:17,23 146:14 175:16 176:6,11 273:14 273:18 | | |
| **adopted** 84:18 | | | |
| **adoption** 84:21 | | | |
| **advance** 56:5,10 204:13,17,22 209:2 | **airport** 247:5 250:9 | **amex** 180:22 | 65:23 66:23 67:9 68:1,7 71:5 79:22 83:5,17 83:25 84:13 |
| **advise** 148:25 | **al** 278:4 279:1 | **amherst** 7:21 8:4,5,14 9:9 | 101:15 105:4 106:18 107:21 |
| **affect** 190:13 | **alleged** 154:24 217:1 | **amount** 46:21 56:17,19,20 57:3,10 58:7 67:3 81:12,16 86:15 131:9,11 141:17 142:9 146:7,9 148:12 149:6 164:9 | 116:8 117:3,10 121:22 122:6 126:11 129:14 134:5 136:4,24 140:16 141:13 154:7 158:8 161:20 163:23 164:24 177:11 |
| **afford** 30:2,18 86:18 108:7,10 108:11,12 112:6 132:4 208:16 | **allegedly** 215:4 | | |
| | **allow** 105:25 | | |
| | **allowed** 16:9 | | |
| **age** 14:5 | **alright** 7:15 9:11 15:13 23:9 31:15 34:4 | | |
| **agent** 54:5 | | | |

**[answer - assume]** Page 286

201:9 212:4
214:4 245:19
273:16,19
**answered** 33:20
41:17 45:7,23
65:22 71:4
87:21 98:4
116:7,9 120:1,3
124:13,14 158:2
158:7 159:9
175:15 185:8,17
185:24 190:9
193:17 201:10
203:24 211:17
212:2,3,4,9,14
212:18,20 228:3
272:4
**answering**
188:6
**answers** 4:23
158:21 234:16
253:11
**anybody** 22:24
24:3 231:14,19
234:11
**anymore** 30:2
30:18 78:20
139:8
**apologize**
258:21
**apostrophe**
230:21 240:16
240:20 264:11
264:13,14

**apparently**
152:1,14 176:14
180:20 247:10
**appeal** 239:5
**appear** 210:23
**appearances** 2:1
228:6
**appeared**
276:10
**appearing**
210:22 211:1
**appellate** 36:25
37:3
**apple** 224:1
**applicable**
223:22
**applicant** 53:24
**application** 3:16
16:23 49:5
51:16,19,22
98:12 99:7
165:1 172:11
194:4,24 195:1
195:16 197:23
197:25 200:4,12
209:13
**applications**
87:16 164:22
208:18
**apply** 74:23
**applying** 74:20
205:5
**approaching**
40:16

**approval** 99:11
99:15
**approximate**
131:9,11 269:21
**approximately**
11:17 47:13
56:8 81:17
178:16
**april** 28:25 33:3
63:8 70:7
123:21 127:25
128:3,5,14,22
134:14 137:3,25
169:24,24
171:11 174:4,6
174:13 246:12
246:13
**area** 9:10
133:19 176:3
**argue** 244:18
**argument**
242:13 245:25
**arrest** 188:18
190:8,12
**article** 254:16
**articles** 262:24
**ascertain** 82:19
**aside** 125:7
**asked** 41:15,17
44:15 45:7
52:23 63:22
65:22 69:22
70:12 71:4,6
89:7 98:4 104:8
104:9 108:15

114:17,18 116:7
118:23,25
124:13 151:25
158:2,7 159:9
185:1 211:17,24
212:2,9,14,17
212:20 213:6
227:12 241:21
242:6,16 272:4
**asking** 29:5 39:3
39:4,6 172:12
174:18 202:3
243:1,24
**aspect** 64:1
**asserted** 229:14
**assertion** 32:9
**assessment**
64:21
**asset** 69:5,8,14
70:9 71:2
**assets** 49:6
196:22 197:10
246:2
**assigns** 51:14
**assist** 20:3 71:2
**assistant** 10:4
10:22,23 11:8
11:14 18:22
**associated**
102:2
**associates** 1:19
2:4
**assume** 7:15
9:11 31:19,21
99:8 104:17

**[assume - bank]**                                                    Page 287

150:5 152:19 157:11 160:5 162:13 176:12 192:6 196:8

**assumed** 61:4

**assumption** 209:24 210:3

**at&t** 14:18,19 14:24 133:16 265:11

**atms** 135:16

**attached** 65:20 66:7,10 235:10 236:4 278:11

**attachment** 188:21

**attended** 8:3

**attending** 9:23

**attention** 191:22 193:15 195:17 222:10

**attested** 49:5,17 59:7 67:23 98:13

**attesting** 42:4 42:13 87:16

**attorney** 132:4 132:5,7,15 133:7,12,21 134:2,10 232:22 239:15 242:23 243:6 247:17 257:22 258:7 259:18 277:14 277:15 278:13

**attorneys** 51:14 132:1 133:24 134:11

**audibly** 4:23 245:19

**august** 36:15 43:25 44:3 46:17 47:7,13 54:10,12 56:5 114:6,9 115:14 153:25 163:6 200:15,22 206:10 211:5 217:9,15 221:21 222:1,6 224:7 235:9 236:4 239:7

**authority** 276:9

**authorized** 277:7

**auto** 125:25 138:16 140:20 140:22 141:7,9

**automatic** 140:24

**available** 82:16 118:1 278:6

**average** 97:5 174:12,18 182:9 184:15,16,17 272:20

**avoid** 57:18 121:9,14 122:2 122:12 213:8

**avon** 27:5 103:10,11

**aware** 6:11 21:6 28:16,18,21 37:6 39:11 41:13 42:1 57:2 59:3 64:5 65:12 68:2 76:6 77:16 79:7 81:9 110:9 110:15,19 113:9 123:21 133:10 168:14 170:11 174:21 185:20 201:23 202:3,9 203:21 224:13 228:2 231:8,11 234:12

**b**

**b** 13:15 123:8 195:20

**b11161** 75:24 76:9

**bachelor** 9:21

**back** 7:5 8:21 9:12,13 13:11 15:13 21:25 22:21 24:8 25:7 27:25 45:1,5,10 45:15 53:17 60:22 63:8 75:15 76:2 77:7 89:15 105:15 122:19 160:10 194:14 198:7 224:5 246:10,18

248:14 255:23 256:13 261:7 262:12 266:6

**background** 97:8

**backstop** 207:6 207:7

**bad** 75:8 227:5

**balance** 13:2 81:19 104:10,12 104:12,13 136:2 136:6 155:2 174:6 196:7,20 200:9

**ballpark** 57:5

**band** 195:20

**bank** 24:14,16 68:4,5 106:24 106:24 134:15 134:17 135:13 135:20,23 138:15,16,23 140:22,22,25,25 141:8,8,12,12 141:20,20 143:17 150:10 150:13 151:23 152:9,11,22,24 154:5 155:10 157:5 159:15,21 161:6,9 162:12 163:11,24 164:6 166:3 167:10,12 167:15 169:4 170:18,21 171:3

800-726-7007                                                           305-376-8800

179:2 191:9
196:9,20 221:3
221:5 247:19,19
249:14 273:13
**banking**  170:19
**bar**  230:25
233:13
**barn**  265:23
**barstools**  94:18
95:4
**bartender**  10:5
**bas**  150:16
**base**  12:12
98:21,23 111:5
114:10,13,15,21
114:24 129:22
**based**  210:3
236:11 273:9
**basically**  114:8
**basis**  140:18,21
141:18 148:17
148:19 151:2
153:21 178:24
270:24
**basked**  224:25
**basket**  225:11
**bates**  159:8,12
159:23 162:8
**bathroom**
250:21
**beach**  2:5
**bearing**  78:22
**becoming**  28:15
**beg**  203:8

**began**  25:10
26:19 28:11
**beginning**  21:5
30:22 104:12
130:5 131:4
169:18 210:10
248:18 268:10
**belief**  79:11
**believe**  5:22
14:25 30:7
34:18 35:12,22
43:22 49:7 65:2
67:2,10 92:19
102:3 109:4
128:17 129:3
130:20 136:6
159:5 173:9
192:2 193:2,17
210:18 216:10
217:23 230:1
252:21
**believed**  59:17
**benefit**  60:4,11
91:6 218:18
**best**  125:4
186:22 203:15
**better**  153:24
157:17,24 187:9
238:2 250:1
**beyond**  269:11
**biafore**  13:15,16
15:14,21 17:3
17:12,22
**biafore's**  13:19
18:2

**big**  141:4 145:1
176:7
**bigger**  222:3
**bill**  83:9 125:13
138:1,20 154:17
163:16 164:10
210:12 241:19
263:6 267:11
269:19,20
**bills**  27:23 30:14
30:17 31:14,16
31:16,18,19
98:6 100:2,20
100:22 101:1,2
101:6 104:25
116:11 117:16
118:1 123:12
124:3,3,7,10,11
124:18 125:3,5
125:8,11,18,25
126:2,7,9,19,22
127:3,6,17,20
127:23 130:16
136:16,22 137:5
137:8,11,15,19
137:21,25 138:5
138:8,11,13,15
138:19,22 139:2
139:5,8,13,15
139:16 140:11
141:9,18,23
142:12,15 143:3
143:10,16 144:4
144:6 147:5,12
147:16,20

148:11 149:12
149:17 150:5,8
150:10,14,17
152:5,6,8,10
154:9,12,15,21
154:24 156:1,3
158:23 160:6,8
160:11,12 164:7
164:13,15,17
165:12 166:4
172:14 179:20
200:1 201:18
206:7 208:14,14
208:15 214:7,21
269:16,25 270:2
270:4,5,7 271:7
**biological**  84:14
**birth**  13:4
**birthday**  165:25
**bit**  7:5 89:15
130:1,21 171:17
239:17 248:24
249:10 250:6
251:20 252:20
**black**  93:23
130:21 273:11
**blank**  147:12
**blue**  235:25
**blvd**  1:17
**bmw**  88:7
**bodily**  188:20
**bonified**  53:23
**bonus**  12:13
**bonuses**  12:14
114:17

**[bordering - cash]**                                                    Page 289

**bordering** 16:5
**born** 15:18
**borrower**
  198:24 199:3
**borrower's**
  198:21
**bottom** 142:2
  193:16 195:17
  263:7
**bought** 74:7,13
**box** 262:13
**boy** 249:17
**boyfriend** 9:8
**brakes** 266:13
**brand** 128:1
**break** 4:20,21
  19:15 68:17,18
  68:20,24 75:25
  80:2 105:22
  131:17,18,18,21
  142:20,21,21
  165:18 217:6,7
  250:21,24
  260:20
**breakfast** 95:16
  96:1,7,9
**breaks** 68:23
**brian** 2:11 23:2
  161:16,21,22
  165:5,13 168:4
  221:22 266:21
  278:1,2
**briefly** 167:16
**bright** 216:23

**bring** 11:23
  78:9 155:11
**brings** 179:6
**broke** 94:18
  95:7
**brokerage**
  169:3
**brokers** 51:13
**brother** 231:23
  232:16 273:23
**brothers** 231:21
**brought** 74:3
  121:19
**budget** 94:19
**buffer** 100:17
**bug** 135:1
**bunch** 107:6
**buy** 56:20 58:7
  59:24 94:18
  110:22 117:11
  117:15,25 118:6
  120:4,6
**buying** 58:6
  118:12 119:9,18
  176:4

---

**c**

**c** 14:12 123:8
**cable** 92:1,2,3
  92:12 93:9
**cafeteria** 96:17
**calculate** 148:12
  149:5
**calculated**
  148:13

**calculations**
  162:19
**calculator**
  143:12
**call** 8:24 24:15
  59:24,25 60:4
  60:12 65:17
  90:9,20 92:14
  92:20 93:10
  96:22 133:19
  179:5 219:24
  223:1,4,6,9
  256:6
**called** 79:8
  167:3 227:6
**calling** 133:17
**calls** 55:22
**cancel** 234:1
**cans** 252:9
**capias** 188:16
  188:23 189:5,11
  189:12,15 190:7
  190:10
**car** 88:4,6,12
  89:17,18 90:23
  91:11 93:3
  142:21 175:17
**card** 24:14,16
  83:9,12 94:10
  136:1,5 143:17
  180:12,15 200:3
  265:17
**cards** 94:8,9
  179:22,24
  180:13,18

**care** 87:24
  260:10 271:17
**case** 1:6 23:13
  24:21 38:2
  77:10,15 78:1,8
  82:23 105:25
  125:1 211:5,9
  213:15 215:1
  223:10 225:8,9
  225:10,14,17
  226:10,18
  228:17,21
  230:24 231:6
  232:8,8,18
  233:2,7 237:1
  238:2,12 239:14
  239:16 243:25
  247:9 251:14,16
  251:21,22 253:7
  261:20 268:7
**cases** 228:12,22
  228:24 251:14
**cash** 53:25
  135:19 141:21
  146:3 150:6
  151:5,25 152:6
  152:8,9,11
  154:5,13 155:11
  155:19 156:10
  156:11,11 157:9
  157:9,24 160:19
  205:22 214:11
  214:17,18,18
  217:10,19
  218:16

**[cashed - check]**                                                              Page 290

| | | | |
|---|---|---|---|
| **cashed** 215:18 | **changes** 278:9 | 117:4,13,20 | 211:22 212:6,12 |
| **cashier's** 54:6 | **characterization** | 118:3,9,15,22 | 212:15,21 213:4 |
| 161:25 162:1 | 89:11 | 121:5,24 122:8 | 213:12 214:9 |
| **ccd** 257:18 | **charitable** | 122:18,24 123:5 | 216:25 217:6,8 |
| **cell** 14:14,21 | 263:8 | 124:1,16 126:14 | 219:10 221:9,13 |
| 91:17,18 93:8 | **charles** 169:1,2 | 129:1,18 130:13 | 222:21,22 227:1 |
| 133:5,15 223:18 | 169:6,15 | 131:19,22 | 227:9 229:13 |
| 223:24 | **chase** 1:19 2:4,4 | 132:12 134:8 | 237:2,4,18 |
| **cells** 192:10 | 3:5 4:6 5:1,5,13 | 136:7 137:2 | 238:5,8,11,21 |
| **center** 11:12 | 5:17 16:8,11,16 | 140:19 144:12 | 238:25 239:8 |
| **ceremony** 25:19 | 16:17 20:15 | 144:21 150:20 | 241:8,23 242:3 |
| **certain** 72:12 | 23:23 26:17 | 153:3,5,7,23 | 242:7,12,17,20 |
| 73:5 121:17 | 28:6 34:9 35:11 | 154:11,16 | 242:23 243:2,7 |
| 208:3 | 36:3,10 38:16 | 155:17 156:23 | 243:15,20,25 |
| **certainly** 273:25 | 39:1,12,17,22 | 157:16,21 158:5 | 244:2,4,8,14,18 |
| **certificate** 15:20 | 40:2,25 41:5,12 | 158:10,19 | 244:23 245:4 |
| 16:21 17:8 | 41:18 42:20,24 | 159:11 164:2,11 | 247:21 248:1,3 |
| 25:23 221:21 | 43:12 45:12,24 | 165:2,16,19 | 248:16,20,23,25 |
| 276:1 277:1 | 49:1,8,12 52:11 | 166:9,12 167:8 | 250:23,25 |
| **certificates** 26:8 | 53:13 55:18,21 | 169:23 170:1 | 252:18 253:7,15 |
| **certified** 54:6 | 55:23,24 59:6 | 171:24 175:20 | 253:17 254:5 |
| 277:6 | 59:11 60:2,9,17 | 177:13 178:1,19 | 255:9,20 257:21 |
| **certify** 276:9 | 63:2 65:25 67:1 | 179:1,18 181:24 | 260:9,25 261:3 |
| 277:7,13 | 67:13,20 68:3 | 184:11,22 185:9 | 261:6 262:10 |
| **cetera** 51:22,23 | 68:10,18,20,25 | 185:14 186:4,20 | 263:20 266:24 |
| **chairs** 176:4 | 71:8 73:7 76:1 | 187:4,17 188:8 | 267:4,6,15,24 |
| **chance** 131:17 | 79:24 83:6 84:2 | 188:15 190:5,16 | 268:3,5 269:24 |
| **change** 6:16 | 84:15 87:13,15 | 190:21,24 191:3 | 270:18 272:6 |
| 13:19 18:1 86:6 | 89:13 90:9,11 | 191:6 192:24 | 273:17,21 |
| 127:8 205:14,17 | 92:9 94:3 98:8 | 193:8,11,19,24 | 274:19,22 275:4 |
| 251:15 279:4,7 | 101:17,21,25 | 195:8 197:1,17 | **chaselaw.com** |
| 279:10,13,16 | 102:10,13 105:6 | 199:5,8 201:13 | 2:7 |
| **changed** 5:11 | 106:21 107:23 | 202:6,18 204:25 | **check** 3:17 54:6 |
| 6:13 18:4 | 108:9 109:13 | 206:15 207:1 | 54:6,7 137:10 |
| 271:10 | 111:16 116:13 | 209:18 210:14 | 137:13 141:21 |

141:21 142:5 144:14 146:6 148:15 150:9 151:6,7,8,11,14 157:14,24 162:1 165:7 168:22 169:12 176:17 177:21 207:15

**checked** 198:14

**checking** 150:2 151:12 160:20 162:1

**checks** 142:1 147:13 178:3

**cheese** 239:20

**child** 84:18 85:3 85:4 260:10 271:13,23 272:3 272:8,13

**children** 13:25 84:8,11,14

**choice** 214:13

**choices** 186:21

**choose** 104:25 105:1

**chose** 37:13 140:11 180:16

**chosen** 170:21

**chrissy** 245:12

**christmas** 147:9

**circle** 14:12 46:19 118:8

**circumstance** 42:17

**circumstances** 33:6 35:13,15 37:9 83:16 85:24 153:13

**civil** 32:1 51:19 278:24,24

**claim** 32:6 35:21 65:16

**claims** 38:1

**clarification** 152:22

**clarify** 4:17 58:22,24

**clause** 79:5,7,9

**clean** 252:9

**clear** 88:10 101:13 156:3,4

**clearly** 47:10 158:3

**click** 235:1 238:16 241:10 252:12 253:20 255:3 266:9

**client** 23:15 238:20 242:23 247:17 257:22 258:7 259:18

**close** 127:5,9 129:19 171:5 181:19,23 192:21 204:9,11 205:2 208:22 209:11 232:10

**closed** 134:20 134:22 135:8,9

135:10,12 175:25 205:3 208:20,21 209:4 209:13 210:11

**closer** 9:14 154:2 239:19

**closing** 54:5 88:25 199:12 204:14

**clothes** 38:18 67:19 94:15,20

**code** 51:24 133:19

**coffee** 38:18,24 39:5

**coincide** 128:8

**colleagues** 18:23,25 19:9

**collect** 33:13

**college** 7:19 9:17,23 10:8 40:9

**collier** 252:9 276:5 277:4

**column** 50:14 71:19

**columns** 71:7,14 71:23 72:12

**combined** 173:7 185:1,2

**comcast** 75:24

**comcast.com** 76:9

**come** 28:10 48:6 57:20,22,22

58:9 62:8 112:15 123:13 138:16,22 149:22 150:10 162:1 186:13 209:14 216:3 233:17 256:13

**comes** 99:2 123:18 257:6 263:6 269:11

**comfortable** 116:12

**comfortably** 112:14

**coming** 56:5 127:7 138:15 185:3 222:4 225:21 234:4 255:15 262:5 265:11

**commission** 179:5 276:19

**common** 107:8

**communicate** 233:1

**communicated** 225:13,16 231:14

**communicating** 223:12

**communication** 19:14 28:2 263:1,13

**communicatio...** 23:24 77:7 78:3

**[communications - contribute]**                                    Page 292

222:23 224:17 225:4,5 238:9 241:22 242:1,2 242:15,16 243:1 243:25 256:19 257:23 258:7

**company** 55:12 83:12 85:22 90:23 99:23 102:1,4 179:7

**compare** 192:16

**compared** 91:2

**comparing** 184:14

**complaint** 34:1 34:2,4 38:2,3,8 77:14 228:16,18 228:18

**complaints** 228:22

**complete** 260:3 277:10

**completed** 278:16

**completely** 29:7 60:15 183:18 187:12

**comport** 33:5

**computer** 73:15 74:14

**computers** 223:19

**concept** 64:5

**concerned** 30:1 48:19 206:8,18

207:3 217:22 229:1

**concerns** 206:12

**concluded** 275:7

**conclusion** 55:22

**concrete** 83:7

**conditioner** 95:7,10 142:20 175:16 273:15 273:18

**conditioners** 176:6,11

**conditioning** 144:14,18,23 146:14

**confer** 257:24 258:5,12 261:14 263:4,9 267:1 267:16,21

**confident** 100:16

**confirm** 46:21 54:2,8 169:20

**confirming** 49:21

**confront** 62:2,4

**connected** 91:1 250:14,17 261:25 277:16

**connecticut** 11:2 17:16,18 26:7,9 27:5 37:2 38:9 74:10

78:16 103:1 106:15 107:11 107:25 111:2,8 114:16,21 125:18 132:6,16 132:22 133:1,8 133:11,24 134:2 134:10,19 135:13,18,20 210:23 211:2,5 228:9 235:10 238:1

**connection** 24:21 49:20 50:3 57:23,24

**consider** 40:18 44:17 59:7 129:5 166:5,10

**considered** 59:4 100:19 278:17

**considering** 38:25 157:7 217:1

**consist** 145:6

**consistent** 129:5

**consists** 145:4

**constitution** 78:25 79:8

**consult** 132:1,6 134:2

**contained** 51:18

**contains** 259:15

**contemporane...** 120:2 215:20

**contempt** 28:16 28:18,21 29:1 32:15 33:14,17 34:5 35:17 61:23 62:2 63:7 63:12,13,20,21 63:25 64:1,8,10 64:20 65:1,2,3 65:13 66:2 67:3 69:2 70:7 83:21 121:15 122:2,13 185:21,22 187:21,24 188:2 234:18 235:9,11 235:13 236:4,6 236:8 237:1,22 239:6 253:9 261:21 262:17 264:4

**content** 70:21

**context** 19:23 53:12,14 64:6 239:21

**continue** 8:17 16:13

**continuing** 244:15

**continuously** 14:19

**contract** 45:4 128:18

**contribute** 127:20,21 134:3 138:19 142:18 207:13

**[contributing - county]**                                    Page 293

| | | | |
|---|---|---|---|
| **contributing** | **corner** 98:20 | 86:11,21 87:5 | 201:8 204:2,22 |
| 144:4 | 142:2 195:18 | 89:3 90:19 91:5 | 205:18,20,21 |
| **contributions** | 196:15 | 95:14 99:4,18 | 206:10 207:6,13 |
| 268:9,23 269:4 | **corr** 268:25 | 102:2 103:19,20 | 208:20 212:8 |
| 269:9 | **correct** 8:6 | 104:23 106:11 | 213:16,18,20 |
| **conversation** | 11:25 13:10 | 107:16 110:3,6 | 214:12 216:7 |
| 20:10,17 25:9 | 17:14 18:17 | 111:6,25 112:24 | 217:13,15 |
| 26:21,25 57:14 | 19:1,11,13 | 114:9 117:18 | 218:14,24 219:7 |
| 75:4,5,6 77:22 | 20:22 22:11,16 | 120:24 121:1 | 219:14,21 |
| 77:24,25 105:12 | 23:10 25:1,4,20 | 122:14,16 | 220:21,24 222:4 |
| 118:10,14 | 27:2,15 31:5,8 | 123:16 125:2,23 | 230:12,13,15,18 |
| 121:18,20 | 33:4 34:5,25 | 126:4,6,16 | 230:19 231:6 |
| 185:18,23,25 | 35:24 36:23 | 127:10,11,12 | 232:20 233:5 |
| 203:16 207:23 | 37:14,22,25 | 128:1,6,22 | 238:4,10 251:25 |
| 207:24 213:14 | 38:6 40:13,15 | 129:24 130:4,9 | 268:22 269:14 |
| 215:10,14 216:1 | 43:16 44:1,2 | 130:15 131:7 | 270:1,8,12,13 |
| 216:1,2 247:6 | 45:15,16 46:2,7 | 133:6,24 136:1 | 271:4 272:9 |
| 248:11,19 | 46:21,22,23,24 | 136:20 139:3 | 274:1 |
| **conversations** | 47:3,4,7 48:11 | 144:18,20 | **correlated** |
| 26:20 28:7 | 48:14,22 49:18 | 146:12 147:17 | 163:21 |
| 57:23 63:11 | 49:23 50:25 | 151:14 153:25 | **correspond** |
| 105:10,16 227:2 | 51:16 52:6,19 | 154:19,20,22,23 | 151:8 |
| 227:13 238:19 | 55:14 56:1,11 | 154:25 167:23 | **corresponds** |
| 238:19 243:6 | 56:16 57:3,21 | 168:12 170:7,15 | 164:4 |
| **cook** 97:11 | 59:18 60:20 | 171:18,21 172:9 | **cost** 96:20 97:10 |
| **coordinate** | 61:1,18,21,25 | 177:8,22 178:13 | 143:3 176:13 |
| 119:7 | 63:9 64:12,23 | 178:21 179:25 | 273:4 |
| **coordinated** | 65:4,6 66:13 | 180:1 181:11 | **costs** 143:11 |
| 119:9 | 69:3,4,13 70:8 | 186:12 187:19 | 175:16 237:24 |
| **copies** 3:19 | 70:20 71:18 | 187:20 191:19 | **counsel** 61:12 |
| 65:20 278:14 | 72:6,8,23 74:4 | 192:1,5,22 | 277:14,16 |
| **copy** 3:17 | 74:11 75:16 | 194:6,10,13 | **country** 184:17 |
| 233:18 239:3 | 82:17 84:9,11 | 195:2,13 197:3 | **county** 276:5 |
| 257:11 275:5 | 84:16,17 85:9 | 197:11,14 198:4 | 277:4 |
| | 85:12,13,15 | 198:10 200:8,16 | |

**[couple - debt]**                                    Page 294

**couple** 90:6 95:1
  95:8 196:20
  232:11 259:24
  260:13 273:5,6
**court** 1:1,20
  17:9 23:12
  29:11 32:18,20
  32:21 33:12,17
  34:10,11,15,16
  34:19,23,24
  35:2,16,19,22
  35:24 36:4 38:8
  61:23 62:2 64:3
  65:7,12,18,21
  66:2,9 69:2
  83:21 85:2
  122:13 185:21
  185:22 189:2
  211:1,5 223:10
  227:7,18,21
  228:6,12,12,17
  228:22 232:19
  235:8 236:3
  237:22 242:13
  244:14 246:3
  252:21 274:24
  275:2,5
**cousin** 240:24
**cover** 54:3
  85:24 86:1
  173:6 218:5
**cr** 191:23
**create** 69:23
  70:12 71:6

**created** 123:22
**credit** 24:14,16
  79:5,9 83:9,12
  94:8,9,10 136:1
  136:5 143:17
  179:22,24
  180:12,13,15,18
  200:3 201:7
  265:17
**creditor** 213:8
  219:18,24
**credits** 9:5
**criminal** 51:22
**crossed** 220:4
**csr** 277:24
**ct** 236:4
**cup** 38:18,24
  39:4
**curiosity** 64:16
**curious** 64:13
**current** 5:6,9,21
  6:19 85:5
  268:15
**currently** 94:1
  98:11 102:4
  103:3 126:12
  155:6 271:7
**custody** 189:14
  190:18
**cut** 87:3 255:22
**cv** 1:6
**cypress** 2:12

**d**

**d** 230:21 240:16
  240:20 241:5
  264:10,13,13,17
  278:1
**d'anna** 20:6
  223:6 230:21
  264:10 278:4
  279:1
**daily** 76:22
  141:17
**damages** 51:20
**data** 71:19,22
  99:9 102:6
  143:15
**date** 1:15 5:24
  6:2 12:2,3 13:4
  30:19 43:17,19
  43:21 51:16
  80:19 102:16
  161:2 234:10
  235:14 243:8
  244:21,22
  253:24 254:3,14
  278:12 279:23
**dated** 36:13,15
  36:17 63:7
  163:6 165:23
  277:19
**dates** 71:15
  171:10 244:25
  256:4
**dating** 20:19
  21:1

**daughter** 15:17
  24:8 28:14
  94:23 103:22
  125:17 187:2,5
  187:10 203:4
  209:9 226:15
  245:12 254:25
  261:23
**daughter's**
  147:9
**day** 19:19,20
  33:9 56:10 96:5
  97:5,5,16,22
  153:15,21,21
  155:13 157:8,10
  162:24 175:24
  194:12,23 195:5
  204:5 205:1,3
  208:19,21,25
  218:14 225:19
  226:7 236:21
  237:12,13
  260:20 276:13
  277:19
**days** 150:23,24
  167:25 191:21
  194:19 206:10
  259:16 278:17
**deal** 78:19 248:2
**dealings** 122:1
**debt** 57:22
  58:10,12,13,15
  58:17,22 61:1
  184:18,20 200:4

**[debtor - different]** Page 295

**debtor** 220:21
220:24
**december** 36:17
129:17 174:14
**decide** 141:14
**decided** 127:1
205:8 212:23
214:10,15 218:5
**decision** 37:20
149:21 186:10
186:13
**declaration**
198:12
**declare** 164:25
279:20
**declared** 147:21
**declining** 82:19
**decree** 17:20,23
**deducted**
172:18
**deductions**
172:12
**defendant** 23:7
23:11 38:5
64:24 66:4
77:19 82:22
232:18
**defendants** 1:9
2:10
**defenses** 253:8
**deficient** 100:10
**define** 38:15,17
38:23 39:2 40:6
128:15

**defines** 181:22
**definitely** 80:9
156:18 258:4
**definition** 40:3
40:23 45:9
**definitions** 41:1
**degree** 9:20
40:7 60:20
107:15 245:22
251:24
**degrees** 249:2
252:4
**delay** 209:22,25
**delayed** 247:8
**delete** 224:9
**deleted** 224:11
**deliver** 161:22
**delta** 116:14,16
**denials** 253:11
**denominations**
157:9
**denote** 157:14
157:22,25
**denoting** 157:23
**dental** 86:8
164:18
**denying** 55:19
118:4
**depend** 42:17
83:16 84:1
**dependants**
272:7
**depending**
95:21 96:5
163:1

**depends** 95:9
96:17 154:3
174:6 181:22
184:14 272:19
**deposing** 278:13
**deposit** 147:2
152:9 159:7,12
159:18 168:6
169:7 178:8
179:9
**deposited** 147:1
147:4 152:17
158:25 164:8
171:9,13 176:23
207:16
**depositing**
154:13
**deposition** 1:12
4:13,15 22:23
22:24 24:2,6,11
25:3 167:13
244:7,21,22,25
252:25 255:2,11
255:17 256:4
257:11 260:4,8
260:16,21
267:20 274:16
275:7 277:1,8
**depositions**
255:15 256:10
**deposits** 135:18
135:23 168:9
172:23 191:25
**depth** 207:18

**describe** 138:11
**desert** 133:7
**designate** 242:4
**designated**
242:8
**desire** 186:14,15
**desktop** 73:9,10
73:20 74:6
**desktops** 73:22
**despite** 67:3
120:25 121:2
123:1
**detail** 19:22
36:20 37:5 63:5
63:20
**details** 20:24
29:17 80:23
213:1 228:15
**determine** 66:16
179:2
**device** 143:7
**devices** 223:16
223:18
**dexterity** 72:24
73:2
**dictating** 72:5
**diem** 129:4
**differ** 54:12,16
190:6 203:8
**difference** 32:8
116:17 182:4,8
**different** 8:7
92:2 115:21
131:13 137:8
144:24 147:7

**[different - dr]**

150:18,24
151:14 157:9,12
162:15 183:8,19
192:25 196:16
197:7 224:24
240:24 250:16
255:14 268:14
268:20

**differentiate**
227:25

**difficult** 29:22
125:19 200:2
201:11

**difficulties**
126:13,15,17

**difficulty** 124:6
126:7,9 136:21
207:4

**dime** 129:22
185:6

**dinner** 95:17
96:24 97:3,4,5
97:10,14,19
164:19 273:4

**dinners** 97:21

**direct** 3:5 4:5
193:15 195:17
222:10

**directing**
191:22 193:20

**directly** 141:19
148:5 230:1

**disclose** 100:3
103:23 104:4,7

**disclosed**
183:13

**disclosing** 100:1

**disclosure** 69:5
69:8,12,15
199:12

**disclosures**
70:10 71:2
102:8

**discounted**
90:25 91:2

**discoverable**
252:23 258:2

**discovery** 24:25
231:12 237:3
239:1,1 244:15

**discuss** 29:12
54:23 55:1
57:12 65:7
79:18 80:1,6,17
200:25 247:9
274:19

**discussed** 20:20
27:22 29:24
55:6 56:19
68:22 98:10
124:17 128:12
185:15 204:13
211:8 232:12,15

**discussing**
57:18 112:25
205:6

**discussion** 81:6
82:3 113:6
207:18 219:16

**discussions**
251:14

**dissipate** 246:2

**distance** 133:17

**district** 1:1,1

**division** 1:2

**divorce** 17:15
17:20,23 21:17
28:12

**divorced** 15:14
15:18 17:12,14
17:24 125:16

**document** 5:3
5:15 25:22,25
42:22 43:3,7
44:25 45:10
49:10,20 52:12
54:4,16 59:16
69:20,23 70:12
70:13 71:7,11
101:23 102:11
123:24 151:11
158:22 160:25
161:2 163:6
169:19 170:15
189:2,12 190:25
191:7 193:9,23
194:1 199:6
221:11 222:14
222:14 257:8
279:20

**documentary**
54:7

**documentation**
158:20 163:19

**documents**
24:10,18,21,22
24:24 32:23
33:2,5,9,25 50:2
50:6 88:25
221:15 222:7
223:11,15
230:24 233:23
239:4 252:23
253:10

**dog** 240:10

**doing** 18:20
70:24 71:17
102:6 115:3
162:19,25 176:3
203:11,14
244:11 249:21
250:22 252:21
261:9,10

**dollars** 39:8
57:9,11 81:17
83:22 88:15
90:6 91:15 95:1
96:12,13,21,22
104:6 108:19
109:7 116:20,21
116:22 131:4
218:10,22 273:5
273:6

**domestic** 191:23

**domestications**
228:11

**dr** 18:10,19 19:3
19:10,18 20:11
20:17,21 21:2,7

**[dr - either]**                                                      Page 297

22:7 24:5 25:10
25:11 26:11,19
26:20,25 27:16
27:19 28:3
29:21,25 31:6
31:11 32:21
33:7,11,16
35:13 36:25
38:11,20 39:8
39:13,18,23
41:22,25 44:11
44:18 45:3,6,14
45:18,21 46:11
46:17 47:7,12
48:14 55:2 57:2
57:24 58:3 61:1
62:1 63:12 65:8
65:13 67:3,17
67:22 68:5 69:2
69:14 71:3
72:22 74:5,14
74:23 75:9,21
76:6,8,14 77:22
77:25 79:18
81:21 82:3 84:8
101:19 102:7
103:6 105:12,16
106:7,14 107:10
108:4,14 110:2
110:5,10,16,20
113:1,7 116:25
118:11 119:10
120:12 121:8
128:12 129:8,25
130:8 132:18

133:11 134:9,15
136:12,19
141:16 148:3,19
148:22 149:18
164:12 166:6
168:10 170:6
174:19 184:23
185:15,21 187:7
187:25 188:24
189:5,13 190:13
190:17 192:5
200:25 201:24
202:10,19
204:22 206:1
208:19 210:22
211:7 213:14
215:15 218:11
218:14 219:17
222:24 223:2
225:16 231:15
232:24 233:2
237:19 251:6
255:17 263:13
272:10 274:9
**drama** 253:1
**driven** 159:21
**driver's** 5:6,10
  5:20,21 6:4,10
  6:14,18,19,25
  7:3
**drivers** 3:12,14
**driving** 233:5
  237:20
**dropping**
  226:15

**due** 51:20
**duly** 4:3 276:10
**dumped** 207:5
**dw** 257:3
**d'anna** 1:4

### e

**e** 2:4 13:15
  14:12 75:9,10
  75:11,12,13,17
  75:18,19,21
  76:3,5,8,11
  170:6,9,11,13
  224:17,23 225:5
  225:18 230:17
  230:20,24 231:3
  231:4 239:12,13
  239:16,23 240:3
  240:5,18 241:5
  245:8 252:25
  253:1 254:8,8
  256:3,15,25
  257:9,17,18
  258:16,17,17
  259:13 260:11
  261:22 262:12
  262:14,24,25
  263:9,18 264:17
  265:25 266:12
  266:18,23 267:7
  267:7,10 278:24
  278:25 279:3,3
  279:3
**earlier** 49:13
  159:17 195:4

**early** 136:9
**earn** 129:22
**earned** 27:22
**earning** 111:20
  113:22,23 129:8
  160:10 171:18
  172:8,23,24
  174:18,19,25
**easier** 136:18
  138:11 139:4
  140:2 204:18
  249:23
**easiest** 141:22
**easily** 124:5,6
  135:23 138:21
**easter** 195:2
**eat** 95:16 96:2,4
  96:4,6,17
  272:18 273:7
**educated** 40:18
**effect** 79:13
  190:17,22
  210:19
**effective** 6:2
**eggs** 96:8
**eight** 92:23
  178:7 222:20
  264:1,8 265:2
**eighth** 179:14
**either** 12:12
  15:18 59:14
  70:2 92:13
  160:5 205:8
  210:11 221:14
  230:1 252:17

**[elected - existing]**    Page 298

| | | | |
|---|---|---|---|
| **elected** 105:23 | 49:2 50:7,19 | **establishment** | **exceptions** |
| **electrician** | 52:22 56:3 | 127:25 170:17 | 165:14 |
| 142:22 175:16 | 59:14 85:11 | **estate** 196:11,15 | **exchanged** |
| **electricity** 31:19 | 88:21,22,25 | **estimate** 11:20 | 251:6 |
| 89:20 91:11 | 110:22,23 | **estimated** | **exchanging** |
| 93:4 | 111:17 113:3 | 199:18 | 251:20 |
| **electronic** | 115:25 196:7 | **et** 51:22,23 | **excursion** 273:4 |
| 223:16,18 225:4 | 198:2,9,9 218:6 | 278:4 279:1 | **exempt** 254:8 |
| **eleven** 221:19 | **entails** 100:8 | **event** 154:3 | 265:1 |
| 264:3 | **enter** 45:13,17 | **everyone's** | **exercise** 9:20,21 |
| **eligible** 87:4 | **entered** 45:25 | 41:10 | **exhibit** 3:9,11 |
| 91:3 | 46:5,8 127:13 | **evidence** 54:7 | 3:12,14,15,16 |
| **else's** 35:5 | 187:21,24 | **ex** 254:18,23 | 3:17,18,19 5:1,4 |
| 149:10 | 200:14 204:1 | 271:13 | 5:14,16,18 6:1 |
| **email** 278:13 | **entire** 11:25 | **exact** 9:6 16:1 | 6:19,23 7:2 |
| **emailed** 278:15 | 38:3 245:24 | 31:1 152:20 | 42:20,23,25 |
| **embarrassing** | **entries** 143:16 | **exactly** 6:14 8:1 | 43:13 49:8,11 |
| 97:11 166:1 | **entry** 71:20 | 9:6 11:19 12:5 | 50:10 53:4,5,18 |
| **emergencies** | 102:6 | 12:25 15:17 | 54:15 66:10 |
| 112:15 116:10 | **equate** 12:13 | 17:6 23:8 32:17 | 98:16,18 101:24 |
| **emergency** | **equated** 53:2 | 78:17 87:2 | 102:12,14,23 |
| 245:25 | **equity** 218:6,8,9 | 108:22 144:25 | 104:11 123:20 |
| **employed** 12:3 | 218:9 | 145:9 153:21 | 123:25 141:24 |
| 40:11,12 | **era** 223:14 | 155:19 156:12 | 155:14 165:20 |
| **employee** | **errata** 278:11 | 158:17 166:4 | 190:24 191:1 |
| 146:19 269:1 | 278:13,16 | 176:15 193:22 | 192:15,19 193:5 |
| 277:13,15 | **escrow** 86:21 | 193:22 204:12 | 193:10 194:15 |
| **employer** 11:11 | 111:25 199:19 | 242:19 | 199:7,9,24 |
| 268:15,20,24 | **escrowed** 148:3 | **examination** 3:3 | 200:5 221:12,18 |
| **encompassed** | **esq** 278:1 | 4:5 | 222:12,17 |
| 150:25 | **esquire** 2:11 | **example** 42:13 | **exhibits** 222:16 |
| **ends** 171:20,25 | **essentially** | 44:16 | **existence** 37:6 |
| **engage** 71:19 | 78:11 80:7 | **except** 115:3 | 137:12 |
| **englewood** 3:12 | **established** | 145:19 263:4 | **existing** 196:7 |
| 47:22,24 48:7 | 251:9 | | |

**expectation**
202:24
**expedia** 265:24
**expend** 270:21
**expenditure**
176:7 181:4
**expenditures**
125:15 176:5
181:1 270:15,19
271:12,18
272:17
**expense** 145:13
145:18 156:9
158:16 163:12
**expenses** 68:9
68:13 88:18
91:9 93:24 94:7
97:25 98:13,15
99:25 142:12,18
142:24,24 143:4
145:1,7,10,12
158:24 159:6
160:14 162:13
166:4,6 167:1,3
167:7,22 172:4
173:6,10,13,19
174:8 175:13,19
179:21 184:1,2
184:4,6,10
201:12 229:12
270:24 271:8
273:12 274:13
**expensive**
125:17

**expires** 276:20
**explain** 44:15
158:11
**explanation**
108:3
**express** 180:5
182:22,24 183:1
183:3,7,8,10,19
183:19
**expressed** 53:24
82:5,8
**extent** 228:5
**extra** 115:3
116:10 207:13
**extravagant**
184:13
**extremely**
192:21
**extrinsic** 146:14
**eye** 86:7 164:18

**f**

**f** 1:7 13:15
245:8 265:25
**fact** 61:4 126:2
133:23 136:18
167:15 182:25
189:12,19
251:19
**facts** 279:20
**fails** 278:20
**fair** 90:20,21
176:5 267:24
**fairfield** 1:17
**fairhaven** 7:7,9
7:16

**fairly** 124:21
131:19 251:21
**faith** 79:4,9
**fall** 244:17
**false** 125:6
134:16 164:16
205:19
**familiarity**
21:13,19
**family** 64:6
67:11 91:5,19
123:12,12,18
124:10 127:20
137:16 138:19
145:5,7,11,13
145:18 158:4,16
159:5 162:13
163:12 166:4,6
167:1,3,7,22
179:21 183:23
184:10 203:4,16
270:8 273:24
274:13
**family's** 67:11
203:2
**far** 31:23 91:10
93:3,15 128:14
128:15 204:17
204:21 244:12
**fargo** 147:3
152:13,18,22,23
153:1,5 158:25
159:8,14,15
160:4 163:24
164:6 217:12

229:24 230:9,12
**farmington**
247:19,20
**fault** 106:16
108:4 152:24
**fax** 2:6
**february** 36:13
187:22 278:3
**federal** 16:9
23:12 64:24
66:20 77:16
228:12,17
232:19 244:14
278:18,24
**fee** 135:16
**feel** 112:9
127:24 137:22
175:18
**feels** 227:5
274:4
**fees** 92:21 93:13
131:1,2 173:21
215:7,24 216:3
216:6 273:23
**feet** 176:9
**felony** 196:23
**felt** 112:8
**fi** 8:24
**fidelity** 3:17
12:22 102:1,7
268:11
**field** 233:13
262:16
**fifth** 191:11
194:17,17

**[fight - form]** Page 300

| | | | |
|---|---|---|---|
| **fight** 237:15 | 133:1 134:10 | **fish** 97:6 | 278:18,24 |
| **figure** 78:11 | 149:8 153:12 | **fiu** 8:13,24 9:7 | **follows** 4:4,16 |
| 117:1,7,18 | 189:1 216:3 | **five** 49:13 52:18 | **food** 94:13,14 |
| 146:20 184:18 | 244:21 246:9 | 68:20 90:4 | 95:15 96:9 |
| 193:21 262:12 | 267:10 | 96:12,13 109:25 | 97:16,22 |
| **file** 1:22 26:7 | **finding** 62:1 | 144:24 196:17 | **forced** 106:1 |
| 108:23 147:25 | **fine** 51:23 115:8 | 198:4,6,12,20 | **foreclose** 103:14 |
| 237:21 238:4,10 | 239:21 257:12 | 264:1,8,15 | 104:18 106:1 |
| 244:19 | 260:24 | 265:2 | **foreclosed** 48:18 |
| **filed** 16:25 17:8 | **finish** 273:19 | **fixed** 201:14 | 103:11 106:20 |
| 17:15 26:4,6 | **finishes** 26:15 | 206:19 | 106:22 |
| 77:13 128:6 | 35:9 111:10 | **fl** 1:18 2:5,13 | **foreclosing** |
| 189:2 268:7 | **finishing** 273:16 | 278:14 | 26:22 27:2 |
| **filing** 65:19,20 | **firm** 1:19 169:3 | **flat** 234:24 | 105:20,22 |
| **fill** 210:4 | 169:4 | 236:19 238:15 | **foreclosure** |
| **final** 17:20 | **first** 4:3 8:2 | 245:21 246:15 | 27:10,12 104:16 |
| **finances** 29:22 | 18:12 20:2,16 | 246:25 248:17 | 105:1 107:1,1 |
| 35:13,15 80:10 | 25:9 26:21,25 | 250:1,15 252:3 | 107:18,24 |
| 85:20 105:13,16 | 29:24 65:10 | 252:15 254:20 | **foregoing** |
| 123:18 169:5 | 71:1 77:12,15 | 262:11 | 279:20 |
| 270:22 | 77:21 85:14 | **flight's** 247:8 | **forever** 148:4 |
| **financial** 29:20 | 89:1,4 100:14 | **floor** 78:2 | **forget** 212:8 |
| 29:25 39:7 | 104:11 110:19 | **florida** 1:1,21 | **forgetful** 211:23 |
| 79:17 80:17 | 128:11,11 | 3:12,14 8:9,15 | **form** 20:12 |
| 81:6 85:23 86:3 | 149:13 170:2 | 8:25 9:1,10 | 23:20 28:4 34:6 |
| 86:19 87:22 | 181:25 195:18 | 14:13 46:19 | 35:25 36:7 |
| 99:24 100:17 | 206:1 221:17 | 47:24 48:8 | 38:12,21 39:9 |
| 121:13 122:1,10 | 228:17 235:2,3 | 74:13 77:21 | 40:21 41:2,9 |
| 126:17 153:21 | 236:20 238:24 | 78:3,5,6,9,14,19 | 43:8 45:22 |
| 203:2 253:5 | 239:4 240:7 | 79:12 111:8 | 48:24 52:7 53:9 |
| 271:24 | 241:10 245:18 | 114:24 131:5 | 53:25 54:5 |
| **financially** | 245:19,25 | 134:24 135:14 | 55:16,19 58:25 |
| 214:14 277:16 | 252:12 253:19 | 135:20 228:11 | 59:9,21 60:6,8 |
| **find** 33:19 69:10 | 256:2 266:9 | 246:3 271:15 | 60:13 62:22 |
| 75:5 109:4 | 268:7 | 276:4,19 277:3 | 66:22 67:8,18 |

**[form - gift]**                                                                Page 301

| | | | |
|---|---|---|---|
| 67:25 68:6 | 206:24 209:16 | **frank** 34:20 | 246:1 274:19 |
| 69:15 73:4 | 210:8 212:25 | **fraud** 245:15 | 277:13 |
| 79:21 83:4,24 | 213:9 214:2,2,3 | 264:19 | **future** 53:25 |
| 84:12 90:8 | 216:24 219:8 | **fraudulent** | 54:1 |
| 93:25 101:14 | 220:25 226:23 | 246:1 | |
| 105:3 106:17 | 227:3 229:9 | **free** 88:10 | **g** |
| 107:20 108:6 | 245:22 269:23 | **frequency** 28:2 | **g** 241:5 264:17 |
| 109:11 117:2,9 | 270:16 | **frequently** | **garbage** 143:21 |
| 117:19,22,24 | **forms** 69:6,8 | 19:17 | 168:21 240:12 |
| 118:5,13,18 | **fort** 1:2 2:13 | **fresh** 89:16 | **garnishment** |
| 121:3,21 122:5 | **forth** 51:17 | **friendly** 28:15 | 220:13,16,18,20 |
| 122:17,20 123:3 | **forward** 263:11 | **friends** 232:10 | **gate** 27:7 31:3 |
| 126:10 128:23 | 263:22 266:15 | 232:13 | 31:10 103:7 |
| 129:13 130:10 | 266:17 267:12 | **front** 183:15 | **gauge** 21:13,19 |
| 132:10 134:4 | 267:13 | **frozen** 214:20 | **general** 21:22 |
| 136:3,23 140:15 | **forwarded** | 214:23 215:5 | **generalized** |
| 144:9,19 150:19 | 263:19,23,23 | 216:11,13,16 | 150:17 |
| 153:19 154:7,14 | 264:7 | 220:6,12 | **generally** 11:21 |
| 155:16 156:21 | **forwarding** | **frugal** 184:12 | 13:1 21:4 95:16 |
| 157:15,18 | 263:9,21 266:23 | **frustrated** | 95:24 96:1 |
| 158:16 163:22 | **found** 29:10 | 69:21 72:19 | 107:1 223:19 |
| 164:5,23 166:7 | 63:7 69:12 | **fulfill** 87:17,19 | 272:25 |
| 166:11 167:6 | **four** 104:6 | **full** 79:4,8 | **getting** 28:12 |
| 171:23 175:14 | 264:1,8,15,20 | 128:17 130:6 | 128:13,16 205:4 |
| 177:10 178:17 | 265:2 | 208:18 | 226:15 |
| 178:22 179:17 | **fourth** 158:13 | **fully** 208:18 | **gg** 276:19 |
| 181:21 184:7,19 | **frame** 22:3 | **fun** 249:11 | **gift** 3:15 38:10 |
| 185:7,12 186:3 | 60:22 89:14 | 252:2 261:8 | 38:15,17,19,25 |
| 186:18 187:1,11 | 103:17 130:9 | **functional** | 39:2,7,8,13,18 |
| 188:4 190:1,14 | 136:9,12 142:13 | 166:15 | 39:23 40:3,6,20 |
| 190:19 192:23 | 174:13 177:3,7 | **funds** 54:2,3,5,8 | 40:23 41:7,14 |
| 195:6 196:24 | 177:15,19 | 120:16 126:21 | 41:19,22,25 |
| 197:15 198:25 | **francis** 11:12 | **funny** 9:13,13 | 42:2,14 43:4,6 |
| 201:9 202:1,15 | 12:4 18:16 | **further** 54:3 | 43:11 44:3,5,5,8 |
| 204:23 206:13 | 19:12 | 63:5 240:1 | 44:8,10,15 |
| | | | 46:16,20 47:6 |

**[gift - greatly]**                                                    Page 302

47:12,15,17
48:1 49:14,17
50:15,20 51:1
52:15,18,20,24
53:1,2,3,6,11,14
53:23 54:3,5,8,9
54:11,12,13,18
54:20 55:1,2,5,5
55:7,10,10 56:1
56:4,14,15
57:25 58:3,9,11
58:20 59:4,5,7,8
59:12,12,13,17
59:25,25 60:1
60:12 61:7,19
112:4,6 116:6
117:7,14 118:4
118:7,17 119:8
202:14 210:6
**gifts**  54:24 67:3
67:7,16,21,22
68:4 117:1,18
118:11 119:1,5
122:19 123:1
192:18 211:12
**give**  11:19 14:2
19:22 44:16
55:2,4 56:7,14
56:19 58:7 83:7
116:25 117:7,17
118:11 119:5
122:21 147:18
148:15 158:21
165:7 242:11

**given**  4:13,23
53:15 78:14
84:19 99:13
101:19 108:3
115:17 122:19
123:1 142:15
162:16 165:7
210:6 219:14
**gives**  38:24
**giving**  59:24
99:14 214:1
**go**  7:8,20 8:7,13
8:20 13:11
15:13 21:25
22:21 51:4
53:17 60:22
73:5 89:12,15
95:23 97:19
99:11 105:15
135:23 144:13
145:23 146:5
149:25 155:10
158:23 161:6,20
164:20 168:9,21
169:19 174:22
176:20 178:6
194:14 195:11
207:14 217:24
218:22 229:10
229:18,20,21,22
233:12 236:22
238:13 244:13
246:10,18 247:5
247:11,22
248:14 249:10

250:23 254:1
255:12 256:15
256:22 261:7,16
262:12,13,13
266:6 272:18
274:22,24
**goal**  113:12
210:12
**goals**  113:6
**goes**  31:20
113:21 123:11
139:9,10 248:11
**going**  4:25
19:15 20:24
22:21 25:7
29:14 30:2,3
34:20 42:20
43:4 55:2,4,7,25
56:2,7,12,14,17
56:19,20 58:3,6
58:14,20 59:4
60:10 62:17
75:7 78:7 80:22
87:25 93:9,12
95:6,18 110:22
111:22 114:25
115:6 116:5,20
116:22 118:19
127:2,14,24
137:21,24 138:1
138:4,8,18,24
139:7,16 150:5
157:22 160:5
161:9 169:19,20
172:19,21

173:23 174:12
174:13,16,17
179:7 186:11
195:17 198:18
199:5 200:1,2
200:15,22
201:11 202:4
203:19,22 205:4
205:7 208:19,22
208:23 209:14
209:25 212:3
213:11 214:6
222:10,11,21
224:24 225:11
227:20 240:18
244:18 249:4,16
249:18 250:9
252:19 256:6,20
258:6 263:8
264:18 267:2
273:7,23 274:6
274:16
**good**  4:7 5:2
72:24 75:8
201:6,7 233:15
**grad**  10:18
**graduate**  7:10
7:22 8:3 11:3
**graduated**  8:23
9:4,8,16,19 40:9
**graduation**  7:18
10:14 11:7
**great**  248:5
**greatly**  95:6

800-726-7007                                              305-376-8800

**[groceries - house]**                                          Page 303

**groceries** 97:13
**gross** 121:6
  131:23
**group** 12:25
**grow** 7:6
**guardian** 84:22
  84:23
**guess** 12:15 20:1
  24:15 52:9 77:6
  77:23 84:7,24
  86:24 96:21
  106:25 114:2
  136:25 140:1
  143:12,17 163:5
  181:20 226:24
  227:7,8 233:25
  234:10 253:12
**guys** 24:22
  77:10 166:13
  186:7 260:15

**h**

**h** 256:25 259:13
  279:3
**half** 10:25 208:1
**hamden** 11:2
**hand** 50:14
  98:20 142:2
  195:18 196:15
  276:13
**handed** 33:22
**hands** 72:24
**hang** 257:8
**happen** 80:25
  107:18 124:2
  150:4 166:25

216:1
**happened** 6:25
  35:17 56:11
  100:13 161:14
  169:16 210:11
  210:12 246:20
**happening**
  69:18 70:10
  114:4 211:4
**happens** 167:25
  220:20 227:7
  240:9
**happy** 244:17
**harassment**
  16:6
**hard** 109:4
**harder** 237:16
**hate** 111:13
**he'll** 141:20
**head** 58:5,6,8,9
  98:1,6 118:20
  145:17 176:8
  213:20
**health** 86:7 97:8
  135:5,7 164:18
  252:8,9
**heard** 79:4
**hearing** 211:1
**hearings** 210:23
**heart** 18:22
**heater** 142:21
  175:16 273:20
  273:22
**heed** 58:2

**held** 40:14
  219:17 235:9
  236:4 237:23
**help** 69:5,14,22
  69:25 72:19
  105:9 187:2,5
  203:1
**helpful** 187:7
**helping** 70:9
**hey** 62:8 81:23
  121:25
**high** 7:8,9,11,18
  8:2 79:1
**higher** 200:9
  214:17
**hit** 140:25
  233:21 234:1,2
  241:6
**hits** 261:10
**hoa** 92:21 93:13
**hold** 11:15
  241:16,16
  244:24 246:10
  264:24 266:1
**holding** 65:3
**home** 9:15
  26:22 27:3,4,8
  47:8,14,16,18
  47:23 48:18
  52:22 53:3 55:8
  56:3,8,18 58:6,7
  67:11,11 96:25
  97:3 110:22,23
  111:17 112:5
  113:21 117:11

117:15,25 118:6
  160:13 172:10
  194:4 202:17
  208:24 214:6
  237:20
**homeowners**
  89:24 90:12,14
  91:12 93:5
**homes** 113:25
  118:12 119:9,18
  122:22
**honest** 17:10
  29:7 78:23
**honestly** 12:25
  13:17 21:5
  34:12 40:5 53:2
  69:19 71:21
  74:7 76:10
  79:14 90:4
  94:24 102:3
  133:14 135:6
  232:6 258:20
**hospital** 11:12
  18:14,24
**hosting** 272:25
**hot** 234:8
**hour** 260:24,25
**house** 17:9
  27:23 30:2
  50:19,22 53:16
  55:7 56:13,21
  59:15,24 73:16
  73:16 94:17
  103:11,15
  105:21 106:20

[house - individual]                                                    Page 304

175:21 176:1,4
176:9 199:12
202:4 210:10
215:9 216:17
271:11 272:1
**household**
31:21 68:9,13
95:4 130:16
142:12 144:6
270:8,24 271:8
**houses** 120:4,6
**huh** 40:17 46:4
53:19 73:19
74:19 83:13
93:16,19,21
116:24 148:9
151:18,20
152:12 160:2
161:3 162:10
163:7 166:20
171:2 173:24
266:8
**hundred** 88:15
88:16 89:23
90:4 91:15,22
94:22 95:1,8
109:25 116:16
116:20 204:15
218:10,22 273:5
273:6
**hundreds** 131:4
131:8
**hurricane** 176:3
**husband** 27:9
45:5 50:18 56:2

56:7 59:23
67:12 68:8
94:23 103:22
104:18 105:8
106:13 112:5
115:18 119:4
123:11 131:14
131:16 142:6
158:15 181:3
187:15 214:5
217:22 224:19
224:20 228:23
229:11,21 230:2
230:10,13
232:23 254:18
254:23 263:1
270:23 271:13
274:2,10
**husband's**
127:2 180:16
203:13 270:4
**hypothetical**
83:19,20 105:7
105:8

**i**

**idea** 33:14 35:23
46:15 57:5 74:2
81:12 90:5
103:25 107:14
108:13,16
133:14 149:16
149:18,22 155:3
168:8 171:6
175:10 185:13
201:22 204:9

210:24 213:19
216:23 239:3
263:24
**identification**
5:3,15 42:22
49:10 101:23
102:11 123:24
190:25 193:9
199:6 221:11
**implicated**
260:10
**implied** 53:24
202:23 227:16
**importance**
157:3,4
**important** 154:4
154:6,10 209:7
**impossible**
247:1
**imprisonment**
51:23
**inbox** 262:14,15
**include** 97:20
179:22 197:20
**included** 86:21
111:25
**including** 12:13
51:19,23 173:21
199:19 200:1
**income** 86:17
93:18 98:21,23
109:3,5,5,5,7,15
109:23 110:1,4
121:6 127:2
128:4 131:13,23

137:5,18 138:4
138:7,22 139:7
139:9,10,12,14
147:23 177:2
178:23 184:23
184:24,24 185:1
185:2 199:24
270:10
**inconvenient**
135:19
**increase** 270:19
**increased** 268:9
**increasing**
237:23
**incredibly**
252:2
**incurring**
125:15
**independent**
161:8,11,13
269:3
**index** 3:3,9
**indicated**
227:14
**indicates** 163:20
**indicating** 52:12
59:16
**individual**
48:10,16 85:20
127:22 138:25
139:17,24,25
140:13,13 147:7
149:11,15
154:19 183:4
198:10 218:24

**individually**
48:21 230:14
**individuals**
209:22
**inform** 187:18
**information**
16:7 51:15,18
82:14,16,20
99:14,17 221:5
**informed** 220:5
**initially** 20:1
**initials** 14:2
**initiates** 107:2
**initiating**
209:20
**injured** 9:13
**inn** 1:17
**inquire** 58:18
62:20 81:21
**inquired** 62:8
64:8
**ins** 29:15 228:6
**insider** 166:5,8
166:10
**institution** 8:3,8
10:19 18:20
**institutions**
253:5
**instruct** 16:14
**instrument**
189:13
**insufficient**
85:24
**insurance** 86:7
86:8,8 88:12

89:18,24 90:12
90:14,23 91:11
91:12 93:4,5
99:1 135:5,7
164:18
**insurers** 51:14
**intelligent**
251:24
**intend** 185:25
**intended** 246:1
**intends** 227:17
**intent** 122:22,23
213:17,19,22,23
221:6
**intention** 82:5
200:18
**intentional**
37:20 51:17
**intentionally**
57:18
**interaction**
123:10
**interest** 186:22
186:25 198:13
199:14 203:15
**interested**
277:17
**interesting**
244:9
**international**
8:10,15 9:1
**internet** 91:22
91:23 92:1,3,10
93:8

**interpretation**
41:11,14
**interrogatory**
253:10
**investment**
102:1 169:4
**investments**
102:1
**invoke** 241:23
242:25 243:5
**invoked** 242:20
243:3,3,8
**involve** 29:7
34:25 35:2
37:16,24 38:7
62:16 64:19,22
66:12,14 228:23
263:13
**involved** 28:23
32:22,23 33:20
33:24,25 34:13
35:12,14,16
65:5
**involvement**
106:7
**involves** 66:17
253:7,8,8,9,9,10
**involving** 21:7
32:21 33:6,10
35:5 36:25
**iphone** 223:25
224:2,4,6
**ira** 100:21
**irrelevant** 16:14
34:23 60:15

187:12
**irs** 146:22 148:6
148:16,22 149:6
149:20
**ish** 224:5
**island** 15:22
17:1
**issue** 61:6 239:5
**issued** 122:3
188:24 189:5
239:6
**issues** 29:12
62:18 64:4
125:11,13
**it'd** 195:13
**item** 255:14

**j**

**j** 241:5,5 264:17
**january** 1:15
43:23,24 103:15
103:16 108:13
276:14 277:19
278:4 279:2
**jerry** 232:2,3,3
**jersey** 232:4
**jill** 1:20 276:18
277:6,24
**jlb** 1:6
**job** 11:13 12:6,7
27:12 29:23
30:4,6 31:6
40:14 74:24
75:1,5,6 80:10
103:14 108:11
115:8,9 128:18

**[job - know]** Page 306

129:5 209:10
278:4 279:2

**jobs** 9:22,25
74:20

**join** 128:12

**joint** 74:1
108:23,24
109:15,23
123:22 126:24
127:13,19 128:3
134:15,17,18
135:6 136:8,15
137:3,7,12,14
137:19,22 138:3
138:9,21,25
139:5,10,24
140:8 141:15
144:5,7 149:21
154:18 162:6
168:17 169:7
170:17 179:24
180:19 183:11
183:20 219:1,12
222:4 254:17,18
254:22 265:4,8
265:12,14 274:6
274:8,12

**jointly** 112:25
127:3 137:15
147:25

**jr** 1:7 278:4
279:1

**judge** 34:12
213:5 243:15

**judgment** 27:11
31:22,24 32:1,4
32:6,9 58:4 61:7
61:20 64:20
65:1 67:4 78:15
78:20 79:12,14
81:10,13,14
82:3,25 83:14
123:1,7 185:6
185:11,16
210:16,17,19,21
211:11 212:1,7
212:11 228:4
241:3 256:6
264:16 265:18

**judgments**
35:16

**judicial** 32:13
36:24 107:2

**july** 120:12,20
161:6 254:16

**june** 6:6 33:3
119:11 120:11
120:16,20
150:21,23 151:9
153:24 156:16
159:7,25 177:16
179:8 180:22

**justice** 25:20
26:2

**k**

**k** 1:7 12:20,24
75:12 100:18,19
101:1 105:2
268:17,21

**kchase** 2:7

**keep** 41:16
111:11 155:23
191:3 226:2
249:16,18

**keeps** 265:21

**kelly** 1:7,8,12
3:5 4:2,10 75:12
75:20 276:9
277:8 278:4
279:2

**kenneth** 2:4

**kept** 127:4,14

**key** 258:19

**keyboard** 73:3

**kidding** 129:2
259:7

**kind** 97:6
125:21 158:22
207:6 223:24
255:19

**knew** 21:20
22:15 27:24
29:13 35:17
43:10 44:5 53:8
53:11 56:2,5,7
56:10,14,17,22
57:10 58:10,13
78:15,16 115:7
116:25 117:17
120:3 122:23
187:15 208:18
208:18,22,23
209:2 210:15,17
211:15,19,24

212:7,13,17
228:4

**know** 4:18,21
6:22 8:1 9:6
10:9 11:19 12:5
12:25 13:17
15:4,17 17:10
20:6,23 21:3,5
22:17,19 23:8
26:23 29:1,6,16
30:8 31:1,9,15
31:18,22,24,24
32:1,15,18
33:16 34:13,21
35:19 39:3,6
40:5,20 41:6,7
41:16,19,23
42:7,18 43:4,6
43:10 44:3,20
44:22,23 48:3,4
49:16,24 50:1
51:2 53:6 55:4
55:25 56:18
57:4,9,11,13
58:4,12,14 61:4
61:22 62:13
63:13,19,21,23
63:25 64:3,13
69:1,8,23 70:6
70:11,18 71:21
72:1,11,11,13
72:15 74:8 75:8
75:14,22 76:7
76:10,11,14
77:20,23 78:17

**[know - legal]** Page 307

79:1,3 81:2
82:13 83:17
84:20,20 85:17
86:14,22 87:2
88:24 90:2,4,5
90:12,18,22
91:8 92:21 93:2
94:21,24 95:7
95:13,18 97:4
98:1,6,14 100:7
100:15 102:3,9
103:15 104:8
106:2 107:7,14
107:22 108:18
108:20,21
109:14 110:8
112:3 115:5
118:16,19,21
119:10,14 120:5
120:9,11,15,17
120:19,23 121:4
121:6,18 126:3
126:5 128:7,20
128:24 130:11
130:14 131:1,3
131:18 132:21
133:13,15,17,23
134:6,23,25
135:11 136:17
138:14 140:18
141:2,3,8
142:14,22 143:1
144:10 145:9,22
146:4 147:16,21
149:23,24 150:7

151:10,13
153:22 155:6,7
155:19 156:12
157:4 158:6
159:2,3,10,16
160:5,24 161:23
162:2,3,5,12
163:5 165:9
166:3 169:3,4,9
169:16 175:10
176:12,15
177:12,23 179:5
181:2 182:23
183:15 184:20
184:21 186:14
186:15 187:10
187:13,24 188:5
188:6,9,16,18
188:20,23
189:15,25 190:2
190:3,9 191:10
192:6,9 193:22
195:7 196:8
197:21,24
198:18,19 202:2
202:7 203:12,19
204:6,7,8,11,11
208:25,25,25
209:17 210:20
211:4,20,25
213:1,2,2
214:21 220:3,12
220:13,18 221:1
221:22,23 223:8
224:22 225:21

227:4,14 228:5
228:14 231:10
232:8 233:25
234:8,8,13,17
238:16 246:9,10
247:25 251:20
252:17 253:3
258:21 259:6
262:25 269:1,20
270:4,5,21,23
271:8,9 273:14
274:3,4
**knowing**  121:2
155:4 187:6
**knowledge**
186:16 228:5

**l**

**l**  75:12,12
256:25 259:13
**lake**  1:17
**landscape**
257:25
**laptop**  73:8 74:5
**large**  1:21
155:25 182:25
**late**  136:9
**laurel**  195:20
**law**  1:19 2:4
64:6 249:11
**lawsuit**  21:15
22:10,17,19
23:19 28:23
29:15 32:22,24
33:21,24 34:1
64:25 66:5,8,9

66:20 69:11
70:7 78:22
82:23 123:17
128:5,9 227:20
227:23,23 228:2
228:5 240:23,25
259:6
**lawsuits**  77:17
77:20 78:9,14
78:17 227:25
**lawyer**  23:2,15
34:12 77:23
78:8 133:1
224:23 229:2,23
231:4 237:22
238:6,9 241:18
274:3
**learn**  37:8
189:16,19
**learned**  190:3
**learning**  189:23
**lease**  103:19
**leave**  95:24
**left**  50:14 98:20
162:5 196:15
268:14
**legal**  21:6,14,19
29:6,12 32:11
33:6,10 35:5
42:8 55:22 61:6
64:1,4 66:18,19
84:20 123:6
131:1,2,5
132:13,14
173:21 175:15

**[legal - lose]**                                                                      Page 308

187:6 189:12,13
214:21 215:7,24
216:3,6 236:13
236:15 246:4
257:25 273:23
278:23
**legally** 48:23,25
61:17
**lender** 50:3
51:12 87:5 99:9
103:24 107:2,5
**lender's** 51:13
**letter** 3:15 43:5
49:17 50:15
52:15 54:18,20
111:3 118:7
**level** 19:14
**liabilities**
195:21 197:2,8
197:13 243:18
**liability** 51:19
**license** 3:13,14
5:7,10,20,21 6:4
6:8,10,14,18,19
6:25 7:3
**life** 62:17 79:20
**lifestyle** 164:21
164:25 184:13
271:10
**likely** 142:14
159:19,20
**limit** 141:19
156:20,22
**line** 16:4 245:25
257:20 279:4,7

279:10,13,16
**liquidity** 206:9
206:12,14,22
217:1
**list** 72:3 196:10
256:23
**listed** 144:24
**literally** 228:3
256:11
**litigation** 21:23
77:3,5,6,22 78:4
78:5,6 228:9
232:12,15
237:24 268:7
**little** 7:5 19:22
29:14 89:15
130:1 147:9
156:7,24 233:13
239:17 248:24
249:10,12,16,25
250:6 252:20
265:5
**live** 14:7,9,11
112:13 117:12
184:12 186:5
232:3 271:15
**lived** 70:3
134:19 170:24
**living** 7:15
10:10 11:1
26:23 27:3
80:14,16 102:21
103:9 104:20
135:20

**load** 265:5
**loan** 3:16 44:18
44:19,20,22,23
44:24 45:2,6,9
45:18 46:3,6,9
50:2,6,7 98:12
164:18,19 194:3
194:8
**loaned** 45:20
**loans** 145:15,19
196:1
**location** 1:17
24:7
**log** 231:5,7,8
242:21 258:2,11
267:2
**logistically**
153:12
**logistics** 156:6
226:16 230:3
233:4
**lol** 237:15 238:1
**long** 11:15
22:14 30:8
75:13,14 88:22
102:4 133:17
186:5 205:12
221:23 247:24
256:9 260:23
267:19 269:1
**longer** 260:23
**look** 5:18 6:1
24:10,13,18
50:10,12 64:22
70:13,14,21

98:15 123:20
133:21 141:24
143:10 159:15
160:4 167:17
168:22 169:10
169:21 171:7
180:2 183:10
193:13 194:14
194:15 196:10
196:11 198:6
218:20 231:3
234:10,16
235:24 236:18
239:12,16,23
243:10 247:13
250:11 252:13
252:14,15,19
259:16 263:16
263:17 266:7
**looked** 17:25
24:20,24 32:23
36:6,19,21
70:15,18 149:2
181:7 197:24
218:21 239:24
255:19 256:4
**looking** 33:25
102:18 177:24
196:16 237:8
243:23 248:18
270:14 273:10
**looks** 165:6,17
169:23 257:25
**lose** 6:8

Veritext Legal Solutions

**[loss - married]** Page 309

| | | | |
|---|---|---|---|
| **loss** 51:20 | 230:1 269:3,9 | 146:4 148:5 | 60:11,23 61:2 |
| **lost** 9:5 21:11 | **maiden** 18:5 | 149:6 171:20,25 | 61:12 114:8 |
| 27:12 29:14,22 | **mail** 75:11,13 | 180:9 182:23 | 119:12 120:17 |
| 30:4,6 31:6 80:9 | 75:17,18,19,21 | 186:13,21 205:1 | 128:17,19 129:5 |
| 103:14 108:11 | 76:5,11 170:6,9 | 208:10,12,15 | 135:25 150:21 |
| 177:25 238:2 | 170:11,13 | 210:12 214:2,7 | **marie** 254:15 |
| **lot** 84:4 160:14 | 230:17,20,24 | 227:17 229:24 | **mark** 4:25 5:1 |
| 175:19 256:1 | 231:3 239:12,16 | 237:6 243:20 | 5:13 42:20 49:8 |
| 265:6 | 239:23 240:3,5 | 247:16 249:5 | 101:21 102:10 |
| **loud** 53:21,22 | 252:25 253:1 | 252:19 256:6 | 190:24 193:8 |
| **low** 155:2,5,6 | 256:3,15 257:9 | 258:6,12 271:2 | 199:5 221:9 |
| 208:16 | 257:17,18 | **makes** 124:10 | **marked** 5:3,15 |
| **lowell** 8:22 9:2 | 258:16,17,17 | 237:15 | 42:22 49:10 |
| 10:8,11,12,14 | 260:11 261:22 | **making** 13:9 | 101:23 102:11 |
| **lower** 91:7 94:4 | 262:12,25 263:9 | 58:23 59:19 | 123:24 190:25 |
| 202:5 207:21 | 263:18 266:12 | 105:23 108:18 | 193:9 199:6 |
| 208:10,24 209:7 | 266:23 267:7,7 | 108:20 136:19 | 221:11 |
| 214:7,10,15 | 267:10 | 137:6 138:18 | **market** 87:4 |
| **lowered** 205:12 | **mailboxes** | 164:12 185:23 | 113:24 |
| **lunch** 95:17 | 262:19 | 268:23 273:25 | **marriage** 15:20 |
| 96:15,16,19 | **mailed** 75:9,10 | **manage** 201:11 | 16:20,23 17:8 |
| 165:17 | 76:8 | **manageable** | 25:23 26:7,9 |
| **lynn** 240:24 | **mails** 76:3 | 86:15 199:23 | 80:13 149:13 |
| **m** | 224:17,23 225:5 | 205:13 210:13 | 166:15 187:25 |
| | 225:18 231:4 | 214:8 | **married** 5:11 |
| **m** 254:8 264:17 | 239:13 240:18 | **management** | 6:17 13:12,23 |
| **mad** 247:14 | 262:14,24 | 62:20 | 17:3 25:11 |
| **made** 37:20 | 266:18 | **manner** 162:5 | 26:11 48:13 |
| 51:21 58:23 | **maintenance** | **manually** 141:5 | 80:11 84:19 |
| 64:21 125:20 | 92:17 93:9 | **march** 49:13 | 85:4 113:1 |
| 142:7 146:24,25 | **major** 9:18 | 52:4,21 53:6 | 127:1 137:15 |
| 168:7 180:10,18 | **make** 71:14 | 54:13,14,17,18 | 166:13 187:18 |
| 183:14 186:10 | 85:2 87:17 | 54:21 55:1 56:1 | 187:22 218:21 |
| 202:10 203:19 | 97:10 112:17 | 56:15 57:1,7,24 | 230:13 |
| 203:22,25 | 116:11 135:17 | 58:11,16 59:20 | |
| 208:15 209:24 | | | |

marry   13:14,16
martinez   1:7,7
  3:5 4:2,10 18:8
  18:10,19 19:3
  19:10,18 20:11
  20:17,21 21:2,7
  22:7 24:5 25:10
  25:11 26:11,19
  26:20,25 27:19
  28:3 29:21,25
  31:6,11 32:21
  33:7,11,16 35:8
  36:25 38:11,20
  39:8,13,18,23
  41:22,25 44:11
  44:18 45:3,6,14
  45:18,21 46:11
  46:17 47:7,12
  48:14 55:2 57:2
  57:24 58:3 61:1
  62:1 63:12 65:8
  65:13 67:3,17
  67:22 68:5 69:2
  69:14 71:3
  72:22 74:14,23
  75:9 76:6,8
  77:22,25 79:18
  81:21 82:3 84:8
  87:8 101:19
  102:7 103:6
  105:12,16
  106:14 107:10
  108:4 110:2,5
  110:10,16,20
  113:1,7 116:25

118:11 119:10
120:12 121:8
128:12 129:8
130:8 132:18
133:11 134:9,15
136:12,19
141:16 148:19
149:18 164:12
166:6 168:10
170:6 174:19
185:15,21 187:7
187:25 188:24
189:5,13 190:13
190:17 192:5
200:25 201:24
202:10,19
204:22 206:1
208:19 210:22
211:7 213:14
215:15 218:11
218:14 219:17
222:24 223:2
225:16 231:15
232:24 233:2
237:19 239:6
241:19 251:6
257:19 263:13
272:10 276:10
277:9 278:4,4
279:1,2
martinez's
  27:16 35:13
  74:5 75:21
  76:14 106:7
  108:14 129:25

148:3,22 184:23
255:17 274:9
massachusetts
  7:7,19 8:4,21,22
  9:9 16:1
master's   10:22
  40:7 60:20
  251:24
masters   107:15
match   120:7
  268:25 269:2
matched   268:24
materials   37:18
matter   34:21
  35:1 100:24
  155:8 205:9,11
matters   29:20
  29:25 35:6
  236:13
max   260:25
max'ing   269:12
maximize
  113:19
mean   29:5,6
  31:23 34:14
  41:6 44:19,23
  53:14 54:16
  62:4 68:12 69:7
  71:24 77:6,20
  113:24 126:8
  140:23 143:10
  148:18 151:7
  155:21,23 156:9
  156:12 158:23
  166:8 175:17

188:5 198:19
202:2 206:14
207:7 216:21
218:9 236:14
244:2,4 260:7
260:21 263:6
266:24 269:8
271:11 272:24
meaning   41:7
  54:13 186:15
  213:5 223:12,15
meaningful   10:3
means   34:14
  42:11,16 52:10
  64:8 66:1 121:2
  121:4,6 220:8
meant   42:3
  43:10 44:3,5,15
  53:6,11,15
  54:10,11 64:14
meat   97:6
media   15:8,9
medical   11:12
medium   184:12
meet   18:7,10
  171:20,25
  257:24 258:5,12
  261:13 263:9
  267:1,16,21
memorable
  156:1
memory   153:24
  156:3
mention   197:22

[mentioned - month]                                                    Page 311

| | | | |
|---|---|---|---|
| **mentioned** | 262:1 | 45:1,2,5,6,11,14 | 208:9 210:1,9 |
| 76:24 77:1 | **minimal** 271:19 | 45:20 50:18,21 | 212:22,23 213:7 |
| **mentions** | **minor** 84:8 | 53:15 55:6 | 213:10 214:6,20 |
| 253:25 | 271:13,23 272:3 | 56:12,17,19,20 | 214:23 215:4,6 |
| **message** 252:24 | 272:8,13 | 56:23 57:3 58:7 | 215:7,8,8,9,18 |
| 254:19 | **minors** 84:11 | 58:8 59:14,15 | 215:19,21,22,24 |
| **messages** 76:23 | **minus** 177:6 | 59:24 67:10,14 | 216:3,4,5,17,17 |
| 224:9,11,13,15 | **minute** 193:13 | 68:8 78:7,12 | 217:22 218:21 |
| 233:12 234:19 | 203:24 | 83:3 101:18 | 218:21 219:25 |
| 236:24 238:18 | **minutes** 68:21 | 105:1 110:10,16 | 220:23 221:3,4 |
| 240:14 251:6,20 | 260:22 267:9 | 110:20 112:13 | 229:1 230:4,11 |
| **messaging** 15:1 | **mischaracteri...** | 112:16 113:9,16 | 231:15 243:14 |
| 15:5,11 | 55:17,18 | 113:19,20,21,22 | 247:2 253:9 |
| **met** 18:12 20:8 | **misplaced** 83:9 | 113:23,25 | 273:25 274:8 |
| 263:4 | **misrepresenta...** | 116:10 117:11 | **month** 20:23 |
| **metrics** 99:20 | 51:18,21 | 117:25 118:1,6 | 21:1 35:20 65:8 |
| **miami** 2:5 | **missed** 65:10 | 119:20,24 120:4 | 65:15 68:14,14 |
| **middle** 1:1 31:1 | **missing** 92:21 | 122:22 123:11 | 80:25 81:2 |
| **mile** 2:12 | 169:24 | 124:9 136:19 | 83:22,23 86:6,9 |
| **military** 91:1,4 | **mistaken** | 137:6,10 138:18 | 86:10,17,21 |
| **million** 57:9,10 | 144:23 | 138:24 139:25 | 87:23 88:15,15 |
| 81:17 83:22 | **mitigate** 250:20 | 140:12 141:22 | 89:23,23 90:21 |
| 108:18 130:7 | 252:22 | 145:11 147:4,18 | 92:24 93:3,4,4,5 |
| 144:8,10 212:5 | **modern** 223:14 | 148:3,20 149:14 | 93:15,17,23 |
| **mind** 59:17 | **mohel** 195:20 | 149:19 150:8,13 | 95:5 97:22 |
| 60:25 89:1,16 | **mom** 125:16 | 150:15 152:11 | 98:25 111:23 |
| 211:10,14,16 | 261:22 262:18 | 154:18,22 | 116:15,18,19,21 |
| 219:25 233:9,10 | 272:24 | 155:18 157:23 | 116:21,23 |
| 235:24 238:15 | **monetary** 38:19 | 158:12,12,14 | 124:18 128:5 |
| 246:25 248:16 | 39:2 51:20 | 161:22 164:12 | 129:17 130:19 |
| 249:1,20 250:15 | 67:21 | 169:7 171:9,18 | 130:22 131:2,3 |
| 251:1 252:3 | **money** 21:11,12 | 175:8 178:15 | 138:17 141:1,18 |
| **mine** 127:2 | 27:13,14 29:15 | 179:19 181:16 | 141:18,20,23 |
| 133:16 181:2 | 31:25 32:2,7,9 | 183:9 185:10,16 | 142:14,15,23 |
| 187:16 220:4 | 33:12,13 44:18 | 200:20 202:4 | 143:4,11 144:1 |

**[month - naples]**                                                      Page 312

145:10 146:11
146:18 147:13
148:14 150:15
150:18,22,23
156:5 160:8,12
162:14,16,20,22
162:24 163:2,3
163:4,13 164:7
167:1,2 168:19
171:11 172:8,10
172:14 173:3,4
173:5,25 174:1
174:2,9,10,19
174:20,25 175:4
175:8,9,10,12
175:18 177:6
178:16,23,24,24
178:25 179:3,4
179:4,6,7,8
181:10,13
182:15,25
183:11 184:6
185:16 196:4
198:4 199:23,25
200:6,16 206:19
207:9,13 208:13
209:13 269:21
270:1,12,14
271:5 273:7,12
**monthly**   68:13
89:17 91:9
94:19 98:15
99:21 100:2,20
117:16 140:17
140:21 142:18

144:6 148:17,19
151:2 160:7,12
173:6,10,13
174:8 199:13,18
202:5 205:12,14
207:14,21
208:15,24 214:7
270:24 272:17
**months**   49:13
52:18 73:14
88:23 92:23
95:8 143:11
151:21 153:18
153:22 155:22
160:9 182:10,18
182:19 232:7
270:17
**morning**   4:7
19:25 38:18
95:23 226:13
**mortgage**   24:15
24:17 27:14
31:9,20 48:20
49:2,5,21 55:12
85:11,14,16,21
85:22,24 86:1,3
86:12,18,24
87:3,4,16,21,25
88:20 93:20
94:1 99:7,12,22
100:7,10,14
106:8,15,20
107:11,18 108:1
111:22 112:2,7
112:9 114:6

115:13,24 116:3
116:6,14,15
130:19 164:22
165:1 173:13
194:4,23 195:1
195:9,16 197:23
197:25 198:1
200:4,14 201:1
201:2,3,8,14,24
201:25 202:10
202:21 203:23
204:1,14,14
205:2,5,5,6
206:19,25 208:8
208:17,18 209:4
209:6,21 213:25
218:1 221:5
267:13
**mortgages**   85:8
85:8 89:2,8,9
**motherload**
262:23
**motion**   235:11
236:6 237:21
238:5,11 244:19
258:4
**mouse**   73:11,15
74:17
**move**   9:11 30:3
30:23 79:12
103:6,12 105:21
253:16
**moved**   8:21
9:10 12:1 30:25
31:3 79:15,15

103:12,13
134:23 135:14
171:4
**moving**   78:19
157:24 256:7
**multiple**   12:23
35:20 95:13
102:5 140:10
142:21 162:16
175:17 177:8
184:2 213:10
**myers**   1:2 2:13

**n**

**n**   230:21,21
240:21,21 262:5
262:5 264:11,11
264:12,12,13,13
264:17
**name**   4:9 5:11
6:13,16 9:25
13:19,20 14:2
16:2 18:1,2,5,7
48:10,17,20
64:19 66:24
98:3 140:4
180:16 198:10
232:1 262:7,8
279:23
**named**   23:7,11
23:19 38:4
77:19 211:9
228:21
**names**   4:11
**naples**   1:18 3:14
12:6,7 14:13

46:19 47:14,16
70:3 102:22
118:8 170:24
171:4 252:8,8
**near** 271:3
**nearly** 13:9
**necessarily**
186:23
**need** 4:20 30:17
47:9 62:18
68:18 69:24
72:19 73:5 78:7
100:23 112:6
118:2 126:24
127:19 131:18
132:2 137:7
140:8 150:8
157:25 193:13
201:17,18
208:15 213:1
226:7 229:7,11
245:25 257:12
260:11 261:3
**needed** 9:14
69:22 75:5
94:17 133:1
135:6,19,24
137:18 138:3
139:14,23 158:4
214:15 215:6,8
215:19,24 216:3
221:4 226:14
229:21 260:17
**needlessly**
237:23

**needs** 221:7
230:11 256:3
**negative** 186:16
**negligent** 51:18
**net** 86:9,9,17
172:15 178:11
197:18
**never** 20:20
27:22 35:14
45:25 46:5 53:2
55:6,10,10 58:5
58:8,23 59:4
61:16 62:8 63:4
63:5 67:5 78:21
78:21 79:14,15
82:25 100:19,25
101:12 106:19
116:1 118:14,25
119:5 121:11,12
121:13,18,23
122:21 123:13
125:22,23
134:11,14
145:20 149:10
185:1,8,18
186:5 201:2
211:8,14,19,24
211:24 212:10
212:13 213:13
213:21 218:4,21
219:23,24,25
227:14,16
231:17 247:3
**new** 5:12 6:14
6:18 74:7 94:18

94:20 127:24,25
128:1,8 176:4
209:10 224:5
232:4 240:3
260:7 268:20
269:1
**news** 119:20
**nice** 247:8
**nicely** 16:10
**nicer** 268:3
**nicknames**
257:1
**nine** 193:8
264:2,8 265:3
**ninth** 222:17
**nodding** 4:23
**nominally**
229:14
**non** 145:13
252:22
**nonpayment**
106:7 108:1
124:25 125:22
**nonsensical**
217:4
**normal** 142:24
**north** 27:7 31:3
31:10 103:7
114:11 125:7
174:20 273:24
**nos** 221:12
**notary** 1:20
276:19 277:7
**notation** 168:6

**note** 278:10
**notes** 277:11
**nothing's** 262:5
**notice** 12:8
257:10,11
**notion** 134:3
**november** 25:16
26:19 81:3
187:19 235:15
235:18
**npm** 1:6
**number** 14:14
14:21 34:5
46:25 76:15
119:22 120:7,10
142:25 159:8,13
159:23 161:4
162:9 175:12
180:25 181:12
184:25 222:11
222:19 242:11
243:24
**numbered**
191:18
**numbers** 70:22
71:7,13,14,24
71:25 72:5,13
73:2 273:9,10
**numerous**
211:18
**nursing** 9:19

**o**

**o** 13:15 14:12
75:12

**[oath - okay]**                                                                    Page 314

**oath**  4:3 42:14
  49:15,18,22
  50:23 51:2 52:6
  52:10 55:13,19
  145:11 210:15
  276:1
**object**  16:4,13
  20:12 23:20
  28:4 34:6 35:25
  36:7 38:12,21
  39:9 40:21 41:2
  48:24 52:7 53:9
  55:16 58:25
  59:9,21 60:6,13
  62:22 66:22
  67:8,18,25 68:6
  79:21 83:4,24
  84:12 89:11
  90:8 93:25
  101:14 105:3
  106:17 107:20
  108:6 109:11
  117:9,19,22,24
  118:5,13,18
  121:3,21 122:5
  122:17,20 123:3
  126:10 128:23
  129:13 130:10
  132:10 134:4
  136:3,23 140:15
  144:9,19 150:19
  153:19 154:7,14
  155:16 156:21
  157:15,18
  163:22 164:5,23

166:7,11 167:6
171:23 175:14
177:10 178:17
178:22 179:17
181:21 184:7,19
185:7,12 186:3
186:18 188:4
190:1 192:23
195:6 196:24
197:15 201:9
202:1,15 204:23
206:13,24
209:16 212:25
214:3 216:24
219:8 220:25
226:23 227:3
229:9 269:23
270:16
**objection**  39:15
  39:20,25 41:8,9
  41:17 43:8 45:7
  45:22 65:22
  71:4 73:4 98:4
  116:7 117:2
  124:13 158:2,7
  158:13 159:9
  188:13 211:13
  211:17 212:2,9
  212:14,20 214:3
  241:24 272:4
**objections**  16:8
  231:11 242:8,13
  266:25
**obligate**  200:15

**obligation**  48:21
  53:23 65:8,13
  125:1 244:14
**obligations**
  67:12 87:17,20
  89:17 132:13,19
**obtain**  17:20
**obviously**
  138:10
**occasions**  56:11
**occur**  137:24
  155:1
**occurred**  52:18
  61:16 63:4
  100:25 107:24
  119:6 142:23
  158:12 203:16
  211:1 217:9
**october**  167:2
**offer**  111:3
**office**  69:21
  131:6
**official**  54:6
  276:13
**officiant**  16:3,12
  16:18
**oh**  32:3 43:4
  55:13,23 60:3
  87:10 92:2 95:1
  98:17 106:12
  116:19 128:20
  131:1,2 135:3
  144:16 152:23
  152:25 165:25
  168:4 176:6

180:25 191:19
191:24 193:19
194:18 195:10
196:13 199:2
215:1 218:4
226:20,22
227:25 234:21
237:21 239:13
240:24 244:8
245:10 246:9
247:14,18 248:7
248:9 249:17,17
249:19 254:18
257:15 259:19
262:20,22
265:17 266:1,6
**okay**  4:8,15,19
  4:22,24 5:9,13
  5:18,23 6:6,12
  6:25 7:2,5 8:5,7
  8:11,19,21,24
  9:2,7,11,16,22
  10:2,7,17 11:1,3
  11:7 12:2,7,17
  12:19 13:1,6,11
  14:4,21 15:3,7
  15:13 16:16,23
  16:25 17:8,20
  17:22 18:4,6,10
  18:12,16,18
  19:2,9,14,20
  20:4,6,10,16,20
  20:23,25 21:9
  21:13 22:2,12
  22:17,21 23:3,6

**[okay - okay]**                                                    Page 315

| | | | |
|---|---|---|---|
| 23:15 24:2,16 | 61:12,22 62:11 | 98:3,9,17,19 | 137:12,17,19,24 |
| 24:24 25:7,8,16 | 62:15,19 63:3 | 100:7,13,16 | 138:3,8,13,24 |
| 25:22 26:4,13 | 63:11,25 64:2,5 | 101:3,5,8 | 139:7,16 140:3 |
| 26:16 27:6,10 | 64:16,18,24 | 102:10,16,20 | 140:5,20 141:4 |
| 27:14,16,25 | 65:7 66:1,4,16 | 103:2,6,18 | 141:11,14,14,25 |
| 28:1,10,18,21 | 66:19 67:2 68:4 | 104:19,24 | 142:4 143:13,24 |
| 28:25 29:3,9,18 | 68:11,15 69:1 | 105:15,22 | 145:6,16,23 |
| 29:24 30:6,13 | 70:15,23 71:1,9 | 106:12,22 107:4 | 146:11 147:15 |
| 30:16,21 31:3,6 | 71:16 72:2,4,9 | 107:17,24 108:3 | 147:18 148:2,15 |
| 31:9,13,15,22 | 72:22,24 73:8 | 108:10,18 | 149:5,22 150:25 |
| 32:1,3,5,8,15,18 | 73:11,18,24 | 109:23 110:4,15 | 151:3,14,21 |
| 32:25 33:5,16 | 74:12,14,17,20 | 110:19 111:7,12 | 152:25 153:2,4 |
| 33:19 34:2,4,18 | 74:23 75:1,4,9 | 111:15 113:16 | 153:9,15 154:5 |
| 35:1,7,19,24 | 75:19,21 76:14 | 114:1,4,13,21 | 155:4,13 156:3 |
| 36:6,9,11,11,14 | 77:9,12,15,21 | 114:24 115:13 | 156:6 158:11 |
| 36:16,18,21,24 | 77:24 78:5,10 | 115:23 116:2 | 159:3,7,12,23 |
| 37:6,8,15,17,23 | 78:11,18 79:4,7 | 117:14,17 | 159:24 160:7,10 |
| 38:10 39:7 40:7 | 79:11,17 80:3,5 | 118:10,16,23 | 160:19 161:2,13 |
| 40:9,16,20 41:6 | 80:6,8,16,19,22 | 119:7 120:7,11 | 161:16,19,20 |
| 41:13 42:2,6,19 | 80:24 81:3,5,15 | 120:15,25 121:2 | 162:8 163:6,19 |
| 42:25 43:6,13 | 81:18,23 82:2,8 | 121:19 122:9 | 164:3,12,17 |
| 43:25 44:6,10 | 82:16,19 83:8 | 123:20 124:4,6 | 165:6,14,23 |
| 44:13,18 45:2 | 83:11,19 84:18 | 124:11,17 125:3 | 166:17 167:17 |
| 45:20 46:16 | 84:25 85:2,5 | 125:7,12,24 | 167:23 168:20 |
| 47:2,4,6,9,17 | 86:9,15 87:7,14 | 126:15,24 | 169:6 170:3,4 |
| 48:1,6,21 50:2,6 | 87:23 88:2,3,18 | 127:16,19 | 171:3,14 172:4 |
| 50:10,13,23 | 88:22 90:3,7,16 | 128:11 129:20 | 172:11,22 173:3 |
| 51:1,5 52:3,6,12 | 90:20,23 91:9 | 129:25 130:2,7 | 173:16,18 174:4 |
| 52:17,20 53:17 | 91:16,20 92:8 | 130:16 131:2,12 | 174:14,15,18,23 |
| 53:17 54:9,12 | 92:12,15,20 | 131:19,20,23,25 | 175:6,11 176:11 |
| 54:20,23 55:4 | 93:7,10,11,12 | 132:6,18,24 | 176:20,24 177:2 |
| 55:11,23 56:22 | 93:17 94:6,9,12 | 133:10,19 134:1 | 178:7 180:10,14 |
| 56:25 57:14,17 | 94:14,19 95:4 | 134:9,12,14,20 | 180:18 181:1,7 |
| 58:20 59:19 | 96:1,6,14,15,23 | 135:15,25 | 181:13,25 182:6 |
| 60:3,10,22 | 97:10,12,15,24 | 136:18,21 | 183:2,6,17,25 |

**[okay - originally]**                                                          Page 316

| | | | |
|---|---|---|---|
| 185:5,10,15 | 230:23 231:2,5 | 267:23,25 268:6 | **opinions** 36:24 |
| 186:7,15,24 | 231:14,24 232:8 | 268:13,19 | 37:1,3,11 |
| 187:5 188:2,10 | 232:21 233:4,9 | 269:15 270:19 | **opportunity** |
| 188:14,20 189:1 | 233:21,23 234:1 | 271:1,17,22 | 37:17 115:7 |
| 189:9 190:11 | 234:4,9 235:20 | 272:2,10,15,17 | 134:2 167:12 |
| 191:11,18,24 | 235:24,25 236:2 | 272:21 273:3,6 | 189:4,6,7,16,18 |
| 192:3,8,13,15 | 236:18,19 237:9 | 273:9,18,22 | 260:12 |
| 192:17 193:2,4 | 237:11,14,20 | 274:15,18 | **opposite** 51:17 |
| 193:5,7,25 | 239:9,13,17,24 | **old** 103:1 | **order** 32:18,20 |
| 194:5,18 195:19 | 240:3,4,9,14,22 | **older** 231:24 | 32:21 35:2,24 |
| 195:24 196:2,19 | 241:5,8,9,14 | **once** 20:2 28:23 | 36:2,4,13,15,17 |
| 198:3,8 199:1 | 243:12 244:7,13 | 29:22 33:20 | 64:6 65:14,18 |
| 199:13,18 200:3 | 244:22 245:2,5 | 128:13 162:23 | 66:2,9,24 85:2 |
| 201:3,21,23 | 245:11,15,16,20 | 162:24 164:12 | 139:24 187:21 |
| 202:9,23 203:5 | 246:8,12,15,23 | 272:19,19 273:3 | 187:24 190:12 |
| 203:6,8,15,19 | 248:6,23 249:17 | **one's** 183:23 | 235:10,11 236:4 |
| 203:21 204:1,9 | 249:19,24 250:7 | **ones** 10:3,6 | 236:6,6 239:5,6 |
| 205:24 206:1,4 | 250:12,15,19 | 94:18 115:21 | 246:1 275:2 |
| 206:6 207:25 | 251:12,19,23 | 124:12,17 | **ordered** 35:19 |
| 208:2 209:21,24 | 252:1,5,10 | 223:21,22 | 35:22 65:7,12 |
| 211:15,25 | 253:13,18 254:6 | 236:25 237:2 | 65:14 83:21 |
| 212:13 214:15 | 254:9,13,17 | 239:22 | 122:13 227:18 |
| 215:8 216:10 | 255:3 256:7,8 | **online** 192:11 | 227:21 242:14 |
| 217:18,21 218:5 | 256:13,14,21 | **oops** 264:20 | **ordering** 278:15 |
| 219:14,22 220:2 | 257:3,6,12,13 | **open** 78:2 135:4 | **orders** 19:25 |
| 220:10,15,18,20 | 258:14,18,20,23 | 137:3 | 34:5,10,11,15 |
| 220:23 221:14 | 258:24,25 259:2 | **opened** 136:8,15 | 34:16,19,23,24 |
| 221:17 222:18 | 259:8,21 260:1 | 138:21 | 36:11 37:9 38:9 |
| 223:11,14,16,17 | 260:6,7,23 | **opening** 128:8 | 65:21 188:2 |
| 223:20,23 225:1 | 261:1,2,15,18 | 128:12 | **organize** 72:12 |
| 225:2,3,12,23 | 262:16,22,22,24 | **operating** 20:2 | **original** 57:10 |
| 226:11 227:2,10 | 263:3,16,22 | 20:3 | 81:14 227:20 |
| 227:13 228:2,13 | 264:16,19 265:7 | **opinion** 82:14 | **originally** 80:18 |
| 228:16,24 | 265:9,16,19 | 203:9 236:15 | 86:13 |
| 229:14 230:9,14 | 266:1 267:18,22 | | |

800-726-7007                                                          305-376-8800

**[outs - pay]**                                                                 Page 317

| | | | |
|---|---|---|---|
| **outs** 29:15 228:6 | **pa** 10:18 13:17 | 183:20 185:6 | **parts** 241:13 |
| **outside** 28:7 | **package** 12:17 | 201:24 205:11 | **party** 21:14 |
| **overtime** 12:15 | **page** 50:12 51:4 | 210:10 213:6 | 82:25 |
| 114:10,18 115:3 | 98:17 104:11 | **pain** 175:23 | **pass** 28:10 |
| 115:7,9 | 142:2 144:13 | **painted** 156:10 | 209:14 |
| **owe** 31:25 32:2 | 145:23 146:5 | 175:22 | **past** 24:19,20 |
| 32:7 88:8 | 149:25 155:13 | **painting** 175:17 | 25:5 131:10 |
| 148:14 184:18 | 160:15 165:3,20 | 176:2 | 140:14 |
| 211:20,21 | 166:17 167:17 | **paper** 143:8,13 | **patients** 19:24 |
| 213:10 | 167:25 168:9,22 | 143:20,25 145:4 | 19:25 20:1 |
| **owed** 29:15 | 169:10,21 170:2 | 162:20 164:4 | 28:14 |
| 33:12 57:2,4,11 | 171:7 176:20 | **papers** 29:11 | **paula** 245:12 |
| 58:22 61:1,7 | 177:24 178:6 | 33:22 64:11 | **pay** 3:19 21:12 |
| 83:3 123:1,7 | 180:2,24,25 | 84:21,24 | 27:13,14 30:14 |
| 211:11,19,21 | 181:14 191:12 | **paperwork** | 35:20 44:25 |
| 212:22,23 213:7 | 191:19,19 | 210:4 | 45:5,10,14 55:7 |
| **owes** 32:9 57:13 | 193:16 194:16 | **paragraph** | 56:2,12,17,20 |
| 57:15 58:3 | 194:17,17 | 53:20 239:4 | 65:8,14 67:11 |
| 61:19 184:20 | 195:18,22,23 | **paraphrasing** | 68:9 81:24,24 |
| **own** 62:17,19 | 196:10,12,12,16 | 251:13 | 82:5,9 83:15,22 |
| 88:4 113:21 | 196:17,19 198:4 | **parental** 271:18 | 83:23 85:21 |
| 115:14 127:21 | 198:6,12,20 | **parents** 271:23 | 87:21 99:23 |
| 160:13 230:14 | 200:5 221:20 | **parkway** 2:12 | 100:19,21 101:1 |
| 271:9,11 | 222:12,16,17 | **part** 65:11 | 101:6 112:9 |
| **owned** 27:8 | 279:4,7,10,13 | 122:7,15 129:3 | 118:1 124:3,3 |
| 196:11,15 198:9 | 279:16 | 129:16 227:5 | 124:10 125:17 |
| 198:9 | **paid** 27:23,23 | 253:22 263:12 | 125:25 126:22 |
| **ownership** | 31:14 55:6 | 268:10 270:4 | 127:3,16 130:16 |
| 198:13 | 58:16 125:3 | **particular** | 135:15 137:5,11 |
| **owns** 102:4 | 126:5 131:3,14 | 73:20 145:10 | 138:4,8,22 |
| **p** | 131:16 137:19 | 163:16 170:22 | 139:2,8,15 |
| **p** 254:8 | 138:1,6 139:16 | 171:5,6 225:10 | 140:10 141:7,9 |
| **p.a.** 2:4 | 148:22 149:10 | **parties** 132:14 | 143:18 144:6 |
| **p.m.** 1:16 | 154:21 158:24 | 273:1 277:14,15 | 145:11 146:19 |
| | 169:14 179:24 | 278:15 | 149:2,3,12,14 |

**[pay - peter]** Page 318

149:17,20 150:5
150:8,9,14
152:5,6,8,9
154:15 156:5
162:13 164:19
165:11 172:13
179:20 180:12
180:16 182:24
184:6 187:14
200:11,15
201:18,18 202:3
205:6,7,9
206:25 208:14
208:19 210:13
212:23 213:11
213:25 214:6,22
221:4 229:3
235:12 236:7
271:7 274:4,5
**payable**  163:14
163:16,17
167:23
**paycheck**
128:13,16
269:11
**paying**  30:17
31:18 82:3
88:20 89:2
100:7 104:25
106:15,19 107:9
107:11,17
116:11 121:15
122:2 123:8,8
123:12 124:7
125:5,8,11,13

126:7,19 127:17
131:13 135:5
136:16,21
137:15 138:13
154:9,12,17
156:1,3 160:11
160:12 164:13
164:15,17 183:3
183:6,25 184:2
184:4 185:16
205:2 206:7,19
207:8 269:16,18
269:20,25 271:7
271:8
**payment**  99:21
100:11 112:1
121:9 122:12
126:9 137:25
140:20,22,24
145:24 146:23
148:5 149:6
151:1 154:24
180:4,9 182:21
198:1 199:19
200:18,20 201:1
201:2 202:5,7
202:10,16,20
203:1,3,17,22
204:4,16 205:1
205:10,12 206:2
207:22 208:8,10
208:24 209:15
213:8 214:7,10
214:11,16,17
216:22 218:11

218:13 243:18
252:7
**payments**  85:3
85:25 86:1,9
88:8,22 89:7,17
105:23 128:21
131:12 138:20
150:24 180:18
182:23,25
183:10 185:23
205:11,14 222:4
227:18,21
229:25 271:6
274:1
**payor**  168:25
**payroll**  178:8,12
**pays**  82:12
131:14 165:13
**peace**  25:21
**penalties**  51:22
279:20
**penalty**  49:23
196:23
**pending**  66:20
109:12 232:18
**people**  79:2 91:1
91:3 113:24
132:21 184:16
245:9 262:9
**people's**  134:18
135:13
**peoples**  135:2
191:9 247:19
**percent**  201:4
201:16,17,19

205:2 206:20
209:15
**percentage**
179:6
**period**  102:17
102:17 171:10
**periodically**
75:7
**perjury**  49:23
279:20
**person**  40:18
42:10,15 51:20
99:14 107:17
123:7,8,8,9
124:21 148:2
211:11,23 213:5
269:25 271:22
273:1
**person's**  213:3
**personal**  16:7
16:14 62:18
127:5,9,14,17
164:19 232:10
236:24 237:6,8
237:10 241:12
241:13,13 249:6
**personally**
270:6 276:10
**perspective**
106:6
**pertain**  264:21
**pertains**  243:21
**pet**  195:2
**peter**  240:12

**[phone - previously]** Page 319

**phone** 14:15,21 15:1,5 91:17 93:8 133:5,15 143:12 192:11 223:24 233:10 233:24 248:4,17 249:6 251:2

**phones** 91:17,18 223:18,18

**photo** 234:5,6,7 234:9,11,13 249:4

**photocopy** 3:12 3:14

**photos** 234:4 251:5 257:4

**physical** 10:4

**physically** 152:13

**physician** 10:22 10:23 11:8,14 18:15,22

**physiciansreg...** 75:20

**physiology** 9:20 9:21

**pick** 24:8 213:11

**picked** 226:15

**picture** 248:1 253:16 255:13 257:4

**pictures** 260:19

**piece** 143:8,13 143:20,25

**pisses** 237:15

**pivot** 233:20 235:22 236:23

**place** 16:2 245:21 248:4

**places** 143:18

**plaintiff** 1:5 2:3 76:24 77:1 78:8 105:25 106:4,7 121:9,15 123:14 223:3,4,12 225:25 228:25 243:13 246:2 247:2,2 252:10 253:8 254:1 257:1 265:20 274:1,5

**plaintiff's** 106:15 108:4

**plaintiff0** 254:6

**plaintiffs** 121:9

**plan** 204:22,24 205:1,3

**planning** 79:17 80:17 81:7 113:3

**please** 4:9 35:8 138:12,12 191:11 247:15 250:5,7 278:12

**pllc** 2:11

**plus** 92:1 116:6 124:15 156:25 173:22 184:23

**pnc** 123:22 136:8 150:13 152:11 161:6,9 170:18,19,21 171:3,6

**pocket** 156:15 156:15,18

**point** 6:21 13:12 15:14 18:7 19:2 30:14,23 66:16 110:9 123:21 125:25 152:21 158:4 201:23 211:20 216:15 269:1

**policy** 90:14

**pool** 92:17 93:9 142:21 175:16 176:3 273:20,22

**pooped** 240:10

**popping** 262:1

**pops** 262:3

**position** 258:1

**possible** 160:11 175:11

**post** 8:2 178:16 178:21 179:12 179:14 267:21 270:10

**potential** 51:13

**potentially** 260:5

**pottery** 265:23

**power** 176:2

**pre** 99:6,10,11 99:15 200:18,20 201:1,2,24 202:3,7 205:2 209:15 213:25 216:22 218:13

**preference** 82:9 82:11

**prejudice** 250:20 252:22

**prejudicial** 258:3

**premed** 9:18

**preparation** 24:10 25:3

**prepare** 69:5,7 69:14

**preparing** 24:2 70:11

**preposterous** 219:20,22 226:6

**prescriptions** 245:10

**presents** 147:10

**pretending** 259:5

**pretty** 111:7 115:2 129:6,19 181:19 201:6

**prevent** 220:3 246:1 247:2

**prevents** 133:11

**previous** 48:18

**previously** 62:5 251:9,12

**[price - put]**                                                            Page 320

**price** 47:20
  110:24 111:17
**priced** 91:7
**principle**
  199:13
**prior** 23:16,24
  24:20 25:11
  28:25 58:10,13
  58:21 78:8
  79:15 100:5
  142:14 170:19
  172:12 210:17
  239:6
**privilege** 231:5
  231:7,8 241:23
  242:4,8,12,20
  242:21,21,24
  243:3,5,7 258:1
  258:11 259:18
  267:2
**privileged** 242:3
  242:5,7,17,25
  243:1,2 258:7
**probably** 19:6
  70:5 107:6
  114:12 195:13
  204:18 222:2
  223:22 224:5
  234:16 257:19
  264:18
**problem** 95:20
  126:19 187:16
  217:25,25 241:1
**problematic**
  61:17

**problems** 125:8
  126:20 217:1
**procedure**
  278:24,24
**proceed** 256:3
**proceeding**
  17:15 28:16
**proceedings**
  28:19,22 35:16
**process** 29:6
  58:6 59:23
  106:9 205:4
  209:9,10,12,19
  209:22,25
  212:24
**processors**
  51:13
**produce** 163:20
  253:6
**produced** 25:22
  231:5,9 237:3
  238:25 258:2,3
  266:25
**production**
  222:8 242:14
  252:22 267:17
  267:21
**program** 10:21
  10:22 11:3
  18:21
**proof** 135:6
**property** 31:10
  47:23 48:7 49:3
  49:21 50:3,7
  88:21 100:4,5

107:3,25 175:25
  196:7 198:13
  218:7,7 272:15
**proposal** 81:5
**proposed** 80:19
**prosperity** 54:1
  54:4,8 59:15
  194:4 201:1,3
  201:24 202:20
  267:13
**protein** 97:6
**provide** 54:7
  99:9 244:15
**provided** 50:2
  51:15
**provider** 14:17
  133:15
**providing** 24:22
  271:23 272:2
**public** 1:20
  276:19 277:7
**pull** 233:13
**pump** 266:13
**punting** 259:20
  261:13
**purchase** 46:18
  47:8,14,16,18
  47:20,23 48:2
  48:16 50:19,21
  52:22 53:2,15
  55:8 56:3,8,18
  59:14,15 94:10
  110:24 111:17
  113:3 183:14
  206:2

**purchased** 48:7
  48:10 74:1
  100:4,5
**purpose** 118:7
  123:12 137:14
  157:13,22,25
  158:1 203:1,3
  219:24 221:4
**purposeful**
  259:4
**purposes**
  119:18 157:12
**pursuant** 27:10
  48:1 50:7 51:23
  99:10 159:13
  192:19 202:10
  220:10,11,12
  229:15 231:12
**push** 262:13
**pushed** 211:15
**put** 20:1 50:18
  58:2 69:23 71:7
  71:11,14,14,23
  72:3 112:5
  113:14,24
  125:25 143:15
  146:21 148:15
  150:13 165:25
  172:19,21 184:8
  185:10 191:2
  195:16 202:4
  204:15 205:8
  206:1,2,4
  208:23 210:1,9
  218:6,8,9

222:14 225:11
233:19 234:24
235:1,2,2,6,20
235:21,22
236:19 237:5
238:15 245:17
246:15 249:1
252:3 254:20
256:20 259:4
260:3 262:11
263:14 274:6,13
**putting**  139:4
246:25 248:16
249:20 250:15
251:1

**q**

**qualification**
99:10
**qualified**  85:7
85:11,14,16
99:6 114:4
115:13
**qualify**  99:21
115:18,24 116:3
**quarterly**
146:20 149:4
**question**  4:16
4:17 23:10 33:8
35:9 36:8 38:13
40:22 41:3,4
47:9 59:1 62:23
83:7 90:10
105:5 109:12
111:10 114:2,3
185:8 190:9

193:18 212:4
214:3 217:3
219:6 222:19
226:25 228:3
235:8 236:3
268:6
**questioning**
16:5
**questions**  16:14
95:15 250:19
251:7 260:12
274:20
**quick**  233:9
256:5
**quickly**  101:5
**quinnipiac**
10:20
**quite**  130:21
171:17 251:20
**quotes**  265:8,10
265:18

**r**

**r**  13:15 75:12
245:8 265:25
279:3,3
**racking**  136:1
**raised**  214:11
258:8
**random**  164:20
**range**  17:6
117:1,8,18
160:8 174:9
**rate**  87:3 90:25
201:3,6

**rates**  201:21
**rather**  238:7
**rating**  201:7
**reach**  246:2
**reaction**  121:20
**read**  34:2 35:21
35:24 36:4,21
36:24 37:4,9,11
37:17,21 38:1,3
53:4,5,17,20,20
65:16,18,19
78:24 82:17
189:2 228:16,18
228:22 235:4
238:6 240:3,7,8
241:11,13,17
244:17 245:18
245:19,20,23
247:15 256:12
274:25 275:1
278:8 279:20
**reading**  53:22
237:9,11 246:18
248:8
**real**  35:2 48:7
129:5 196:11,14
256:5
**reality**  205:5
**really**  10:6
21:24 29:19
53:2 55:21
63:19 69:19
95:21 108:2
130:23 156:1
188:6 191:5

213:14 251:13
271:14
**reaped**  218:18
**reason**  34:18
37:23 46:13
106:14 107:8
132:8 135:21
169:6 170:23
171:6 193:2
207:21 210:18
210:20 213:24
214:5 215:3,17
216:2 217:21
221:2 278:10
279:6,9,12,15
279:18
**reasonable**
278:17
**reasoning**
203:13,13
**reasons**  107:6
213:3
**recall**  10:8 13:1
16:3,12,18
41:23 76:10
167:10
**receipt**  57:25
119:7 278:17
**receive**  15:20
46:16,20 47:12
47:15,17,23
48:1 52:20
55:25 58:3,20
59:4 60:10 67:2
67:7,10

**[received - reporter]** Page 322

| | | | |
|---|---|---|---|
| **received** 38:10 38:19 39:7,13 39:18,23 41:22 41:25 44:10 47:6 49:14 52:24 56:4 67:16,21 68:4,8 118:4,6 145:11 194:12,20 195:4 221:23,25 229:15 234:4 | **records** 179:2 **red** 135:25 **redo** 210:5 **reduce** 117:15 **refer** 192:18 **referenced** 278:6 **referred** 5:3,15 42:22 49:10 101:23 102:11 123:24 190:25 193:9 199:6 221:11 253:10 | **refused** 105:25 **regan** 1:20 276:18 277:6,24 **regard** 27:1 119:1 137:25 271:12 278:19 **regarding** 222:24 224:14 225:14,16 233:7 243:25 **regards** 224:23 231:4 239:16 | 100:15 102:9 124:15,19 145:2 152:20 153:16 153:20 154:4,6 154:10 156:8,17 156:18,19 163:11 207:24 208:2 230:3 **reminder** 26:14 **renovate** 175:22 **renovations** 175:21 176:1,3 |
| **receiving** 30:8 58:11 61:7,19 128:21 139:19 168:11,15 184:5 211:11 271:5 | **referring** 223:8 235:10 236:5 243:19 **refi** 214:10 229:16 245:8,9 265:25 | **regular** 87:4 96:9 128:13,16 128:21 **related** 228:25 **relates** 224:11 | **rent** 104:4,4 125:17 **rented** 160:13 **reopen** 246:10 **repairing** 71:2 |
| **recent** 151:21 153:17 155:23 155:24 226:11 **recently** 57:15 155:22 270:14 **recognize** 102:14 191:7 193:12 199:9 | **refill** 245:10 **refinance** 85:18 205:17,20 217:9 217:19 221:6 245:5,6 267:14 **refinanced** 215:4,17 | **relationship** 18:18 19:3 22:7 23:16 25:10 26:18 28:11 166:15 170:19 **relative** 277:13 277:15 **relevance** 16:6 | **repairs** 175:18 **repay** 45:18 53:24 **repeat** 21:18 65:10 157:19 268:10 **repeating** 238:19 |
| **recognized** 193:19 **recollection** 161:8,11,13 **record** 53:21 76:2 235:4 250:23 251:4,5 252:20 257:24 258:6 260:2,15 267:20 274:23 274:24 277:10 | **reflect** 200:3 **reflected** 159:8 164:22 178:2 196:19 197:2 199:24 273:13 **reflecting** 102:25 **refreshed** 266:2 266:4 | **relevant** 253:15 **reliance** 51:21 **reloading** 265:21 **remain** 137:21 **remember** 6:14 10:6 16:1 17:6 18:12 33:22 44:17 54:20,22 71:13 73:14 | **rephrase** 4:17 **replace** 95:10 176:7 **replaced** 6:21 **replacing** 176:2 **report** 277:8 **reported** 109:2 109:6,15 **reporter** 1:20 1:20 111:13 |

**[reporter - right]** Page 323

| | | | |
|---|---|---|---|
| 274:24 275:2,5 277:6 | **responding** 235:5,8 236:3 | **retaining** 132:15 133:11 | **rhode** 15:22 16:25 |
| **reporter's** 277:1 | **response** 122:4 | **retake** 107:2 | **ridiculous** 208:5 |
| **repository** 165:11 | 222:11 237:25 239:11 246:21 | **retirement** 3:18 13:2,7 83:23 | 208:7 |
| **represent** 217:23 221:20 | 246:23 247:4 | 99:1 101:6,7,18 | **right** 5:6 7:5,8 7:10,22 8:2 10:2 |
| **representations** 243:21 | **responses** 24:25 222:12 253:1 | 102:2 110:10,16 110:21 112:14 | 12:5,10 13:23 13:25 16:20 |
| **represented** 196:22 | **responsibilities** 67:12 84:6,7 | 112:17,18,19,21 113:7,10,13,15 | 18:6 19:5 22:6 32:7,15 43:2 |
| **representing** 23:4 | 86:20 87:22,24 99:24 272:13 | 113:16,19 116:11 119:11 | 49:17 50:24 51:4,9 55:23 |
| **represents** 51:12 | **responsibility** 66:18,20 86:4 | 119:17,21,24 120:4 124:23 | 60:5 71:22 78:6 78:13 81:9 85:7 |
| **request** 241:25 242:10,11 | 187:14,16 271:24 | 130:8 197:20,22 207:15 208:8,10 | 86:13 87:1 88:8 89:7,16,24 90:1 |
| 243:18,24 244:1 244:3,12,16 | **responsible** 237:23 | 216:4,5,13,16 216:19 246:4 | 91:1,6,7,16,22 92:18 93:1,20 |
| 253:6 | **responsive** 222:8 241:20 | 254:13,14 268:9 268:11 269:4,10 | 94:4,5,16 97:4 98:13 99:6 |
| **requested** 24:23 277:9 | 242:11 244:5 258:19 267:8 | 269:12 | 102:23 103:21 103:23 104:10 |
| **requests** 222:8 241:21 253:11 | **rest** 131:16 230:7 | **return** 109:9,15 109:19,21 | 104:15 107:15 110:23 111:5 |
| **require** 127:23 | **restart** 209:8 | 147:22 202:20 | 112:4,6,21 |
| **required** 54:1 156:10 | **restroom** 131:18 | **returned** 278:16 | 113:1,4,18 115:20,21,22 |
| **requires** 155:1 | **result** 51:19 202:24 204:19 | **returns** 108:23 108:24 120:25 | 116:14 117:5,21 119:19 121:25 |
| **reserve** 14:12 46:19 118:8 | **results** 233:22 234:22 | **review** 167:12 167:15 168:18 | 123:20 124:21 126:16 127:5 |
| **resident** 17:17 | **resume** 74:21 | 238:23 277:9 278:7 | 128:14 129:19 130:21,22 |
| **residential** 3:16 194:3 | **retain** 23:3,6,9 | **revise** 180:7 184:24 | 135:17 139:1,21 140:21 141:24 |
| **respect** 107:25 | **retained** 23:25 229:8,10 230:7 | **rhetorical** 83:17 105:5 | |

**[right - saying]** Page 324

142:2 144:13,22
146:5,15 151:17
153:17 154:17
155:22 156:20
160:17 162:8,15
163:15,18 164:4
165:16 166:17
168:5 169:3,10
169:18 170:22
171:7,17,18
172:4,11 173:8
173:10,20,22
174:2,16,22
175:24 176:9,20
177:5 178:5,8
178:11,12,20
179:11,15,22
180:2,7,22
181:13,19 182:9
183:23 184:23
185:20 186:22
189:11,16,19,22
190:6 192:8,22
194:3,20 195:13
195:18 198:6,17
202:11 203:15
203:24 206:9
207:2,20 208:22
211:4 213:21
217:25 218:2,12
219:16 222:7
228:10 231:21
232:1,5 233:1
233:12,17
234:18 235:14

235:20,22,24
236:11,22 237:5
237:14 238:13
238:23 239:21
239:25 240:23
241:10 244:11
245:11,17
246:15,20 247:6
247:9,15,22
248:23 249:1,4
249:9,11,12,12
249:15,15 250:8
250:10,13,16,17
251:1,4,19
252:1,3,7,12
253:12 254:10
254:17,20 255:7
257:6,14 259:8
259:13 261:7,8
261:12,21 262:1
262:4,4,23,25
263:3,22 264:6
264:10,23 265:1
265:20 266:3,5
266:9,11,14,16
266:18,19
267:16 269:13
270:3,7 272:25
274:11,16,20,22
**rights** 165:3
**road** 170:22
 195:20
**rolled** 86:24
**rollover** 268:13
 268:17

**romantic** 19:2
 22:6 25:10
 26:18 28:11
**room** 20:2,3
 72:18 73:20
 184:16 260:14
**roughly** 9:5
 13:3 24:19
 30:20 92:11,13
 95:13 131:15
 175:3 182:8
**rounds** 19:24
**rousseau** 1:8,12
 18:5
**rousseau1** 75:20
**rule** 243:4
 278:24,25
**rules** 4:15 16:9
 278:18
**running** 135:25
**russo** 18:6

**s**

**s** 14:12 75:12
 256:25 259:13
 279:3
**sahara** 133:7
**sailed** 243:9
**saint** 11:12 12:4
 18:16 19:12
**salary** 11:18
 12:10,12,15
 27:17,20 30:8
 40:16 85:5
 108:14 111:1,4
 111:7 112:10

114:8,10,13,15
114:21,24
115:12 125:12
127:14 129:19
129:22,25
168:10 171:21
172:2,3,8
179:12 274:9,12
**sale** 105:24
**sanction** 65:13
 66:2 67:4
 121:15 122:3,13
**saravis** 1:20
 276:18 277:6,24
**sausage** 96:8
**save** 112:14,16
 112:21 113:7,12
 116:20,22
**saved** 124:23
**saving** 130:23
**savings** 3:18
 13:7 147:9
 150:2 151:12
 160:20 162:1
 184:8 191:20
**saw** 19:20,23
 33:9 34:4,8
 64:10 164:8
 221:17
**saying** 41:21,24
 44:25 45:4,10
 45:13 72:19,20
 79:10 99:3
 101:13 112:2
 125:9 126:17

**[saying - sense]**                                      Page 325

137:1 139:23
141:15 150:17
153:5 155:20,23
183:18,21
201:10 235:9
236:2,3 237:14
249:22,22
255:10 258:16
**says** 46:18 47:2
50:15 51:11
98:21 118:7
160:16 161:16
165:5 168:4
180:4 191:14,20
191:22 192:7,11
194:6 196:11,14
196:14 198:13
198:21 237:1,14
237:19 238:4
239:4,5,19
242:1 250:7
255:22 266:20
266:22
**sb** 14:6,7
**scaffolding**
254:18
**schedule** 244:7
255:11
**scheduling**
255:17 256:9
**school** 7:8,9,11
7:18 8:2 10:18
10:18 13:18
24:8 79:1 209:9

**schwab** 120:12
120:20 169:1,2
169:6,15
**science** 9:21
**scope** 67:6 78:2
175:24 176:1
263:24 267:21
**scrap** 143:25
162:19
**screen** 237:11
263:14
**screens** 176:2
**scroll** 239:17,18
239:25,25 249:9
249:11,12,16,25
250:6,8 253:18
255:23
**scrolling** 248:21
**seal** 276:13
**search** 75:1
222:7,19,23
223:11 224:15
224:17,22
230:17,20,23,25
230:25 233:9,13
233:22 234:2
241:6 252:1
255:14 258:20
258:22 262:8,16
262:17
**searched** 251:10
**searches** 259:24
260:11,17,18
261:7

**searching**
223:15,16 234:3
257:9 262:7
266:10
**second** 23:12
50:12 53:20
85:16 128:25
182:3 193:15
195:22,23
196:10 198:7
228:20 236:22
248:6 253:20
255:17 257:18
**secondary** 87:4
**secoya** 14:12
46:18 47:22
49:21 50:3 56:9
73:17,18,22
74:3,9 85:14,16
86:12 88:23
90:16 118:8
175:25 199:12
218:8,15
**section** 51:24
**security** 247:5
**see** 5:24 19:18
33:23 42:25
46:25 50:14
51:8,11 52:1
54:19 65:20,24
98:20 102:7,23
146:6 171:15
172:6,13 175:1
176:25 178:8
180:4,21 181:12

183:13 191:25
192:10 193:25
198:15,20,23
199:13,18
210:25 226:7
227:6 233:17,20
233:21,21 234:2
234:25 235:2,6
235:21 239:21
250:16 252:4,15
252:16 253:6
259:1 260:19
261:16,19 262:2
262:3 267:9,10
**seed** 239:20
**seeing** 255:21
**seem** 39:4
**seems** 29:16
**seen** 17:23
25:25 32:20,20
32:25 33:2 73:8
74:14,17,20,23
74:25 170:13
221:14 238:21
247:22,23
**selected** 75:15
171:3
**send** 138:24
139:25 140:24
234:11
**sending** 255:22
**sense** 70:16
112:17 208:12
271:2

**sent** 257:18
261:22 262:24
**separate** 49:20
52:17 144:14
194:19 205:11
224:24
**september**
165:3 235:12
236:7 243:8
**sequestered**
148:3
**sequestering**
178:14
**served** 231:11
242:21 253:5
**service** 15:11
133:5 221:21
**servicers** 51:14
**services** 53:25
**serving** 24:24
**set** 51:16 86:23
138:16 139:12
140:8,20 141:7
**setting** 1:19
252:25
**settlement** 54:4
**seven** 155:22
184:18 264:1,8
264:15,16 265:2
**several** 36:11
85:10 244:4
**shape** 60:8
**shared** 271:12
**sheesh** 62:25

**sheet** 278:11,13
**ship** 243:9
**shoot** 246:9
**short** 22:14
68:24 75:25
104:15 105:24
131:21 165:18
208:8 217:7
250:24 260:16
**shortfall** 207:6
**shorthand**
277:6
**shortly** 77:8
**show** 163:25
222:11 234:22
236:24 244:8
253:12 254:22
**showed** 255:6
**showing** 243:22
**shown** 255:11
**shows** 178:3,4
254:22 261:23
**shredded** 7:1,2
**shuttled** 155:15
**shuttling** 154:5
**side** 134:25
172:19,21
256:20 274:7
**sighing** 72:18
**sign** 16:20 43:13
109:17,21
278:12
**signature** 43:15
51:6,9,17
160:25 170:4

193:20,25
198:21 276:17
277:23
**signed** 26:2
41:21,24 43:7
49:2,14,18,20
49:22 50:6,23
51:2 52:10,10
52:12 53:4
55:13 59:16
60:3 84:21,23
87:16 98:12
99:3,7 108:25
128:17 142:5
160:17,17
165:21 170:15
192:19,20
194:10,23 195:1
208:17 209:12
278:21
**significant**
176:5
**signing** 41:23
54:20 120:25
**similar** 73:2
115:2
**single** 9:25
125:16 138:20
185:6 208:13
**sisters** 231:22
**sit** 28:14 120:22
145:3
**situation** 33:10
104:16,21,24
123:7 125:7

131:5 172:16
187:6 203:2
**situations** 21:6
**six** 117:1,7,18
151:21 153:18
153:22 155:22
239:19 264:1,8
264:15 265:2
**sixty** 109:25
**skip** 244:23
258:13
**sleeps** 271:25
**slightly** 197:7
**slip** 211:10
**slow** 87:13
**small** 135:20
164:19
**smart** 223:18
**smarter** 208:9
**snapshot** 200:7
**social** 15:8,9
**sold** 88:25
**sole** 269:25
271:22
**solutions** 278:23
**somebody** 18:7
34:15 42:3 58:4
61:8,19,20
66:14 100:21
212:22,23
**someone's** 190:8
190:12
**somewhat** 90:21
**soon** 131:19
208:25 221:24

**[sophie - stored]**

**sophie** 240:13
**sophisticated**
124:21 125:24
251:21
**sorry** 21:18
26:16 31:1
35:10 65:11
83:20 87:10
92:5 111:14
152:21,23,23
169:22 177:15
177:25 182:13
195:12 237:17
247:14,14
256:18 265:5,21
266:4
**sorts** 94:11 99:9
**soul** 232:19
**source** 131:13
168:13
**sourced** 274:9
**south** 157:2
**spam** 224:10
**speak** 22:24
23:1 24:5
209:21
**speaker** 235:25
**speaking** 16:8
**specific** 31:17
63:20 157:13
163:11 222:19
227:8,10 265:23
**specifically**
51:12 122:12
141:5 223:15

224:22 225:25
**spelling** 259:13
**spend** 94:10
144:8 218:23
246:3
**spending** 270:2
270:5,7,12,23
270:25 271:4
**spent** 8:14
158:16 174:4
175:8 177:5
183:9 184:9
269:22,22
**spoke** 241:14
**spoken** 24:3
**spot** 73:5 260:3
**spots** 213:11
**spouse** 149:12
149:14
**spreadsheet**
72:14
**square** 176:9
198:20
**squares** 196:20
**stack** 192:16
**stalking** 223:10
**standard** 87:4
176:11
**start** 8:11 28:15
30:17 68:15
111:4 128:16
142:2 163:4
222:21 249:6
256:25 266:5
269:2

**started** 8:5 11:8
12:24 20:18
22:6 28:13
33:24 80:16
89:9 110:7
115:5 128:13
129:3,16 136:12
136:19 138:18
144:4 164:12,13
205:6
**starting** 11:15
11:18 130:5
181:13 209:9,9
**starts** 248:22
**state** 1:21 4:9
15:20 16:25
228:11 276:4,19
277:3
**stated** 134:1
147:23 184:2
279:21
**statement** 3:18
24:17 41:21,24
42:4 50:23
59:19,20 99:3
99:18 102:16,17
103:24 104:2
168:18 169:19
169:20 171:10
174:7 181:7,25
191:20 192:19
197:14 236:11
**statements**
24:14,14,15,16
24:16 49:14,22

52:3 58:23
162:12 166:3
167:10,13,15
168:15 183:13
236:18 265:17
**states** 1:1 51:24
78:24 79:8
**stating** 54:17
**statuses** 132:14
**statute** 237:22
278:18
**stayed** 11:25
**stays** 268:17
**steady** 40:14
**stenographic**
277:11
**stenographica...**
277:8
**step** 260:14
261:4
**stepdaughter**
84:10
**stepfather** 85:1
**steven** 13:15
**stop** 96:3 105:23
165:16 239:20
250:9
**stopped** 103:16
106:14,19
107:11
**stopping** 132:15
133:4 189:22
219:11
**stored** 233:23
234:5

**[story - take]**                                                        Page 328

| | | | |
|---|---|---|---|
| **story** 9:13 | **substantive** 251:14 | **supposed** 165:10,23 | **suspend** 274:16 |
| **strategize** 121:13 | **succeeded** 22:10 | 222:13 227:11 | **switch** 127:8 |
| **street** 2:5 | **successors** 51:14 | 227:15 229:18 | 137:24 139:6,23 |
| **stress** 62:17,19 | **sucks** 227:4 | 229:20,21 | **switched** 9:18 |
| **strike** 61:6 | **suddenly** 144:5 | **sure** 5:24 12:23 | 12:23 102:5 |
| 122:25 123:6 | **sued** 21:11 22:9 | 19:16 36:12 | **switching** 127:23 137:22 |
| 197:5 | 83:2,12 124:25 | 37:12 40:19 | 138:19 |
| **strong** 258:4 | 125:22,23 | 42:5,12 50:11 | **swore** 197:10 |
| **structure** 121:13 122:1,10 | **suffer** 51:20 | 54:25 59:25 | **sworn** 4:3 41:21 |
| **stubs** 3:19 | **sufficient** 54:2 | 60:24 67:19 | 41:24 42:4 99:3 |
| **student** 145:15 | 85:21 86:2,17 | 68:16,20 73:1 | 99:18 103:24 |
| 145:19 164:18 | **suggested** 278:16 | 73:12,15 76:12 | 104:1 172:9 |
| 196:1 | **suit** 23:7 | 76:13 82:18 | 197:13 276:10 |
| **study** 9:17 | **suite** 2:12 | 88:24 93:6 95:3 | **system** 21:14,19 |
| 179:2 | **suites** 1:17 | 97:17,19 109:1 | **t** |
| **stuff** 147:10 | **sum** 53:24 | 129:6 133:25 | **t** 254:8 264:17 |
| 238:6 241:18 | 199:23 | 144:25 147:11 | 277:6,24 279:3 |
| 249:14 260:5 | **summary** 178:2 | 147:11,15 | 279:3 |
| **stuffed** 236:12 | 254:24,25 | 158:24 162:13 | **table** 233:19 |
| **subject** 67:4 | 265:16,18 | 175:2 183:17 | 234:24 235:6,21 |
| 227:21 257:17 | **summer** 81:2 | 187:3 192:6 | 237:5 238:15 |
| 257:19 259:14 | 111:3 | 218:4 221:22 | 239:20 245:17 |
| **subpoenas** 253:4 255:22 | **supplement** 260:16 | 235:23 237:6 | 245:22 246:16 |
| **subsequently** 18:1 | **supplemental** 260:4,8,21 | 243:11 247:16 | 246:25 248:4,17 |
| **substance** 213:15 226:18 | 267:20 | 249:5 251:8,17 | 248:21 249:20 |
| 226:20 | **support** 64:5 | 256:16,24 266:8 | 249:23 250:1 |
| **substantial** 57:2 | 85:4 207:8 | **surgeon** 18:21 | **take** 4:20,21 |
| **substantially** 111:8 | **supporting** 123:12 125:17 | 72:22,25 | 5:18 6:1 13:19 |
| | | **surgeries** 20:3 | 34:20 50:10,12 |
| | | **surgery** 9:14 | 68:17,18,20 |
| | | 18:22 | 86:7 87:11,24 |
| | | **surprise** 120:22 | 97:20 98:15 |
| | | **surprised** 29:3 | 99:23 137:9 |
| | | | 141:21,22,24 |

149:18 150:13
155:10 156:11
167:17 168:22
169:10,21
172:10 178:15
180:2 198:6
204:14 208:9
209:6 214:11,17
215:8 217:6
243:10 246:4
247:2,3,13
248:1 249:4
250:11 253:16
260:19
**taken** 68:24
75:25 101:18
113:20 131:21
158:15,15
165:18 186:24
189:13 190:18
215:21,22 217:7
218:16 250:24
**takes** 265:5
269:1
**talk** 27:19 28:14
28:14 29:19,20
31:10 54:23
56:25 75:1
80:10 81:25
87:9 89:14
106:4 119:16
121:8 181:4
186:7 188:12
215:1 223:1
226:9,10,20

227:19,23 232:5
256:3,5 259:21
260:15 267:3,4
267:4,17 273:18
**talked** 63:20
77:3,5,10 78:21
81:23 99:22
123:15 124:12
134:11 142:17
173:19 175:12
206:16 226:12
226:25 228:24
231:17 273:14
**talking** 22:3
28:13 44:14
53:1,1 68:15
76:2 94:25
111:11 144:11
172:15 182:14
188:13 191:3
226:13 240:1,2
248:12 253:4
261:19 263:25
**talks** 255:14
**tally** 143:9
**tax** 93:17
108:23,24 109:9
109:15,19,21
120:25 147:22
178:16,21
179:12,14
182:14 270:10
**taxes** 86:7 99:1
146:19,20,21,24
147:14,19 148:3

148:14,23 149:2
149:11 160:5
172:15,16,18
175:4 178:11,15
**technicality**
136:25
**technically**
140:1,6
**technique** 62:20
**technology**
125:24
**tel** 2:6
**telephone** 14:14
76:14
**tell** 16:6 19:25
30:11,13 34:15
62:9 66:14 88:2
145:10 152:15
155:21 158:14
158:17 164:10
167:11 210:25
227:10,17 228:8
234:8 242:10
243:7 244:6,16
270:24
**teller** 135:24
**telling** 41:16
207:20 208:4
239:16
**tells** 179:4
**ten** 14:24 29:16
58:13 96:13,21
96:22 124:18
228:3 264:2,2,8
265:3

**tennant** 103:21
**tens** 95:13
**term** 64:10
106:22
**termination**
32:13
**terms** 258:19
273:4
**test** 15:1 262:1
**testified** 4:4
69:1 70:6
114:15 251:12
**testify** 89:4,6
145:3,5 159:17
164:3 213:17
**testifying**
155:25 185:5
210:15
**testimony** 58:15
61:22 68:22
71:16 160:7
180:8,11 188:9
206:18 213:13
213:21 217:4
251:15 278:8,17
**text** 76:19,21,23
225:18,19,23,25
226:8 230:17,20
230:23 236:24
238:18 240:14
247:24 251:6,20
252:24 254:1,12
254:19
**texting** 15:7,8

[texts - time]                                                                          Page 330

| | | | |
|---|---|---|---|
| **texts**  240:18 | 116:2 122:1 | **thoughts**  58:17 | **tickets**  160:24 |
| **thank**  16:10 | 128:25 129:15 | 236:16 | **tight**  126:21 |
| 153:11 245:18 | 131:14 141:2,4 | **thousand**  39:8 | 200:2 |
| 245:20 249:8 | 144:24 145:17 | 90:6 93:7,12 | **time**  1:16 4:20 |
| 274:23 | 149:2 160:21 | 104:6 109:25 | 7:16 9:8 11:1,11 |
| **therapy**  10:4 | 165:23 176:8 | 116:16,17,20,21 | 12:20 13:6 |
| **thing**  56:22 89:1 | 186:16,21 187:9 | 116:22 204:15 | 14:19 17:17,24 |
| 89:4 131:1 | 187:12 193:1 | 218:10,22 | 18:12 20:16 |
| 139:13 144:24 | 196:16 204:17 | **thousands** | 21:10,14 22:1,3 |
| 156:1 238:1 | 204:21 220:8,10 | 95:14 131:4,8 | 22:12,18 23:16 |
| 241:11 244:20 | 220:11 221:25 | **thread**  250:13 | 23:25 25:2 |
| 244:24 245:22 | 225:5 241:19 | 254:12 | 28:13 29:24 |
| 247:17 248:9 | 242:3,10 243:15 | **threads**  250:16 | 46:20 47:19 |
| 250:7 252:4 | 248:22 255:6 | **three**  15:19 85:8 | 48:7 56:25 |
| 255:16 257:15 | 257:16,22 | 85:8,20 88:15 | 58:21 60:22 |
| 262:13 263:7 | 258:19 260:11 | 88:16 89:23 | 71:1 75:14 |
| **things**  62:17 | 260:17 262:12 | 90:9 91:22 | 77:12,21 81:5 |
| 71:7,11 72:12 | 266:24,25 | 92:23 94:22 | 81:10 83:16 |
| 84:4 92:21 | 267:24 | 147:8 150:15,24 | 86:16 88:20 |
| 94:17 116:11 | **third**  158:8 | 178:7 182:9,18 | 89:14 95:22 |
| 142:17,23 | 196:11,12 | 182:19 192:10 | 96:24 97:21 |
| 164:20 221:4 | 222:12,16 254:2 | 198:14 208:1,1 | 100:18 102:5,6 |
| 226:2 228:8 | **thirteen**  167:25 | 222:15 250:16 | 103:17 104:20 |
| 229:22 260:13 | 264:3,4 | 255:5 260:9,18 | 108:12 111:1 |
| 262:25 270:8 | **thirty**  97:14 | 264:1,7,10,15 | 113:1,25 126:20 |
| 273:24 | **thought**  58:5,15 | 264:20,21,25 | 128:11,17,22 |
| **think**  9:4 17:4 | 59:23 66:12 | 265:1,2 266:4 | 129:3,16 130:9 |
| 34:1,10 37:23 | 79:14,15 101:10 | 272:21 | 136:9,12,22 |
| 59:12 66:19 | 101:12 109:23 | **threw**  143:22 | 140:25 142:13 |
| 67:6 70:10 74:7 | 110:1,4 139:4 | 145:4 162:20 | 146:19 154:2,25 |
| 78:22 79:25 | 176:14 208:5 | 164:4 | 155:7,10 158:4 |
| 80:13,15 85:23 | 212:10,13,16,24 | **ticket**  150:2 | 158:8,13 163:1 |
| 95:5 98:5,9 | 218:4 219:23 | 151:12 160:21 | 170:24 173:14 |
| 107:8,25 108:2 | 261:9 | 162:2 | 174:13 176:22 |
| 110:6 114:19 | | | 177:3,7,15,19 |

**[time - turn]**                                                              Page 331

195:12 200:7,19
200:21,22
202:11,12
203:25 204:9
206:22 208:22
210:16 211:20
216:12,15 219:2
221:2,17 222:3
226:11,14
250:21 259:22
268:6 269:18
**times**  7:25 9:18
12:23 35:20
71:19 85:20
102:5 142:21
150:15 162:22
184:3 211:18
212:5 228:3
242:20 255:1
**title**  11:13,15
43:2 51:24
**today**  4:7
119:19 120:22
155:25 225:21
226:21 233:6
**today's**  43:21
**together**  58:2
80:14,16 113:4
149:23
**told**  17:4 29:10
62:5 63:5 72:1
105:14 106:3,12
106:14 132:18
134:9 145:9
185:17 211:8

213:21 214:5,23
215:3 216:8,11
216:13,15
226:10 232:19
232:21
**took**  9:4 106:24
115:8 130:8,11
152:11 155:4,14
205:22 215:18
216:17 221:2,6
221:24 234:6,7
234:9,13 251:5
253:23 255:13
255:23
**tool**  233:13
**top**  98:1,6
145:17 176:8
194:6 237:11
248:15 255:21
**topic**  57:17
**total**  12:17
192:13 196:22
199:18 270:21
**totaled**  173:19
**totally**  95:22
**touch**  249:7
**touching**  237:9
249:6
**towards**  50:18
50:21 55:6
112:5 185:10,16
202:16 208:23
210:10 214:6
**town**  10:10

**traffic**  226:14
**trained**  20:2
**transaction**
60:11 135:16
141:4 152:20
154:25 156:8
157:5 158:17
**transactions**
121:14 122:10
135:23 153:21
157:8 162:16
163:12 191:20
**transcript**  275:3
277:9,10 278:6
278:20
**transcripts**
278:14
**transfer**  9:7
149:19 154:21
157:23 191:16
191:23 192:4,7
192:11 213:24
245:11 265:22
**transferred**
7:25 8:9 54:3
148:19 150:16
167:3 179:19
218:2 274:11
**transferring**  9:5
140:12 154:18
**transfers**  68:4,5
141:15 177:8
231:15 243:13
246:1 253:9

**trick**  153:10
**tried**  105:24
238:1
**trouble**  100:17
104:25 125:5
126:18,18
136:16 140:12
206:6 207:8
269:16,18
**true**  50:3,7
51:16 59:19,20
104:22 179:20
216:10 277:10
279:21
**truth**  203:7
**truthful**  99:13
99:17
**truthfulness**
206:16
**try**  29:7 87:8
188:12 226:2
241:5 261:21
265:18,20
**trying**  33:13
69:21,22 78:9
153:10,11,12
154:3 193:21
237:21 244:21
247:18 250:20
**tune**  183:7
**turn**  142:1
159:23 160:15
169:18 170:2
191:11 192:15

**[twelve - united]**                                                      Page 332

**twelve** 264:3
**twenty** 70:2
  175:4 222:20
  264:10
**twice** 162:20
  272:19,19
**two** 9:4,5 10:25
  15:18 37:3
  43:25 54:24
  57:9,10,17
  67:22 71:21
  77:16 78:3
  81:17 85:7 89:2
  89:8 95:11
  109:2,6 111:11
  115:21 119:18
  120:4,6 121:14
  122:11 131:10
  132:9 143:18
  146:18 147:7,13
  157:7,9,11
  170:24 171:3
  177:3 180:21
  183:8 184:25
  188:2 192:10,13
  192:22 194:18
  204:19 205:11
  206:10 219:24
  223:8,11,21
  224:5 228:11,12
  251:13 254:11
  255:1,23 264:1
  264:7,15,20
  265:2 269:4,10
  269:22 270:20

271:10 272:21
**type** 10:21
  42:10,15 72:7
  72:10,13,20
  73:2 88:6
  125:15 143:7
  164:21 230:25
  233:14 234:1,9
  234:18 240:16
  240:23 241:8
  245:5,8 252:7
  252:10 254:8,13
  254:17,24 255:2
  256:22 259:8
  262:2,17,19
**typed** 70:22
**typical** 97:5
  273:3
**typically** 96:3
  96:16,20 97:3
  97:13 141:17,20
**typing** 74:15

**u**

**u** 75:12 241:5
  264:17
**uh** 40:17 46:4
  53:19 73:19
  74:19 83:13
  93:16,19,21
  116:24 148:9
  151:18,20
  152:12 160:2
  161:3 162:10
  163:7 166:20
  171:2 173:24

266:8
**ultimately** 9:19
  204:18
**umass** 7:21 8:5
  8:11,14 9:2 10:8
  10:14
**unaware** 141:12
  251:23
**unclear** 165:1
**under** 16:9
  42:14 49:15,17
  49:22,22 50:23
  51:2 52:6,10
  55:13,19 58:21
  65:14 78:18
  85:2 99:18,20
  145:11 156:19
  195:20,20
  196:23 210:15
  230:25 234:19
  240:17,18
  244:17 245:6
  254:22 255:14
  257:6,14 259:8
  264:4,6 265:12
  265:14 278:18
  279:20
**undergrad** 7:19
  9:20 10:5
**undersigned**
  51:12 276:9
**understand**
  4:16 22:12
  27:16 32:8 33:8
  41:4 42:2,8

44:14 52:9,25
  54:1,4 60:16,18
  66:1 67:15
  69:19 84:24
  106:22 114:2,3
  132:11,13,19
  137:1 157:20
  169:2 172:7
  217:3 220:15
  226:24 227:11
  250:2
**understandable**
  95:22
**understanding**
  21:9,22,25 22:9
  33:6,10 58:21
  69:17,20 72:16
  78:13,18 81:15
  81:18 107:10
  119:23 122:9,11
  129:7 174:24
  189:12 190:7,11
**understood**
  60:25
**undertaken**
  122:11,12
**unemployed**
  202:12
**unfrozen**
  216:19
**uniform** 3:16
  194:3
**united** 1:1 51:24
  78:24 79:8
  191:9

**university** 8:4
8:10,16,22 9:9
10:20
**unmanageable**
201:8
**unnecessary**
253:2
**unprivileged**
241:22 242:2,6
242:16
**unrelated** 73:6
**unresponsive...**
248:24
**unusual** 122:25
149:8 156:7
188:9
**upcoming** 185:4
**upkeep** 176:4
**upper** 98:20
196:15
**upstairs** 156:10
175:17,22,23
**usaa** 90:24 91:3
**use** 15:3,5 75:11
75:17,18 100:21
100:25 101:6
124:9 127:2
138:4 139:7,14
172:13 208:8
215:9 216:4,5
216:17,18 220:9
221:7,7 230:10
**used** 59:14,15
149:12 169:7
207:6,12 230:4

230:7 247:19
278:20
**using** 74:17
**usually** 107:18
224:10

**v**

**v** 1:7 278:4
279:1
**vacation** 156:11
**value** 39:2
**values** 112:20
**varies** 89:23
95:19,24 97:1,2
97:5 163:1
178:23 179:4
**various** 132:14
**vary** 68:14 95:6
179:7
**vegetable** 97:7
**verbal** 45:17
46:5
**verbally** 77:5
**verge** 16:5
**verify** 278:9
**veritext** 278:14
278:23
**veritext.com**
278:14
**veronica** 254:25
**versus** 116:15
257:19
**video** 247:12
**view** 145:14,18
**violated** 239:6

**violation** 239:1
**visit** 273:23,24
**vs** 1:6 278:4
279:1

**w**

**w** 256:25 259:13
**wait** 6:13 26:14
35:8 111:10
128:24 180:23
205:9 215:25
218:15 257:15
261:9 264:20
266:1
**waiting** 247:5
**waitress** 10:5
**waive** 274:25
**waived** 241:24
242:9,13 258:1
258:2,9 266:25
**walk** 207:23
**want** 8:16 14:3
25:14 26:23
40:24 59:25
60:5 62:12,13
63:1 100:23
104:16,17,21
112:11 113:19
122:7,15 135:15
140:7 180:7
189:25 190:2,3
191:3 214:17,18
234:24 236:23
237:6 244:8,10
245:20 247:16
249:5,7 252:21

255:3 259:24
260:3,9,10,15
261:16 262:2,3
262:25 273:19
275:2
**wanted** 9:9,14
37:8 62:19 75:6
89:4 112:13,16
124:9 132:13
133:8 156:11
207:16 208:3
209:11
**wants** 238:4,10
**warrant** 188:18
190:8
**washing** 176:2
**water** 31:20
91:13,14,14
93:5
**way** 49:19 60:8
61:5 92:2 96:3
100:19 122:1
140:10,11
141:22 144:3
157:17,24
160:23 204:19
207:16 208:3,6
210:11 218:4
227:16 248:2
259:4
**ways** 121:8
140:10
**we've** 63:19
131:3 142:20,21
142:22,23 156:9

**[we've - witness]**                                              Page 334

175:12,17,18
273:12
**weatherstone**
103:9,12,13,18
104:3,5
**web** 180:4
**wedding** 15:23
15:25 25:17
81:6
**week** 24:19,20
25:5 97:17,18
272:18 273:3
**weekend** 272:1
**wells** 147:3
152:13,17,22,23
153:1,5 158:25
159:8,14,15
160:4 163:24
164:6 217:12
229:24 230:9,12
**welsh** 1:4 20:6
20:17,20,21
22:9 26:20 27:1
29:13 33:11
36:25 57:3,22
58:8,10,12 65:9
65:14 210:16
222:24 223:1
224:12,14,18
225:7,14,17
230:18 233:14
234:2 256:25
257:7,14,19
259:9 264:6
278:4 279:1

**went** 7:19 8:15
8:22 9:2,19
10:18 139:12
144:17 146:22
151:23 152:13
153:4 156:11
158:17 159:5
161:21 164:1,6
164:10 172:4
178:3 181:10,16
205:24 217:12
217:19 218:24
220:23 221:3
229:6 251:5
**whatsapp** 15:3
**white** 1:17
**wife** 28:12 119:5
**wifi** 259:16
261:24
**willful** 239:1
**william** 1:7 18:8
278:4 279:1
**williammartin...**
170:10
**willing** 60:12
116:25 117:17
118:21,25 119:5
257:23,24 258:5
258:11 267:1
**wire** 191:22
192:4,5,7
194:12,21 195:4
195:14
**withdraw**
112:17 150:8

**withdrawal**
146:1 150:2
151:5,12,16
156:13 159:13
159:25 160:16
160:20 162:2,9
165:20 166:19
166:22 207:15
**withdrawals**
119:16 208:15
**withdrawing**
110:20
**withdrawn**
110:10,16
119:24 120:16
120:19 150:6
160:19 168:2
**withdrew** 113:9
119:10,20 120:3
120:9,12
**witness** 4:3
20:14 23:22
26:16 34:8
35:10 36:2,9
38:15,23 39:11
39:16,21 40:1
40:23 41:4,10
41:15 43:10
45:9,23 48:25
52:9 53:11 59:3
59:23 60:8,15
62:24 63:1
65:24 66:24
67:10,19 68:2,8
68:23 71:6 73:5

79:23 84:1,14
87:10,14 92:7
94:1 98:5
101:16 105:5
106:19 107:22
108:7 111:12,14
116:9 117:11,23
117:25 118:6,14
118:19 121:4,23
122:7,21 123:4
124:14 126:12
128:24 129:15
130:11 132:11
134:6 136:5,25
140:17 144:10
144:20 152:23
153:1,6,20
154:9,15 156:22
157:19 158:3,9
158:14 159:10
163:24 164:6,25
166:8 167:7
175:15 177:12
178:18,23
181:22 184:8,20
185:8,13 186:19
187:2,12 188:5
188:14 190:2,15
190:20 191:2,5
193:21 195:7
196:25 197:16
201:10 202:2,16
204:24 206:14
206:25 209:17
210:9 211:19

**[witness - year]**

212:3,10 213:1
213:10 214:5
219:9 221:1
226:24 227:4
229:10 237:17
239:3 241:17
243:5,11 244:10
244:20,24 245:1
245:3 247:18
248:7,10,13
252:17 253:13
253:21,24 254:3
255:8,18 258:6
260:12 261:2,5
262:9 263:19
266:20 267:12
268:2 270:17
272:5 273:20
274:20 276:13
278:8,10,12,20
279:23
**women's** 252:8
252:8
**word** 34:21 41:7
42:8,14 55:12
55:13 169:3
230:18,21
233:14 253:25
**words** 41:1,6
**work** 19:9 28:13
75:18,18,19
95:21,23 96:3,4
96:6,18,19,19
96:20,25 111:4
125:20 127:7

245:9 254:18
**worked** 12:15
18:14,20 19:12
19:19
**worker** 245:12
254:15
**workers** 255:1
**working** 11:8
74:8 101:4,9
103:16 110:3,6
110:7 114:11
124:9 127:6
129:3,15,16
132:24 136:12
137:15 138:14
138:15
**workplace** 28:8
**works** 21:23
31:22
**worry** 62:18
208:13
**worth** 197:18
**wrap** 259:25
260:5
**writ** 188:20
**write** 43:17 45:4
137:10,13
141:20,21
234:16
**writing** 157:23
161:17 225:18
226:2 233:2
**written** 44:25
45:4,10,14 46:1
77:7

**wrong** 257:15
**wrote** 34:1 51:1
143:13 172:9,11

**x**

**x** 254:8

**y**

**y** 14:12 75:12
**yahoo** 75:15
257:9
**yahoo.com.**
75:12 170:10
**ye** 136:11
**yeah** 8:12,18
12:18,21 14:11
15:8,10 19:8
21:21 22:16
23:12 25:15
30:24 56:24
70:22 73:1
74:16 75:23
77:11 84:23
86:8 102:24
103:8 105:11
106:5 111:6
113:2,8 124:22
125:18 126:1,21
127:15 128:2
129:11 133:16
139:9 140:24
141:6,10 142:16
143:12,23 144:2
144:16 146:24
149:12,17 151:8
151:22 152:1

153:8,20 156:5
160:9 163:4,9
165:13,15 173:5
173:5 188:5
191:15,16,17,19
191:25 194:16
194:18 203:10
206:17 215:11
216:11 222:16
223:5 224:1,5
224:10 232:11
234:15,20,23
236:17 237:10
238:16 241:2,7
241:11 243:11
245:1 246:7,11
246:17,19
247:10,12
248:10,13
249:14 250:23
251:3 252:13,14
254:7,21 255:4
255:16,18
256:11 257:10
257:10,10,16
258:10 261:25
262:15,15 264:5
266:22 268:1,2
272:5 273:14
274:14 275:4,6
**year** 7:13,24 8:1
8:10,13,16 11:5
11:9,25 13:9,16
13:22,23 15:16
17:3 19:15

**[year - zinn's]**                                                        Page 336

26:23 30:19
70:1 80:12 81:1
81:2 86:5 90:6
108:19 109:8,14
110:7 112:10
129:9 130:3,6
130:17 151:19
178:20 185:3,4
201:14 205:15
205:17,20
206:19 214:16
215:25
**years**  8:14 9:3,4
9:6 10:24,25
11:17,23 14:22
14:24 27:17
29:16 40:14
43:25 58:13
85:9 131:10
132:24 170:24
171:3 198:14
208:1,1 210:17
269:5,10,22
270:20 271:10
**yell**  111:14
**yep**  246:22
255:3
**younger**  231:24
231:25

**z**

**z**  262:5
**zero**  115:12
187:13 242:20
242:21

**zinn**  2:11 16:4
16:13 20:12
23:2,3,16,20,24
24:3 26:14 28:4
34:6 35:8,25
36:7 38:12,21
39:9,15,20,25
40:21 41:2,8,17
43:8 45:7,22
48:24 52:7 53:9
55:16,20,22
58:25 59:9,21
60:6,13 62:22
62:25 65:22
66:22 67:8,18
67:25 68:6,17
68:19 71:4 73:4
79:21 83:4,24
84:12 87:8,11
89:11 90:8,10
92:5,8 93:25
98:4 101:14
105:3 106:17
107:20 108:6
109:11 111:10
111:13 116:7
117:2,9,19,22
117:24 118:5,13
118:18 121:3,21
122:5,17,20
123:3 124:13
126:10 128:23
129:13 130:10
131:13,14,17,20
132:10 134:4,13

136:3,23 140:15
144:9,19 145:24
150:19 152:21
152:25 153:2,19
154:7,14 155:16
156:21 157:15
157:18 158:2,7
158:13 159:9
161:16,21,22
163:22 164:5,23
165:5,8 166:7
166:11 167:6
168:4 169:22
171:23 175:14
177:10,24
178:17,22
179:17 181:21
184:7,19 185:7
185:12 186:3,18
187:1,11 188:4
188:12 190:1,14
190:19 192:23
193:17 195:6
196:24 197:15
201:9 202:1,15
204:23 206:13
206:24 209:16
210:8 211:13,17
212:2,9,14,20
212:25 213:9
214:2 216:24
219:8 220:25
222:20 225:7
226:23 227:3
229:3,7,9,11,18

229:20,22,23,25
230:2,3 234:25
236:25 237:15
237:21 238:4,7
238:10,18,23
239:2 240:1
241:14,16,19,25
242:5,10,15,19
242:22,25
243:10,12,17,23
244:1,3,6,12,16
244:22,25 245:2
247:14,16,24
248:6,9,11,14
248:18,22
250:21 252:4,16
253:4,12,14,20
253:22,25 255:6
255:16 256:3,19
257:17 258:13
259:20 260:7,23
261:1,11 262:2
262:4,7 263:4,7
263:9,13,18
264:7 266:10,12
266:19,22 267:3
267:8,10,23
268:1 269:23
270:16 272:4
273:16,19
274:21 275:1,6
278:1
**zinn's**  131:6
266:17

**[zinn.law - zoom]**                                                    Page 337

**zinn.law**   278:2
**zinnlaw**   2:11
**zoom**   210:23
  211:1 260:4,22

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.