2UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

D'ANNA WELSH,

      Plaintiff,

    v.                                      Case No. 2:22-cv-216-KCD-NPM

WILLIAM V. MARTINEZ JR.,
KELLY MARTINEZ,

      Defendants.

_____/

## ORDER

For over thirteen years, Defendant William Martinez has played a high-stakes game of keep-away with a $2.36 million judgment. This fraudulent-transfer action is just the latest chapter in a long, cross-country saga stemming from his stubborn refusal to pay it. Martinez, a heart surgeon now living in Naples, Florida, possesses assets that Plaintiff D'Anna Welsh claims were fraudulently shuttled to his wife, Defendant Kelly Martinez (formerly Rousseau).[1] Welsh now moves for summary judgment on her claims against those assets, which is fully briefed. (*See* Docs. 146, 156, 157, 157.) [2] For the reasons below, her motion is **DENIED**.

---

[1] To avoid confusion, the Court refers to Kelly Martinez as "Rousseau" and William Martinez as "Martinez."

[2] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

## I. Background

The story begins in Connecticut. A jury found that Martinez stalked and terrorized Welsh, his ex-girlfriend. The details are stark: Martinez installed spy cameras in Welsh's bedroom and shower, put spyware on her computer, and attached a GPS tracker to her car. The jury made Welsh whole, entering a $2.36 million verdict in her favor. The Connecticut Appellate Court provides a more detailed account of the facts for those interested. *See Welsh v. Martinez*, 157 Conn. App. 223, 226 (2015), *cert. denied*, 317 Conn. 922 (2015).

The ink on the verdict was barely dry when Welsh moved to protect her judgment, suspecting Martinez would try to hide his assets. The Connecticut trial court agreed, issuing an asset standstill order that forbade Martinez from transferring anything beyond ordinary living expenses: "The [defendant] is enjoined from voluntarily transferring or encumbering any assets except business assets in the ordinary course of business and personal assets for ordinary living expenses, including court-ordered alimony and child support." *Welsh v. Martinez*, 216 A.3d 718, 723 (2019). The Connecticut court also ordered Martiez to disclose his assets. *Id.* at 723-24. So, for our purposes here, Welsh is a judgment creditor with respect to the $2.36 million judgment against Martinez.

Welsh's concerns were well-founded. Martinez violated the disclosure and asset standstill orders dating to 2012. *Id.* He funneled over $2 million of

2

his income to his then-wife to keep it out of Welsh's reach. *Id.* at 725. The state court responded with a $2.2 million contempt fine, payable to Welsh in $25,000 monthly installments. *Id.*

Fast forward to 2020, and the scene shifts to Florida. Twelve days after the Connecticut court entered the contempt fine, Martinez transferred roughly $120,000 from his retirement account to Rousseau. She used those funds to buy a house in Englewood, Florida ("Englewood Property"). (Doc. 13-1 ¶ 14.)

The math is straightforward: the house cost $238,200, Rousseau took out a $108,200 mortgage, and Martinez's cash covered the rest. Martinez was not on the title or the mortgage, but he lived there. (Doc. 156 ¶ 10.) At the time, he was unemployed and had stopped paying child support. Welsh calls the $120,000 payment a gift. Martinez claims it was not a gift, but his contribution to the family's living expenses. (*Id.* ¶¶ 11, 13.)

According to Welsh, the cash transfers for the Englewood Property, as well as any mortgage payments from Martinez, were made with the intent to defraud her in violation of Florida's Uniform Fraudulent Transfer Act, Fla. Stat. § 726.105 ("FUFTA"). (Doc. 27 ¶ 99.) And since her claim arose before such transfers were made, the intent to defraud is obvious. (*Id.* ¶ 117.)

In October 2020, Rousseau sold the Englewood Property for $247,500, and approximately $120,000 in cash from the sale proceeds was transferred to Dr. Martinez. (Doc. 156 ¶ 29.) None of it went to Welsh. Instead, Martinez and

3

Rousseau bought another home—the "Secoya Property"—for $620,000, taking title as tenants by the entirety.

To close the deal, they took out a $480,000 mortgage, with Martinez handing over $140,000 in cash. (*Id.* ¶ 22.) Although the parties disclosed the cash as a gift on the mortgage application, Martinez now denies that fact.[3] (*Id.*) Then, barely two weeks after a Connecticut judge threatened to lock him up for dodging his $25,000 monthly fines, Martinez suddenly produced a $380,000 check to pay down the Secoya Property mortgage. (*Id.* ¶ 28.)

A year after purchasing the Secoya Property, Rousseau and Martinez executed a quitclaim deed, transferring the property to themselves as joint tenants (instead of tenants by the entirety). They also signed a new mortgage, this time for $202,000. (*Id.* ¶ 33.) As part of the refinance, Rosseau cashed out $96,000.

Welsh's take on the Secoya Property is simple: Martinez's cash transfers for the down payment and mortgage paydowns were calculated moves to defraud her under FUFTA. Because her judgment predates these transfers, Welsh argues his intent to hide assets is obvious. Martinez pushes back against

---

[3] The "gift letter" states that Martinez provided "$119,970" and "$120,160" to Rousseau for the purchase of the Secoya Property. (Doc. 156-2.) So it appears this total should be $240,130. But the parties both reference the $140,000 figure. (Doc. 146 ¶ 61.)

this narrative, claiming the transfers were either exempt or for living expenses.

Back in Connecticut, the trial court issued a contempt order and arrest warrant because Martinez stopped paying the required fines. (Doc. 156 ¶¶ 15, 29.) To date, Martinez has refused to surrender or otherwise purge his contempt. (W. Martinez Dep., 87:19-21.) Welsh eventually domesticated the Connecticut judgment as an active Florida judgment under Florida's Enforcement of Foreign Judgments Act. (Doc. 13-1 ¶ 3.) The contempt order and the capias are fully enforceable in Florida in the same manner as the judgment of a Florida state court. *See Welsh v. Martinez*, 350 So. 3d 811, 814 (Fla. Dist. Ct. App. 2022).

That finally brings us to federal court. Welsh first sued to "enforce the Connecticut orders and judgments here." *Welsh v. Martinez*, No. 2:21-CV-396-JLB-NPM, 2025 WL 2443064, at *1 (M.D. Fla. Apr. 8, 2025). After poring over Martinez's finances, the litigation ended with a stark ultimatum: pay Welsh $21,000 a month, or face arrest by the U.S. Marshals. *Id.* at *9. For now, at least, Martinez is making those payments.

As for this companion case, Welsh cast a wider net. She sues Martinez and, for the first time, brings Rousseau into the fray. (Doc. 27.) Welsh asserts direct claims under the Florida Uniform Fraudulent Transfer Act, targeting the cash poured into the Englewood and Secoya properties. She also demands

5

an equitable lien and a constructive trust on the Secoya home to protect any equity or sale proceeds. Moving past the real property, she targets Martinez's broader financial ecosystem—his IRA, a joint PNC Bank account, and his American Express account—claiming they were all used to fraudulently shield his income. The only missing piece is the final tally: because the dollar figures for those financial accounts are unclear, the total amount Welsh wants to claw back is a mystery (more on that below).

## II. Standard of Review

"Summary judgment is appropriate when a movant shows that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019). "And a fact is material if it may affect the outcome of the case under the applicable substantive law." *Toca v. Debonair Props. LLC*, No. 2:23-CV-303-KCD, 2025 WL 2106674 (M.D. Fla. July 28, 2025).

"The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial." *Andrews v. Ciccone*, No. 3:23-CV-88-MMH-SJH, 2025 WL 2508878, at \*2 (M.D. Fla. Sept. 2, 2025). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). This requires the nonmovant to "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Alexander as trustee of Franklin Pharmacy, LLC v. Aaron*, No. 3:15-CV-1314-AKK, 2017 WL 11437294, at \*1 (N.D. Ala. June 1, 2017); *see also Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 177 (5th Cir. 2016).

### III. Discussion

Before touching the merits, the Court must address an overarching concern with Welsh's motion: she does not identify the relief she is seeking with the required clarity. She wants the Court to declare Martinez's financial transfers unlawful—that much is clear. But exactly which transfers? To be fair, Welsh does provide a chart for some accounts and pinpoints a few specific transactions. But she doesn't stop there. Instead of limiting her claims to those

concrete numbers, her motion waves at nebulous other transactions and broadly asks the Court to somehow claw back "the entirety of" funds Martinez withdrew while she was a judgment creditor. (Doc. 146 at 42.) A federal court cannot award broad, open-ended relief like that. The very purpose of summary judgment is to pinpoint specific, undisputed issues where judgment is appropriate as a matter of law. That basic mechanism breaks down entirely when the requested relief is just a nebulous moving target.

Welsh makes one more threshold argument we need to clear away. She points out—accurately—that Martinez has an outstanding capias for his arrest in Connecticut for failing to pay his contempt fines. Because he is dodging that warrant, Welsh argues, this Court should invoke the fugitive disentitlement doctrine and simply strip him of his right to defend this lawsuit at all. *See Ener v. Martin*, 987 F.3d 1328, 1331 (11th Cir. 2021) ("The fugitive disentitlement doctrine empowers courts to dismiss the lawsuits or appeals of fugitives from the law.").

It is a tempting shortcut. Martinez has indeed spent years flouting state court orders. But federal courts do not just lock the courthouse doors simply because a litigant is behaving badly in another jurisdiction. As the Supreme Court has explained, stripping a party of their right to a hearing is a uniquely severe sanction—a blunt instrument that courts should only reach for as a last resort. *Degen v. United States*, 517 U.S. 820, 827 (1996). We only pull that

8

trigger when it is necessary to effectuate the concerns underlying the fugitive disentitlement doctrine. *Id.* at 823-24. In the Eleventh Circuit, those concerns are entirely functional. They include the "difficulty of enforcement against one not willing to subject himself to the court's authority; the inequity of allowing a fugitive to use court resources only if the outcome is an aid to him; and the need to avoid prejudice to the nonfugitive party." *Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir. 1998).

That practical focus demands special caution when the doctrine is used to sideline a civil defendant. *F.D.I.C. v. Pharaon*, 178 F.3d 1159, 1162-63 (11th Cir. 1999). Barring a fugitive from affirmatively seeking a court's help makes perfect sense—you cannot flout the law and then ask for its favor. But it is an entirely different matter to bar him from defending against civil claims. "If such application of the doctrine were permitted, virtually anyone might be able to obtain a judgment against a fugitive simply by filing a claim and moving for judgment based on the fugitive disentitlement doctrine." *Id.* at 1162.

Preventing Marinez from defending himself in this case would be a step too far. He might be hiding from a Connecticut civil contempt order, but his absence is not crippling our ability to decide whether money was fraudulently transferred to Rousseau in Florida. And more importantly, stripping Martinez of his defenses would effectively blindside Rousseau, who is a co-defendant in this property dispute. The punishment simply does not fit the crime. The Court

9

therefore declines to apply the fugitive disentitlement doctrine to bypass the merits of this case. *See, e.g., Stansell v. Revolutionary Armed Forces of Colum.*, No. 19-20896-CIV, 2022 WL 11287345, at \*3 (S.D. Fla. Oct. 19, 2022) ("[T]he Eleventh Circuit also clearly holds that the fugitive disentitlement doctrine may not be used to prevent a civil defendant from defending himself.").

Turning to the merits, Welsh brings a laundry list of claims under Florida law seeking a wide array of remedies—everything from equitable liens to sweeping declaratory judgments. (*See* Doc. 27.) But strip away the legal labels, and every single count boils down to the exact same core allegation: Martinez fraudulently dissipated his assets or illegally funneled them to Rousseau to dodge his debt. Because they share that fundamental DNA, Welsh's claims all rise or fall together on that basic premise. And the problem for Welsh, as explained below, is that she has not shown the underlying fraud as a matter of law.

To prove a fraudulent transfer under Florida law, a plaintiff can proceed under two theories—actual fraud or constructive fraud. *See Wiand v. Cloud*, 919 F. Supp. 2d 1319, 1330 (M.D. Fla. 2013). Welsh argues both here. (*See* Doc. 146 at 40.)

Actual fraud is present when the debtor made the transfer or incurred the obligation "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]" Fla. Stat. § 726.105(1)(a). The fraudulent transfer statute

requires "[1] a creditor to be defrauded, [2] a debtor intending fraud, [3] and a conveyance of property which is applicable by law to the payment of the debt due." *Johnson v. Dowell*, 592 So. 2d 1194, 1196 (Fla. Dist. Ct. App. 1992).

Proving actual intent is notoriously tricky. Debtors rarely confess to fraud, and Martinez has not done so here. So the law looks to "badges of fraud"—circumstantial clues like whether the transfer was to an insider, whether the debtor retained control of the property, or whether the debtor was insolvent. Fla. Stat. § 726.105(2)(a)-(k); *see also In re Levine*, 134 F.3d 1046, 1053-54 (11th Cir. 1998). While "[a] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance . . . several of them when considered together may afford a basis to infer fraud." *Johnson*, 592 So. 2d at 1197.

When multiple badges appear together, a factfinder might infer fraud. But because intent is a tangled web of credibility and circumstance, it is rarely suitable for summary judgment. *See, e.g.*, *Auto. Sales, Inc. v. Federated Mut. Implement & Hardware Ins. Co.*, 256 So. 2d 386, 386 (Fla. Dist. Ct. App. 1972) ("Fraud is a subtle thing, requiring a full explanation of the facts and circumstances of the alleged wrong to determine if they collectively constitute a fraud."). Fraudulent transfer issues also generally turn on the credibility of witnesses, making summary judgment inappropriate. *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir. 1991); *see also Friedman v.*

11

*Heart Inst. of Port St. Lucie, Inc.*, 863 So. 2d 189 (Fla. 2003), *Yaralli v. Am. Reprographics Co., LLC*, 165 So. 3d 785, 789 (Fla. Dist. Ct. App. 2015), *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 153 (Fla. Dist. Ct. App. 1994).

In her brief, Welsh asserts that the intent element should be decided in her favor as a matter of law because all the badges of fraud are evident against Martinez and his conduct. To be sure, she has marshaled plenty of favorable evidence pointing to fraud. But at summary judgment, favorable evidence is not enough—it must be conclusive. The Court cannot agree that the record is so airtight as to settle the question of intent as a matter of law.

Take Martinez's period of unemployment, for example. He claims that being out of work forced him to tap into his retirement account to help purchase the Englewood and Secoya properties. In his telling, this was a fair trade: he provided the cash in exchange for a roof over his head, while Rousseau shouldered the rest of the household bills. Welsh, naturally, cries foul. She argues that Martinez's egregious and reprehensible conduct strips away any exempt status he might claim for the accounts or the homestead. (Doc. 146 at 69-70.) Then there are the credit card charges. In his affidavit, Martinez swears that those transactions were not fraudulent transfers, but simply payments for ordinary living expenses. (Doc. 156-1.) Welsh flatly disputes this. But at summary judgment, the Court cannot step in to weigh conflicting

12

evidence and crown a winner. *See Ryder Int'l Corp. v. First Am. Nat. Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991).

That same evidentiary standoff applies to the bank accounts. Take the joint PNC account, for example. Welsh characterizes every deposit Martinez made into it as a calculated move to hide his income behind Rousseau's name. But Martinez paints a much more mundane picture: a married couple simply pooling their resources to manage a household. Figuring out which version of reality is true—tracing the commingled funds, determining who actually controlled the purse strings, and separating a fraudulent scheme from ordinary marital spending—is a quintessential job for a factfinder at trial, not a judge on a cold record.

Complicating matters further, the evidence is a jumble of potentially exempt and nonexempt funds. There is no way to ferret out the difference on this cold record. Welsh simply asks the Court to somehow claw back any and all funds Martinez withdrew from his retirement account while she was a judgment creditor. But the exact final tally of these alleged fraudulent transfers is anyone's guess. Welsh bears the burden of proving her damages, and the numbers here are deeply disputed. At summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As deserving as Welsh may be to judgment in her favor, she cannot

13

expect the Court to pore over the record and search for authority supporting her requested relief. *See Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1149 (11th Cir. 2017) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties."); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him.").

Welsh can't get there on a constructive fraud theory either. To win on that front, she has to prove Martinez made the transfers without receiving "reasonably equivalent value" in exchange, while he was insolvent. Fla. Stat. §§ 726.105(1)(a), 726.106. But as just discussed, the question of what Martinez actually got in return is hotly contested. He says he traded his retirement cash for a roof over his head and a break from the monthly bills while he was out of work. Is that reasonably equivalent value? Maybe, maybe not. But determining the fair market value of that arrangement is a quintessential question of fact, not something the Court can resolve on this posture.

The bottom line is this: the current record simply does not allow the Court to say with the requisite certainty that fraud permeated some, most, or any of these transactions. And without that foundational hook, not a single one of Welsh's claims can be granted as a matter of law. This case needs to go to trial. Only as a fact-finder can the Court wade through the conflicting paper

14

trail and assess the credibility of the witnesses firsthand. To declare a winner now, on a cold record, would be to bypass the very process required to resolve such deep factual disputes. Accordingly, Plaintiff's Motion for Summary Judgment (Doc. 146) is **DENIED**.

ORDERED in Fort Myers, Florida on March 9, 2026.

Kyle C. Dudek
United States District Judge