UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| D'ANNA WELSH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:22-cv-00216-KCD-NPM |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM V. MARTINEZ, JR., and | ) | |
| KELLY MARTINEZ f/k/a KELLY | ) | |
| ROUSSEAU, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

Plaintiff D'Anna Welsh respectfully submits the following Proposed Findings of Fact and Conclusions of Law for the Court's consideration following the bench trial in this matter.

**PROPOSED FINDINGS OF FACT**

A. **The Parties**

1. Plaintiff D'Anna Welsh is a judgment-creditor of Defendant William V. Martinez, Jr. ("Dr. Martinez") pursuant to a $2,360,000 judgment entered by the Superior Court of Hartford County, Connecticut on December 5, 2012, Case No. CV-10-6012959-S (the "Connecticut Judgment").

2. Now more than 13 years later, the Connecticut Judgment balance is $2,588,588, inclusive of interest.

3.    In this trial, Welsh seeks money judgments against both Defendants, avoidance of the fraudulent transfers, an equitable lien on the Secoya Property, a constructive trust over identifiable proceeds, injunctive relief prohibiting further dissipation, and declaratory relief establishing her rights in the transferred assets. The total money damages sought are approximately **$2,979,901.32**, exclusive of amounts to be proven at trial from the continuing PNC wage diversions and IRS refund dissipation. The breakdown is as follows:

A. **$120,000,** representing Dr. Martinez's fraudulent transfer to Mrs. Martinez for the purchase of the Englewood Property;

B. **$140,000,** representing Dr. Martinez's fraudulent transfer to Mrs. Martinez as the down payment for the Secoya Property;

C. **$380,000,** representing Dr. Martinez's fraudulent transfer to pay down Mrs. Martinez's Prosperity mortgage on the Secoya Property;

D. **$96,048,** representing cash extracted by Defendants in the August 25, 2021 cash-out refinance of the Secoya mortgage, as such equity had been funded by Dr. Martinez's fraudulent transfers; K. Martinez Dep. 217:9-11; ECF No. 146, para. 81;

E. Approximately **$2,000,000,** representing Dr. Martinez's wages deposited into the joint PNC account since April 2022 that constitute continuing fraudulent transfers, in amounts to be determined from the trial record;

F. **$135,507.50,** in identified funds transferred from the PNC account to or for the benefit of Mrs. Martinez as liquidated fraudulent transfers through the March 2, 2023 discovery cutoff; ECF No. 146, para. 115; Chase Decl., Ex. B (ECF No. 146-1);

**G. $101,750.00,** in payments on Mrs. Martinez's American Express account made from the PNC joint account between April and December 2022; ECF No. 146, para. 116; Chase Decl., Ex. B (ECF No. 146-1);

**H. $6,796.17,** representing the IRS Treas 310 tax refund deposit confirmed in the PNC records on May 4, 2022, plus any additional IRS refund amounts dissipated during the overwithholding period as may be proven at trial; Chase Decl., Ex. B (ECF No. 146-1); and

**I.** Such other amounts as may be proven at trial from Dr. Martinez's dissipation of retirement funds and other assets during the period from January 1, 2020 to the date of trial, including amounts withdrawn from his retirement accounts beyond those already accounted for above.

4.      Welsh, who was a citizen of Connecticut as of April 5, 2022, domesticated the Connecticut Judgment as an active Florida judgment on February 9, 2021, pursuant to Fla. Stat. § 55.505, under Collier County Circuit Court Case No. 11-2021-CA-000365-0001-XX. ECF No. 13-1 at 1.

5.      Defendant Kelly Martinez f/k/a Kelly Rousseau ("Ms. Martinez") is the current wife of Dr. Martinez. She married Dr. Martinez in November 2019. K. Martinez Dep. 186:19-20. Both Defendants were citizens of Florida as of April 5, 2022.

6.      Ms. Martinez is an "insider" of Dr. Martinez within the meaning of Fla. Stat. §§ 726.102(8) and (13) as his spouse. ECF No. 146 at 3.

7.      Dr. Martinez and Ms. Martinez reside together in Naples, Florida.

3

## B.     The Connecticut Judgment and Contempt History

8.     The Connecticut Judgment arose from Dr. Martinez's installation of spy cameras in Welsh's bedroom pointed toward her bed and toward her shower, keystroke spyware on her computer, and a GPS tracker on her vehicle. *Welsh v. Martinez*, 157 Conn. App. 223 (2015).

9.     Immediately following the jury verdict in June 2012, Welsh filed a Motion to Prevent Defendant's Fraudulent Transfer of Property, which the Connecticut court granted. The court entered an asset standstill order enjoining Dr. Martinez from voluntarily transferring or encumbering any assets except for ordinary living expenses, including court-ordered alimony and child support. ECF No. 13-1, Ex. C.

10.     Notwithstanding the asset standstill order, Dr. Martinez, then earning approximately $700,000 per year net as a cardiac surgeon, deposited the entirety of his wages into a bank account held solely in the name of his then-wife, Cristina Martinez, from October 30, 2012 through March 24, 2016, placing more than $2.2 million in wage income beyond Welsh's reach. *Welsh v. Martinez*, 191 Conn. App. 862, 869-70 (2019).

11.     After Dr. Martinez's Farmington Bank account was frozen by Welsh's collection efforts, Dr. Martinez and Cristina Martinez opened a new account solely in Cristina's name at People's United Bank for the express

4

purpose of placing the entirety of his wages outside the reach of Welsh as a judgment creditor. *Welsh v. Martinez*, 191 Conn. App. at 874-75.

12.    On November 9, 2017, the Connecticut Superior Court found Dr. Martinez in civil contempt of the asset standstill order, concluding that he had acted "knowingly, with full knowledge of the asset standstill order, and for the express purpose of placing the entirety of such funds outside the reach of the plaintiff." *Id.* at 869-70.

13.    The Connecticut Appellate Court affirmed the contempt finding in 2019, holding that Dr. Martinez had engaged in "a gross exercise of self-help which the law disallows" and that exonerating his conduct "would be an undue inducement to litigants' exercise of self-help." *Id.* at 875. The Appellate Court further held that the conduct involved "a deliberate attempt on the part of the defendant to thwart the plaintiff's ability to utilize statutory collection procedures by depositing the entirety of his wages into the account of a third party in contravention of the asset standstill order over the course of several years." *Id.* at 878.

14.    On February 19, 2020, the Connecticut Superior Court (Schuman, J.) entered a Ruling on Remand fixing the total compensatory contempt fine at $2,048,009, ordering Dr. Martinez to pay Welsh $25,000 per month directly until paid in full, and reaffirming his obligation to submit quarterly sworn asset and income disclosures to Welsh. ECF No. 13-1, Ex. D at pp. 51-55.

15.     Dr. Martinez failed to make his court-ordered $25,000 monthly contempt payments beginning in August 2019. ECF No. 13-1, Ex. G. The only payment Dr. Martinez made after August 2019 was a single $25,000 payment on September 15, 2020, made solely to avoid incarceration after the Connecticut court issued an express threat. W. Martinez Dep. 87:16-18. He has made no $25,000 payments since.

16.     Dr. Martinez failed to submit any of his required quarterly sworn asset and income disclosures to Welsh between August 2020 and August 2021. ECF No. 146 at 45.

17.     On August 14, 2020, the Connecticut Superior Court entered a contempt order finding Dr. Martinez had the ability to pay, had failed to make any $25,000 monthly payments since August 2019, and ordering him to pay $25,000 by September 15, 2020 or face incarceration or confinement for civil contempt. ECF No. 13-1, Ex. G.

18.     On December 23, 2020, the Connecticut Superior Court confirmed that Dr. Martinez "remains in contempt of court" and issued a capias for his arrest. ECF No. 13-1, Ex. M. That capias remains open. Dr. Martinez has never surrendered. W. Martinez Dep. 87:19-21.

19.     The December 23, 2020 Contempt Order and capias were domesticated in Collier County, Florida and are enforceable in Florida in the

6

same manner as the judgment of a Florida state court. Welsh v. Martinez, 350 So. 3d 811, 814 (Fla. 2d DCA 2022).

### C.      Dr. Martinez's Insolvency

20.      From January 1, 2020 to the present, Dr. Martinez has been insolvent within the meaning of Fla. Stat. § 726.103, in that the sum of his debts has been greater than all of his assets at fair valuation and he has not been paying his debts as they became due. ECF No. 146 at 38.

21.      As of January 1, 2020, Dr. Martinez held approximately $1,040,274 in his Charles Schwab IRA Rollover account and approximately $270,472 in his Capital Group American Funds IRA, for total retirement assets of approximately $1,310,746. ECF No. 13-1 at 61; ECF No. 146 at 25.

22.      Dr. Martinez's debt to Welsh as of January 2020, consisting of the Connecticut Judgment plus the accrued contempt fine, exceeded $2 million and has continued to grow. His total assets at no point approached that figure.

23.      Between January 1, 2020 and March 2, 2023, Dr. Martinez withdrew $1,069,428 from his retirement accounts. ECF No. 13-1 at 61; ECF No. 146 at 50-51. His Charles Schwab IRA declined from $1,040,274 to $59,575, and his Capital Group American Funds IRA declined from $270,472 to $0. ECF No. 146 at 25.

24.      By January 2023, Dr. Martinez's retirement accounts had been entirely depleted. During the period from January 2020 through January 2023,

Dr. Martinez withdrew a total of approximately $1,535,947.32 from his retirement accounts. He paid Welsh nothing from those withdrawals beyond the single September 2020 payment of $25,000.

25. Dr. Martinez admitted at deposition that, given his retirement account balance and his salary, "sure, there's money that could be paid" to Welsh. W. Martinez Dep. 122:13-25. He admitted he had not attempted to determine what he could pay. W. Martinez Dep. 124:11-20.

26. Dr. Martinez testified he has made no effort to purge his contempt, has produced no documents explaining his failure to pay Welsh since regaining employment in 2021, and has been simply "waiting for a judge in Florida to order him" before paying anything. W. Martinez Dep. 57:21-58:2; 139:24-142:2.

**D.    The Englewood Property Transfer (January-March 2020)**

27. On January 23, 2020, Welsh filed a Statement of Amount of Judgment in the Connecticut Superior Court. ECF No. 13-1, ¶ 13.

28. On January 31, 2020, eight days after Welsh's filing, Dr. Martinez withdrew $120,000 from his American Funds retirement account. *Id.*

29. On February 19, 2020, twelve days after the Connecticut court entered its Ruling on Remand fixing Dr. Martinez's contempt liability at $2,048,009 and ordering payment of $25,000 per month directly to Welsh, Dr. Martinez transferred that $120,000 in retirement proceeds to Ms. Martinez as

a gift toward the purchase of real property at 6231 Lomax St., Englewood, Florida, Charlotte County (the "Englewood Property"). ECF No. 13-1, ¶ 14.

30.   The purchase price of the Englewood Property was $238,200. Ms. Martinez signed a $108,200 mortgage in favor of Bank of America, N.A. ECF No. 13-1, Ex. F. Dr. Martinez contributed the $120,000 balance. ECF No. 13-1, ¶ 18.

31.   The mortgage documents for the Englewood Property, signed by both Dr. Martinez and Ms. Martinez, expressly characterized Dr. Martinez's $120,000 contribution as a "gift" from Dr. Martinez to Ms. Martinez. W. Martinez Dep. 42:6-13.

32.   At her deposition, Ms. Martinez confirmed she received a gift of $120,000 from Dr. Martinez for the purchase of the Englewood home. K. Martinez Dep. 52:15-22.

33.   The Warranty Deed for the Englewood Property conveyed title solely to Ms. Martinez. ECF No. 13-1, Ex. E. Dr. Martinez was not on the deed and was not on the mortgage. ECF No. 13-1, Exs. E, F. He had no legal obligation to contribute to the purchase.

34.   Dr. Martinez was unemployed at the time of the Englewood transfer.

35.   Ms. Martinez did not claim the homestead exemption for the Englewood Property. ECF No. 146, ¶ 36.

36.     In October 2020, Ms. Martinez sold the Englewood Property for $247,500. ECF No. 13-1, ¶ 48. After satisfaction of the $108,200 mortgage and closing costs, approximately $120,000 in net proceeds were realized. None of those proceeds were paid to Welsh. ECF No. 13-1, ¶ 50; ECF No. 146 at 38.

37.     Dr. Martinez made no payments to Welsh in connection with or following the Englewood transfer.

### E.     The Secoya Property Transfers (August 2020)

38.     On August 13, 2020, the day before the Connecticut Superior Court entered its August 14, 2020 contempt order warning Dr. Martinez of the risk of incarceration, sellers signed a Warranty Deed for real property at 15919 Secoya Reserve Circle, Naples, Collier County, Florida (the "Secoya Property"). ECF No. 13-1, Ex. H; ECF No. 13-1, Ex. G at 1.

39.     The Secoya Property features four bedrooms, three and a half bathrooms, a pool, and 3,091 square feet of living area. ECF No. 13-1, ¶ 27. Its purchase price was $620,000. ECF No. 13-1, ¶ 30.

40.     The recorded Warranty Deed, dated August 25, 2020 and recorded August 28, 2020 (OR 5808, PGS 1542-43), conveyed title of the Secoya Property to both Ms. Martinez and Dr. Martinez as tenants by the entireties. ECF No. 13-1, Ex. I. The seller's signature page had been signed and notarized on August 13, 2020, and the first page of the deed identifying the grantees was altered between execution and recording. *Id.*

41.    Dr. Martinez, unemployed and claiming an inability to pay Welsh the court-ordered $25,000 monthly contempt sanction, contributed $140,000 in cash from his Charles Schwab retirement account as a "bona fide gift" to Ms. Martinez toward the purchase of the Secoya Property. W. Martinez Dep. 75:17-25. This contribution was memorialized in a Gift Letter signed by both Dr. Martinez and Ms. Martinez ("Donor": William Martinez Jr.; "Recipient": Kelly Rousseau). ECF No. 146-1 (Gift Letter).

42.    Ms. Martinez confirmed at deposition that she received a gift of approximately $139,000 from Dr. Martinez for the purchase of the Secoya home. K. Martinez Dep. 47:6-16.

43.    On August 25, 2020, Ms. Martinez executed a $480,000 mortgage in favor of Prosperity Home Mortgage, LLC ("Prosperity") to fund the balance of the Secoya purchase price. ECF No. 13-1, Ex. J. The mortgage was recorded August 28, 2020. *Id.*

44.    Ms. Martinez qualified for the $480,000 Prosperity mortgage based solely on her own income and assets, without Dr. Martinez's contribution. She earned base employment income of $13,750 per month ($165,000 per year) and held liquid assets of approximately $147,994, plus ownership of the Englewood Property valued at $250,000. ECF No. 13-1, ¶ 35. Her retirement account balance was "around $300,000" in 2020. K. Martinez Dep. 13:1-8. Her monthly payment on the $480,000 Prosperity mortgage was $2,641 inclusive of

11

estimated escrow. ECF No. 13-1, ¶ 36. She testified at deposition that she qualified for the mortgages and had the ability to fulfill those obligations. K. Martinez Dep. 87:16-22. Dr. Martinez's $140,000 contribution was not necessary for Ms. Martinez to acquire the Secoya Property.

45. On August 28, 2020, the same day the $480,000 Prosperity mortgage was recorded, and less than two weeks after the Connecticut court ordered Dr. Martinez to pay $25,000 by September 15, 2020 or face incarceration, Dr. Martinez transferred $380,000 from his Bank of America account to Prosperity, paying down Ms. Martinez's mortgage from $480,000 to approximately $100,000. ECF No. 13-1, ¶¶ 38-39; ECF No. 13-1, Ex. J.

46. At the time of the $380,000 transfer, Dr. Martinez was unemployed. He was not a party to the Prosperity mortgage and had no legal obligation on that debt. ECF No. 13-1, Ex. J. He made the transfer while simultaneously failing to pay Welsh the court-ordered $25,000 monthly contempt fine.

47. Defendants have not offered a credible economic justification for the $380,000 mortgage prepayment. Pre-paying and depleting $380,000 in capital on a 2.875% 30 year fixed mortgage to save approximately $1,600 per month in reduced payments would require approximately 20 years to break even on the capital deployed, without accounting for the time value of money or the opportunity cost of those funds to Welsh.

12

48.     In total, Dr. Martinez transferred $640,000 in cash to or for the benefit of Ms. Martinez for the Englewood and Secoya properties between January and August 2020, while admittedly insolvent, while subject to multiple contempt orders, and while making no payments to Welsh. ECF No. 146 at 38.

49.     A year after the Secoya purchase, on August 25, 2021, Dr. Martinez and Ms. Martinez executed a quitclaim deed transferring the Secoya Property to themselves as joint tenants (instead of tenants by the entireties), and changed Ms. Martinez's name on the deed from Kelly "Rousseau" to Kelly "Martinez." ECF No. 146, ¶ 79, Ex. N. The quitclaim deed was recorded September 20, 2021 (OR 6013, PGS 3663-64). *Id.*

50.     Also on August 25, 2021, Dr. Martinez and Ms. Martinez refinanced the Prosperity mortgage with a new $202,000 mortgage, recorded September 20, 2021 (OR 6013, PGS 3665-86). ECF No. 146, ¶ 81, Ex. P. The listed borrower on the new mortgage is "Kelly Martinez and William Martinez, Jr. Wife and Husband." *Id.* As part of the refinance, Ms. Martinez cashed out $96,048. K. Martinez Dep. 217:9-11.

### F.     The PNC Account: Ongoing Wage Diversion Since April 2022

51.     In December 2021, Dr. Martinez resumed employment as a locum tenens at Riverview Cardiac Surgery in Bradenton, Florida. ECF No. 13-1, ¶

62. As of March 1, 2022, Dr. Martinez became employed full-time at Riverview Cardiac Surgery at a base salary of at least $300,000 per year plus production bonuses, paid in monthly installments. ECF No. 146, ¶ 86. Dr. Martinez's annual compensation has since grown to approximately $642,903.73 over the most recent twelve-month period.

52.    In April 2022, Dr. Martinez opened a joint checking account with Ms. Martinez at PNC Bank. W. Martinez Dep. 130:4-9. Dr. Martinez testified at deposition that he opened the joint account with Ms. Martinez specifically so that she could more easily access his money. W. Martinez Dep. 130:6-9.

53.    Since opening the PNC joint account, Dr. Martinez has deposited the entirety of his employment paychecks into that account. W. Martinez Dep. 130:10-12.

54.    Ms. Martinez does not deposit her own income into the PNC joint account. K. Martinez Dep. 139:10-22. She maintains her own separate personal account at Wells Fargo from which she continues to pay all household bills. *Id.*; K. Martinez Dep. 127:6-8.

55.    Dr. Martinez pays no household bills in his own name other than his credit cards. W. Martinez Dep. 95:20-96:2. Before the joint PNC account was opened, Dr. Martinez paid none of the monthly household bills. K. Martinez Dep. 144:5-7.

14

56.    Ms. Martinez periodically withdraws cash from the PNC joint account and deposits it into her personal Wells Fargo account to pay household expenses. K. Martinez Dep. 152:6-16; 154:17-23. Ms. Martinez would not pay bills directly from the PNC account; instead, she would take cash or transfer funds from the PNC account to her own personal account. K. Martinez Dep. 154:17-23.

57.    Between April 2022 and the date of trial, Dr. Martinez has deposited approximately $2 million in employment wages into the joint PNC account. Not one dollar of those wages has been paid directly to Welsh.

58.    The PNC joint account, held by Dr. Martinez and Ms. Martinez as a married couple, is not subject to garnishment by Welsh as a creditor of Dr. Martinez alone, just as the ex-wife Cristina's People's United Bank account was not reachable by Welsh from 2012 through 2016.

59.    Ms. Martinez's lifestyle has not changed since Dr. Martinez resumed depositing income into the joint account. K. Martinez Dep. 271:10-11. The couple's combined annual household income during the relevant period has been approximately $450,000 to $500,000, and has since increased. K. Martinez Dep. 185:2-13.

60.    Ms. Martinez testified that she has had no conversation with Dr. Martinez about paying Welsh, has no intention of ever having such a conversation, and will never ask Dr. Martinez about paying the contempt

15

judgment "as long as she lives." K. Martinez Dep. 185:5-186:6. She testified she has had the opportunity to ask Dr. Martinez about the open capias for his arrest but has declined to do so. K. Martinez Dep. 189:4-10. She testified it would have "no effect on her at all" if Dr. Martinez were taken into custody pursuant to the capias. K. Martinez Dep. 190:9-23.

61.    Ms. Martinez testified she has "no idea" whether the couple's combined household income could contribute to the judgment owed to Welsh. K. Martinez Dep. 185:2-13.

62.    In addition to the overall pattern of wage diversion, the record through the March 2, 2023 discovery cutoff reflects specific PNC account cash withdrawals totaling $135,507.50 for which Defendants have not provided adequate explanation. ECF No. 146, ¶¶ 115-116; Chase Decl., Ex. B (ECF No. 146-1). These include without limitation: $11,218.82 on May 9, 2022 (Check No. 101, made out to Kelly Martinez for "Bills," signed by Dr. Martinez); $10,186.10 on May 31, 2022 (Check No. 121, made out to Kelly Martinez, purpose blank); $6,000.00 and $3,980.00 on June 6, 2022 (both signed by Kelly Martinez, no stated purpose); $11,650.00 on June 30, 2022 (signed by Kelly Martinez, no stated purpose); $10,000.00 on July 13, 2022 (signed by Kelly Martinez, no stated purpose); $9,083.60 on July 29, 2022 (signed by Kelly Martinez, no stated purpose); $9,187.29 on August 31, 2022 (signed by Kelly Martinez, no stated purpose); $15,200.00 on September 14, 2022 (signed by Dr.

16

Martinez, no stated purpose); $9,341.03 on October 3, 2022 (signed by Kelly Martinez); $20,000.00 on October 31, 2022 (signed by Kelly Martinez, no stated purpose); $9,660.66 on November 30, 2022 (signed by Kelly Martinez, no stated purpose); and $10,000.00 on December 12, 2022 (signed by Kelly Martinez, no stated purpose). Chase Decl., Ex. B (ECF No. 146-1).

63.    In the same period, the following American Express payments totaling $101,750.00 were made from the PNC joint account: $3,500.00 (April 19, 2022); $1,250.00 (April 22, 2022); $13,500.00 (June 1, 2022); $2,500.00 (June 2, 2022); $14,000.00 (July 1, 2022); $11,500.00 (August 1, 2022); $18,000.00 (September 1, 2022); $13,000.00 (October 3, 2022); $7,500.00 (November 1, 2022); and $6,500.00 (December 1, 2022), for a total paid to American Express from Dr. Martinez's wages over nine months. No American Express account holder was identified by name in these records. ECF No. 146, ¶ 116; Chase Decl., Ex. B (ECF No. 146-1). The PNC statements in evidence show the AmEx payments made under the account identifier "Ckf613257994POS," and the account statements do not identify any account holder other than Kelly A. Martinez as the primary account holder. Chase Decl., Ex. B (ECF No. 146-1).

64.    These specific cash withdrawals and American Express payments, individually and collectively, corroborate the overall fraudulent wage-diversion scheme. The $20,000.00 cash withdrawal on October 31, 2022, signed

17

by Kelly Martinez with no stated purpose, is the equivalent of nearly a full month of Dr. Martinez's court-ordered contempt obligation, which he simultaneously refused to pay Welsh. The $18,000.00 AmEx payment in September 2022 is likewise the equivalent of nearly a full contempt payment. These transactions are part of the continuous course of conduct through which Dr. Martinez's wages were systematically funneled to Ms. Martinez and dissipated, rather than applied to his judgment debt.

65. The deposition discovery cutoff in this case was March 2, 2023. ECF No. 146 at 28 n.4. The specific transactional record regarding the PNC account available for these proposed findings therefore extends through approximately that date. Welsh's claims as to the continuing fraudulent transfer of wages through the joint PNC account extend from April 2022 through the date of trial and beyond. Welsh reserves the right to supplement these findings based on all evidence adduced at trial concerning transactions occurring after March 2, 2023, including but not limited to Dr. Martinez's post-2023 employment income, any additional PNC account withdrawals, and the disposition of IRS tax refunds.

## G. Profligate Expenditures Show Dr. Martinez's State of Mind

66. While depositing the entirety of his employment wages into the PNC joint account and paying Welsh nothing, Dr. Martinez maintained a

18

lifestyle inconsistent with his claimed inability to pay. ECF No. 146, ¶¶ 131-145.

67.    Dr. Martinez pays approximately $400 per week on meals outside the home at restaurants. W. Martinez Dep. 100:5-9. He testified that he vacations once or twice per year, spending approximately $5,000 to $10,000 per vacation. W. Martinez Dep. 107:1-14. For example, in July 2022, he took an extended RV trip visiting the Hoover Dam, Las Vegas, Horseshoe National Park, and Lake Powell, during which he also gave Ms. Martinez approximately $5,000 in cash. W. Martinez Dep. 130:24-131:14; 131:5-14. During that trip he stayed at the Mandalay Bay hotel in Las Vegas and gambled, losing approximately $1,000. W. Martinez Dep. 132:1-19. ECF No. 146, ¶¶ 142-144.

68.    Dr. Martinez pays approximately $400 per month for golf during high season and $200 per month during low season, which he considers an ordinary living expense for his "mental health." W. Martinez Dep. 106:1-9. He pays approximately $130 four times per year at comedy clubs. W. Martinez Dep. 106:10-19. ECF No. 146, ¶¶ 139-140.

69.    Ms. Martinez owns a 2015 BMW free and clear. K. Martinez Dep. 88:4-11. After the deposition period, Dr. Martinez also leased a 2023 BMW M3 at approximately $1,757.54 per month, while frequently driving Ms. Martinez's BMW X5 to avoid exceeding his annual mileage limit on the lease. Welsh v. Martinez, No. 2:21-cv-396, ECF No. 131 at 16.

70.    Dr. Martinez pays approximately $500 per month for gasoline and approximately $30 per month for dry cleaning, $55 per month for haircuts, and $75 per month for dog food. W. Martinez Dep. 102:25-103:3; 104:18-19; 105:3-5; 105:6-14. ECF No. 146, ¶¶ 132-138.

71.    Dr. Martinez pays nothing for his own health and dental insurance, as he is covered under Ms. Martinez's employer-sponsored plan. W. Martinez Dep. 104:5-10. ECF No. 146, ¶ 133.

72.    None of these expenditures were made to Welsh, to the judgment, or even toward a discharge of Dr. Martinez's contempt citation. W. Martinez Dep. 139:24-142:2.

## F.    Additional Asset Dissipation: Overwithholding and IRS Refund

73.    The PNC account statements in evidence show that on May 4, 2022, a $6,796.17 direct deposit from "IRS Treas 310" was deposited into the PNC joint account. Chase Decl., Ex. B (ECF No. 146-1) at p. 17. That deposit represents an IRS tax refund, which was deposited directly into the joint account rather than applied to Welsh's judgment.

74.    After resuming employment in December 2021, Dr. Martinez elected to overwithhold federal income taxes from his paychecks, resulting in IRS tax refund checks. Dr. Martinez dissipated those refund proceeds and omitted them from his required quarterly asset disclosures to Welsh.

20

75.     When required by the Court to disclose his gross wages rather than his self-defined "take home pay," Dr. Martinez had been reporting a materially lower figure that both understated his income and obscured the extent of his overwithholding.

76.     Between December 2021 and the date he began making nominal monthly payments to Welsh in July 2023, Dr. Martinez received $418,140.80 in disclosed take-home pay and paid Welsh nothing. When he did begin making payments, they ranged from $3,000 to $5,000 per month, well below his court-ordered obligation.

## PROPOSED CONCLUSIONS OF LAW

### A.     Jurisdiction and Governing Law

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

2.     Florida's Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. §§ 726.101 et seq., governs Plaintiff's claims in Counts One through Five.

3.     Welsh is a "creditor" within the meaning of Fla. Stat. § 726.102(5). Dr. Martinez is a "debtor" within the meaning of Fla. Stat. § 726.102(7). Ms. Martinez is an "insider" within the meaning of Fla. Stat. §§ 726.102(8) and (13) as Dr. Martinez's spouse. ECF No. 146 at 3.

21

4.   Welsh's claims arose from the Connecticut Judgment, entered December 5, 2012. Welsh is therefore a creditor "whose claim arose before" each of the Florida transfers challenged in this action. Fla. Stat. § 726.106(1).

**B.   Count One: Actual Fraudulent Transfer, Fla. Stat. § 726.105(1)(a)**

5.   To establish actual fraud under Fla. Stat. § 726.105(1)(a), a plaintiff must prove: (1) a creditor to be defrauded; (2) a debtor intending fraud; and (3) a conveyance of property applicable to payment of the debt due. *Johnson v. Dowell,* 592 So. 2d 1194, 1196 (Fla. 2d DCA 1992).

6.   Intent to defraud is established through statutory "badges of fraud." Fla. Stat. § 726.105(2)(a)-(k). A single badge may create a suspicious circumstance; several considered together afford a basis to infer fraud and raise a rebuttable presumption that the transfer was fraudulent. Wiand v. Lee, 753 F.3d 1194, 1200 (11th Cir. 2014); Johnson, 592 So. 2d at 1197.

7.   At least ten of the eleven statutory badges of fraud are present and established by undisputed record evidence:

a.   Insider. Ms. Martinez is Dr. Martinez's wife and an insider under §§ 726.102(8), (13). ECF No. 146 at 3.

b.   Retained possession and control. Dr. Martinez lived in both homes. Ms. Martinez provided him full access to the joint PNC account. W. Martinez Dep. 130:6-9; ECF No. 146 at 27.

c.  Concealment. Dr. Martinez failed to disclose the Englewood and Secoya transfers to Welsh or to the Connecticut court as required under the asset disclosure order. ECF No. 13-1 at 13; ECF No. 146 at 23.

d.  Pending judgment and suit. Welsh's judgment had been outstanding since December 2012. The contempt fine was re-liquidated twelve days before the Englewood transfer. The incarceration warning was issued the day before the Secoya closing. ECF No. 13-1, Exs. D, G.

e.  Substantially all assets. The $640,000 in transfers constituted the substantial entirety of Dr. Martinez's liquid assets while he was insolvent. ECF No. 146 at 38; W. Martinez Dep. 122:13-25.

f.  Absconded. Dr. Martinez is a fugitive from the December 23, 2020 Connecticut capias and has refused to surrender. ECF No. 13-1, Ex. M; W. Martinez Dep. 87:19-21.

g.  Removed or concealed assets. Dr. Martinez withdrew more than $1,069,428 from his retirement accounts between January 2020 and March 2023 and used those funds for purposes other than paying Welsh. He also failed to provide his mandatory

23

quarterly asset disclosures for more than a year. ECF No. 146 at 50-51.

h.     No reasonably equivalent value. Every challenged transfer was memorialized as a gift on the face of the transaction documents. Dr. Martinez received no deed interest in Englewood, no legal obligation on either property's mortgage, and no enforceable ownership right at the time of the transfers. ECF No. 13-1, Exs. E, F, J; W. Martinez Dep. 75:17-25; K. Martinez Dep. 44:8-12, 47:6-16, 52:15-22.

i.     Insolvency. From January 1, 2020 forward, Dr. Martinez's debts to Welsh alone exceeded $2 million while his total assets never approached that figure. ECF No. 146 at 38; ECF No. 13-1, Ex. G.

j.     Transfer shortly after substantial debt incurred. The Englewood transfer occurred twelve days after the contempt fine was re-liquidated at $2,048,009. ECF No. 13-1, Ex. D. The Secoya transactions occurred the day before and the day of the August 14, 2020 incarceration-warning contempt order. ECF No. 13-1, Ex. G.

8.     The existence of ten statutory badges of fraud, combined with the surrounding circumstances, raises a rebuttable presumption that the challenged transfers were made with actual intent to hinder, delay, and

24

defraud Welsh. *Wiand v. Lee*, 753 F.3d at 1200. Defendants have not rebutted that presumption.

9.     The surrounding circumstances further establish actual fraudulent intent independent of the badge presumption. Dr. Martinez's Florida conduct is a continuation of the same deliberate asset-shifting scheme for which he was held in civil contempt in Connecticut. *Welsh v. Martinez,* 191 Conn. App. at 869-70, 875, 878. The timing of each transfer, its immediate connection to a new development in Welsh's collection efforts, and Dr. Martinez's admitted indifference to his obligation confirm his intent.

10.     When a husband is insolvent, a rebuttable presumption independently arises that a transfer to his wife is fraudulent, and the wife bears more than the ordinary burden of proof to establish that the consideration was proportionate to the value transferred. *Harkins v. Holt,* 169 So. 481, 482 (Fla. 1936); *United States v. Horton*, 760 F.2d 1225, 1228 (11th Cir. 1985). Dr. Martinez was insolvent at the time of each challenged transfer. Ms. Martinez has not met the burden imposed by Harkins and Horton.

11.     Dr. Martinez's transfer of $120,000 from his retirement account to Ms. Martinez for the purchase of the Englewood Property constitutes a fraudulent transfer made with actual intent to hinder, delay, and defraud Welsh, avoidable under Fla. Stat. § 726.105(1)(a).

25

12.     Dr. Martinez's transfer of $140,000 from his retirement account to Ms. Martinez as a down payment for the Secoya Property constitutes a fraudulent transfer made with actual intent to hinder, delay, and defraud Welsh, avoidable under Fla. Stat. § 726.105(1)(a).

13.     Dr. Martinez's transfer of $380,000 from his Bank of America account to pay down Ms. Martinez's Prosperity mortgage on the Secoya Property constitutes a fraudulent transfer made with actual intent to hinder, delay, and defraud Welsh, avoidable under Fla. Stat. § 726.105(1)(a).

14.     Dr. Martinez's ongoing deposit of the entirety of his employment wages into the joint PNC account, structured to keep those wages accessible to the couple while placing them beyond Welsh's reach as a judgment creditor, constitutes a continuing fraudulent transfer of his wages under Fla. Stat. § 726.105(1)(a).

C.     **Count Two: Constructive Fraudulent Transfer Under Fla. Stat. §§ 726.105(1)(b) and 726.106**

15.     Under Fla. Stat. § 726.106(1), a transfer is fraudulent as to a creditor whose claim arose before the transfer if the debtor made the transfer without receiving reasonably equivalent value in exchange and was insolvent at the time or became insolvent as a result of the transfer.

16.     Welsh's claim arose from the Connecticut Judgment, entered in 2012, well before any of the challenged Florida transfers.

26

17.     Dr. Martinez was insolvent at the time of each of the challenged transfers. His debts to Welsh alone exceeded $2 million. His total assets never equaled or exceeded that figure. ECF No. 146 at 38.

18.     Dr. Martinez did not receive reasonably equivalent value for any of the challenged transfers. Each transfer was expressly documented as a gift by both Defendants. Love, affection, and marital consideration do not constitute reasonably equivalent value as a matter of law. *Walker v. Treadwell* (In re Treadwell), 699 F.2d 1050, 1051 (11th Cir. 1983); *United States v. Major,* 551 B.R. 531, 542 (M.D. Fla. 2016). Transfers to an insider are scrutinized more closely. *In re McFarland,* 619 Fed. Appx. 962, 975 (11th Cir. 2015).

19.     The Court finds that the transfers of $120,000 for Englewood, $140,000 as the Secoya down payment, and $380,000 to pay down the Secoya mortgage each constitute constructive fraudulent transfers avoidable under Fla. Stat. §§ 726.105(1)(b) and 726.106.

## D.     Count Five: Fraudulent Asset Conversion Under Fla. Stat. § 222.30

20.     Florida Statute section 222.30 provides a cause of action where a debtor converts nonexempt assets into exempt assets with actual intent to hinder, delay, or defraud a creditor. *In re Jennings,* 332 B.R. 465, 469 (Bankr. M.D. Fla. 2005), aff'd sub nom. *Jennings v. Maxfield,* 2006 WL 6829886 (M.D.

27

Fla. Apr. 5, 2006). The same badges of fraud applicable under FUFTA apply to a section 222.30 claim. *Id.*

21. Dr. Martinez converted nonexempt retirement funds into exempt homestead property (the Secoya Property held as tenants by the entireties) and converted nonexempt employment wages into jointly-held tenants-by-the-entireties property (the PNC joint account) with actual intent to hinder, delay, and defraud Welsh.

22. Property held as tenants by the entireties is exempt from the claims of creditors of only one spouse only where the original transfer into that tenancy was not itself fraudulent. *In re Anderson,* 561 B.R. 230, 240 (Bankr. M.D. Fla. 2016); *Ellis Sarasota Bank & Tr. Co. v. Nevins,* 409 So. 2d 178, 180 (Fla. 2d DCA 1982). Because the transfers into both the Secoya tenancy and the PNC joint account were made with actual fraudulent intent, neither the homestead exemption nor the tenants-by-the-entireties exemption shields those assets from Welsh.

**E.** **The Retirement Account Exemption and Homestead Exemption Do Not Apply**

23. Dr. Martinez's retirement accounts lost any applicable exemption under Fla. Stat. § 222.21 because he used those accounts primarily for self-dealing and immediate personal consumption rather than for retirement purposes. Under *In re Yerian,* 927 F.3d 1223, 1231 (11th Cir. 2019), a debtor

28

who uses IRA funds for self-dealing purposes, including purchasing homes and other assets for personal use, forfeits the retirement account exemption. Dr. Martinez used his IRA funds to purchase homes as gifts to his wife, to pay down her mortgage, and to fund daily living expenses. His conduct falls squarely within *Yerian*.

24.     The homestead exemption does not protect the Secoya Property from Welsh's claims because Dr. Martinez funded the homestead with transfers made with actual intent to hinder, delay, and defraud Welsh. Fla. Stat. § 222.30. Under *In re Jennings,* 332 B.R. at 469, a debtor cannot claim the homestead exemption where the original transfer of funds into the homestead was itself fraudulent. The conversion of Dr. Martinez's nonexempt retirement funds into the Secoya homestead was a fraudulent asset conversion under section 222.30 as to Welsh.

25.     Florida law does not permit a debtor to shield assets that are themselves the product of fraudulent conduct. *In re Anderson,* 561 B.R. at 240; *Nevins,* 409 So. 2d at 180.

## F.     Equitable Lien and Constructive Trust (Count Four)

26.     Welsh is entitled to an equitable lien on the Secoya Property in the amount of Dr. Martinez's fraudulent contributions, which total $520,000 ($140,000 down payment plus $380,000 mortgage paydown). The Court has

29

authority to impose such a lien under Fla. Stat. § 726.108(1)(b)-(c) and its inherent equitable powers.

27.    Florida courts impose equitable liens on homestead property where a debtor engages in egregious and contemptuous conduct and uses fraudulently obtained or transferred funds to invest in that homestead, thereby thwarting a creditor's right to recover. Dr. Martinez's serial, willful contempt of court orders over more than a decade, combined with his deliberate use of retirement funds to fund the Secoya homestead while paying Welsh nothing, constitutes precisely the type of egregious conduct warranting an equitable lien. ECF No. 146 at 60-62.

28.    In the alternative, Welsh is entitled to a money judgment against Ms. Martinez as a transferee for the value of the fraudulent transfers she received, to the extent of Dr. Martinez's contributions. Fla. Stat. § 726.109.

G.    **Injunctive and Declaratory Relief (Counts Three, Six, and Seven)**

29.    Welsh is entitled to injunctive relief under Fla. Stat. § 726.108(1)(a)-(c) and the Court's equitable powers prohibiting further transfers of Dr. Martinez's income and assets, including his employment wages, except as ordered by the Court in aid of execution of Welsh's judgment.

30.    Welsh is entitled to declaratory judgment that: (a) the identified fraudulent transfers are void as to Welsh; (b) Welsh holds an equitable lien on

30

the Secoya Property in the amount of Dr. Martinez's fraudulent contributions;

(c) Dr. Martinez's retirement account exemption did not apply to the funds transferred; and (d) the homestead exemption does not shield the Secoya Property from Welsh's equitable claims to the extent of the fraudulent transfers.

31. Ms. Martinez's interests in the Secoya Property and the proceeds of any fraudulent transfers she received from Dr. Martinez are subordinate to Welsh's equitable claims to the extent of those fraudulent transfers.

## H. **Damages**

32. Welsh is entitled to money judgments against both Defendants, the avoidance of the fraudulent transfers, and recovery of the value thereof, including money damages of approximately **$2,979,901.32,** as follows:

A. **$120,000,** representing Dr. Martinez's fraudulent transfer to Mrs. Martinez for the purchase of the Englewood Property;

B. **$140,000,** representing Dr. Martinez's fraudulent transfer to Mrs. Martinez as the down payment for the Secoya Property;

C. **$380,000,** representing Dr. Martinez's fraudulent transfer to pay down Mrs. Martinez's Prosperity mortgage on the Secoya Property;

D. **$96,048,** representing cash extracted by Defendants in the August 25, 2021 cash-out refinance of the Secoya mortgage, as such equity had been funded by Dr. Martinez's fraudulent transfers; K. Martinez Dep. 217:9-11; ECF No. 146, para. 81;

E. Approximately **$2,000,000,** representing Dr. Martinez's wages deposited into the joint PNC account since April 2022 that

31

constitute continuing fraudulent transfers, in amounts to be determined from the trial record;

F. **$135,507.50,** in identified funds transferred from the PNC account to or for the benefit of Mrs. Martinez as liquidated fraudulent transfers through the March 2, 2023 discovery cutoff; ECF No. 146, para. 115; Chase Decl., Ex. B (ECF No. 146-1);

G. **$101,750.00,** in payments on Mrs. Martinez's American Express account made from the PNC joint account between April and December 2022; ECF No. 146, para. 116; Chase Decl., Ex. B (ECF No. 146-1);

H. **$6,796.17,** representing the IRS Treas 310 tax refund deposit confirmed in the PNC records on May 4, 2022, plus any additional IRS refund amounts dissipated during the overwithholding period as may be proven at trial; Chase Decl., Ex. B (ECF No. 146-1); and

I. Such other amounts as may be proven at trial from Dr. Martinez's dissipation of retirement funds and other assets during the period from January 1, 2020 to the date of trial, including amounts withdrawn from his retirement accounts beyond those already accounted for above.

33. As to Dr. Martinez, Welsh is entitled to avoidance of each fraudulent transfer identified above and all relief available under Fla. Stat. § 726.108, including an equitable lien on the Secoya Property, injunctive relief, and a money judgment to the extent of the transfers made by him. Fla. Stat. § 726.108(1)(b)-(c).

34. As to Mrs. Martinez, Welsh is entitled to a money judgment as against a transferee for the value of the assets she received through the fraudulent transfers, to the extent of her receipt, pursuant to Fla. Stat. § 726.109(2). Mrs. Martinez's good faith is not a defense here given her actual

32

knowledge of Dr. Martinez's contempt obligations, the open capias, and her active participation in the scheme as established by the record.

35.    Both Defendants are jointly and severally liable to Welsh for the damages identified above to the fullest extent that the law permits, including on the wage-diversion theory under which both Dr. Martinez and Mrs. Martinez actively participated in routing his wages through the joint PNC account to keep them beyond Welsh's reach.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:    */s/ Kenneth E. Chase*
Kenneth E. Chase
Chase Law & Associates, P.A.
951 Yamato Road, Suite 280
Boca Raton, FL 33431
Tel: (305) 402-9800
Fax: (305) 402-2725
Email: kchase@chaselaw.com

*Counsel for Plaintiff D'Anna Welsh*

33

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth E. Chase, hereby certify that I served the foregoing via CM/ECF, which serves electronic notice to all counsel of record, on March 23, 2026.

By:    */s/ Kenneth E. Chase*
Kenneth E. Chase